1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  TEvangelis@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
  BEvanson@gibsondunn.com
HEATHER L. RICHARDSON, SBN 246517
  HRichardson@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA,
  SBN 254433
  DManthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
  JLipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Tel.: 415.393.8200
Fax: 415.393.8306

Attorneys for Plaintiffs Lydia Olson,
Miguel Perez, Postmates Inc., and
Uber Technologies, Inc.

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

LYDIA OLSON; MIGUEL PEREZ; POSTMATES INC.; and UBER TECHNOLOGIES, INC.,

Plaintiffs,

v.

STATE OF CALIFORNIA; XAVIER BECERRA, in his capacity as Attorney General of the State of California; and "JOHN DOE," in his official capacity,

Defendants.

CASE NO. 2:19-cv-10956

**COMPLAINT FOR VIOLATION OF FEDERAL AND CALIFORNIA CONSTITUTIONAL RIGHTS, DECLARATORY,  INJUNCTIVE, AND OTHER RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiffs Lydia Olson and Miguel Perez (together, "Individual Plaintiffs"), and Postmates Inc. ("Postmates") and Uber Technologies, Inc. ("Uber") (together, "Company Plaintiffs") file this Complaint for declaratory, injunctive, and other relief determining that California Assembly Bill 5 ("AB 5")—a recently enacted statute that

becomes effective on January 1, 2020—is unconstitutional.  AB 5 violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, the Ninth Amendment to the United States Constitution, and the Contracts Clause of Article I of the United States Constitution, as well as the Equal Protection Clause, Inalienable Rights Clause, Due Process Clause, Baby Ninth Amendment, and Contracts Clause of the California Constitution.

## **INTRODUCTION**

1.     Plaintiffs bring this lawsuit to protect their constitutional rights and defend their fundamental liberty to pursue their chosen work as independent service providers and technology companies in the on-demand economy.

2.     AB 5 is an irrational and unconstitutional statute designed to target and stifle workers and companies in the on-demand economy.

3.     The on-demand economy is a free-market system in which Plaintiffs Lydia Olson and Miguel Perez, along with other independent service providers like them, have enjoyed opportunities to earn money when and where they want, with unprecedented independence and flexibility.  These opportunities have been made possible by mobile applications ("apps") operated by network companies that connect consumers requesting certain services with independent providers of those services.  Network companies that operate these apps, like Company Plaintiffs, are sometimes referred to as "app-based platforms," "network companies," or "platform companies."  Those independent service providers who find their customers using the network companies' mobile apps may be referred to as "app-based independent service providers," performing "on-demand work."

4.     Plaintiffs Olson and Perez choose to work as independent service providers in the modern app-based on-demand economy as a means of earning a substantial or supplementary income while maintaining the right to decide when, where, and how they work.  In fact, hundreds of thousands of Californians choose to provide these services— such as providing transportation to a passenger or delivering food, groceries, and other

goods—and enjoy an unprecedented level of flexibility and freedom without the restrictions, limitations, and burdens of traditional employment.

5.     Such independent service providers like Individual Plaintiffs are able "to integrate work into their existing lifestyles, to manage it along with other work, and to assemble what amounts to a form of income insurance," thereby gaining the ability "to create their own financial stability."[1]  For example, Plaintiff Olson uses on-demand work to supplement her primary income while still ensuring that she can always care for her husband, who has multiple sclerosis, whenever he needs her.  Plaintiff Perez uses on-demand work more regularly to earn a more substantial income than he previously did as a trucker, while still making it to all of his son's little league games.  Other fathers too choose app-based on-demand referrals for the flexibility to work around children's soccer games or ballet performances.  An aspiring comedian might choose to perform transportation services referred through an app so that she can attend an audition without checking with her boss.  A student might choose to use a delivery platform for referrals to earn money between classes.  A retiree might use an app's referrals to supplement fixed income and for social interaction.  A military spouse might choose to work in the on-demand economy to help ease the burdens of frequent relocation.  Others might choose it as a way to supplement "traditional" full-time work or to bridge the gap between salaried positions.[2]  In short, these independent workers can work as much, or as little, as they want in order to accommodate family, social, professional, academic, and other commitments.[3]

---

[1]   Intuit and Emergent Research, *Dispatches from the New Economy: The On-Demand Economy Worker Study*, at 4-5, June 2017, https://fdocuments.us/document/dispatches-from-the-new-economy-the-on-the-underlying-dynamics-affecting-the.html.

[2]   AB 5's principal sponsor has indicated that the law was specifically designed to address people who have a full-time job and choose to supplement their income with side work.  @LorenaSGonzalez, Twitter (Dec. 19, 2019, 6:29 AM), https://twitter.com/LorenaSGonzalez/status/1207669238481092610 (AB 5 "was in response to people who have a job but have to work side hustles").

[3]   For many other examples of the flexibility afforded by on-demand work, *see O'Connor v. Uber Techs. Inc.*, No. CV-13-03826-EMC (N.D. Cal. July 9, 2015)

Gibson, Dunn & Crutcher LLP

6.     Because app-based work empowers individuals to generate income on a flexible schedule, "[m]any people choose this mode of work, even when they have other options."[4]  Even with record low levels of unemployment, hundreds of thousands of Californians are flocking to on-demand work.  Instead of a daily commute, an outdated workplace hierarchy, and the daily grind of an inflexible 9-to-5 job, these workers enjoy the freedom to be their own bosses, set their own hours, and earn income whenever they want.  Many such workers also choose to "multi-app"—i.e., simultaneously use the apps of several app-based network companies.  By using multiple apps at the same time— e.g., Uber, Postmates, Grubhub, and DoorDash—independent service providers can more easily find service requests to perform, including multiple service requests at the same time, thereby maximizing their potential for earnings during the time period that they choose to make themselves available.  Plaintiffs Olson and Perez both regularly multi-app to increase convenience and enhance their earnings.

7.     Plaintiff Olson holds an MBA from the University of California, Davis, and was employed in several management positions before becoming an independent business owner in 2011.  She runs a consulting firm that works with small businesses and churches.  Shortly after Ms. Olson started her consulting business, her husband was diagnosed with multiple sclerosis, and she was grateful that, as an independent business owner, she had the flexibility to take time off to care for him when needed.  In addition to her consulting work, Ms. Olson began using the Uber and Lyft apps for driving referrals to supplement her primary income while still maintaining the flexibility to support her husband.  Given her husband's illness and the fact that she has little or no notice of when she will have to take time off to care for him, as well as her consulting business, Ms. Olson could not give up the flexibility that she has as an independent service provider in exchange for a more traditional work arrangement.

---

(Dkt. 307); Evangelis Declaration Exhibits 1–40, *O'Connor v. Uber Techs. Inc.*, No. CV-13-03826-EMC (N.D. Cal. July 9, 2015) (Dkt. 299).

[4]   Intuit and Emergent Research, *supra* note 1, at 3.

8.      Plaintiff Perez likewise has relied on the freedom and flexibility he has as an independent contractor to support his family.  He once drove a big rig as a commercial, class A truck driver for FedEx on a regular graveyard shift.  He disliked the inflexible schedule and long hours because of how little time he got to spend with his wife and children, and he found that he was constantly getting injured on the graveyard shift.  Mr. Perez's dissatisfaction led him to look for other work, and he decided to experiment with running his own on-demand business on his own terms by accepting referrals for consumers looking for rides or deliveries from several on-demand apps. Now running his own delivery business, Mr. Perez gets to decide when he starts work and when he stops.  He is able to be his own boss and tailor his work to be present for all the important life events for his children.  And he has nearly doubled his earnings from when he was a truck driver, allowing his wife to quit her job and spend more time with their daughter.

9.      Individual Plaintiffs experience these benefits from on-demand work as tangible and central to their and their families' well-being and quality of life; these benefits represent foundational and critical gains that they realize every day from being their own bosses.

10.     The app-based on-demand economy also has benefited consumers.  The advanced technologies of app-based network companies like Company Plaintiffs have reduced the costs associated with finding and hiring independent service providers, eliminated barriers to enter markets with high initial setup costs, increased convenience for independent service providers and consumers, and lowered prices for numerous services by making it easy to connect independent service providers directly with paying consumers.  As a result, consumers "have flocked to these networked services because of the added convenience, lower prices, and higher quality services."[5]   Millions of

---

[5]  Will Rinehart, *The Modern Online Gig Economy, Consumer Benefits, and the Importance of Regulatory Humility*, American Action Forum (Nov. 19, 2015), https://www.americanactionforum.org/research/the-modern-online-gig-economy-consumer-benefit-and-the-importance-of-regula/.

California consumers and brick and mortar businesses, and the state's economy as a whole, have benefited from the services of these independent service providers and the on-demand economy.

11.   Some of the many benefits to consumers, small businesses, and the public from the on-demand economy include providing convenient and affordable transportation, reducing impaired and drunk driving, improving mobility and access to local merchants for seniors and individuals with disabilities, providing new transportation options for families who cannot afford a vehicle, fostering growth of small businesses that are able to reach a broader market, and providing new, affordable, and convenient consumer-outreach options for local businesses and their patrons.

12.   These benefits to workers, consumers, merchants, and the public as a whole have been fueled by technology companies, like Company Plaintiffs, creating and operating websites, apps, and other technologies that instantly connect independent service providers willing to perform a service with consumers willing to pay for the service.  For example, among other apps, Plaintiff Uber operates an app-based platform that connects consumers looking for a ride with drivers looking for such riders.  Plaintiff Postmates operates an app-based platform that connects (i) consumers wishing to purchase goods (such as food) with (ii) merchants and (iii) independent couriers willing to deliver the purchased goods.  Other network companies operate online platforms that match independent service providers with persons willing to pay someone to perform any multitude of other services.

13.   Importantly, the only service that network companies provide is access to an app.  Neither Company Plaintiff hires drivers or delivery persons.  They are technology companies that create and operate apps, which facilitate the connection of consumers and independent service providers, so that consumers can hire an independent service provider to perform particular services.

14.   Network companies have been an engine of economic growth, innovation, and work opportunities in California, across the country, and around the world.

15.     Rather than embrace how the on-demand economy has empowered workers, benefited consumers, and fueled economic growth, some California legislators have irrationally attacked it.   California Assemblywoman Lorena Gonzalez, in particular, published an Op-Ed in the *Washington Post* in September 2019 unfairly attacking on-demand work, Uber, and other network companies.[6]

16.     This hostility towards the on-demand economy held by Assemblywoman Gonzalez and many of her colleagues in the California legislature ultimately led to the passage of AB 5.   Assemblywoman Gonzalez was the lead drafter, sponsor, and proponent of the bill.   The California legislature passed AB 5 on September 11, 2019; it was signed into law on September 18, 2019; and it is scheduled to take effect on January 1, 2020.

17.     Assemblywoman Gonzalez and other legislators who voted for AB 5 have publicly and repeatedly stated that their purpose in supporting the statute is to force network companies to change the classification of workers who use their technology from "independent contractors" to "employees" and thus restructure their businesses.   In other words, their goal is to deprive workers of the flexibility and freedom of their current independent status, and instead place them under the authority, control, and direction of an employer.

18.     This overt hostility to on-demand work has manifested in Assemblywoman Gonzalez's request that executive officials unfairly, and with overt bias, use the law to target network companies for immediate enforcement actions.   She explicitly added authorization for the City Attorneys of California's largest cities to bring enforcement actions under AB 5 against Company Plaintiffs.[7]   And she has repeatedly encouraged

---

[6]   Lorena Gonzalez, *The Gig Economy Has Costs.  We Can No Longer Ignore Them*, Wash. Post (Sept. 11, 2019), https://www.washingtonpost.com/opinions/2019/09/11/gig-economy-has-costs-  we-can-no-longer-ignore-them/.

[7]   Carolyn Said, *Uber: We'll Fight in Court to Keep Drivers as Independent Contractors*, San Francisco Chronicle (Sept. 11, 2019),  https://www.sfchronicle.com/business/article/Uber-We-ll-fight-in-court-to-keep-drivers-as-14432241.php ("Uber's attitude spurred Gonzalez to add a last-minute provision to AB 5 allowing

immediate enforcement actions against network companies.[8]  At least one such City Attorney also publicly stated support for this expansion of enforcement authority under AB 5 and expressed his intent to use this authority "to do the job" directed by Assemblywoman Gonzalez.[9]  Other state and city officials have similarly stated their intent to bring enforcement actions against network companies, including Company Plaintiffs.

19.    AB 5 is a vague and incoherent statute that does not accomplish what its sponsors have stated they sought to achieve.  Company Plaintiffs maintain that (among other things) they are not hiring entities under AB 5 and can establish that app-based independent service providers are not employees under the ABC test.[10]

20.    But if the enforcers of AB 5—such as Defendants, executive officials, or the four city attorneys whom AB 5 purports to deputize into enforcers of state law— were to succeed in carrying out the intent of AB 5's sponsors, this would deprive independent service providers such as Individual Plaintiffs of the flexibility they so value working in the on-demand economy.  And it would impose economic, administrative, and other costs on platform companies such as Company Plaintiffs by requiring them to

---

the state attorney general, city attorneys of cities with populations of over 750,000, and local prosecutors to sue companies that misclassify workers, she said.").

[8]  @LorenaSGonzalez, Twitter (Nov. 21, 2019, 8:05 AM), https://twitter.com/LorenaSGonzalez/status/1197546573158158336?s=20.

[9]  Said, *supra* note 7 (quoting statement of San Francisco City Attorney Dennis Herrera on AB 5's inclusion of enforcement authority for city attorneys and touting "his record of taking on cases about worker pay and benefits," including having "already filed several cases against Uber and Lyft").

[10]  In arbitrations in California and New York, Company Plaintiffs have prevailed in establishing that the independent service providers who use their platforms are not employees under the "ABC test."  The federal government has likewise concluded that independent service providers are not employees under the Federal Labor Standards Act or the National Labor Relations Act.  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2019-6 (Apr. 29, 2019) (recognizing that app-based on-demand workers are "independent contractors" under the Fair Labor Standards Act); Advice Memorandum from Jayme L. Sophir, Assoc. Gen. Counsel, Div. of Advice, Nat'l Labor Relations Bd. to Jill Coffman, Reg'l Dir., Region 20, Nat'l Labor Relations Bd. 15 (Apr. 16, 2019) (concluding that UberX and UberBLACK drivers are independent contractors under the National Labor Relations Act).  Nothing in this Complaint should be read to waive or forfeit any argument Company Plaintiffs would make in an enforcement action brought against them under AB 5.

fundamentally restructure their business models.  If found to have violated AB 5, Company Plaintiffs could be subject to civil penalties and even criminal punishment. For some companies, the burdens of restructuring their businesses and the potential penalties from the threatened enforcement of AB 5 could force them to stop doing business in California.

21.    If AB 5 were enforced against Company Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy, it would harm many independent service providers who prefer to provide services on their own schedules via the app-based platforms that network companies operate.   Inevitably, forced reclassification would eliminate the flexibility and entrepreneurship that is the foundation of platform-based work.  And that, in turn, would reduce the number of people who are able to earn money via on-demand work.  "[A] lucky few will secure full-time jobs," but the rest will be forced "right out of a stable income stream."[11]  For example, according to one study, requiring rideshare company Lyft to reclassify its drivers as employees and to adopt formal work schedules for those new employees would lead to more than 300,000 fewer drivers in California.[12]  The displacement of hundreds of thousands of workers who rely on the current arrangement and for whom the performance of this work is possible only if they maintain agency over the conditions in which they choose to do this work would cause them irreparable injury.

22.    AB 5 has already forced one company to terminate entirely its relationship with hundreds of independent service providers with only a lucky few receiving positions as employees.[13]  Other companies are replacing independent service providers

---

[11]  Bonnie Kristian, *How California's New Gig Economy Law Could Put Freelancers Out of Business* (Oct. 24, 2019), https://theweek.com/articles/873453/how-californias-new-gig-economy-law-could-freelancers-business.

[12]  Beacon Economics LLC, *How Many Drivers Would Lyft Recruit Under a Traditional Work Arrangement? An Analysis*, at 2, Aug. 2019, https://images.kusi.com/wp-content/uploads/2019/09/Beacon-Economics-August-2019.pdf.

[13]  *See, e.g.*, Carlos Garcia, *Vox Media Fires Hundreds of Freelance Writers Over California 'Gig Economy' Law—And They're Tweeting Angrily About It* (Dec. 16, 2019), https://www.theblaze.com/news/ca-gig-economy-law-gets-writers-fired.

Gibson, Dunn & Crutcher LLP

in California with workers from out of state as a result of AB 5.[14]  And at least two lawsuits have already been filed seeking to enjoin and invalidate AB 5 as unconstitutional and/or preempted by federal law.[15]

23.    In a thinly veiled attempt to conceal their irrational intent to target and harm network companies, legislators framed the statute as merely codifying the three-prong worker classification test from *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 416 P.3d 1 (Cal. 2018).  But the statute does much more than that.  *Dynamex* adopted an "ABC test" to determine whether a worker is an employee, not an independent contractor, for purposes of California's wage orders, which are "quasi-legislative regulations" that "impose obligations relating to the minimum wages, maximum hours, and a limited number of very basic working conditions (such as minimally required meal and rest breaks) of California employees."  *Id.* at 5 & n.3.  AB 5 goes much further, and codifies the ABC test for not only wage orders but also for the California Unemployment Insurance Code and the entirety of the California Labor Code. It also attaches the threat of criminal sanctions by making misclassification a misdemeanor or even a felony under California law pursuant to penalties provided for in the existing Labor Code.[16]

---

[14] *See, e.g.*, Jeff Lasky, *Concerns Raised As California's Independent Contractor Law Is Set To Take Effect*, ABC10 News (Dec. 27, 2019), https://www.10news.com/ news/local-news/questions-and-concerns-from-workers-with-controversial-independent-contractor-law-about-to-take-affect.

[15] *See, e.g.*, Complaint, *Am. Society of Journalists and Authors, Inc. v. Becerra*, No. 2:19-cv-10645 (C.D. Cal. Dec. 17, 2019).

[16] The California Labor Code requires employers to provide numerous benefits to their employees, including minimum wage (Cal. Lab. Code § 1194 (West 2019)); overtime compensation (*id.*); indemnification for business expenses (*id.* § 2802); meal and rest periods (*id.* § 226.7); and workers' compensation (*id.* § 3700).  Under the Labor Code, employers are subject to criminal and civil liability for numerous violations, including violation of provisions related to overtime, meal periods, alternative workweeks, makeup work time, and rest days (*see, e.g., id.* § 553); failing to pay minimum wage (*id.* § 1199); failing to comply with various wage withholding provisions (*id.* § 225); failing to comply with itemized paystub requirements (*id.* § 226.6); and failing to make required payments to a health or welfare fund, pension fund, vacation plan, or similar benefit fund (*id.* § 227).

Gibson, Dunn & Crutcher LLP

24.     The irrationality of AB 5 is confirmed by its laundry list of exemptions. AB 5 spends only a few lines of text adopting the ABC test.  The vast majority of the statute is a list of exemptions that carve out of the statutory scope dozens of occupations, including direct salespeople, travel agents, grant writers, construction truck drivers, commercial fisherman, and many more.   There is no rhyme or reason to these nonsensical exemptions, and some are so ill-defined or entirely undefined that it is impossible to discern what they include or exclude.  For example, some types of workers are excluded (e.g., a delivery truck driver delivering milk) while others performing substantively identical work are not excluded (e.g., a delivery truck driver delivering juice).  The statute exempts "Professional service providers . . . [such as] fine artist services" (AB 5 § 2(c)(2)(B)(i)-(xi)), but does not define "fine artist services," leaving individuals guessing whether or not they qualify for the exemption at great financial risk. Nor is there any rational reason why an individual who chooses to earn income by direct selling Tupperware is exempt, and yet, if that same person earns extra income by offering driving services, there is no exemption.

25.     This targeting of app-based workers and platforms and treating them disparately from traditional workers violates the Equal Protection Clauses of the United States and California Constitutions.  There is simply no rational basis for subjecting exempt occupations and non-exempt occupations to different rules and burdens.  Where, as here, the breadth of a statute is so disjointed with the reasons offered for it that the statute seems inexplicable by anything but animus toward the class it is designed to affect, the statute lacks a rational relationship to legitimate state interests and violates equal protection.   And where, as here, there does not appear any reason why the California legislature would choose those carve-outs other than to respond to the demands of political constituents, the law is unconstitutional even under the most minimal "rational basis" standard of judicial review.

26.     And to the extent AB 5 is enforced against on-demand workers and companies in a manner consistent with the sponsors' stated intent to require

Gibson, Dunn & Crutcher LLP

reclassification of workers in the on-demand economy, AB 5 violates the inalienable rights and due process clauses of the California Constitution, as well as the Fourteenth Amendment to the United States Constitution.  App-based independent service providers and the companies that operate the platforms they use have a constitutional right to pursue the occupation of their choice—not to be forced to be employees when they are independent, or to be forced to be taxi or delivery companies when they are technology companies.  And platform companies have a constitutionally protected interest in running their businesses free from unreasonable governmental interference, including statutes that irrationally classify and target them as a politically disfavored group.

27. In addition, if enforced against independent service providers like Individual Plaintiffs and network companies such as Company Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy, AB 5 also would violate the Contracts Clauses of the United States and California Constitutions.  The on-demand economy is built upon a structure of contracts in which consumers are connected via apps with independent service providers, not employees.  *See*, *e.g.*, *Lawson v. Grubhub Inc.*, 302 F. Supp. 3d 1071, 1093 (N.D. Cal. 2018) (holding that a driver who used the Grubhub platform to perform deliveries is an "independent contractor" under California law); *cf.* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2019-6 (Apr. 29, 2019) (recognizing that app-based independent service providers are "independent contractors" under the Fair Labor Standards Act); Advice Memorandum from Jayme L. Sophir, Assoc. Gen. Counsel, Div. of Advice, Nat'l Labor Relations Bd. to Jill Coffman, Reg'l Dir., Region 20, Nat'l Labor Relations Bd. 15 (Apr. 16, 2019) (concluding that UberX and UberBLACK drivers are independent contractors under the National Labor Relations Act).  Company Plaintiffs have entered into millions of contracts with independent service providers (including with Individual Plaintiffs), and millions of contracts with users of their apps, in reliance on the pre-AB 5 framework.  If Defendants are able to use the threat of enforcement of AB 5 to force Company Plaintiffs to reclassify independent service providers as

Gibson, Dunn &
Crutcher LLP

employees (even if these workers are correctly classified as independent contractors), that would completely upend this entire contractual landscape, and—at the very least—substantially impair the existing contractual relationships, rendering many of them invalid, and forcing Company Plaintiffs to enter into new contracts with dramatically different obligations. There is no significant and legitimate public purpose—only irrational animus—for this legislative attempt to incite enforcement of AB 5 against network companies in a manner that would impair preexisting contracts, and harm network companies and independent service providers alike.

28. Plaintiffs support the goal of protecting workers and clarifying California's rules surrounding worker classification, but singling out network companies and subjecting them to different rules is an improper, ineffectual, and unconstitutional means of furthering that objective. It irreparably harms network companies and app-based independent service providers by denying their constitutional rights to be treated the same as others to whom they are similarly situated. These and other adverse consequences also would undermine the public's interest in having access to the app-based platforms that network companies have created, with the attendant benefits of being able to hire independent service providers on demand with the click of a button.

29. For these reasons, the Court should declare that AB 5 is unconstitutional and invalid, and preliminarily and permanently enjoin all enforcement of AB 5 against Company Plaintiffs.

## **PARTIES**

30. Plaintiff Lydia Olson is a driver who resides in Antelope, California and uses the Uber platform to get leads for passenger requests to transport passengers in the Sacramento and San Francisco Bay areas.

31. Plaintiff Miguel Perez is an independent courier who resides in Canyon Country, California, and uses the Postmates platform to get leads for delivery requests in the Los Angeles County area.

Gibson, Dunn &
Crutcher LLP

13

32.     Plaintiff Postmates is a technology company that operates an online marketplace and mobile app-based platform that connects individual consumers seeking to order food or other goods with local merchants (such as restaurants and retail stores), and if the consumer seeks delivery of a purchase, with independent couriers who use the Postmates platform to receive delivery referral notifications and choose whether to accept the consumer's offer to pick up and complete the requested delivery.

33.     Plaintiff Uber is a technology company that licenses and operates an online and mobile app-based platform that connects individuals in need of goods or services with those willing to provide them.

34.     Defendant State of California is a sovereign State.

35.     Defendant Xavier Becerra is being sued in his official capacity as the Attorney General of California.  In that capacity, he has authority to enforce AB 5.

36.     Defendant "John Doe" is a placeholder designation for any unidentified California official who has authority, or purports to have authority, to enforce AB 5 against Company Plaintiffs, in the event that additional officials must be included as defendants in this lawsuit in order to afford Plaintiffs complete relief.

## JURISDICTION AND VENUE

37.     This civil action arises under the United States Constitution and the Fifth and Fourteenth Amendments thereof, the California Constitution, and 42 U.S.C. § 1983.

38.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

39.      This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) to redress deprivations "under color of any State law, statute, [or] ordinance . . . of any right, privilege or immunity secured by the Constitution of the United States . . . ."

40.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 57.

41.     Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

42.     Venue is proper in this district under 28 U.S.C. § 1391(b).

Gibson, Dunn &
Crutcher LLP

14

43.     An actual controversy exists between the parties concerning the constitutionality and validity of AB 5.  A declaration that the statute is invalid and/or an injunction against its enforcement would resolve the controversy.

44.     A preliminary injunction enjoining Defendants from enforcing AB 5 against Company Plaintiffs would preserve the status quo and protect Plaintiffs' rights during this proceeding, and a permanent injunction would protect their rights after this proceeding ends.

## FACTS

### I.     Assembly Bill 5's Sponsors Attempt to Codify And Extend The Reach Of The *Dynamex* "ABC Test."

45.     On December 3, 2018, California Assemblywoman Lorena Gonzalez introduced AB 5. According to the bill, its purpose is to "codify the decision of the California Supreme Court" in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 416 P.3d 1 (Cal. 2018), and to "clarify the decision's application in state law." AB 5 § 1(d).

46.     *Dynamex* adopted a three-factor test—or "ABC test"—to determine whether a worker is an independent contractor or an employee for purposes of the California Industrial Welfare Commission's wage orders.  The wage orders provide minimum wage, maximum hour, and working condition requirements for specific industries.

47.     The wage order at issue in *Dynamex* imposes wage and hour obligations for companies that "employ" workers, which the wage order defines as "to engage, suffer, or permit to work."  Construing that specific language, *Dynamex* concluded that workers are presumed to be employees for purposes of the wage order unless three conditions are met:

> A.  The individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact;

B.  The service is performed outside the usual course of the business of the employer; and

C.  The individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

416 P.3d at 48.

48.     Although *Dynamex* applied the ABC test solely for purposes of California's wage orders, AB 5 codifies the ABC test for purposes of those wage orders, *and* expands it to apply to the entirety of the California Labor Code, *and* the California Unemployment Insurance Code.  *See Garcia v. Border Transp. Grp., LLC*, 28 Cal. App. 5th 558, 561, 570 (2018) (explaining that "*Dynamex* did not purport to [apply] in every instance where a worker must be classified as either an independent contractor or an employee," and that "*Dynamex* does not apply" to "non-wage-order claims" (emphasis omitted)).

49.     Specifically, Section 2 of AB 5 adds a new provision to Article 1 of the California Labor Code, § 2750.3, that incorporates the ABC test verbatim.  Section 3(i) of AB 5 amends the definition of "employee" in the Labor Code by linking that definition to the new § 2750.3.  And Section 4 of AB 5 amends Section 606.5 of the Unemployment Insurance Code to incorporate the definition of "employee" in Section 621 of the Code—a provision that, in turn, Section 5 of AB 5 amends to also incorporate *Dynamex*'s ABC test.  The Unemployment Insurance Code requires employers to pay unemployment insurance contributions for all of their employees.  *See* Cal. Unemp. Ins. Code §§ 976, 977 (West 2019).  Employers must also account for administrative costs associated with withholding unemployment insurance taxes, paying them over to the State, keeping extensive records of these transactions, and complying with recurring reporting requirements.  *See id.* §§ 13020, 13021.

50.     AB 5 also transforms employment regulations into potential criminal liability.  Any employer who fails to withhold or pay these taxes, regardless of intent, could be guilty of a misdemeanor and subject to fines up to $1,000 for each occurrence

Gibson, Dunn &
Crutcher LLP

and up to one year of imprisonment. *Id.* § 2118.  Additionally, employers who fail to comply with numerous Unemployment Insurance Code provisions and regulations are potentially liable for dozens of penalties. *See generally* Cal. Emp't Dev. Dep't, Penalty Reference Chart (2018), https://www.edd.ca.gov/pdf_pub_ctr/de231ep.pdf.   Just a handful of examples include fines for failing to report the hiring of a new or rehired "employee" within the prescribed time limit (Cal. Unemp. Ins. Code § 1088); failing "to file a report of wages of each of [its] workers on magnetic media or other electronic means" (*id.* § 1114(b)); filing a false statement of withholdings to an "employee" (*id.* § 13052); or failing to supply a required "identifying number" (*id.* § 13057(a)).

51.   AB 5 states that it may be enforced by the California Attorney General or "a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association." AB 5 § 2(j).  The lawsuits may seek injunctive relief "to prevent the continued misclassification of employees as independent contractors," "[i]n addition to any other remedies available." *Id.*

52.   At least one city attorney has already stated an intent to use this enforcement authority against Company Plaintiffs "to do the job."[17]   And Lorena Gonzalez, the bill's lead sponsor, publicly "ask[ed] the 4 big City Attorneys offices to file for injunctive relief on 1/1/20" against Company Plaintiffs.[18]

## II.   The Exemptions In Assembly Bill 5 Target The Statutory Scope To The On-Demand Economy.

53.   AB 5 spends only a few lines adopting *Dynamex*'s ABC test for the entire California Labor Code and California Unemployment Code.  The vast majority of the

---

[17]  *See* Said, *supra* note 7.

[18]  @LorenaSGonzalez, Twitter (Nov. 21, 2019, 8:05 AM), https://twitter.com/lorenasgonzalez/status/1197546573158158336.

Gibson, Dunn & Crutcher LLP

statute is a morass of complicated provisions exempting dozens of occupations from that test.

54.   The legislature added these carve-outs to AB 5 solely for interest groups and labor.

55.   Under Section 2(a)(2) of the statute, the exempted workers are governed by the alternative "control-of-the-work" test from *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 769 P.2d 399 (Cal. 1989); AB 5 thus does not apply *Dynamex* to these exempted workers.  The *Borello* test uses a multi-factor balancing analysis—where no one factor is dispositive—to determine whether a worker is an employee or an independent contractor.   Courts applying this test have concluded that app-based independent service providers are independent contractors, not employees.   *See*, *e.g.*, *Lawson*, 302 F. Supp. 3d at 1093 (concluding after a bench trial that a worker who provided delivery services to customers via Grubhub "was an independent contractor" and "not an employee" under the *Borello* test).   Signaling that the exemptions were meant to allow independent contractor relationships to continue for the exempted businesses, Assemblywoman Gonzalez stated that *Borello* "was weighted heavily against . . . trying to prove misclassification."[19]

56.   The statutory exemptions carve out most types of workers traditionally considered to be independent contractors, with a glaring and intentional exception:  app-based independent service providers.

57.   AB 5's exemptions include:

    a.   Workers engaged in occupations requiring licenses, *see* AB 5 § 2(b)(1)-(4), (6), including:

        i.   licensed insurance agents and other individuals requiring an insurance license;[20]

---

[19]   @LorenaSGonzalez, Twitter (Dec. 25, 2019, 10:57 AM), https://twitter.com/LorenaSGonzalez/status/1209911130522406913?s=20.

[20]   Specifically, "[a] person or organization who is licensed by the Department of Insurance pursuant to Chapter 5 (commencing with Section 1621), Chapter 6

       ii.  licensed individuals in the medical profession (physicians, surgeons, dentists, podiatrists, psychologists, and veterinarians), so long as they are providing medical or professional services to or by a health care entity;[21]

      iii.  licensed attorneys, architects, engineers, private investigators, and accountants;

      iv.  registered or licensed securities broker-dealers or investment advisers; and

      v.  commercial anglers working on American (but not foreign) vessels.

b.  <u>Direct sales workers as described in Section 650 of the California Unemployment Insurance Code</u>.  AB 5 § 2(b)(5).

      i.  A direct sales salesperson generally is anyone "engaged in the trade or business of primarily in person demonstration and sales presentation of consumer products, including services or other intangibles, in the home."  Cal. Unemployment Ins. Code § 650(a).

c.  <u>Professional service providers</u>, *see* AB 5 § 2(c)(2)(B)(i)-(xi), including those who provide:

      i.  marketing services;

      ii.  human resources services;

      iii.  travel agent services;

      iv.  graphic design services;

      v.  grant writing services;

---

(commencing with Section 1760), or Chapter 8 (commencing with Section 1831) of Part 2 of Division 1 of the Insurance Code."  AB 5 § 2(b)(1).

[21]  AB 5 exempts from the provision concerning medical occupations "employment settings currently or potentially governed by collective bargaining agreements."  AB 5 § 2(b)(2).

vi.   fine artist services;

vii.   services of agents licensed by the U.S. Treasury to practice before the IRS;

viii.   payment processing agent services;

ix.   photography or photojournalist services;

x.   services provided by a freelance writer, editor, or newspaper cartoonist;[22] and

xi.   services provided by a licensed esthetician, electrologist, manicurist, barber, or cosmetologist.

d.   <u>Real estate licensees and repossession agencies</u>.  AB 5 § 2(d)(1)-(2).

e.   "<u>[B]usiness-to-business contracting relationship[s]</u>," subject to certain conditions.  AB 5 § 2(e).

f.   <u>Contractors and subcontractors in the construction industry</u>, subject to certain conditions.  AB 5 § 2(f).

g.   <u>Subcontractors providing construction trucking services</u>—*i.e.*, "hauling and trucking services provided in the construction industry"—subject to certain conditions.  AB 5 § 2(f)(8).

h.   <u>Referral agencies and service providers, subject to certain conditions</u>.  AB 5 § 2(g).

i.   <u>Motor clubs and individual motor club service providers</u>.  AB 5 § 2(h).

58.   There is no rhyme or reason to these exemptions.  For example, it makes no sense to exempt certain workers depending on what *type* of license they have.  Drivers who transport passengers and use the Uber app for black car referrals, for instance, obtain government-issued business licenses for their transportation businesses.  Yet AB 5 treats them differently from other independent workers who must obtain licenses for *their* businesses.  There is no rational basis for such disparate treatment.

---

[22]  This exemption applies to a "freelance writer, editor, or newspaper cartoonist who does not provide content submissions to the putative employer more than 35 times per year."  AB 5 § 2(c)(2)(B)(x).

Gibson, Dunn &
Crutcher LLP

59.    Many of the exemptions are wholly arbitrary.  For example, a delivery truck driver is exempt when delivering milk, but not when delivering juice, fruit, baked goods, or meat products.  *See* AB 5 § 5(c)(1)(A).  A commercial fisherman is exempt when working on an American vessel, but not a foreign vessel.  *See id.* § 2(b)(6).  And a freelance editor or writer is exempt if she publishes 35 submissions per year per "putative employer," but not if she publishes 36.  *See id.* § 2(c)(2)(B)(x).  When asked about this 35-submission cutoff, Assemblywoman Gonzalez said:  "Was it a little arbitrary? Yeah."[23]  News articles report that "employers and workers in other industries including truck drivers, therapists, and entertainers say it is unclear how AB 5 will affect them, leading some to take precautionary measures and others to say they hope a court will clarify the matter soon."[24]

60.    AB 5 does not identify any data, studies, reports, or other justification or explanation for its exemptions.

61.    The legislature included many of the exemptions as political favors or to politically favored groups without any valid legislative purpose or rational basis, to the

---

[23]  Katie Kilkenny, *"Everybody Is Freaking Out": Freelance Writers Scramble to Make Sense of New California Law*, The Hollywood Reporter (Oct. 17, 2019), https://www.hollywoodreporter.com/ news/everybody-is-freaking-freelance-writers-scramble-make-sense-new-california-law-1248195 (internal quotation marks omitted) (quoting Assemblywoman Gonzalez).  It already has triggered companies such as Vox Media to announce they are ending contracts with hundreds of freelancers in California.  *See*, *e.g.*, Megan McArdle, *How a law aimed at Uber and Lyft is hurting freelance writers*, Washington Post (Dec. 19, 2019), https://www.washingtonpost.com/opinions/2019/12/19/how-law-aimed-uber-lyft-is-hurting-freelance-writers/; James Barrett, The Daily Wire (Dec. 17, 2019), https://www.dailywire.com/news/sb-nation-writers-lose-jobs-because-of-new-california-law-democrat-behind-law-says-its-not-all-bad-gets-smacked-apologizes.  This aspect of the law is challenged in a lawsuit pending in this Court.  *See American Society of Journalists and Authors, Inc. v. Becerra*, No. 2:19-cv-10645 (C.D. Cal. filed December 17, 2019).  That lawsuit and outcry prompted Assemblywoman Gonzalez to solicit ideas for ways to carve-out even more workers—but not those who use on-demand apps—on Twitter, less than two weeks before the law takes effect.  @LorenaSGonzalez, Twitter (Dec. 19, 2019, 9:47 AM), https://twitter.com/ LorenaSGonzalez/status/1207719056272310273.

[24]  Katy Grimes, *California's Independent Contractors Are About to Become Dependent Employees – or Unemployed*, California Globe (Dec. 17, 2019), https://californiaglobe.com/section-2/californias-independent-contractors-are-about-to-become-dependent-employees-or-unemployed/.

Gibson, Dunn & Crutcher LLP

detriment of the platform companies.  At least one legislator warned during the debate over AB 5's passage that the legislation "undermines the principle of equal treatment under the law and deprives many Californians the right to be their own bosses, by exempting some industries over others."[25]

62.    In the months preceding the passage of AB 5, the California Labor Federation circulated a one-page form that business groups could complete to request an exemption from the statute.  These "opt out" forms were the idea of Assemblywoman Gonzalez's staff and her staff, in turn, worked to amend the bill to create additional exemptions based upon the relative interest from labor groups in specific businesses seeking an exemption.  This process played out repeatedly and is responsible for the irrational and arbitrary results of the final bill.[26]  Assemblywoman Gonzalez touted the fact that the bill reflected the union's bare political interests to irrationally benefit friends and harm others, explaining at the time of its passage in the California Assembly that "I am a Teamster . . . . I am the union."[27]

**III.    California Legislators Confirm In Public Statements That They Intended To Target Network Companies.**

63.    In the weeks immediately before and after the California legislature passed AB 5 on September 11, 2019, the primary supporters of the statute, and the interest groups that lobbied for it, repeatedly disparaged the on-demand economy and confirmed that their purpose in promoting and voting for the statute was to target and harm network companies.

---

[25]  Christine Mai-Duc and Lauren Weber, *It Isn't Just Uber:  California Prepares for New Gig Worker Rules…and Confusion*, Wall Street Journal (Dec. 17, 2019), https://www.wsj.com/articles/confusion-in-california-as-gig-worker-law-set-to-take-effect-11576590979.

[26]  In addition, Assemblywoman Gonzalez has promised a "part 2 to the bill," apparently to add more exemptions for politically favored groups.  @LorenaSGonzalez, Twitter (Nov. 21, 2019, 7:45 AM), https://twitter.com/lorenasgonzalez/status/1197541485056409611?s=12.

[27]  @LorenaGonzalez, Twitter (May 30, 2019, 7:23 AM), https://twitter.com/lorenasgonzalez/status/1134087876390428672?s=21.

Gibson, Dunn & Crutcher LLP

64.     For example, AB 5's sponsor, Assemblywoman Gonzalez, stated that AB 5 was directed at network companies, with comments such as the following:

    a.  On September 9, 2019, while defending AB 5, Assemblywoman Gonzalez accused platform companies like Uber and Postmates of engaging in "wage theft."[28]

    b.  On September 11, 2019, Assemblywoman Gonzalez criticized network companies like Uber and Postmates, stating that they "rely on a contract workforce" and, according to her, AB 5 will stop such "gig economy companies" from relying on independent contractors.[29]

    c.  On September 12, 2019, Assemblywoman Gonzalez stated that California has "allowed a great many companies—including 'gig' companies such as Uber . . . to rely on a contract workforce, which enables them to skirt labor laws, exploit working people and leave taxpayers holding the bag."[30]

    d.  On September 18, 2019, Assemblywoman Gonzalez stated that Uber's Chief Legal Counsel is "full of sh*t."[31]

    e.  On September 26, 2019, Assemblywoman Gonzalez proposed legislation that would mandate that Uber publicly disclose sensitive information in its internal investigations.

---

[28]  @LorenaSGonzalez, Twitter (Sept 9, 2019, 6:29 PM), https://twitter.com/LorenaSGonzalez/status/ 1171234109999341569.

[29]  Gonzalez, The Gig Economy Has Costs, *supra* note 6.

[30]  Glenn Jeffers, *Legislature OKs Bill to Curb "Gig" Workers; Uber Vows to Ignore*, Daily Journal (Sept. 12, 2019), https://www.dailyjournal.com/articles/354215; *see also* George Skelton, *Labor Won Big With Bill To Rewrite California Employment Law—But It's Flawed*, L.A. Times (Sept. 12, 2019), https://www.latimes.com/california/story/2019-09-11/skelton-ab5-independent-contractors-california-employment-law.

[31]  @MikeBlountSac, Twitter (Sept. 18, 2019, 1:22 PM), https://twitter.com/mikebountsac/status/1174403405478936578 (quoting Assemblywoman Gonzalez; alteration in original).

f.   On November 21, 2019, Assemblywoman Gonzalez publicly asked the City Attorneys in California's four largest cities to immediately file for injunctive relief under AB 5 against network companies on January 1, 2020.[32]  She later clarified that the goal was to target "large companies" that run such platforms.[33]

g.   On November 25, 2019, Assemblywoman Gonzalez encouraged app-based independent service providers to file unemployment insurance claims.[34]

h.   On November 27, 2019, Assemblywoman Gonzalez took sides in a pending litigation, opposing Uber's effort to enforce its arbitration agreement with drivers.[35]

i.   On December 29, 2019, the *Los Angeles Times* reported that Assemblywoman "Gonzalez said she is open to changes in the bill next year, including an exemption for musicians—but not for app-based ride-hailing and delivery giants."[36]

65.   Other lawmakers who supported AB 5 similarly attacked the on-demand economy and made clear that their vote was focused on platform companies like Company Plaintiffs.

---

[32]  @LorenaSGonzalez, Twitter (Dec. 25, 2019, 10:12 AM), https://twitter.com/LorenaSGonzalez/status/1209899767355961344?s=20.

[33]  @LorenaSGonzalez, Twitter (Nov. 21, 2019, 8:05 AM), https://twitter.com/LorenaSGonzalez/status/1197546573158158336?s=20.

[34]  @LorenaSGonzalez, Twitter (Nov. 25, 2019, 2:21 PM), https://twitter.com/LorenaSGonzalez/status/1199090860329033728?s=20;   @LorenaSGonzalez, Twitter (Nov. 25, 2019, 1:22 PM), https://twitter.com/LorenaSGonzalez/status/1199075844888489984?s=20.

[35]  @LorenaSGonzalez, Twitter (Nov. 27, 2019, 4:16 AM), https://twitter.com/LorenaSGonzalez/ status/1199663397123579905?s=20.

[36]  Margot Roosevelt, *New Labor Laws Are Coming To California.  What's Changing In Your Workplace?*, L.A. Times (Dec. 29, 2019), https://www.latimes.com/business/story/2019-12-29/california-employment-laws-2020-ab5-minimum-wage.

    a. On July 10, 2019, California Assembly Speaker Anthony Rendon defended AB 5 by stating that "the gig economy is . . . a continuation of hundreds of years of corporations trying to screw over workers," and asserted that, with AB 5, "we're in a position to do something about that."[37]

    b. On September 7, 2019, California State Assemblywoman Buffy Wicks advocated for AB 5 and stated that "just because your employer uses a smartphone app, doesn't mean they should be able to misclassify you as an independent contractor."[38]

66.    Representatives from the California Labor Foundation, which was the principal lobbying group supporting AB 5, similarly attacked the on-demand economy while lobbying legislators to pass the bill:

    a. On September 11, 2019, the California Labor Foundation tweeted a link to a *New York Times* article titled:  "Take That 'Gig' and Shove It:  A California bill would make it harder for companies like Uber to take advantage of workers."[39]

    b. On September 13, 2019, the California Labor Foundation tweeted a statement about AB 5 that said:  "We cannot allow technology to be used as an excuse to exploit workers."[40]

---

[37] @Rendon63rd, Twitter (July 10, 2019, 4:40 PM), https://twitter.com/Rendon63rd/status/1149101100928159744; *see also* Miriam Pawel, *You Call It the Gig Economy. California Calls It "Feudalism,"* N.Y. Times (Sept. 12, 2019), https://www.nytimes.com/2019/09/12/opinion/california-gig-economy-bill-ab5.html (internal quotation marks omitted) (quoting Speaker Rendon).

[38] @BuffyWicks, Twitter (Sept. 7, 2019, 6:57 AM), https://twitter.com/BuffyWicks/status/1170335312758706177?s=20.

[39] @CaliforniaLabor, Twitter (Sept. 12, 2019, 1:11 PM), https://twitter.com/CaliforniaLabor/status/ 1172241240903094273.

[40] @CaliforniaLabor, Twitter (Sept. 13, 2019, 7:33 AM), https://twitter.com/CaliforniaLabor/status/ 1172518612482981888.

c.   On September 18, 2019, the California Labor Foundation's Legislative Director tweeted a quotation from an article that said:  "California has the highest poverty rate of any state.  Gig jobs are part of this travesty.  By rejecting the exploitative gig business model, this victory is the most significant action against poverty, precarity & homelessness in recent memory."[41]

67.   These well-funded lobbying efforts by "old economy" companies accomplished their mission to target network companies for irrational treatment:  As enacted, AB 5 spends the majority of its text exempting dozens of occupations from its reach—after spending just a few words on its purported purpose of codifying *Dynamex*.  Absent from the long list of exemptions are network companies.  That was no accident.  Gonzalez vowed from the beginning that network companies would not make the list: "It's not going to happen," she pledged.[42]  And after AB 5 passed, she tweeted in celebration that she had "fought so hard for #AB5 with no gig carve-outs."[43]

68.   In short, the principal legislative supporters and lobbyists behind AB 5 had one goal in mind:  target platform companies in an attempt to force them to reclassify the independent service providers who operate on their platforms to employees.[44]

---

[41]  @Unionista27, Twitter (Sept. 18, 2019, 7:42 AM), https://twitter.com/unionista27/status/ 1174332775215714304.

[42]  Margot Roosevelt, *California Bill Curbing Use of Contractors Would Not Exempt Uber, Lyft, Other Tech Firms*, L.A. Times (Mar. 26, 2019), https://www.latimes.com/business/la-fi-uber-lyft-employee-contractor-bill-20190326-story.html.

[43]  Lorena Gonzalez (@LorenaSGonzalez), Twitter (Sept. 22, 2019, 12:16 PM), https://twitter.com/LorenaSGonzalez/status/1175851372526194689.

[44]  This animus is a widely recognized fact.  *See, e.g.*, Rachel Uranga, *Port Truckers Brake for AB 5*, L.A. Bus. J. (Oct. 4, 2019), https://labusinessjournal.com/news/2019/oct/04/port-truckers-brake-ab5logistics-companies-drivers/ ("AB5 takes direct aim at ride-share services Uber Technologies Inc. and Lyft Inc . . . ."); David Brunori, *Contractors, Employees And The Sharing Economy:  SALT In Review*, Law360.com (Sept. 20, 2019), https://www.law360.com/tax-authority/articles/1201352/contractors-employees-and-the-sharing-economy-salt-in-review ("While [AB 5] does not actually say it, it is clearly aimed at modern companies like Uber and Lyft—and increasingly more business in the sharing economy space."); Kristian, *supra* note 11 ("A.B. 5's primary target is gig employers like ridesharing apps Uber and Lyft, whose drivers are classified as contract workers, not employees.").

## IV.   Substantial Civil And Criminal Penalties May Attach To State And Private Enforcement Actions Against Company Plaintiffs.

69.     As explained above, AB 5 codifies the ABC test in a new Section 2750.3 of the Labor Code.  Dozens of provisions of the Labor Code provide criminal penalties for violations, in addition to any civil penalties that also may attach.

70.     A few examples of the criminal penalties in the Labor Code that network companies could be threatened with if Defendants enforce AB 5 against them in the manner consistent with the sponsors' stated intent include:

a.   Labor Code § 553: Misdemeanor for violation of provisions related to overtime, meal periods, alternative workweeks, makeup work time, and rest days.

b.   Labor Code § 1199: Misdemeanor punishable by a fine and/or imprisonment for up to 30 days for failing to pay minimum wage.

c.   Labor Code § 225: Misdemeanor for violating certain provisions regarding wage withholdings.

d.   Labor Code § 226.6: Misdemeanor punishable by a fine of up to $1,000 and/or imprisonment of up to one year for failing to comply with itemized paystub requirements.

e.   Labor Code § 227: Felony punishable by imprisonment of up to five years and/or a fine of up to $1,000 for failing to make certain required payments to a health or welfare fund, pension fund, vacation plan, or similar benefit fund.

71.     AB 5 also extends the ABC test to the Unemployment Insurance Code, which imposes civil penalties for various violations, including:

a.   Unemployment Insurance Code § 1088.5(e): Fine of $24 per employee for failing to report the employee's hire within a specified time.

Gibson, Dunn & Crutcher LLP

27

b. Unemployment Insurance Code § 1112(a): Penalty of 15% for failure to pay unemployment contributions when due.

c. Unemployment Insurance Code § 1126.1: Fine of $100 per unreported employee for failure to register as an employer.

72.   The Private Attorneys General Act also authorizes employees to sue to recover civil penalties for Labor Code violations, including misclassification.  *See* Cal. Labor Code §§ 2698 *et seq.*  Employees may sue on behalf of themselves, other employees, or the State of California.  In addition to seeking any civil penalties that the Labor and Workforce Development Agency may assess under the Labor Code, the Act allows the private plaintiffs to seek a civil penalty of $100 "for each aggrieved employee per pay period" for an "initial violation," and $200 "for each aggrieved employee per pay period for each subsequent violation." *Id.* § 2699(f)(2).

73.   There are millions of app-based independent service providers in California.  Company Plaintiffs separately contract with thousands of independent service providers like Individual Plaintiffs, many of whom use the app-based platforms of multiple network companies simultaneously.  If network companies are forced to change their business models or to stop doing business in the State in a manner consistent with the sponsors of AB 5's expressed intent, it will harm their actual employees.  It also will harm the independent service providers with whom the network companies contract.  If network companies could continue to operate in California, their economic model may look radically different if AB 5 is enforced against them in a manner consistent with the sponsors' state intent—and cost work opportunities for thousands of independent service providers.

**V.   If AB 5 Were Enforced Against Company Plaintiffs In A Manner Consistent With The Sponsors' Stated Intent To Require Reclassification Of Their Independent Contractors As Employees, It Would Cause Substantial**

Gibson, Dunn & Crutcher LLP

**Economic And Non-Economic Harms—To The Independent Service Providers, Companies, And Many Others.**

74.     Company Plaintiffs, and many other similarly situated companies in California and across the country, built their businesses by creating apps, websites, and other technologies for the on-demand economy.  These companies operate on-demand app-based platforms that connect those willing to pay for a service with those willing to provide it.  It is because independent service providers have the flexibility, freedom, and independence to pick and choose which jobs they want to perform and when they want to perform them that the business model has been so successful.  Many workers would stop doing on-demand work if they no longer had this freedom and were, instead, forced into a formal employer-employee relationship with set hours, inflexible schedules, supervision, and other rigid formalities that attach to such a relationship.  This decrease in app-based independent service providers would result in substantial economic and non-economic harm to the network companies, and even more significant harm to the workers who are denied this source of income and to customers who are denied the convenience, efficiency, reasonable prices, and availability of app-based on-demand services.

**A.     Lydia Olson**

75.     Lydia Olson is an independent driver who uses the Uber app (and other apps) to find passengers.

76.     Ms. Olson needs the flexibility that comes with being an independent service provider.  She takes care of her husband, who has multiple sclerosis.  Given his illness, it is not always foreseeable when she will be needed.  In the past, she has taken several days, or even weeks, off from work to care for him.  Thus she requires not only a stable and consistent income, but also flexibility in her hours.  It would be much harder—and perhaps impossible—to be able to care for her husband when she needs to, if she were an employee.  Ms. Olson holds an MBA from the University of California, Davis, has personal experience as an employee in several management positions, and

based on her experience does not believe a position as an employee would provide her the flexibility she needs.

77.   Ms. Olson runs her own consulting company.   This business varies substantially in terms of how many hours it demands from her.   To help stabilize her income, she uses the Uber app to connect with riders.   As an independent service provider, when the consulting business is slower, she can pick up more opportunities on the Uber app.   When it is busier, she can use the app less frequently—or stop entirely, and pick it up again when she has more time.   She values the ability to use Uber to supplement her income as needed, sometimes a little and sometimes a lot.   That would not be possible if she had a fixed schedule, needed to work a certain number of hours per week, or was prevented from working a certain number of hours in a given week.

**B.   Miguel Perez**

78.   Plaintiff Miguel Perez is a courier who uses the Postmates app to run his own delivery business.

79.   Mr. Perez previously drove a truck on the graveyard shift for FedEx Corporation.   He did not feel safe working overnight and did not like the rigidity of working a regular shift.

80.   Mr. Perez now runs his own delivery business primarily using Postmates, although he also uses many other platforms like Caviar, Grubhub, DoorDash, and Uber Eats when he finds fewer or less convenient referrals on Postmates.

81.   Mr. Perez earns approximately double what he previously earned driving for FedEx and feels safer as a result of not having to work the graveyard shift.   Because of the extra money he has made running his own delivery business, his wife was able to quit her job to spend more time with family.   Additionally, because Mr. Perez earns his income working for himself, he can deduct his business expenses from his taxes.

82.   Mr. Perez values the flexibility of working for himself.   He can take off whenever he wants to spend time with his family—whether for vacations or just to see his son play little league baseball—without requesting permission or even telling

anyone.  He never has to go into an office or attend trainings or meetings.  He also can accept or decline delivery requests at his option and often does so if a delivery address is too far away, it looks like it will take too long before the food is ready, or parking will be a big problem.  He has learned the streets and merchants in the Los Angeles area well, and he sets his own pace and uses his own strategy to get deliveries to his customers efficiently.

83.    Mr. Perez does not want to work as someone else's employee again.  That would upend his life.  He also fears that if Defendants are able to use the threat of enforcement under AB 5, consistent with the sponsors' stated intent, to force platform companies and independent service providers into rigid employer-employee relationships, platform companies will simply not be able to hire everyone who uses their apps as employees.  Many of these workers will no longer be able to enjoy the flexibility he appreciates so much—and they will lose important sources of income for themselves and their families on which they have relied for years.

### C.    Postmates

84.    Postmates is a technology company that operates an online marketplace and mobile platform (the "Postmates App") connecting local merchants, consumers, and independent couriers to facilitate the purchase, fulfillment, and, when applicable, local delivery of anything from takeout to grocery goods from merchants to the consumers. When the consumers place delivery requests from the local merchants, such as restaurants or grocery stores, through Postmates' App, nearby independent couriers receive a notification and can choose whether to accept the consumer's offer to pick up and complete the requested delivery.

85.    To begin making deliveries using the Postmates app, a courier must, among other things, execute a "Fleet Agreement," which provides: "The Parties intend this Agreement to create the relationship of principal and independent contractor and not that of employer and employee."

86.     Each courier is free to use the Postmates app as much or as little as he or she wants—there is no set schedule, minimum-hours requirement, or minimum-delivery requirement.  When a customer requests a delivery using the Postmates app, the app sends basic information about the delivery request to the closest available couriers, who may accept, reject, or ignore the request.  It is entirely up to them.

87.     If AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassifying these couriers as employees and thus deny Postmates the ability to contract with independent couriers, Postmates would be forced to change this business model.

**D.     Uber**

88.     Uber is a technology company that develops proprietary software used to create digital marketplaces, operated through app-based platforms (the "Uber Apps").  Through the use of proprietary algorithms, the Uber Apps connect individuals in need of goods or services with those willing to provide them.

89.      The most widely used Uber marketplace is operated through the Uber Rides App.  Riders download the Uber Rider App and independent drivers download the Uber Driver App, and in combination, the apps, connect riders to vehicles operated by independent service providers.  The Uber Rides Apps are used in cities throughout the world and facilitates the transportation of millions of riders each day.  Using the Uber Ride App, riders can connect with available transportation providers based on their location offering a variety of transportation options.

90.     To begin using the Uber Driver App, any driver must, among other things, execute a "Technology Services Agreement," which provides, in bold text: "the relationship between the parties under this Agreement is solely that of independent contracting parties," and "this Agreement is not an employment agreement, nor does it create an employment relationship."

91.     There is no typical driver who uses the Uber Driver App.  Drivers have a number of individual choices that will determine their work circumstances.  Each

independent driver is free to use the Uber Driver App as much or as little as he or she wants—there is no set schedule, minimum-hours requirement, or minimum-ride or minimum-delivery requirement.  Drivers use their own vehicles and tools, manage their own vehicle maintenance, oversee their own appearance and manner of serving riders, and determine their own driving routes and other aspects of the rides they give to riders.

92.    Many drivers who use the Uber Drivers App marketplace provide transportation services to earn supplemental income when convenient for them while working as an employee of an employer.  Other drivers accept referrals from the Uber Drivers App marketplace when convenient for them and work one or more freelance jobs, such as a property manager, realtor, or graphic designer.  Still other drivers have no employer and selectively accept referrals from the Uber Drivers App, perhaps because they care for a loved one who is sick; they have small children; or they have other commitments that prevent them from regularly accepting referrals.  *See* Declarations of Putative Class Members, *O'Connor v. Uber Techs. Inc.*, No. CV-13-03826-EMC (N.D. Cal. July 9, 2015) (Dkt. 307); Evangelis Declaration Exhibits 1–40 *O'Connor v. Uber Techs. Inc.*, No. CV-13-03826-EMC (N.D. Cal. July 9, 2015) (Dkt. 299) (charts compiling these declarations, demonstrating heavy variation across drivers who use the Uber App).

93.    As with other network companies, if AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to reclassify drivers in California as employees, it would invalidate Uber's Technology Services Agreement with the drivers, deprive many part-time drivers of the opportunity to accept referrals from the Uber Drivers App, and impose substantial costs and burdens on Uber that, ultimately, would harm consumers.

\*   \*   \*

94.    Many other network companies use apps and similar technology to pair workers with customers willing to pay for the performance of a certain task.  If AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent

to classify these independent service providers as employees of the companies, it would force the companies to incur huge costs.  It also would allow fewer people to work in the on-demand economy.  One study, for example, found that reclassification would increase an app-based transportation company's operating costs by 20% and lead to approximately 300,000 fewer drivers in California.[45]

95.    Reducing the number of drivers would mean longer wait times and reduced service areas for consumers, undermining the on-demand marketplace of Uber and other network companies.  Whereas the independent service providers can currently choose to take an on-demand opportunity (or not) wherever they happen to be, an employment model is invariably based on set shifts in a dedicated location during set hours.

96.    Moreover, the contracts between many platform companies and independent service providers treat—and/or explicitly classify—the workers as independent service providers.  These contracts make clear that the companies do not have certain obligations to the workers as employees under the Labor Code, and also that the independent service providers do not have the same obligations to the platform companies as they would if those companies were traditional "employers."  If AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require platform companies to reclassify independent service providers as employees, these contracts would become invalid, unlawful, or otherwise unenforceable.

97.    If AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require platform companies to reclassify independent service providers as employees, this would impose major administrative, payroll, legal, and other burdens on them.  The massive costs that enforcement of AB 5 would force upon many platform companies were not lost on California lawmakers; imposing these costs was their intent.

98.    Independent service providers too could face reduced work opportunities and more taxes, as reclassification would make it "more difficult for them to claim

---

[45]  *See* Beacon Economics LLC, *supra* note 12, at 2.

federal income tax deductions for business expenses" and could preclude them from benefiting from other tax deductions.[46]

99.     These adverse consequences for workers could be especially substantial for those who "multi-app" when searching for work opportunities.  Instead of being an independent service provider who can operate several apps at once to pick and choose which tasks to perform and where to perform them, the new employees will have to pick one "employer" to work for—and do so under the direction of that new employer.  The flexibility that has defined the on-demand economy, fueled its growth, and empowered independent service providers would be replaced with the rigid and inflexible 9-to-5 business model to the detriment of network companies, independent service providers, and, ultimately, consumers.

## COUNT I
**Declaratory Relief:  Violation of the U.S. Constitution's Equal Protection Clause**

100.   Plaintiffs incorporate all other paragraphs of this Complaint.

101.   AB 5 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because it draws classifications between network companies and non-network companies without a rational basis for distinguishing between the two groups.

102.   Likewise, the statute draws irrational distinctions between independent service providers and non-independent service providers that perform substantially the same work, disfavoring independent service providers relative to similarly situated non-independent service providers.  Laws unconstitutionally singling out a certain class of citizens for disfavored legal status or general hardships are rare.  AB 5 is such an exceptional and invalid form of legislation.

103.   No sophisticated economic analysis is required to see the pretextual nature of California's proffered explanations for AB 5's differential treatment.  There is no

---

[46] Howard Gleckman, *Will California's New Labor Law Change the Way Gig Workers Are Taxed?*, Tax Policy Ctr. (Sept. 20, 2019), https://www.taxpolicycenter.org/taxvox/will-californias-new-labor-law-change-way-gig-workers-are-taxed.

1   rational distinction between network companies and many of the non-network
2   companies granted exemptions under AB 5.  The California legislators' focus on
3   subjecting network companies to AB 5, and their willingness to grant a laundry list of
4   non-network company exemptions in order to spare those types of companies the costs
5   and burdens of complying with AB 5, demonstrates irrational animus against network
6   companies in violation of their equal protection rights.  This type of singling out, in
7   connection with a rationale so weak that it undercuts the principle of non-contradiction,
8   fails to meet even the relatively easy standard of rational basis review.

9       104.   Strict scrutiny review applies because AB 5 is designed to burden,  and if
10  enforced against independent service providers like Individual Plaintiffs and network
11  companies such as Company Plaintiffs in a manner consistent with the sponsors' stated
12  intent would burden, the fundamental rights of network companies and workers to
13  pursue their chosen profession and determine when and how they earn a living.

14      105.   In addition, there is no rational basis for targeting network companies for
15  disfavored treatment.  For example, AB 5 ostensibly exempts business-to-business
16  services, freelance writers, grant writers, graphic designers, insurance agents, direct
17  sellers, manicurists, hair dressers, and real estate agents.  The independence, autonomy,
18  and other characteristics of these types of workers are substantially similar to app-based
19  independent service providers.

20      106.   If the California legislature's goal in enacting AB 5 truly were to protect
21  workers from perceived harms caused by perceived misclassification and to prevent
22  employers from skirting their earnings and safety obligations, the statute would not
23  contain the dozens of exemptions that leave so many workers outside of its purported
24  protective umbrella.  Where, as here, the breadth of the statute is so discontinuous with
25  the reasons offered for it that the statute seems inexplicable by anything but animus
26  toward the class it is designed to single out, the statute lacks a rational relationship to
27  legitimate state interests.  And where, as here, the exclusion of certain workers from

28

licensing requirements is inconsistent with asserted state interests, the law violates equal protection.

107.   Not only is animus toward the on-demand economy the only *possible* explanation for the express exemption of a litany of similarly situated companies but not platform companies, but it is also the *actual* explanation for the scheme.   The public record is filled with statements by California legislators who voted for the bill, including the sponsor of AB 5, attacking platform companies specifically, targeting such companies in their support of AB 5, and stating their view that AB 5 will stop the purported "unscrupulous" business practices of such companies.

108.   This sort of malicious, irrational, and plainly arbitrary action by state officials defeats AB 5 under the rational relation test.

109.   The manner in which AB 5's exemptions were created further confirms that the statute violates the Equal Protection Clause.   Many exemptions resulted from "back door" deals and political favors to industry groups—*i.e.*, not a valid legislative purpose.[47] For example, "among truckers, only those who tow disabled vehicles or haul building construction materials obtained exemptions."[48]   Platform companies also sought an express exemption as the statute was moving through the California legislature, but were denied exemptions.

110.   Legislatures may not draw lines for the purpose of arbitrarily excluding individuals, including by doing so as a concession to one constituent but not another. Yet, the sponsors of AB 5 included the exemptions solely in response to the demands of political constituents.

111.   Moreover, although its legislative proponents claim that the statute will prevent "exploitation" of independent service providers, if enforced consistent with AB 5's sponsors' stated intent to prevent network companies from contracting with

---

[47]   *See* Skelton, *supra* note 30 ("How do you qualify for an exemption?   Answer: pressure and persistence.   Better also hire a lobbyist.   And, of course, it helps to be a political supporter." (internal quotation marks omitted)).

[48]   Skelton, *supra* note 30.

independent contractors, AB 5 will instead void their valuable contracts with network companies and cripple their fundamental right to pursue their lawful occupation, while simultaneously carving out a laundry list of exemptions for dozens of classes of independent contractors who are, by the logic employed by AB 5's proponents, equally "exploited" by the businesses with whom they contract. By the sponsors' logic, AB 5 makes it more likely that workers in the exempted businesses will be "exploited," given that the statute excludes those workers from the *Dynamex* standard they would otherwise be subject to for certain wage order claims. Thus, AB 5 is so discontinuous with the reasons offered for it that it is inexplicable by anything but animus toward the class it is designed to affect, lacks a rational relationship to legitimate state interests, and violates equal protection.

112.   Plaintiffs have no adequate remedy at law.

## COUNT II

**Declaratory Relief:  Violation of the California Constitution's Equal Protection Clause**

113.   Plaintiffs incorporate all other paragraphs of this Complaint.

114.   For substantially the same reasons as described in Count I, AB 5 violates Article 1, Section 3(b)(4) of the California Constitution.

115.   Plaintiffs will be deprived of equal protection under the law in violation of the California Constitution if AB 5 is enforced against them.

## COUNT III

**Declaratory Relief:  Violation of the California Constitution's Inalienable Rights Clause**

116.   Plaintiffs incorporate all other paragraphs of this Complaint.

117.   AB 5 violates Article I, Section 1 of the California Constitution, which provides:  "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

Gibson, Dunn &
Crutcher LLP

118.   AB 5 violates this provision because it infringes the rights of network companies and independent service providers to pursue their chosen profession, which is an essential component of liberty, property, happiness, and privacy.  On-demand work is an occupation, even if it is a specific or particular one.  AB 5 infringes the right to pursue this occupation.  It also infringes the rights of network companies, independent service providers, and customers to make contracts governing their occupations and purchases, and to associate with one another.  The freedom to enter into their own work agreements, and to buy services from willing sellers, are of paramount importance to network companies, independent service providers, and customers.  The right to pursue their chosen occupation is the very essence of independent service providers' and network companies' personal freedom and opportunity.

119.   To the extent it is enforced consistent with the sponsors' intent of forcing network companies to reclassify independent service providers as employees, AB 5 deprives network companies and independent service providers of these rights by forbidding them from entering into their chosen work arrangements—that of independent service providers, with the flexibility and autonomy that entails.  The sponsors of AB 5 seek to destroy the chosen occupation of independent service providers and platform companies—to make independent service providers like Plaintiff Perez and Plaintiff Olson into employees, and to make technology companies like Uber and Postmates into delivery companies.  And in doing so, they would impose massive obligations on both network companies—which must comply with a host of laws governing employers—and independent service providers—who must comply with duties that bind employees, such as the duty of loyalty to one's employer.  In addition, mandatory reclassification would not only replace independent service providers' chosen working relationships with an entirely different one, but it also would force many independent service providers out of their lines of work entirely, because network companies cannot hire every on-demand worker as an employee.

Gibson, Dunn &
Crutcher LLP

120.   The interference with, and deprivation of, these rights is unreasonable and arbitrary.  AB 5 is not narrowly tailored to any compelling governmental interest, nor is the least restrictive means to serve any such end.  It is not even rationally related to any legitimate governmental interest.  It has no substantial relation to the public, health, safety, or morals, or to the general welfare, and it is not congruous with any legitimate purpose the government may proffer.  For example, AB 5 is unrelated to serving any interest in worker protection because it outlaws working relationships of the workers' own choosing and undermines their flexibility and autonomy by imposing rigid and duty-laden employer-employee relationships on the on-demand economy.  Any overlap with traditional employment is both minimal and irrelevant.  The current employment regulatory structure is not a rational fit for the on-demand economy; rather, it impedes the convenience and flexibility that are at its heart.  Moreover, AB 5 plainly does not serve consumer needs; the actual incidence of any harm the government could proffer is extremely rare.  Rather, AB 5 is motivated by animus towards the on-demand economy and its occupations, and a desire to protect politically favored constituents.  These purposes show that any proffered rational basis for AB 5 is illusory.

## COUNT IV
### Declaratory Relief:  Violation of the U.S. Constitution's Due Process Clause
### (Right To Pursue Chosen Occupation)

121.   Plaintiffs incorporate all other paragraphs of this Complaint.

122.   For substantially the same reasons set forth in Count III, AB 5 violates the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution.

123.   In addition, California businesses have a constitutionally protected interest in operating free from unreasonable governmental interference.  Businesses are therefore protected from baseless or invidiously discriminatory standards and have a right to be free from excessive and unreasonable government conduct intentionally directed toward them to force them out of business.

124.  The public record is replete with evidence showing that California legislators supported AB 5 in an effort to isolate and harm platform companies, if not put them out of business.

125.  The legislature's circuitous path to legitimate ends, when a direct path is available, shows that AB 5 lacks a rational basis.  If California wanted to provide independent service providers access to certain benefits and protections, it could have passed more direct and less-restrictive measures to achieve that end.  For example, platform companies advocated for legislation that would allow for creation of an independently administered "portable benefits" fund into which all rideshare companies would pay.[49]  The fund would pay for a series of benefits chosen by drivers, including paid sick leave, paid time off, and disability coverage if a driver could not work due to an accident while driving.[50]  Independent service providers would own these benefits and keep them irrespective of what type of on-demand work they performed.

126.  The malicious and arbitrary purpose of the statute—combined with the back-room dealing that led to its laundry list of irrational exemptions—creates a "wholly arbitrary" standard in violation of due process.

## COUNT V
**Declaratory Relief:  Violation of the California Constitution's Due Process Clause (Right To Pursue Chosen Occupation)**

127.  Plaintiffs incorporate all other paragraphs of this Complaint.

128.  For substantially the same reasons set forth in Counts III and IV, AB 5 violates the Due Process Clause of Article I, Section 7 of the California Constitution.

---

[49]  *See, e.g.,* Open Letter from David Rolf, President, SEIU 775, Dara Khosrowshahi, CEO, Uber, & Nick Hanauer, Founder, Civic Venture Partners, *An Open Letter to Business, Labor and Government: Building a Portable Benefits System for Today's World* (Jan. 23, 2017), https://ubernewsroomapi.10upcdn.com/wp-content/uploads/2018/01/Portable-Benefits-Principles-FINAL.pdf.

[50]  *See* Uber Commc'ns & Policy Team, *Moving Work Forward in California*, Medium (Aug. 29, 2019), https://medium.com/uber-under-the-hood/moving-work-forward-in-california-7de60b6827b4.

Gibson, Dunn & Crutcher LLP

## COUNT VI

### Declaratory Relief:  Violation of the U.S. Constitution's Ninth Amendment

129.   Plaintiffs incorporate all other paragraphs of this Complaint.

130.   For substantially the same reasons set forth in Counts III, IV, and V, AB 5 violates the Ninth Amendment to the U.S. Constitution.

131.   The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments.  The right to work on one's own terms—as an independent service provider, rather than an employee—is one of those fundamental rights.

## COUNT VII

### Declaratory Relief:  Violation of the California Constitution's Baby Ninth Amendment

132.   Plaintiffs incorporate all other paragraphs of this Complaint.

133.   For substantially the same reasons set forth in Counts III, IV, V, and VI, AB 5 violates Article I, Section 24 of the California Constitution.

## COUNT VIII

### Declaratory Relief:  Violation of the California Constitution's Due Process Clause

134.   Plaintiffs incorporate all other paragraphs of this Complaint.

135.   For substantially the same reasons as described in Counts I through VII, Company Plaintiffs would be deprived of due process in violation of Article I, Section 7 of the California Constitution if AB 5 is enforced against them as the statute's sponsors intend.

## COUNT IX

### Declaratory Relief:  Violation of the U.S. Constitution's Contracts Clause

136.   Plaintiffs repeat and incorporate all other paragraphs of this Complaint.

137.   Article 1, Section 10 of the Constitution provides:  "No state shall . . . pass any . . . Law impairing the Obligation of Contracts."

Gibson, Dunn &
Crutcher LLP

138.   Company Plaintiffs are parties to valid contracts with the independent service providers who operate on their platforms, including Individual Plaintiffs.   These contracts establish that the workers are independent contractors for the purposes of their work found by using the app-based platforms of the Company Plaintiffs.

139.   If AB 5 were enforced consistent with the sponsors' intent in a way that required Company Plaintiffs to reclassify independent service providers who use their apps as employees, this would invalidate these existing contracts between Company Plaintiffs and the independent service providers who operate on their platforms, including Company Plaintiffs' contracts with Individual Plaintiffs.

140.   Such reclassification of the independent service providers who operate on Company Plaintiffs' platforms would substantially impair existing contracts between Company Plaintiffs and the independent service providers, including Individual Plaintiffs.

141.   The classification of independent service providers under the existing contracts between Company Plaintiffs and the independent service providers, including Individual Plaintiffs, is a critical feature of Company Plaintiffs' total contractual relationship with the independent service providers who operate on Company Plaintiffs' platforms.

142.   If AB 5 were enforced consistent with the sponsors' intent in a way that required reclassification of independent service providers as employees, it would severely modify a key contractual right in existing contracts between Company Plaintiffs and the independent service providers, including Individual Plaintiffs.

143.   If AB 5 were enforced consistent with the sponsors' intent in a way that required reclassification of independent service providers as employees, it would impose new obligations under the existing contracts between Company Plaintiffs and the independent service providers, including Individual Plaintiffs, that Plaintiffs and the independent service providers did not voluntarily agree to undertake, such as providing health insurance, unemployment coverage, and other employment benefits.

144.   If AB 5 were enforced consistent with the sponsors' intent in a way that required reclassification of individual service providers as employees, it would wipe out numerous contractual obligations between Company Plaintiffs and independent service providers, including Individual Plaintiffs, under their existing contracts.

145.   If AB 5 were enforced consistent with the sponsors' intent in a way that required reclassification of individual service providers as employees, it would eliminate the critical flexibility that independent service providers, including Individual Plaintiffs, are guaranteed under their existing contracts with Company Plaintiffs.

146.   If AB 5 were enforced consistent with the sponsors' intent in a way that required reclassification of individual service providers as employees, it would severely undermine the contractual bargain between Company Plaintiffs and the independent service providers, including Individual Plaintiffs, under the existing contracts between Company Plaintiffs and independent service providers, including Individual Plaintiffs, because AB 5 eliminates the very essence of the contractual bargain in these existing contracts.

147.   If AB 5 were enforced consistent with the sponsors' intent in a way that required reclassification of individual service providers as employees, it would substantially interfere with the reasonable expectations under existing contracts between Company Plaintiffs and independent service providers, including Individual Plaintiffs, because reclassification eliminates the primary value of those contracts.

148.   Company Plaintiffs and Individual Plaintiffs had no reason to anticipate that AB 5, if enforced consistent with the sponsors' intent in a way that required reclassification of individual service providers as employees, would effectuate a dramatic departure from California's prior treatment of the existing contracts between Company Plaintiffs and independent service providers, including Individual Plaintiffs, when they bargained for these contracts.

149.   The classification of independent service providers, including Individual Plaintiffs, as independent contractors in the existing contracts between Company

Plaintiffs and independent service providers, including Individual Plaintiffs, had "obvious value" and was a significant factor in Company Plaintiffs' bargaining expectations when entering into these contracts.

150.   AB 5's purported reclassification of independent service providers, including Individual Plaintiffs, as employees of Company Plaintiffs prevents the parties from safeguarding or reinstating the rights held in the existing contracts.

151.   AB 5 is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

152.   AB 5 has no legitimate public purpose because the statute was enacted to target and harm platform companies.

153.   AB 5's impairment of the existing contracts between Company Plaintiffs and independent service providers, including Individual Plaintiffs, was not drawn with moderation and reason because it was drawn with the spirit to target and harm Company Plaintiffs.

154.   AB 5's irrational exemptions demonstrate California did not exercise the police power in passing it, but instead sought to provide a benefit to special interests while harming Company Plaintiffs.

155.   AB 5 does not reasonably advance the purpose of protecting workers because its exemptions leave numerous workers outside of its scope without any rational rhyme or reason.

156.   AB 5's narrow focus on Company Plaintiffs demonstrates that AB 5 was not enacted to protect any broad societal interest.

157.   AB 5's ostensible legislative purpose of helping workers is "suspect" because the legislature excluded similarly situated workers without explaining the necessity for such exemptions to advance its legislative purpose.

158.   The forced reclassification AB 5's sponsors intended would unreasonably and substantially impair the existing contracts between Company Plaintiffs and

Gibson, Dunn & Crutcher LLP

independent service providers, including Individual Plaintiffs, because an evident and more moderate course would have served the State's purported purpose equally well.

159.  If forced reclassification of independent service providers, including Individual Plaintiffs, as employees was necessary to protect workers, then the California Legislature would not have irrationally exempted from reclassification, without explanation, numerous categories of Individual Plaintiffs engaged in the exact same conduct as independent service providers, including Individual Plaintiffs.

160.  AB 5 therefore violates the Contracts Clause of the U.S. Constitution, and this violation is actionable under Section 1983 of Title 42 of the U.S. Code.

<u>COUNT X</u>
**Declaratory Relief:  Violation of the California Constitution's Contracts Clause**

161.  Plaintiffs incorporate all other paragraphs of this Complaint.

162.  For substantially the same reasons as described in Count IX, enforcement of AB 5 against Company Plaintiffs as intended by the statute's sponsors also would violate Article I, Section 9 of the California Constitution, which provides that a "law impairing the obligation of contracts may not be passed."

<u>COUNT XI</u>
**Injunctive Relief**

163.  Plaintiffs incorporate all other paragraphs of this Complaint.

164.  Defendants should be preliminarily and permanently enjoined from enforcing AB 5 against Company Plaintiffs.

165.  If enforcement of AB 5 were to force the reclassification of Individual Plaintiffs from independent contractors to employees, Individual Plaintiffs would suffer severely and irreparably.  Individual Plaintiffs both rely heavily on this independence and flexibility for their income, and because they care for ailing and struggling family members.  Absent an injunction, they will suffer severe irreparable harm.

166.  If required to reclassify independent service providers as employees, Company Plaintiffs would incur immediate injury for which there is no adequate remedy at law, including because the statute violates their constitutional rights, threatens their

business models, and forces them to incur unrecoverable administrative and compliance costs. Constitutional violations constitute *per se* irreparable harm.

167. Forced reclassification also would require Company Plaintiffs to retrain staff, consult with legal counsel, and develop new compensation, benefits, and other policies.

168. These injuries would result directly from enforcement of AB 5 in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy against Company Plaintiffs, cannot be adequately compensated by money damages, and would be irreparable absent preliminary and permanent injunctive relief.

169. These injuries are preventable and redressable with appropriate injunctive relief that prevents Defendants from giving effect to or enforcing the statute against Company Plaintiffs.

170. The balance of harms weighs in favor of injunctive relief. Defendants cannot claim an interest in the enforcement of an unconstitutional law. Nor can they plausibly claim harm from an injunction prohibiting enforcement of a statute that purports merely to clarify preexisting law.

171. The public interest favors injunctive relief because many members of the public depend on their contractor status as a way to earn income without the burdens and rigid demands of a traditional 9-to-5 job.

172. Moreover, depriving the public of the ability to transact with on-demand contractors would increase prices, increase wait times, and reduce access to important services, particularly in low-income and rural areas.

## **PRAYER FOR RELIEF**

Plaintiffs ask this Court to order appropriate relief, including, but not limited to, the following:

    A. enter a judgment declaring that AB 5 is invalid and unenforceable against Company Plaintiffs because enforcement as intended by the statute's

sponsors would violate the equal protection clauses of the United States Constitution and the California Constitution;

B.  enter a judgment declaring that AB 5 is invalid and unenforceable against Company Plaintiffs because enforcement as intended by the statute's sponsors would violate the Inalienable Rights Clause of the California Constitution, due process clauses of the California Constitution and the Fourteenth Amendment to the United States Constitution, the Ninth Amendment to the United States Constitution, and/or the Baby Ninth Amendment to the California Constitution;

C.  enter a judgment declaring that AB 5 is invalid and unenforceable against Company Plaintiffs because enforcement would violate the contracts clauses of the United States Constitution and/or the California Constitution;

D.  enter a preliminary injunction, pending final resolution of this action, enjoining Defendants from taking any action to enforce AB 5 against Company Plaintiffs;

E.  enter a permanent injunction enjoining Defendants from taking any action to enforce AB 5 against Company Plaintiffs;

F.  grant Plaintiffs an award of reasonable attorney's fees under 42 U.S.C. § 1988; and

G.  grant Plaintiffs such additional or different relief as the Court deems just and proper.

Dated: December 30, 2019

By:  _/s/ Theane Evangelis_
Theane Evangelis
Attorney for Plaintiffs

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs demand trial by jury on all issues so triable.

3

4

Dated:  December 30, 2019

5

6

7                                                        By:   */s/ Theane Evangelis*
                                                                Theane Evangelis

8                                                               Attorney for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP