GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
    TEvangelis@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
    BEvanson@gibsondunn.com
HEATHER L. RICHARDSON, SBN 246517
    HRichardson@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA,
    SBN 254433
    DManthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
    JLipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Tel: 415.393.8200
Fax: 415.393.8306

Attorneys for Plaintiffs Lydia Olson, Miguel Perez,
Postmates Inc., and Uber Technologies, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYDIA OLSON, MIGUEL PEREZ, POSTMATES INC., and UBER TECHNOLOGIES, INC.<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA; XAVIER BECERRA, in his capacity as Attorney General of the State of California; and "JOHN DOE," in his official capacity,<br><br>Defendants. | CASE NO.  2:19-cv-10956-DMG-RAO<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:      Hon. Dolly M. Gee<br>Hearing Date: February 7, 2020<br>Time:       2:00 P.M. |

Gibson, Dunn & Crutcher LLP

Memorandum in Support of
Plaintiff's Motion for
Preliminary Injunction

Case No. 2:19-cv-10956

# TABLE OF CONTENTS

Page(s)

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

BACKGROUND ........................................................................................................ 2

LEGAL STANDARD ................................................................................................ 6

ARGUMENT ............................................................................................................. 7

I.     Plaintiffs Are Likely To Succeed On The Merits ................................ 7

     A.    AB 5's Sponsors Irrationally Targeted Network Companies And On-Demand Workers In Violation Of Equal Protection. .................... 7

          1.  AB 5 Is Motivated By Animus. .............................................. 8

          2.  The Exemptions Do Nothing But Protect Politically Favored Groups. ..................................................................................... 9

          3.  AB 5 Does Not Advance Its Purported Purpose. .................. 11

     B.    Denying On-Demand Workers Their Right To Pursue Their Chosen Occupation Would Deprive Them Of Liberty Without Due Process. ............................................................................................ 12

     C.    Enforcement Of AB 5 Would Unconstitutionally Impair Plaintiffs' Contracts. ................................................................................ 13

          1.  Substantial Impairment. ........................................................ 14

          2.  "Reasonable" and "Appropriate" Tailoring. .......................... 15

II.    Forced Reclassification Would Irreparably Injure Plaintiffs ............ 16

          1.  Irreparable Injury To The Individual Plaintiffs. ................... 17

          2.  Irreparable Injury To The Company Plaintiffs. .................... 19

III.   The Balance Of Harms Favors A Preliminary Injunction ............... 22

IV.   The Public Interest Sharply Favors A Preliminary Injunction ........ 23

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ajilon Prof'l Staffing, LLC v. Griffin*,
  2009 WL 976522 (D. Ariz. Apr. 10, 2009) ............................................................ 18

*Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., W. Va.*,
  488 U.S. 336 (1989) ................................................................................................ 11

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................................. 6

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978) ................................................................................... 14, 15, 16

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ..................................................................... 18, 19, 22

*Arc of California v. Douglas*,
  757 F.3d 975 (9th Cir. 2014) ............................................................................ 16, 17

*Arizona Dream Act Coal. v. Brewer*,
  855 F.3d 957 (9th Cir. 2017) .................................................................................. 23

*Ass'n of Surrogates & Sup. Ct. Reporters in City of N.Y. v. State of N.Y.*,
  940 F.2d 766 (2d Cir. 1991) ................................................................................... 14

*Cal Fire Local 2881 v. California Pub. Employees' Ret. Sys.*,
  6 Cal. 5th 965 (2019) .............................................................................................. 14

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
  563 F.3d 847 (9th Cir. 2009), ................................................................................. 21

*Cal. Trucking Ass'n v. Becerra*,
  No. 3:18-cv-02458-BEN-BLM (S.D. Cal. Dec. 31, 2019) ...................................... 23

*Campanelli v. Allstate Life Ins. Co.*,
  322 F.3d 1086 (9th Cir. 2003) ................................................................................ 15

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
  840 F.2d 701 (9th Cir. 1988) ................................................................................... 18

*Chamber of Commerce of U.S. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ................................................................................ 21

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*City of Cleburne v. Cleburne Living Center*,
    473 U.S. 432 (1985) ............................................................................ 7

*Cornwell v. Hamilton*,
    80 F. Supp. 2d 1101 (S.D. Cal. 1999) ............................................. 13

*Craigmiles v. Giles*,
    312 F.3d 220 (6th Cir. 2002) ............................................................ 9

*Douglas v. Indep. Living Ctr. of S. California, Inc.*,
    565 U.S. 606 (2012) .......................................................................... 21

*Dynamex Operations W. Inc. v. Superior Court*,
    4 Cal. 5th 903 (2018) ......................................................................... 5

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) .......................................................................... 10

*Equip. Mfrs. Inst. v. Janklow*,
    300 F.3d 842 (8th Cir. 2002) .......................................................... 15

*Fowler Packing Co., Inc. v. Lanier*,
    844 F.3d 809 (9th Cir. 2016) ................................................. 9, 10, 11

*Ganley v. Claeys*,
    2 Cal. 2d 266 (1935) ........................................................................ 13

*Garcia v. Google, Inc.*,
    766 F.3d 929 (9th Cir. 2014) .......................................................... 16

*Garris v. Hanover Ins. Co.*,
    630 F.2d 1001 (4th Cir. 1980) ........................................................ 14

*Greene v. McElroy*,
    360 U.S. 474 (1959) .......................................................................... 12

*Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*,
    307 F. Supp. 3d 1010 (E.D. Cal. 2018) ......................................... 12

*Hartford Steam Boiler Inspection & Ins. Co. v. Harrison*,
    301 U.S. 459 (1937) .......................................................................... 10

*Hays v. Wood*,
    25 Cal. 3d 772 (1979) .................................................................. 8, 10

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Horwitz-Matthews, Inc. v. City of Chicago*,
    78 F.3d 1248 (7th Cir. 1996) ................................................................. 14

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ............................................................ 23

*Lawson v. Grubhub Inc.*,
    302 F. Supp. 3d 1071 (N.D. Cal. 2018) ............................................... 15

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ................................................................... 6

*McPherson v. Blacker*,
    146 U.S. 1 (1892) .................................................................................... 9

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ................................................................ 23

*Merrifield v. Lockyer*,
    547 F.3d 978 (9th Cir. 2008) ................................................................ 11

*Metro. Life Ins. Co. v. Ward*,
    470 U.S. 869 (1985) .............................................................................. 11

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ................................................................ 16

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ........................................................................ 16, 19

*Nelson v. NASA*,
    530 F.3d 865 (9th Cir. 2008) ............................................................ 18, 19

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) .................................................................................... 8

*OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.*,
    602 Fed. App'x 669 (9th Cir. 2015) ...................................................... 7

*Philip Morris USA Inc. v. Scott*,
    561 U.S. 1301 (2010) ............................................................................ 21

*Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty., Ind.*,
    57 F.3d 505 (7th Cir. 1995) .................................................................... 8

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
### (*continued*)

Page(s)

*Purdy & Fitzpatrick v. State*,
   71 Cal. 2d 566 (1969) ................................................................. 12

*Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ....................................................... 22

*Republic of the Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988) ...................................................... 6

*Romer v. Evans*,
   517 U.S. 620 (1996) ............................................................ 8, 9, 12

*S.G. Borello & Sons, Inc. v. Dep't of Industrial Relations*,
   48 Cal. 3d 341 (1989) .................................................................. 5

*Santos v. City of Houston, Tex.*,
   852 F. Supp. 601 (S.D. Tex. 1994) .......................................... 8, 12

*Ex parte Scaranino*,
   7 Cal. 2d 309 (1936) ................................................................. 10

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
   709 F.3d 1281 (9th Cir. 2013) ..................................................... 6

*Squaw Valley Dev. Co. v. Goldberg*,
   375 F.3d 936 (9th Cir. 2004) ....................................................... 9

*St. Joseph Abbey v. Castille*,
   712 F.3d 215 (5th Cir. 2013) ...................................................... 11

*Sveen v. Melin*,
   138 S. Ct. 1815 (2018) ........................................................ 14, 15

*Truax v. Raich*,
   239 U.S. 33 (1915) .................................................................... 12

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) .................................................................... 9

*Vill. of Willowbrook v. Olech*,
   528 U.S. 562 (2000) .................................................................... 7

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................... 6

## TABLE OF AUTHORITIES
(*continued*)

<u>Page(s)</u>

*In re Workers' Comp. Refund*,
46 F.3d 813 (8th Cir. 1995) ....................................................................... 15, 16

**Constitutional Provisions**

U.S. Const. amend. IX ............................................................................................. 12

U.S. Const. amend. XIV, § 1 ............................................................................... 7, 12

U.S. Const. art I., § 10 ............................................................................................. 13

Cal. Const. art. I, § 1 ............................................................................................... 12

Cal. Const. art. I, § 7(a) ....................................................................................... 7, 12

Cal. Const. art. I, § 9 ............................................................................................... 13

Cal. Const. art. I, § 24 ............................................................................................. 12

**Statutes**

Cal. Gov't Code § 815(a) ......................................................................................... 22

Cal. Gov't Code § 820.6 .......................................................................................... 22

**Other Authorities**

Beacon Economics LLC, *How Many Drivers Would Lyft Recruit Under a
Traditional Work Arrangement?* Aug. 2019, https://images.kusi.com/
wp-content/ uploads/2019/09/Beacon-Economics-August-2019.pdf ..................... 24

Brendan Nyhan & Jason Reifler, *When Corrections Fail:  The Persistence
of Political Misperceptions*, 32 Pol'y Behav. 303 (2010) ................................... 22

CBS 47 KSEE24, *CA Senator Andreas Borgeas Calls AB5 Most 'Half-
hazard' Piece of Legislation He's Seen*, YouTube (Sept. 19, 2009),
https://www.youtube.com/watch?v=mwtSZRR-f0U ............................................. 6

David Brunori, *Contractors, Employees And The Sharing Economy: SALT
In Review* (Sept. 20, 2019), https://www.law360.com/tax-
authority/articles/1201352/contractors-employees-and-the-sharing-
economy-salt-in-review; .......................................................................................... 5

**TABLE OF AUTHORITIES**
(*continued*)

1

Page(s)

2   FLSA2019-6, Op. Letter from Keith E. Sonderling, Acting Administrator,
3       Wage and Hour Division, U.S. Dep't of Labor (Apr. 29, 2019)
        https://www.dol.gov/whd/opinion/FLSA/2019/2019_04_29_06_FLSA.
4       pdf ................................................................................................................... 15

5   James Sherk, *The Rise of the Gig Economy: Good for Workers and*
6       *Consumers*, Heritage Found. (Oct. 7, 2016),
        https://www.heritage.org/jobs -and-labor/report/the-rise-the-gig-
7       economy-good-workers-and-consumers ...................................................... 23

8
    Joshua Frulinger, *The gig economy is crashing: Freelance jobs at*
9       *UpWork sunk 31% in past month*, Thinknum Alternative Data,
10      https://media.thinknum.com/articles/gig-economy-broken/ ..................... 24

11  Kate Conger & Noam Scheiber, *California Bill Makes App-Based*
        *Companies Treat Workers as Employees*, N.Y. Times (Sept. 11, 2019),
12      https://www.nytimes.com/2019/09/11/technology/california-gig-
13      economy-bill.html ........................................................................................ 4

14  Katy Grimes, *How Assemblywoman Lorena Gonzalez was Forced to*
15      *Author AB 170 and Voted NO on Her Own Bill*, Cal. Globe (Sept. 16,
        2019), https://californiaglobe.com/section-2/how-assemblywoman-
16      lorena-gonzalez-was-forced-to-author-ab-170-and-voted-no-on-her-
17      own-bill/ ....................................................................................................... 10

18  Miriam Pawel, *You Call It the Gig Economy.  California Calls It*
19      *"Feudalism,"* N.Y. Times (Sept. 12, 2019), https://www.nytimes.com/
        2019/09/12/opinion/california-gig-economy-bill-ab5.html ........................ 4

20
    Rachel Uranga, *Port Truckers Brake for AB 5*, L.A. Bus. J. (Oct. 4, 2019),
21      https://labusinessjournal.com/news/2019/oct/04/port-truckers-brake-
22      ab5logistics-companies-drivers/ .................................................................. 5

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

The legislators who sponsored AB 5 irrationally, and unconstitutionally, targeted independent service providers and app-based network companies in the on-demand economy.  And if AB 5 were enforced as its sponsors intend and have threatened, Plaintiffs Lydia Olson and Miguel Perez (together, "Individual Plaintiffs"), would suffer severely in their ability to earn an income in the manner of their choosing.  Plaintiffs Postmates and Uber (together, "Company Plaintiffs") would also be harmed irreparably, as would consumers and the public in general, which have come to rely on the on-demand economy and the attendant benefits to independent service providers, merchants, consumers, and many others.

The "on-demand economy" has brought a technological revolution to California's (and the world's) economy, through which a variety of apps developed by technology companies connect independent service providers to consumers looking for their services.  For the independent service providers, this innovation provides income without requiring them to conform their lives to the dictates of a traditional work schedule or to pledge their loyalty to a single employer.

Ms. Olson, for example, can run her own independent consulting business while caring for her husband who has multiple sclerosis, all while supplementing her primary income by performing on-demand work when the timing suits her.  Mr. Perez earns nearly twice as much money as an app-based independent service provider than he did working full-time as a trucker—so much more that his wife has been able to quit her job to care for their young daughter, and the family has climbed out of debt to start saving for a home.  As his own boss in the on-demand economy, he never has to miss his son's little league baseball games because a supervisor has called him into work, and he is never required to work the graveyard shifts he dislikes.

Legions of individuals have similar stories.  A single parent, for example, whose family obligations preclude full-time work, can earn money using the Uber Driver App to connect with consumers seeking a ride.  An individual who works full-time and

Gibson, Dunn &
Crutcher LLP

Memorandum in Support of
Plaintiffs' Motion for
Preliminary Injunction

1

Case No. 2:19-cv-10956

supplements W-2 income with earnings from delivery leads received through the Postmates App can invest earnings in a tuition fund for her child. A student can make occasional deliveries, but spend the end of the semester studying for finals and, during that time, never open the app. These independent service providers—and hundreds of thousands like them—have benefitted immeasurably from the flexibility and control that on-demand work offers. *See* Compl. ¶¶ 5–6, 92 & n.3; McCrary Decl. ¶¶ 24–26.

The sponsors of AB 5 explicitly, and unapologetically, sought to take away this flexibility and independence. They targeted network companies, and irrationally exempted dozens of other professions, in violation of the Equal Protection and Due Process Clauses. And if enforced the way its sponsors intend—to wipe out contracts between independent service providers and network companies in California—AB 5 would dramatically reshape the industry, invalidating hundreds of thousands of contracts that have been in place for years, and forcing parties to enter into new contracts against their will, in violation of the Contracts Clause.

The harm from enforcement of the statute in this way would be immeasurable and irreparable, and would reach not only the Individual and Company Plaintiffs, but the entire economy. It would turn the technological clock backwards by a decade and abandon the immense benefits the on-demand economy has made possible. The momentous disruption to Plaintiffs—and the daily lives of millions of Californians— threatened by AB 5 raises significant constitutional questions that should be examined by this Court before it is enforced.

## BACKGROUND

Network companies have been an engine of economic growth and job creation in California, across the country, and around the world. *See* Compl. ¶ 4. Postmates Inc., for example, operates an app-based platform that connects customers wishing to purchase goods (such as food) with local merchants and, when applicable, with couriers willing to deliver the purchased good. Uber Technologies, Inc. operates an app-based platform that matches customers looking for a ride with drivers willing to provide that

ride, among other apps.  Other network companies operate platforms that match persons willing to pay someone to provide any number of other services.  The on-demand economy has dramatically reduced drunk driving deaths, increased convenience, and expanded opportunities for local businesses and their patrons.  *See id.* ¶ 8.

Hundreds of thousands of Californians have chosen to work as independent service providers in the on-demand economy, integrate on-demand work into their existing lifestyles, and maintain a ready source of income.

Plaintiff Lydia Olson chose on-demand work because, as the owner of a small consulting business, she needed a steady, reliable income stream.  The flexibility on-demand work provides has also allowed her to care for her husband who suffers from multiple sclerosis and often needs her assistance with little to no notice, making traditional employment challenging.  Olson Decl. ¶ 3.  She intentionally chooses to work as an independent contractor because of the flexibility and autonomy such work provides, and does not want—nor has ever wanted—to work as an employee.  *Id.* ¶ 7.

Plaintiff Miguel Perez chose on-demand work to avoid the risks associated with driving a truck during the graveyard shift; to allow his wife to be closer to their daughter who suffers from separation anxiety; to permit him to regularly attend his son's baseball practices and games; and to simultaneously increase his own income, climb out of debt, and start saving for a home.  Perez Decl. ¶¶ 8, 18.

Independent service providers work as much or as little as they want, whenever they want, and wherever they want.  A father might choose on-demand work for the flexibility to work around his children's soccer games and ballet performances.  A retiree might choose on-demand work to supplement fixed income and to meet new people.  A military spouse might choose on-demand work to help ease the burdens of frequent relocation.  Still others might choose on-demand work as a way to supplement "traditional" full-time work or to bridge the gap between salaried positions.  The flexibility and autonomy offered by the on-demand economy to workers on a mass scale is unprecedented.  *See* Compl. ¶¶ 5–6, 8, 92 & n.3; McCrary Decl. ¶¶ 24–26.

---

As set forth at length in the Complaint (¶¶ 63–68), the sponsors of AB 5 openly stated their intent to target the on-demand economy:

- Assemblywoman Lorena Gonzalez, the sponsor and lead drafter of the bill, repeatedly explained that AB 5 was designed to stop network companies from working with independent contractors and instead force them to hire employees. *Id.* ¶¶ 15–18, 63–68.  On September 11, 2019, she criticized network companies for "rely[ing] on a contract workforce" and pronounced that AB 5 will stop such companies from relying on independent contractors.  *Id.* ¶ 64b.

- Assembly Speaker Anthony Rendon, the principal coauthor of the bill, stated similarly that with AB 5, "we're in a position" to force network companies to reclassify independent service providers as employees.  *Id.* ¶ 65a.   He stated that the on-demand economy "crushes the dreams and lives of workers."  "When you hear about folks talking about the new economy, the gig economy, the innovation economy," according to Rendon, "it's f—g feudalism all over again."[1]

- Advocating for AB 5, Assemblywoman Buffy Wicks similarly stated her desire to target network companies through passage of AB 5.  Compl. ¶ 65b.

- State Senator (and Co-Author of the Bill) Maria Durazo said that "the so-called gig companies present themselves as the innovative future of tomorrow, a future where companies don't pay Social Security or Medicare."[2]

These and many other public comments make clear what countless commentators have recognized:  AB 5 "is clearly aimed at modern companies like Uber and Lyft—and

---

[1]   @Rendon63rd, Twitter (July 10, 2019, 4:40 PM), https://twitter.com/Rendon63rd/status/1149101100928159744; *see also* Miriam Pawel, *You Call It the Gig Economy.  California Calls It "Feudalism,"* N.Y. Times (Sept. 12, 2019),   https://www.nytimes.com/2019/09/12/opinion/california-gig-economy-bill-ab5.html (internal quotation marks omitted) (quoting Speaker Rendon).
[2]  Kate Conger & Noam Scheiber, *California Bill Makes App-Based Companies Treat Workers as Employees*, N.Y. Times (Sept. 11, 2019), https://www.nytimes.com/2019/09/11/technology/california-gig-economy-bill.html.

---

Gibson, Dunn &
Crutcher LLP

Memorandum in Support of
Plaintiffs' Motion for
Preliminary Injunction

4

Case No. 2:19-cv-10956

increasingly more business in the sharing economy space."[3]

Assemblywoman Gonzalez has called on executive officials to immediately bring enforcement actions against network companies, specifically naming one Company Plaintiff as her chief target.  Compl. ¶ 64f; *see also id.* ¶ 18.  California executive officials have left no doubt as to how they interpret AB 5 and have expressed their desire "to do the job" that Assemblywoman Gonzalez has directed them to do.  *Id.* ¶ 18.

Legislators claimed the statute merely codified the California Supreme Court's holding in *Dynamex Operations W. Inc. v. Superior Court*, 4 Cal. 5th 903, 913 (2018), but that is false.  For decades, California worker classification has been governed by a multifactor balancing test examining the degree of control exerted by a company over a worker (*S.G. Borello & Sons, Inc. v. Dep't of Industrial Relations*, 48 Cal. 3d 341 (1989)); *Dynamex* changed that standard, but *only* in the "one specific context ... of California wage orders" (4 Cal. 5th at 913 (emphasis omitted)).  AB 5, however, codifies the ABC test not only for wages orders but also for the entire California Labor Code and Unemployment Insurance Code, subjecting entities who fail to comply with this more stringent test to numerous civil and criminal penalties.  *See* Compl. ¶¶ 69–72.

The supporters of AB 5 did their best to limit the scope of the law *only* to the network companies.  They responded to lobbyists from all corners, and littered the bill with exemptions from the statute's requirements.  At Gonzalez's urging, the California Labor Federation went so far as to circulate an "AB 5 Exemption Request Form" for its members to complete and then submit to the legislature.  *See id.* ¶ 62.  One State Senator described the result of this blizzard of political dealing as "one of the most haphazard

---

[3] David Brunori, *Contractors, Employees And The Sharing Economy: SALT In Review*, Law360 (Sept. 20, 2019), https://www.law360.com/tax-authority/articles/1201352/contractors-employees-and-the-sharing-economy-salt-in-review; *see also*, *e.g.*, Rachel Uranga, *Port Truckers Brake for AB 5*, L.A. Bus. J. (Oct. 4, 2019), https://labusinessjournal.com/news/2019/oct/04/port-truckers-brake-ab5logistics-companies-drivers/ ("AB5 takes direct aim at ride-share services Uber Technologies Inc. and Lyft Inc.").

pieces of legislation that I've ever seen." "If you had the financial wherewithal as an industry to hire fancy lobbyists," he explained, "you got a carve out."[4]

These well-funded lobbying efforts created an irrational Frankenstein-like statute: The vast majority of the statute's text is spent exempting *dozens* of occupations from its reach. But Gonzalez vowed from the beginning that network companies would not make the list, pledging: "It's not going to happen." Compl. ¶ 67. After AB 5 passed, she tweeted that she had "fought so hard for #AB5 with no gig carve-outs." *Id*. And she has since made clear that although she is open to considering further exemptions, the network companies she targeted will never be exempted by any such "fix." *Id*. ¶ 64i.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit uses a "sliding scale" approach to preliminary injunctions. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). Under this approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id*. at 1131. Where, as here, "the balance of equities tips sharply in [P]laintiff[s'] favor," the Court may issue a preliminary injunction where "there are serious questions going to the merits—a lesser showing than likelihood of success on the merits." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (emphasis and internal quotation marks omitted); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a *fair chance* of success on the merits." *Republic of the*

---

[4] CBS 47 KSEE24, *CA Senator Andreas Borgeas Calls AB5 Most 'Half-hazard' Piece of Legislation He's Seen*, YouTube (Sept. 19, 2009), https://www.youtube.com/watch?v=mwtSZRR-f0U.

*Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (internal quotation marks omitted) (emphasis added); *see also OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.*, 602 Fed. App'x 669, 771 (9th Cir. 2015).

# ARGUMENT

If interpreted and enforced as AB 5's sponsors intend and as state and city executive officials have threatened—to force reclassification of independent service providers who use network platforms to connect with consumers—AB 5 is unconstitutional. Such reclassification would irreparably harm Lydia Olson, Miguel Perez, Company Plaintiffs, and the entire economy. The balance of harms and the public interest overwhelmingly favor an injunction to preserve the status quo until the court can decide whether AB 5 is constitutional.[5]

## I.    Plaintiffs Are Likely To Succeed On The Merits

Plaintiffs are likely to prevail, and have at the very least raised "serious questions" over the constitutionality of AB 5 under the Equal Protection, Due Process, and Contracts Clauses of the United States and California Constitutions.

### A.    AB 5's Sponsors Irrationally Targeted Network Companies And On-Demand Workers In Violation Of Equal Protection.

The United States and California Constitutions each require California to provide the "equal protection of the laws" to persons within its jurisdiction. U.S. Const. amend. XIV, § 1; Cal. Const. art I, § 7(a). This guarantee is "essentially a direction that all persons similarly situated should be treated alike" (*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)) and "secure[s] every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents" (*Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

---

[5] Company Plaintiffs maintain that they are not hiring entities under AB 5 and can establish that app-based independent service providers are not employees under the ABC test. *See* Compl. ¶ 19 & n.10. Nevertheless, a preliminary injunction is necessary to prevent Defendants' threatened enforcement according to their erroneous and unconstitutional interpretation of AB 5.

No law may draw classifications that do not "rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "A regulatory statute which singles out a particular class, or makes distinctions in the treatment of business entities engaged in the same business activity, must bear a reasonable relationship to the underlying purpose of the statute, and that purpose must be legitimate." *Santos v. City of Houston, Tex.*, 852 F. Supp. 601, 608 (S.D. Tex. 1994). By requiring that classifications "bear a rational relationship to an independent and legitimate legislative end, [courts] ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633 (1996); *see also Hays v. Wood*, 25 Cal. 3d 772, 786–87 (1979) (under rational basis review, a court must "conduct a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals" (internal quotation marks omitted)).

AB 5 is unconstitutional because its classifications (1) target network companies and are motivated by animus, (2) are clearly designed to benefit favored constituents, and (3) lack the necessary "fit" between the legislative goals and the classifications used.

### 1. AB 5 Is Motivated By Animus.

The principal sponsors of AB 5 made clear their intent to single out network companies. The day AB 5 passed, the statute's sponsor and lead drafter, Assemblywoman Lorena Gonzalez, published an editorial deriding these companies: "The Gig Economy Has Costs. We Can No Longer Ignore Them." Compl. ¶ 15, n.6. The day the bill was signed, she tweeted that she had "fought so hard for #AB5 with no gig carve-outs." *Id.* ¶ 67. Since AB 5's passage, she has expressed her willingness to consider additional exemptions, but expressly stated she would not consider an exemption for network companies. *Id.* ¶¶ 62, 67 & n.26. Countless commentators have recognized that "[w]hile [AB 5] does not actually say it, it is clearly aimed at modern companies like Uber and Lyft—and increasingly more business in the sharing economy space." *Id.* ¶ 68 & n.44. In light of this explicit targeting, it matters not that the statute does not specifically single out the network companies. *See Pro-Eco, Inc. v. Bd. of*

Gibson, Dunn &
Crutcher LLP

Memorandum in Support of
Plaintiffs' Motion for
Preliminary Injunction

8

Case No. 2:19-cv-10956

*Comm'rs of Jay Cty., Ind.*, 57 F.3d 505, 515 n.11 (7th Cir. 1995) (a law "may contain language of general applicability and still violate the Equal Protection Clause without a showing of unfair enforcement").

This animus alone is enough to enjoin AB 5's enforcement, because "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (invalidating law poorly aimed at targeting disfavored group); *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 945–46 (9th Cir. 2004), *overruled on other grounds by Lingle v. Chevron USA, Inc.*, 544 U.S. 528 (2005) ("[A] plaintiff may pursue an equal protection claim by raising a triable issue of fact as to whether the defendants' asserted rational basis was merely a pretext for differential treatment." (punctuation omitted)).  Equal protection is "designed to prevent any person or class of persons from being singled out as a special subject for discriminating and hostile legislation." *McPherson v. Blacker*, 146 U.S. 1, 39 (1892).  And the evidence of animus is stronger here—where legislators aired their animus publicly—than in other cases, where animus was inferred.  *Compare Romer*, 517 U.S. at 632–35.

### 2. The Exemptions Do Nothing But Protect Politically Favored Groups.

"Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002).  The Ninth Circuit recently reversed a decision granting a motion to dismiss in an equal protection challenge to a California minimum wage statute that was ostensibly designed to codify judicial decisions, but added carve-outs to "procure [a labor union's] support in passing [the] legislation." *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 812–13, 816 (9th Cir. 2016).  This was impermissible: "[L]egislatures may not draw lines for the purpose of arbitrarily excluding individuals," even to "protect" those favored groups' "expectations." *Id.* at 815.

Like the measure in *Fowler*, AB 5's arbitrary exemptions were crucial to

procuring the interest group support necessary to ensure its passage.[6]    The statute provides no explanation for its hundreds of lines of exemptions.    *See Hartford Steam Boiler Inspection & Ins. Co. v. Harrison*, 301 U.S. 459, 463 (1937).    And there is, in fact, "no other reason why the California legislature would choose to carve out these [occupations] other than to respond to the demands of [certain] political constituent[s]." *Fowler*, 844 F.3d at 815.    As one legislator reported, "if you had the financial wherewithal as an industry to hire fancy lobbyists, you got a carve out."    *See supra* note 4 and accompanying text.    The grants of exemptions to occupations *outside* the network economy became so transactional that the California Labor Federation circulated an "AB 5 Exemption Request Form" to be submitted to the legislature with instructions for where to insert the exemption into the statutory text.

"[T]here is no more effective practical [guarantee] against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally," because "nothing opens the door to arbitrary action so effectively as to allow [state] officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Hays*, 25 Cal. 3d at 777; *Eisenstadt v. Baird*, 405 U.S. 438, 454 (1972) (same).    AB's sponsors sought to "pick and choose" the "few" against whom the legislation would apply in order to "escape the political retribution" that would have ensued "if larger numbers were affected." *Hays*, 25 Cal. 3d at 777.    They flouted the "require[ment]" that laws "impose[d] upon a minority" must be "imposed generally." *Id.*; *see also Ex parte Scaranino*, 7 Cal. 2d 309, 312 (1936) ("A general law must include within its sanction all who come within its

---

[6]  Indeed, Assemblywoman Gonzalez admitted that she "had no other choice" to add one particular exemption "as a condition of AB 5's passage."    Katy Grimes, *How Assemblywoman Lorena Gonzalez was Forced to Author AB 170 and Voted NO on Her Own Bill*, Cal. Globe (Sept. 16, 2019), https://californiaglobe.com/section-2/how-assemblywoman-lorena-gonzalez-was-forced-to-author-ab-170-and-voted-no-on-her-own-bill/.    This was just one of AB 5-s dozens of exemptions.

Gibson, Dunn &
Crutcher LLP

Memorandum in Support of
Plaintiffs' Motion for
Preliminary Injunction

10

Case No. 2:19-cv-10956

purpose and scope."). They did so to protect the old economy from the new. But "economic protection of a particular industry" is not "a legitimate governmental purpose." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 222–23 (5th Cir. 2013); *see Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 878 (1985) (law unconstitutional where its "aim [was] designed only to favor domestic industry within the State").

### 3. AB 5 Does Not Advance Its Purported Purpose.

AB 5 purports to codify *Dynamex*, but *Dynamex* did not apply the ABC test only to a certain disfavored group. In fact, the litany of AB 5 exemptions actually *remove* the exempted entities from the ABC test *Dynamex* otherwise mandated, which accomplishes the *opposite* of the statute's supposed purposes for the exempted entities, and leaves only singled-out entities to bear the weight of the law. AB 5 does not advance "a legitimate government interest." *Fowler*, 844 F.3d at 818.

For example, in *Merrifield v. Lockyer*, a California pest-controller licensing scheme purported to protect pest controllers and the public from harms associated with mishandling toxic pesticides, but exempted from the licensing requirement a group of controllers more likely to recommend and handle such pesticides than a similarly situated economic group singled out by the law. 547 F.3d 978, 990–91 (9th Cir. 2008). The Ninth Circuit concluded that the government "undercut its own rational basis for the licensing scheme" by including the targeted group but excluding the other. *Id.* at 992. The court observed that the legislature's "singling out of a particular economic group, with no rational or logical reason for doing so, [i]s strong evidence of an economic animus with no relation to public health, morals or safety." *Id.* at 989.

Like the regulation in *Merrifield*, AB 5's exemptions undermine its stated purpose and demonstrate its drafters' animus toward network companies. If the ABC test really were necessary to protect workers, it would be irrational to leave nearly all non-app-based independent workers out in the cold. Put simply, "there is a disconnect between" the law's reach and its stated purpose. *St. Joseph Abbey*, 712 F.3d at 225; *see Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., W. Va.*, 488 U.S. 336, 346 (1989)

(assessment system resulting in "relative undervaluation of comparable property ...
denies petitioners the equal protection of the law"); *Santos*, 852 F. Supp. at 608
(invalidating ordinance under which "jitneys have been excluded from operating on city
streets, while numerous other forms of similarly situated business entities providing
ground transportation have been operating without restriction").   AB 5 is "so
discontinuous with the reasons offered for it" that it is "inexplicable by anything but
animus toward the class it affects." *Romer*, 517 U.S. at 632.

### B.   Denying On-Demand Workers Their Right To Pursue Their Chosen Occupation Would Deprive Them Of Liberty Without Due Process.

The California Constitution declares "All people are by nature free and
independent and have inalienable rights.  Among these are enjoying and defending life
and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining
safety, happiness, and privacy." Cal. Const. art I, § 1.  The California and United States
Constitutions also prohibit California from depriving any person of "life, liberty, or
property without due process of law."  U.S. Const. amend. XIV, § 1; Cal. Const. art I,
§ 7(a).  And their enumerations of rights "may not be construed to impair or deny others
retained by the people."  Cal. Const. art I, § 24; U.S. Const. amend. IX.

The "right to 'follow a chosen profession free from unreasonable governmental
interference comes within the "liberty" and "property" concepts of' substantive due
process."  *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, 307 F. Supp. 3d
1010, 1024 (E.D. Cal. 2018) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)).
"It requires no argument to show that the right to work for a living in the common
occupations of the community is of the very essence of the personal freedom and
opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v.
Raich*, 239 U.S. 33, 41 (1915).  "*Any* limitation on the opportunity" to earn a living
"impedes the achievement of economic security, which is essential for the pursuit of life,
liberty and happiness; courts sustain such limitations only after careful scrutiny." *Purdy
& Fitzpatrick v. State*, 71 Cal. 2d 566, 579 (1969) (emphasis added).   And the

Gibson, Dunn &
Crutcher LLP

Memorandum in Support of
Plaintiffs' Motion for
Preliminary Injunction

12

Case No. 2:19-cv-10956

"[L]egislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations." *Ganley v. Claeys*, 2 Cal. 2d 266, 268 (1935).

Individual Plaintiffs (and many like them, *see* Compl. ¶ 5) do not want to be employees; they want the freedom and independence of being independent contractors. Ms. Olson explained: "I could not work for Uber or Lyft if they required me to be an employee. Given my husband's illness and the fact that I have little or no notice of when I will have to take time off to care for him, I could not give up the flexibility that I have as an independent contractor." Olson Decl. ¶¶ 10. And Mr. Perez stated: "I know what it is like to be an employee, and I do not want to be one. I want to be in control of when I work, how much I work, and how much I earn, and want to be my own boss. I believe that the new law in California called AB 5 is threatening the freedom and flexibility that I have relied on for years to support my family." Perez Decl. ¶¶ 19.

If AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy, it would impose a severe, and unconstitutional, restriction on Plaintiffs' right to pursue their vocations on mutually agreed terms. *See Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1114 (S.D. Cal. 1999) (invalidating California's regulations that practitioners of African hair braiding obtain cosmetology license when mandated curriculum had little overlap with practice of hair braiding, thus demonstrating that required curriculum was "not a rational exercise of licensure to the practice of Plaintiffs' desired profession").

## C.   Enforcement Of AB 5 Would Unconstitutionally Impair Plaintiffs' Contracts.

If enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy, AB 5 also violates the Contracts Clauses of the United States and California constitutions, each of which prohibit the legislature from enacting a "law impairing the obligation of contracts." Cal. Const. art I, § 9; U.S. Const. art I., § 10. The Contracts Clauses thus

"restrict[] the power of States to disrupt contractual arrangements" (*Cal Fire Local 2881 v. California Pub. Employees' Ret. Sys.*, 6 Cal. 5th 965, 977 (2019) (quoting *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018))); indeed, the federal Contracts Clause "was perhaps the strongest single constitutional check on state legislation during our early years as a Nation" (*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978)).

### 1. Substantial Impairment.

Forced reclassification would invalidate thousands of on-demand economy contracts, which specify work as independent contractors, and replace them with an arrangement to which the parties *never* agreed—that of employer and employee.  This would substantially "undermine" the contractual bargain between Company Plaintiffs and affected independent service providers by "severely modif[ying a] contractual right" that is a "critical feature of [the company's] total contractual relationship with its agents."  *Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1006 (4th Cir. 1980).

Indeed, so applied, AB 5 would *eliminate* the very *essence* of Plaintiffs' contractual bargain.  *See Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996) ("It is easy to see what th[e Contracts Clause] means when the state passes a law rendering a class of existing (as distinct from future, not-yet-entered-into) contracts legally unenforceable, thus wiping out contractual obligations.").  Individual and Company Plaintiffs have built thriving businesses around contracts that connect thousands of continuously revolving independent service providers to the on-demand requests of consumers.  This contractual feature is definitional to the on-demand economy.  If AB 5 were enforced as its sponsors intend, it would eliminate the flexibility that Individual Plaintiffs value to earn extra income on a schedule they set and would require those with full-time jobs to forfeit existing on-demand contracts entirely—an unquestionably "substantial impairment" to these existing contracts.  *See Garris*, 630 F.2d at 1011(law modifying company's unequivocal right to terminate relationship with its agent within 60 days violated the Contracts Clause); *Ass'n of Surrogates & Supreme Court Reporters Within City of New York v. State of N.Y.*, 940 F.2d 766, 772 (2d Cir.

1991) (wage lag law substantially impaired contracts where it had "effect of withholding ten percent of each employee's expected wages over a period of twenty weeks"); *Spannus*, 438 U.S. at 240, 250–51 (invalidating state law altering when employee benefits vested because law "substantially altered" company's "contractual relationships with its employees . . . by superimposing pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake").

Plaintiffs had no reasonable expectation that their contracts were vulnerable, given that California courts and federal agencies have upheld these contracts. *See*, *e.g.*, *Lawson v. Grubhub Inc*., 302 F. Supp. 3d 1071, 1093 (N.D. Cal. 2018) (holding driver who used Grubhub was "independent contractor" under *Borello*); FLSA2019-6, Op. Letter from Keith E. Sonderling, Acting Administrator, Wage and Hour Division, U.S. Dep't of Labor ("U.S. Dep't of Labor Letter") (Apr. 29, 2019) at 7, https://www.dol.gov/whd/opinion/FLSA/2019/2019_04_29_06_FLSA.pdf    (finding independent service providers are not "employees" under federal law).

**2.  "Reasonable" and "Appropriate" Tailoring.**

In determining whether "the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose" (*Sveen*, 138 S. Ct. at 1822 (internal quotation marks omitted)), the "State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act" (*Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859 (8th Cir. 2002)).  Enforcing AB 5 to entirely nullify a private contract would receive heightened scrutiny under the Contracts Clause because "[t]he more severe the impairment, the more searching the examination . . . must be." *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1098 (9th Cir. 2003); *see also In re Workers' Comp. Refund*, 46 F.3d 813, 819 (8th Cir. 1995) ("Although a contract does not have to be completely nullified to be substantially impaired, heightened impairment triggers heightened scrutiny.").   Indeed, even "significant and legitimate public purposes" cannot justify impairment of contracts without "moderation or reason" or if it is done "in the spirit of oppression." *Workers' Comp.*, 46 F.3d at 821.

Gibson, Dunn &
Crutcher LLP

Memorandum in Support of
Plaintiffs' Motion for
Preliminary Injunction

15

Case No. 2:19-cv-10956

As discussed above, AB 5 targets network companies while protecting special interests. The law's narrow focus on network companies shows that it was not "enacted to protect a broad societal interest." *Spannaus*, 438 U.S. at 248–49; *accord Workers' Comp.*, 46 F.3d at 821 ("Despite its sweeping language about benefitting the broad societal interest or class, the statute's retroactive implementation benefits only a selected few."). Quite the opposite, AB 5's ostensible legislative purpose of helping workers is "suspect" because the legislature excluded similarly situated non-app-based workers.

## II. Forced Reclassification Would Irreparably Injure Plaintiffs

A preliminary injunction is necessary to prevent *imminent* and *irreparable* harms to Plaintiffs from enforcement of AB 5 in the way its sponsors intend (*see* Compl. ¶¶ 63–68) and as executive officials have threatened (*id.* ¶¶ 18, 52).

As an initial matter, Plaintiffs face the infringement of their constitutional rights, and the Ninth Circuit Court has held that even "an *alleged* constitutional infringement will often alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (emphasis added); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (recognizing as irreparable harm the dilemma of either "continually violat[ing] [state] law and expos[ing] [oneself] to potentially huge liability; or . . . suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review"). Even more concretely, AB 5 threatens to upend Ms. Olson and Mr. Perez's lives by depriving them of their livelihood, as well as the freedom, stability, and work satisfaction that they now enjoy. And if enforced the way AB 5's sponsors intend, and as executive officials have threatened, Company Plaintiffs would suffer immeasurable harm from having to dramatically restructure their businesses.[7]

---

[7] Plaintiffs sought injunctive relief in this pre-enforcement action as soon as legally possible—namely, once their irreparable injury ripened to imminence with Assemblywoman Gonzalez's incitement of an enforcement action against them in her recent tweets on November 21 and December 25, 2019. Plaintiffs thus have not delayed seeking relief here. *See, e.g.*, *Arc of California v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014) ("waiting to file for preliminary relief until a credible case for irreparable harm can be made is prudent rather than dilatory"); *see also Garcia v. Google, Inc.*, 766 F.3d

### 1.  Irreparable Injury To The Individual Plaintiffs.

Like hundreds of thousands of California citizens, Ms. Olson and Mr. Perez intentionally choose app-based on-demand work *specifically* because it gives them unprecedented independence and flexibility to work in accordance with their personal circumstances and preferences; and those advantages have become central to their independent businesses and lives.  Whether it means avoiding the dangers of the graveyard shift, supplementing income from another small business, making it to little league games, or caring for a spouse, Ms. Olson and Mr. Perez rely heavily on the autonomy associated with being their own bosses and working when, where, and how they choose.  If enforced as its sponsors intend, AB 5 could destroy the businesses and livelihoods they worked hard to build.  The irreparable harm they could suffer as a result begins with substantial, unrecoverable economic losses but extends much farther.  After years of enjoying the independence and flexibility central to their lives, their lives have been thrown into uncertainty.  And they could be forced to seek traditional employment—an inflexible form of work incompatible with their personal circumstances and their families' needs.

Mr. Perez quit driving a truck on the graveyard shift to launch his own local delivery business.  Perez Decl. ¶¶ 3–5.  He uses the Postmates App, among others, to connect with consumers and local merchants seeking delivery services.  *Id.*  He has built his own business by cultivating relationships with local merchants from which he regularly delivers and developing innovative strategies to deal with unique delivery opportunities and challenges in his community.  *Id.* ¶ 7.  Using these skills, Mr. Perez has doubled his income without having to answer to supervisors, adhere to rigid work schedules, or work long hours on the graveyard shift.  *Id.* ¶¶ 6–7.

---

929, 938 (9th Cir. 2014), *on reh'g en banc*, 786 F.3d 733 (9th Cir. 2015) (finding plaintiff was not dilatory where she "took legal action as soon as . . . she began receiving death threats—in other words, as soon as there was a need for speedy action"); Stoker Declaration, ¶¶ 2–3.  Moreover, any putative delay in seeking preliminary relief at most "is but a single factor to consider in evaluating injury" and "courts are loath to withhold relief solely on that ground."  *Arc of California*, 757 F.3d at 991.

Mr. Perez's success has allowed his family to get out of debt and save up to buy their own home; his wife was able to leave her job in order to spend more time with their children, including their young daughter who suffers from separation anxiety.  *Id.* ¶ 8. Moreover, because he is his own boss, he now has the autonomy to take long weekends, lead family trips, or attend family events like his son's baseball games.  *Id.* ¶¶ 8, 18.

Forced reclassification as a result of AB 5 would eliminate this essential income stream and effect a "major, negative, and permanent disruption" in Mr. Perez's life.  *Id.* ¶ 20.  Mr. Perez fears that AB 5 will require him to give up his delivery business, forfeit his sole source of income, and return to more dangerous and less lucrative shift work.  *Id.* ¶¶ 19–20.  He would suffer unrecoverable financial losses as a result of giving up his delivery business, even temporarily, and the loss of customer goodwill and Mr. Perez's business constitutes irreparable harm.  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009); *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("the loss of one's [business] does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of [losses]"); *Ajilon Prof'l Staffing, LLC v. Griffin*, 2009 WL 976522, at *3 (D. Ariz. Apr. 10, 2009) ("It is well-settled that injury to or destruction of a business constitutes irreparable harm for which preliminary and permanent injunctive relief may be appropriate.").  Moreover, he would lose the autonomy and flexibility that led him to become an independent service provider in the first place.  These harms cannot be cured retrospectively or with monetary relief, even if such relief were available.  *See* Perez Dec. ¶ 20 ("No amount of money can give me my freedom and flexibility back"); *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709–10 (9th Cir. 1988) (loss of job satisfaction and its associated distress may constitute irreparable harm).

Plaintiff Olson is an independent business owner who operates a consulting firm.  Olson Dec. ¶ 2.  Shortly after she launched her firm in 2011, her husband was diagnosed with multiple sclerosis.  *Id.* ¶ 3.  She often must take extended time off from work to care for him, sometimes for several weeks at a time.  *Id.*  She supplements the income

she makes from her consulting business by using the Uber and Lyft apps to find leads for riders seeking transportation services. *Id.* ¶¶ 4–6.

Ms. Olson's transportation business allows her to stabilize her income and provides the flexibility to control her own schedule, while caring for him when needed even on short notice. *Id.* ¶¶ 3–5. Ms. Olson could not work for Uber and Lyft if she were classified as their employee, because she cannot give up this flexibility. *Id.* ¶ 10. Ms. Olson has "grave concerns" about AB 5, because it threatens her source of "guaranteed income" that she and her husband rely on. *Id.* ¶ 4, 11–12. She would lose a stable source of income as well as the necessary balance of work and life responsibilities predicated on the unique opportunities available only through on-demand work. *Id.* ¶¶ 10–12. These harms extend far beyond monetary losses, and are irreparable, warranting an injunction.

### 2. Irreparable Injury To The Company Plaintiffs.

Although Plaintiffs' maintain that properly interpreted and applied, AB 5 does not require Company Plaintiffs to reclassify independent service providers whom they contract with as employees, the stated intent of AB 5's principal sponsors and state officials' threatened enforcement of AB 5 puts Company Plaintiffs in a no-win position that constitutes irreparable harm. On the one hand, they can attempt to reclassify certain service providers, thus relinquishing the contracts at the heart of their business models and incurring substantial, irrecoverable economic harms associated with restructuring their businesses (if that were even possible). On the other, they can choose to continue under their current models and face the imminent threat of prosecution and potential criminal liability. In either case, the impossible dilemma they face absent an injunction is irreparable harm *in itself. See Morales*, 504 U.S. at 381; *accord American Trucking*, 559 F.3d at 1058 ("[a] constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm," because "'constitutional violations cannot be adequately remedied through damages'") (quoting *Nelson*, 530 F.3d at 882).

Legislators and California officials have made clear that they intend AB 5 to be

enforced against network companies like Company Plaintiffs.  Compl. ¶¶ 63–73; Stoker Decl. ¶¶ 2–3, Exs. A, B, C, D.  Company Plaintiffs thus face the irrecoverable costs of defending numerous prosecutions, not to mention the potential for substantial civil and criminal penalties under the Labor Code and Unemployment Insurance Code if a court adopts the State's erroneous and unconstitutional interpretation of AB 5.  *See* Compl. ¶¶ 69–72.  But if Company Plaintiffs were to treat independent service providers who use their apps as employees to avoid the threat of prosecution, the costs of reclassifying them as employees would be astronomical and unrecoverable in the event Plaintiffs ultimately prevail in this suit.

Network companies are built to connect independent service providers with customers; network companies have never provided services themselves.  *See* U.S. Dep't of Labor Letter at 7 (observing that network companies "provide[]a referral service").

For example, more than 300,000 independent service providers in California use the Postmates app to find leads and deliver services to merchants and consumers in the state.  Andres Decl. ¶ 6.  Because it is not a delivery company, Postmates employs only approximately 1,200 individuals, all of whom are "dedicated to sales, engineering, analytics, strategy, design, support (of merchants, couriers, and other aspects of the platform), and other functions."  *Id.* ¶ 36.  Postmates' business is not staffed or structured to provide delivery services or to hire, schedule, and manage a large workforce of delivery employees or provide employee benefits to them.  *Id.*  But if forced to reclassify the independent service providers who use the app as employees, Postmates would face the prospect of spending significant sums to construct a management and human resources infrastructure to accommodate a large workforce.  *Id.* ¶¶ 37–38.

Plaintiff Uber's business model is built around proprietary technology that creates networks allowing, for example, consumers seeking rides or food delivery to connect with independent service providers nearby.  Rosenthal Decl. ¶¶ 7–8.  Since October 2018, "more than 395,000 independent drivers and delivery persons in California have used the Uber Apps to find and provide services to riders and consumers."  *Id.* ¶ 9.

Gibson, Dunn &
Crutcher LLP

Memorandum in Support of
Plaintiffs' Motion for
Preliminary Injunction

20

Case No. 2:19-cv-10956

Because Uber is a technology company and not a transportation or delivery company, it does not assign, supervise, or determine the routes of drivers or delivery persons. *Id.* ¶ 47. Nor does it have the workforce to do so: Uber has approximately 6,000 actual employees in California, most of whom are dedicated to technology product development. *Id.* ¶ 59. Thus, if forced to reclassify certain independent drivers and delivery persons who use the Uber Apps as Uber employees, Uber would have to incur the significant costs associated with, for example, reworking its pay structure; setting up processes and hiring staff to manage employee benefit and liabilities payments; and training and supervising drivers and delivery persons. *Id.* ¶ 64.

Company Plaintiffs also stand to lose substantial revenues if their platforms are unable to respond to customer demand dynamically and in real time. *See* Andres Decl. ¶ 41 (explaining Postmates would lose revenue "during those times when its new shift 'employees' could not meet high demand" and "would be forced to incur the expenses of paying employees to wait during periods of low demand"); Rosenthal Decl. ¶ 62 (explaining Uber "relies on independent service providers having the flexibility and autonomy to pick and choose when they want to login to the Uber App" and "not currently responsible for ensuring that there are enough drivers or delivery persons in a given location to satisfy demand.").

If Company Plaintiffs are forced to reclassify, the financial harm they would suffer as a result of Defendants' unconstitutional actions could never be remedied. *See Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012); *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010); *see also Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers) ("Normally the mere payment of money is not considered irreparable . . . but that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable." (citation omitted)). Any claims against the state for reimbursement of these costs would be barred by sovereign immunity. *See*, *e.g.*, *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d

847, 852 (9th Cir. 2009), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal, Inc.*, 565 U.S. 606 (2012); Cal. Gov't Code §§ 815(a), 820.6 (granting general sovereign immunity to "public entit[ies]" and public employees acting "under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable").

In addition to these administrative costs, both Postmates and Uber could be forced to cancel or drastically modify their existing contracts with independent service providers, destroying the goodwill they have built with independent service providers over many years such that many independent service providers might never return to doing business with them. *See id.* ¶ 63; Andres Decl. ¶ 42. This damage to Company Plaintiffs' goodwill and reputation is unquestionably irreparable injury because it is particularly difficult to monetize. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991).

In addition to losing goodwill with independent service providers, Company Plaintiffs stand to lose considerable goodwill in the eyes of the public as a result of AB 5's threatened enforcement against them. AB 5's drafters have derided network companies including Company Plaintiffs and accused them of openly and willfully violating labor laws, of "theft", of "unscrupulous" conduct, and of "trying to screw workers," to name a few. Compl. ¶¶ 64, 65, 108. Public discourse of this kind creates an aura around network companies including Company Plaintiffs that—although patently incorrect—is damaging and difficult to refute. *See* Rosenthal Decl. ¶ 61; *see also* Brendan Nyhan & Jason Reifler, *When Corrections Fail: The Persistence of Political Misperceptions*, 32 Pol'y Behav. 303 (2010). And the goodwill and reputational harm would necessarily be irreparable. *See American Trucking*, 559 F.3d at 1058–59; *Rent–A–Center, Inc.*, 944 F.2d at 603. A preliminary injunction is thus warranted to preserve the status quo while Plaintiffs' claims are litigated.

## III.   The Balance Of Harms Favors A Preliminary Injunction

The irreparable injury Plaintiffs will suffer absent preliminary injunctive relief is alone enough to tilt the balance of equities sharply in favor of an injunction, because

1     "the balance of the equities favor preventing the violation of a party's constitutional

2     rights." *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).

3     Moreover, Defendants will not be harmed in any way by a preliminary injunction—

4     which would merely preserve the status quo—to allow for orderly litigation of this case.

5     *See Cal. Trucking Ass'n v. Becerra*, No. 3:18-cv-02458-BEN-BLM, ECF No. 77, at 4

6     (S.D. Cal. Dec. 31, 2019) (concluding that the public interest "and equities weigh in

7     favor" of a TRO enjoining enforcement of AB 5, because the law "provides an

8     alternative should the ABC test be struck down."). In addition, Defendants have "no

9     legitimate interest in enforcing an unconstitutional [statute]." *KH Outdoor, LLC v. City*

10     *of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

**IV.     The Public Interest Sharply Favors A Preliminary Injunction**

12     "[I]t is always in the public interest to prevent the violation of a party's

13     constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

14     Enforcement of AB 5 as its sponsors intend—forcing network companies to reclassify

15     certain on-demand workers—would cause an astronomical upheaval in the on-demand

16     economy, and in the economy writ large, harming not only independent service

17     providers and network companies, but consumers, merchants, and the public at large.

18     Forced reclassification would deprive thousands of members of the public of their

19     ability to work in the on-demand economy and generate independent income. Andres

20     Decl. ¶¶ 33–34, 42, 45; Rosenthal Decl. ¶¶ 66–68; McCrary Decl. ¶¶18, 51–58. The on-

21     demand economy benefits everyone by empowering workers to quickly on-board to

22     provide services when they desire, and also to exit when convenient. McCrary Decl. ¶¶

23     15, 25–26. Many individuals rely on this easy entry to meet a sudden financial crisis.

24     *Id.* ¶ 33. And most workers highly value this flexibility and the convenience that it

25     entails, and do not work a rigid 40-hour week. *Id.* ¶¶ 156, 24–26, 56.[8]

---

[8] *See also* James Sherk, *The Rise of the Gig Economy: Good for Workers and Consumers*, Heritage Found. (Oct. 7, 2016), https://www.heritage.org/jobs-and-labor/report/the-rise-the-gig-economy-good-workers-and-consumers (freedom to set

If network companies were forced to reclassify independent service providers who use their apps as employees, even the lucky few who would still be able to secure income from the on-demand sector would suffer decreased job satisfaction—and many more would lose their ability to earn this income entirely due to competing commitments or decreased opportunities. *Id.* For many, it would force them out of business entirely. Andres Decl. ¶¶ 33–34; Rosenthal Decl. ¶¶ 66–68; McCrary Decl. ¶¶ 18, 51–58; Joshua Frulinger, *The gig economy is crashing: Freelance jobs at UpWork sunk 31% in past month*, Thinknum Alternative Data (reporting new data showing that in the month after AB 5's passage, the number of available jobs in the on-demand economy "plummeted"), https://media.thinknum.com/articles/gig-economy-broken/ (last visited Jan. 2, 2020).[9]

Forced reclassification would also result in a decrease in income for on-demand workers, and less competition for the market as a whole, thereby harming consumers and increasing prices for many services. The dynamic model of the on-demand economy increases service providers' surplus over twice what most would earn in a traditional full-time or even part-time model. McCrary Decl. ¶ 25. Low-income individuals in particular capture benefits from being able to work flexibly in the on-demand economy across multi-apps, seamlessly sorting through all available market opportunities to fetch the best price for their services. *Id.* ¶¶ 27–29. As Dr. McCrary explains, upsetting this model would cause numerous harms to network companies and the consumers and workers who use their apps. *Id.* ¶¶ 30–58.

The public goods that would be lost from enforcement of AB 5 as its sponsors

---

their own schedules a "major" reason workers entered this segment of the economy—for example, 95 percent of drivers who use the Lyft app, "identif[y] the ability to work flexible hours as an 'extremely important' ... [or] 'very important'" "consideration in using the service"); Beacon Economics LLC, *How Many Drivers Would Lyft Recruit Under a Traditional Work Arrangement?* at 2, Aug. 2019, https://images.kusi.com/wp-content/uploads/2019/09/Beacon-Economics-August-2019.pdf.

[9] *See also* Beacon Economics at 1 (finding reclassification would force an estimated 300,673 drivers who currently contract with Lyft to close shop).

---

intend are innumerable. *Id.* ¶ 34.[10]  Reclassification would impose 20 to 40 percent more in total labor costs on many networks companies, which could be passed on to the public or offset through automated technology or other less labor-intensive capital, leading to fewer income-earning opportunities for workers. *Id.* ¶¶ 17–19, 40–58.  Fewer products and services would be sold and overall consumer welfare would diminish. *Id.* ¶ 47.  And the reduced consumer activity will harm merchants who rely on on-demand activity to reach consumers. *Id.* ¶ 46.

There is no question that these harms should be avoided while the constitutionality of AB 5 is litigated.

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin Defendants from enforcing or causing to be enforced AB 5 against them, pending final judgment.

January 8, 2020

By:  /s/ *Theane Evangelis*

Theane Evangelis
Joshua S. Lipshutz
Blaine H. Evanson
Heather L. Richardson
Dhananjay S. Manthripragada

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Plaintiffs*

---

[10]  *See also* Sherk, *supra* n. 8 (when Uber "enter[s] a geographic area in California," there is a "3.6% – 5.6% decrease in the rate" of alcohol-related motor vehicle homicides); Beacon Economics at 2.