GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
    TEvangelis@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
    BEvanson@gibsondunn.com
HEATHER L. RICHARDSON, SBN 246517
    HRichardson@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA,
    SBN 254433
    DManthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
    JLipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Tel: 415.393.8200
Fax: 415.393.8306

Attorneys for Plaintiffs Lydia Olson, Miguel Perez,
Postmates Inc., and Uber Technologies, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYDIA OLSON, MIGUEL PEREZ, POSTMATES INC., and UBER TECHNOLOGIES, INC.<br><br>                         Plaintiffs,<br><br>        v.<br><br>STATE OF CALIFORNIA; XAVIER BECERRA, in his capacity as Attorney General of the State of California; and "JOHN DOE," in his official capacity,<br><br><br>                         Defendants. | **CASE NO. 2:19-cv-10956-DMG-RAO**<br><br>**DECLARATION OF PATRICIA CARTES ANDRES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Dolly M. Gee<br>Hearing Date: February 7, 2020<br>Time: 2:00 P.M. |

1

## Declaration of Patricia Cartes Andres

2

3
I, Patricia Cartes Andres, hereby declare and state:

4
1.      I am currently employed as the Director of Trust and Safety and Insurance

5
Operations for Postmates Inc. ("Postmates"). I have been employed by Postmates since

6

7
January 8, 2018. I make this declaration in support of Plaintiffs' Motion for a

8
Preliminary Injunction, and I am authorized to make these statements on behalf of

9
Postmates.

10

11
2.      In my current position for Postmates, I have personal knowledge of

12
Postmates' business model, Postmates' software and other technology, and Postmates'

13
contracts with the independent contractor couriers who use Postmates' technology. I

14

15
have access to and personal knowledge of the matters and information set forth in this

16
declaration, and if called upon to testify thereto, can and would competently do so. The

17
information set forth in this declaration is true and based on my own personal knowledge

18

19
(unless otherwise stated). The documents and records discussed in this declaration are

20
maintained in the regular course of Postmates' business.

21
## A.    Postmates is a Technology Company that Connects Merchants, Consumers, and Independent Couriers

22

23
3.      Postmates is a technology company headquartered in San Francisco,

24
California that was founded in May 2011.

25

26
4.      Postmates provides and maintains an online marketplace and mobile

27
platform (the "Postmates App") connecting local merchants, consumers, and

28
independent couriers to facilitate the purchase, fulfillment, and, when applicable, local

Gibson, Dunn &
Crutcher LLP

delivery of goods from merchants to the consumers. When the consumers place orders for delivery from the local merchants, such as restaurants or grocery stores, through the Postmates App, nearby independent couriers receive a notification and can choose whether to accept the consumer's offer to pick up and complete the requested delivery.

5.      Consumers can submit delivery requests in the Postmates App tailored to their specific delivery needs. For example, a consumer can request delivery of anything from takeout to groceries from a diverse set of local merchants, including small businesses for whom the Postmates App provides an efficient and expansive tool to reach new customers. The consumer can connect with a merchant and, if they desire delivery, with an independent courier through the Postmates App to ensure local delivery of any item from any store or restaurant within minutes.

6.      Couriers use the Postmates App to create an independent connection with a merchant and consumer based on the merchant's and consumer's local delivery needs. Based on my review of company records, more than 300,000 independent contractor couriers in California currently use the Postmates App to find and provide services to merchants and consumers.  The vast majority of couriers use the Postmates App to provide delivery services only intermittently and for short periods of time.

7.      Each independent courier who uses the Postmates App is free to work as much or as little as he or she wants—there is no set schedule, minimum-hours requirement, or minimum-delivery requirement. When a consumer requests a delivery using the Postmates App, the app sends basic information about the delivery request to

the closest available independent couriers, who may accept, reject, or ignore the request. It is entirely up to them.

8.      Postmates' business model dynamically matches supply with demand in real time. While a small minority of the independent couriers who contract with Postmates use the Postmates App to make regular deliveries over an extended period of time, other independent couriers make frequent deliveries for weeks and then discontinue all deliveries for months, only to resume making deliveries again. And still more independent couriers use the Postmates App to make deliveries for only a few short weeks to satisfy a temporary need for income and then never use the Postmates App to facilitate such deliveries again (at least as far as Postmates knows, because these couriers retain access to the Postmates App and could use it again if they choose to do so). Postmates' current business model can accommodate all of these types of independent couriers.

9.      Postmates operates no vehicles to assist independent couriers with their deliveries, and does not require the use of specific tools or equipment. Nor does Postmates require couriers to accept any specific delivery offers, oversee the appearance of couriers or their vehicles, or require any specific route.  Rather, couriers use their own vehicles and tools, manage their own vehicle maintenance, oversee their own appearance and manner of serving consumers, and determine their own driving routes and other aspects of the deliveries that they make to consumers. Couriers are responsible for their own vehicle insurance, as well as compliance with all legal requirements for being a

driver in their chosen state. Other than being required to meet federal, state, and local laws and regulations, couriers control the manner and means of their work.

10.     Postmates is a means for independent couriers to become their own bosses and operate their own delivery businesses.  Individual couriers can operate as they please.  Independent couriers are provided unprecedented autonomy, never before seen in the history of work. A barista cannot leave her coffee shop mid-shift when there are no customers, travel across the street to do barista work for a rival coffee shop, and then come back to her original coffee shop to continue barista work.  But an independent courier has the freedom and flexibility to use multiple competitor apps simultaneously to maximize her income.  That's the level of autonomy that Postmates provides to independent couriers to start and stop their business, and work across apps.

11.     Couriers who choose to sign up to use the Postmates App to perform services may simultaneously do work on behalf of themselves or third parties.  Postmates does not have a policy preventing couriers from working full-time or part-time for themselves or third parties.  Indeed, Postmates does not have a policy preventing couriers from "multi-apping"—i.e., using other applications such as Lyft or Uber at the same time as the Postmates App to take on multiple forms of on-demand work. As a result, couriers can transition from using the Postmates App to other applications simply by swiping their phones.

Gibson, Dunn &
Crutcher LLP

**B.    Postmates Contracts with Independent Couriers**

12.    Any courier who wants to use the Postmates App to connect with a potential consumer must agree to the Fleet Agreement. A true and correct copy of the current Fleet Agreement is attached hereto as **Exhibit A**.

13.    The current Fleet Agreement explains that "Postmates provides and maintains an online marketplace and mobile platform on which individual customers (collectively "Customers"); restaurants, retail stores, and other merchants (collectively "Merchants"), and independent providers of delivery services connect to facilitate the purchase, fulfillment, and, when applicable, delivery of goods from Merchant(s) to Customer(s)." Ex A at 1.

14.    The current Fleet Agreement further explains: "You [i.e., "Couriers"] are an independent provider of delivery services . . . . [and] enter into this Agreement for the right to access Postmates in order to receive Delivery Opportunities[.]" Ex. A at 1.

15.    Section 1A of the current Fleet Agreement provides: "The Parties acknowledge and agree that this Agreement is between independent businesses that are separately owned and operated." Ex. A at 2.

16.    Section 1A of the current Fleet Agreement provides: "The Parties intend this Agreement to create the relationship of principal and independent contractor and not that of employer and employee." Ex. A at 2.

17.    Section 1B of the current Fleet Agreement provides: "Nothing in this Agreement requires You to accept any Delivery Opportunity(s) from Postmates, and

nothing in this Agreement shall guarantee You any particular volume of Delivery Opportunities or Deliveries for any particular time period." Ex. A at 2.

18.     Section 2A of the current Fleet Agreement provides: "You understand and agree that in providing any services under this Agreement, You are not an employee or customer of Postmates, any Merchant selling goods through Postmates, or any Customer purchasing goods through Postmates." Ex. A at 2.

19.     Section 2B of the current Fleet Agreement provides: "You understand that: (i) You are free to select the times You wish to use Postmates; (ii) You are free to accept, reject, or ignore any particular Delivery Opportunities made available to You through Postmates; and (iii) You have the sole right to control the manner and means by which You perform Deliveries through Postmates." Ex. A at 2.

20.     Section 2E of the current Fleet Agreement provides: "Nothing in this Agreement shall prevent the Parties from at any time engaging in similar arrangements or business with others, including the Parties' direct competitors, and You agree to immediately notify Postmates in writing if You believe You have been restricted in any way by Postmates from engaging with or providing your services to any other entity(s)." Ex. A at 3.

21.     Section 2F of the current Fleet Agreement provides: "You understand and agree that You are not required at any time to wear or use any clothing or equipment provided by or bearing Postmates' name or logo; or to purchase, lease, or rent any products, equipment, or services from Postmates." Ex. A at 3.

Gibson, Dunn &
Crutcher LLP

7

22.    Section 4A of the current Fleet Agreement in relevant part provides: "Nothing in this Agreement prevents the Parties from negotiating a different rate of pay, and You are free to accept, reject, or ignore any Delivery Opportunities as a means to earn different rates of pay." Ex. A at 5.

23.    Section 4C of the current Fleet Agreement provides: "Customers can pay You a gratuity in cash or via other payment method(s). Nothing in this Agreement shall prevent You from retaining 100% of any gratuity paid by a Customer. Postmates acknowledges it has no right to interfere with the amount of gratuity given to You by a Customer." Ex. A at 5.

24.    The Fleet Agreement is a contract to which Postmates and independent couriers in California have entered and governs Postmates' interactions with all independent couriers.

25.    The provisions in the Fleet Agreement cited above all individually and together represent critical and essential features of Postmates' contractual relationship with each and every independent courier.

26.    Postmates does not desire to take on new obligations under the Fleet Agreement with regard to the independent contractor couriers without changing the agreement.

27.    Postmates invested substantial resources in determining and establishing its current obligations to the independent contractor couriers as represented in the Fleet Agreement.

28.    Postmates did not anticipate AB 5's purported changes to the law when it entered into the Fleet Agreement with the independent couriers.  California courts have repeatedly affirmed that similar provisions were suitable to establish and maintain a contractual relationship with the couriers as independent contractors and, to the extent, that AB 5 may be enforced consistent with its sponsors purported intent to reclassify on-demand workers as employees, Postmates had no reason to anticipate this disruption.

29.    The cited provisions of the Fleet Agreement are central to the value Postmates holds in these contracts between Postmates and the independent couriers because Postmates' business model is based on the flexible arrangement provided by these provisions.

## C.    There is No Typical Courier Who Uses the Postmates App

30.    There is no typical courier who uses the Postmates App. Each independent courier has a number of individual choices that will determine his/her work circumstances, including what months to deliver, what days to deliver, what times of day to deliver, which city to deliver in, which neighborhood of a given city to deliver in, the route for driving a delivery from one place to another, and so on. Independent couriers choose whether, when, and how often to turn on the Postmates App, and have the option—but not the obligation—to accept referrals passed along to them by the Postmates App.

31.    In short, independent couriers make their own choices about how to go about the work of making deliveries referred to them through the app. Some independent

couriers make extensive deliveries using their personal vehicles, while others choose to make deliveries by foot or bicycle in an area near their work, school, or home.

32.     Independent couriers run the full range of backgrounds and alternative work situations. Some independent couriers are bankers or attorneys or graphic artists or grocery store clerks who work a full-time job for an employer, and infrequently use the Postmates App to earn extra income on occasion. Other independent couriers accept referrals from the Postmates App when convenient for them and work one or more freelance jobs, such as a translator, babysitter, realtor, or graphic designer. Still other independent couriers accept referrals when their family or social lives make it convenient, such as after visiting with a friend across town or in between breaks from college or while waiting for a child to get out of a sports practice.

**D.     Postmates Will Suffer Irreparable Injury if AB 5 Is Enforced Against It In A Manner Consistent With Its Sponsors' Stated Intent To Require Reclassification Of On-Demand Workers As Employees**

33.     Because the online marketplace and mobile platform maintained by Postmates relies on the flexibility provided to independent couriers, if AB 5 were enforced against Postmates in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, Postmates could have to significantly restructure its existing business model, which in turn could seriously harm Postmates' business, including by impacting Postmates' ability to add independent couriers to its platform.   This could reduce earning opportunities for thousands of independent couriers in California and impact the fluid nature in which

Gibson, Dunn &
Crutcher LLP

Postmates' three-sided marketplace is able to meet consumer and independent courier supply and demand in real time.

34.     Postmates cannot hire as employees every one of the independent contractor couriers with whom it has entered into Fleet Agreement contracts, and assume that the platform would work as it currently does.  Given that numerous employment laws (e.g., rest and meal breaks) are based around scheduled "shift work," an employment model on the platform would necessitate an increased amount of control over the work being performed.  This would result in diminished access to the platform by couriers who have trouble finding traditional employment and rely on flexibility in when, where, and how they work (e.g., students and retirees).

35.     Postmates' business model is built around operating an online platform that connects merchants and consumers willing to pay for delivery services with independent couriers willing to provide those services.  If AB 5 were enforced against Postmates in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, Postmates' Fleet Agreement with couriers in California would be void.  The Fleet Agreement is critical to Postmates' business: it is the mechanism by which Postmates maintains its relationships with a skilled, flexible, and autonomous constituency of delivery service providers who work when they want, as much as they want, and where they want.

36.     Although the Postmates App operates in cities throughout the world and facilitates millions of deliveries each day, Postmates has about only 1,200 actual

Gibson, Dunn &
Crutcher LLP

employees. These employees are dedicated to sales, engineering, analytics, strategy, design, support (of merchants, couriers, and other aspects of the platform), and other functions. Postmates' business is not staffed or structured to provide delivery services; to hire, schedule, and manage a large workforce of employee couriers; or to maintain and provide a comprehensive array of employment benefits.

37.    If AB 5 were enforced against Postmates in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, Postmates could be required to spend significant amounts in restructuring and staffing fees alone to construct the management and human resources infrastructure necessary to run a delivery services company, instead of a technology company with independent contractors.

38.    If AB 5 were enforced against Postmates in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, Postmates could be required to significantly alter its current business model, which does not include any management of the independent delivery couriers in the performance of their tasks, and instead train, retrain, discipline, and supervise the conduct of purported employee couriers in the performance of their deliveries to ensure conformity with Postmates' policies and applicable laws.

39.    If AB 5 were enforced against Postmates in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, Postmates will lose the goodwill of many of the consumers, merchants,

Gibson, Dunn &
Crutcher LLP

12

and independent couriers who use the Postmates App and rely on the flexibility attendant in their current contracts with Postmates.  The vast majority of daily deliveries that the Postmates App facilitates occur around typical meal times. Because of the requirements in California law related to the scheduling of employee shifts, meal periods, and rest breaks, among other requirements, Postmates will be unable to ensure an efficient functioning of its platform at peak times with an employee courier system and will suffer from increased administrative and labor costs during periods with few delivery requests.

40.    Postmates relies on independent contractors having the flexibility and autonomy to pick and choose when they want to login to the Postmates App.  Postmates is not currently responsible for ensuring that there are enough couriers in a given location to satisfy demand and does not currently have the administrative and staffing infrastructure to do so.

41.    If AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, and Postmates was forced to hire shift employees and place them on rigid schedules and fixed locations throughout California, Postmates could not facilitate an immediate and efficient response to consumer demands. If forced to make this change, Postmates would lose revenue—and its brand and reputation would suffer—during those times when its new shift "employees" could not meet high demand, and it would be forced to incur the expenses of paying employees to wait during periods of low demand.

Gibson, Dunn &
Crutcher LLP

13

42.     Moreover, if AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, and couriers no longer had the freedom to choose when to login or log out, when and where to accept delivery offers, and how to perform their independent delivery services, Postmates expects that many independent couriers would stop using the Postmates App.  Postmates would lose its relationships with skilled, flexible couriers who, for various individualized reasons, cannot—or are unwilling to— become full-time employees bound to fixed work schedules.

43.     If AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, Postmates also would incur significant administrative costs. The company would have to, for example, rework its pay structure; set up processes and hire staff to manage payroll withholding and payment of payroll taxes; administer workers' compensation, disability, and unemployment insurance benefits; and pay its share of premiums on those policies.

44.     If AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, moreover, this reorganization may occur only for those couriers in California, not independent couriers elsewhere, which would require setting up a new delivery business in California and then attempting to integrate that business with its

Gibson, Dunn &
Crutcher LLP

14

existing technology business, which operates everywhere else. The logistics of doing that would create huge administrative and other burdens on Postmates.

45.     If AB 5 is later held unenforceable, Postmates would then have to attempt to reverse this reengineered business model, which would inflict additional economic and reputational losses. And there is no guarantee that many of the former couriers would return to using the Postmates App after being forced to give up mobile, app-based work and search for a source of income elsewhere.  Likewise, there is no guarantee that consumers and merchants who rely on Postmates' current business model and choose not to participate in the reengineered business model would return to using the Postmates App.

46.     Postmates would not need to make the above-listed expensive and costly changes to its business model or suffer the potential financial, reputational, or other harms absent the threat of AB 5 being enforced against Postmates in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees.

47.     Postmates would not need to make any of these changes and could avoid these imminent harms and continue to pursue its business under its existing business model in the absence of the AB 5 sponsors' threatened enforcement against it in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees.

Gibson, Dunn &
Crutcher LLP

1         I declare under penalty of perjury under the laws of the State of California and the

2

3    United States of America that the foregoing is true and correct, and that this declaration

4    was executed in San Francisco, California, on this 30th day of December, 2019.

5

6

7                                       Patricia Cartes Andres

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

16

# EXHIBIT A

# Postmates

---

**Effective May 11, 2019**

This Fleet Agreement (the "Agreement"), effective the date accepted by You, is made and entered into by and between you ("You") and Postmates Inc. ("Postmates"). By entering into this Agreement, You also acknowledge that You have read, understood, and voluntarily agreed to the Postmates Terms of Service and Privacy Policy, both of which are expressly incorporated herein by reference. Additionally, and for clarity, You and Postmates may each be referenced in this Agreement as a "Party" and together as the "Parties."

IMPORTANT: PLEASE REVIEW THIS AGREEMENT CAREFULLY, SPECIFICALLY THE MUTUAL ARBITRATION PROVISION IN SECTION 10. UNLESS YOU OPT OUT OF ARBITRATION AS PROVIDED BELOW, THIS AGREEMENT REQUIRES THE PARTIES TO RESOLVE DISPUTES THROUGH FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL BASIS TO THE FULLEST EXTENT PERMITTED BY LAW. BY ACCEPTING THIS AGREEMENT, YOU ACKNOWLEDGE THAT YOU HAVE READ, UNDERSTOOD, AND VOLUNTARILY AGREED TO ALL OF THE TERMS OF THIS AGREEMENT, INCLUDING THE MUTUAL ARBITRATION PROVISION, AND THAT YOU HAVE TAKEN TIME AND SOUGHT ANY ASSISTANCE NEEDED TO COMPREHEND AND CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.

## Recitals

Postmates provides and maintains an online marketplace and mobile platform on which individual customers (collectively "Customers"); restaurants, retail stores, and other merchants (collectively "Merchants"), and independent providers of delivery services connect to facilitate the purchase, fulfillment, and, when applicable, delivery of goods from Merchant(s) to Customer(s). You are an independent provider of delivery services, authorized and able to satisfy any and all legal requirements necessary to perform the services contemplated by this Agreement in the geographic location(s) in which You operate. You understand and agree that You may enter into this Agreement either as an individual or a business entity, and You desire to enter into this Agreement for the right to access Postmates in order to receive Delivery Opportunities (as defined in section 3A below). In consideration of these recitals and the mutual promises below, and for other good and valuable consideration, You and Postmates agree as follows:

## 1. Purpose Of Agreement

1A. This Agreement governs the entire relationship between the Parties, and establishes the Parties' respective rights and obligations arising out of this relationship. The Parties acknowledge and agree that this Agreement is between independent businesses that are separately owned and operated. The Parties intend this Agreement to create the relationship of principal and independent contractor and not that of employer and employee. Neither Party shall have the right to bind the other by contract (or otherwise) except as specifically provided in this Agreement.

1B. Nothing in this Agreement requires You to accept any Delivery Opportunity(s) from Postmates, and nothing in this Agreement shall guarantee You any particular volume of Delivery Opportunities or Deliveries for any particular time period.

1C. Postmates reserves the right, at any time, to modify external documents referenced and incorporated into this Agreement and/or any information referenced via hyperlink. Such modifications shall become effective upon posting. Your continued use of Postmates after any such changes shall constitute Your consent to such changes.

1D. You acknowledge and agree that if Postmates modifies any provision of this Agreement (including any information referenced via hyperlink) you will not have a renewed opportunity to opt out of arbitration. You further acknowledge and agree that Your acceptance of this Agreement does not create a renewed opportunity to opt out of arbitration (if applicable).

## 2. Your Operations

2A. You understand and agree that in providing any services under this Agreement, You are not an employee or customer of Postmates, any Merchant selling goods through Postmates, or any Customer purchasing goods through Postmates.

2B. You understand that: (i) You are free to select the times You wish to use Postmates; (ii) You are free to accept, reject, or ignore any particular Delivery Opportunities made available to You through Postmates; and (iii) You have the sole right to control the manner and means by which You perform Deliveries through Postmates.

2C. You represent that, as applicable, You possess all equipment, including mobile telephone, modes of transportation, etc. (collectively "Equipment") and personnel necessary to lawfully provide the services contemplated by this Agreement. Moreover, You agree that You are solely responsible for ensuring that such Equipment conforms to applicable laws, including those pertaining to health, safety, inspection, and operational capability, and that You are responsible for all costs and expenses You may incur under this Agreement, including, but not limited to, traffic tickets, tolls, parking fees, inspections, insurance, and any other costs related to Equipment. Except as otherwise required by law, You assume all risk of damage or loss to Your Equipment.

2D. Nothing in this Agreement prohibits You, to the extent permitted by law and subject to the terms of this Agreement, from hiring, subcontracting, or otherwise engaging any other person (a "Subcontractor") to assist You with the performance of a Delivery, provided that any such Subcontractor accepts the terms of this Agreement and separately completes the process to receive Delivery Opportunities from Postmates. You agree to bear sole responsibility for the direction and control over any Subcontractor. Specifically, to the extent You engage a Subcontractor, unless otherwise mandated by law, You assume full and sole responsibility for the payment of all amounts due or required to be withheld from Subcontractor(s) for work performed under this Agreement, including but not limited to any wages, benefits and expenses, state and federal income tax withholdings, unemployment insurance contributions, and/or social security taxes. Postmates shall have no responsibility for money or obligations You may owe Subcontractor(s), and neither You nor any Subcontractor(s) shall participate in or receive any wages or other benefits available to Postmates' employees. The Parties acknowledge and agree that any provisions of this Agreement reserving ultimate authority in Postmates have been inserted solely to achieve compliance with federal, state, or local laws, regulations, and interpretations thereof, and/or to ensure the safety of Postmates for all users.

2E. Nothing in this Agreement shall prevent the Parties from at any time engaging in similar arrangements or business with others, including the Parties' direct competitors, and You agree to immediately notify Postmates in writing if You believe You have been restricted in any way by Postmates from engaging with or providing your services to any other entity(s).

2F. You understand and agree that You are not required at any time to wear or use any clothing or equipment provided by or bearing Postmates' name or logo; or to purchase, lease, or rent any products, equipment, or services from Postmates.

2G. You agree that before you receive access to Postmates, You will submit to and pass a background check based on Your own social security number. You also agree that, at its sole discretion and in accordance with applicable law, Postmates may require You to submit to and pass additional background check(s) conducted with Your consent.

2H. SMS and push communications from Postmates, its affiliates or its representatives and/or Merchants or Customers, may include but are not limited to: (1) operational communications concerning your user account, sign up progress to become a Contractor, use of the Platform, or features available on the Platform, (2) communications relating to Deliveries and Delivery Opportunities, including delivery fees, (3) news concerning Postmates and industry developments that affect your relationship with us, and (4) account verification communications. With your consent, Postmates may also send you marketing SMS regarding promotions from us or our third-party partners. Message and data rates may apply.

2I. You agree that Postmates, its affiliates or its representatives may contact You (including for marketing purposes from Postmates or our third-party partners where permitted by law) by email, phone, push notifications, SMS, or by other comparable means (including by use of an automatic telephone dialing system) at the email address(es), phone(s), or phone number(s) You provide to Postmates.

2J. You also agree and consent to SMS and push communications from Postmates, its partners, affiliates, or representatives, and/or Merchants or Customers, that may include but are not limited to: (1) operational communications concerning Your user account, sign up progress to use Postmates, use of Postmates, or features available from Postmates; (2) communications relating to Deliveries and Delivery Opportunities, including any money paid to You fees for services provided; (3) news concerning Postmates and industry developments that affect Your relationship with Postmates; and (4) account verification communications. Message and data rates may apply.

YOU CAN UNSUBSCRIBE FROM POSTMATES' MARKETING EMAIL LIST BY FOLLOWING THE UNSUBSCRIBE OPTIONS IN THE MARKETING EMAIL ITSELF. PLEASE BE ADVISED THAT IF YOU OPT OUT OF MARKETING EMAILS, POSTMATES MAY STILL SEND YOU EMAILS ABOUT YOUR ACCOUNT OR ANY TRANSACTIONS BETWEEN THE PARTIES.

IF YOU WISH TO OPT OUT OF MARKETING TEXT OR SMS MESSAGES, IN RESPONSE TO SUCH A MESSAGE YOU MAY REPLY "STOP" FROM THE MOBILE DEVICE RECEIVING THE MESSAGE. YOU ACKNOWLEDGE THAT YOU ARE NOT REQUIRED TO CONSENT TO RECEIVE MARKETING TEXTS OR CALLS AS A CONDITION OF PERFORMING SERVICES USING POSTMATES.

## 3. Deliveries

3A. Postmates may notify You of the opportunity to complete a delivery from a Merchant to a Customer (each, a "Delivery Opportunity"), and You may have the option to choose automatic acceptance or other preferences for certain Delivery Opportunities. For a Delivery Opportunity You accept (each, a "Delivery"), You agree to complete the delivery of the good(s) purchased by a Customer in a form free from tampering, in the condition intended by the Customer and/or Merchant, according to the terms of this Agreement and/or as otherwise set forth in the Fleet Help Center, and in compliance with any and all applicable federal, state, and local laws, rules and regulations, including but not limited to applicable food and health safety laws, rules, and/or regulations. You further agree that for any Delivery that includes any age-restricted items, including but not limited to alcohol, tobacco, e-cigarettes, or vaporizers, You are responsible for ensuring the Delivery complies with all federal, state, and local laws, including but not limited to ensuring that the individual accepting the Delivery is the individual who placed the order, has provided valid identification, is the required age, and is not intoxicated.

3B. You agree that Postmates may provide You with a prepaid debit card that can be used to pay for certain Deliveries. Any unauthorized use of this prepaid debit card will be considered theft and/or fraud. You further agree that if You lose the prepaid debit card, You will report the loss to Postmates immediately.

3C. You agree that if you fail to complete any Delivery (a "Service Failure"), Postmates reserves the right to recover any costs incurred by Postmates related to your action(s) or omission(s). You further agree that if You fail to return to a Merchant any item that cannot be delivered (a "Return Failure"), Postmates reserves the right to recover any costs incurred by Postmates related to the Return Failure. If You dispute responsibility for a Service Failure or Return Failure, You agree to resolve the dispute pursuant to the "Payment Disputes" provision in Section 5 below.

## 4. Fees For Services Provided

4A. Unless otherwise notified in writing by Postmates or as otherwise provided herein, You will receive payment per completed leg of Delivery in the amount listed in the payment schedule for the relevant type of delivery and/or relevant market as found in the Fleet Help Center. Postmates reserves the right, at its sole discretion, to change the payment schedules at any time for any reason, and Your continued use of the Postmates Platform shall constitute Your consent to any change. Nothing in this Agreement prevents the Parties from negotiating a different rate of pay, and You are free to accept, reject, or ignore any Delivery Opportunities as a means to earn different rates of pay.

4B. Postmates agrees to transmit payment(s) for all completed leg(s) of Delivery to You via direct deposit payment no later than seven (7) days after You complete the related Delivery, unless otherwise agreed to by the Parties. You are responsible for any applicable processing fees associated with such remittance, and You agree to accept transfer and/or transaction fees, as applicable, for such payments.

4C. Customers can pay You a gratuity in cash or via other payment method(s). Nothing in this Agreement shall prevent You from retaining 100% of any gratuity paid by a Customer. Postmates acknowledges it has no right to interfere with the amount of gratuity given to You by a Customer.

## 5. Payment Disputes

5A. In the event of a Service Failure or Return Failure, You agree that You may forfeit all or a portion of the payment as described in Section 4 above (depending on the extent to which the Service Failure results from Your action or omission). Any reduction of payment shall be based upon proof provided by the Customer, Merchant, You, and/or any other party with information relevant to the dispute. Postmates shall make the initial determination as to what percentage of fault You bear, and You shall

have the right to challenge Postmates' determination as described in the provisions set forth in Sections 10 and 11, below.

5B. In the event Postmates fails to remit payment in a timely or accurate manner, You shall have the right to seek proper payment by any legal means contemplated by this Agreement, provided, however, You first inform Postmates in writing of the failure and provide Postmates a reasonable opportunity to cure.

## 6. Reporting Your Income

6A. If You earn the minimum income established by the Internal Revenue Service, Postmates shall report all payments made to You on a calendar year basis by issuing an IRS Form 1099.

6B. You agree that Postmates may fulfill any tax-related obligations, including but not limited to providing 1099 Forms, through any means, including by electronic transmission to the email address associated with Your Postmates account as provided by You. Further, You agree to report all such payments to the appropriate federal, state, and local taxing authorities.

## 7. Insurance

7A. At Your own expense, You shall, during the Term of this Agreement, maintain up-to-date insurance of the types and in amounts equal to or greater than the minimum requirements as required by law in the jurisdiction in which You provide services as contemplated by this Agreement. This includes, but is not limited to, vehicle insurance that is equal to or greater than the minimum vehicle insurance coverage amounts and types required by state or local law, workers' compensation insurance, and/or occupational accident insurance.

7B. Postmates may offer You the opportunity to participate in certain group insurance plans made available by third-party providers to You

7C. You agree to deliver to Postmates, upon request, up-to-date certificates of insurance as proof of coverage. You agree to make available updated certificates each time You purchase, renew, or alter Your insurance coverage. You also agree to give Postmates at least thirty (30) days' prior written notice before cancellation of any insurance policy required by this Agreement.

## 8. Confidentiality

8A. You acknowledge and agree that in the performance of this Agreement You may have direct or indirect access or exposure to Postmates' confidential information ("Confidential Information"). Confidential Information includes Postmates' data, provider IDs, user information, Customer information, package information, and the transaction volume, marketing and business plans,

business, financial, technical, operational and such other nonpublic information (whether disclosed in writing or verbally) that Postmates designates as being proprietary or confidential or that You should reasonably know to treat as confidential.

8B. You acknowledge and agree that: (a) all Confidential Information shall remain the exclusive property of the Postmates; (b) You shall not use Confidential Information for any purpose except to complete a Delivery; (c) You shall not disclose Confidential Information to any third-party; and (d) You shall not keep Confidential Information and shall return or destroy (with confirmation of destruction) all Confidential Information upon the termination of this Agreement or at Postmates' request.

8C. Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it: (a) is or becomes part of the public domain through no action or omission by You; (b) was possessed by You prior to the date of this Agreement without an obligation of confidentiality; or (c) is disclosed to You by a third party having no obligation of confidentiality with respect thereto.

8D. If You becomes legally compelled to disclose any Confidential Information, other than pursuant to a confidentiality agreement, You will provide Postmates prompt written notice of such disclosure and will cooperate with Postmates should Postmates seek a protective order or another appropriate remedy. If Postmates waives Your compliance with this obligation or fails to obtain a protective order or other appropriate remedy, You will furnish only that portion of the Confidential Information that is legally required to be disclosed; provided that any Confidential Information so disclosed shall maintain its confidentiality protection for all purposes other than such legally compelled disclosure.

## 9. Indemnity

9A. You agree to indemnify, protect, and hold harmless Postmates, including all parent, subsidiary, and/or affiliated companies, as well as its and their past and present successors, assigns, officers, owners, directors, agents, representatives, attorneys, and employees (collectively "Indemnitees"), from: (i) any and all claims, demands, damages, lawsuits, losses, liabilities and causes of action arising directly or indirectly from, as a result of or in connection with the actions of You and/or any Subcontractor under this Agreement, including but not limited to, personal injury to or death of any person (including You and/or any Subcontractor); (ii) any liability arising from Your failure to comply with the terms of this Agreement; (iii) any and all tax liabilities and responsibilities for payment of all federal, state, and/or local taxes, including, but not limited to all payroll taxes, self-employment taxes, workers' compensation premiums, and any contributions imposed or required under federal, state, and/or local laws, that are owed by You with respect to Your and/or any Subcontractors using the Postmates Platform to complete Deliveries; and (iv) all costs associated with Your business, including, but not limited to, the expense and responsibility for any and all applicable insurance, local, state, and/or federal licenses, permits, taxes, and assessments of any and all regulatory agencies, boards or municipalities.

9B. You agree that Your obligations in this Section 9 shall include the cost of defense, including attorneys' fees, as well as the payment of any final judgment rendered against or settlement agreed upon by Postmates or any of the Indemnitees

## 10. Mutual Arbitration Provision

10A. Arbitration of Disputes. The Parties mutually agree to resolve any disputes between them exclusively through final and binding arbitration instead of filing a lawsuit in court.

i. Postmates and You expressly agree that this Mutual Arbitration Provision is governed exclusively by the Federal Arbitration Act (9 U.S.C. §§ 1-16) ("FAA") and shall apply to any and all claims between the Parties, including but not limited to those arising out of or relating to this Agreement, Your classification as an independent contractor, Your provision of services under this Agreement, the fees received by You for performing Deliveries, the termination of this Agreement, the deactivation of Your Postmates account, and all other aspects of Your relationship with Postmates, past or present, whether arising under federal, state, or local law, including without limitation harassment, discrimination, and/or retaliation claims and claims arising under or related to the Civil Rights Act of 1964 (or its state or local equivalents), Americans with Disabilities Act (or its state or local equivalents), Age Discrimination in Employment Act (or its state or local equivalents), Family Medical Leave Act (or its state or local equivalents), Fair Labor Standards Act (or its state or local equivalents), state and local wage and hour laws, state and local statutes or regulations addressing the same or similar subject matters, and all other federal, state, and/or local claims arising out of or relating to Your relationship or termination of that relationship with Postmates. The Parties expressly agree that this Agreement shall be governed by the FAA even in the event You and/or Postmates are otherwise exempted from the FAA. Any disputes in this regard shall be resolved exclusively by an arbitrator. In the event, but only in the event, the arbitrator determines the FAA does not apply, the state law governing arbitration agreements in the state in which You perform delivery services shall apply.

ii. Only an arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision, including without limitation any dispute concerning arbitrability. However, as stated in Section 10B.iv below, the preceding clause shall not apply to any dispute relating to or arising out of the Class Action Waiver and Representative Action Waiver, which must proceed in a court of competent jurisdiction and cannot be heard or arbitrated by an arbitrator.

10B. BY AGREEING TO ARBITRATE DISPUTES BETWEEN THEM AS DESCRIBED HEREIN THE PARTIES TO THIS AGREEMENT AGREE THAT ALL SUCH DISPUTES WILL BE RESOLVED THROUGH BINDING ARBITRATION BEFORE AN ARBITRATOR AND NOT BY WAY OF A COURT OR JURY TRIAL.

i.  If either Party wishes to initiate arbitration, the initiating Party must notify the other Party in writing via certified mail, return receipt requested, or hand delivery within the applicable statute of limitations period. This demand for arbitration must include (1) the name and address of the Party seeking arbitration, (2) a statement of the legal and factual basis of the claim, and (3) a description of the remedy sought. Any demand for arbitration by You must be delivered to Postmates Attn: Legal Department, 201 3rd Street, Suite 200, San Francisco, California, 94103.

ii.  **CLASS ACTION WAIVER—PLEASE READ.** Postmates and You mutually agree that any and all disputes or claims between the Parties will be resolved in individual arbitration. The Parties further agree that by entering into this Agreement, they waive their right to have any dispute or claim brought, heard or arbitrated as a class and/or collective action, or to participate in any class and/or collective action, and an arbitrator shall not have any authority to hear or arbitrate any class and/or collective action ("Class Action Waiver").

iii.  **REPRESENTATIVE ACTION WAIVER—PLEASE READ.** Postmates and You mutually agree that any and all disputes or claims between the Parties will be resolved in individual arbitration. The Parties further agree that by entering into this Agreement, they waive their right to have any dispute or claim brought, heard or arbitrated as a representative action, or to participate in any representative action, including but not limited to, claims brought under any state's Private Attorneys General Act (PAGA), and an arbitrator shall not have any authority to arbitrate a representative action ("Representative Action Waiver").

iv.  Notwithstanding any other clause contained in this Agreement, this Mutual Arbitration Provision, or the American Arbitration Association Commercial Arbitration Rules ("AAA Rules"), any claim that all or part of this Class Action Waiver and/or Representative Action Waiver is unenforceable, unconscionable, void, or voidable shall be determined only by a court of competent jurisdiction and not by an arbitrator. As stated above, all other disputes regarding interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision shall be determined exclusively by an arbitrator.

v.  You agree and acknowledge that entering into this Mutual Arbitration Provision does not change Your status as an independent contractor in fact and in law. You further agree that when performing services pursuant to the terms of this Agreement, You are not doing so as an employee of Postmates, a Merchant, or a Customer. You further agree that any disputes in this regard shall be determined exclusively by an arbitrator.

vi.  Any arbitration shall be governed by the AAA Rules, except as follows: (1) The arbitration shall be heard by one arbitrator selected in accordance with the AAA Rules. The arbitrator shall be an attorney with experience in the law underlying the dispute; (2) Unless applicable law provides otherwise, as determined by the Arbitrator, Postmates and You shall equally share filing fees and

other similar and usual administrative costs, as are common to both court and administrative proceedings. Postmates shall pay any costs uniquely associated with arbitration, such as payment of the Arbitrator and room rental; (3) The arbitrator may issue orders (including subpoenas to third-parties) allowing the Parties to conduct discovery sufficient to allow each Party to prepare that Party's claims and/or defenses, taking into consideration that arbitration is designed to be a speedy and efficient method for resolving disputes; (4) Except as provided in the Class Action Waiver and Representative Action Waiver, the arbitrator may award all remedies to which a Party is entitled under applicable law and which would otherwise be available in a court of law, but shall not be empowered to award any remedies that would not have been available in a court of law for the claims presented in arbitration. The arbitrator shall apply the state or federal substantive law, or both, as is applicable; (5) The arbitrator may hear motions to dismiss and/or motions for summary judgment and will apply the standards of the Federal Rules of Civil Procedure governing such motions; (6) The arbitrator's decision or award shall be in writing with findings of fact and conclusions of law; (7) Either Postmates or You may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief on the ground that without such relief the arbitration provided in this Section 10 may be rendered ineffectual.

vii. Regardless of any other terms of this Agreement, nothing prevents You from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Mutual Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Mutual Arbitration Provision. This Mutual Arbitration Provision also does not prevent federal administrative agencies from adjudicating claims and awarding remedies based on the claims addressed in this Section 10, even if the claims would otherwise be covered by this Mutual Arbitration Provision. Nothing in this Mutual Arbitration Provision prevents or excuses a Party from satisfying any conditions precedent and/or exhausting administrative remedies under applicable law or as required under this Agreement before bringing a claim in arbitration. Postmates will not retaliate against You for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

viii. The AAA Rules may be found at www.adr.org or by searching for "AAA Commercial Arbitration Rules" using a service such as www.google.com or by asking Postmates to provide a copy.

ix. **Right to Opt Out of Arbitration.** Arbitration is not a mandatory condition of Your contractual relationship with Postmates, and therefore You may opt out of this Mutual Arbitration Provision. In order to opt out, You must notify Postmates of Your intention to opt out by submitting to Postmates, via USPS Priority Mail or hand delivery to Attn: Legal Department, 201 3rd Street, Suite 200, San Francisco, California, 94103, a written notice stating that you are opting out of this

Mutual Arbitration Provision. This written notice must be signed by You, and not any attorney, agent, or other representative of yours. In order to be effective, Your opt-out notice must be postmarked or received by Postmates within thirty (30) days of Your acceptance of this Agreement. If You opt out as provided in this subparagraph, Contractor will not be subject to any adverse action as a consequence of that decision and may pursue available legal remedies without regard to this Mutual Arbitration Provision. If You do not opt out within thirty (30) days of Your execution of this Agreement, Your failure to do so shall constitute mutual acceptance of the terms of this Mutual Arbitration Provision by Postmates and You.

x.  You may only opt out on behalf of Yourself. A written notice submitted to Postmates indicating Your intention to opt out may apply, at most, to You.

xi.  Your decision to opt out of this Mutual Arbitration Provision will relieve You only of Your obligation to arbitrate the disputes specified in this Mutual Arbitration Provision, and does not relieve You of any obligation to arbitrate disputes not specified in this Mutual Arbitration Provision that might arise under any Postmates Terms of Service to which You may be bound as a customer. Similarly, Your decision to opt out of another arbitration provision contained in any other agreement shall not relieve You of Your obligation to arbitrate disputes pursuant to this Mutual Arbitration Provision.

xii.  Right To Consult With An Attorney: You have the right to consult with private counsel of Your choice, at Your own expense, with respect to any aspect of, or any claim that may be subject to this Mutual Arbitration Provision.

xiii.  In the event any portion of this Mutual Arbitration Provision is deemed unenforceable, the remainder of this Mutual Arbitration Provision will be enforceable. In any case in which (1) the dispute is filed as a class, collective, or representative action and (2) there is a final judicial determination that all or part of the Class Action Waiver and/or Representative Action Waiver is invalid or unenforceable, the class, collective, or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver and Representative Action Waiver that is valid and enforceable shall be enforced in arbitration.

## 11. Term and Termination of Agreement

11A. This Agreement shall remain in full force and effect for a term of one (1) year from the date it is accepted by You and may not be terminated early without penalty except in the following limited circumstances:

i.  Upon the mutual written consent of the Parties hereto (with electronic communication satisfying this requirement). with the mutually agreed-upon termination date stated in the written notice.

    ii. By Postmates, upon thirty (30) days' written notice to You, if You have not performed a delivery for a period of at least four (4) months (with electronic communication satisfying this requirement), with the date of transmission commencing the thirty (30) day period.

    iii. By Postmates, in the event of an anticipated change in control or cessation of its operations in Your market, upon thirty (30) days' written notice to You (with electronic communication satisfying this requirement), with the date of transmission commencing the thirty (30) day period.

    iv. If one Party has materially breached the Agreement, immediately upon written notice to the breaching Party (with electronic communication satisfying this requirement), with such notice specifying the breach relied upon. In the case of a material breach by You, and upon written notice, Postmates may deactivate Your Postmates account.

11B. The following acts and/or occurrences shall constitute a material breach of this Agreement:

    i. Failure by Postmates to remit to You all fees for a completed Delivery within twenty-one (21) days of the completed Delivery.

    ii. Failure by You to maintain current insurance coverage in the amounts and types specified herein or as required by law.

    iii. Failure by You to complete a Delivery without waiver of the obligation as communicated by Postmates.

    iv. Failure by You to maintain all licenses, permits, authorities, registrations and/or other prerequisites to operate that are required by law and/or this Agreement.

    v. Any act by a Party that causes the other party to violate its obligations under any applicable state, federal or local law.

    vi. Documented complaint by a Customer, employee of Postmates, employee of a Merchant. and/or third-party that You have engaged in conduct that a reasonable person would find physically threatening, highly offensive or harassing.

    vii. Failure by You to reasonably cooperate with Postmates in the investigation of or response to any claim (insurance, civil, or otherwise) arising out of or related to Your and/or Subcontractor's alleged or actual acts or omissions while using Postmates.

    viii. Documented abuse or manipulation of promotions or referral programs offered by Postmates.

ix. Failure by You to provide delivery in a manner consistent with Postmates' effective operation of the Postmates Platform.

11C. Early termination of this Agreement by Postmates without proper notice (as established in subsection A above) shall result in liquidated damages of $100.00 for each day that notice is not properly provided to You, up to a maximum amount of $500.00. The Parties acknowledge that liquidated damages are appropriate because actual damages are not reasonably ascertainable.

11D. Other than for illegal or destructive acts, in the event You dispute that You materially breached this Agreement, You may challenge Postmates' decision using the dispute resolution process described in Section 10, above. In all such instances, the Parties will be responsible for their own attorneys' fees and costs, subject to any remedy to which they may be entitled under applicable law and which would otherwise be available in a court of law, but Postmates shall bear the Arbitrator's and arbitration fees and costs. Notwithstanding the foregoing, as set forth below, You are not precluded from asserting that applicable law requires Postmates to bear the Arbitrator's and arbitration fees and costs, even for illegal or destructive acts. In the event there is a dispute in this regard, the Arbitrator must determine the appropriate apportionment of fees at the earliest practicable time following commencement of the arbitration.

11E. If not terminated, the Agreement shall be automatically renewed for successive one-year terms, unless terminated by either party as described in Sections 11A and 11B.

11F. The Parties' obligations and rights arising under Section 5, 6, 8, 9, 10, 11, 12, and 13 of this Agreement shall survive termination of this Agreement and deactivation of Your Postmates account.

## 12. Entire Agreement, Transferability, And Waiver

12A. Unless otherwise stated in this Agreement, this Agreement shall constitute the entire agreement and understanding between the Parties with respect to the subject matter of this Agreement and shall not be modified, altered, changed, or amended in any respect, unless in writing and executed by both Parties. This Agreement supersedes any prior contract between the Parties. This Agreement may not be assigned by either Party without written consent of the other, and shall be binding upon the Parties hereto, including their heirs and successors, provided, however, that Postmates may assign its rights and obligations under this Agreement to an affiliate of Postmates or any successor(s) to its business and/or purchaser of all or substantially all of its stock or assets. References in this Agreement to Postmates shall be deemed to include such successor(s).

12B. The failure of a Party in any instance to insist upon a strict performance of the terms of this Agreement or to exercise any option herein, shall not be construed as a waiver or relinquishment of such term or option and such term or option shall continue in full force and effect.

## 13. Miscellaneous

13A. Severability. Except as otherwise provided in this agreement, if any part of this Agreement is declared unlawful or unenforceable, the remainder of this Agreement shall remain in full force and effect.

13B. Captions. Captions appearing in this Agreement are for convenience only and do not in any way limit, amplify, modify, or otherwise affect the terms and provisions of this Agreement.

13C. Savings Clause. If any part of this Agreement is declared unlawful or unenforceable, the remainder of this Agreement shall remain in full force and effect.

13D. Force Majeure. The performance of the obligations of this Agreement on the part of either Party shall be excused by reasons of closing of public highways, changes in operations, strikes or work stoppages, weather conditions that make operations unsafe or impractical, Acts of God, or the temporary or permanent cessation of business by either Party.

13E. Conflict of Terms Clause. In case of any inconsistency or conflict between the terms and conditions of this Fleet Agreement and those of the Privacy Policy or Terms of Service, the terms of this Fleet Agreement shall govern and control.

13F. Stripe Connected Account Terms of Service. You represent and warrant that You have reviewed, understand, and agree to the Stripe Connected Account Agreement, which is expressly incorporated herein by reference.

By entering into this Agreement, You expressly acknowledge and agree that You read and fully understand the provisions of this Agreement, You have had sufficient time and opportunity to consult with legal and tax advisors before executing this Agreement, You are legally competent to enter into this Agreement, and You agree to be bound by this Agreement.

GET THE APP   PRIVACY   TERMS