GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
    TEvangelis@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
    BEvanson@gibsondunn.com
HEATHER L. RICHARDSON, SBN 246517
    HRichardson@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA,
    SBN 254433
    DManthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
    JLipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Tel: 415.393.8200
Fax: 415.393.8306

Attorneys for Plaintiffs Lydia Olson, Miguel Perez,
Postmates Inc., and Uber Technologies, Inc.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYDIA OLSON, MIGUEL PEREZ, POSTMATES INC., and UBER TECHNOLOGIES, INC.<br><br>                    Plaintiffs,<br><br>        v.<br><br>STATE OF CALIFORNIA; XAVIER BECERRA, in his capacity as Attorney General of the State of California; and "JOHN DOE," in his official capacity,<br><br>                    Defendants. | **CASE NO. 2:19-cv-10956-DMG-RAO**<br><br>**DECLARATION OF JUSTIN MCCRARY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Dolly M. Gee<br>Hearing Date: February 7, 2020<br>Time: 2:00 P.M. |

Gibson, Dunn &
Crutcher LLP

Declaration of Justin McCrary
in Support of Plaintiffs' Motion
for Preliminary Injunction

Case No. 2:19-cv-10956

# TABLE OF CONTENTS

I.  Introduction ................................................................................................................. 1

    A.  Qualifications ................................................................................................ 1

    B.  Assignment ................................................................................................... 3

    C.  Summary of Opinions ................................................................................. 3

II.  The On-Demand Economy Has Grown in Size and Provides Benefits to Workers and Consumers ......................................................................................................... 5

    A.  Size and Growth of Work Opportunities in the On-Demand Economy ................. 6

    B.  The On-Demand Economy Has Several Distinguishing Features, Which Improve Market Efficiency and Benefit Workers and Consumers ................................. 7

III.  Background on AB 5 and Worker Classification ........................................... 13

IV.  If AB 5 Were Enforced to Require Reclassification of Workers in the On-Demand Economy, It Will Cause Harms to Plaintiffs, Other Network Companies, Other Workers, and Consumers ................................................................................................. 15

    A.  Network Companies Will Incur Substantial Costs ................................... 15

    B.  Network Companies Will Increase Prices and Sell Fewer Products and Services 16

    C.  Network Companies May Make Substantive Changes to Worker Arrangements, Which Would Lead to Additional Harms ....................................................... 20

## I.      Introduction

### A.      Qualifications

1.      I am an economist with expertise in economic modeling, law and economics, and statistical methods, among other subjects.  I received my A.B. in Public Policy from Princeton University in 1996.  After working at National Economic Research Associates in White Plains, New York, and the Federal Reserve Bank of New York from 1996–1998, I began my Ph.D. in Economics at the University of California, Berkeley ("Berkeley"), completing the degree in June 2003.  From 2003 through 2007, I was Assistant Professor of Public Policy and Assistant Professor of Economics at the University of Michigan ("Michigan").  In January 2008, I became Assistant Professor of Law at Berkeley and was promoted to Professor in July 2010.  While at Berkeley, I taught courses on introductory, intermediate, and advanced statistics to J.D., L.L.M., and Ph.D. students; on law and economics to J.D. students as well as undergraduates; on labor economics to Ph.D. students in economics and in other fields; and on business law to J.D., L.L.M., and M.B.A. students.

2.      From July 1, 2017, to December 31, 2017, I took leave from Berkeley and assumed a position as the Samuel Rubin Visiting Professor of Law at Columbia Law School ("Columbia").  In 2018, I joined the faculty at Columbia as the Paul J. Evanson Professor of Law, a position I hold today.  At Columbia, I teach corporations, antitrust, economics, statistics, and law and economics.

3.      In addition to my position as Professor at Berkeley, I served as the Founding Director of D-Lab, the Social Sciences Data Laboratory at Berkeley, from June 2014 to June 2017.  At D-Lab, I lectured on and advised graduate students and faculty regarding high performance computing, statistical software, and statistical techniques.

4.      From September 2008 until July 2014, when I began to direct the D-Lab, I co-directed the Law and Economics Program at Berkeley Law with Robert Cooter and Daniel Rubinfeld (2008–2011), and with Robert Cooter and Eric Talley (2012–2014).

5.      Since 2008, I have co-directed the Economics of Crime Working Group of the National Bureau of Economic Research ("NBER").  The NBER is the preeminent professional association of economists in the world, with over 1,400 members worldwide.  I was invited to become a Faculty Research Fellow of the NBER in 2006 and remained in that position until 2012, when I was invited to become a Faculty Research Associate.

6.      My research spans a range of topics, including econometric and statistical methodology, antitrust, crime, employment discrimination, education, fertility, financial markets, income inequality, and monetary policy.  Many of my articles have been published in leading peer-reviewed economics journals such as the American Economic Review, the Review of Economics and Statistics, the Journal of Economic Literature, and the Journal of Econometrics.

7.      In addition, I am frequently asked to review articles for the leading economics journals, including Econometrica, the American Economic Review, the Quarterly Journal of Economics, the Journal of Political Economy, the Review of Economic Studies, the Journal of Econometrics, the Review of Economics and Statistics, and the American Law and Economics Review.

8.      I have co-edited a book, Controlling Crime: Strategies and Tradeoffs, which was published by the University of Chicago Press.  Over the years, my research has been supported by the universities at which I have taught, the Arnold Foundation, the MacArthur Foundation, the NBER, the National Institutes of Health, the National Science Foundation, the Robert Wood Johnson Foundation, and the Spencer Foundation.

9.      I frequently provide pro bono consulting to federal, state, and local government entities, including the U.S. Department of Justice, the California Department of Justice, the Equal Employment Opportunity Commission, and the City of Chicago.

10.     In addition to my work as an academic and as a testifying expert, I have experience as a consultant on a variety of matters.  My consulting experience has spanned a wide range of industries and markets, with many involving the study and use of economics, econometrics, and statistics.

11.     I have served as an expert witness in a variety of litigation matters, including matters involving consumer class actions, and provided economic and statistical analysis on issues related to class certification, among others.  I am being compensated for my work on this matter at my standard rate of $900 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

12.     A copy of my curriculum vitae, including a list of my previous testimony and depositions, is included as Appendix A.  A list of the materials I have relied upon in forming my opinions is included as Appendix B.

### B.     Assignment

13.     Counsel for Plaintiffs asked me to analyze whether there are economic harms associated with California Assembly Bill 5 ("AB 5") to Plaintiffs and on-demand economy companies in general,[1] as well as workers and consumers, if AB 5 were enforced against Plaintiffs in a manner consistent with what I understand is its sponsors' stated intent to require that all workers who find customers through mobile app-based companies in the on-demand economy be reclassified as employees of those companies.

### C.     Summary of Opinions

14.     In this report, I consider a particular type of platform company that operates in a two-sided or multi-sided market bringing together consumers and service providers.[2]  Since platform companies do not always involve service providers, I define for the purposes of this report the

---

[1] The on-demand aspect of these companies refers "to their use of technology to respond to a customer's *immediate...* or *specific* need," such as for a driver or service provider skillset.  A similar term to the on-demand economy is the gig economy.  *See* Sarah Donovan, David Bradley, and Jon Shimabukuro, "What Does the Gig Economy Mean for Workers?" Congressional Research Service, February 5, 2016, p. 1, https://fas.org/sgp/crs/misc/R44365.pdf, accessed December 30, 2019.

[2] Economists and at least some bodies of law have recognized that two-sided markets can be fundamentally different from those of other markets.  *See* E. Glen Weyl, "A Price Theory of Multi-Sided Platforms," *American Economic Review* 100, no. 4, 2010, pp. 1642–1672 at pp. 1644, 1665–1668;  Opinion, *Ohio et al. v. American Express Co. et al.*, June 25, 2018, pp. 2–5, 12–15; and Decision, *US Airways, Inc., for American v. Sabre Holdings Corporation*, September 11, 2019, pp. 27–29, 57–58.

term "network company" to refer to a platform company that connects independent service providers and consumers, where the independent service provider supplies a one-time service such as delivering food or local transportation. Those independent service providers who find their customers by using network companies' mobile apps are sometimes referred to as "on-demand workers," performing "on-demand" or "gig" work.[3]  In this report I refer to them as "on-demand workers."  Examples of network companies include Postmates and Uber, and examples of service providers who utilize network companies' platforms include delivery persons and drivers.  Network companies have been transformative in connecting consumers and service providers.

15.     Network companies have several distinguishing features that improve market efficiency and benefit both consumers and service providers:

    a.  They allow service providers the flexibility to choose their schedule, location, and hours, which is highly valued by many service providers.

    b.  They often allow service providers to work on multiple platforms or hold various jobs at once, which benefits service providers and enhances competition between network companies.

    c.  They have a relatively quick and easy enrollment process, which facilitates independent service provider entry into the on-demand economy and may especially benefit independent service providers who need money quickly, such as those between jobs.

    d.  They efficiently match labor supply with consumer demand through the use of advanced technology and flexible schedules, benefiting both independent service providers and consumers.

16.     Based on my analyses and review of the evidence, I find that AB 5 – if enforced against Plaintiffs in a manner consistent with the sponsors' stated intent to require that all workers who find customers through mobile app-based companies in the on-demand economy be reclassified as employees – would cause harm to a wide group of Californians in a variety of ways.

17.     Reclassification would cause harm to Postmates, Uber, and other network companies as:

---

[3] Sarah Donovan, David Bradley, and Jon Shimabukuro, "What Does the Gig Economy Mean for Workers? Congressional Research Service, February 5, 2016, pp. 1–2, https://fas.org/sgp/crs/misc/R44365.pdf, accessed December 30, 2019.

    a.   They will incur a substantial increase in costs.

    b.   They will sell fewer products and services.

    c.   They may need to make substantive changes to work arrangements and business models in response to the new cost structure and regulations. For example, in response to wage and hour regulations, network companies are likely to decide to exert more control over service providers, such as restricting work hours, imposing strict schedules, or forbidding service providers from working on multiple platforms simultaneously (multi-apping). In turn, network companies are likely to be less efficient in matching consumer demand with labor supply than they currently are.

18.    Reclassification would cause harm to many individuals who have chosen to work as independent contractors using network companies' apps to find customers.

    a.   Some independent contractors will lose their sources of income, earn lower compensation per task, or have fewer tasks available to them.

    b.   Some will be able to continue working, but in a manner that they do not prefer. They may have to work different hours, accept a less flexible schedule, or lose the ability to multi-app.

19.    Reclassification would cause harm to consumers who benefit from the products and services the on-demand economy makes available to them.

    a.   Consumers will pay higher prices for products and services provided by network companies. While I have not undertaken an econometric analysis as part of this report, it is my opinion that some prices likely would be materially higher and the viability of some companies or markets would be in question.

    b.   Consumers could have less access to service providers if matching becomes less efficient.

## II.    The On-Demand Economy Has Grown in Size and Provides Benefits to Workers and Consumers

20.    Companies in the on-demand economy participate in a multi-sided market where service providers constitute one of the sides utilizing the platform. More concretely, the on-demand

economy can be thought of as involving multiple components, which typically include: (1) independent service providers paid by the task; (2) consumers who demand the specific service provided by those service providers; (3) merchants who seek to connect with consumers and independent service providers; and (4) a platform run by a network company that connects the service provider, the merchant, and consumer.[4]  These companies make it easier for service providers to find consumers quickly at low cost.  Such companies are frequently app-based. Prominent examples of network companies include Postmates and Uber.  The Postmates platform connects consumers with merchants, and if consumers request delivery, with independent delivery persons who deliver food and other products from restaurants and merchants.[5]  The Uber platform connects consumers with drivers, food deliverers, and bike rentals, among other services.[6]

21.     In this section, I provide an overview of the on-demand economy and situate the business models of Postmates and Uber in that context.  I begin by documenting the size and growth of work opportunities in the on-demand economy.  I then present several distinguishing features of on-demand economy companies like Postmates and Uber, which improve market efficiency and benefit workers and consumers.

### A.     Size and Growth of Work Opportunities in the On-Demand Economy

22.     Work arrangements involving intermediaries have long existed, but they have become more common after the advent of online or app-based platforms, and work arrangements involving intermediaries that are short-term or even task-based were unusual until online connectivity reduced the cost of matchmaking.  Research by Katz and Krueger finds that between 2005 and 2015, there was an increase in the share of workers engaged in alternative work arrangements, which includes independent contractors, on-call workers, temporary help agency workers, and contract workers.[7]  They show that about 10 to 15 percent of workers were

---

[4] National Association of Counties, Counties Futures Lab, "The Future of Work:  The Rise of the Gig Economy," November 2017, p. 3, https://www.naco.org/sites/default/files/documents/Gig-Economy.pdf, accessed December 23, 2019; and Sarah Donovan, David Bradley, and Jon Shimabukuro, "What Does the Gig Economy Mean for Workers? Congressional Research Service, February 5, 2016, pp. 1–2, https://fas.org/sgp/crs/misc/R44365.pdf, accessed December 30, 2019.

[5] Postmates, "About Postmates," https://postmates.com/about, accessed December 24, 2019.

[6] Uber, "About us," Products Section, https://www.uber.com/us/en/about/, accessed December 24, 2019.

[7] These work arrangements are alternative in that they are different from a more traditional employee based work arrangement.  *See* Lawrence F. Katz and Alan B. Krueger, "Understanding Trends in Alternative Work Arrangements in the United States," NBER Working Paper No. 25425, 2019, p. 3, ("[the survey] suggests a 1-2 percentage point increase in the share of workers in alternative work from 2005 to 2015"); and Lawrence F. Katz and Alan B. Krueger,

engaged in alternative work arrangements in the years around 2015, with the variance due to differences in survey design and other factors.[8]  Other researchers have reached a similar conclusion about California, stating that "independent contracting is probably growing, but not very dramatically [in California]."[9]

23.	Individuals working in the mobile app-based on-demand economy, such as a delivery person using the Postmates app or a driver using the Uber app, represent a small but growing share of all alternative work arrangements.  For example, Katz and Krueger note that according to several recent studies, "0.5 percent to 1.5 percent of the workforce was engaged in online work [on on-demand platforms like Uber and Postmates] for sample periods covering late 2015 to the end of 2017."[10]  Similarly, research by JP Morgan finds that slightly more than 1 percent of the participants in their sample had received income from using on-demand platforms to perform transportation work or other work, up from about 0.1 percent in 2013.[11]  Individuals in San Francisco and California overall were more likely to have earnings from using on-demand platforms than individuals in most other cities and states.[12]

### B.	The On-Demand Economy Has Several Distinguishing Features, Which Improve Market Efficiency and Benefit Workers and Consumers

---

"The Rise and Nature of Alternative Work Arrangements in the United States, 1995–2015," *ILR Review* 72, no. 2, 2019, pp. 382–416 at p. 383.

[8] Lawrence F. Katz and Alan B. Krueger, "Understanding Trends in Alternative Work Arrangements in the United States," NBER Working Paper No. 25425, 2019, pp. 1–2, and Table 1.

[9] Robert Habans, "Is California's Gig Economy Growing?  Exploring Trends in Independent Contracting," UCLA Institute for Research on Labor and Employment, June 2016, p. 38, https://irle.ucla.edu/wp-content/uploads/2016/03/Is-Californias-Gig-Economy-Growing-Exploring-Trends-in-Independent-Contracting.pdf, accessed December 23, 2019.

[10] Lawrence F. Katz and Alan B. Krueger, "Understanding Trends in Alternative Work Arrangements in the United States," NBER Working Paper No. 25425, 2019, pp. 19–20;  and Lawrence F. Katz and Alan B. Krueger, "The Rise and Nature of Alternative Work Arrangements in the United States, 1995–2015," *ILR Review* 72, no. 2, 2019, pp. 382–416 at p. 383 ("Thus, the online gig workforce is relatively small compared to other forms of alternative work arrangements, although it is growing very rapidly.")

[11] Diana Farrell, Fiona Greig, and Amar Hamoudi, "The Online Platform Economy in 2018:  Drivers, Workers, Sellers, and Lessors," JPMorgan Chase & Co. Institute, 2018, p. 3, https://institute.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-ope-2018.pdf, accessed December 26, 2019.

[12] Diana Farrell, Fiona Greig, and Amar Hamoudi, "The Online Platform Economy in 2018:  Drivers, Workers, Sellers, and Lessors," JPMorgan Chase & Co. Institute, 2018, pp. 19–20, https://institute.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-ope-2018.pdf, accessed December 26, 2019.

>    1.    **The On-Demand Economy Allows Workers Flexibility to Choose Their Schedule and Hours, Which Is Highly Valued by Many Workers**

24.    On-demand platforms offer workers the ability to have flexible work schedules, which many workers prefer.  Most workers in alternative work arrangements do not work rigid 40-hour-per-week jobs.[13]  In contrast to the set schedule of a traditionally employed worker, drivers and delivery persons who use network companies' apps to find work just log on to those companies' apps at times that are convenient to them in order to find customers.[14]

25.    Research on Uber further shows that workers value and commonly take advantage of the fact that using these platforms can support flexible work schedules.  Chen et al. analyze data on actual work schedules of drivers and find that the data show that "a substantial fraction of drivers active in one week are simply not active the subsequent week" and that "there is substantial week-to-week variation in hours worked."[15]  That is, different drivers have distinct preferences for work schedules and those preferences also vary over time.[16]  Traditional full-time or even part-time jobs could only imperfectly accommodate such preferences.  Chen et al. estimate that drivers who use the Uber app earn more than twice the surplus they would in less-flexible [work] arrangements."[17]

26.    Additional academic research further confirms that some workers have a strong preference for flexibility.  Mas and Pallais find that even though the majority of workers do not value scheduling flexibility, a substantial share of them are willing to give up a large share of their earnings to avoid employer discretion in setting hours.[18]  They find that women are

---

[13] Lawrence F. Katz and Alan B. Krueger, "The Rise and Nature of Alternative Work Arrangements in the United States, 1995–2015," *ILR Review* 72, no. 2, 2019, pp. 382–416 at p. 404; and Sean Captain, "Ahead of its IPO, Postmates starts offering no-strings perks for couriers," *FastCompany,* August 13, 2019, https://www.fastcompany.com/90389438/postmates-offers-no-strings-perks-for-couriers-ahead-of-ipo, accessed December 24, 2019.

[14] To start driving, a driver using the Uber app needs to click "Go" on the app and accept the match to a rider.  *See* Uber, "Information about taking trips," https://www.uber.com/us/en/drive/basics/how-to-take-trips/, accessed December 23, 2019.  Postmates fleet agreement recognizes that delivery persons are "free to select the times [she or he] wish[es] to use Postmates."  *See* Postmates, "Fleet Agreement," May 11, 2019, https://fleet.postmates.com/legal/agreement, accessed December 23, 2019.

[15] M. Keith Chen, Judith Chevalier, Peter Rossi, and Emily Oehlsen, "The Value of Flexible Work:  Evidence from Uber Drivers," *Journal of Political Economy* 127, no. 6, 2019, pp. 2735–2794 at pp. 2748–2749.

[16] M. Keith Chen, Judith Chevalier, Peter Rossi, and Emily Oehlsen, "The Value of Flexible Work:  Evidence from Uber Drivers," *Journal of Political Economy* 127, no. 6, 2019, pp. 2735–2794 at pp. 2746–2749.

[17] M. Keith Chen, Judith Chevalier, Peter Rossi, and Emily Oehlsen, "The Value of Flexible Work:  Evidence from Uber Drivers," *Journal of Political Economy* 127, no. 6, 2019, pp. 2735–2794 at p. 2735.

[18] They conduct an experiment with job applicants for a call center position. Their findings from this experiment are consistent with their findings from a nationally representative survey of the labor force. Alexandre Mas and Amanda

especially interested in flexible jobs in which they can avoid hours irregularity by choosing the hours they work.[19]  The schedule flexibility offered by Uber or Postmates allows workers to avoid irregular work set by an employer and instead choose when and where the worker would like to work.

> **2.    Network Companies Often Allow Workers to Work on Multiple Platforms or Hold Various Jobs at Once, Benefiting Workers and Increasing Competition Between Platforms**

27.    Katz and Krueger show that workers with alternative work arrangements are almost three times more likely to hold multiple jobs rather than traditional workers.[20]  Similarly, according to a national survey by Marketplace Edison Research, 44 percent of on-demand workers consider the money they earn in the on-demand economy as their primary source of income, while 53 percent consider it as their secondary source.[21]  According to research by JP Morgan Chase Institute, established platform participants earn a quarter of their income using platforms, suggesting that workers prefer to combine different forms of labor supply.[22]  Workers' ability to work using multiple platforms is bolstered by the network companies' willingness to allow the workers who use them to do so flexibly, as documented above.  This income supplement is particularly important for lower-income individuals.[23]

---

Pallais, "Valuing Alternative Work Arrangements," *American Economic Review* 107, no. 12, 2017, pp. 3722–3759 at pp. 3725-3726 ("almost 40 percent of applicants would not take this job [which permit employer discretion in scheduling] even if it paid 25 percent more than a M-F 9 AM-5 PM position").

[19] Alexandre Mas and Amanda Pallais, "Valuing Alternative Work Arrangements," *American Economic Review* 107, no. 12, 2017, pp. 3722–3759 at p. 3727.

[20] Table 2 shows that traditional workers are multiple job holders, while 32 to 33 percent of workers in alternative work arrangements hold multiple jobs according to Table 3.  *See* Lawrence F. Katz and Alan B. Krueger, "The Rise and Nature of Alternative Work Arrangements in the United States, 1995–2015," *ILR Review* 72, no. 2, 2019, pp. 382–416, Table 2 at p. 389.

[21] Three percent of the workers did not know how to classify it.  *See* Marketplace Edison Research, "The Gig Economy," December 2018, p. 4, http://www.edisonresearch.com/wp-content/uploads/2019/01/Gig-Economy-2018-Marketplace-Edison-Research-Poll-FINAL.pdf, accessed December 21, 2019.

[22] JPMorgan Chase & Co. Institute, "The Online Platform Economy:  Who earns the most?" https://institute.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/ope-who-earns-the-most.pdf, accessed December 21, 2019.

[23] For the lower quintile of the income distribution, the income earned by using an on-demand online platform corresponded to 28.3 percent of the annual earnings among established platform participants.  In contrast, among the highest quintile, this share was below 20 percent.  They define "established [platform] participants" as "those who also received platform income at any point in the two years before October 2014."  *See* JPMorgan Chase & Co. Institute, "The Online Platform Economy:  Who earns the most?" pp. 2, 6, https://institute.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/ope-who-earns-the-most.pdf, accessed December 21, 2019.

28.     Both Postmates and Uber allow workers who use their apps to use multiple apps simultaneously ("multi-apping").[24]  For example, Uber does not have a policy preventing a driver from multi-apping, nor does it have a policy preventing a driver from competing with the Uber app by completing referrals from other rideshare lead generation platforms such as the Lyft app.[25]

29.     These arrangements allow workers to choose among different apps, enhancing immediate competition between platforms for workers.  For example, if work using the Uber app did not offer drivers sufficiently competitive compensation and terms (whether generally, or on a given day, or even in a given hour), drivers could begin accepting more work offers from other apps. Consumers and on-demand workers are likely to benefit from this competition.

      **3.     Network Companies Efficiently Match Labor Supply with Consumer Demand Through the Use of Advanced Technology and Flexible Schedules, Benefiting Both Workers and Consumers**

30.     Network companies' apps have improved matching of customers with workers through their use of innovative technology to solve traditional coordination and information problems. By coordination and information problems, I refer to difficulties in coordinating on-demand workers' labor supply with consumers' demand, and the asymmetry of information between these two types of participants in the on-demand economy.  For example, without an app, it is hard for a driver to know whether there is enough demand for his work to be profitable on a particular afternoon. Uber resolves this asymmetry by providing this information to drivers through the app.

31.     Network companies also match supply and demand through price mechanisms, which further improves market efficiency.  For example, the rates that consumers pay to drivers through the Uber app increase when demand is high.  Chen and Sheldon (2015) find that such dynamic pricing creates incentives for potential drivers to accept requests for rides by consumers, which ensures that spikes in consumer demand are efficiently met.  Symmetrically, this also means that when driver supply is below the level that would meet consumer demand, those drivers willing to

---

[24] Ezra Dubroff, "Driving for Multiple Food Delivery Apps at the Same Time," *The Rideshare Guy*, July 21, 2017, https://therideshareguy.com/how-to-drive-for-multiple-delivery-apps/, accessed December 21, 2019.
[25] Uber, "Why drivers choose Uber," https://www.uber.com/us/en/drive/uber-vs-lyft/, accessed December 22, 2019.

drive are paid commensurate with their scarcity.  Chen and Sheldon also find that drivers tend to work longer during such periods and conclude that this pattern "increases the number of trips that occur, and boosts the overall efficiency of the Uber system."[26]  This benefit is enabled by drivers' flexible work schedules, which allow drivers to respond to price signals.  As a result, consumers benefit from a larger supply of drivers when more rides are needed, and drivers benefit from higher earnings when it is more costly to drive and driver supply is low.  Cohen et al. estimate that UberX alone generated $6.8 billion in consumer surplus in the US in 2015, or over six times Uber's sales revenue from UberX in the US.[27]  In other words, riders in the US would in the aggregate be willing to forgo $6.8 billion to have access to Uber.[28]  In the case of platforms like Postmates and UberEats, small local businesses such as restaurants that offer products through these platforms will also benefit from the chance to connect with customers and through the platform's management of demand fluctuations.

### 4.   Network Companies Facilitate Entry into the On-Demand Economy

32.     Network companies typically allow on-demand workers to sign up for tasks with a simple online enrollment process.  For example, drivers can sign up to use Uber online as long as they meet some minimum requirements.  These requirements include having at least one year of licensed driving experience in the US, having an eligible 4-door vehicle, and passing a review of their driving record and criminal history.[29]  It does not involve an enrollment fee.[30]

33.     Joining the fleet that uses the Postmates app as delivery persons is also easy.  A candidate merely has to sign up online.  The process requires them to authorize a background check, review an agreement, upload a photo, and set up a direct deposit.[31]  Financially stressed

---

[26] M. Keith Chen and Michael Sheldon, "Dynamic Pricing in a Labor Market:  Surge Pricing and Flexible Work on the Uber Platform," Working Paper, 2015, p. 2,
https://www.anderson.ucla.edu/faculty_pages/keith.chen/papers/SurgeAndFlexibleWork_WorkingPaper.pdf.
[27] The researchers obtain an estimate of consumer surplus of $2.9 billion in the four cities with the largest Uber markets, which was more than six times Uber's revenues from UberX in those cities, which they scale up to get their nationwide estimate of $6.8 billion of consumer surplus.  *See* Peter Cohen et al., "Using Big Data to Estimate Consumer Surplus:  The Case of Uber," NBER Working Paper No. 22627, 2016, p. 1.
[28] Peter Cohen et al., "Using Big Data to Estimate Consumer Surplus:  The Case of Uber," NBER Working Paper No. 22627, 2016, p. 16.
[29] Uber, "Driver requirements," https://www.uber.com/us/en/drive/requirements/, accessed December 22, 2019.
[30] Uber, "Ready to hit the road?" https://www.uber.com/au/en/drive/how-it-works/, accessed December 23, 2019.
[31] Postmates, "How do I become a Postmate?" https://support.postmates.com/fleet/articles/219622448-article-How-do-I-become-a-Postmate-, accessed December 20, 2019.

individuals, perhaps due to a job loss or an unexpected expense, may particularly benefit from the ability to quickly sign up to use an on-demand platform and begin earning income. For example, recent research shows that many new participants in the on-demand economy experienced a decrease in income or an involuntary job loss shortly before becoming an on-demand worker.[32]

34.     In addition to these features offered by network companies that benefit service providers and consumers, they may also have some positive externalities for the public. One example is the reduction in use of unnecessary ambulance services. Due to a lack of other means of ready transportation, many patients have to resort to using ambulance services even though their conditions do not qualify as medically necessary for using an ambulance.[33] Such medically unnecessary use of ambulances creates large costs to society. Network companies like Uber and Lyft provide patients with a readily available means to find transportation to reach hospitals and receive timely medical treatment. Compared with traditional ambulances, Uber and Lyft are much cheaper.[34] And their real-time car tracking feature provides patients with more predictable wait time than provided by the ambulance dispatch center.[35] In a 2019 study, Moskatel and Slusky found that UberX's entry decreased the use of per capita ambulance services by at least 6.7 percent.[36] Such substitution away from ambulances likely reduced public spending on medically related transportation costs, which are substantial.[37] The full social implications of

---

[32] Dmitri K. Koustas, "What do Big Data Tell Us about Why People Take Gig Economy Jobs?" *AEA Papers and Proceedings* 109, 2019, pp. 367–371 at p. 367; and Diana Farrell, Fiona Greig, and Amar Hamoudi, "Bridging the Gap," JPMorgan Chase & Co. Institute, October 2019, p.13, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3481471, accessed January 2, 2020 ("Employment events catalyze changes in platform participation, especially in the transportation sector. Driver participation and revenues increase when people lose a job and decrease when they gain a job.")

[33] Anthony J. Billittier IV et al., "A Multisite Survey of Factors Contributing to Medically Unnecessary Ambulance Transports," *Academy Emergency Medicine* 3, no. 11, 1996, pp. 1046–1050 at p. 1048 ("…for those patients whose transports were deemed medically unnecessary, 39 percent reported that they had chosen ambulance transport because they had no other way to get to the ED."); and Karen Camasso-Richardson, MD, James A. Wilde, MD, and Emory M. Petrack, MD, MPH, "Medically Unnecessary Pediatric Ambulance Transports: A Medical Taxi Service?" *Academy of Emergency Medicine* 4, 1997, pp. 1137–1141 at p. 1139 ("The chief reason for calling an ambulance was no other means of transportation...").

[34] Leon Moskatel and David Slusky, "Did UberX Reduce Ambulance Volume?" *Health Economics* 28, 2019, pp. 817–829 at p. 817 ("Many have now started to seek alternate, cheaper transport to the emergency room in the form of ride-sharing services such as Uber and Lyft.").

[35] Chandra Steele, "Why I Used Uber Instead of an Ambulance," *PCMag.com*, July 18, 2016, https://www.pcmag.com/article/346165/why-i-used-uber-instead-of-an-ambulance, accessed December 26, 2019.

[36] Leon Moskatel and David Slusky, "Did UberX Reduce Ambulance Volume?" *Health Economics* 28, 2019, pp. 817–829 at p. 817.

[37] In addition to personal costs of ambulances, there is evidence of large inefficiencies in ambulance usage. *See* Melissa Bailey, "Ambulance trips can leave you with surprising – and very expensive – bills," *The Washington Post*, November 20, 2017, https://www.washingtonpost.com/national/health-science/ambulance-trips-can-leave-you-with-

this change are unclear as of yet; since to my knowledge, there has been no analysis of how the introduction of rideshare platforms has changed patient health outcomes.

## III.    Background on AB 5 and Worker Classification

35.     AB 5 was passed in September 2019 and becomes effective on January 1, 2020.[38]  I understand that in terms of classifying work arrangements as a matter of law, the bill codifies and both expands and narrows the applicability of California Supreme Court's decision in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*.[39]  I understand that the law requires the use of the "ABC test" to determine whether certain workers are employees or independent contractors for purposes of the Labor Code, the Unemployment Insurance Code, and the Industrial Welfare Commission (IWC) wage orders.[40]

36.     I understand that under this test, a worker must be classified as an employee rather than an independent contractor if the following three conditions are not all met:  (A) "the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;" (B) "the worker performs work that is outside the usual course of the hiring entity's business;" and (C) "the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed."[41]

37.     I do not offer an opinion on whether or not any given company can satisfy the ABC test codified in AB 5.  I understand for purposes of this declaration, however, that as stated by its sponsors, this law is intended to impact independent rideshare and delivery service providers and other independent contractors who find customers through mobile app-based companies in the

surprising--and-very-expensive--bills/2017/11/17/6be9280e-c313-11e7-84bc-5e285c7f4512_story.html, accessed December 26, 2019 ("…in 2012 Medicare paid more than $50 million in improper ambulance bills,…").
[38] California Legislative Information, "AB-5 Worker status: employees and independent contractors," September 19, 2019, https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB5, accessed December 20, 2019.
[39] California Legislative Information, "AB-5 Worker status: employees and independent contractors," September 19, 2019, https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB5, accessed December 20, 2019.
[40] California Department of Industrial Relations, "Independent contractor versus employee," https://www.dir.ca.gov/dlse/faq_independentcontractor.htm, accessed December 21, 2019.
[41] California Department of Industrial Relations, "Independent contractor versus employee," https://www.dir.ca.gov/dlse/faq_independentcontractor.htm, accessed December 21, 2019.

on-demand economy.[42]  Many other occupations are explicitly exempt from the law, including direct salespersons, commercial fishermen, certain freelance writers and photographers, licensed barbers and cosmetologists, doctors, real estate agents, and financial services professionals.[43]  It is estimated that the law could require well over one million independent contractors in California to be reclassified as employees.[44]

38.     Whether a worker is classified as an employee or an independent contractor has implications under applicable law, which requires employers to provide certain benefits to employees but not to independent contractors,[45] which can include, for example, premiums for workers' compensation, Social Security, Medicare, and unemployment insurance,[46] paid sick leave that can be taken for employees themselves or a family member,[47] and health insurance for full-time employees under certain circumstances per the Affordable Care Act (ACA).[48] Companies could also decide to provide benefits such as health insurance to independent service providers.  For example, Uber, Lyft, Postmates, and other companies are promoting a ballot initiative in which they would offer certain benefits to drivers, including a health care stipend.[49]

---

[42] Judy Lin, "Who's in, who's out of AB 5," Cal Matters, https://calmatters.org/economy/2019/09/whos-in-whos-out-of-ab-5/, September 11, 2019, accessed December 21, 2019.

[43] Judy Lin, "Who's in, who's out of AB 5," Cal Matters, September 11, 2019, https://calmatters.org/economy/2019/09/whos-in-whos-out-of-ab-5/, accessed December 21, 2019.

[44] Judy Lin, "California Debates Law Requiring 2 Million Independent Contractors to Become Employees," *Times of San Diego*, July 6, 2019, https://timesofsandiego.com/politics/2019/07/06/california-debates-law-requiring-2-million-independent-contractors-to-become-employees/, accessed December 21, 2019 ("…Assembly Bill 5 could sweep up some 2 million workers across industries…"); and Sarah Thomason, Ken Jacobs, and Sharon Jan, "Estimating the Coverage of California's New AB5 Law," UC Berkeley Labor Center, November 12, 2019, http://laborcenter.berkeley.edu/estimating-the-coverage-of-californias-new-ab-5-law/, accessed December 21, 2019 ("…we estimate that the ABC test will apply to 64 percent of workers who are independent contractors at their main job;").  Using the prior estimate that there are 2 million independent contractors in California, this implies that 64 percent × 2 million, or about 1.3 million independent contractors in California are estimated to undergo a change of employment status from independent contractor to employee under AB 5.

[45] Stephen Fishman, "California Passes Historic Gig-Worker Law," *NOLO*, https://www.nolo.com/legal-encyclopedia/california-gig-worker-law-AB-5.html, accessed December 21, 2019.

[46] California Department of Industrial Relations, "Answers to frequently asked questions about workers' compensation for employers," https://www.dir.ca.gov/dwc/faqs.html, accessed December 21, 2019; Internal Revenue Service, "Topic No. 751 Social Security and Medicare Withholding Rates," https://www.irs.gov/taxtopics/tc751, accessed December 21, 2019; and David M. Steingold, "Employer's Guide to Unemployment Insurance Tax in California," *NOLO*, https://www.nolo.com/legal-encyclopedia/how-pay-unemployment-insurance-employees-california.html, accessed December 21, 2019.

[47] California Department of Industrial Relations, "Healthy Workplace Healthy Family Act of 2014 (AB 1522)," https://www.dir.ca.gov/dlse/ab1522.html, accessed December 21, 2019.

[48] Robert Sheen, "California Bill AB5 May Impact Your ACA Compliance Process," *The ACA Times*, October 16, 2019, https://acatimes.com/california-bill-ab5-may-impact-your-aca-compliance-process/, accessed December 21, 2019.

[49] Graham Rapier, "Uber and Lyft reveal their alternative proposal to California's new gig-economy law," *Business Insider*, October 29, 2019, https://www.businessinsider.com/uber-lyft-ab5-ballot-initiative-california-gig-economy-law-2019-10, accessed January 2, 2020.

This shows that reclassification is not the only way for independent service providers to receive certain benefits.

39.     In summary, were independent service providers in the on-demand economy required to be reclassified as employees as I understand AB 5's sponsors intend, their new employers may need to provide a number of additional benefits to them, if they were not already providing them.

IV.     **If AB 5 Were Enforced to Require Reclassification of Workers in the On-Demand Economy, It Will Cause Harms to Plaintiffs, Other Network Companies, Other Workers, and Consumers**

40.     In this section, I analyze whether there are economic harms associated with AB 5 to Plaintiffs and the on-demand economy in general, including workers and consumers.  I have been instructed to assume for the purposes of this analysis that AB 5 would be enforced in a manner consistent with what I understand is its sponsors' stated intent to require reclassification of workers in the mobile app-based on-demand economy.  Thus, I assume that AB 5 will result in requiring a provision of a number of additional benefits, including those identified above.  In Section IV.A, I summarize evidence on the likely costs of providing these additional benefits.  This evidence suggests that companies would incur additional costs that are 20 to 40 percent of their total labor costs.  Companies facing a new cost structure will reassess various business decisions.  For example, they will determine how much of the higher costs to pass on to consumers in the form of higher prices, which I analyze in Section IV.B.  They will also reassess other aspects of their business model, such as the nature of their arrangements with workers, which I analyze in Section IV.C.  As a result of these analyses, and based on my assumptions explained above, I identify harms associated with AB 5 to Plaintiffs and other network companies, as well as workers and consumers.

A.     **Network Companies Will Incur Substantial Costs**

41.     Several studies provide relevant evidence on the likely costs network companies would incur if they were forced to reclassify independent contractors as employees.  In a recent study, Barclays quantified these extra costs using Uber and Lyft as examples and found the extra costs

to be 23 percent of a hypothetical part-time driver's income.[50]  An analysis from *Fortune* also uses Uber as an example and estimates the additional costs to be about 32 percent of a hypothetical full-time driver's income.[51]  These estimates of cost increases from Barclays and *Fortune* are consistent with other sources, which put them at 29 to 39 percent.[52]

> **B.     Network Companies Will Increase Prices and Sell Fewer Products and Services**

42.     If service providers in the on-demand economy, including delivery persons who use the Postmates and UberEats apps and rideshare drivers who use the Uber app, were required to change from independent contractors to employees, then costs to their new employers would rise substantially, as discussed above.  Applying to this case both economic principles and estimates from empirical literature, I conclude that as a result of the cost increases resulting from AB 5, consumers will face higher prices and service providers will have fewer work opportunities, even absent any changes in how these businesses organize themselves (and such changes are likely, as I discuss in Section IV.C).  That is, at least some, and possibly most, of the increased labor costs will be passed to consumers.  The exact amount of pass-through, or fraction of the cost increases paid by consumers in the form of higher prices, will depend on a variety of factors and require further empirical investigation beyond the scope of my report.[53]

---

[50] Ross Sandler, Deepak Mathivanan, Mario Lu, Trevor Young, CFA, and Thomas Chadwick, "Uber Technologies Inc./Lyft, Inc.: Quick Update on Pending Ride-hailing Regulation: 1099 vs. W-2," Barclays, June 10, 2019.
[51] Stephen Gandel, "Uber-nomics:  Here's what it would cost Uber to pay its drivers as employees," *Fortune,* September 17, 2015, https://fortune.com/2015/09/17/ubernomics/, accessed December 21, 2019.
[52] Carolyn Said, "Uber circulates new gig-work bill as alternative to AB5," *San Francisco Chronicle*, September 10, 2019, https://www.sfchronicle.com/business/article/Uber-circulates-new-gig-work-bill-as-alternative-14426247.php, accessed December 19, 2019 ("…experts say [driver employment status] can add 30%to labor costs."); and Bureau of Labor Statistics, "Employer Costs for Employee Compensation – September 2019," December 18, 2019, Table 1, https://www.bls.gov/news.release/pdf/ecec.pdf, accessed December 21, 2019; and  Robert Habans, "Exploring the Costs of Classifying Workers as Independent Contractors:  Four Illustrative Sectors," UCLA Institute for Research on Labor and Employment, December 2015, p. 1, https://irle.ucla.edu/wp-content/uploads/2016/03/IndependentContractorCost_20151209-1-2.pdf, accessed December 21, 2019.
[53] Some of these factors include the degree of competition in the marketplace, the nature of the cost increase (firm-specific or industry-specific), the new employee's labor response to their new benefits, and the price sensitivities of customers and service providers.  *See* RBB Economics, "Cost Pass-Through:  Theory, Measurement, and Potential Policy Implications," February 2014 ("RBB Cost Pass-Through 2014").

43.     To substantiate the points above, consider first a situation in which companies have at least some ability to choose their own price,[54] which is typical of many real-world industries.[55] In this case, each company optimally sets its price to consumers as a function of its marginal costs, among other factors.[56]  Marginal costs are costs that increase as production increases.[57]  In particular, a company's optimal price will increase as its marginal costs increase.[58]  Thus, since marginal costs increase substantially due to AB 5,[59] such companies will increase their prices to consumers, with some of the price increases likely being substantial.

44.     Second, consider an industry that fits the textbook definition of perfect competition, in which companies must simply charge or "take" the market price.[60]  If AB 5 only impacted a single company, we would expect that company to bear the entire cost in order to continue charging the market rate, leading to no pass through, but also possibly to the shut-down of the firm.[61]  In this context, the costs of AB 5 will affect many companies offering similar services. Since many firms are impacted by these increased costs, the market price to consumers would be expected to rise, as the increased costs associated with AB 5 are passed through to consumers.[62]

---

[54] This means that a company can raise its prices by at least some amount without losing all of its sales.  In other terms, the consumer elasticity of demand for the product is not infinite.  For example, recent empirical work estimates the price elasticity of demand for UberX to be between -0.4 and -0.6, which implies that Uber can raise its prices by at least some amount without losing all of its sales.  *See* Peter Cohen et al., "Using Big Data to Estimate Consumer Surplus: The Case of Uber," NBER Working Paper No. 22627, 2016, p. 4.

[55] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, (Reading, MA:  Addison Wesley, 2000), p. 610 ("If this definition [of market power as the ability to set price above marginal cost] is applied literally, probably every firm in the United States has at least a tiny bit of market power.  The model of perfect competition is an extreme one, that describes few, if any, actual industries.").

[56] Bulow and Pfleiderer set up and solve the general pricing decision facing a generic firm.  They show that the optimal price depends on marginal costs.  *See* Jeremy I. Bulow and Paul Pfleiderer, "A Note on the Effect of Costs Changes on Prices," *Journal of Political Economy* 91, no. 1, 1983, pp. 182–185 at pp. 182–183.

[57] Lynne Pepall, Daniel J. Richards, and George Norman, *Industrial Organization:  Contemporary Theory and Practice*, (Cincinnati, Ohio:  South-Western, 2002), p. 64 ("We can derive the marginal cost of production, MC(q), which can be calculated as the addition to total cost that is incurred in increasing output by one unit.").

[58] Jeremy I. Bulow and Paul Pfleiderer, "A Note on the Effect of Costs Changes on Prices," *Journal of Political Economy* 91, no. 1, 1983, pp. 182–185 at p. 183.  In their optimal pricing formula, they show that when both marginal revenue and demand are decreasing with price, then prices will be increasing with marginal costs.

[59] The cost of employee benefits such as minimum wages, social security, unemployment benefits, workers' compensation, and more are all proportional to the amount of labor provided.  These benefits are either leveraged as mandated fees per hour of work (minimum wages, for example), or as a proportional tax on the earnings of the employee (social security, for example).  Thus, each incremental increase in labor will have an incremental increase in provision of these benefits, meaning that marginal costs will be raised as employee benefits are increased.

[60] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, (Reading, MA:  Addison Wesley, 2000), p. 610.

[61] RBB Economics, "Cost Pass-Through:  Theory, Measurement, and Potential Policy Implications," February 2014, p. 65 ("In a perfectly competitive setting, there is no scope for individual firms to pass-through firm-specific cost changes, so the firm-specific pass-through rate will be zero.").

[62]  RBB Economics, "Cost Pass-Through:  Theory, Measurement, and Potential Policy Implications," February 2014, p. 64 ("With perfect competition, the extent of industry-wide pass-through will depend on the relative elasticities of demand and supply.  If demand is relatively elastic, pass-through rates will be low; if it is relatively inelastic, pass-through rates will be high.").  Cohen et al. empirically estimates that the demand for UberX is inelastic, between -0.4

If consumers are unwilling to pay the higher costs associated with such service provision, then widespread firm shut-down would be the clear prediction.

45.     Thus, in either setting, it is clear that economic principles predict prices to consumers to increase due to AB 5.  These predictions are also supported by the empirical literature on pass-through.  A recent literature review of pass-through found that when many firms in an industry experienced the same increases in marginal costs, either through input cost increases or per-unit taxes on goods sold, these cost increases were almost always partially passed through to prices.[63] More recent studies find when minimum wages are increased, the majority, and possibly the entirety, of the associated increase in labor costs is passed through to consumers paying for these services.[64]  As AB 5 in essence increases a more comprehensive set of employee benefits than just the minimum wage, it seems probable that the increased labor costs due to AB 5 would similarly lead to higher prices.  Analyst reports have also predicted prices to increase due to AB 5.[65]

46.     When prices to consumers increase, consumers purchase less.  Consequently, AB 5 would be predicted to lead to fewer products and services sold through on-demand platforms.[66] Higher costs and lower quantities sold will lower overall consumer welfare for these types of services, which consumers greatly value.  Researchers have estimated that consumer surplus –

---

and -0.6, suggesting that pass-through would not be low.  *See* Peter Cohen et al., "Using Big Data to Estimate Consumer Surplus:  The Case of Uber," NBER Working Paper No. 22627, 2016, p. 4.

[63] RBB Economics, "Cost Pass-Through:  Theory, Measurement, and Potential Policy Implications," February 2014 ("RBB Cost Pass-Through 2014"), pp. 122–131 for a recent literature review of pass through for a variety of cost shocks – both industry-specific and firm-specific – in a wealth of different industries with varying levels of competition. The industry-specific cost increases in the papers studied focused on two types of costs:  increase input costs (in the markets for gasoline, coffee, groceries, cheese, electricity, office supplies, and automobiles) and increases in excise taxes leveled on each unit of the good sold (in the markets for cigarettes, gasoline, and alcohol).  Of the seventeen studies cited in Tables 8 and 9, fifteen found consistently positive pass through.  One study on automobiles found a 0 percent pass through for one brand of cars, and that was a lower bound, with an average pass through of 38 percent. Another study on pass-through of alcohol taxes across the border did not find evidence of any pass through.

[64] Researchers find that minimum wage increases of grocery workers were completely passed onto customers through higher supermarket prices.  *See* Tobias Renkin, Claire Montialoux, and Michael Siegenthaler, "The Pass-through of Minimum Wages into US Retail Prices:  Evidence from Supermarket Scanner Data," Working Paper, 2019, p. 2 ("Our main finding is that there is a full pass-through of minimum wage increases into grocery prices.").  In Hungary, 75 percent of a minimum wage increase was paid by consumers.  *See* Peter Harasztosi and Attila Lindner, "Who Pays for the Minimum Wage?" *The American Economic Review* 109, no. 9, 2019, pp. 2693–2727 at p. 2693 ("around 75 percent of the minimum wage increase was paid by consumers").

[65] Ross Sandler, Deepak Mathivanan, Mario Lu, Trevor Young, CFA, and Thomas Chadwick, "Uber Technologies Inc./Lyft, Inc.:  Quick Update on Pending Ride-hailing Regulation:  1099 vs. W-2," Barclays, June 10, 2019, p. 1 ("we'd guess that each company would raise prices to pass some of the incremental costs on to the customer").

[66] In other words, demand is downwards sloping.  *See* Hal R. Varian, *Intermediate Microeconomics*, (New York, NY: W. W. Norton & Company, 2010), pp. 106–107.  Cohen et al. empirically estimate negative demand elasticities, ensuring that this condition holds.  *See* Peter Cohen et al., "Using Big Data to Estimate Consumer Surplus:  The Case of Uber," NBER Working Paper No. 22627, 2016, p. 4.

the difference between a consumer's value from a product and its cost – is $1.60 for each dollar spent on Uber rides.[67]  Consumer welfare will decrease if fewer such products and services are sold, and those that are sold will be at higher prices.

47.    Additionally, if network companies facilitate fewer sales of products and services due to AB 5, there will be less need for the labor that uses those network companies to find work.  If consumers using Postmates purchase fewer products or less frequently request delivery as a result of the higher prices, there will be less need for delivery persons to deliver the products.  Similarly, if customers using Uber ride less as a result of the higher prices, then there will be less need for drivers.  Network companies would respond accordingly by having fewer opportunities available per hour or fewer service providers.  Thus, in addition to harming the customers, these cost increases could harm workers.  In fact, there is already some evidence of harm to workers, as evidenced by Vox Media's recent decision to replace its freelance writers in California,[68] which it attributed to AB 5.[69]  I elaborate on the potential impacts on workers in the following section.

48.    Network companies may also pass on some of the higher costs in the form of lower wages to workers, either through lower compensation per task or fewer tasks per working period.  In other industries, at least 80 percent of the cost of employee benefits are offset through lower wages.[70]  To the extent that workers' wages are above the minimum wage after AB 5, there will be scope to reduce their wages to offset the additional benefits.[71]  Since drivers vary in their level

---

[67] Peter Cohen et al., "Using Big Data to Estimate Consumer Surplus:  The Case of Uber," NBER Working Paper No. 22627, 2016, p. 1.

[68] In particular, Vox Media announced that it will replace its freelance writers in California, most of whom cover sports for the SB Nation site owned by Vox Media, with SB Nation employees.  *See* Ari Levy and Alex Sherman, "Vox Media to cut hundreds of freelance jobs ahead of changes in California gig economy laws," *CNBC*, December 16, 2019, https://www.cnbc.com/2019/12/16/vox-media-to-cut-hundreds-of-freelance-jobs-ahead-of-californias-ab5.html, accessed December 31, 2019.

[69] As John Ness, the executive director of SB Nation, stated in his recent post, AB 5 makes it impossible for Vox Media/SB Nation to continue their current California team structure because "it restricts contractors from producing more than 35 written content 'submissions' per year."  As a result, hundreds of freelance writers in California will be losing their opportunities to release their work on Vox Media/SB Nation in the next few months.  Although John Ness encouraged freelance writers to apply to become full-time or part-time employees for Vox Media/SB Nation, he stated that "many of [them] already have other full-time jobs and may not have the bandwidth…"  *See* John Ness, "Thank you, California," *SB Nation*, December 16, 2019, https://www.sbnation.com/2019/12/16/21024100/thank-you-california, accessed December 31, 2019.

[70] Seth Harris and Alan Krueger, "A Proposal for Modernizing Labor Laws for Twenty-First-Century Work:  The Independent Worker," The Hamilton Project, Discussion Paper 2015-10, 2015, p. 25 ("Research has found that 80 percent or more of employers' costs of providing employee benefits, such as health insurance, is ultimately borne by employees in the form of lower wages.").

[71] For example, research finds that when workers receive a mandated increase in one part of their compensation package, employers often reduce other parts of their compensation package.  *See* Jeffrey Clemens, Lisa B. Kahn, and Jonathan Meer, "The Minimum Wage, Fringe Benefits, and Worker Welfare," NBER Working Paper No. 24635,

of hourly compensation, the net effect could vary across drivers and will also depend on other changes made by on-demand economy companies.  I explore this in the next section when considering how on-demand economy companies may restructure their platforms, were all service providers to become employees.

49.     The economic principles and literature that I rely on above draw upon traditional economic analysis of markets, yet I expect many of those conclusions to still hold for two-sided or multi-sided markets involving network companies.  Such markets can differ substantially from other markets,[72] yet the core implication of AB 5 is that network companies will face higher costs, and those costs are likely to be borne by one or more of the groups of users of network companies.  For example, a network company's platform may have consumers on one side, delivery persons on one side, and restaurants on one side, and it is likely that, were network companies to continue to operate with AB 5, they would pass those costs on to consumers, delivery persons, and restaurants.[73]

### C.     Network Companies May Make Substantive Changes to Worker Arrangements, Which Would Lead to Additional Harms

50.     In addition to the decision of how much of the cost increase to pass-through to consumers and workers, network companies will also consider whether to modify other aspects of their business models.  As discussed in Section II, network companies have several key features that attract service providers on one side of the market and consumers on the other and promote efficient exchanges and allocations of goods and services.  If companies are induced to disable or limit any of these key features due to AB 5, there would likely be additional harms to workers

---

2018, p. 2 ("we estimate that recent minimum wage increases are accompanied by significant declines in employer [health insurance] coverage.").

[72] E. Glen Weyl, "A Price Theory of Multi-Sided Platforms," *American Economic Review* 100, no. 4, 2010, pp. 1642–1672 at pp. 1644, 1665–1668.

[73] While different authors use different assumptions and approaches in modeling multi-sided markets, one seminal and widely cited article is by Rochet and Tirole.  They develop a benchmark model of a two-sided market with two-sided network externalities, which is a core feature of two-sided markets.  That means that buyers' valuation of the service provided by the market grows with the number of sellers, and vice versa.  Rochet and Tirole first consider a setting with a single platform and find that the platform's prices charged to each side of the platform are increasing in the marginal cost per transaction on the platform.  They also consider a setting with multiple platforms and show that higher marginal costs will lead to higher buyer and seller prices when both parties are sensitive to platform-specific price changes.  This result is derived by solving the two equations in their Proposition 3 to obtain buyer and seller prices as a function of marginal costs and the other parameters.  Thus, based on these results, since AB 5 increases marginal costs, all sides of the platform, including consumers and service providers, would be expected to bear at least some of the costs in the form of higher prices.  *See* Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets", *Journal of the European Economic Association* 1, no. 4, 2003, pp. 990–1029 at pp. 997, 1004.

and consumers, including decreased efficiency.  In this section, I describe three such examples of changes that could result from the changes in economic incentives induced by AB 5.

### 1. Network Companies May Restrict Workers' Hours and Reduce Their Flexibility

51.     Unlike the previous discussion on pass-through, which focused on marginal costs, there are also fixed costs per worker associated with AB 5.  Fixed costs per worker do not vary proportionally with the worker's hours worked.  For example, a company may have to pay a particular cost regardless of whether a worker works one hour or 20 hours, or in the case of mandated health insurance coverage, 30 hours or 50 hours.  Such fixed costs per worker could lead companies to restrict workers' hours and reduce their flexibility.

52.     Consider the example of mandated health insurance coverage.  Under the Affordable Care Act (ACA), sufficiently large employers are required to provide health insurance to all employees working at least 30 hours per week or 130 hours per month.[74]  In order to avoid paying this cost, employers have purported to limit the hours of their workers to keep them below 30 hours.  A 2013 survey by the U.S. Chamber of Commerce and International Franchise Association found that many of these companies were adjusting hours and work status of their employees from full-time to part-time because of the healthcare law, even before the law went into effect.[75]

53.     Employers incur substantial costs to provide healthcare:  the average annual costs for providing health insurance per employee was expected to be over $14,000 in 2018, of which 70

---

[74] Employers subject to the ACA are applicable large employers (ALEs), who include all employers with at least 50 full-time (or full-time equivalent) employees.  *See* Internal Revenue Service, "Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act," https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-the-affordable-care-act, accessed December 27, 2019.

[75] U.S. Chamber of Commerce, "Presentation of Findings from National Research Conducted Among business Decision-Makers," November 12, 2013, https://www.uschamber.com/report/presentation-findings-national-research-conducted-among-business-decision-makers, accessed December 27, 2019 ("Many businesses are already seeing their health care costs increasing because of the law.  To cope, 31% of franchise and 12% of non-franchise businesses have already reduced worker hours, a full year before the employer mandate goes into effect. Additionally, 27% of franchise and 12% of non-franchise businesses have already replaced full-time workers with part-time employees.  Other cost control methods cited by survey participants included hiring only temporary help and cutting benefits and bonuses.").

percent would be covered by employers.[76]  As a result of such large healthcare costs, on-demand economy companies may restrict workers' hours worked per week, however that would be measured,[77] to ensure they are considered part-time workers for the purpose of the ACA, similar to the responses that we have seen in other firms documented above.  If this were the case, and absent any offsetting benefits from other employment benefits or elsewhere, on-demand workers who previously worked more than 30 hours per week would be harmed by the reduction in hours.[78]  Moreover, on-demand workers would lose flexibility over their schedule – they would no longer be able to work when they want to work, such as when more drivers are needed and prices are high, but rather, would only be able to work if they have not already worked 30 hours. This loss of flexibility would further harm workers and likely reduce the efficiency with which network companies can match labor supply with consumer demand, which would also hurt consumers.

### 2.      Network Companies Would Likely Prevent Employees from Multi-Apping or Impose Work Schedules

54.      Wage and hour employee regulations generally require a company to determine how many hours an employee worked in order to determine if their average earnings are above the minimum wage or working overtime.[79]  In a practical sense, it is unclear how this would be determined for multi-apping employees.[80]  For example, if a service worker was multi-apping to simultaneously act as a delivery person through the Postmates app and a rideshare driver through

---

[76] Carolyn Y. Johnson, "Large employers say health plans will cost more than $14,000 for an employee in 2018," *The Washington Post*, https://www.washingtonpost.com/news/wonk/wp/2017/08/08/large-employers-say-health-plans-will-cost-more-than-14000-for-an-employee-in-2018/, accessed December 27, 2019.

[77] Currently on-demand economy service providers are often paid by the task, not by a wage per hour.  *See* Section IV.C on the difficulties in determining how many hours a service provider worked for a particular company.

[78] A non-trivial number of on-demand workers currently work more than 30 hours per week.  For example, Hall and Krueger found that in Los Angeles and San Francisco, 15 percent of drivers using the Uber app worked at least 35 hours per week in October 2015.  *See* Jonathan V. Hall and Alan B. Krueger, "An Analysis of the Labor Market for Uber's Driver-Partners in the United States," *ILR Review* 71, no. 3, 2018, pp. 705–732 at p. 721.

[79] Seth Harris and Alan Krueger, "A Proposal for Modernizing Labor Laws for Twenty-First-Century Work:  The Independent Worker," The Hamilton Project, Discussion Paper 2015-10, 2015, p. 13.

[80] Seth Harris and Alan Krueger, "A Proposal for Modernizing Labor Laws for Twenty-First-Century Work:  The Independent Worker," The Hamilton Project, Discussion Paper 2015-10, 2015, p. 13 ("Many benefits included in that [social] compact, such as the minimum wage, overtime pay, and ACA eligibility, are tied to hours worked—and, even more specifically, hours worked for a particular employer.  Determining whether and for whom an independent worker is 'working' is impossible or deeply problematic in too many circumstances for the concept of work hours to translate into these emerging relationships.").

the Uber app, it is unclear which company would be responsible for the time the worker waits between tasks.[81]

55.     Companies would prefer to avoid this complication and not face the risk of being responsible for time that an on-demand worker was working on another platform.  They could address this issue in several ways.  First, they could forbid multi-apping.[82]  This would reduce the benefits of multi-apping discussed in Section II.  Indeed, recent research shows that limiting multi-apping would negatively impact the market.[83]  Second, they could impose strict work schedules and only let workers work for other companies outside those hours.  This would eliminate the scheduling flexibility that many workers value as well as the efficiency benefits of such flexibility.

56.     Even in the absence of multi-apping, there are complications involved in determining how many hours an on-demand worker worked.  For example, on-demand workers often have considerable flexibility in choosing whether to accept a given work request even when they are logged into the platform.[84]  In such a system, it is unclear how to determine how much time a service provider worked.  For example, would wait time between completed work tasks be counted as time worked for the purposes of wage and hours regulations?  In such a system with wage and hours benefits, workers would be incentivized to log in and decline work requests,[85] if doing so increased the number of hours they were counted as working.  Network companies

---

[81] One approach, which would sidestep this issue, would be for the worker to not be compensated for such wait time. *See* Seth Harris and Alan Krueger, "A Proposal for Modernizing Labor Laws for Twenty-First-Century Work:  The Independent Worker," The Hamilton Project, Discussion Paper 2015-10, 2015, pp. 9, 13 ("Under existing FLSA doctrine, and assuming the driver is an employee, whether the driver's waiting time constitutes compensable work hours turns on the question of whether the driver is 'waiting to be engaged' or 'engaged to wait.' …If … she is waiting to be engaged [she] does not qualify to be paid for the waiting time.").

[82] Ross Sandler, Deepak Mathivanan, Mario Lu, Trevor Young, CFA, and Thomas Chadwick, "Uber Technologies Inc./Lyft, Inc.: Quick Update on Pending Ride-hailing Regulation:  1099 vs. W-2," Barclays, June 10, 2019, p. 1 ("Further, reclassifying drivers from independent contractors to employees may have the unintended consequences of…platforms mandating drivers' exclusivity.").

[83] Bryan and Gans show how restricting multi-apping may lower total surplus due to changes to wait times and prices. *See* Kevin A. Bryan and Joshua S. Gans, "A theory of multihoming in rideshare competition," *Journal of Economics and Management Strategy*, no. 28, 2019, pp. 89–96 at p. 95 ("it is possible that restricting driver multihoming [multi-apping] can reduce total surplus, by affecting both equilibrium price and wait time.").

[84] Seth Harris and Alan Krueger, "A Proposal for Modernizing Labor Laws for Twenty-First-Century Work:  The Independent Worker," The Hamilton Project, Discussion Paper 2015-10, 2015, p. 9 ("[The service provider] is not obligated to pick up any particular customer. She can wait for a customer of her choosing, or until after she has completed her personal activities, whatever they might be.").

[85]  Seth Harris and Alan Krueger, "A Proposal for Modernizing Labor Laws for Twenty-First-Century Work:  The Independent Worker," The Hamilton Project, Discussion Paper, 2015-10, 2015, p. 13 ("A worker in the online gig economy could be primarily engaged in personal tasks while one or more intermediaries' apps are turned on…. Determining whether and for whom an independent worker is 'working' is impossible or deeply problematic in too many circumstances for the concept of work hours to translate into these emerging relationships.").

would likely alter the structure of their platforms accordingly.  For example, they may require workers to schedule their work shifts in advance and accept a minimum percentage of requests during that shift to be treated as working for the purposes of wage and hours regulations.[86]  Such changes would further reduce worker flexibility and discretion.

### 3.    Network Companies May Use Less Labor and More Capital

57.    Economic principles indicate that an increase in the price of labor relative to the price of capital will lead businesses to utilize more capital, such as machines or equipment, and less labor.[87]  This prediction is confirmed in recent empirical research on reactions to increases in employee benefits.  For example, Harasztosi and Lindner show that firms respond to minimum wage increases by investing in capital.[88]  Applying this principle to this case, if AB 5 increased the cost of labor, we will likely see a similar resource shift in the on-demand economy, with network companies using more equipment and less labor.

58.    The on-demand delivery industry is already showing signs of increased use of capital inputs relative to labor inputs as automated services exist and are expanding.[89]  If the labor costs associated with labor inputs is too expensive relative to these robots, companies may shift production towards these automated services at the expense of human labor.  Absent any offsetting benefits, if companies began investing heavily in capital inputs, workers would be harmed by less hours worked, lower earnings, and fewer alternative work opportunities within the same industry.

*** 

59.    These are just a few examples of how Postmates, Uber, and other network companies may reorganize their business model and operations as a result of AB 5, if it results in forced

---

[86] For example, Grubhub has used a block-scheduling plan, in which the service provider is required to sign up for delivery person shifts in advance of their chosen workday day, while also being required to accept a minimum number of deliveries during that shift.  *See* Opinion, *Raef Lawson v. Grubhub Inc., et al.*, February 8, 2018, pp. 9–10.

[87] Hal R. Varian, *Intermediate Microeconomics*, (New York, NY: W. W. Norton & Company, 2010), pp. 365–366, which highlights how cost-minimizing firms will choose inputs such that all marginal products per dollar spent on inputs are equal.

[88] Peter Harasztosi and Attila Lindner, "Who Pays for the Minimum Wage?" *The American Economic Review* 109, no. 9, 2019, pp. 2693–2727 at p. 2693 ("firms responded to the minimum wage [increase] by substituting labor with capital.").

[89] Kiwi Campus, Inc., for example, is a company that uses mechanical couriers, or "kiwibots" to deliver food on college campuses, and has recently grown to deliver in Sacramento.  *See* Kiwibot, "About us," https://www.kiwibot.com/about-us, accessed December 27, 2019.

reclassification of independent service providers as employees.  Since, under that scenario, they would be required to operate in a way that they could have previously operated, but chose not to, it can be inferred that the new method is not optimal from their perspective.  Thus, the companies would be harmed by having to operate in a less efficient manner with higher costs. Additionally, as discussed above, workers and consumers are also harmed.

Executed this 3rd day of January, 2020

_____

Justin McCrary, Ph.D.

**Appendix A**

# Justin McCrary

Columbia University
School of Law
521 Jerome Greene Hall
New York, NY 10027

Cell Phone:  (510) 409-6418
Email:  justin.mccrary@gmail.com
Homepage:  https://www.law.columbia.edu/faculty/justin-mccrary

## Current Appointments

Columbia University
2018–  Paul J. Evanson Professor of Law

National Bureau of Economic Research
2012–  Faculty Research Associate

## Past Appointments

Columbia University
Fall 2017  Samuel Rubin Visiting Professor of Law

University of California, Berkeley
2014–17  Director, Social Sciences Data Laboratory (D-Lab)
2010–19  Professor of Law
2008–10  Assistant Professor of Law

European Central Bank (Banco de España)
2013–14  Economist

University of Michigan
2003–07  Assistant Professor, Gerald R. Ford School of Public Policy
2003–07  Assistant Professor, Department of Economics (courtesy)

National Bureau of Economic Research
2006–12  Faculty Research Fellow
2008–19  Co-director, Crime Working Group

Federal Reserve Bank of New York
1996–98  Assistant Economist

## Education

Ph.D. Economics, University of California, Berkeley, 2003

A.B. Public Policy, Princeton University, 1996

## Testimony Experience

*Phoenix Light SF Limited, et al. vs. Wells Fargo Bank*
U.S. District Court for the Southern District of New York

   Mortgage-backed securities case (servicing)

   Testimony regarding matching and other statistical methodologies

   Retained by Wells Fargo Bank

   Deposed on October 4, 2019

   Report filed on July 25, 2019

# Appendix A

*Rescap Liquidating Trust v. Primary Residential Mortgage, Inc.*
U.S. District Court for the District of Minnesota

> Mortgage-backed securities case (bankruptcy)
>
> Testimony regarding sampling, damages, and statistical concepts
>
> Retained by Primary Residential Mortgage, Inc.
>
> Supplemental report filed on August 23, 2019
>
> Report filed on August 9, 2019

*Jacob Beaty and Jessica Beaty vs. Ford Motor Company*
U.S. District Court for the Western District of Washington

> Consumer products liability case
>
> Testimony regarding conjoint analysis and heterogeneity
>
> Retained by Ford Motor Company
>
> Deposed on June 25, 2019
>
> Class certification report filed on May 24, 2019

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
U.S. District Court for the Eastern District of New York

> Antitrust case
>
> Testimony regarding liability, two-sided markets, market power, and credit and debit card payment systems
>
> Retained by Mastercard, Bank of America, Barclays, Capital One, Citibank, Fifth Third, First National Bank of Omaha, HSBC, JPMorgan Chase, PNC, SunTrust, Texas Independent Bancshares, and Wells Fargo
>
> Report filed on June 10, 2019

*Shamrell v. Apple Inc.*
Superior Court of the State of California, County of San Diego

> Putative class action regarding products liability, Unfair Competition Law and Consumers Legal Remedies Act
>
> Testimony regarding heterogeneity across putative class members, failure rate methodologies, econometrics, and data science
>
> Retained by Apple, Inc.
>
> Deposed on June 6, 2019
>
> Supplemental class certification report filed on October 17, 2018
>
> Class certification report filed on March 29, 2017
>
> Report filed on February 1, 2017

*Cuyahoga County v. Purdue Pharma LP, et al., and Summit County v. Purdue Pharma LP, et al.,*
U.S. District Court of the Northern District of Ohio

> Prescription opioid medication litigation
>
> Testimony regarding causation, drug use, economics of crime, regression methodology
>
> Retained by Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceuticals, Inc.
>
> Deposed on May 31, 2019
>
> Report filed on May 10, 2019

# Appendix A

*Lerman v. Apple Inc.*
U.S. District Court for the Eastern District of New York

> Putative class action regarding products liability
>
> Testimony regarding heterogeneity across putative class members, the nature of products, and conjoint analysis
>
> Retained by Apple, Inc.
>
> Deposed on May 29, 2019
>
> Report filed on April 3, 2019

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc.*
Supreme Court of the State of New York, County of New York

> Mortgage-backed securities case
>
> Testimony regarding sampling and statistical methods
>
> Retained by Morgan Stanley
>
> Deposed on May 15, 2019
>
> Report filed on October 19, 2018

*Rebuttal Testimony of Powerex Corp re: BPA Southern Intertie Hourly Rate*
U.S. Department of Energy, Bonneville Power Administration

> Administrative proceeding concerning the rates for transmission of electricity
>
> Testimony regarding regression methodology
>
> Retained by Powerex Corp.
>
> Testimony before the Hearing Officer on April 23, 2019
>
> Report filed on March 28, 2019

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*
U.S. District Court for the Southern District of New York

> Antitrust price fixing case (Sherman Act §§ 1, 3 and Commodity Exchange Act)
>
> Testimony regarding trader communications and sampling methodologies
>
> Retained by Credit Suisse
>
> Deposed on January 17, 2019
>
> Report filed on October 25, 2018

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Holdings LLC, Morgan Stanley & Co. LLC, as successor to Morgan Stanley & Co. Inc., Morgan Stanley, and Saxon Mortgage Services, Inc.*
Supreme Court of the State of New York, County of New York

> Mortgage-backed securities case
>
> Testimony regarding sampling and statistical methods
>
> Retained by Morgan Stanley
>
> Deposed on January 8, 2019
>
> Report filed on August 7, 2018

**Appendix A**

*Trinidad Lopez v. Liberty Mutual Insurance Company*
U.S. District Court for the Central District of California

    Wage and hour case after class certification

    Testimony regarding damages and statistics

    Retained by Liberty Mutual

    Report filed on December 21, 2018


*Samsung Electronics Co., Ltd., v. Kuroda Electric Co., Ltd., Sakai Display Products Corporation and Sharp Corporation*
International Chamber of Commerce

    Contractual dispute regarding supply of television panels

    Testimony regarding economic theory, data science, statistics

    Retained by Samsung Electronics Co.

    Testified at arbitration hearing on December 20, 2018

    Report filed on September 28, 2018


*In re: Part 60 RMBS Put-Back Litigation*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley Mortgage Capital Holdings LLC

    Deposed on November 27, 2018

    Report filed on June 22, 2018


*In Re: RFC and ResCap Liquidating Trust Litigation*
U.S. District Court for the District of Minnesota and
U.S. Bankruptcy Court for the Southern District of New York

    Mortgage-backed securities case (bankruptcy)

    Testimony regarding sampling, damages, and statistical concepts

    Retained by Advanced Financial Services, BMO Harris Bank, Cadence Bank, Colonial Savings, CTX Mortgage, Decision One, First Guaranty, Freedom Mortgage, Home Loan Center, HSBC Mortgage, Impac Funding, PNC, Provident, Standard Pacific, Synovus, and Universal American

    Testified at jury trial on November 1, 2018 (Minnesota; Home Loan Center)

    Final rebuttal report filed on June 14, 2018

    Deposed on April 24, 2018

    Rebuttal to supplemental disclosure filed on February 26, 2018

    Report filed on October 27, 2017


*Residential Funding Company v. Universal American Mortgage Co.*
U.S. District Court for the District of Minnesota

    Mortgage-backed securities case (bankruptcy)

    Testimony regarding sampling and statistical methods

    Retained by Universal American Mortgage Co.

    Report filed on August 30, 2018

# Appendix A

*In re Gateway Plaza Residents Litigation*
Supreme Court of the State of New York, County of New York

  Putative class action regarding warranty of habitability

  Testimony regarding electricity usage, individual preferences and choices, and heterogeneity across putative class members; large scale data analysis

  Retained by Gateway Plaza

  Supplemental class certification and rebuttal report filed on August 8, 2018

  Class certification report filed on September 18, 2017

*United States of America v. SavaSeniorCare*
U.S. District Court for the Middle District of Tennessee

  False Claims Act case

  Testimony regarding sampling and statistical methods

  Retained by SavaSeniorCare

  Report filed on August 6, 2018

*Latoya Brown et al. v. Madison County, Mississippi*
U.S. District Court for the Southern District of Mississippi

  Putative class action alleging violations of Section 1983 and the Fourth and Fourteenth Amendments

  Testimony regarding regression methodologies, measurement error, and data science

  Retained by Latoya Brown et al.

  Report filed on July 2, 2018

*Martin Dulberg et al. v. Uber Technologies, Inc. and Rasier, LLC*
U.S. District Court for the Northern District of California

  Putative class action alleging breach of contract

  Testimony regarding heterogeneity in damages across putative class members

  Retained by Uber Technologies, Inc.

  Supplemental report filed on June 28, 2018

  Affirmative report filed on January 11, 2018

*Tri-City, LLC; Endor Car and Driver, LLC; Zehn-NY, LLC; Zwei-NY, LLC; Abatar, LLC; and Flatiron Transit, LLC v. New York Taxi and Limousine Commission and Meera Joshi*
Supreme Court of the State of New York, County of New York

  Article 78 proceeding challenging an administrative ruling

  Testimony regarding mismatch between accessibility regulation and accessibility demand

  Retained by plaintiffs

  Supplemental report filed on May 18, 2018

  Affirmative report filed on April 13, 2018

*Federal Home Loan Bank of Boston, v. Ally Financial, Inc., et al.*
Superior Court of the State of Massachusetts, Business Litigation Session, Suffolk County

  Mortgage-backed securities case

  Testimony regarding sampling and statistical methods

  Retained by Morgan Stanley

  Report filed on May 17, 2018

# Appendix A

*Cheryl Phipps and Shawn Gibbons v. Wal-Mart Stores, Inc.*
U.S. District Court for the Middle District of Tennessee

    Putative class action alleging discrimination in employment

    Testimony regarding the decentralized nature of Walmart's internal labor market and concomitant heterogeneity across proposed class members in pay and promotion outcomes

    Retained by Walmart

    Deposed on April 30, 2018

    Report filed on April 20, 2018

*People of the State of California v. Morgan Stanley & Co.*
Superior Court of the State of California, County of San Francisco

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley & Co.

    Deposed on February 9, 2018

    Report filed on January 25, 2018

*Tony Dickey and Paul Parmer et al. v. Advanced Micro Devices, Inc.*
U.S. District Court for the Northern District of California

    Putative class action alleging false advertising

    Testimony regarding availability of information regarding and market for computer chips and heterogeneity across putative class members

    Retained by Advanced Micro Devices

    Report filed on January 26, 2018

*Federal Home Loan Bank of Chicago v. Banc of America Funding Corporation, et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

    Mortgage-backed securities case

    Testimony regarding sampling, regression, and statistical methods

    Retained by Morgan Stanley

    Deposed on December 14, 2017

    Report filed on August 21, 2017

*In re Lehman Brothers Holdings, Inc., et al., Debtors*
U.S. Bankruptcy Court for the Southern District of New York

    Mortgage-backed securities case

    Testimony regarding sampling, resampling methods for inference, and statistical methods

    Retained by Lehman Brothers Holdings, Inc.

    Deposed on October 9, 2017

    Report filed on August 28, 2017

*Deutsche Bank National Trust Company v. Morgan Stanley Mortgage Capital Holdings LLC*
U.S. District Court for the Southern District of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley Mortgage Capital Holdings LLC

    Deposed on March 27, 2017

    Report filed on December 16, 2016

**Appendix A**

*Rosen v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

    Putative class action regarding false advertising

    Testimony regarding economics of safety

    Retained by Uber Technologies, Inc.

    Deposed on February 3, 2017

    Report filed on January 13, 2017

    Affirmative report filed on December 2, 2016


*Blackrock Allocation Target Shares: Series S Portfolio, et al., v. Wells Fargo Bank, N.A.; Royal Park Investments SA/NV v. Wells Fargo Bank, N.A., as Trustee; National Credit Union Administration Board, et al., v. Wells Fargo Bank, N.A.; Phoenix Light SF Limited, et al., v. Wells Fargo Bank, N.A.; and Commerzbank AG v. Wells Fargo Bank, N.A.*
U.S. District Court for the Southern District of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Wells Fargo Bank

    Report filed on January 18, 2017


*LA Taxi Cooperative, Inc. et al. v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

    False advertising case

    Testimony regarding economics of safety

    Retained by Uber Technologies, Inc.

    Report filed on January 13, 2017

    Affirmative report filed on November 18, 2016


*State of Illinois v. Hitachi Ltd., et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

    Antitrust price-fixing case

    Testimony regarding liability and damages

    Retained by Hitachi Ltd.

    Report filed on November 11, 2016


*In re: City of San Bernardino, California, Debtor*
U.S. Bankruptcy Court, Central District of California, Riverside Division

    Municipal bankruptcy case

    Testimony regarding economics, econometrics, rare risks and the value of a statistical life

    Retained by the City of San Bernardino

    Report filed on October 3, 2016


*U.S. Bank National Association v. Morgan Stanley Mortgage Capital Holdings LLC*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley Mortgage Capital Holdings LLC

    Deposed on September 10, 2016

    Report filed on June 17, 2016

# Appendix A

*National Credit Union Administration Board v. RBS Securities, Inc.*
U.S. District Court for the Central District of California &
U.S. District Court for the District of Kansas

> Mortgage-backed securities case
>
> Testimony regarding sampling and statistical methods
>
> Retained by RBS Securities
>
> Deposed on January 28, 2016
>
> Report filed on October 16, 2015

*Temple-Inland, Inc., v. Thomas Cook, et al.*
U.S. District Court for the District of Delaware

> Escheat law case
>
> Testimony regarding sampling, statistical methods, and economic theory
>
> Retained by the State of Delaware
>
> Deposed on November 24, 2015
>
> Report filed on October 23, 2015

*National Consumer Protection Service v. Farmacias Cruz Verde S.A. et al.*
Honorable Civil Court of Santiago (Chile)

> Antitrust putative class action
>
> Testimony regarding appropriate methods for estimating damages
>
> Retained by Salcobrand
>
> Report filed on November 14, 2015

*Douglas O'Connor, et al., v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

> Putative class action regarding independent contractor versus employee
>
> Testimony regarding heterogeneity in alleged damages across putative class members, potential for class conflict
>
> Retained by Uber Technologies, Inc.
>
> Report filed on October 27, 2015
>
> Report filed on July 7, 2015

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*
U.S. District Court for the District of Massachusetts

> Discovery dispute in affirmative action case
>
> Testimony regarding necessary inputs into statistical methodologies
>
> Retained by Harvard College
>
> Report filed on July 30, 2015

*Securities and Exchange Commission v. James V. Mazzo and David L. Parker*
U.S. District Court for the Central District of California

> Civil insider trading suit
>
> Testimony regarding probability theory and statistics
>
> Retained by James V. Mazzo and David L. Parker
>
> Deposed on May 13, 2015
>
> Report filed on March 13, 2015

# Appendix A

*In re: City of Stockton, California, Debtor*
U.S. Bankruptcy Court, Eastern District of California

Municipal bankruptcy suit

Testimony regarding economic theory, labor economics, and econometrics

Retained by the City of Stockton

Deposed on March 13, 2013

Report filed on February 15, 2013

*In the Matter of Act 111 Interest Arbitration Between Commonwealth of Pennsylvania and Pennsylvania State Troopers Association*

Hearings on wage setting

Testimony regarding rare risks and the value of a statistical life

Retained by the Pennsylvania State Troopers Association

Testified at arbitration hearing on December 4, 2012

Report filed on December 4, 2012

## Scholarship on Sampling, Statistics, and Econometrics

Conservative Tests Under Satisficing Models of Publication Bias (with Garret Christensen and Daniele Fanelli)
*PLOS One*, Volume 11, Number 2, February 22, 2016

New Evidence on the Finite Sample Properties of Propensity Score Matching and Reweighting Estimators (with Matias Busso and John DiNardo)
*Review of Economics and Statistics*, Volume 96, Number 5, December 2014

Incomes in South Africa Since the Fall of Apartheid (with Murray Leibbrandt and James Levinsohn)
*Journal of Globalization and Development*, Volume 1, Issue 1, January 2010

Manipulation of the Running Variable in the Regression Discontinuity Design: A Density Test
*Journal of Econometrics*, Volume 142 , Issue 2, February 2008

## Scholarship on Competition

Measuring Benchmark Damages in Antitrust Litigation (with Daniel L. Rubinfeld)
*Journal of Econometric Methods*, Volume 3, January 2014

## Scholarship on Finance

Dark Trading at the Midpoint: Pricing Rules, Order Flow, and Price Discovery (with Robert Bartlett)
Accepted, *Journal of Law, Finance, and Accounting*

How Rigged Are Stock Markets?: Evidence from Microsecond Timestamps (with Robert Bartlett)
Conditionally Accepted, *Journal of Financial Markets*

Subsidizing Liquidity with Wider Ticks: Evidence from the Tick Size Pilot Study Timestamps (with Robert Bartlett)
Conditionally Accepted, *Journal of Empirical Legal Studies*

Shall We Haggle in Pennies at the Speed of Light or in Nickels in the Dark?: How Minimum Price Variation Regulates High Frequency Trading and Dark Liquidity (working paper, 2015, with Robert Bartlett)

# Appendix A

## Scholarship on Risk and Crime

Why We Need Police (with Deepak Premkumar)
  Chapter 3 in *The Cambridge Handbook of Policing in the United States*, Tamara Rice Lave and Eric Jr. Miller, eds., Cambridge University Press, June 2019

Are U.S. Cities Underpoliced? Theory and Evidence (with Aaron Chalfin)
  *Review of Economics and Statistics*, Volume 100, Issue 1, March 2018, 167–186

Criminal Deterrence: A Review of the Literature (with Aaron Chalfin)
  *Journal of Economic Literature*, Volume 55, Number 1, March 2017, 5–48 (lead article)

The Deterrence Effect of Prison: Dynamic Theory and Evidence (with David S. Lee)
  *Advances in Econometrics*, Volume 38, 2017, editors Matias D. Cattaneo and Juan Carlos Escanciano
  2018 Emerald Literati Award, Outstanding Author Contribution

Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process: An Empirical Inquiry (with Tamara Lave)
  *Brooklyn Law Review*, Volume 78, Summer 2013, Number 4, 1391–1439

General Equilibrium Effects of Prison on Crime: Evidence From International Comparisons (with Sarath Sanga)
  *Cato Papers on Public Policy*, Volume 2, 2012

*Controlling Crime: Strategies and Tradeoffs* (co-edited with Phil Cook and Jens Ludwig), Chicago: University of Chicago Press, 2011.

## Scholarship on Labor Economics

Unmarked?  Criminal Record Clearing and Employment Outcomes (with Jeffrey Selbin (lead author) and Joshua Epstein)
  *Journal of Criminal Law and Criminology*, Volume 108, Number 1, 2017 (lead article)

The Effect of Female Education on Fertility and Infant Health: Evidence from School Entry Laws Using Exact Date of Birth (with Heather Royer)
  *American Economic Review*, Volume 101, Number 1, February 2011

Comment on "Free to Punish? The American Dream and the Harsh Treatment of Criminals", by Rafael di Tella and Juan Dubra
  *Cato Papers on Public Policy*, Volume 1, 2011

Dynamic Perspectives on Crime
  in *Handbook of the Economics of Crime*, Chapter 4, Edward Elgar, 2010

The Effect of Court-Ordered Hiring Quotas on the Composition and Quality of Police
  *American Economic Review*, Volume 97, Number 1, March 2007

Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment
  *American Economic Review*, Volume 92, Number 4, September 2002

## Scholarship on Intellectual Property

A Reconsideration of Copyright's Term (with Kristelia A. Garcia)
  forthcoming, *Alabama Law Review*

## Scholarship on Monetary Policy

Following Germany's Lead: Using International Monetary Linkages to Estimate the Effect of Monetary Policy on the Economy (with Julian di Giovanni and Till von Wachter)
  *Review of Economics and Statistics*, Volume 91, Number 2, May 2009

# Appendix A

## Other Scholarship

The Ph.D. Rises in American Law Schools, 1960-2011: What Does It Mean for Legal Education? (with Joy Milligan and James Phillips)
*Journal of Legal Education*, Volume 65, Number 543, Spring 2016

## Other Activities

2019–     Member, Board of Directors, Plectica, LLC

2017–     Member, Board of Directors, American Law and Economics Association

2007–     Co-Director (with Phil Cook and Jens Ludwig), *Crime Working Group*, National Bureau of Economic Research

2009–2014 Co-Director, *Law and Economics Program*, University of California, Berkeley

## Courses Taught

### Columbia

2019-2020 L6293: Antitrust and Trade Regulation (Fall); L6916: Litigation, Economics, and Statistics (Fall)

2018-2019 L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2017-2018 L6231: Corporations (Fall)

### Berkeley

2016-2017 Law 244.4: Litigation and Statistics (Fall); Law 216: Law and Economics Workshop (Fall); Law 218.6: Law and Economics of Discrimination (Fall)

2015-2016 Law 250: Business Associations (Fall); Law 244.4: Litigation and Statistics (Fall); Letters and Science 39D: Race, Policing, and Data Science (Fall)

2014-2015 Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer)

2013-2014 Law 250S: Business Associations (Summer)

2012-2013 Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall)

2011-2012 Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall); Law 251.31: Introduction to Law, Economics, and Business (Spring); Legal Studies 145: Law and Economics I (undergraduate)

2010-2011 Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 216: Law and Economics Workshop (Fall and Spring); Legal Studies 145: Law and Economics I (undergraduate); Law 209.6: Topic in Quantitative Methods (JSP); Econ 250C: Labor Economics (graduate, shared course with 209.6)

2009–2010 Law 216: Law and Economics Workshop (Fall and Spring); Law 209.32: Quantitative Methods II (JSP)

2008–2009 Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP); Law 209.32: Quantitative Methods II (JSP)

2007–2008 Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP)

### Michigan

Introduction to Quantitative Methods (policy), First Econometrics Field Course (economics), Advanced Economic Theory (policy)

# Appendix A

## Grants and Fellowships

2007–2010  NIH, Constructive Proposals for Dealing With Attrition (with John DiNardo)

2009  Committee on Research, Junior Faculty Research Grant, UC Berkeley

2006–2009  NIH, The Effect of Female Education on Fertility and Infant Health (with Heather Royer, Grant # R03 HD051713)

2006–2011  NSF, New Instrumental Variables Estimates of the Effects of Schooling and Military Service: Empirical Strategies Using Non-Public-Use Data (with Josh Angrist and Stacey Chen)

2005  RWJ Foundation Health and Society Scholars Program, Small Grant Program

2004  Rackham Interdisciplinary Grant, University of Michigan

2004  CLOSUP Grant, University of Michigan

2004  National Poverty Center Grant, University of Michigan

2002–2003  Chancellor's Dissertation Year Fellowship, UC Berkeley

## Presentations

2018–2019  Columbia University, School of Law; Conference on Empirical Legal Studies, University of Michigan

2017–2018  Columbia University, School of Law; Georgetown University, School of Law

2016–2017  George Mason University, School of Law; University of Michigan, Economics Department (Summer, Fall); Equities Leaders Summit; University of Zürich, Department of Economics; ETH (Swiss Federal Institute of Technology) Zürich, Law and Economics; Northwestern University, School of Law; Duke University, School of Law; Duke University, Information Initiative

2015–2016  Goldman Sachs; University of California, Berkeley, School of Law; University of Virginia, School of Law; University of California, Irvine; Equal Employment Opportunity Commission; National Bureau of Economic Research, Summer Institute

2014–2015  Duke University; Federal Reserve Bank of New York; Equal Employment Opportunity Commission (EEO-DataNet); American Law and Economics Association (discussant); New York University (NYU / Penn Law and Finance Conference); National Bureau of Economic Research, Summer Institute (discussant)

2013–2014  University of Southern California, School of Law; London School of Economics; Bank of Spain; CEMFI; Carlos III; University of Zaragoza; University of Rotterdam; University of Maastricht; University of Götenborg

2012–2013  University of California, Los Angeles, School of Law

2011–2012  University of Oregon, Department of Economics; University of British Columbia, Department of Economics; Brown University, Department of Economics; University of Rochester, Department of Economics; Cato Institute; National Bureau of Economic Research, Summer Institute; Harvard Law School

2010–2011  Northwestern, School of Law; University of Wisconsin, Department of Economics; Brookings Institution; Cato Institute

2009–2010  University of Chicago, School of Law; Cornell University, School of Law and Department of Economics; University of Michigan, School of Law and Department of Economics; University of Virginia, School of Law, Olin Conference

2008–2009  University of California, Los Angeles, School of Law; University of Arizona, School of Law and Department of Economics; Stanford University, School of Law and Department of Economics; University of Miami, Department of Economics

2007–2008  Northwestern University, School of Law; University of Michigan, Department of Economics; National Bureau of Economic Research, Summer Institute; Florida State University

*Prior to 2007–2008, presentations are at departments of economics, unless otherwise noted*

2006–2007   University of Michigan, Program in Survey Methodology; Public Policy Institute of California; Brown University

2005–2006   University of Michigan; University of California, Irvine; University of California, Santa Barbara; University of California, Santa Cruz; California State University, Long Beach; University of Western Ontario; University of Toronto; University of Illinois, Chicago; University of Chicago, Graduate School of Business; APPAM; University of Florida; University of California, Berkeley, School of Law; Princeton University; RAND; Hebrew University (conference in honor of Reuben Gronau); Stanford University, University of Wisconsin, Madison; Northwestern University; Crime and Economics Summer Workshop, University of Maryland

2004–2005   Federal Reserve Bank of Chicago; University of Illinois, Urbana-Champaign; University of Michigan, William Davidson Institute; University of Maryland; Urban Institute; American Economics Association Meetings; City University of New York Health Economics Seminar; University of Wisconsin, Madison; Stanford University; University of California, Davis; University of California, Berkeley, Labor Lunch; NBER Summer Institute, Education/Labor Studies

2003–2004   University of Michigan; APPAM; NBER Labor Studies Meeting (Fall); Massachusetts Institute of Technology; Harvard University, Kennedy School; University of California, Los Angeles; University of California, San Diego; Columbia University; University of California, Berkeley; NBER Summer Institute, Monetary Policy; NBER Summer Institute, Labor Studies

2002–2003   University of California, San Diego; University of California, Los Angeles; RAND Institute; University of Chicago, Graduate School of Business; University of Chicago, Harris School of Public Policy; University of Michigan, Ford School of Public Policy; Columbia University; Dartmouth College; Federal Reserve Bank of New York; Boston University

Last updated: October 8, 2019

# Appendix B

## Documents Relied Upon

| Document Title | Document Date |
|---|---|
| **Academic Articles** | |

1. Alexandre Mas and Amanda Pallais, "Valuing Alternative Work Arrangements," *American Economic Review 107*, no. 12, pp. 3722–3759 — 2017

2. Anthony J. Billittier IV, et al., "A Multisite Survey of Factors Contributing to Medically Unnecessary Ambulance Transports," *Academy Emergency Medicine 3*, no. 11, pp. 1046–1052 — 1996

3. Dmitri K. Koustas, "What do Big Data Tell Us about Why People Take Gig Economy Jobs?" *AEA Papers and Proceedings 109*, pp. 367–371 — 2019

4. E. Glen Weyl, "A Price Theory of Multi-Sided Platforms," *American Economic Review* 100, no. 4, pp. 1642–1672 — 2010

5. Jean-Charles Rochet and Jean Tirole, "Platform in Two-Sided Markets," *Journal of the European Economic Association* 1, no. 4, pp. 990–1029 — 2003

6. Jeffrey Clemens, Lisa B. Kahn, and Jonathan Meer, "The Minimum Wage, Fringe Benefits, and Worker Welfare," NBER Working Paper No. 24635 — 2018

7. Jeremy I. Bulow and Paul Pfleiderer, "A Note on the Effect of Costs Changes on Prices," *Journal of Political Economy* 91, no. 1, pp. 182–185 — 1983

8. Jonathan V. Hall and Alan B. Krueger, "An Analysis of the Labor Market for Uber's Driver-Partners in the United States", *ILR Review 71*, no. 3, pp. 705–732 — 2018

9. Karen Camasso-Richardson, James A. Wilde, and Emory M. Petrack, "Medically Unnecessary Pediatric Ambulance Transports: A Medical Taxi Service?" *Academy of Emergency Medicine 4*, pp. 1137–1141 — 1997

10. Kevin A. Bryan and Joshua S. Gans, "A theory of multihoming in rideshare competition", *Journal of Economics and Management Strategy*, no. 28, pp. 89–96 — 2019

11. Lawrence F. Katz and Alan B. Krueger, "The Rise and Nature of Alternative Work Arrangements in the United States, 1995–2015," *ILR Review 72*, no. 2, pp. 382–416 — 2019

12. Lawrence F. Katz and Alan B. Krueger, "Understanding Trends in Alternative Work Arrangements in the United States," NBER Working Paper No. 25425 — 2019

13. Leon Moskatel and David Slusky, "Did UberX Reduce Ambulance Volume?" *Health Economics 28*, pp. 817–829 — 2019

14. M. Keith Chen and Michael Sheldon, "Dynamic Pricing in a Labor Market: Surge Pricing and Flexible Work on the Uber Platform," Working Paper — 2015

15. M. Keith Chen, Judith Chevalier, Peter Rossi, and Emily Oehlsen, "The Value of Flexible Work: Evidence from Uber Drivers," *Journal of Political Economy 127*, no. 6, pp. 2735–2794 — 2019

16. Peter Cohen et al., "Using Big Data to Estimate Consumer Surplus: The Case of Uber," NBER Working Paper No. 22627 — 2016

17. Peter Harasztosi and Attila Lindner, "Who Pays for the Minimum Wage?" *The American Economic Review* 109, no. 9, pp. 2693–2727 — 2019

18. Seth Harris and Alan Krueger, "A Proposal for Modernizing Labor Laws for Twenty-First-Century Work: The Independent Worker," The Hamilton Project, Discussion Paper 2015-10 — 2015

# Appendix B

| Document Title | Document Date |
|---|---|
| 19    Tobias Renkin, Claire Montialoux, and Michael Siegenthaler, "The Pass-through of Minimum Wages into US Retail Prices: Evidence from Supermarket Scanner Data", Working Paper | 2019 |

**Analyst Reports**

| | |
|---|---|
| 20    Ross Sandler, Deepak Mathivanan, Mario Lu, Trevor Young, CFA, and Thomas Chadwick, "Uber Technologies Inc./Lyft, Inc.: Quick Update on Pending Ride-hailing Regulation: 1099 vs. W-2," Barclays | June 10, 2019 |

**Books**

| | |
|---|---|
| 21    Dennis W. Carlton and Jeffrey M. Perloff , Modern Industrial Organization, (Reading, MA: Addison Wesley) | 2000 |
| 22    Hal Varian, Intermediate Microeconomics, (New York, NY: W. W. Norton & Company) | 2010 |
| 23    Lynne Pepall, Daniel J. Richards, and George Norman, Industrial Organization: Contemporary Theory and Practice, (Cincinnati, Ohio:  South-Western) | 2002 |

**Legal Documents**

| | |
|---|---|
| 24    Opinion, *Ohio et al. v. American Express Co. et al.* | June 25, 2018 |
| 25    Opinion, *Raef Lawson v. Grubhub Inc., et al.* | February 8, 2018 |
| 26    Decision, *US Airways, Inc., for American v. Sabre Holdings Corporation* | September 11, 2019 |

**Public Press**

| | |
|---|---|
| 27    Ari Levy and Alex Sherman, "Vox Media to cut hundreds of freelance jobs ahead of changes in California gig economy laws," *CNBC*, https://www.cnbc.com/2019/12/16/vox-media-to-cut-hundreds-of-freelance-jobs-ahead-of-californias-ab5.html | December 16, 2019 |
| 28    Carolyn Said, "Uber circulates new gig-work bill as alternative to AB5," *San Francisco Chronicle*, https://www.sfchronicle.com/business/article/Uber-circulates-new-gig-work-bill-as-alternative-14426247.php | September 10, 2019 |
| 29    Carolyn Y. Johnson, "Large employers say health plans will cost more than $14,000 for an employee in 2018," *The Washington Post*, https://www.washingtonpost.com/news/wonk/wp/2017/08/08/large-employers-say-health-plans-will-cost-more-than-14000-for-an-employee-in-2018/ | Undated |
| 30    Chandra Steele, "Why I Used Uber Instead of an Ambulance," *PCMag.com*, https://www.pcmag.com/article/346165/why-i-used-uber-instead-of-an-ambulance | July 18, 2016 |
| 31    David M. Steingold, "Employer's Guide to Unemployment Insurance Tax in California," *NOLO*, https://www.nolo.com/legal-encyclopedia/how-pay-unemployment-insurance-employees-california.html | Undated |
| 32    Graham Rapier, "Uber and Lyft reveal their alternative proposal to California's new gig-economy law," *Business Insider*, https://www.businessinsider.com/uber-lyft-ab5-ballot-initiative-california-gig-economy-law-2019-10 | October 29, 2019 |
| 33    John Ness, "Thank you, California," *SB Nation*, https://www.sbnation.com/2019/12/16/21024100/thank-you-california | December 16, 2019 |

**Appendix B**

| Document Title | Document Date |
|---|---|
| 34 | Judy Lin, "California Debates Law Requiring 2 Million Independent Contractors to Become Employees," *Times of San Diego*, https://timesofsandiego.com/politics/2019/07/06/california-debates-law-requiring-2-million-independent-contractors-to-become-employees/ | July 6, 2019 |
| 35 | Judy Lin, "Who's in, who's out of AB 5," Cal Matters, https://calmatters.org/economy/2019/09/whos-in-whos-out-of-ab-5/ | September 11, 2019 |
| 36 | Melissa Bailey, "Ambulance trips can leave you with surprising – and very expensive – bills," *The Washington Post*, https://www.washingtonpost.com/national/health-science/ambulance-trips-can-leave-you-with-surprising--and-very-expensive--bills/2017/11/17/6be9280e-c313-11e7-84bc-5e285c7f4512_story.html | November 20, 2017 |
| 37 | Robert Sheen, "California Bill AB5 May Impact Your ACA Compliance Process," *The ACA Times*, https://acatimes.com/california-bill-ab5-may-impact-your-aca-compliance-process/ | October 16, 2019 |
| 38 | Sarah Thomason, Ken Jacobs, and Sharon Jan, "Estimating the Coverage of California's New AB5 Law," UC Berkeley Labor Center, http://laborcenter.berkeley.edu/estimating-the-coverage-of-californias-new-ab-5-law/ | November 12, 2019 |
| 39 | Sean Captain, "Ahead of its IPO, Postmates starts offering no-strings perks for couriers," *FastCompany*, https://www.fastcompany.com/90389438/postmates-offers-no-strings-perks-for-couriers-ahead-of-ipo | August 13, 2019 |
| 40 | Stephen Fishman, "California Passes Historic Gig-Worker Law," *NOLO*, https://www.nolo.com/legal-encyclopedia/california-gig-worker-law-AB-5.html | Undated |
| 41 | Stephen Gandel, "Uber-nomics: Here's what it would cost Uber to pay its drivers as employees," *Fortune*, https://fortune.com/2015/09/17/ubernomics/ | September 17, 2015 |

**Other Publicly Available Materials**

| | |
|---|---|
| 42 | Bureau of Labor Statistics, "Employer Costs for Employee Compensation – September 2019," https://www.bls.gov/news.release/pdf/ecec.pdf | December 18, 2019 |
| 43 | California Department of Industrial Relations, "Answers to frequently asked questions about workers' compensation for employers," https://www.dir.ca.gov/dwc/faqs.html | Undated |
| 44 | California Department of Industrial Relations, "Healthy Workplace Healthy Family Act of 2014 (AB 1522)," https://www.dir.ca.gov/dlse/ab1522.html | Undated |
| 45 | California Department of Industrial Relations, "Independent contractor versus employee," https://www.dir.ca.gov/dlse/faq_independentcontractor.htm | Undated |
| 46 | California Legislative Information, "AB-5 Worker status: employees and independent contractors", https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB5 | Undated |
| 47 | Diana Farrell, Fiona Greig, and Amar Hamoudi, "Bridging the Gap," JPMorgan Chase & Co. Institute, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3481471 | October 2019 |
| 48 | Diana Farrell, Fiona Greig, and Amar Hamoudi, "The Online Platform Economy in 2018: Drivers, Workers, Sellers, and Lessors," JPMorgan Chase & Co. Institute, https://institute.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-ope-2018.pdf | 2018 |
| 49 | Ezra Dubroff, "Driving for Multiple Food Delivery Apps at the Same Time," The Rideshare Guy, https://therideshareguy.com/how-to-drive-for-multiple-delivery-apps/ | July 21, 2017 |

# Appendix B

| Document Title | Document Date |
|---|---|
| 50 Internal Revenue Service, "Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act", https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-the-affordable-care-act | Undated |
| 51 Internal Revenue Service, "Topic No. 751 Social Security and Medicare Withholding Rates," https://www.irs.gov/taxtopics/tc751 | Undated |
| 52 JPMorgan Chase & Co. Institute, "The Online Platform Economy:  Who earns the most?" https://institute.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/ope-who-earns-the-most.pdf | Undated |
| 53 Kiwibot, "About us," https://www.kiwibot.com/about-us | Undated |
| 54 Marketplace Edison Research, "The Gig Economy," http://www.edisonresearch.com/wp-content/uploads/2019/01/Gig-Economy-2018-Marketplace-Edison-Research-Poll-FINAL.pdf | December 2018 |
| 55 National Association of Counties, Counties Futures Lab, "The Future of Work:  The Rise of the Gig Economy,"  https://www.naco.org/sites/default/files/documents/Gig-Economy.pdf | November 2017 |
| 56 Postmates, "About Postmates," https://postmates.com/about | Undated |
| 57 Postmates, "Fleet Agreement," https://fleet.postmates.com/legal/agreement | Undated |
| 58 Postmates, "How do I become a Postmate?" https://support.postmates.com/fleet/articles/219622448-article-How-do-I-become-a-Postmate- | Undated |
| 59 RBB Economics, "Cost Pass-Through:  Theory, Measurement, and Potential Policy Implications" | February 2014 |
| 60 Robert Habans, "Exploring the Costs of Classifying Workers as Independent Contractors: Four Illustrative Sectors," UCLA Institute for Research on Labor and Employment, https://irle.ucla.edu/wp-content/uploads/2016/03/IndependentContractorCost_20151209-1-2.pdf | December 2015 |
| 61 Robert Habans, "Is California's Gig Economy Growing?  Exploring Trends in Independent Contracting," UCLA Institute for Research on Labor and Employment, https://irle.ucla.edu/wp-content/uploads/2016/03/Is-Californias-Gig-Economy-Growing-Exploring-Trends-in-Independent-Contracting.pdf | June 2016 |
| 62 Sarah Donovan, David Bradley, and Jon Shimabukuro, "What Does the Gig Economy Mean for Workers?" Congressional Research Service, https://fas.org/sgp/crs/misc/R44365.pdf | February 5, 2016 |
| 63 U.S. Chamber of Commerce, "Presentation of Findings from National Research Conducted Among business Decision-Makers," https://www.uschamber.com/report/presentation-findings-national-research-conducted-among-business-decision-makers | November 12, 2013 |
| 64 Uber, "About us," Products Section, https://www.uber.com/us/en/about/ | Undated |
| 65 Uber, "Driver requirements," https://www.uber.com/us/en/drive/requirements/ | Undated |
| 66 Uber, "Information about taking trips," https://www.uber.com/us/en/drive/basics/how-to-take-trips/ | Undated |
| 67 Uber, "Ready to hit the road?" https://www.uber.com/au/en/drive/how-it-works/ | Undated |
| 68 Uber, "Why drivers choose Uber," https://www.uber.com/us/en/drive/uber-vs-lyft/ | Undated |

**Note: In addition to the documents on this list, I considered all documents cited in my report to form my opinions.**