GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  TEvangelis@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
  BEvanson@gibsondunn.com
HEATHER L. RICHARDSON, SBN 246517
  HRichardson@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA,
  SBN 254433
  DManthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
  JLipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Tel: 415.393.8200
Fax: 415.393.8306

Attorneys for Plaintiffs Lydia Olson, Miguel Perez,
Postmates Inc., and Uber Technologies, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYDIA OLSON, et al., | CASE NO.  2:19-cv-10956-DMG-RAO |
| Plaintiffs, | |
| v. | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| STATE OF CALIFORNIA, et al., | |
| Defendants. | Judge:          Hon. Dolly M. Gee<br>Hearing Date: February 7, 2020<br>Time:           2:00 p.m. |

# TABLE OF CONTENTS

<u>Page(s)</u>

INTRODUCTION ......................................................................................... 1

ARGUMENT .................................................................................................. 2

I.     Plaintiffs Are Likely To Succeed On The Merits. ............................ 2

    A.    AB 5 Irrationally Targets Network Companies And Furthers No Legitimate Governmental Purpose. .......................... 2

        1.    AB 5's Irrational Exemptions Demonstrate That The Statute Does Not Further A Legitimate State Interest. .......... 3

        2.    The Record Amply Demonstrates That Improper Animus Motivated AB 5's Enactment. ................................ 6

    B.    AB 5 Irrationally Denies On-Demand Workers Their Right To Pursue Their Chosen Occupations. ......................... 9

    C.    Enforcement Of AB 5 Would Unconstitutionally Impair Plaintiffs' Contracts. .............................................. 13

II.    Defendants Do Not Deny That Allowing Them To Enforce AB 5 As They Intend Would Irreparably Injure Plaintiffs. .......................... 17

    A.    The Unrebutted Evidence Shows That Plaintiffs Face Multiple Forms Of Recognized Irreparable Harm. ....................... 17

    B.    Plaintiffs Did Not "Delay" Seeking A Preliminary Injunction. ........ 19

III.    The Balance Of Equities Favors Maintaining The Status Quo. ................... 22

IV.    The Public Interest Weighs Heavily Against Disruption Of The On-Demand Economy While Plaintiffs' Constitutional Challenges Are Pending. ............................................................................ 23

CONCLUSION ............................................................................................ 25

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A&A Int'l Apparel, Inc. v. Xu*,
  2015 WL 12850544 (C.D. Cal. Jan. 29, 2015)........................................................17

*Alexander v. FedEx Ground Package Sys., Inc.*,
  765 F.3d 981 (9th Cir. 2014) .................................................................................10

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978)..........................................................................................15, 16

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ..........................................................................17, 18

*Anderson v. United States*,
  612 F.2d 1112 (9th Cir. 1979) ...............................................................................23

*Ass'n of Surrogates & Supreme Court Reporters Within City of New York
  v. State of N.Y.*,
  940 F.2d 766 (2d Cir. 1991) ...................................................................................16

*Baumgardner v. Cty. of Cook*,
  108 F. Supp. 2d 1041 (N.D. Ill. 2000) .....................................................................6

*Cal Fire Local 2881 v. California Pub. Employees' Ret. Sys.*,
  6 Cal. 5th 965, 977 (2019) .....................................................................................16

*California Trucking Ass'n v. Becerra*,
  2020 WL 248993 (S.D. Cal. Jan. 16, 2020) ......................................2, 15, 17, 18, 22

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985).........................................................................................3, 6, 8

*Clayton v. Steinagel*,
  885 F. Supp. 2d 1212 (D. Utah 2012) ....................................................................11

*Conn v. Gabbert*,
  526 U.S. 286 (1999)................................................................................................12

*Cornwell v. Hamilton*,
  80 F. Supp. 2d 1101 (S.D. Cal. 1999) ....................................................................11

*Craigmiles v. Giles*,
  312 F.3d 220 (6th Cir. 2002) ............................................................................12, 13

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019)..............................................................................................8

*Dynamex West v. Superior Court*,
  4 Cal. 5th 903 (2018)................................................................................................1

*Equip. Mfrs. Inst. v. Janklow*,
  300 F.3d 842 (8th Cir. 2002) ..................................................................................16

# TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*,
880 F.3d 450 (9th Cir. 2018) ..................................................................... 12

*Fed. Exp. Corp. v. California Pub. Utilities Comm'n*,
1993 WL 399380 (N.D. Cal. Sept. 23, 1993) ............................................. 21

*First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*,
356 F. Supp. 2d 1048 (N.D. Cal. 2005) ...................................................... 20

*Fowler Packing Co., Inc. v. Lanier*,
844 F.3d 809 (9th Cir. 2016) ....................................................................... 5

*Franceschi v. Yee*,
887 F.3d 927 (9th Cir. 2018) ..................................................................... 12

*Gallinger v. Becerra*,
898 F.3d 1012 (9th Cir. 2018) ................................................................. 7, 8

*Ganley v. Claeys*,
2 Cal. 2d 266 (1935) ................................................................................. 12

*Garrett v. City of Escondido*,
465 F. Supp. 2d 1043 (S.D. Cal. 2006) ...................................................... 22

*Garris v. Hanover Ins. Co.*,
630 F.2d 1001 (4th Cir. 1980) .............................................................. 15, 16

*Gwangju Cultural-Contents Inv. Corp. v. K2 Advanced Media LLC*,
2012 WL 12882706 (C.D. Cal. Nov. 28, 2012) .......................................... 21

*Idaho v. Coeur d'Alene Tribe*,
794 F.3d 1039 (9th Cir. 2015) ................................................................... 18

*Indep. Living Ctr. of S. California, Inc. v. Maxwell-Jolly*,
572 F.3d 644 (9th Cir. 2009) ..................................................................... 22

*Int'l Refugee Assistance Project v. Trump*,
857 F.3d 554 (4th Cir. 2017) ....................................................................... 9

*K-2 Ski Co. v. Head Ski Co.*,
467 F.2d 1087 (9th Cir. 1972) ................................................................... 13

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
402 F. Supp. 3d 877 (N.D. Cal. 2019)............................................. 19, 20, 21

*Kobell v. Suburban Lines, Inc.*,
731 F.2d 1076 ....................................................................................... 20, 21

*Latta v. Otter*,
771 F.3d 496 (9th Cir. 2014) ..................................................................... 22

*Lawson v. Grubhub Inc.*,
302 F. Supp. 3d 1071 (N.D. Cal. 2018) ...................................................... 14

# TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Levine v. Fair Political Practices Comm'n,*
222 F. Supp. 2d 1182 (E.D. Cal. 2002) ................................................. 22

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
571 F.3d 873 (9th Cir. 2009) ............................................................. 23

*Maryland v. King,*
133 S.Ct. 1 (2012) ........................................................................ 22

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.,*
545 U.S. 844 (2005) ........................................................................ 8

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) ............................................................. 17

*Merrifield v. Lockyer,*
547 F.3d 978 (9th Cir. 2008) .............................................................. 4

*Metro. Life Ins. Co. v. Ward,*
470 U.S. 869 (1985) ........................................................................ 5

*Metromedia Broad. Corp. v. MGM/UA Entm't Co, Inc.,*
611 F. Supp. 415 (C.D. Cal. 1985) ...................................................... 20

*Morris v. U.S. Army Corps of Engineers,*
990 F. Supp. 2d 1082 (D. Idaho 2014) .................................................. 23

*Nelson v. Nat'l Aeronautics & Space Admin.,*
530 F.3d 865 (9th Cir. 2008) ............................................................. 18

*Miller ex rel. NLRB v. Cal. Pac. Medic. Ctr.,*
991 F.2d 536 (9th Cir. 1993) ......................................................... 19, 20

*Nordlinger v. Hahn,*
505 U.S. 1 (1992) ........................................................................... 2

*OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.,*
602 Fed. App'x 669 (9th Cir. 2015) .................................................... 2, 9

*Planned Parenthood Greater Memphis Region v. Dreyzehner,*
853 F. Supp. 2d 724 (M.D. Tenn. 2012) ................................................. 8

*Purdy & Fitzpatrick v. State,*
71 Cal. 2d 566 (1969) .................................................................... 12

*Regents of Univ. of Cal. v. United States Dep't Homeland Sec.,*
No. 17-cv-05211-WHA (N.D. Cal. Jan. 9, 2018) ........................................ 9

*Romer v. Evans,*
517 U.S. 620 (1996) .................................................................. 3, 5, 6

*RUI One Corp. v. City of Berkeley,*
371 F.3d 1137 (9th Cir. 2004) ........................................................... 16

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Schweiker v. Wilson*,
450 U.S. 221 (1981).................................................................................. 3

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)................................................................................... 7

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
709 F.3d 1281 (9th Cir. 2013) ............................................................. 2, 9

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013) ................................................................... 5

*United States v. Ninety Three Firearms*,
330 F.3d 414 (6th Cir. 2003) ................................................................... 7

*Valle del Sol, Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ............................................................... 24

*Washington Health Care Ass'n v. Arnold-Williams*,
601 F. Supp. 2d 1224 (W.D. Wash. 2009) ............................................ 16

*Western States Trucking Ass'n v. Schoorl*,
377 F. Supp. 3d 1056 (E.D. Cal. 2019) ................................................ 15

*In re Workers' Comp. Refund*,
46 F.3d 813 (8th Cir. 1995) ............................................................. 14, 16

*Yue v. Conseco Life Ins. Co.*,
282 F.R.D. 469 (C.D. Cal. 2012)........................................................... 19

**Other Authorities**

https://twitter.com/LorenaSGonzalez/status/1219523961517527040............ 18

https://twitter.com/LorenaSGonzalez/status/1219528872351322114; ........ 18

https://www.dol.gov/whd/opinion/FLSA/2019/2019_04_29_06_
FLSA.pdf ............................................................................................... 14

Joe Fitzgerald Rodriguez, SF Examiner, *Newsom's CA budget includes
$20 million for AB 5 enforcement* (Jan 10, 2020),
https://www.sfexaminer.com/ news/newsoms-ca-budget-includes-20-
million-for-ab-5-enforcement .............................................................. 18

Postmates, Thinking Bigger and Bolder on Benefits (Aug. 13, 2019)
https://blog.postmates.com/thinking-bigger-and-bolder-on-benefits-
f0a96b1435e2.......................................................................................... 13

**Regulations**

Industrial Wage Commission's Wage Order No. 9 ....................................... 15

Gibson, Dunn &
Crutcher LLP

## **INTRODUCTION**

The government's opposition provides no justification for AB5's irrational scheme or the havoc it wreaks.  The government fails even to *mention* Plaintiffs' uncontroverted evidence that, if AB 5 were enforced as its sponsors intend, the lives of Individual Plaintiffs Lydia Olson and Miguel Perez would be dramatically upended, imposing unrecoverable real-life harm on them and their families.  Like AB 5's sponsors, the government is so determined to target *Company* Plaintiffs that it ignores entirely the costs AB 5 imposes on the *individuals* it seeks to compel into employment relationships.  The government's outright failure even to address the irreparable injury prong of the injunction analysis or the evidence Plaintiffs put forth is dispositive, given the extreme harm facing Individual Plaintiffs, Company Plaintiffs, and the public at large if AB 5 were enforced as its sponsors intend.

Nor is there, anywhere in the government's brief, a rational justification for the classifications AB 5 draws that could support its constitutionality.  The government claims that "AB 5 seeks to remedy the widespread misclassification of workers as independent contractors" by codifying and expanding the ABC test from *Dynamex West v. Superior Court*, 4 Cal. 5th 903 (2018).  Opp. 7.  But whereas *Dynamex* applied generally to all wage order claims, AB 5 *rolls back Dynamex* for the wage order claims of the millions of exempted workers.  Under AB 5, these workers' claims are now subject to the very *Borello* standard that AB 5's sponsors said provides insufficient protection to workers.  AB 5 thus takes the generally applicable ABC test articulated in *Dynamex* and applies it *disparately*—eliminating its more stringent standard for some segments of the market, and expanding it for others.

This patently unequal treatment, combined with the severe restrictions it imposes on the ability of independent service providers to pursue their chosen professions and the upending of millions of contracts, renders AB 5 unconstitutional.  Plaintiffs have shown they are likely to prevail on their claims, and—as the government does not dispute—have at the very least identified "serious questions" over the statute's

constitutionality. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). As the Southern District of California did in a related challenge to AB 5 (*Cal. Trucking Ass'n v. Becerra*, 2020 WL 248993 (S.D. Cal. Jan. 16, 2020)), the Court should issue a preliminary injunction to preserve the status quo.

## ARGUMENT

Plaintiffs' *unrebutted* evidence shows that "the balance of equities tips sharply in [P]laintiff[s'] favor." *Shell Offshore*, 709 F.3d at 1291. Plaintiffs and the public will suffer irreparably absent an injunction, and Plaintiffs have, at the very least, met their burden to show "there are *serious questions* going to the merits—a lesser showing than likelihood of success on the merits." *Id*. (emphasis and internal quotation marks omitted). To be clear, Plaintiffs have shown a *likelihood* of success on the merits, but at this stage, the burden on Plaintiffs is to advance "serious questions" and show "a fair chance of success on the merits." *OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.*, 602 F. App'x 669, 671 (9th Cir. 2015) (citation omitted). Plaintiffs have met their burden under any articulation of the preliminary injunction standard.

## I.   Plaintiffs Are Likely To Succeed On The Merits.

The sponsors of AB 5 unconstitutionally targeted network companies, and if enforced as the sponsors intended and as the government has threatened, AB would deprive Plaintiffs of the right to work their chosen professions, and shred their mutually desired contracts. Plaintiffs are likely to prevail on the merits of their claims, and at the very least have raised serious questions on the constitutionality of AB 5.

### A.   AB 5 Irrationally Targets Network Companies And Furthers No Legitimate Governmental Purpose.

No law may draw classifications that fail to "rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Here, Defendants (1) do not, and cannot, identify a single legitimate governmental end that aligns with the means the legislature employed in AB 5 and (2) do nothing to counter Plaintiffs' showing that AB 5 is motivated by animus against network companies.

## 1. AB 5's Irrational Exemptions Demonstrate That The Statute Does Not Further A Legitimate State Interest.

Even under rational basis review, there must be *some* legitimate end that aligns with the distinctions the government has drawn. *See Schweiker v. Wilson*, 450 U.S. 221, 235 (1981) (classificatory scheme must "rationally advanc[e] a reasonable and *identifiable* governmental objective" (emphasis added)); *Romer v. Evans*, 517 U.S. 620, 632 (1996) ("[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained."); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

Defendants assert only that "AB 5 seeks to remedy the widespread misclassification of workers as independent contractors" in order to curb "erosion of the middle class and the rise in income inequality." Opp. 7. To that end, Defendants claim "[t]he Legislature wanted to ensure that workers were afforded the appropriate protections under state law," like minimum wage, liability insurance, and paid leave. *Id.* Yet one glance at AB 5's patchwork exemption scheme reveals its glaring incongruity with this proffered motive. *See* Mot. 11–12.

In a stunning (and misleading) sleight of hand, Defendants tell the Court the exemptions "broadly cover licensed professionals, including lawyers, architects, dentists, etc." Opp. 12. That is simply false. AB 5 exempts not only surgeons and psychologists, but also barbers, cosmetologists, manicurists, tutors, persons who provide minor home repairs, home cleaners, errand runners, furniture assemblers, dog walkers, dog groomers, picture hangers, pool cleaners, yard cleaners, fishermen, direct sellers, and in-home cosmetics sellers—to name a few. AB 5 §§ 2750.3(c)(1), (g)(2)(C). Further, within those categories, AB 5 exempts some workers and includes others similarly situated for no discernible (let alone articulated) reason. "For example, some types of workers are excluded (e.g., a delivery truck driver delivering milk) while others

1    performing substantively identical work are not excluded (e.g., a delivery truck driver

2    delivering juice)." Compl. ¶ 24.

3         Defendants claim that *Dynamex*'s ABC test is a benefit to the middle class and an

4    engine of income equality.  That is incorrect.  But even if Defendants were right, their

5    claim is *illusory*, given that, for many exempted groups, AB 5 renders *Dynamex*

6    inapplicable to wage order claims to which it previously applied—and even states that

7    the exemptions that "would relieve an employer from liability … shall apply

8    retroactively to existing claims and actions to the maximum extent permitted by law."

9    AB 5 § 2(i)(2).  If the legislature truly enacted AB 5 to further the sole interest

10   Defendants manage to proffer in their opposition brief, it would not have exempted

11   dozens of industries, many of which are similarly situated to Plaintiffs.  Instead, the

12   legislature readily granted exemptions for these industries while arbitrarily refusing to

13   consider any exemption for network companies.  *See* Compl. ¶¶ 64i, 67, 109.[1]

14        Put simply, AB 5 takes the generally applicable *Dynamex* ABC test, renders it

15   inapplicable to some groups and expands its applicability for other, similarly situated,

16   groups, without any rational basis for doing so.  That is the epitome of an irrational and

17   discriminatory statute.

18        Defendants concede that a statute fails rational basis review when its exemptions

19   *contradict* the justification put forward by its proponents.  *See* Opp. 12; *Merrifield v.*

20   *Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) ("We cannot simultaneously uphold the

21   licensing requirement under due process based on one rationale and then uphold

22   Merrifield's exclusion from the exemption based on a completely contradictory

23   rationale.").  And that is exactly what AB 5's slapdash carve-out scheme does for many

24   classes of workers.  For non-exempt workers and network companies like Plaintiffs, if

25   —————————————————

26   [1]  Defendants argue that the complaint is unverified and therefore is not itself sufficient
     evidence.  Opp. 4 n.5, 16.  But the complaint collects undisputed statements of AB 5's

27   key sponsors (and other evidence).  More critically, Defendants ignore the evidence
     (sworn affidavits) that Plaintiffs offered specifically to support this motion.  *See* Dkts.

28   15–20.

Gibson, Dunn &
Crutcher LLP

Reply in Support of
Plaintiffs' Motion for
Preliminary Injunction

4

Case No. 2:19-cv-10956-DMG-RAO

enforced against them in the manner in which its sponsors intend, AB 5 will "inflict[] on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it." *Romer*, 517 U.S. at 635.

Contrary to the government's unsupported assertion, the traditional workers and companies that AB 5 carves out *are* "'similarly-situated' entities who are exempt from the law in a way that contradicts the statute's purpose." Opp. 12. Many of the exempted traditional service providers and businesses resemble app-based service providers and network companies in all important respects. *See*, *e.g.*, Compl. ¶ 24 ("Nor is there any rational reason why an individual who chooses to earn income by direct selling Tupperware is exempt, and yet, if that same person earns extra income by offering driving services, there is no exemption."). For example, there is no material difference between providing local "moving" of items *from* one's home and local delivery of items *to* one's home. AB 5 § 2750.3(g)(2)(C). Yet app-based workers are subject to the ABC test, while similar traditional workers are not.

The real explanation for the exemptions is clear: They were crucial to procuring the interest group support necessary to ensure AB 5's passage, as Assemblywoman Gonzalez and other legislators openly acknowledged. *See* Mot. 9–11 (recounting that Assemblywoman Gonzalez admitted that she "had no other choice" to add one particular exemption "as a condition of AB 5's passage" and that one legislator reported that "if you" could curry favor with legislators and "hire fancy lobbyists, you got a carve out"). This fact dooms the constitutionality of AB 5 because "legislatures may not draw lines for the purpose of arbitrarily excluding individuals," even to "protect" those favored groups' "expectations." *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016); *see also St. Joseph Abbey v. Castille*, 712 F.3d 215, 222–23 (5th Cir. 2013) ("economic protection of a particular industry" is not "a legitimate governmental purpose"); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 878 (1985) (law unconstitutional where its "aim [was] designed only to favor domestic industry within the State").

Defendants argue that AB 5's broad sweep somehow mitigates its nonsensical

carve-out scheme.  Opp. 13 (citing a study finding that AB 5 applies to a relatively large number of workers and occupations).  But a law does not survive rational basis review just because it burdens more than the target of its animus.

For example, in *Moreno*, the Court struck down a statute intended "to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).  The statute, however, swept up more than just "hippies," making various other groups of individuals also ineligible for food stamps.  *Id.* at 530–32.  Nevertheless, the Supreme Court invalidated the statute under the "[t]raditional equal protection analysis."  *Id.* at 538.  The law's broad sweep beyond the targeted class of persons played no role in the Court's rational basis analysis.  Rather, as here, the critical facts were the glaring incompatibility between the statute's means and its stated ends, and evidence that it was designed to irrationally target a particular group.  *Id.*

Defendants assert that Plaintiffs are not members of a "suspect class" or "politically unpopular group."  Opp. 7–10.  This distinction makes no difference here. *See*, *e.g.*, *Baumgardner v. Cty. of Cook*, 108 F. Supp. 2d 1041, 1054 (N.D. Ill. 2000) ("Simply because a class of individuals is not part of a suspect or quasi-suspect class does not mean that they are not protected under the Equal Protection Clause.  In the absence of a suspect of quasi-suspect class, the state action must still bear a rational relationship to the legitimate state objectives and interest." (citing *Cleburne*, 473 U.S. at 442)).  The Supreme Court invalidated the challenged provisions in *Moreno* and *Romer not* because they involved suspect classes—they did not (under the Court's precedent at the time)—but under rational basis review, given that the provisions created irrational distinctions between similarly situated persons.  *Moreno*, 413 U.S. at 538; *Romer*, 517 U.S. at 632.  The same is true here.

### 2.  The Record Amply Demonstrates That Improper Animus Motivated AB 5's Enactment.

The government does not address the dozens of statements identified in the

complaint and in the preliminary injunction motion showing the irrational animus toward network companies that motivated AB 5's sponsors.  Instead, Defendants bury their head and ask the Court to ignore them.

Defendants cite *United States v. Ninety Three Firearms*, 330 F.3d 414 (6th Cir. 2003), for the proposition that "reliance on one stray comment in the legislative history cannot override the statute's structure, meaning, and purpose."  Opp. 9.  Plaintiffs are correct as far as that goes: Individual legislators' statements have no bearing on the *interpretation* of AB 5.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 403 (2010) ("The manner in which the law could have been written has no bearing; what matters is the law the Legislature did enact.  We cannot rewrite that to reflect our perception of legislative purpose[.]" (quotation, emphasis, and citation omitted)).  But those statements *are* probative of the *animus* AB 5's sponsors harbor toward network companies, in violation of their equal protection rights.  *Ninety Three Firearms* dealt with the interpretation of a statute, but has no bearing on the question whether the enforcement of the statute would violate equal protection.[2]

Further, Plaintiffs have proffered far more than a "stray comment" by a single legislator.  *Multiple* legislators have made *dozens* of statements on and off the Assembly and Senate floors demonstrating their irrational animus toward network companies.  A sampling includes accusing gig companies of engaging in "wage theft," "skirt[ing] labor laws," and "exploit[ing] working people" (Assemblywoman Gonzalez) (Compl. ¶ 64); stating that Uber's Chief Legal Counsel is "full of sh*t" and publicly calling on the City Attorneys in California's four largest cities to immediately file for injunctive relief under AB 5 on January 1, 2020 (Assemblywoman Gonzalez) (*id.*); claiming that "the gig economy is … a continuation of hundreds of years of corporations trying to screw over

---

[2]  *Gallinger v. Becerra*, 898 F.3d 1012 (9th Cir. 2018), is similarly inapposite.  In contrast to the multiple, specific allegations Plaintiffs make in the instant case, the plaintiffs in *Gallinger* failed to support their theory of impermissible animus with *any* factual allegations.  *Id.* at 1020.

workers" and calling the gig economy "f—g feudalism all over again" (Assembly Speaker Rendon) (Comp. ¶ 65a; Mot. 4); and stating that "just because your employer uses a smartphone app, doesn't mean they should be able to misclassify you as an independent contractor" (Assemblywoman Wicks) (Compl. ¶ 65b).

Defendants' suggestion that legislator statements outside the official legislative history "are not competent evidence" of animus (Opp. 9) is refuted by Defendants' own cases. In *Gallinger v. Becerra*, a case cited by Defendants, the Ninth Circuit took judicial notice of a statute's legislative history "as well as letters and newspaper articles" (placed in the record *by the Attorney General*) in determining whether the plaintiffs plausibly alleged impermissible legislative animus, observing that "animus need not be explicit in the legislative history for a plaintiff to establish impermissible intent." 898 F.3d 1012, 1020 (9th Cir. 2018) (the court ultimately held the materials it considered did not demonstrate animus) (citing *Cleburne*, 473 U.S. at 447–50; *see also Planned Parenthood Greater Memphis Region v. Dreyzehner*, 853 F. Supp. 2d 724, 737 (M.D. Tenn. 2012) (finding—based in part on campaign platform pledges, statements made by a principal lawmaker after the bill was passed, and a press release by the Lieutenant Governor—that the plaintiffs "well demonstrated a likelihood of success on their Equal Protection claim" by showing that "the Defendant acted with political motivation"); *cf. McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) (noting in Establishment Clause case that the Court cannot "ignore perfectly probative evidence" and that "our precedents sensibly forbid an observer to turn a blind eye to the context in which the policy arose" (internal quotation marks and brackets omitted)); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (finding that an agency's purported rationale for adding a question concerning citizenship status to the census was "more of a distraction" and explaining that courts are "not required to exhibit a naiveté from which ordinary citizens are free" (citation omitted)).

Defendants' argument also contradicts their own arguments in other litigation. The Attorney General has *repeatedly* taken the position that government officials'

statements outside a measure's official record are "competent evidence" of their subjective intent. For example, he and other plaintiffs argued that tweets and letters to congressional leaders demonstrate that President Trump's decision to rescind DACA was motivated by impermissible reasons. *See* Plaintiffs' Motion for Provisional Relief at 29–30, *Regents of Univ. of Cal. v. United States Dep't Homeland Sec.*, No. 17-cv-05211-WHA (N.D. Cal. Jan. 9, 2018).[3]

The Attorney General was right then, and wrong now: Legislators' statements are "perfectly probative evidence" of the government's motive.[4] There is no reason to categorically exclude this evidence, particularly at the preliminary injunction stage, before discovery has commenced. To draw such a distinction would create an artificial evidentiary limitation where none is justified. And in the absence of any evidence countering—or even attempting to explain away—these compelling indications of animus, the Court should conclude, at bare minimum, that Plaintiffs are likely to succeed on their claims. At the very least, Plaintiffs have shown "serious questions" about the statute's constitutionality and "a fair chance of success on the merits" of their equal protection claims (*Shell Offshore*, 709 F.3d at 1291; *OTR Wheel*, 602 Fed. App'x at 671 (citation omitted)), which Defendants do not even attempt to contest.

## B.  AB 5 Irrationally Denies On-Demand Workers Their Right To Pursue Their Chosen Occupations.

Defendants admit that the U.S. and California Constitutions guarantee workers the right to pursue their chosen occupations. Opp. 13. However, they argue, AB 5 does not implicate this right because it "does not dictate occupation" but "merely establishes

---

[3]  *See also* Brief Amicus Curiae of Virginia, Maryland, California, Connecticut, Delaware, Illinoise, Iowa, Maine, Massachusetts, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia in Support of Appellees and Affirmance at 16–18, *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (citing many examples of judicial reliance on statements by lawmakers outside the official record, including "campaign statements," "party platforms," "private citizens' statements in *The Federalist*," and "[o]ur common sense" (internal quotation marks omitted)).

[4]  *Id.* at 18 (citation omitted).

the standard for ascertaining, for any occupation, whether a worker is an employee or an independent contractor." *Id.* at 14–15.  This argument fails on two grounds:

*First*, AB 5 *does* "regulate occupation" (*id.* at 13); indeed, its sponsors intended it to regulate occupations like those of Mr. Perez and Ms. Olson out of existence.  As Individual Plaintiffs' declarations—which the government ignores—establish, running one's own business as an independent service provider is a dramatically different occupation than being an employee.

Mr. Perez was an employee for several years, and during that time was required to work on shifts dictated by his employer (and to follow his employer's other dictates as well).  Perez Decl. ¶¶ 3, 19.  He did not get to decide when to spend time with his wife and children.  *Id.*  Now he does.  *Id.* ¶¶ 6, 15, 18.  He declares:  "I know what it is like to be an employee, and I do not want to be one.  I want to be in control of when I work, how much I work, and how much I earn.  I want to be my own boss." *Id.* ¶¶ 13, 16, 19.[5]  He does not want AB 5 to force him to "give up [his] delivery business and go back to driving a truck for a set shift," and he does not want the law to destroy "this great line of work" for others either.  *Id.* ¶ 20.

Similarly, Ms. Olson has her own business and an MBA; she knows that being an employee is a fundamentally different career than being a business owner.  Olson Decl. ¶¶ 2, 6–10.  Running her own "business as a driver" enables her to connect with riders using multiple competing apps and to take time off with no notice to care for her husband.  *Id.* ¶¶ 6, 10.  She declares:  "I could not work for Uber or Lyft if they required me to be an employee."  *Id.* ¶ 10.  That would be a different occupation than she is in now:  "Because I am my own boss, I answer to no one but myself and the needs of my family."  *Id.*  She "chose not to" be an employee, and does not want to enter into a

---

[5]  The control exercised over FedEx drivers—which is chronicled in a case cited by Defendants (*Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 989–90 (9th Cir. 2014)), finding those drivers to be employees—is a major reason Mr. Perez chose to run his own delivery business instead of being a delivery driver-employee again.  Perez Decl. ¶¶ 3, 6, 19–20.

fundamentally different "business relationship" she did not choose for herself.  *Id.* ¶ 12.

Other evidence—which the government also ignores—demonstrates the fundamental differences between the work of an independent service provider in the on-demand economy and the work of a shift employee in the transportation or delivery industries.  As economist Dr. Justin McCrary explains, it is a wholly different "work arrangement," in a different "economy," offering vastly more flexibility than employment in the transportation or delivery industries.  McCrary Decl. ¶¶ 22–29.  AB 5, if enforced consistent with its sponsors' intent, would wipe out that work arrangement.  *Id.*  ¶¶ 50–58.  Declarants from both Postmates and Uber similarly explain that independent service providers work a completely different occupation than they could if they were forced to be employees.  Andres Decl. ¶¶ 6–29, 43; Rosenthal Decl. ¶¶ 7–39, 46–55.  "Independent couriers are provided unprecedented autonomy, never before seen in the history of work.  A barista cannot leave her coffee shop mid-shift when there are no customers, travel across the street to do barista work for a rival coffee shop, and then come back to her original coffee shop to continue barista work."  Andres Decl. ¶ 10.  By contrast, if Postmates and Uber were required to hire service providers as employees, they would have to start managing, training, retraining, disciplining, and supervising them, perhaps including requiring them to work "on rigid schedules and fixed locations"—if they could hire them at all.  *Id.* ¶¶ 38–47; Rosenthal Decl. ¶¶ 50, 59–66.

Several courts in similar cases have rejected Defendants' argument that a challenged law does not truly impair the right to pursue a particular *occupation*, but merely imposes reasonable labor regulations.  For example, the court in *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101 (S.D. Cal. 1999), struck down a law applying cosmetology regulations to African hair braiding.  In so doing, it rejected the government's argument that African hair braiding is a form of cosmetology, rather than its own occupation, and therefore could be subject to the reasonable regulations that apply to cosmetology.  *Id.* at 1106 (the government "interests stated assume the critical contention at issue—i.e., that natural hair care is part of the profession of cosmetology");

*see also*, *e.g.*, *Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012).  If enforced as its sponsors intend, AB 5 would ban drivers from working for themselves. That would be a "limitation on the opportunity" to earn a living at least as grave as banning people from working "on public works" (*Purdy & Fitzpatrick v. State*, 71 Cal. 2d 566, 568, 579 (1969)), or limiting the hours people may work as barbers (*Ganley v. Claeys*, 2 Cal. 2d 266, 267–70 (1935)).

*Second*, even if AB 5 did not infringe the fundamental right to pursue a chosen occupation, it *still* would need to satisfy rational basis review.  *See Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002) (noting that laws that regulate certain "fundamental rights" receive strict scrutiny, and "[a]ll other regulations are subject to 'rational basis' review").  And for the reasons explained above and in Plaintiffs' motion, AB 5 cannot meet that test.  If enforced as its sponsors are urging, it could gut the livelihoods of hundreds of thousands of Californians who operate their own businesses, and harm millions of California customers in the process.  *See*, *e.g.*, Rosenthal Decl. ¶ 9; Andres Decl. ¶ 6; McCrary Decl. ¶¶ 24–59.[6]  Forcing people to choose an employment relationship or nothing would *burden* "the middle class" and *further* "income inequality."  Opp. 1, 3, 7, 17, 21.  On-demand work enables many—with little to no barriers to entry—to earn a good income and benefits.  *See*, *e.g.*, Perez Decl. ¶ 6 ("I have earned over $200,000 using the Postmates app.  I estimate that I make about double what I did driving a truck [as an employee].");  McCrary Decl. ¶¶ 27 (noting that the "income

---

[6]  Ironically, Defendants' headline case, *Franceschi v. Yee*, 887 F.3d 927, 938 (9th Cir. 2018), rejects the argument that revocation of a driver's license violated the plaintiff's right to work as an attorney because the plaintiff could still use "services such as Lyft or Uber" to get around.  If enforced in line with its sponsors' intent, AB 5 would preclude independent service providers from providing *exactly these services*.  That is a much more fundamental deprivation of the right to pursue one's chosen profession than, for example, "the inevitable interruptions of our daily routine as a result of legal process" at issue in Defendants' case, *Conn v. Gabbert*, 526 U.S. 286, 292 (1999).  Defendants' other case, *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 459 (9th Cir. 2018), merely "hold[s] there is no constitutional right to engage in illegal employment, namely, prostitution."  Transporting passengers and goods is legal.

supplement" provided by on-demand work "is particularly important for lower-income individuals"), 33 ("Financially stressed individuals, perhaps due to a job loss or an unexpected expense, may particularly benefit from the ability to quickly sign up to use an on-demand platform and begin earning income."); Postmates, Thinking Bigger and Bolder on Benefits (Aug. 13, 2019) https://blog.postmates.com/thinking-bigger-and-bolder-on-benefits-f0a96b1435e2 (noting Postmates' "new package of benefits").  AB 5's "adverse effect" on the very problems it was supposedly designed to solve shows that it is irrational.  *E.g.*, *Craigmiles*, 312 F.3d at 226.

### C.  Enforcement Of AB 5 Would Unconstitutionally Impair Plaintiffs' Contracts.

AB 5's sponsors designed the law to tear up Plaintiffs' contracts, which are the essential basis of the "unprecedented autonomy" in the "business relationship" between Company Plaintiffs and Individual Plaintiffs.  Andres Decl. ¶ 10; Olson Decl. ¶ 12.  AB 5 thus violates the Contracts Clauses of the federal and state constitutions.  Mot. 13–16.

Defendants respond that Plaintiffs "provide no evidence … demonstrating the nature of the contracts or the way in which they are impaired."  Opp. 16.  That is demonstrably false.  Defendants simply *ignore* the evidence Plaintiffs submitted, which includes the contracts themselves (Rosenthal Decl. Exs. A–B; Andres Decl. Ex. A) as well as descriptions of these agreements' importance and evidence of how AB 5, if enforced to mandate reclassification, would dismantle them and replace them with fundamentally different employer-employee contracts that the parties never chose and indeed explicitly rejected (*e.g.*, Rosenthal Decl. ¶¶ 20–52, 57–66; Anders Decl. ¶¶ 12–29, 33–47; McCrary Decl. ¶¶ 40–59; Olson Decl. ¶¶ 7–12; Perez Decl. ¶¶ 13–20).  And Defendants offer no evidence of their own, a far cry from *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1089 (9th Cir. 1972), which states merely that "general assertions which are substantially controverted by counter-affidavits" are inadequate to support a preliminary injunction in the absence of likelihood of success on the merits.

Next, Defendants argue that California courts have previously nullified—or at

least held not "determinative"—other contracts about whether a worker is "an employee or an independent contractor for purposes of state law." Opp. 16.  Even if true, however, *AB 5's* invalidation of Plaintiffs' contracts would be a *separate* Contracts Clause violation.  "Because the relevant documents provided that the" Plaintiffs would be independent contractors rather than employers and employees, "it logically follows that the [Plaintiffs] had a reasonable expectation" they would not have an employer-employee relationship, and AB 5 impairs those expectations.  *In re Workers' Comp. Refund*, 46 F.3d 813, 818 (8th Cir. 1995).  Indeed, the *Workers' Comp.* court rejected an argument that the plaintiffs "were on notice that their contracts" could be "changed" by future government action, because this did not show that the parties expected their *existing contractual relationship*—on which they had made "settled plans and arrangements"—to change.  *Id.* at 818–19.

Regardless, Defendants are incorrect.  Plaintiffs' unchallenged evidence establishes that they expected to be able to continue performing their contracts as written.  *E.g.*, Rosenthal Decl. ¶ 44; Andres Decl. ¶ 28.  These expectations were reasonable, both because no court has ever required Uber, Postmates, or *any other network company* to reclassify independent service providers, and also because judicial and regulatory authorities had held that they are *not* employees.  *Lawson v. Grubhub Inc.*, 302 F. Supp. 3d 1071, 1093 (N.D. Cal. 2018) (driver who used Grubhub was "independent contractor" under *Borello*); FLSA2019-6, Op. Letter from Keith E. Sonderling, Acting Administrator, Wage and Hour Division, U.S. Dep't of Labor (Apr. 29, 2019) at 7, https://www.dol.gov/whd/opinion/FLSA/2019/2019_04_29_06_ FLSA.pdf (independent service providers are not "employees" under federal law). Indeed, AB 5's drafter, Lorena Gonzalez, stated that the pre-AB 5 test "was weighted heavily against workers or agencies trying to prove misclassification"—i.e., in favor of upholding the contractual relationships the parties had voluntarily entered into—and that was why AB 5 was necessary.  Stoker Decl. Ex. B.  Given AB 5's admitted purpose of overturning past law upholding contracts and instead forcing reclassification,

Defendants cannot argue with a straight face that AB 5 is not, at a minimum, "a substantial impairment of a contractual relationship" (Opp. 15 (citation omitted))—if it is enforced as its sponsors intend.  Indeed, AB 5 can have no purpose *other than* to upset existing contractual relationships.[7]

Finally, Defendants' defense of AB 5 as a rational employment regulation (*id.* at 17) fails for the reasons discussed above—AB 5 unreasonably harms the very workers the government claims it is designed to help, and threatens to shutter an immensely beneficial sector of the California economy—and because Defendants have not shown they are likely to demonstrate that AB 5's contractual impairment was made "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption."  *Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1006 (4th Cir. 1980) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  As Defendants do not deny, they face heightened scrutiny in making this showing because the law entirely nullifies Plaintiffs' contracts—and Defendants will bear the burden of proof.  *See* Mot. 15.  They will not be able to justify their severe contractual impairment because AB 5 was enacted to benefit a select few, at the expense of the contractual arrangements that undergird an entire essential industry.  *See id.* at 16.

---

[7]  *Western States Trucking Ass'n v. Schoorl*, 377 F. Supp. 3d 1056 (E.D. Cal. 2019), does not say otherwise.  That case concerned the effect of *Dynamex*—a decision that is limited to interpreting the Industrial Wage Commission's Wage Order No. 9, and will remain in effect during the preliminary injunction.  *Western States* simply noted that a company could still hire an independent contractor under *Dynamex*; the company might just need to pay the contractor according to the wage order.  *Id.* at 1072.  *Dynamex* did *not* set a general test for when a worker is an "employee" instead of an "independent contractor"; it did *not* abrogate the common law test for employment, but merely interpreted the "suffer or permit to work" language of the wage order.  4 Cal. 5th at 953.  By contrast, AB 5 means a worker *cannot be an independent contractor* unless she meets the ABC test.  Reinforcing this point, a court recently held that a federal interstate trucking law *does* preempt application of AB 5 in that industry—even though some courts had concluded it does not preempt *Dynamex*.  *California Trucking*, 2020 WL 248993, at *8.  In order for Defendants' argument to be compelling, they would need to make a binding promise that AB 5 will *not* be enforced to require Plaintiffs to reclassify their business relationships—something they appear unwilling to do.

Defendants respond with platitudes about the state's "police power" to "regulate wages and employment conditions" (Opp. 17), but the Contracts Clauses are *limits* on that police power. The Clauses apply to "contracts of employment" just as they apply to contracts on every other subject. *Cal Fire Local 2881 v. California Pub. Employees' Ret. Sys.*, 6 Cal. 5th 965, 977 (2019). And courts regularly invalidate laws impairing employment-related contracts. *E.g.*, *Garris*, 630 F.2d at 1011 (law modifying company's unequivocal right to terminate relationship with its agent within 60 days); *Ass'n of Surrogates & Supreme Court Reporters Within City of New York v. State of N.Y.*, 940 F.2d 766, 772 (2d Cir. 1991) (wage lag law that had the "effect of withholding ten percent of each employee's expected wages over a period of twenty weeks"); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250–51 (1978) (law that "superimpose[ed] pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake"). Defendants ignore *all* of these cases.[8]

Moreover, even "significant and legitimate public purposes" cannot justify impairment of contracts without "moderation or reason" or impairment "in the spirit of oppression," as here. *Workers' Comp.*, 46 F.3d at 821. The government's unfounded fears of "exploitation" are legally insufficient because "leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002). Indeed, Defendants' own case (*Washington Health Care Ass'n v. Arnold-Williams*, 601 F. Supp. 2d 1224, 1237 (W.D. Wash. 2009)), invalidated a law designed to protect vulnerable adults from closure of their boarding homes because the government had not shown it "[wa]s reasonable or necessary." AB 5 even more clearly violates the Contracts Clauses.

---

[8] *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004), did not hold that employment regulations are immune from Contracts Clause challenges. Rather, it held that wage and benefit regulations did not impair *a lease agreement* because no "provision of the lease agreement addresses payment to or employment benefits for [the] employees." *Id.* at 1147. Here, AB 5 (if enforced consistent with its sponsors' intent) would completely upend Company Plaintiffs' contracts with Individual Plaintiffs.

## II.  Defendants Do Not Deny That Allowing Them To Enforce AB 5 As They Intend Would Irreparably Injure Plaintiffs.

Plaintiffs have established a likelihood of irreparable harm in the absence of relief, and Defendants make little attempt to assert otherwise.  Indeed, in what can only be described as willful blindness to the immeasurable harms they seek to impose upon Plaintiffs, Defendants fail to mention—much less refute—any of Plaintiffs' voluminous evidence showing the multitude of ways in which enforcement of AB 5 is likely to irreparably injure Ms. Olson, Mr. Perez, their families, and Company Plaintiffs.  Because "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction" (*People of New York ex rel. Spitzer v. Cty. of Delaware*, 82 F. Supp. 2d 12, 16 (N.D.N.Y. 2000) (collecting cases)), the unrebutted record of Plaintiffs' numerous, serious, and imminent injuries compels preliminary injunctive relief.

### A.  The Unrebutted Evidence Shows That Plaintiffs Face Multiple Forms Of Recognized Irreparable Harm.

Courts routinely hold that a plaintiff suffers irreparable harm when, "without significantly transforming their business operations, … they face the risk of governmental enforcement actions, as well as criminal and civil penalties."  *Cal. Trucking*, 2020 WL 248993, at *10; *accord, e.g.*, *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009) (irreparable harm exists when plaintiffs face "a threat of imminent proceedings by a state of a criminal and civil enforcement nature").  Indeed, this is precisely why the Southern District of California recently granted a preliminary injunction against AB 5's enforcement against "any motor carrier operating in California."  *Cal. Trucking*, 2020 WL 248993, at *11.  The Ninth Circuit also has long recognized that constitutional deprivations alone constitute irreparable harm.  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." (quotation omitted)).  And plaintiffs may establish irreparable harm by showing that they will suffer other significant interim harms, including monetary injuries, for which they cannot recover damages.  *See, e.g.*, *Idaho v. Coeur d'Alene*

*Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (even monetary damages constitute irreparable injury where unrecoverable).

Plaintiffs presented ample evidence that all of these harms are likely in the absence of relief here.  Plaintiffs have shown an imminent enforcement action against them under AB 5 is likely unless they "significantly transform" their businesses at substantial and unrecoverable financial cost.  *See* Mot. at 19–20 (citing declarations); *Cal. Trucking*, 2020 WL 248993, at *11 (irreparable harm exists where plaintiffs face enforcement unless they "restructure their business model, including by obtaining [equipment], hiring and training employee drivers, and establishing administrative infrastructure"); *Am. Trucking*, 559 F.3d at 1058 (same).  AB 5 specifically provides city attorneys with the purported authority to bring injunctive actions against companies to ensure that such a suit is brought against Plaintiffs, and one has already stated he intends to "do the job."  Mot. 13.  AB 5's sponsor likewise spent the last month threatening Company Plaintiffs with imminent enforcement.  *See* Stoker Decl. ¶ 2.[9]  And the Governor's proposed budget includes $20 million to enforce the law.[10]

Ms. Olson and Mr. Perez have likewise shown how this threat endangers their livelihoods, throws their families into disarray, and prevents them from caring for distressed loved ones—in declarations Defendants ignore.  *See* Perez Decl. ¶¶ 19–20; Olson Decl. ¶¶ 10–12.  These undeniable injuries to Individual Plaintiffs alone satisfy Plaintiffs' burden.  *See*, *e.g.*, *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 881–82 (9th Cir. 2008), *rev'd and remanded on other grounds*, 562 U.S. 134 (2011)

---

[9]  She has also just this week encouraged private plaintiffs to file suit, going so far as to offer legal advice and to prejudge the merits of particular potential future cases.  *See*, *e.g.*, @LorenaSGonzalez, Twitter (Jan. 20, 2020, 11:55 PM), https://twitter.com/LorenaSGonzalez/status/1219528872351322114; @LorenaSGonzalez, Twitter (Jan. 20, 2020, 11:35 PM), https://twitter.com/LorenaSGonzalez/status/1219523961517527040.

[10]  *See* Joe Fitzgerald Rodriguez, SF Examiner, *Newsom's CA budget includes $20 million for AB 5 enforcement* (Jan 10, 2020), https://www.sfexaminer.com/news/newsoms-ca-budget-includes-20-million-for-ab-5-enforcement.

(holding "balance of hardships tips sharply toward" plaintiffs because "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm" and "loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress"); *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 483, 484 (C.D. Cal. 2012) ("uncertainty, stress, and inability to plan" to prevent "suffer[ing] an emotional injury—failure to provide for their loved ones—that no monetary award could ever compensate" is irreparable injury).

Defendants completely ignore this powerful evidentiary showing.  They do not even address it—indeed, their opposition does not even include an irreparable harm subsection.  Interim relief stands sentinel precisely to prevent such needless and devastating injuries while this Court considers Plaintiffs' claims.

### B.     Plaintiffs Did Not "Delay" Seeking A Preliminary Injunction.

Rather than contest Plaintiffs' irreparable harm showing, Defendants argue that no injunction may issue due to "delay." Opp. 18–19.  But they do not deny that Plaintiffs filed suit and sought an injunction against enforcement *as soon as the law could be enforced*.  And the cases cited by Defendants establish that delay alone can *never* support an adverse finding on irreparable harm.  *See*, *e.g.*, *Kiva Health Brands LLC v. Kiva Brands Inc*., 402 F. Supp. 3d 877, 897 (N.D. Cal. 2019) ("The Ninth Circuit has explained that delay is but a single factor to consider … and that courts are loath to withhold relief solely on that ground." (citation and quotation omitted)); *Miller ex rel. NLRB v. Cal. Pac. Medic. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) ("delay by itself is not a determinative factor" (citation and quotation omitted) (alteration accepted)).  Every case cited by Defendants considers lengthy delay only in relation to whether that delay *also* calls into question the veracity of a plaintiff's evidence on irreparable harm.  *See, e.g.*, *Kiva*, 402 F. Supp. 3d at 897 (finding that plaintiff's "evidence of irreparable harm is … not substantial" before considering four-year delay).  Defendants invite *clear legal error* in asking this Court to deny preliminary injunctive relief based on delay alone.

Defendants make no effort to show that the short duration of time between the

enactment of AB 5 in late September and the filing of Plaintiffs' suit in December calls into question a *single* harm asserted by Plaintiffs.  Defendants do not deny that Ms. Olson and Mr. Perez will face the real and imminent prospect of losing their ability to support and care for their families, nor that Company Plaintiffs will face imminent enforcement suits if they do not restructure their businesses, nor that any of the multitude of costs associated with reclassification cannot be recovered from Defendants should Plaintiffs prevail in this suit.  *See* Opp. 19–20.  Defendants thus make no viable argument that a purported delay is even relevant to evaluating whether Plaintiffs have met the legal standard for irreparable harm.[11]

Defendants misrepresent every case they cite in asserting a three-month "delay" precludes preliminary injunctive relief.  For example, *Kiva* did not involve a four *month* delay, as Defendants represent, but a four *year* delay.  402 F. Supp. 3d at 897; *see also First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*, 356 F. Supp. 2d 1048, 1055 (N.D. Cal. 2005) (seven-month delay from plaintiff's discovery of trademark issue in May to its preliminary injunction filing on December 23); *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1082 n.12, 1091 n.27 (recognizing NLRB delay of "some *fifteen* months," but declining to deny relief on that basis because "delay" is "not dispositive" and relevant only if the Board's "glacial pace" was "unexplained" (emphasis added)); *Miller*, 991 F.2d at 539 (explaining NLRB waited "[e]ight months"); *Metromedia Broad. Corp. v. MGM/UA Entm't Co, Inc.*, 611 F. Supp. 415, 427 (C.D. Cal. 1985) (considering four-month delay because it caused harm to the defendant).  These cases in fact establish that a mere three months *cannot* rebut an evidentiary showing of irreparable harm.  *See*, *e.g.*,

---

[11]  Defendants also assert that Plaintiffs' purported "delay" in challenging AB 5 dates to *Dynamex*, which explicitly applied only to individual wage orders.  Opp. 18.  *Dynamex* did not extend to the entirety of California's Unemployment Insurance and Labor Codes or grant injunctive enforcement remedies for state actors to seek civil and criminal penalties against companies based on the alleged misclassification of workers under the ABC test.  Compl. ¶ 23.  *Dynamex* also did not create the arbitrary classifications embodied in AB 5.  Defendants' contention that Plaintiffs nevertheless could have sued sooner to enjoin AB 5—a statutory scheme that did not even exist—is baffling.

*Kiva*, 402 F. Supp. 3d at 898 (898 (collecting cases in which delays around three months did not defeat showing of irreparable harm).  That is especially true where, as here, Defendants have *stipulated* that the complexity of the constitutional issues and numerous claims requires additional time and consideration to adequately address.[12]

Defendants rely on the recent denial of an *ex parte* temporary restraining order sought against AB 5 on the basis of delay, but that decision was based solely on the standard for *ex parte* relief and says nothing of the preliminary injunction standard.  An applicant for a temporary restraining order must "show that (1) it will be irreparably harmed but for ex parte relief; and (2) it is without fault in creating the need for ex parte relief."  *Gwangju Cultural-Contents Inv. Corp. v. K2 Advanced Media LLC*, 2012 WL 12882706, at *2 (C.D. Cal. Nov. 28, 2012); *see also* Opp. Ex. 1 at 2–3 (citing the *ex parte* standard and recognizing it was "in addition" to the traditional preliminary injunction showing).  These elements are inapplicable here, where Plaintiffs are seeking only a preliminary injunction and not a temporary restraining order.  Indeed, in the matter Defendants cite, the court did not apply this *ex parte* standard to the plaintiffs' pending preliminary injunction motion, which remains on calendar.

Defendants' cases also make clear that a multi-year "delay" must be "unexplained" to undermine a plaintiff's irreparable harm showing.  *See*, *e.g.*, *Kobell*, 731 F.2d at 1091 n.27.  But here, Plaintiffs explained why recent threats against them from state actors forced their need for relief now (Stoker Decl. ¶ 2) and why Plaintiffs had to wait a week to file this motion (*id.* ¶¶ 4–7).  Plaintiffs sought a preliminary injunction as soon as the threat of harm from enforcement became both imminent and real.  And it is the imminent *enforcement* of AB 5 against Plaintiffs—not its *enactment*— which provided Plaintiffs with the requisite basis to seek a preliminary injunction to prevent irreparable harms associated with such an enforcement action.  *See*, *e.g.*, *Fed. Exp. Corp. v. Cal. Pub. Utils. Comm'n*, 1993 WL 399380, at *3 (N.D. Cal. Sept. 23,

---

[12]  Joint Stipulation to Revise Briefing Schedule, Dkt. 22 at 2 (Jan. 22, 2020).

1993) ("In suits such as this one, which the plaintiffs intends as a 'first strike' to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury." (internal quotation marks omitted)); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1052 (S.D. Cal. 2006) (granting preliminary injunction on finding of irreparable harm due to "imminent threat of litigation arising from … enforcement"); *Levine v. Fair Political Practices Comm'n*, 222 F. Supp. 2d 1182, 1191 (E.D. Cal. 2002) (same, despite law's enactment more than a year prior); *Cal. Trucking*, 2020 WL 248993, at *10 n.12 ("It is true that Plaintiffs could have moved for a preliminary injunction within weeks, rather than months, of AB-5's adoption in September 2019, but the Court is not persuaded that a two month delay in filing the motion wholly undermines their showing of irreparable harm.").

Plaintiffs have not engaged in any cognizable delay and, even if they had, such passage of time is not "unexplained," does not call into question the irreparable harm evidence presented by Plaintiffs, and cannot alone serve as the basis for the denial of a preliminary injunction.

## III.    The Balance Of Equities Favors Maintaining The Status Quo.

Defendants' sole argument regarding the balancing of equities is a conclusory assertion that a state suffers irreparable injury whenever it is enjoined from effectuating statutes.  *See* Opp. 20.  But the Ninth Circuit has repeatedly rejected this argument, and indeed has specifically rejected the claim that either of Defendants' cited sources can support such a finding.  *See*, *e.g.*, *Latta v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014) ("Individual justices, in orders issued from chambers, have expressed the view that a state suffers irreparable injury when one of its laws is enjoined.  …  No opinion for the Court adopts this view."); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009), *vacated and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012) (describing *Coalition for Economic Equity v. Wilson* as "dicta" and explaining "a state may suffer an abstract form of harm whenever one of

its acts is enjoined.  To the extent that is true, however, it is not dispositive of the balance of harms analysis.  If it were, then the rule requiring 'balance' of 'competing claims of injury' … would be eviscerated." (citation omitted)).  Defendants' abstract assertion of its injury thus cannot offset the substantial and specific harms, supported by evidence and declarations, that Plaintiffs and their families will suffer without relief.

In addition, Defendants cannot argue that the government will be *irreparably* harmed by an injunction prohibiting AB 5's enforcement while simultaneously maintaining that AB 5 merely codifies *Dynamex*, which a preliminary injunction would leave untouched.  *Dynamex* is, and will remain, the law of the land during the pendency of Plaintiffs' challenge.

Perhaps recognizing these problems, Defendants claim that any interim relief prohibiting Defendants' enforcement of AB 5 would constitute a "mandatory injunction," which imposes a heightened burden on Plaintiffs.  Opp. 6, 20.  That is not correct.  A "mandatory injunction orders a responsible party to take action."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks omitted).  An injunction *prohibiting* a state official from taking an enforcement action is not a mandatory injunction, which Defendants' cited case makes clear.  *See Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (explaining "prohibitory" injunction that prevents the government from taking an action is not a "mandatory" injunction); *accord*, *e.g.*, *Morris v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 1082, 1088 (D. Idaho 2014).  Plaintiffs are thus under no heightened burden to show that both the facts and the law "clearly favor" relief here.  Instead, Plaintiffs need only show the balance of equities tips in their favor, which they have done through sworn, unrebutted, and unanswered evidence on irreparable harm.

## IV.   The Public Interest Weighs Heavily Against Disruption Of The On-Demand Economy While Plaintiffs' Constitutional Challenges Are Pending.

Plaintiffs identified a list of harms that the public at large would suffer if AB 5 were enforced as its sponsors intended and as Defendants have threatened, and

Gibson, Dunn &
Crutcher LLP

Reply in Support of
Plaintiffs' Motion for
Preliminary Injunction

23

Case No. 2:19-cv-10956-DMG-RAO

Defendants address only one in their opposition (that enjoining a likely constitutional violation is in the public interest).  *See* Mot. 23.  Defendants do not even respond to Plaintiffs' evidentiary showing and expert testimony establishing that AB 5 threatens to upend a critical area of the economy—by abrogating workers' rights to be their own bosses while using apps to find leads, by forcing some of California's most valuable firms to jettison their successful business models, and by depriving customers and businesses of the great benefits those models have enabled.  *See id.* at 23–25.  Forcing companies to make major changes to their operations—leaving California an aberration in their global businesses—only to see them potentially reversed once the Court adjudicates the merits of Plaintiffs' challenges would greatly disserve all Californians who use their apps.  *See*, *e.g.*, Andres Decl. ¶¶ 41–47; Rosenthal Decl. ¶¶ 57–66.  Plaintiffs collected copious evidence of these harms, and Defendants do not dispute it.

Defendants ask the Court to defer to the unrestrained judgement of state legislators about what is in the public interest—despite a complete lack of evidence to support such findings.  *See* Opp. 20–22.  But as the Ninth Circuit has explained, it is "clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available."  *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (internal quotation marks omitted).

As explained above, Defendants' rationalizations of AB 5 are deeply flawed, including because the law undermines the very workers' rights it purports to protect—and, for politically favored groups, *undoes* the ABC test Defendants claim is so essential for worker protection.  The "negotiation with various stakeholders including industry, labor, and others" that produced the irrationally unequal treatment at AB 5's core is a reason *not* to allow Defendants to enforce AB 5.  Opp. 21.

Plaintiffs seek the most mild form of injunctive relief—maintenance of the status quo, including *Dynamex*'s application to all occupations equally—while the constitutionality of the statute in question is adjudicated.  The significant upheaval to

the economy and public as a whole that would occur if AB 5 were enforced as its sponsors intended and Defendants have threatened warrants a preliminary injunction.

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin Defendants from enforcing or causing to be enforced AB 5 against them, pending final judgment.

January 24, 2020                              By:  /s/ *Theane Evangelis*

                                             Theane Evangelis
                                             Joshua S. Lipshutz
                                             Blaine H. Evanson
                                             Heather L. Richardson
                                             Dhananjay S. Manthripragada

                                             GIBSON, DUNN & CRUTCHER LLP

                                             *Attorneys for Plaintiffs*