GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
    TEvangelis@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
    BEvanson@gibsondunn.com
HEATHER L. RICHARDSON, SBN 246517
    HRichardson@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA,
    SBN 254433
    DManthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
    JLipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Tel: 415.393.8200
Fax: 415.393.8306

Attorneys for Plaintiffs Lydia Olson, Miguel Perez,
Postmates Inc., and Uber Technologies, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYDIA OLSON, et al.<br><br>                    Plaintiffs,<br><br>        v.<br><br>STATE OF CALIFORNIA, et al.<br><br>                    Defendants. | **CASE NO. 2:19-cv-10956-DMG-RAO**<br><br>**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE**<br><br>Judge:              Hon. Dolly M. Gee<br>Hearing Date:  February 7, 2020<br>Time:               2:00 P.M. |

1    **TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2              Pursuant to Federal Rules of Evidence ("FRE"), Rule 201, Plaintiffs Lydia Olson,

3    Miguel Perez, Postmates, Inc. and Uber Technologies, Inc. ("Plaintiffs") respectfully

4    request that the Court take judicial notice of the following documents:

5    **Exhibit 1:** Plaintiffs' Motion for Provisional Relief, *Regents of Univ. of Cal. v. United*

6              *States Dep't Homeland Sec.*, No. 17-cv-05211-WHA (N.D. Cal. Jan. 9,

7              2018)

8    **Exhibit 2:** Brief Amicus Curiae of Virginia, Maryland, California, Connecticut,

9              Delaware, Illinoise, Iowa, Maine, Massachusetts, New Mexico, New York,

10             North Carolina, Oregon, Rhode Island, Vermont, Washington, and the

11             District of Columbia in Support of Appellees and Affirmance, *Int'l Refugee*

12             *Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017)

13   **Exhibit 3:** Order Granting Temporary Restraining Order, *California Trucking Ass'n et*

14             *al., v. Becerra et al.*, No. 3:18-cv-02458-BEN-BLM (S.D. Cal. Dec. 31,

15             2019)

16   **Exhibit 4:** Order Granting Preliminary Injunction, *California Trucking Ass'n et al., v.*

17             *Becerra et al.*, No. 3:18-cv-02458-BEN-BLM (S.D. Cal. Jan. 16, 2020)

18   **Exhibit 5:** Docket Report, *First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*, 356 F.

19             Supp. 2d 1048, No. 3:04-cv-02842-WHA (N.D. Cal. 2005)

20   **Exhibit 6:** @LorenaSGonzalez, Twitter (Jan. 20, 2020, 11:55 PM),

21             https://twitter.com/LorenaSGonzalez/status/1219528872351322114

22   **Exhibit 7:** @LorenaSGonzalez, Twitter (Jan. 20, 2020, 11:35 PM),

23             https://twitter.com/LorenaSGonzalez/status/1219523961517527040

24                                        **LEGAL STANDARD**

25             Under Rule 201(c)(2), courts "must take judicial notice if a party requests it and

26   the court is supplied with the necessary information." Judicial notice of court decisions

27   is appropriate under this rule. *See, e.g.*, *U.S. v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir.

28   2004). "It is well established that [a court] may take judicial notice of judicial

proceedings in other courts." *Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014); *see also Mullis v. U.S. Bankr. Court for Dist. of Nevada*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987) (noting that "pleadings, orders and other papers on file in the underlying bankruptcy case" were subject to judicial notice).  In addition, courts may take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet." *Gerritsen v. Warner Bros. Entertainment Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015); *see also Hawaii v. Trump*, 859 F.3d 741, 773 n. 14 (9th Cir.) (taking judicial notice of President Trump's statement made via twitter), *vacated on other grounds*, 138 S. Ct. 377 (2017).

## CONCLUSION

Defendants' Request for Judicial Notice is being made in connection with its Motion for a Preliminary Injunction.  Based upon the foregoing, the Court is respectfully requested to take judicial notice of the exhibits attached hereto.

Dated:  January 24, 2020

By: */s/ Theane Evangelis*

Theane Evangelis
Joshua S. Lipshutz
Blaine H. Evanson
Heather L. Richardson
Dhananjay S. Manthripragada

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Plaintiffs*

# EXHIBIT 1

EXHIBIT 1
Page 4

Jeffrey M. Davidson (SBN 248620)
Alan Bersin (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the University
of California and Janet Napolitano, in her official
capacity as President of the University of California*

Theodore J. Boutrous, Jr. (SBN 132099)
Ethan D. Dettmer (SBN 196046)
Jesse S. Gabriel (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam
Gonzalez Avila, Saul Jimenez Suarez, Viridiana
Chabolla Mendoza, Norma Ramirez, and Jirayut
Latthivongskorn*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA  94612-0550
Telephone: (510) 879-1247
E-mail: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

Joseph W. Cotchett (SBN 36324)
Nancy L. Fineman (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

Jonathan Weissglass (SBN 185008)
Stacey M. Leyton (SBN 203827)
Eric P. Brown (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara
and Service Employees International Union
Local 521*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | CASE NO. 17-CV-05211-WHA<br><br>**PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF**<br><br>**MEMORANDUM IN SUPPORT**<br><br>Judge: Honorable William Alsup<br>Hearing: December 20, 2017, 8:00 a.m.<br>Courtroom: 8, 19th Floor |

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 5

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiff, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |
| County of Santa Clara and Service Employees International Union Local 521, | CASE NO. 17-CV-05813-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

Notice of Motion and Motion for Provisional Relief..................................................... 1

Memorandum in Support of Motion for Provisional Relief ........................................... 2

Introduction ................................................................................................................... 2

Background .................................................................................................................... 4

      A.     History of Deferred Action ......................................................... 4

      B.     The Creation of DACA ............................................................... 6

      C.     Benefits of DACA....................................................................... 7

      D.     The Rescission of DACA ........................................................... 8

      E.     Harm from the Rescission .......................................................... 10

Standard of Review ..................................................................................................... 15

Argument ..................................................................................................................... 15

PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................................ 15

I.     Defendants' Rescission of DACA Is Arbitrary and Capricious. ...................... 15

      A.     Defendants Failed to Explain the Basis for the Rescission................................... 16

      B.     Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made. ............................... 18

      C.     Defendants Failed to Offer a Reasoned Explanation for Their Reversal of Policy. ................................................................................................................... 20

      D.     The Rescission Appears to Rely on a False Legal Premise. ................................. 22

      E.     The Announced Reason for the Rescission Was Pretextual ................................. 29

II.    The Rescission Should Be Vacated Because It Is a Substantive Rule That Did Not Comply with the APA's Notice and Comment Requirements ......................... 31

PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF............ 34

I.     Plaintiffs Face Irreparable Harm................................................................... 34

II.    The Balance Of Equities and the Public Interest Weigh Heavily in Favor of Provisional Relief............................................................................................ 35

CONCLUSION ............................................................................................... 37

i

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 7

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Alaska v. U.S. Dep't of Transp.*,
    868 F.2d 441 (D.C. Cir. 1989) ................................................................33

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...............................................................16

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014) .............................................................18

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .................................................................7

*Ariz. Dream Act Coal. v. Brewer*,
    81 F. Supp. 3d 795 (D. Ariz. 2015) .........................................................8

*Ariz. Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) .............................................21, 26, 35, 36

*Arizona v. United States*,
    567 U.S. 387 (2012) ..............................................................................23

*Bair v. Cal. State Dep't of Transp.*,
    867 F. Supp. 2d 1058 (N.D. Cal. 2012) ................................................18

*Batalla Vidal v. Duke*,
    No. 16 cv. 41196 (E.D.N.Y. Oct. 27, 2017) .............................. *passim*

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ..............................................................................20

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs*,
    620 F.3d 936 (9th Cir. 2010) .................................................................16

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
    840 F.2d 701 (9th Cir. 1988) .................................................................35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ..........................................................................16, 31

*Cmty. Nutrition Inst. v. Young*,
    818 F.2d 943 (D.C. Cir. 1987) ...............................................................32

*Colwell v. Dep't of Health & Human Servs.*,
    558 F.3d 1112 (9th Cir. 2009) ..........................................................32, 33

ii

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 8

*Consumer Energy Council of Am. v. FERC*,
   673 F.2d 425 (D.C. Cir. 1982) ..................................................................................34

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ......................................................................21, 22, 26

*Crickon v. Thomas*,
   579 F.3d 978 (9th Cir. 2009) ...................................................................................20

*Crowley Caribbean Transp., Inc. v. Peña*,
   37 F.3d 671 (D.C. Cir. 1994) ...................................................................................24

*Edison Elec. Inst. v. EPA*,
   996 F.2d 326 (D.C. Cir. 1993) ...........................................................................24, 25

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) .........................................................................................21, 22

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
   630 F.3d 1153 (9th Cir. 2011) .................................................................................36

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .............................................................................................3, 21

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..................................................................................................16

*Gant ex rel. Gant v. E.E.O.C. v. Ethan Allen, Inc.*,
   44 F.3d 116 (2d Cir. 1994) ......................................................................................31

*Greene v. McElroy*,
   360 U.S. 474 (1959) ..................................................................................................20

*Hernandez v. Hughes Missile Sys. Co.*,
   362 F.3d 564 (9th Cir. 2004) ...................................................................................30

*Humane Soc'y of U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ...........................................................................18, 23

*Int'l Chem. Workers Union Council of the United Food & Commercial Workers Int'l v.*
   *NLRB*, 467 F.3d 742 (9th Cir. 2006) .....................................................................25

*Int'l Longshoremen's & Warehousemen's Union v. Meese*,
   891 F.2d 1374 (9th Cir. 1989) .................................................................................25

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*,
   358 F.3d 40 (D.C. Cir. 2004) ...................................................................................28

*Jicarilla Apache Nation v. U.S. Dep't of the Interior*,
   613 F.3d 1112 (D.C. Cir. 2010) ...............................................................................20

iii

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 9

*Kenney v. Glickman*,
    96 F.3d 1118 (8th Cir. 1996) ........................................................................24

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ........................................................................36

*Lester v. Parker*,
    235 F.2d 787 (9th Cir. 1956) ........................................................................20

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ....................................................................................33

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
    459 F. Supp. 2d 874 (N.D. Cal. 2006) ........................................................28

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) ......................................................................34

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ....................................................................................23

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ....................................................................29

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ................................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................17, 19

*Municipality of Anchorage v. United States*,
    980 F.2d 1320 (9th Cir. 1992) ................................................................32, 33

*N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*,
    727 F.2d 1127 (D.C. Cir. 1984) ..............................................................17, 31

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ........................................................................18

*Neil v. Biggers*,
    409 U.S. 188 (1972) ................................................................................18, 26

*Noel v. Chapman*,
    508 F.2d 1023 (2d Cir. 1975) ......................................................................34

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1164 (N.D. Cal. 2015) ........................................................35

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ........................................................................18

iv

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 10

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) ...................................................................................28

*United States ex rel. Parco v. Morris*,
   426 F. Supp. 976 (E.D. Pa. 1977) ......................................................................4, 6, 34

*Paulsen v. Daniels*,
   413 F.3d 999 (9th Cir. 2005) ...................................................................................33

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015)...............................................................................3, 16, 22

*Phillips Petroleum Co. v. FERC*,
   792 F.2d 1165 (D.C. Cir. 1986)................................................................................23

*Pinho v. Gonzales*,
   432 F.3d 193 (3d Cir. 2005).....................................................................................25

*Pub. Citizen v. Heckler*,
   653 F. Supp. 1229 (D.D.C. 1986) ......................................................................17, 31

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978).................................................................................................20

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999).................................................................................................23

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) .................................................................................36

*Sacora v. Thomas*,
   628 F.3d 1059 (9th Cir. 2010) .................................................................................16

*Safe Air for Everyone v. EPA*,
   488 F.3d 1088 (9th Cir. 2007) .................................................................................23

*San Diego Air Sports Ctr., Inc. v. F.A.A.*,
   887 F.2d 966 (9th Cir. 1989) ...................................................................................32

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) (*Chenery I*) ......................................................................2, 17, 23

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) (*Chenery II*).......................................................................17, 28

*Sierra Club v. Jackson*,
   833 F. Supp. 2d 11 (D.D.C. 2012) ...........................................................................29

*Squaw Transit Co. v. United States*,
   574 F.2d 492 (10th Cir. 1978) ...........................................................................17, 31

v

EXHIBIT 1
Page 11

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) (*Texas I*) ................................................................26, 27

*Texas v. United States* (*Texas II*),
    809 F.3d 134 (5th Cir. 2015) ......................................................................25, 26, 27

*United States v. Texas*,
    136 S. Ct. 2271 (2016) ....................................................................................... *passim*

**Statutes and Regulations**

8 C.F.R. § 212.5(f) ..............................................................................................................8

8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) .............................................................................5

8 C.F.R. § 214.14(d)(2) .....................................................................................................5

8 C.F.R. § 274a.12(c)(14) ..................................................................................................7

5 U.S.C. § 551(5) ........................................................................................................32, 34

5 U.S.C. § 553 ......................................................................................................3, 30, 33

5 U.S.C. § 604(a) .........................................................................................................3, 33

5 U.S.C. § 706(2)(A) ....................................................................................................2, 16

6 U.S.C. § 202(5) ...............................................................................................................4

8 U.S.C. § 1103(a)(3) .......................................................................................................23

8 U.S.C. § 1182(a)(9)(B)–(C) .......................................................................................7, 11

8 U.S.C. §§ 1611(b)(2)–(3), 1621(d) ................................................................................8

Act of July 25, 1958, Pub. L. No. 85-559, § 2, 72 Stat. 419, 419-20 ..........................4, 14

Act of Sept. 11, 1957, Pub. L. No. 85-316, § 4(d), 71 Stat. 639, 640...............................4

Cal. Unemp. Ins. Code § 1264(a)(2) ................................................................................8

Cal. Veh. Code § 12801(a)-(b) .........................................................................................8

Cal. Veh. Code § 12801.5 .................................................................................................8

Cal. Veh. Code § 1208.9 ...................................................................................................8

Cuban Adjustment Act, Pub. L. No. 89-732, §1, 80 Stat. 1161 (1966).............................5

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 .......................................5

vi

EXHIBIT 1
Page 12

Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986).....................................5

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### NOTICE OF MOTION AND MOTION FOR PROVISIONAL RELIEF

Please take notice that on December 20, 2017, 8:00 a.m., at 450 Golden Gate Avenue, San Francisco, California, Courtroom 8, plaintiffs in the above-captioned actions will, and hereby do, move for provisional relief enjoining defendants from implementing the September 5, 2017 memorandum rescinding the Deferred Action for Childhood Arrivals program ("the Rescission").  Plaintiffs will demonstrate that (1) they are likely to succeed on the merits of their claims under the Administrative Procedure Act ("APA"), (2) the Rescission is causing irreparable harm, and (3) the balance of equities and the public interest weigh heavily in favor of provisional relief in the form of returning to the status quo existing prior to the Rescission.

As the Court held in its Order Re Motion to Complete Administrative Record (Dkt. No. 79), the administrative record filed by defendants (Dkt. No. 64) is incomplete and must be expanded. Defendants' compliance with that ruling has been stayed by the court of appeals.  Nonetheless, as provided in the Court's scheduling order and because of the urgency caused by defendants' arbitrary selection of March 5, 2018 as the termination date for DACA, plaintiffs now move on the basis of the current incomplete administrative record, the discovery they obtained prior to the court of appeals' stay, and the declarations and exhibits submitted in connection with this motion and the accompanying request for judicial notice.  Plaintiffs will supplement their motion if the court of appeals permits expansion of the administrative record or if discovery reveals additional relevant information.  As demonstrated below, however, the current record establishes that plaintiffs are likely to succeed on the merits of their claim that the rescission of DACA was arbitrary, capricious, and not in accordance with law.  Plaintiffs seek injunctive relief at this time only as to their APA claims, but maintain their other constitutional, statutory, and equitable claims for a later stage of this case.

EXHIBIT 1
Page 14

## MEMORANDUM IN SUPPORT OF MOTION FOR PROVISIONAL RELIEF

### INTRODUCTION

Since 2012, the Deferred Action for Childhood Arrivals ("DACA") program has enabled nearly 800,000 young people who were brought into the United States as children to live and work in this country without fear of deportation.[1]  Since the program was established, DACA recipients have relied on its protections to become medical residents and teachers, serve in the U.S. military, open businesses and earn degrees, start families, and purchase homes.  Yet on September 5, 2017, defendants rescinded DACA, telling its beneficiaries that "DACA was fundamentally a lie," Appendix ("App.") at 1869-70 (Duke Statement), and that they should "prepare for and arrange their departure from the United States," *id.* at 2199–2200 (Talking Points).  The Rescission already is causing catastrophic and irreparable harm to DACA recipients, as the threat of deportation—to countries where they have not lived since they were children—forces them to make wrenching choices whether to leave their schools, jobs, and even their U.S. citizen children and other family members.  The harm also extends to their loved ones, employers, schools, and communities.  The Rescission is unjust and unlawful, and it violates the fundamental prohibition on arbitrary agency action imposed by the Administrative Procedure Act ("APA").

The APA requires courts to set aside agency action that is "arbitrary, capricious, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This standard requires agency action to be both reasonable and reasonably explained.  The Rescission is neither.  The Rescission contains only a single vague sentence of justification: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  AR 255.  This conclusory assertion fails the requirement that the basis for agency action "be clearly disclosed and adequately sustained," *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*), especially for an action threatening the expulsion of nearly 700,000 current DACA recipients from their country.

---

[1]    Although 800,000 young people have received DACA at various times, this motion focuses on the irreparable harm to the 700,000 current DACA recipients if defendants are permitted to implement the Rescission.

EXHIBIT 1
Page 15

1    The government's empty explanation of the Rescission echoes its failure to consider the

2    Rescission's consequences.  The government's decision fails to acknowledge the human and economic

3    havoc that it will inflict on DACA recipients, their families, schools, employers, employees, clients, and

4    communities.  The record further reveals that the Department of Homeland Security ("DHS") never

5    evaluated the benefits of DACA when rescinding the program.  The absence of reasonable consideration

6    or explanation is particularly appalling where, as here, an agency is reversing a "prior policy [that] has

7    engendered serious reliance interests."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015).

8    Reasonable decision-making in these circumstances demands a "more detailed justification than what

9    would suffice for a new policy created on a blank slate."  *FCC v. Fox Television Stations, Inc.*, 556 U.S.

10   502, 515 (2009).  The government's one-sentence justification for rescinding DACA fails to meet this

11   standard, contradicting its own statements to the Ninth Circuit and the Supreme Court asserting that

12   DACA is both lawful and sound policy, as well as its decision eight months ago to leave DACA intact.

13   The government's failure to consider relevant factors or plausibly explain the basis for the

14   Rescission suggests that its proffered justifications are pretextual.  Inconsistent and shifting explanations

15   for the Rescission reinforce this conclusion.  For example, although the government has sought to

16   defend the Rescission as a response to purported "litigation risk," the author of the Rescission

17   memorandum testified that responding to "litigation risk" would be "the craziest policy you could ever

18   have as a department."  App. at 1928-26 (Hamilton Dep. 207:20-208:11).  Agency action that is based

19   on pretext is arbitrary by definition and must be set aside.

20   Finally, the Rescission was accomplished without the procedural steps required by law.  The

21   Rescission constitutes a substantive rule subject to the APA's notice and comment requirements, 5

22   U.S.C. § 553, which are designed to ensure that agency action proceeds on the basis of relevant factors.

23   *See also* 5 U.S.C. § 604(a) (requiring consideration of effects on small entities).  Had the government

24   considered such factors—including the Rescission's devastating impact on DACA recipients and their

25   families, and its broader consequences for local governments, employers, educators, and the economy—

26   the Rescission could not reasonably have been adopted.

27   This Court should grant provisional relief enjoining defendants' illegal action and preserving the

28   status quo pending a final judgment in this action.

3

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 16

## BACKGROUND

### A.       History of Deferred Action

DACA is consistent with a series of deferred action programs dating back half a century.  The

government has long recognized that "there simply are not enough resources to enforce all of the rules

and regulations presently on the books" and that "[i]n some situations, application of the literal letter of

the law would simply be unconscionable and would serve no useful purpose."  App. at 1594 (Bernsen

Memo).  Accordingly, consistent with their authority to "[e]stablish[] national immigration enforcement

policies and priorities," 6 U.S.C. § 202(5), DHS and previously the INS have frequently exercised

discretion not to remove otherwise removable immigrants.  App. at 1822-23 (Johnson Letter).

Consistency and administrative convenience have often led the government to exercise its

discretion programmatically.  Since at least 1956, the government has implemented numerous forms of

"discretionary relief," including parole, temporary protected status, deferred enforced departure,

extended voluntary departure, and deferred action.  Administrative Record ("AR") (Dkt. No. 64-1) 15.

- In 1956, President Eisenhower "paroled" into the United States roughly 1000 foreign-born orphans who had been adopted by American citizens overseas but were precluded from entering the United States because of statutory quotas, App. at 1602 (Eisenhower Letter — Orphans), as well as tens of thousands of Hungarian refugees after the unsuccessful Hungarian revolution, App. at 1603 (Eisenhower Letter — Hungarians).  In both cases, Congress eventually passed laws enabling the paroled individuals to become lawful permanent residents.  *See* Act of Sept. 11, 1957, Pub. L. No. 85-316, § 4(d), 71 Stat. 639, 640 (orphans); Act of July 25, 1958, Pub. L. No. 85-559, § 2, 72 Stat. 419-20 (Hungarian refugees).

- That same year, the Eisenhower Administration granted "extended voluntary departure" to nonimmigrants present in the United States who had sought, but not received, "Third Preference" visas based on exceptional ability in the arts and sciences.  When the INS rescinded this policy sixteen years later with a perfunctory explanation that the program was "having an increasingly unfavorable effect on the domestic job market," a federal court held that the rescission was ineffective because it did not comply with the APA's notice-and-comment procedures, even though the original policy had not been published in the Federal Register.  *United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 980 n.8, 983, 984, 986 (E.D. Pa. 1977).

- The Eisenhower, Kennedy, Johnson, and Nixon Administrations paroled more than 600,000 Cubans in the United States through a series of discretionary programs.  For example, in 1961, the Kennedy Administration established the Cuban Refugee Program, which directed the routine admission of Cubans under the Attorney General's parole authority.  *See* App. at 1604 (Kennedy Letter).  This program ended through an agreement between the United States and Cuba, followed by legislation providing lawful permanent residence for the individuals who had been paroled under the program.  Cuban Adjustment Act, Pub. L. No. 89-732, §1, 80 Stat. 1161 (1966).

- In 1962, in response to famine in China, President Kennedy established the Hong Kong Parole Program to provide extended voluntary departure to 15,000 Chinese refugees.  App. at 1605

4

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 17

(USCIS Refugee Timeline). This program ended in 1966 with passage of the Immigration and Nationality Act of 1965, which for the first time provided for the regular admission of refugees.

- In 1987, President Reagan instituted the Family Fairness Program, which provided extended voluntary departure to children whose parents were in the process of legalizing their immigration status under the Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986). App. at 1607 (1987 INS Analysis). In 1990, President George H. W. Bush expanded the program to spouses of such immigrants. *Id.* at 1612-13 (1990 INS Analysis). Collectively, the Family Fairness Program extended relief to approximately 1.5 million people, estimated to be 40 percent of the undocumented population at the time. *Id.* at 1613. The Family Fairness Program ended with the passage of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, providing a path to permanent residence for the beneficiaries of the program.

- In 1997, the Clinton Administration established a deferred action program for individuals self-petitioning for relief under the Violence Against Women Act of 1994. App. at 1640-46. The George W. Bush Administration similarly provided deferred action to certain applicants for T visas (victims of human trafficking) and U visas (victims of crimes such as domestic violence) in 2002 and 2003, respectively. *Id.* at 1650-51. These programs are still in place, *see id.* at 1651, and the deferred action programs for T visa and U visa applicants have been codified, *see* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (T visa applicants); 8 C.F.R. § 214.14(d)(2) (U visa applicants).

- The George W. Bush Administration also established a deferred action program in 2005 temporarily granting relief to thousands of foreign students affected by Hurricane Katrina who, because of the hurricane, could not satisfy the requirements of their student visas. App. at 1661-62. Because this program was initiated in response to a specific event, USCIS made clear from the outset that all benefits would expire on February 1, 2006. *Id.*

- In 2009, the Obama Administration established a deferred action program providing relief to widowed spouses who had been married to U.S. citizens for less than two years and therefore could not obtain permanent residence through their spouses. *Id.* at 1664-71. Several months later, Congress eliminated the statutory requirement that had prompted the establishment of the program and USCIS accordingly withdrew the program as "obsolete." *Id.* at 1672-82 (Neufeld Memo).

A chart summarizing the 17 prior deferred action programs is attached as Addendum A.

This history underscores three important points. First, programmatic grants of deferred action have been common for half a century, across many presidential administrations. Second, the programmatic use of deferred action has gone largely unchallenged. Until the Texas DAPA litigation in 2014, there had been no judicial challenge to the creation of any prior deferred action program. *See* Br. of Former Federal Immigration and Homeland Security Officials as Amici Curiae in Support of the United States at 3, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 922865 ("While [deferred action] policies have at times generated political controversy, until recently their legal underpinnings did not.").

5

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 18

Third, the Rescission is the first time the government has terminated a deferred action program and subjected its existing beneficiaries to deportation.  Virtually all of the prior programs ended either because a statute or regulation was enacted to protect the recipients, or because the program was designed from the outset to address a temporary disruption (e.g., the Hurricane Katrina program).  In the single instance where the executive branch attempted to terminate a deferred action program without providing an opportunity for notice and comment, a court found a violation of the APA.  *See Parco*, 426 F. Supp. at 985.

**B.     The Creation of DACA**

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing DACA (the "2012 DACA Memorandum").  *See* AR 1–3.  Under DACA, individuals who were brought to the United States as children and met certain criteria could apply for deferred action for renewable two-year terms.  *Id.*  The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that our immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *Id.* at 1–2.

Eligibility for DACA was limited to individuals who (1) came to the United States under the age of sixteen; (2) had continuously resided in the United States since June 15, 2007, and were present in the United States both on June 15, 2012 and on the date they requested DACA; (3) were in school, had graduated from high school, had obtained a GED, or had been honorably discharged from the United States military or Coast Guard; (4) had clean criminal records and were not a threat to national security or public safety; (5) were under the age of 31 as of June 15, 2012; and (6) did not have lawful immigration status.  *See* AR 1.  To apply for DACA, eligible individuals were required to provide the government with sensitive personal information, such as their home addresses and fingerprints, submit to a rigorous DHS background check, and pay a considerable fee.  App. at 1744-45, 47 (USCIS FAQs). Applicants then were evaluated on a case-by-case basis.  *See* AR 2.

A DACA determination results in an initial two-year deferral, which DHS stated from the outset would be "subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States."  AR 3.  DHS established a straightforward

6

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 19

1    renewal process and "strongly encourage[d]" DACA recipients to submit renewal requests in advance of

2    the relevant expiration date.  App. at 1756-57 (USCIS FAQs).[2]

3          Understanding that eligible individuals might be reluctant to step forward and voluntarily

4    disclose information which, absent DACA, could facilitate their removal from the United States, the

5    government launched an extensive outreach campaign to promote applications and renewals.  App. at

6    1742-61, 1762-64, 1785, 1799 (USCIS DACA Outreach).  The government repeatedly promised that

7    information provided in connection with the program would not be used for immigration enforcement

8    purposes absent special circumstances.  *Id.* at 1763-64, 1747, 1772 (DACA Toolkit).

9          **C.    Benefits of DACA**

10         DACA has conferred important benefits on recipients.  Most directly, DACA recipients are

11   permitted to reside in the United States and are protected from arrest or detention.  *Ariz. Dream Act*

12   *Coal. v. Brewer*, 757 F.3d 1053, 1058–59 (9th Cir. 2014); *see also* AR 2.  During the period of deferred

13   action, DACA recipients do not accrue time for "unlawful presence" for purposes of the immigration

14   law's bars on re-entry.  *See* 8 U.S.C. § 1182(a)(9)(B)–(C).

15         Under longstanding regulations, immigrants benefiting from deferred action may seek social

16   security numbers and employment authorization.  App. at 1742-45 (USCIS FAQs); AR 3; *see also*

17   8 C.F.R. § 274a.12(c)(14).  DACA recipients also became eligible for "advance parole," allowing them

18   to apply to travel abroad and return lawfully to the United States.  *See* App. at 1787-88 (USCIS Toolkit);

19   1758-59 (USCIS FAQ); *see also* 8 C.F.R. § 212.5(f).  Advance parole has permitted DACA recipients to

---

2         To qualify for renewal, DACA recipients were required to meet just three basic criteria: (1) they must not have left the United States without advance parole; (2) they must have continuously resided in the United States after submitting their DACA applications; and (3) they must not have been convicted of serious or repeated crimes, or otherwise pose a threat to national security or public safety.  App. at 1742, 1757 (USCIS FAQs).

EXHIBIT 1
Page 20

visit ailing family members, attend births and funerals, and participate in educational, cultural, and employment-related conferences.  App. at 2202, Topic 3.[3]

DACA recipients also became eligible to receive certain public, private, and practical benefits. For example, the individual plaintiffs have obtained driver's licenses, medical insurance, research funding and tuition benefits.  App. at 2203–04, Topic 6; *see also* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015).[4]  DACA also has enabled recipients to open bank accounts, obtain credit cards, and purchase homes and vehicles.  App. at 2201, Topic 2.

DACA has been transformative for beneficiaries and their families and communities.  *See, e.g.*, App. at 1373-74 (Suárez-Orozco Decl. ¶¶ 7-8); App. at 0363-68 (Gonzales Decl. ¶¶ 18-32).  As the government has recognized, DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."  App. at 1822-23 (Johnson Letter); App. at 2201, 2203, Topics 1, 5.  Even more fundamentally, DACA has provided recipients with a sense of dignity and security that carries demonstrable benefits to their mental and physical health, family well-being, and ability to make life plans.  App. at 2202-03, Topic 4.

**D.    The Rescission of DACA**

In December 2016, Secretary of Homeland Security Jeh Johnson publically stated that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."  App. at 1822-23 (Johnson Letter).  And initially, even after the change in

---

[3]    Where multiple declarations provide support for the facts stated herein, the citation provided is to the Topical Index to Plaintiff and Third-Party Declarations within the Appendix, *see* App. at 2201-2210, which identifies and provides a specific citation to each supporting declaration.

[4]    DACA permits otherwise ineligible individuals in California to obtain regular driver's licenses. *See* Cal. Veh. Code §§ 12801(a)-(b), 12801.5, 12801.6(a)-(b).  California also provides "AB 60" driver's licenses to undocumented immigrants without DACA, *see* Cal. Veh. Code § 12801.9, but such licenses are "not acceptable for official federal purposes."  *Id.* § 12801.9(d)(2).  DACA recipients also can obtain unemployment insurance benefits, *see* Cal. Unemp. Ins. Code § 1264(a)(2).

EXHIBIT 1
Page 21

1   administrations, Secretary of Homeland Security John Kelly in February 2017 specifically exempted

2   DACA from the administration's broad repeal of other immigration directives, AR 230, and

3   characterized "DACA status" as a "commitment . . . by the government towards the DACA person,"

4   App. at 1841.  President Trump himself emphasized that "dreamers should rest easy" and agreed that the

5   "policy of [his] administration [is] to allow the dreamers to stay."  *Id.* at 1853.

6          No court has ever held DACA to be unlawful.  Yet, in June 2017, government officials,

7   including Attorney General Sessions, began communicating with attorneys general from several states

8   that had previously challenged another deferred action program, Deferred Action for Parents of

9   Americans and Lawful Permanent Residents ("DAPA").  App. at 2033-34 (*Batalla Vidal* Interrogatory

10  Response).  Those discussions culminated in a June 29, 2017 letter from nine state attorneys general to

11  Attorney General Sessions, threatening to challenge DACA in court unless the federal government

12  rescinded the program by September 5, 2017.  AR 238-40.[5]  A group of 20 other attorneys general sent a

13  competing letter to President Trump urging him to *maintain* DACA, asserting that the arguments against

14  the program were "wrong as a matter of law and policy."  App. at 2089 (Becerra Letter).

15         On September 4, 2017, Mr. Sessions sent a one-page letter to Acting Secretary of Homeland

16  Security Elaine Duke asserting that DACA "was effectuated . . . without proper statutory authority" and

17  "was an unconstitutional exercise of authority by the Executive Branch."  AR 251.  He noted that DAPA

18  had been "enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of

19  multiple legal grounds and then by the Supreme Court by an equally divided vote," and suggested that

20  DACA might encounter the same result.  *Id.*

21         The next day, the Attorney General held a press conference where he "announce[d] that the

22  program known as DACA . . . is being rescinded."  App. at 1866 (Sessions Press Conf.).  As in his letter

23  to the Acting Secretary, the Attorney General asserted that DACA was an unconstitutional exercise of

24  authority by the executive branch and "vulnerable to the same legal and constitutional challenges that

25  the courts recognized with respect to the DAPA program."  AR 251.  He also claimed that DACA had

26

27  [5]     On September 1, 2017, Tennessee Attorney General Herbert H. Slatery III reversed course and
     decided Tennessee would not join the threatened expansion of the suit, citing "a human element to this

28  [issue]" that "should not be ignored."  App. at 1859-60 (Slatery Letter).

EXHIBIT 1
Page 22

1   "contributed to a surge of unaccompanied minors on the southern border that yielded terrible

2   humanitarian consequences." *Id.* This was nonsensical; DACA eligibility was restricted to a fixed

3   group of individuals who had lived continuously in the United States for at least five years since June

4   15, 2007 and were present in the United States on June 15, 2012; DACA could not have led to any

5   changes at the border in 2017.

6          Minutes after the Attorney General's press conference, Acting Secretary of Homeland Security

7   Duke issued a memorandum formally rescinding the DACA program. *See* AR 252–56. The Rescission

8   instructed DHS to immediately stop accepting DACA applications or approving new applications for

9   advance parole; to accept renewal applications only from individuals whose current deferred action

10   would expire on or before March 5, 2018, and to accept such renewals only through October 5, 2017;

11   and to allow individuals' DACA to expire beginning March 5, 2018. AR at 255.

12          Secretary Duke issued an accompanying statement asserting that the government had decided to

13   end DACA rather than "allow the judiciary to potentially shut the program down completely and

14   immediately." App. at 1869-70 (Duke Statement). Secretary Duke also expressed "sympath[y]" and

15   "frustrat[ion]" on "behalf" of DACA recipients and asserted that "DACA was fundamentally a lie." *Id.*

16          **E.      Harm from the Rescission**

17          The Rescission is causing irreparable injuries right now that will only worsen with time.

18   Because the Rescission threatens nearly 700,000 deeply-rooted immigrants with deportation from the

19   United States, its consequences are enormous and multi-faceted. The accompanying Appendix presents

20   extensive evidence of the severe harm that is being and will be inflicted by the government's action.

21   The discussion below can only begin to describe the Rescission's damaging effects.

22          **1.      Direct Legal Consequences**

23          As a result of the Rescission, eligible individuals were prevented from applying for DACA, and

24   others were unable to gather sufficient funds in time to pay the renewal fee by the abrupt October 5,

25   2017 cutoff. App. at 2209, Topics 19, 21. As a result, eligible individuals already have been denied the

26   benefits of the program. *Id.* DACA recipients have already lost the ability to seek advance parole and

27   are therefore precluded from traveling outside the United States. App. at 2210, Topic 23. Each day

28

EXHIBIT 1
Page 23

1   beginning March 5, 2018, an average of more than one thousand individuals will lose DACA and

2   immediately become vulnerable to arrest, detention, and removal.  App. at 2097 (CAP Study).  If they

3   are removed, most of these individuals will become subject to a 10-year bar on re-entry because they

4   accrued more than one year of "unlawful presence" prior to the creation of DACA.  In some cases,

5   DACA recipients will be subject to a *permanent* bar if, in addition to one year of "unlawful presence,"

6   they were previously ordered removed or granted voluntary departure and then later re-entered.  *See* 8

7   U.S.C. § 1182(a)(9)(B)–(C).

8              **2.     Injuries to Individual DACA Recipients**

9              The Rescission has already inflicted severe harm on DACA recipients and their families.  DACA

10  recipients are experiencing anxiety, depression, and fear because of the Rescission.  App. at 2205, Topic

11  13.[6]  This is taking an immediate toll on DACA recipients' well-being and affecting their studies, work,

12  and families.  App. at 2206-07, Topics 12-13.  The University of California has observed an increase in

13  demand for mental health services, which it cannot fully meet.  App. at 2202, Topic 8; *see also id.*,

14  Topic 7 (allocation of scarce resources).  And understandably so: because of the program's age

15  restrictions, DACA recipients are mostly young adults, now making decisions whether to get married,

16  start families, take mortgages, attend college or graduate school, start businesses, or change careers.

17  App. at 2204-06, Topics 9-10.  Of course, hundreds of thousands of DACA recipients already have

18  made such life-changing decisions in reliance on DACA, and now face devastating personal,

19  professional, and economic losses as a result of the government's precipitous reversal.

20             The Rescission carries immediate economic and professional consequences.  DACA recipients

21  have invested enormous effort and financial resources into building their lives and careers in this

22  country, which they now stand to lose.  App. at 2205-06, Topics 9-10.  They face the loss of educational

23  and employment opportunities, and even those early in their two-year DACA grants face immediate

24  losses from the unavailability of advance parole.  App. at 2204-05, 2208, Topics 9-10, 23.  The

25  Rescission has already prevented more than 70 recipients who have pending advance parole applications

26  _____

27  [6]     As one researcher found, the physical and emotional manifestations of stress can include chronic
    headaches, ulcers, sleep loss and eating disorders, and thoughts of suicide.  App. at 362 (Gonzales Decl.
28  ¶ 13).

EXHIBIT 1
Page 24

1    from studying abroad and presenting research.  App. at 1479 (Vazquez-Ramos Decl. ¶¶ 6-7).  For

2    example, Joel Sati—described as a "once-in-a-decade" doctoral candidate and academic prospect in

3    jurisprudence and social policy who had a pending advance parole application at the time of the

4    Rescission—has already been deprived of important opportunities to present his research abroad.  *See*

5    App. at 656-57 (Kutz Decl. ¶ 13); App. at 875 (Morrill Decl. ¶ 21); App. at 1322-23 (Sati Decl. ¶¶ 39-

6    41).

7         DACA recipients are being forced—right now—to make momentous and irreversible decisions

8    about their educational and professional paths.  For example, plaintiff and first-year UC Irvine law

9    student Viri Chabolla Mendoza is struggling to decide whether to continue making the personal and

10   financial investments required to attend law school, because without a work authorization, the

11   Rescission will limit or eliminate her ability to work as an attorney, App. at 113 (Chabolla Decl. ¶ 69),

12   as it will for other DACA recipient law students, who have been incurring significant debt to finance

13   their legal education.  App. at 448-49 (Gorjian Decl. ¶¶ 15-16).  Medical and doctoral students—

14   including plaintiffs New Latthivongskorn and Norma Ramirez—are wrestling with similar decisions.

15   App. at 670–71 (Latthivongskorn Decl. ¶¶ 47–49); App. at 1161 (Ramirez Decl. ¶ 52).  Medical students

16   at UC are facing the choice of self-selecting out of their only real opportunity to obtain a medical

17   residency position after years of medical training, lest they be rendered unable to care for their patients

18   when their work authorization expires.  App. at 65-67 (Braddock Decl. ¶¶ 4-5, 8); App. at 723-24

19   (Lucey Decl. ¶¶ 13-18); App. at 1357-59 (Stobo Decl. ¶¶ 6, 10, 12); App. at 0519-20 (Huang Decl. ¶

20   16).  And plaintiff Saul Jimenez already has been forced to abandon plans to pursue a master's degree.

21   App. at 0557 (Jimenez Decl. ¶ 45).  Many other DACA recipients are being forced to make choices now

22   that may adversely impact their ability to pursue their education and career objectives.  App. at 2203-04,

23   Topics 9-10.

24        Beyond its immediate career consequences, the Rescission is imposing economic and financial

25   harms on DACA recipients, many of whom are already looking to minimize or unwind the long-term

26   financial commitments—including student loans and mortgages, office leases, and employee hires—

27   they made in reliance on the program.  App. at 2205-06, 2209, Topics 10, 20.  The Rescission, by

28

12
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 25

1    canceling work authorizations, will deprive DACA recipients of the ability to work legally, and in many

2    cases render them unable to continue their education.  App. at 2203-04, Topics 9-10.

3            The Rescission is also causing irreparable harm to the parents, children, and siblings of DACA

4    recipients.  *See, e.g.*, App. at 2206, Topic 11.  Approximately 26 percent of DACA recipients have U.S.-

5    citizen children, while approximately 17 percent have a U.S.-citizen spouse, and nearly 60 percent have

6    a U.S.-citizen sibling.  App. at 1510 (Wong Decl. ¶ 31).  DHS's decision that DACA recipients should

7    "prepare for and arrange their departure from the United States," App. at 2199–2200 (Talking Points);

8    App. at 1510-12 (Wong Decl. ¶ 32), therefore presents DACA recipients with the agonizing decision

9    whether to uproot their loved ones from their country of citizenship or leave them behind.  As a result of

10   the Rescission, almost two hundred thousand U.S.-citizen children face the terrifying prospect that their

11   parents may soon be deported.  The Rescission has caused some DACA recipients not to begin families

12   at all.  For example, as a result of the Rescission, plaintiff Dulce Garcia has put on hold her dream of

13   adopting a child and becoming a mother.  App. at 267–68 (Garcia Decl. ¶¶ 64, 700).

14           **3.      Injuries to State and Local Governments and Educational Institutions**

15           The Rescission is also harming DACA recipients' schools and employers, and the cities,

16   counties, and states where they reside and work.  App. at 2206–10, Topics 14, 17, 18, 22.  For example,

17   some DACA recipients have decided to cancel their enrollment at the University of California because

18   the Rescission forecloses their ability to work during and after their education.  App. at 0512 (Holmes-

19   Sullivan Decl. ¶ 18).  The University of California and other educational institutions such as the

20   California State University and the California Community Colleges, thus face the loss of their

21   investments in time, financial aid, research dollars, housing benefits, and other support, and the loss of

22   DACA students and employees is diminishing the research expertise, exchange of ideas, and cultural

23   vitality that are central to their academic missions.  App. at 2205, Topic 14; *see also id.* at 2206, Topic

24   12.  And public school districts are also struggling to effectively educate their student populations given

25   decreased attendance and the fear and stress caused by the Rescission.  App. at 353–54 (L. Gonzales

26   Decl. ¶¶ 4-5, 10); *id.* at 784–85 (Maxwell Decl. ¶¶ 9, 11).

27

28

13

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 26

1        The interests of the plaintiff States, County of Santa Clara, and City of San Jose are also being

2 irreparably harmed by the Rescission.  The DACA program has improved the economic welfare of

3 recipients by providing access to higher-skilled jobs, better job mobility, higher wages, and greater

4 purchasing power.  App. at 1500 (Wong Decl. ¶ 12); *see also* App. at 2201-02, 2203, Topics 2, 5.

5 Recent data show that 91 percent of DACA recipients are currently employed (93 percent for those 25

6 years and older), and hourly wages of DACA recipients have increased by 69 percent (81 percent for

7 those 25 years and older since the program began).  App. at 1500, 1503 (Wong Decl. ¶¶ 13, 18).

8        As DACA employees leave the workforce, the economy as a whole will continue to suffer

9 enormous losses.  DACA has greatly benefited state and local economies, including plaintiff States,

10 plaintiff County of Santa Clara, and plaintiff City of San Jose, by increasing DACA recipients' earnings

11 and growing the tax base.  App. at 2206–07, Topic 17.  As entrepreneurs and employees, DACA

12 recipients are achieving financial independence and purchasing cars and homes, thereby generating

13 additional economic activity, along with tax revenue for state and local governments.  App. at 2199-

14 2200, 2206–07, Topics 2, 17.  Over a ten-year period, it is estimated that the Rescission will cost the

15 federal government $60 billion in lost revenue and $215 billion in lost GDP.  App. at 0073 (Brannon

16 Decl. ¶ 11).  The comparable figures for California alone are $19 billion and $71 billion.  App. at 0073

17 (Brannon Decl. ¶¶ 11, 14).  State and local governments, including plaintiffs States, County of Santa

18 Clara, and City of San Jose, also employ DACA recipients to provide important public services.  App. at

19 2209, Topic 18.

20        As DACA recipients continue to lose employment authorization, many will lose their health

21 insurance.  App. at 716 (Lorenz Decl. ¶ 7); App. at 1310 (Santos Toledo Decl. ¶ 26); App. at 1324 (Sati

22 Decl. ¶ 48); App. at 1448 (Tabares Decl. ¶ 14).  The resulting increase in the uninsured population will

23 place an increased burden on emergency healthcare services in plaintiff States, plaintiff County of Santa

24 Clara, and plaintiff City of San Jose, and will reduce overall public health as fewer people will seek

25 medical care because they lack insurance or because they fear being reported to immigration authorities.

26 App. at 2206, Topic 15.

27        The separation of families caused by the Rescission will likely bring more children into

28 government child welfare services programs, further increasing government costs.  App. at 0779

EXHIBIT 1
Page 27

(Márquez Decl. ¶ 18).  Uncertainty about parental immigration status contributes to heightened levels of stress and anxiety in children.  For example, one study found that mothers' eligibility for DACA led to significant improvements in their children's mental health—improvements that will be lost because of the Rescission.  App. at 0814–16 (Mendoza Decl. ¶¶ 4, 6–8); App. at 0464–67 (Hainmueller Decl. ¶¶ 4–11).

Public safety will also suffer.  Effective local law enforcement depends on a trusting relationship between police and the communities they serve.  App. 2206, Topic 16.  DACA recipients face particular vulnerabilities once their DACA grants end, given the information they have already turned over to federal immigration authorities.  *See* App. at 2210, Topic 24.  If DACA recipients lose their protection, and fear that interactions with police could end with their deportation, they will be less likely to call the police if they are victimized or if they witness crimes.  App. at 2206, Topic 16.  By forcing these particularly vulnerable individuals back into undocumented status, the Rescission damages the public safety mission of law enforcement agencies.  *Id.*

## STANDARD OF REVIEW

A preliminary injunction is warranted where the plaintiffs establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities" tips in their favor, and (4) that an "injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Agency action cannot stand if it is arbitrary, capricious, or contrary to law, or if it is done without appropriate process.  The unexplained rescission of DACA cannot withstand the slightest scrutiny, and therefore plaintiffs are likely to succeed on the merits.

## I.      Defendants' Rescission of DACA Is Arbitrary and Capricious.

The Administrative Procedure Act "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  To ensure that agency actions are reasonable and lawful, a court must

15

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 28

conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). After undertaking that review, a court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010).[7] As with formal rulemaking, final agency action achieved through an informal process is subject to review under § 706 of the APA. *See, e.g.*, *Perez*, 135 S. Ct. at 1209 (arbitrary and capricious review is available for agency rules that do not proceed through notice and comment); *Sacora v. Thomas*, 628 F.3d 1059, 1068–69 (9th Cir. 2010) (same).

Agency action should be set aside as arbitrary and capricious if the agency fails to explain the basis of its decision, fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made," or fails to offer a "reasoned explanation" for departures from preexisting policies. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In cases where the purported rationale for agency action is pretextual, it must be set aside without further inquiry. *See, e.g.*, *N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130–31 (D.C. Cir. 1984); *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986). Here, defendants violated the APA on each of these grounds.

### A. Defendants Failed to Explain the Basis for the Rescission.

It is a "simple but fundamental rule of administrative law" that "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," and not post hoc grounds articulated during litigation. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*). Meaningful judicial review cannot proceed unless "the grounds upon which the administrative agency acted [are]

---

[7]   An action under the APA requires final agency action that is ripe for review. In the motion to dismiss filed in *Batalla Vidal v. Duke*, No. 16-cv-41196 (E.D.N.Y. Oct. 27, 2017), ECF No. 95-1, defendants did not challenge finality or ripeness. If defendants take a contrary position in this case, plaintiffs will respond either in their opposition to defendants' motion to dismiss or in their reply supporting the instant motion.

EXHIBIT 1
Page 29

1   clearly disclosed and adequately sustained." *Chenery I*, 318 U.S. at 94.  Accordingly, an agency action

2   must be set aside unless its basis is "set forth with such clarity as to be understandable." *Chenery II*, 332

3   U.S. at 196.

4        The four-page Rescission memorandum flunks this basic test, inflicting grievous harm on

5   millions of people without providing any clear explanation why.  The bulk of the document is a two-

6   and-a-half page "Background" section that provides a generic discussion of the history of the DACA

7   and DAPA programs, including a brief discussion of the DAPA litigation in the Fifth Circuit.  It

8   summarizes the Attorney General's one-page September 4, 2017 letter, and quotes his assertions that

9   DACA was "effectuated without statutory authority," and was "an unconstitutional exercise of authority

10  by the Executive Branch."  DHS's entire purported reasoning for rescinding DACA is then set forth in a

11  66-word paragraph, which states in full:

12           Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the
             ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear
13           that the June 15, 2012 DACA program should be terminated.  In the exercise of my
             authority in establishing national immigration policies and priorities, except for the
14           purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

15  AR 255.

16        This cryptic statement does not remotely meet the APA's requirement that an agency provide a

17  reasoned basis for its actions.  *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)

18  ("[C]onclusory statements will not do; an agency's statement must be one of reasoning." (internal

19  citations omitted)).  Indeed, the memorandum barely states any rationale for the decision at all.  The

20  reference to the Attorney General's one-page letter is not reasoning—the Attorney General's letter

21  contains only a conclusory assertion that DACA is illegal.  AR 251.  Just as perplexing is the reference

22  to the Supreme Court's purported "ruling" in the "ongoing litigation"—presumably referring to the four-

23  four affirmance in the Texas DAPA case.  This even split was no "ruling" at all, let alone a ruling

24  regarding DACA.  *See Neil v. Biggers*, 409 U.S. 188, 192 (1972) ("Nor is an affirmance by an equally

25  divided Court entitled to precedential weight.").

26        Because DHS failed to provide any comprehensible rationale for its decision, the Rescission

27  must be set aside.  *See Chenery II*, 332 U.S. at 196–97 ("It will not do for a court to be compelled to

28  guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must

17

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 30

be precise from what the agency has left vague and indecisive."); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 849 (9th Cir. 2003) (same).

### B.   Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made.

To survive review under the arbitrary-and-capricious standard, an agency must "demonstrate a rational connection between the facts it found and the choice it made." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 n.15 (9th Cir. 2007); *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010) (same).  Although courts "defer to agency expertise on questions of methodology, they do not ignore an agency's failure to address factors pertinent to an informed decision." *Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012) (Alsup, J.).  The Rescission addresses none of the considerations appropriate to an action of this magnitude, nor does it articulate a rational connection between the facts found and the action undertaken.

Defendants failed to consider any of DACA's numerous benefits before issuing the Rescission. *See* App. at 2199-2202, Topics 1-6; App. at 1935-36 (Nealon Dep. 151:21-152:13).  Defendants ignored DHS's own finding, when creating DACA, that "many of [the] young people [eligible for DACA] have already contributed to our country in significant ways."  AR 2.  Defendants likewise failed to evaluate the enormous economic benefits of DACA.  *See* App. at 73-74 (Brannon Decl. ¶¶ 10-16); App. at 2205-08, Topics 14, 15, 17, 18, 22; App. at 1873-75 (McCament Dep. 12:14-14:7); App. at 1936-37, 1938 (Nealon Dep. 152:15-153:2, 154:9-22) (acknowledging benefits).

Defendants also failed to assess—at all—the devastating impact that the Rescission will have on DACA recipients, their families and friends, their employers, employees, clients, or universities, or the public at large.  *See State Farm*, 463 U.S. at 52 ("reasoned decisionmaking" requires agencies to "look at the costs as well as the benefits" of their actions).  The fundamental consequence of the Rescission— that nearly 700,000 young people will be vulnerable to deportation to countries that many cannot remember—is not even mentioned.  The collateral consequences—the loss of work, the loss of the

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 31

ability to travel, the damage to DACA recipients' mental and physical health, the destruction of human capital and potential—are not addressed either.[8]

Defendants also ignored the economic and social costs associated with the Rescission. Rescinding DACA will cause massive economic harm, depleting the country's workforce and reducing the demand for goods and services.  The American economy will lose an estimated $215 billion in GDP over ten years—a loss equivalent to the entire economic output of Oregon—and the federal government alone will lose an estimated $60 billion as a result of the Rescission.  *See* App. at 73 (Brannon Decl. ¶ 11); *see also id.* ¶ 14.  None of these costs were referenced in the Rescission or incorporated into the agency's decision-making process.  *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (ignoring cost, even where the relevant statutes "leave[] agencies with flexibility," constitutes arbitrary and capricious action).

Defendants also ignored the Rescission's infringement on core constitutional interests.  For example, DACA recipients are already being deprived of the ability to travel internationally or practice particular professions.  *See, e.g.*, *Lester v. Parker*, 235 F.2d 787, 789 (9th Cir. 1956) (recognizing the "constitutionally protected right to work"); *Greene v. McElroy*, 360 U.S. 474, 492 (1959) (recognizing the constitutionally protected right to "hold specific private employment and to follow a chosen profession"); *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (recognizing that the right to travel abroad is a constitutionally protected liberty interest).  The interests of educational institutions in choosing whom they will educate and to create a rich and diverse academic climate informed by DACA recipients' perspectives—central aspects of academic freedom protected by the First Amendment—are also being seriously impaired.  *See* App. at 504 (Hexter Decl. ¶ 14).[9]

---

[8]     *See, e.g.*, App. at 724-25 (Lucey Decl. ¶¶ 19-20) (Rescission impacting medical students' decisions as to whether to enter National Residency Matching Process); App. at 186 (Doe 1 Decl. ¶ 19) (Rescission causing uncertainty about ability to become a lawyer); App. at 1324 (Sati Decl. ¶¶ 45-46) (Rescission causing uncertainty about ability to complete professional school).

[9]     Academic freedom is a First Amendment right that protects a university's right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."  *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (internal citation omitted).

19

EXHIBIT 1
Page 32

The administrative record here reflects none of the consideration of the benefits or costs that normally would be relevant to agency decisions.  Indeed, the decision to rescind DACA was reached after just two-and-a-half hours of meetings and a handful of follow-up conversations.  *See, e.g.*, App. at 1878-80, 1884-89, 1890-92 (McCament Dep. 72:22-75:17, 124:22-128:16, 130:2-132:7); App. at 1911-26 (Hamilton Dep. 98:6-113:15).  The decision was made without input from any of a host of interested or knowledgeable sources.  *See, e.g.*, App. at 1942-45 (Nealon Dep. 165:3-168:18); App. at 1904-06 (McCament Dep. 240:20-242:5); App. at 2023-24 (Neufeld Dep. 187:6-188:8).  Indeed, the agency did not even consult with its own personnel responsible for immigration enforcement.  *See* App. at 2192-93, 2196 (Miller Dep. 99:12-19, 100:3-7, 204:1-21).

As far as the record reveals, there was no policy rationale for the Rescission at all.  Where, as here, there "are no findings and no analysis . . . to justify the choice made," the APA "will not permit" a court to accept the agency's decision.  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962); *see also Crickon v. Thomas*, 579 F.3d 978, 985 (9th Cir. 2009) (same).

**C.      Defendants Failed to Offer a Reasoned Explanation for Their Reversal of Policy.**

When the government reverses its own earlier policy, it has an even greater burden to justify its actions.  The agency must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously."  *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (internal citation omitted); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency cannot depart from prior policy without "explaining its changed position").  Thus, reversing a pre-existing policy requires a "more detailed justification than what would suffice for a new policy created on a blank slate."  *Fox*, 556 U.S. at 515.

Here, the Rescission represents a 180-degree reversal of DHS's prior position on the merits of deferred action and the legality of DACA.  In introducing the program in 2012, the agency explained that DACA was "necessary to ensure that [DHS's] enforcement resources are not expended on [] low priority cases but are instead appropriately focused on people who meet our enforcement priorities."  AR 1.  It further explained:

20

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 33

1
2
3
4

> Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

5   AR 2. The Rescission did not address these findings at all.

6          With respect to the program's legality, just two years ago, the government defended DACA

7   before the Ninth Circuit, stating that DACA was "a valid exercise of the Secretary's broad authority and

8   discretion to set policies for enforcing the immigration laws, which includes affording deferred action

9   and work authorization to certain aliens who, in light of real-world resource constraints and weighty

10  humanitarian concerns, warrant deferral rather than removal."  United States' Br. as Amicus Curiae,

11  *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), *petition for cert. filed*, No. 15-15307

12  (U.S. Mar. 31, 2017), 2015 WL 5120846 at *1.[10]  DHS made similar arguments before the Fifth Circuit

13  in 2014.  *See* Br. for United States, *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) (No. 14-10049),

14  2014 WL 10657553; *see also* Br. for United States at 23, *Crane*, 2012 WL 6633751 ("It is in the public

15  interest to focus the government's limited resources to the enforcement of its highest priority cases—

16  such as aliens who pose national security risks, serious criminals, and repeat offenders, rather than to

17  aliens who arrived in the United States as children and have no criminal record.").

18         Because the Rescission did not address the policy merits of DACA at all, it did not begin to

19  evaluate the reliance interests engendered by the program.  *Perez*, 135 S. Ct. at 1209 (government must

20  provide special justification "when its prior policy has engendered serious reliance interests that must be

21  taken into account").  The policy justification for the program has become ever stronger as DACA

22  recipients, in reliance on the program, have become more educated, better-employed, and even more

23  embedded in the fabric of American life.  *See supra* Background § C.  Since 2012, DACA recipients

24  have structured their lives around the program, making decisions to get married, start families, take out

25

26  _____

27  [10]     The Ninth Circuit concluded that Arizona's policy of rejecting documents issued to DACA recipients as proof of authorized presence for the purpose of obtaining a state driver's license was preempted by federal law, but declined to consider the legality of DACA.  *Ariz. Dream Act*, 855 F.3d at 975.

28

EXHIBIT 1
Page 34

1  loans, enroll in graduate programs, and build careers in reliance on the government's promises and

2  representations.  *See, e.g.*, App. at 2199-2201, Topics 1, 2, 4, 5.

3        Employers, employees, and institutions likewise have made important decisions in reliance on

4  the government's representations about DACA.  For example, educational institutions like UC have

5  admitted and hired DACA recipients, with the expectation that they would be able to live and teach,

6  research, pursue professional careers, or otherwise work in the United States for the foreseeable future.

7  *See, e.g.*, App. at 2205-06, Topic 14.  As DACA recipients are being forced to abandon their work and

8  studies—in many cases dropping out of degree programs—their employers and educational institutions

9  are losing the benefits they derive from the contributions of DACA recipients, as well as the value of the

10  considerable time, effort, energy, and financial resources invested in them.  *See, e.g.*, App. at 2205-06,

11  2208, Topics 14, 22.  The elimination of DACA will force "systemic, significant changes" to these

12  institutions, *see Encino Motors*, 136 S. Ct. at 2126, disrupting education, research, and health care as

13  DACA-recipient teachers, scientists, and hospital workers can no longer fulfill those roles.

14        The Rescission's failure to weigh the reliance interests created by DACA renders it untenable.

15        **D.    The Rescission Appears to Rely on a False Legal Premise.**

16        In his one-page letter, the Attorney General opined that DACA was illegal and should be

17  rescinded.  In the Rescission memorandum, the Acting Secretary stated that she was taking this letter

18  "into consideration."  AR 254–55.  To the extent the Rescission depends on a conclusion that DACA

19  was illegal, that conclusion is wrong: DACA was a lawful exercise of DHS's enforcement discretion.

20  And if, contrary to the Attorney General's letter, DACA is legal, then the Rescission must be set aside.

21  *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007); *Chenery I*, 318 U.S. at 94 ("[A]n order may

22  not stand if the agency has misconceived the law."); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101

23  (9th Cir. 2007); *Locke*, 626 F.3d at 1051; *see also Phillips Petroleum Co. v. FERC*, 792 F.2d 1165,

24  1170–71 (D.C. Cir. 1986) (rejecting agency interpretation of statute where agency's position "was based

25  solely on its erroneous reading" of a Supreme Court case and agency "believed itself bound by" that

26  case).

27

28

22

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 35

### 1.   DACA Is a Lawful Exercise of Enforcement Discretion

Contrary to the Attorney General's assertion that DACA was an unconstitutional exercise of authority by the Executive Branch, DACA was a lawful exercise of well-established enforcement discretion that has been conferred by Congress.  Deferred action programs like DACA are a lawful exercise of the Secretary's broad statutory authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(f), and to carry out the "administration and enforcement of th[e INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a), including by authorizing aliens to be lawfully employed, 8 U.S.C. § 1324a(h)(2).

Prosecutorial discretion is well-recognized as important to the enforcement of the immigration laws.  *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).  This is true both because "[d]iscretion in the enforcement of immigration law embraces immediate human concerns," such as which individuals "pose less danger than" others, *Arizona v. United States*, 567 U.S. 387, 396 (2012), and because there are many more removable aliens than there are enforcement resources.  See AR 4 ("[A]lthough there are approximately 11.3 million undocumented aliens in the country, [DHS] has the resources to remove fewer than 400,000 such aliens each year."); *see also* 8 U.S.C. § 1103(a)(3) (granting DHS Secretary authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]").  Deferred action is explicitly contemplated in DHS's regulations and "has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court." AR 16.  As set forth above, DHS has often exercised enforcement discretion on not just an individual but a programmatic basis, dating to the 1950s.  *See* Background § A.

DACA is entirely consistent with earlier deferred action programs and is a reasonable exercise of DHS's enforcement authority under the INA.  DACA is explicitly framed as an exercise of prosecutorial discretion.  *See* AR 1 (2012 DACA Memorandum sets forth how "in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws").  The 2012 DACA Memorandum identifies certain categories of "criteria" that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."  *Id.*  Some of the criteria provide guidelines for how DHS employees are to exercise their discretion, such as whether the

23

EXHIBIT 1
Page 36

1    individual "poses a threat to national security or public safety."  *Id.*  Moreover, the 2012 DACA

2    Memorandum instructs DHS officials to take deferred action under the policy only "on an individual"

3    and "case by case basis," and to give "consideration . . . to the individual circumstances of each case."

4    AR 2.  Just like past deferred action programs, DACA is a use of "[d]iscretion in the enforcement of

5    immigration law" to "embrace[] immediate human concerns" by deprioritizing enforcement for those

6    who were brought to this country as children, have clean records, and have lived continuously in the

7    United States since 2007.  *Arizona*, 567 U.S. at 396. ("The equities of an individual case may turn on

8    many factors, including whether the alien has . . . long ties to the community.").

9         Merely because the creation of DACA was an act of prosecutorial discretion does not mean,

10   however, that the *termination* of DACA is unreviewable.  First, courts have emphasized that judicial

11   review of general enforcement policies should proceed.  *See, e.g.*, *Crowley Caribbean Transp., Inc. v.*

12   *Peña*, 37 F.3d 671, 676 (D.C. Cir. 1994) ("[A]n agency's statement of a general enforcement policy may

13   be reviewable for legal sufficiency where the agency has . . . articulated it in some form of universal

14   policy statement."); *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (distinguishing

15   between a reviewable "Enforcement Policy Statement" and the unreviewable particularized enforcement

16   decision); *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996) (same and collecting cases)).  Here,

17   plaintiffs challenge DHS's wholesale rescission of a program—a clearly justiciable policy choice.

18        Second, DHS's decision to rescind DACA appears to be based on a legal determination

19   regarding the legality of DACA.  Such legal questions fall squarely within the core function of the

20   judiciary; there is "law to apply," and the policies underlying judicial deference to executive discretion

21   do not come into play.  *See, e.g.*, *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d

22   1374, 1378–79 (9th Cir. 1989) (permitting judicial review of advisory opinion and policy statement in

23   light of agency's interpretation of its organic statute); *Edison*, 996 F.2d at 333 (explaining that plaintiffs'

24   challenge to agency policy statement involves a challenge to "the [agency's] interpretation of [the Act]

25   and its implementing regulations . . . Clearly, this interpretation has to do with the substantive

26   requirements of the law; it is not the type of discretionary judgment [that is] shield[ed] from judicial

27   review."); *Pinho v. Gonzales,* 432 F.3d 193, 203-04 (3d Cir. 2005) ("purely legal determinations made

28

24
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 37

by the agency [ ] remain subject to judicial review"). Courts can and should say what the law is, rather than abdicating that function to administrative agencies.

### 2. The *Texas* Decision Is Neither Controlling Nor Persuasive with Respect to DACA

The Attorney General's one-page letter focused on a Fifth Circuit decision affirming a preliminary injunction of DAPA. *See* AR 51; *see also* AR 253–255 (citing *Texas v. United States* (*Texas II*), 809 F.3d 134 (5th Cir. 2015)). To the extent the Rescission was based on the premise that *Texas* was controlling or persuasive authority for a finding that DACA was illegal, that premise is mistaken.

*First*, *Texas* did not even purport to decide the legality of DACA. *See, e.g.*, *Texas II*, 809 F.3d at 172–73 (observing that although district court's "finding was partly informed by analysis of the implementation of DACA, the precursor to DAPA, any extrapolation from DACA [to DAPA] must be done carefully"); Br. for Pet'rs at 59, *Texas*, 2016 WL 836758 ("This suit does not challenge the original DACA policy.").

*Second*, *Texas* is an out-of-circuit case that does not control this Court or the Ninth Circuit. *See, e.g.*, *Int'l Chem. Workers Union Council of the United Food & Commercial Workers Int'l v. NLRB*, 467 F.3d 742, 748 n.3 (9th Cir. 2006).[11] The Supreme Court's four-four deadlock, *see United States v. Texas*, 136 S. Ct. 2271 (2016), is not a precedential ruling either. *See Neil v. Biggers*, 409 U.S. at 192 ("If the judges are divided, the reversal cannot be had, for no order can be made.").

*Third*, the executive branch's formal public statements affirming DACA's legality are more persuasive and relevant to evaluating the Rescission than *Texas*'s provisional evaluation of DAPA. The Office of Legal Counsel expressed its "preliminary view" in 2014 that DACA is "permissible." AR 21 n.8. And the government has vigorously advocated DACA's legality in court, explaining that the program is "a valid exercise of the Secretary's broad authority and discretion to set policies for

---

[11]     The Fifth Circuit issued two decisions in *Texas*—one denying the government's motion for a stay pending appeal, *see Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (*Texas I*), and a second affirming a preliminary injunction of the DAPA program, *see Texas II*, 809 F.3d 134. Both decisions are accompanied by powerful, lengthy dissents. *See Texas II*, 809 F.3d at 188-219 (King, J., dissenting); *Texas I*, 787 F.3d at 769-84 (Higginson, J., dissenting).

EXHIBIT 1
Page 38

1   enforcing the immigration laws."  United States' Br. as Amicus Curiae, *Arizona Dream Act*, 2015 WL

2   5120846; *see also* Br. for United States, *Crane*, 2014 WL 10657553; Br. for United States, *Crane*, 2012

3   WL 6633751; Br. for Pet'rs at 59–60, *Texas*, 2016 WL 836758.

4          *Fourth*, *Texas* is distinguishable on the facts and the law.  DAPA was a deferred action program

5   for certain individuals who were parents of U.S. citizens or lawful permanent residents.  *See Texas II*,

6   809 F.3d at 191 (King, J., dissenting).  The Fifth Circuit found that DAPA was not actually discretionary

7   and therefore violated the APA's notice-and-comment procedures.  *See id.* at 170–78.  The same cannot

8   be said for DACA.  *See* Letter to Judge Garaufis from Counsel for Defs. at 5, *Batalla Vidal v. Duke*, No.

9   16-cv-4756 (E.D.N.Y. Sept. 29, 2017) (Dkt. No. 69) ("the original DACA policy itself . . . is an exercise

10  of 'prosecutorial discretion' that is 'a special province of the Executive'").  Indeed, the Fifth Circuit has

11  acknowledged that the 2012 DACA Memorandum "makes it clear that [ICE] Agents shall exercise their

12  discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case

13  basis."  *Crane v. Johnson*, 783 F.3d 244, 254-55 (5th Cir. 2015).

14         Moreover, the Fifth Circuit concluded that DAPA was foreclosed by statute because the INA

15  contained "an intricate process for illegal aliens to derive a lawful immigration classification from their

16  children's immigration status," and DAPA was inconsistent with the statutory scheme.  *Texas II*, 809

17  F.3d at 179; *see also id.* at 186.  There is no comparable pathway for individuals brought to this country

18  as children.

19         The Fifth Circuit further suggested that the large number of individuals potentially eligible for

20  DAPA suggested administrative overreach.  *See id.* at 181, 183.  But more than one-third of the entire

21  undocumented population was eligible for DAPA, compared with less than ten percent potentially

22  eligible for deferred action under DACA.  *See id.* at 148, 174 n.138.

23         *Fifth* and finally, any application of the Fifth Circuit's reasoning to DACA would be unfounded,

24  as the government argued to the Supreme Court.[12]  The Fifth Circuit's ruling depended heavily on the

25  invalid inference that because an allegedly low percentage of DACA applications had been denied based

26  on discretionary reasons, the discretion embedded in the DAPA program might be illusory.  *See id.* at

27

28  [12]      *See* Br. for Pet'rs, *Texas*, No. 15-674, 2016 WL 836758 (Mar. 1, 2016).

26

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 39

1   172-76.  But it was entirely consistent with the reasonable exercise of discretion for there to be a low

2   denial rate for DACA.  As even the Fifth Circuit recognized, "DACA involve[s] . . . self-selecting

3   applicants, and persons who expect[] to be denied relief would seem unlikely to apply."  *Texas II*, 809

4   F.3d at 174; *see also id.* ("Eligibility for DACA was restricted to a younger and less numerous

5   population, which suggests that DACA applicants are less likely to have backgrounds that would

6   warrant a discretionary denial." (footnote omitted)).  A declaration from Donald Neufeld, Associate

7   Director for USCIS Service Center Operations confirmed that "deferred action under DACA is a case-

8   specific process that necessarily involves the exercise of the agency's discretion"; identified "several

9   instances of discretionary denials"; and noted "that approximately 200,000 requests for additional

10  evidence had been made upon receipt of DACA applications."  *Id.* at 175 (alteration and internal

11  quotation marks omitted).

12          The Fifth Circuit also improperly conflated two separate concepts—lawful *presence* and legal

13  *status*—in finding DAPA was a grant of legal status foreclosed by the INA.  Those are immigration law

14  terms of art that are distinct.  "Whereas legal status implies a right protected by law, legal presence

15  simply reflects an exercise of discretion by a public official."  *Texas I*, 787 F.3d at 774 (Higginson, J.,

16  dissenting) (internal citation and emphasis omitted); *see also Texas II*, 809 F.3d at 199 (King, J.,

17  dissenting); Reply Br. for Pet'rs at 16-18, *Texas*, 2016 WL 75049.  DACA does not confer a legal status

18  under the immigration laws, which only Congress can do.  Instead, it confers at most lawful presence.

19          In sum, the Rescission cannot be justified on the premise that *Texas* dictates a finding that

20  DACA was illegal.

21                  **3.      Purported "Litigation Risk" Cannot Justify the Rescission**

22          Despite the letter from Attorney General Sessions, the government has not in this litigation nor in

23  *Batalla Vidal* asserted that DACA was illegal.  Instead, it has retreated to the position that DHS could

24  rescind DACA based on mere "litigation risk" stemming from a threat by nine state attorneys general

25  that they would seek to amend their complaint in the *Texas* case to encompass DACA.  This post hoc

26  explanation was not asserted at the time of the Rescission and cannot be accepted as a justification for

27  DHS's action.  *Chenery II*, 332 U.S. at 196.

28

EXHIBIT 1
Page 40

1    Nor can the "litigation risk" rationale withstand scrutiny.  "Litigation risk," standing alone, is not

2    a sufficient reason for the federal government to do anything.  The senior DHS official responsible for

3    drafting the Rescission has testified that acting on the basis of "litigation risk" is the "craziest policy you

4    could ever have" as a basis for government action.  App. at 1928-26 (Hamilton Dep. 207:20-208:11);

5    *see also* App. at 1938-39 (Nealon Dep. 154:23-155:11) (not aware of any other policy rescinded due to

6    litigation risk); App. at 2025 (Neufeld Dep. 189:8-22) (not aware of termination of other deferred action

7    programs due to litigation risk or illegality).

8    This case and others illustrate the hollowness of the "litigation risk" rationale.  Far from

9    eliminating "litigation risk," the rescission of DACA predictably prompted at least nine lawsuits,

10   including suits by 19 state attorneys general, as well as universities, cities and counties, private

11   individuals, a union, and a civil rights group.  App. at 2090 (Becerra Letter).  Thus, "[a]t most, the

12   Department deliberately traded one lawsuit for another."  *Organized Vill. of Kake v. U.S. Dep't of*

13   *Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (agency's desire to avoid litigation did not satisfy its

14   obligation to provide a reasoned explanation for its change in policy); *see also Int'l Union, United Mine*

15   *Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (litigation risk was not valid

16   grounds on which to act); *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 904

17   (N.D. Cal. 2006) ("legal uncertainty alone [is not] a sufficient justification" for agency action); *Sierra*

18   *Club v. Jackson*, 833 F. Supp. 2d 11, 34 (D.D.C. 2012) (similar).

19   To tolerate the "litigation risk" rationale—which could apply to virtually any agency action—

20   would be to countenance an end-run around the APA.  An agency could ignore the policy merits of any

21   issue and simply cite litigation risk as a basis for its action.  This is untenable.  *Cf. Mexichem Specialty*

22   *Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015) ("The risk is that an agency could circumvent

23   the rulemaking process through litigation concessions, thereby denying interested parties the opportunity

24   to oppose or otherwise comment on significant changes in regulatory policy.  If an agency could engage

25   in rescission by concession, the doctrine requiring agencies to give reasons before they rescind rules

26   would be a dead letter.").

27   Even taking "litigation risk" on its own terms, the administrative record does not contain any

28   intelligent assessment of litigation risk that could withstand APA review.  A reasonable litigation risk

EXHIBIT 1
Page 41

1   assessment would have to address the probability of prevailing in the district courts, the courts of

2   appeals, and the Supreme Court, the timing of any resolution and the prospects of a stay of an adverse

3   judgment, and the risks of litigation weighed against the benefits of DACA, among other factors.  A

4   reasonable litigation risk analysis would have to consider the government's prior position that DACA

5   was legal.  A reasonable analysis would also need to address the government's current position that the

6   legality of deferred action programs such as DACA is non-justiciable.  If the government were right

7   about that, then there would be no "litigation risk" justifying the Rescission.

8           The administrative record reflects no consideration of any of these factors.  Nor does it reflect

9   any consideration of reasonable policy alternatives that could mitigate "litigation risk" while

10  maintaining the benefits of DACA.  The government's "litigation risk" rationale cannot support the

11  Rescission.

12          **E.       The Announced Reason for the Rescission Was Pretextual**

13          The government's failures to provide a clear explanation for the Rescission, to address DACA's

14  benefits, or to justify the government's reversal of position, suggest that the stated reasons for acting are

15  not the true reasons.  In addition, the circumstances surrounding the announcement of the Rescission,

16  and subsequent actions by DHS, DOJ, and the White House, show that the Attorney General's

17  articulated reason for the Rescission—the supposed illegality of DACA—is pretextual:

18  •   The very same day as the Rescission, the President tweeted:  "Congress now has 6 months to
19      legalize DACA (something the Obama Administration was unable to do).  If they can't, I will
        revisit this issue!"[13]  But if the rationale for the Rescission were a genuine belief that DACA
20      was illegal, there would be no basis to "revisit this issue" and possibly reinstate an illegal
        policy.

21  •   DHS did not immediately terminate DACA.  Instead, it announced that it would continue
22      processing renewal applications for an additional month for benefits that expired between
        September 5, 2017 and March 5, 2018, and would recognize DACA grants already conferred,
23      leaving the program in place for at least an additional six months.  If DACA were illegal,
        DHS would have no basis to leave it in place for months and years.

24  •   On October 18, 2017, the Attorney General testified to Congress that DACA could be legal
25      under the *Texas* case if it were implemented "on an individualized basis."  *See Oversight of
        the U.S. Department of Justice: Hearing before the S. Comm. on the Judiciary*, 115th Cong.
26      (2017) (testimony of Jefferson B. Sessions, Att'y Gen. of the United States), available at

27  _____
    [13]     *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 8:38 PM),
28  https://twitter.com/realDonaldTrump/status/905228667336499200.

                                                    29

EXHIBIT 1
Page 42

https://www.judiciary.senate.gov/meetings/10/18/2017/oversight-of-the-us-department-of-justice.  If DACA "lacks statutory authority" and was "an unconstitutional exercise of authority by the Executive Branch," no manner of implementation by DHS could make it legal.

- The motion to dismiss filed by the government in *Batalla Vidal* makes no argument that DACA was effectuated without statutory authority or was an unconstitutional exercise of authority, but relies instead on the "litigation risk" justification.

- The Senior Counselor to the Acting Secretary of DHS, who *drafted* the Rescission, undercut the litigation risk justification when he testified that a policy of reacting to litigation threats would be the "craziest policy you could ever have" because "you could never do anything if you were always worried about being sued."  App. at 1928-26 (Hamilton Dep. 207:20-208:11).

- In their motion to dismiss in *Batalla Vidal*, defendants contend that the rescission of DACA is not reviewable under the APA and that the notice and comment requirement, 5 U.S.C. § 553, does not apply to the Rescission.  However, if defendants really believed that the *Texas* decision presented an unmanageable litigation risk, they also must believe that the *Texas* decision correctly held that a program like DACA is reviewable and that the notice-and-comment requirement applies.

These facts show that the decision to rescind DACA could not have been based on a good-faith belief that the program was unsupported by legislative authority, was an unconstitutional exercise of authority by the executive branch, or presented unmanageable litigation risk.  *Cf. Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004) (conflicting explanations may serve as evidence of pretext); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (same).

The true reason for the Rescission appears to have been revealed on October 8, 2017, when President Trump sent a letter to Congressional leaders setting forth the "Immigration Principles and Policies" that he said "must be included as part of any legislation addressing the status of [DACA] recipients."  App. at 1990-99.  The *New York Times* described the "Principles and Policies" as "a long list of hard-line immigration measures," including funding for a border wall.  App. at 2004.  This evidence, linking the Rescission to the administration's legislative strategy, suggests that the decision to rescind DACA was a cynical ploy to make DACA recipients a bargaining chip in order to secure support for harsh immigration legislation from members of Congress who support DACA recipients and would not otherwise support the administration's immigration agenda.  A complete administrative record and further discovery, if permitted by the court of appeals, will enable the parties to prove or disprove this

EXHIBIT 1
Page 43

1  point.[14]  But the current record of shifting explanations is enough evidence of pretext to warrant setting

2  aside the Rescission.  *See Pub. Citizen*, 653 F. Supp. at 1237 ("For an agency to say one thing . . . and do

3  another . . . is the essence of arbitrary action.  It indicates that the Secretary's stated reason may very

4  well be pretextual." (citation omitted)); *see also New England Coal. on Nuclear Pollution*, 727 F.2d at

5  1130–31 (agency action arbitrary and capricious where agency's stated reason does not line up with

6  action); *Squaw Transit Co.*, 574 F.2d at 496 (agency action is arbitrary and capricious where it "does not

7  apply the criteria it has announced as controlling").

8  **II.      The Rescission Should Be Vacated Because It Is a Substantive Rule That Did Not Comply
9             with the APA's Notice and Comment Requirements**

10         The Rescission also fails to meet the APA's procedural requirements.  The Rescission is a

11  categorical rule limiting the power of DHS to exercise discretion, and DHS was therefore required to

12  abide by the full panoply of APA procedures including notice and comment in order to promulgate it.  It

13  did not do so.

14         Under the APA, substantive rules must go through notice and comment rulemaking before they

15  become effective.  *San Diego Air Sports Ctr., Inc. v. F.A.A.*, 887 F.2d 966, 971 (9th Cir. 1989); *see also*

16  5 U.S.C. § 551(5) (defining "rule making" to include "repealing a rule").  A rule is substantive if it

17  "narrowly limits administrative discretion" or establishes a "binding norm" that "so fills out the statutory

18  scheme that upon application one need only determine whether a given case is within the rule's

19  criterion."  *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009) (internal

20  citation omitted).  The ultimate question in discerning between substantive rules and non-binding policy

21  statements "is the agency's intent to be bound."  *Municipality of Anchorage v. United States*, 980 F.2d

22  1320, 1325 (9th Cir. 1992) (internal citation omitted).

23         The Rescission is a substantive rule at least because it (1) binds DHS and limits its discretion,

24  and (2) bans DACA recipients from applying for and traveling on advance parole.

25

26

27  _____

[14]      Pretextuality is one of the forms of "bad faith or improper behavior" that warrants discovery

28  from agency decisionmakers.  *Overton Park*, 401 U.S. at 420.

31

EXHIBIT 1
Page 44

There can be no dispute that DHS intends to be bound by the Rescission, and that the Rescission limits the agency's discretion. *See Colwell*, 558 F.3d at 1124; *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) ("cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule").  The Rescission is a blanket prohibition that DHS and its agents must apply in all DACA cases.  As of September 5, 2017, DHS is flatly prohibited from accepting new DACA applications, and as of October 5, 2017, is flatly prohibited from issuing DACA renewals.  Unlike DACA, the Rescission makes no exceptions for case-by-case determinations. *See, e.g.*, AR 255 (stating that DHS will "reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters" set forth in the Rescission).[15]  By its terms, the Rescission thus ensures that new or renewed requests for deferred action will be categorically denied.  Such mandatory language evinces a substantive rule. *See Anchorage*, 980 F.2d 1324 (the "critical factor" in evaluating the substantive nature of an agency action is "the extent to which the challenged [action] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case" (internal citation omitted)); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 447 (D.C. Cir. 1989) (holding that agency order was a rule in part due to "mandatory language cabining DOT's enforcement discretion").  The Rescission's only reference to DHS's discretion is its discretion to *terminate*, not continue, grants of deferred action. *See* AR 255 (DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate").

The Rescission is similarly categorical and substantive in banning current DACA recipients from receiving advance parole based on their DACA eligibility. *See id.* (DHS "[w]ill not approve any new Form I-131 applications for advance parole under standards associated with the DACA program" and "[w]ill administratively close all pending Form I-131 applications" filed under DACA program).  The

---

[15]      While the face of the Rescission admits no exceptions, DHS's website states that it "will consider DACA requests received from residents of the U.S. Virgin Islands and Puerto Rico on a case-by-case basis."  App. at 1894-95  (McCament Dep. 189:15-190: 13, 192:18-22) (USCIS not considering whether to accept late applications from other geographic areas subject to natural disasters aside from Puerto Rico and U.S. Virgin Islands); App. at 2011-12 (Neufeld Dep. 113:2-114:18) (similar). *See also* https://www.uscis.gov/archive/i-821d.

32

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 45

1    ban on advance parole is a "binding norm," such that DHS officials "need only determine whether a

2    given case is within the [the Rescission]'s criterion"; i.e., whether an individual with DACA seeks

3    advance parole. *See Colwell*, 558 F.3d at 1124.

4        By creating a categorical rule barring DACA recipients from renewing their grants of deferred

5    action and precluding new potential DACA recipients from obtaining deferred action under DACA,

6    DHS promulgated a substantive rule without following the proper procedures including notice and

7    comment, *see* 5 U.S.C. § 553, and an assessment of effects on small entities, *see* 5 U.S.C. § 604(a). The

8    Rescission must therefore be set aside. *See Paulsen v. Daniels*, 413 F.3d 999, 1003-04 (9th Cir. 2005)

9    (concluding that Bureau of Prisons "plainly violated the APA" by promulgating a rule that barred

10    category of prisoners from relief without notice).

11        In this regard, it is irrelevant that the 2012 DACA Memorandum did not go through the notice-

12    and-comment process. DACA was an exercise of prosecutorial discretion and not required to go

13    through notice and comment. *See* 5 U.S.C. § 553(b)(A); *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993). By

14    contrast, the Rescission does not present itself as an exercise of DHS's discretion, and in fact prohibits

15    the exercise of discretion in the adjudication of applications for deferred action.

16        In addition, DHS's obligation to follow notice-and-comment procedures for the Rescission exists

17    whether or not DACA itself went through such procedures. *See* 5 U.S.C. § 551(5) (defining "rule

18    making" to include "repealing a rule"); *see also Consumer Energy Council of Am. v. FERC*, 673 F.2d

19    425, 448 (D.C. Cir. 1982) ("[T]he argument that repeal was required because the regulations were

20    defective does not explain why notice and comment could not be provided."); *id.* at 447 n.79 (allowing

21    repeal, without notice and comment, of a defective rule "would ignore the fact that the question whether

22    the regulations are indeed defective is one worthy of notice and an opportunity to comment"). As the

23    Ninth Circuit observed, "when the government seeks to repeal a regulation, it is generally not bound for

24    [notice-and-comment] purposes by the way it classified that regulation at the time of its promulgation."

25    *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1018 n.12 (9th Cir. 1987).

26        Under strikingly similar circumstances, the blanket rescission of a deferred action program has

27    been found to require notice and comment, even where the deferred action program itself was adopted

28    without such procedures. *See Parco*, 426 F. Supp. at 980–81 (holding that memorandum revoking

33

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 46

1  existing discretion of immigration officials to extend indefinitely the voluntary departure of certain

2  categories of immigrants must be subjected to notice and comment).  Because the rescission in *Parco*

3  left no discretion for agency officials considering requests for deferred action, it was "in reality a flat

4  rule of eligibility" requiring notice and comment.  *Id.* at 984-85 (distinguishing *Noel v. Chapman*, 508

5  F.2d 1023 (2d Cir. 1975), which considered a program providing the agency official "sole discretion"

6  over applications for departure extensions).

7         The Rescission illustrates why the notice-and-comment process is so important.  The record

8  developed through a proper procedure would have ensured that DHS did not "undo all that it

9  accomplished" through DACA "without giving all parties an opportunity to comment on the wisdom" of

10  that action.  *See Consumer Energy Council of Am.*, 673 F.2d at 446.  Had DHS considered the evidence

11  that would have been presented in the notice-and-comment process—such as the Rescission's

12  devastating effects on DACA recipients and their families and its broader consequences for employers,

13  educators, and the economy—the Rescission could not reasonably have been adopted.

14        **PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF**

15         The other preliminary injunction requirements are likewise satisfied because plaintiffs will suffer

16  irreparable harm without provisional relief, the balance of equities tips sharply in their favor, and

17  provisional relief is in the public interest.

18  **I.   Plaintiffs Face Irreparable Harm.**

19         The Rescission is already inflicting severe and irreparable harm on plaintiffs, as discussed above

20  and in the attached Appendix.  DACA recipients, including the individual plaintiffs and DACA-recipient

21  UC students, have already lost eligibility to travel using advance parole, in some cases with irreparable

22  consequences for their careers.  App. at 2210, Topic 23.  They are being forced right now to make

23  decisions with life-altering personal and professional consequences—such as whether to pursue or

24  continue professional educations and whether to forego the process for matching to a medical residency,

25  an opportunity virtually impossible to recover.  App. 2204-2206, 2209, Topics 9-12, 20.  The "loss of

26  opportunity to pursue one's chosen profession constitutes irreparable harm."  *Ariz. Dream Act Coalition*

27  *v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).  This irreparable injury is further "exacerbated by

28  Plaintiffs' young age and fragile economic status."  *Id.*

<center>34</center>

EXHIBIT 1
Page 47

1    The Rescission has caused serious emotional harm to the individual plaintiffs and DACA-

2  recipient university and community college students, who have lost the security of knowing they will be

3  able to live and work in the United States and are experiencing resulting anxiety, depression, and fear.

4  *See* App. at 2204-05, Topics 12-13; *see also* App. at 2202, Topic 8 (University of California has

5  observed increase in demand for mental health services, which it cannot fully meet).  These emotional

6  and psychological injuries constitute irreparable harm.  *See, e.g.*, *Chalk v. U.S. Dist. Court Cent. Dist. of*

7  *Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1193 (N.D. Cal.

8  2015).  Beyond the losses experienced by individual DACA recipients, the Rescission is harming their

9  affiliated institutions such as the University of California, and cities and states within which they reside

10  and work, causing imminent, irreparable harm to plaintiff States, plaintiff County of Santa Clara,

11  plaintiff City of San Jose, and plaintiff University of California.  *See, e.g.*, App. at 2205-07, Topics 14,

12  17.  As set forth above, DACA has resulted in the integration of hundreds of thousands of individuals

13  into the American social and economic fabric.  The decisions made over the next few months by DACA

14  recipients will have irreparable consequences for their communities and State and local governments,

15  including the immediate losses of valued students, employees, and community members, along with

16  erosion of the gains in economic output, public health, and safety that resulted from DACA.  In this

17  situation, "[a] delay, even if only a few months, pending trial represents precious, productive time

18  irretrievably lost."  *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir.

19  2011).

20  **II.    The Balance Of Equities and the Public Interest Weigh Heavily in Favor of Provisional**
         **Relief.**

21

22    The final two elements of the preliminary injunction test—the balance of the equities and the

23  public interest—merge when the government is a party.  *See League of Wilderness Defs./Blue*

24  *Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014)*.*  In assessing these

     factors, courts consider the impacts of the injunction on nonparties as well.  *See id.* at 766.

25

26    The balance of the equities and the public interest weigh overwhelmingly in favor of provisional

27  relief.  DACA recipients are integral contributors to their families, schools, employers, communities,

28  and the United States as a whole.  DACA permits recipients to earn a living in the United States, support

35

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 48

1    their families, and attend college.  *See, e.g.*, App at 2199-2200, Topic 2; *see also* App. at 2206-07, Topic

2    17; App. at 224-30 (Essig Decl. ¶¶ 8-10, 12-13); App. at 1347-48 (J. Smith Decl. ¶ 6); App. at 1505,

3    1515-16, 1518-19, 1520-21 (Wong Decl. ¶¶ 21, 43, 49, 55); App. at 2199-2200, 2206-07, Topics 2, 17;

4    *see also* App. at 1504, 1509 (Wong Decl. ¶¶ 20, 30).

5            Moreover, the harm of taking DACA away from nearly 700,000 current DACA recipients would

6    be a loss of $215 billion in U.S. GDP over the next ten years, App. at 73 (Brannon Decl. ¶ 11), and those

7    losses are beginning now as DACA recipients prepare for the possibility of deportation.  Enjoining the

8    rescission of the DACA program and allowing these individuals to continue contributing to their

9    communities and the country at large is in the public interest.

10           An injunction would also further public health and safety, which will suffer due to the

11   Rescission.  For example, as individuals lose DACA protection they may become less likely to interact

12   with law enforcement even if they are victimized or witness crimes.  *See* App. at 1342 (Smith Decl. ¶¶

13   7-8); App. at 1287-88 (Rosen Decl. ¶¶ 3, 5).  Without work authorization, DACA recipients will not be

14   able to continue filling crucial positions providing public services.  App. at 2209, Topic 18; *see also*

15   App. at 96 (Carrizales Decl. ¶¶ 9-10); App. at 790-91 (McLeod Decl. ¶ 6); App. at 1109 (Oh Decl. ¶ 6).

16   The Rescission also would cause many DACA recipients to lose health insurance, *see* App. at 716

17   (Lorenz Decl. ¶ 7); App. at 1310 (Santos Toledo Decl. ¶ 26); App. at 1324 (Sati Decl. ¶ 48); App. at

18   1448 (Tabares Decl. ¶ 14), and an increased uninsured population will burden emergency healthcare

19   services and reduce overall public health as people become reluctant to seek medical care due to lack of

20   insurance or fear of being reported to immigration authorities, *see* App. 2206, Topic 15; App. at 0177-78

21   (Cody Decl. ¶¶ 11-13); App. at 777, 0779 (Márquez Decl. ¶¶ 12, 17); App. at 0716 (Lorenz Decl. ¶¶ 6–

22   7).  The Rescission also will likely contribute to an increase in the number of children using government

23   child welfare services programs, *see* App. at 0779 (Márquez Decl. ¶ 18), and contribute to heightened

24   levels of stress and anxiety in children whose parents face uncertain immigration status, *see* App. at 814-

25   16 (F. Mendoza Decl. ¶¶ 4, 6-8); App. at 464-67 (Hainmueller Decl. ¶¶ 4-11).

26           The government will not face any harm if a preliminary injunction is granted.  There will be no

27   harm—and much benefit—to the United States if DHS continues to process new applications for DACA

28   status and renewal applications pending a final judgment.  Furthermore, the government has no interest

EXHIBIT 1
Page 49

1  in enforcing unlawful rules.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145  (9th Cir. 2013) ("[The

2  government] cannot suffer harm from an injunction that merely ends an unlawful practice."); *Arizona*

3  *Dream Act*, 855 F.3d at 978 ("[I]t is clear that it would not be equitable or in the public's interest to

4  allow the state to violate the requirements of federal law, especially when there are no adequate

5  remedies available." (quoting *Valle del Sol v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).  Moreover,

6  it is estimated that up to 200,000 individuals have had their DACA grants renewed since President

7  Trump took office.  App. at 2092 (CAP Study).  If the government believed DACA recipients presented

8  a serious harm to its interests, the administration would not have continued granting renewals for almost

9  nine months.

10        Accordingly, both the balance of the equities and the public interest favor provisional relief.

11                                    *        *        *

12        Plaintiffs have demonstrated a strong prospect of success on the merits, and have established

13  irreparable harm if the Rescission is permitted to proceed.  The balance of equities and the public

14  interest likewise point to a single conclusion: the Court should award provisional relief.

15

16                                    **CONCLUSION**

17        For the foregoing reasons, this Court should enjoin defendants from proceeding with the

18  Rescission and should award provisional relief directing the government to restore the DACA program

19  pending adjudication on the merits.

20

21

22

23

24

25

26

27

28

EXHIBIT 1
Page 50

1    Dated: November 1, 2017              Respectfully submitted,

2

3    COVINGTON & BURLING LLP         XAVIER BECERRA
                                                Attorney General of California

4    /s/ Jeffrey M. Davidson                MICHAEL L. NEWMAN
   Jeffrey M. Davidson (SBN 248620)      Supervising Deputy Attorney General

5    Alan Bersin (SBN 63874)
   One Front Street, 35th Floor

6    San Francisco, CA 94111-5356        /s/ James F. Zahradka II
   Telephone: (415) 591-6000           JAMES F. ZAHRADKA II (SBN 196822)

7    Facsimile: (415) 591-6091            Deputy Attorney General

8    Email: jdavidson@cov.com

9    Lanny A. Breuer (*pro hac vice*)       CHRISTINE CHUANG
                                          REBEKAH A. FRETZ

10   Mark H. Lynch (*pro hac vice*)        RONALD H. LEE
   Alexander A. Berengaut (*pro hac vice*)   KATHLEEN VERMAZEN RADEZ

11   Megan A. Crowley (*pro hac vice*)     SHUBHRA SHIVPURI
   Ashley Anguas Nyquist (*pro hac vice*)   1515 Clay Street, 20th Floor

12   Jonathan Y. Mincer (Bar No. 298795)   Oakland, CA 94612-0550
   Ivano M. Ventresca (*pro hac vice*)     Telephone: (510) 879-1247

13   COVINGTON & BURLING LLP
   One CityCenter                           *Attorneys for Plaintiff State of California*

14   850 Tenth Street, NW
   Washington, DC 20001-4956        JANET T. MILLS

15   Telephone: (202) 662-6000         Attorney General of Maine
   Facsimile: (202) 662-6291          SUSAN P. HERMAN (*pro hac vice*)

16   E-mail: lbreuer@cov.com, mlynch@cov.com,   Deputy Attorney General
   aberengaut@cov.com, mcrowley@cov.com,   6 State House Station

17   anyquist@cov.com, jmincer@cov.com,    Augusta, Maine 04333
   iventresca@cov.com                   Telephone: (207) 626-8814

18                                          Email: susan.herman@maine.gov

19   Mónica Ramírez Almadani (SBN 234893)   *Attorneys for Plaintiff State of Maine*

20   COVINGTON & BURLING LLP
   1999 Avenue of the Stars

21   Los Angeles, CA 90067-4643       BRIAN E. FROSH
   Telephone: (424) 332-4800         Attorney General of Maryland

22   Facsimile: (424) 332-4749          STEVEN M. SULLIVAN (*pro hac vice*)
   Email: mralmadani@cov.com        Solicitor General

23                                          200 Saint Paul Place, 20th Floor
   Erika Douglas (SBN 314531)        Baltimore, Maryland 21202

24   COVINGTON & BURLING LLP        Telephone: (410) 576-6325
   333 Twin Dolphin Drive, Suite 700     Email: ssullivan@oag.state.md.us

25   Redwood Shores, CA 94061-1418
   Telephone: (650) 632-4700         *Attorneys for Plaintiff State of Maryland*

26   Facsimile: (650) 632-4800

27   Email: edouglas@cov.com

28

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 51

Charles F. Robinson (SBN 113197)
Margaret Wu (Bar No. 184167)
Julia M. C. Friedlander (SBN 165767)
Sonya Sanchez (SBN 247541)
Norman Hamill (SBN 154272)
Harpreet Chahal (SBN 233268)
Michael Troncoso (SBN 221180)
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone: (510) 987-9800
Facsimile: (510) 987-9757
Email: charles.robinson@ucop.edu

*Attorneys for Plaintiffs The Regents of the
University of California and Janet Napolitano,
in her official capacity as President of the
University of California*

LORI SWANSON
Attorney General State of Minnesota
JULIANNA F. PASSE (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1136
Email: julianna.passe@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

GIBSON, DUNN & CRUTCHER LLP

/s/ Theodore J. Boutrous, Jr.

THEODORE J. BOUTROUS, JR., SBN 132099
tboutrous@gibsondunn.com
KATHERINE M. MARQUART, SBN 248043
kmarquart@gibsondunn.com
JESSE S. GABRIEL, SBN 263137
jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER, SBN 196046
edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

COTCHETT, PITRE & McCARTHY, LLP
OFFICE OF THE CITY ATTORNEY

/s/ Nancy L. Fineman

NANCY L. FINEMAN
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

RICHARD DOYLE (SBN 88625)
NORA FRIMANN (SBN 93249)
OFFICE OF THE CITY ATTORNEY
200 East Santa Clara Street, 16th Floor
San José, California 95113
Telephone: (408) 535-1900
Facsimile: (408) 998-3131
Email Address: cao.main@sanJoséca.gov

*Attorneys for Plaintiff City of San Jose*

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 52

PUBLIC COUNSEL
MARK D. ROSENBAUM, SBN 59940
mrosenbaum@publiccounsel.org
JUDY LONDON, SBN 149431
jlondon@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO, SBN 310852
lcortes@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

LAURENCE H. TRIBE, SBN 39441
larry@tribelaw.com Harvard Law School
*Affiliation for identification purposes only
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767

ERWIN CHEMERINSKY, *pro hac vice*
forthcoming
echemerinsky@law.berkeley.edu
University of California, Berkeley School of
Law
*Affiliation for identification purposes only
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

LEAH M. LITMAN, *pro hac vice*
forthcoming llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only
401 East Peltason Drive Irvine, CA 92697
Telephone: (949) 824-7722

*Attorneys for Plaintiffs DULCE GARCIA,
MIRIAM GONZALEZ AVILA, SAUL
JIMENEZ SUAREZ, VIRIDIANA CHABOLLA
MENDOZA, NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN*

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 53

1

2 /s/ James R. Williams     /s/ Eric P. Brown

3
 JAMES R. WILLIAMS, County Counsel  JONATHAN WEISSGLASS
4 GRETA S. HANSEN      jweissglass@altber.com
 LAURA S. TRICE       STACEY M. LEYTON
5 laura.trice@cco.sccgov.org    sleyton@altber.com
 MARCELO QUIÑONES     ERIC P. BROWN
6 marcelo.quinones@cco.sccgov.org  ebrown@altber.com
 OFFICE OF THE COUNTY COUNSEL ALTSHULER BERZON LLP
7 COUNTY OF SANTA CLARA   177 Post St., Suite 300
 70 West Hedding Street     San Francisco, CA 94108
8 East Wing, Ninth Floor     Telephone: (415) 421-7151
 San Jose, CA 95110-1770
9 Telephone: (408) 299-5900    *Attorneys for Plaintiffs COUNTY OF SANTA*
10 Facsimile: (408) 292-7240    *CLARA AND SERVICE EMPLOYEES*
             *INTERNATIONAL UNION LOCAL 521*
11
 *Attorneys for Plaintiff COUNTY OF SANTA*
12 *CLARA*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 54

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION**

I, Jeffrey M. Davidson, hereby attest, pursuant to Civil L.R. 5-1, that I have received authorization to electronically sign and file this document from each of the persons identified in the signature block.

Dated: November 1, 2017

/s/ Jeffrey M. Davidson
Jeffrey M. Davidson

*Counsel for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 55

**ADDENDUM A**

**HISTORY OF DEFERRED ACTION**

| | Program | Creation | Termination |
|---|---|---|---|
| 1 | 1956:  Parole of orphans adopted by U.S. citizens | Presidential statement | Act of Sept. 11, 1957, Pub. L. No. 85-316, § 4(d), 71 Stat. 639, 710 (1957) allowed paroled individuals to become lawful permanent residents |
| 2 | 1956:  Parole of Hungarian refugees after unsuccessful Hungarian revolution | Presidential statement | Act of July 25, 1958, Pub. L. No. 85-559, §2, 72 Stat. 419, 419-20 (1958) allowed paroled individuals to become lawful permanent residents |
| 3 | 1956:  Third Preference visa petitioners granted voluntary extended departure | INS Operating Instruction 242.10(a)(6)(i) | Notice and comment procedures. The INS originally attempted to terminate the program with a perfunctory explanation in a memo from the INS Associate Commissioner of Operations, but a district court held this violated the APA's notice and comment requirements. |
| 4 | 1961:  Cuban Refugee Program | Presidential letter | Memorandum of Understanding with Cuba in 1965 and passage of Cuban Adjustment Act |
| 5 | 1962:  Hong Kong Parole Program in response to famine in China | Presidential authorization of Attorney General's use of parole authority | Passage of Immigration and Nationality Act of 1965 |
| 6 | 1975:  Parole for Southeast Asian refugees | Presidential authorization of Attorney General's use of parole authority | Passage of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) |
| 7 | 1981:  Polish refugees granted extended voluntary departure | Extended voluntary departure | Reagan Administration ended program when relations improved with Poland; existing beneficiaries retained extended voluntary departure |
| 8 | 1987:  Family Fairness Program | INS Commissioner memo | Passage of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990) |
| 9 | 1990:  Expansion of Family Fairness Program | INS Commissioner memo | Passage of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990) |

1

EXHIBIT 1
Page 56

| 10 | <u>1990</u>: Certain Chinese nationals provided deferred enforced departure after Tiananmen Square protests | Executive Order 12711 | Program was time-limited at inception, terminating January 1, 1994 |
|---|---|---|---|
| 11 | <u>1997</u>: Petitioners for relief under Violence Against Women Act | INS Acting Executive Associate Commissioner memo | N/A – still in place |
| 12 | <u>2001</u>: Applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act | INS Acting Executive Associate Commissioner memo | Codified into regulations regarding T and U visa status |
| 13 | <u>2002</u>: Certain T visa applicants were provided deferred action | INS Executive Associate Commissioner memo | Promulgation of regulations codifying this policy, 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) |
| 14 | <u>2003</u>: Certain U visa applicants were provided deferred action | INS Associate Director of Operations memo | Promulgation of regulations codifying this policy, 8 C.F.R. § 214.14(d)(2) |
| 15 | <u>2005</u>: Foreign students affected by Hurricane Katrina were provided deferred action | USCIS Press Release | Program was time-limited from inception, terminating February 1, 2006 |
| 16 | <u>2007</u>: Certain Liberians were provided deferred enforced departure | Presidential memo | N/A – still in place |
| 17 | <u>2009</u>: Certain surviving spouses of U.S. citizens provided were deferred action | USCIS Acting Associate Director memo | Passage of Section 568(c) of the Department of Homeland Security Appropriations Act, Pub. L. No. 111-83, 123 Stat. 4142, 4186 (2009) |

2

EXHIBIT 1
Page 57

1   JEFFREY M. DAVIDSON (SBN 248620)
    ALAN BERSIN (SBN 63874)
2   COVINGTON & BURLING LLP
    One Front Street, 35th Floor
3   San Francisco, CA 94111-5356
    Telephone: (415) 591-6000
4   Facsimile: (415) 591-6091
    Email: jdavidson@cov.com,
5   abersin@cov.com
    *Attorneys for Plaintiffs The Regents of the*
6   *University of California and Janet Napolitano, in*
    *her official capacity as President of the*
7   *University of California*

8   THEODORE J. BOUTROUS, JR. (SBN 132099)
    ETHAN D. DETTMER (SBN 196046)
9   JESSE S. GABRIEL (SBN 263137)
    GIBSON, DUNN & CRUTCHER LLP
10  333 South Grand Avenue
    Los Angeles, CA 90071-3197
11  Telephone: (213) 229-7000
    Facsimile: (213) 229-7520
12  Email: tboutrous@gibsondunn.com,
    edettmer@gibsondunn.com,
13  jgabriel@gibsondunn.com
    *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14  *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
    *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15  *Latthivongskorn*

16  [*Additional Counsel Listed on Signature Page*]

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and*
*Service Employees International Union Local 521*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF** |

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 58

1   STATE OF CALIFORNIA, STATE OF          CASE NO. 17-CV-05235-WHA
    MAINE, STATE OF MARYLAND, and
2   STATE OF MINNESOTA,

3                 Plaintiffs,

4            v.

5   U.S. DEPARTMENT OF HOMELAND
    SECURITY, ELAINE DUKE, in her official
6   capacity as Acting Secretary of the Department
    of Homeland Security, and the UNITED
7   STATES OF AMERICA,

8            Defendants.

9   CITY OF SAN JOSE, a municipal corporation,   CASE NO. 17-CV-05329-WHA

10                Plaintiffs,

11           v.

12  DONALD J. TRUMP, President of the United
    States, in his official capacity, ELAINE C.
13  DUKE, in her official capacity, and the
    UNITED STATES OF AMERICA,
14
             Defendants.
15
16  DULCE GARCIA, MIRIAM GONZALEZ        CASE NO. 17-CV-05380-WHA
    AVILA, SAUL JIMENEZ SUAREZ,
17  VIRIDIANA CHABOLLA MENDOZA,
    NORMA RAMIREZ, and JIRAYUT
18  LATTHIVONGSKORN,

19                Plaintiffs,

20           v.

21  UNITED STATES OF AMERICA, DONALD
    J. TRUMP, in his official capacity as President
22  of the United States, U.S. DEPARTMENT OF
    HOMELAND SECURITY, and ELAINE
23  DUKE, in her official capacity as Acting
    Secretary of Homeland Security,
24
             Defendants.
25

26

27

28

_____
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 59

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | CASE NO. 17-CV-05813-WHA |

1
2
3                    Plaintiffs,
4               v.
5   DONALD J. TRUMP, in his official capacity
    as President of the United States, JEFFERSON
6   BEAUREGARD SESSIONS, in his official
    capacity as Attorney General of the United
7   States; ELAINE DUKE, in her official
    capacity as Acting Secretary of the Department
8   of Homeland Security; and U.S.
    DEPARTMENT OF HOMELAND
9   SECURITY,
10                    Defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 60

PLEASE TAKE NOTICE that Plaintiffs The Regents of the University of California,

Janet Napolitano, in her official capacity as President of the University of California, the States of

California, Maine, Maryland, and Minnesota, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez

Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, Jirayut Latthivongskorn, City of San Jose,

County of Santa Clara and Service Employees International Union Local 521 (collectively, "Plaintiffs")

hereby request, pursuant to Rule 201 of the Federal Rules of Evidence, that the Court take judicial notice

of the items described below in connection with Plaintiffs' Motion for Provisional Relief, filed

concurrently herewith.  Plaintiffs request judicial notice of the following documents attached as Exhibits

to the Declaration of Jesse Gabriel in Support of Plaintiffs' Motion for Provisional Relief:

1. Exhibit A: Memorandum from INS General Counsel Sam Bernsen to INS Commissioner titled "Legal Opinion Regarding Service Exercise of Prosecutorial Discretion," dated July 15, 1976, available at https://goo.gl/uXW6Sg.

2. Exhibit B: Statement by President Dwight Eisenhower Concerning the Entry Into the United States of Adopted Foreign-Born Orphans, dated October 26, 1956, available at https://goo.gl/VDfcgW.

3. Exhibit C: White House Statement Concerning the Admission of Additional Hungarian Refugees, dated December 1, 1956, available at https://goo.gl/D4DMuS.

4. Exhibit D: Letter from President John F. Kennedy to Secretary Abraham Ribicoff, dated January 27, 1961, available at https://goo.gl/Hnf1LL.

5. Exhibit E: USCIS publication titled "Refugee Timeline," last updated June 27, 2017, available at https://goo.gl/5fhA9y.

6. Exhibit F: "Legalization and Family Fairness – An Analysis" by Alan Nelson, dated October 26, 1987.

7. Exhibit G: Memorandum from INS Commissioner Gene McNary to Regional Commissioners titled "Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens," dated February 2, 1990, available at https://goo.gl/7wcLLy.

8. Exhibit I: Memorandum from Paul Virtue for the Acting Executive Associate Commissioner to Regional Directors, District Directors, Officers-in-Charge, and Service Center Directors, titled "Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues," dated May 6, 1997, available at https://goo.gl/QEp4kX.

9. Exhibit J: Memorandum from Stuart Anderson to Johnny N. Williams, titled "Deferred Action for Aliens with bona fide Applications for T Nonimmigrant Status," dated May 8, 2002, available at https://goo.gl/BUvRpU.

1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 61

10. Exhibit K: Memorandum from USCIS Associate Director of Operations William R. Yates to Director, Vermont Service Center, titled "Centralization for Interim Relief For U Nonimmigrant Status Applications," dated October 8, 2003, available at https://goo.gl/tBvYwN.

11. Exhibit L: USCIS publication titled "Victims of Human Trafficking & Other Crimes," last updated August 25, 2017, available at https://goo.gl/wwV6jF.

12. Exhibit M: USCIS Press Release titled "USCIS Announces Interim Relief For Foreign Students Adversely Impacted By Hurricane Katrina," dated November 25, 2005, available at https://goo.gl/rRmaHm.

13. Exhibit N: Memorandum from Donald Neufeld to USCIS Field Leadership, titled "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children," dated September 4, 2009, available at https://goo.gl/cAXvUR.

14. Exhibit O: Memorandum from Donald Neufeld to USCIS Executive Leadership, titled "Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children," dated December 2, 2009, available at https://goo.gl/T9dECx.

15. Exhibit Q: Remarks on Immigration Reform and an Exchange with Reporters by President Barack Obama, dated June 15, 2012, available at https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.

16. Exhibit R: Archived USCIS publication of Frequently Asked Questions regarding DACA, available at https://www.uscis.gov/archive/frequently-asked-questions.

17. Exhibit S: USCIS publication titled "F5—General information… How do I request consideration of deferred action for childhood arrivals?," dated October 2013, available at https://www.uscis.gov/sites/default/files/nativedocuments/daca.pdf.

18. Exhibit T: USCIS publication titled "(DACA) Toolkit," dated June 2014, https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/DACA_Toolkit_CP_072914.pdf.

19. Exhibit U: USCIS publication titled "Don't Let Your Work Permit Expire; Follow These DACA Renewal Tips," last updated June 5, 2015, https://www.uscis.gov/archive/dont-let-your-work-permit-expire-follow-these-daca-renewal-tips.

20. Exhibit V: USCIS Form I-821D, titled "Consideration of Deferred Action for Childhood Arrivals," dated January 9, 2017.

21. Exhibit W: Letter from Secretary Jeh Johnson to Congresswoman Judy Chu, dated December 30, 2016, available at https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.

22. Exhibit AA: Letter from Tennessee Attorney General Herbert H. Slatery III to Senators Lamar Alexander and Bob Corker, dated September 1, 2017, available at

2

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 62

http://static1.1.sqspcdn.com/static/f/373699/27673058/1504293882007/DACA%2Bletter%2B9-1-2017.pdf?token%3DstUlwSIo3qeVjBe7%252BUHbTCIuvts%253D.

23. Exhibit CC: Remarks on DACA, as prepared for delivery, by Attorney General Jefferson Sessions, dated September 5, 2017, available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

24. Exhibit DD: "Statement from Acting Secretary Duke on the Rescission of Deferred Action for Childhood Arrivals (DACA)," dated September 5, 2017, available at https://www.dhs.gov/news/2017/09/05/statement-acting-secretary-duke-rescission-deferred-action-childhood-arrivals-daca.

25. Exhibit KK: Transcript of the testimony of Attorney General Jefferson Sessions before the Senate Judiciary Committee, dated October 18, 2017.

26. Exhibit LL: White House publication titled "President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies," dated October 8, 2017, available at https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration.

27. Exhibit PP: Excerpts of the transcript of the testimony of Secretary Elaine Duke before the Senate Committee on Homeland Security and Government Affairs, dated September 27, 2017.

28. Exhibit QQ: Department of Homeland Security publication titled "Fact Sheet: Rescission Of Deferred Action For Childhood Arrivals (DACA)," dated September 5, 2017, available at https://www.dhs.gov/news/2017/09/05/fact-sheet-rescission-deferred-action-childhood-arrivals-daca.

29. Exhibit RR: USCIS publication titled "Consideration of Deferred Action for Childhood Arrivals: Guidance for Employers," dated November 20, 2012, available at https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/DACA-Fact-Sheet-I-9_Guidance-for-employers_nov20_2012.pdf.

30. Exhibit SS: Letter from ICE Director John Morton to All Employees titled "Secretary Napolitano's Memorandum Concerning the Exercise of Prosecutorial Discretion for Certain Removable Individuals Who Entered the United States as a Child," dated June 15, 2012, available at https://www.ice.gov/doclib/about/offices/ero/pdf/s1-certain-young-people-morton.pdf.

31. Exhibit TT: Social Security Administration publication titled "Social Security Number and Card—Deferred Action For Childhood Arrivals," available at https://www.ssa.gov/pubs/deferred_action.pdf.

32. Exhibit UU: USCIS Form G-1145, titled "e-Notification of Application/Petition Acceptance," available to download at https://www.uscis.gov/g-1145.

33. Exhibit VV: USCIS Form I-765, titled "Application for Employment Authorization," dated January 17, 2017, available to download at https://www.uscis.gov/i-765.

3

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 63

34. Exhibit WW: Letter from California Attorney General Xavier Becerra, et al., to President Donald J. Trump (July 21, 2017), available at https://oag.ca.gov/system/files/attachments/press_releases/7-21-17%20%20Letter%20from%20State%20AGs%20to%20President%20Trump%20re%20DACA.final_.pdf.

35. Exhibit YY: USCIS, "I-821D, Consideration of Deferred Action for Childhood Arrivals," last updated October 6, 2017, available at https://www.uscis.gov/archive/i-821d.

36. Exhibit ZZ: Memorandum for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* (Aug. 30, 2001), available at http://www.asistahelp.org/documents/resources/Policy_Memo__Cronin__83001_DFC4BA7F5E85D.pdf.

37. Exhibit AAA: USCIS, *DED Granted Country – Liberia*, available at https://www.uscis.gov/humanitarian/deferred-enforced-departure/ded-granted-country-liberia/ded-granted-country-liberia.

38. Exhibit BBB: Gerald R. Ford Presidential Library, *Emergency Program for Parole of Refugees from Vietnam* (Apr. 16, 1975), available at https://www.fordlibrarymuseum.gov/library/document/0164/19077062.pdf.

39. Exhibit CCC: Executive Order 12711, available at U.S. State Department, https://www.state.gov/documents/organization/28450.pdf.

A Court "must take judicial notice" of adjudicative facts "if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). The Court can judicially notice any "fact that is not subject to reasonable dispute because it: . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Exhibits A, F, G, I-K, N, O, QQ, and ZZ are all government memoranda—many of which are still publicly available on government websites—establishing or discussing the United States' immigration policies. Exhibit M is a government press release announcing a new deferred action program. Exhibits R-V, RR, UU, VV, WW, and YY are USCIS publications and forms. Exhibit SS is a letter from ICE Director John Morton available on the ICE website. Exhibit TT is a Social Security Administration publication. The Court may take judicial notice of such records and memoranda of government administrative bodies. *See Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) (taking judicial notice of USCIS interpretation guidance); *Lee v. City of Los Angeles*, 250 F.3d 668, 689-

4

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 64

1  90 (9th Cir. 2001) (a court may take judicial notice of undisputed matters of public record); *Cnty. of*

2  *Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 nn.5, 8, 11 (N.D. Cal. 2017) (taking judicial notice of

3  government memoranda and letters); *McCray v. Unite Here! Local 19*, No. 16-CV-01233-BLF, 2017

4  WL 567319, at *2 n.1 (N.D. Cal. Feb. 13, 2017) (collecting cases).

5      Exhibits E, L, and AAA are government websites that detail past and current policies

6  providing relief from immigration enforcement.  Exhibits B-D are public statements of President

7  Eisenhower and President Kennedy that are hosted on a website maintained by the University of

8  California, Santa Barbara, a public university.  Specifically, this website is of the American Presidency

9  Project, "the leading source of presidential documents on the internet."  *See* The American Presidency

10  Project, http://www.presidency.ucsb.edu/index.php.  Exhibit Q is a statement by President Obama on the

11  White House archived website.  Exhibit W is a letter from Secretary Jeh Johnson available on the House

12  of Representatives website.  Exhibit AA is a letter from Tennessee Attorney General Herbert H. Slatery

13  III available on the world wide web.  Exhibit CC is a prepared statement by Attorney General Jefferson

14  Sessions, available on the Department of Justice website.  Exhibit DD is a statement from Acting

15  Secretary Duke available on the DHS website.  Exhibit LL is a letter from President Trump found on the

16  White House website.  Exhibit BBB is a document posted on the website of the Gerald R. Ford

17  Presidential Library.  Exhibit CCC is an Executive Order posted on the U.S. State Department website.

18  Exhibit WW is a letter from California Attorney General Xavier Becerra available on the Office of the

19  Attorney General Website.

20      The Court may take notice of government documents and publications available on

21  websites.  As a general matter, "[i]t is not uncommon for courts to take judicial notice of factual

22  information found on the world wide web."  *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224

23  (10th Cir. 2007).  The Ninth Circuit has held that it is appropriate to take judicial notice of information

24  "made publicly available by government entities" on their websites.  *Daniels-Hall v. Nat'l Educ. Ass'n*,

25  629 F.3d 992, 998–99 (9th Cir. 2010).  *See also Lindsey v. United Airlines, Inc.*, No. C 17-00753, 2017

26  WL 2404911, at *6 (N.D. Cal. June 2, 2017) (Alsup, J.) (taking judicial notice of certificate of merger

27  because it "is a public document and its authenticity can be accurately and readily determined from the

28  Delaware Secretary of State website"); *Cnty. of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022,

5

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 65

1   1024 (N.D. Cal. 2005) (Alsup, J.) (taking judicial notice of a price-control regime described on a

2   Department of Health and Human Services website and a report by the same department).

3       Exhibits KK and PP are transcripts of congressional testimony.  In general,

4   "[l]egislative history is properly a subject of judicial notice."  *Anderson*, 673 F.3d at 1094 n.1.  This is

5   also true of testimony given at congressional hearings.  *See Adarand Constructors, Inc. v. Slater*, 228

6   F.3d 1147, 1168 n.12 (10th Cir. 2000) (taking "judicial notice of the content of hearings and testimony

7   before [] congressional committees and subcommittees"); *see also Cnty. of Santa Clara*, 250 F. Supp. 3d

8   at nn. 4, 6, 7, 10 (taking judicial notice of government officials' press conference statements, press

9   briefings, and interview statements).

10       Because the above documents satisfy the criteria of Rule 201(b) of the Federal Rules of

11   Evidence, the Court must take judicial notice of them pursuant to Rule 201(c)(2) of the Federal Rules of

12   Evidence.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos  17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 66

| | |
|---|---|
| Dated: November 1, 2017 | Respectfully submitted, |
| COVINGTON & BURLING LLP | XAVIER BECERRA |
| /s/ Jeffrey M. Davidson | Attorney General of California |
| Jeffrey M. Davidson (SBN 248620) | MICHAEL L. NEWMAN |
| Alan Bersin (SBN 63874) | Supervising Deputy Attorney General |
| One Front Street, 35th Floor | |
| San Francisco, CA 94111-5356 | /s/ James F. Zahradka II |
| Telephone: (415) 591-6000 | JAMES F. ZAHRADKA II |
| Facsimile: (415) 591-6091 | Deputy Attorney General |
| Email: jdavidson@cov.com | |
| | CHRISTINE CHUANG |
| Lanny A. Breuer (*pro hac vice*) | REBEKAH A. FRETZ |
| Mark H. Lynch (*pro hac vice*) | RONALD H. LEE |
| Alexander A. Berengaut (*pro hac vice*) | KATHLEEN VERMAZEN |
| Megan A. Crowley (*pro hac vice*) | RADEZ SHUBHRA SHIVPURI |
| Ashley Anguas Nyquist (*pro hac vice*) | 1515 Clay Street, 20th Floor |
| Jonathan Y. Mincer (Bar No. 298795) | P.O. Box 70550 |
| Ivano M. Ventresca (*pro hac vice*) | Oakland, CA 94612-0550 |
| COVINGTON & BURLING LLP | Telephone: (510) 879-1247 |
| One CityCenter | |
| 850 Tenth Street, NW | *Attorneys for Plaintiff State of California* |
| Washington, DC 20001-4956 | |
| Telephone: (202) 662-6000 | JANET T. MILLS |
| Facsimile: (202) 662-6291 | Attorney General of Maine |
| E-mail: lbreuer@cov.com, mlynch@cov.com, | SUSAN P. HERMAN (*pro hac vice*) |
| aberengaut@cov.com, mcrowley@cov.com, | Deputy Attorney General |
| anyquist@cov.com, jmincer@cov.com, | 6 State House Station |
| iventresca@cov.com | Augusta, Maine 04333 |
| | Telephone: (207) 626-8814 |
| Mónica Ramírez Almadani (SBN 234893) | Email: susan herman@maine.gov |
| COVINGTON & BURLING LLP | |
| 1999 Avenue of the Stars | *Attorneys for Plaintiff State of Maine* |
| Los Angeles, CA 90067-4643 | |
| Telephone: (424) 332-4800 | BRIAN E. FROSH |
| Facsimile: (424) 332-4749 | Attorney General of Maryland |
| Email: mralmadani@cov.com | STEVEN M. SULLIVAN (*pro hac vice*) |
| | Solicitor General |
| Erika Douglas (SBN 314531) | 200 Saint Paul Place, 20th Floor |
| COVINGTON & BURLING LLP | Baltimore, Maryland 21202 |
| 333 Twin Dolphin Drive, Suite 700 | Telephone: (410) 576-6325 |
| Redwood Shores, CA 94061-1418 | Email: ssullivan@oag.state.md.us |
| Telephone: (650) 632-4700 | *Attorneys for Plaintiff State of Maryland* |
| Facsimile: (650) 632-4800 | |
| Email: edouglas@cov.com | |
| | |
| Charles F. Robinson (SBN 113197) | |
| Margaret Wu (Bar No. 184167) | |
| Julia M. C. Friedlander (SBN 165767) | |
| Sonya Sanchez (SBN 247541) | |
| Norman Hamill (SBN 154272) | |
| Harpreet Chahal (SBN 233268) | |

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 67

| | |
|---|---|
| 1 | Michael Troncoso (SBN 221180) | LORI SWANSON |
| | University of California | Attorney General State of Minnesota |
| 2 | Office of the General Counsel | JULIANNA F. PASSE (*pro hac vice*) |
| | 1111 Franklin Street, 8th Floor | Assistant Attorney General |
| 3 | Oakland, CA 94607-5200 | 445 Minnesota Street, Suite 1100 |
| | Telephone: (510) 987-9800 | St. Paul, Minnesota 55101-2128 |
| 4 | Facsimile: (510) 987-9757 | Telephone: (651) 757-1136 |
| | Email: charles.robinson@ucop.edu | Email: julianna.passe@ag.state.mn.us |
| 5 | | |

1  Michael Troncoso (SBN 221180)
   University of California
2  Office of the General Counsel
   1111 Franklin Street, 8th Floor
3  Oakland, CA 94607-5200
   Telephone: (510) 987-9800
4  Facsimile: (510) 987-9757
   Email: charles.robinson@ucop.edu

   LORI SWANSON
   Attorney General State of Minnesota
   JULIANNA F. PASSE (*pro hac vice*)
   Assistant Attorney General
   445 Minnesota Street, Suite 1100
   St. Paul, Minnesota 55101-2128
   Telephone: (651) 757-1136
   Email: julianna.passe@ag.state.mn.us

5

6  *Attorneys for Plaintiffs THE REGENTS OF THE*        *Attorneys for Plaintiff State of Minnesota*
   *UNIVERSITY OF CALIFORNIA and JANET*
7  *NAPOLITANO, in her official capacity as President*
   *of the University of California*

8

9  GIBSON, DUNN & CRUTCHER LLP                COTCHETT, PITRE & McCARTHY, LLP
                                               OFFICE OF THE CITY ATTORNEY
10 /s/ Theodore J. Boutrous, Jr.               /s/ *Nancy L. Fineman*

11 THEODORE J. BOUTROUS, JR., SBN 132099       NANCY L. FINEMAN
   tboutrous@gibsondunn.com                    BRIAN DANITZ (SBN 247403)
12 KATHERINE M. MARQUART, SBN 248043           bdanitz@cpmlegal.com
   kmarquart@gibsondunn.com                    TAMARAH P. PREVOST (SBN 313422)
13 JESSE S. GABRIEL, SBN 263137                tprevost@cpmlegal.com
   jgabriel@gibsondunn.com                     San Francisco Airport Office Center
14 333 South Grand Avenue                      840 Malcolm Road, Suite 200
   Los Angeles, CA 90071-3197                  Burlingame, CA 94010
15 Telephone: (213) 229-7000                   Telephone: (650) 697-6000
   Facsimile: (213) 229-7520                   Facsimile: (650) 697-0577
16

17 ETHAN D. DETTMER, SBN 196046                RICHARD DOYLE (SBN 88625)
   edettmer@gibsondunn.com                     NORA FRIMANN (SBN 93249)
18 555 Mission Street                          OFFICE OF THE CITY ATTORNEY
   San Francisco, CA 94105                     200 East Santa Clara Street, 16th Floor
19 Telephone: (415) 393-8200                   San José, California 95113
   Facsimile: (415) 393-8306                   Telephone: (408) 535-1900
20                                             Facsimile: (408) 998-3131
   PUBLIC COUNSEL                              Email Address: cao.main@sanJoséca.gov
21 MARK D. ROSENBAUM, SBN 59940
   mrosenbaum@publiccounsel.org                *Attorneys for Plaintiff City of San Jose*
22 JUDY LONDON, SBN 149431
   jlondon@publiccounsel.org
23 610 South Ardmore Avenue
   Los Angeles, CA 90005
24 Telephone: (213) 385-2977
   Facsimile: (213) 385-9089
25

26 BARRERA LEGAL GROUP, PLLC
   LUIS CORTES ROMERO, SBN 310852
27 lcortes@barreralegal.com
   19309 68th Avenue South, Suite R102
28 Kent, WA 98032

---

8

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 68

1   Telephone: (253) 872-4730
    Facsimile: (253) 237-1591
2
    LAURENCE H. TRIBE, SBN 39441
3   larry@tribelaw.com Harvard Law School
    *Affiliation for identification purposes only
4   1575 Massachusetts Avenue
    Cambridge, MA 02138
5   Telephone: (617) 495-1767
6
    ERWIN CHEMERINSKY, *pro hac vice*
7   forthcoming
    echemerinsky@law.berkeley.edu
8   University of California, Berkeley School of Law
    *Affiliation for identification purposes only
9   215 Boalt Hall, Berkeley, CA 94720-7200
    Telephone: (510) 642-6483
10
    LEAH M. LITMAN, *pro hac vice*
11  forthcoming
    llitman@law.uci.edu
12  University of California, Irvine School of Law
    *Affiliation for identification purposes only
13  401 East Peltason Drive Irvine, CA 92697
    Telephone: (949) 824-7722
14
15  *Attorneys for Plaintiffs DULCE GARCIA,*
    *MIRIAM GONZALEZ AVILA, SAUL*
16  *JIMENEZ SUAREZ, VIRIDIANA CHABOLLA*
    *MENDOZA, NORMA RAMIREZ, and JIRAYUT*
17  *LATTHIVONGSKORN*
18
    /s/ James R. Williams                          /s/ Eric P. Brown
19
20  JAMES R. WILLIAMS, County Counsel             JONATHAN WEISSGLASS
    GRETA S. HANSEN                               jweissglass@altber.com
20  LAURA S. TRICE                                STACEY M. LEYTON
    laura.trice@cco.sccgov.org                    sleyton@altber.com
21  MARCELO QUIÑONES                              ERIC P. BROWN
22  marcelo.quinones@cco.sccgov.org               ebrown@altber.com
    OFFICE OF THE COUNTY COUNSEL                  ALTSHULER BERZON LLP
23  COUNTY OF SANTA CLARA                         177 Post St., Suite 300
    70 West Hedding Street                        San Francisco, CA 94108
24  East Wing, Ninth Floor                        Telephone: (415) 421-7151
    San Jose, CA 95110-1770
25  Telephone: (408) 299-5900                     *Attorneys for Plaintiffs COUNTY OF SANTA*
    Facsimile: (408) 292-7240                     *CLARA AND SERVICE EMPLOYEES*
26                                                *INTERNATIONAL UNION LOCAL 521*
27  *Attorneys for Plaintiff COUNTY OF SANTA CLARA*
28

---

9

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 69

1

2

3

4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

5

6

7

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO,
*in her official capacity as President of the
University of California*,

              Plaintiffs,

8

                v.

CASE NO. 17-CV-05211-WHA

9

10

11

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and ELAINE
DUKE, *in her official capacity as Acting
Secretary of the Department of Homeland
Security*,

**[PROPOSED] ORDER GRANTING
PLAINTIFFS' MOTION FOR
PROVISIONAL RELIEF**

12

              Defendants.

13

14

15

STATE OF CALIFORNIA, STATE OF
MAINE, STATE OF MARYLAND, and
STATE OF MINNESOTA,

CASE NO. 17-CV-05235-WHA

16

              Plaintiffs,

17

                v.

18

19

20

U.S. DEPARTMENT OF HOMELAND
SECURITY, ELAINE DUKE, *in her official
capacity as Acting Secretary of the Department
of Homeland Security*, and the UNITED
STATES OF AMERICA,

21

              Defendants.

22

CITY OF SAN JOSE, a municipal corporation,

CASE NO. 17-CV-05329-WHA

23

Plaintiff,

24

v.

25

26

27

DONALD J. TRUMP, President of the United
States, in his official capacity, ELAINE C.
DUKE, in her official capacity, and the
UNITED STATES OF AMERICA,

Defendants.

28

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

EXHIBIT 1
Page 70

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES OF AMERICA, DONALD J. TRUMP, *in his official capacity as President of the United State*s, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, *in her official capacity as Acting Secretary of Homeland Security*,<br><br>        Defendants. | CASE NO. 17-CV-05380-WHA |
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; JEFFERSON BEAUREGARD SESSIONS, *in his official capacity as Attorney General of the United States*; ELAINE DUKE, *in her official capacity as Acting Secretary of Homeland Security*; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>        Defendants. | CASE NO. 17-CV-05813-WHA |

EXHIBIT 1
Page 71

1        Having considered Plaintiffs' Motion For Provisional Relief, ECF No. ___ ("Plaintiffs'

2 Motion"), IT IS HEREBY ORDERED THAT:

3      1)  Plaintiffs have demonstrated that (a) they are likely to succeed on the merits of their

4          claim under the Administrative Procedure Act that the September 5, 2017 memorandum

5          rescinding the Deferred Action for Childhood Arrivals ("DACA") program ("the

6          Rescission") should be set aside, (b) the Rescission is causing and will cause irreparable

7          harm absent provisional relief, and (c) the balance of equities and the public interest

8          weigh heavily in favor of provisional relief in the form of returning to the status quo

9          existing prior to the Rescission.  Plaintiffs' Motion is therefore granted.

10     2)  Defendants are enjoined from implementing the Rescission, or any portion thereof.

11     3)  Defendants are directed to immediately return the administration of the DACA program

12         to the state of its existence prior to the Rescission, using the same means, methods and

13         policies for considering and granting deferred action requests and requests for advance

14         parole as were utilized before the Rescission, including without limitation:

15          a.  restoration of eligibility for initial requests for deferred action and associated

16             employment authorization;

17          b.  restoration of eligibility for renewals for deferred action and associated

18             employment authorization;

19          c.  restoration of eligibility for requests for advance parole; and

20          d.  restoration of its policies relating to the use of information provided by DACA

21             applicants and their employers.

22

23   **SO ORDERED**, this __ day of _____, 2017.

24

25                            _____

26                          Honorable William H. Alsup

                           United States District Judge

27

28

EXHIBIT 1
Page 72

# EXHIBIT 2

EXHIBIT 2
Page 73

No. 17-1351

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
————————————

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, *et al.*,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *et al.*,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Maryland (8:17-cv-00361-TDC)

————————————

**BRIEF AMICUS CURIAE OF VIRGINIA, MARYLAND, CALIFORNIA, CONNECTICUT, DELAWARE, ILLINOIS, IOWA, MAINE, MASSACHUSETTS, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF APPELLEES AND AFFIRMANCE**

MARK R. HERRING
 *Attorney General of Virginia*

STUART A. RAPHAEL
 *Solicitor General*

TREVOR S. COX
 *Deputy Solicitor General*

MATTHEW R. MCGUIRE
 *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240

April 19, 2017

BRIAN E. FROSH
 *Attorney General of Maryland*

STEVEN M. SULLIVAN
 *Solicitor General*

Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
(410) 576-6427

Additional counsel on signature page

EXHIBIT 2
Page 74

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS...........................................................................i

TABLE OF AUTHORITIES ...................................................................iii

INTERESTS OF AMICI..........................................................................1

ARGUMENT: THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
IN GRANTING THE PRELIMINARY INJUNCTION ..........................................4

I.   The district court did not abuse its discretion in finding that Plaintiffs
     are likely to prove that EO-2 violates the Establishment Clause. ..................5

     A.   A law is invalid when its predominant purpose is to
          disadvantage a particular religion. ........................................5

     B.   The evidence of President Trump's anti-Muslim animus was
          overwhelming and unrebutted. ..............................................8

     C.   The President's campaign statements are admissible. ........................16

     D.   Limiting the travel ban to six overwhelming Muslim countries
          does not cleanse the taint of religious animus....................................19

     E.   The President cannot be empowered by Congress to violate the
          Establishment Clause. ........................................................20

II.  The district court did not abuse its discretion in balancing the equities
     and determining that an injunction serves the public interest. .....................22

     A.   Defendants produced no evidence that the injunction would
          harm national security. ........................................................22

     B.   The injunction is necessary to prevent harm to States'
          proprietary interests...........................................................24

i

EXHIBIT 2
Page 75

C.      The injunction is necessary to prevent harm to States' quasi-
        sovereign and sovereign interests......................................................29

D.      Preventing constitutional violations serves the public interest. ..........31

CONCLUSION ..........................................................................................................32

CERTIFICATE OF SERVICE ..............................................................................35

ii

EXHIBIT 2
Page 76

## TABLE OF AUTHORITIES

Page

**CASES**

*Agostini v. Felton,*
    521 U.S. 203 (1997) ........................................................................21

*Alfred L. Snapp & Son., Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ................................................................. 29, 30

*Aziz v. Trump,*
    No. 1:17cv116, 2017 WL 465918 (E.D. Va. Feb. 3, 2017) .................................29

*Aziz v. Trump,*
    No. 1:17cv116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) ................... 1, 12, 20

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
    512 U.S. 687 (1994) .........................................................................7

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ......................................................................20

*California v. United States,*
    438 U.S. 645 (1978) ......................................................................17

*Centro Tepeyac v. Montgomery Cty.,*
    722 F.3d 184 (4th Cir. 2013) ................................................. 4, 16, 22, 31

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) .....................................................................6, 8

*Engel v. Vitale,*
    370 U.S. 421 (1962) ......................................................................30

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) .........................................................................6

*Everson v. Bd. of Educ.,*
    330 U.S. 1 (1947) .......................................................................2, 3

*Hawai'i v. Trump*,
  No. 1:17cv00050, 2017 WL 1011673 (D. Haw. Mar. 15, 2017),
  *reaffirmed*, 2017 WL 1167383 (D. Haw. Mar. 29, 2017) ....................... 1, 19, 24

*Hein v. Freedom From Religion Found., Inc.*,
  551 U.S. 587 (2007) ...................................................................................21

*INS v. Chadha*,
  462 U.S. 919 (1983) ............................................................................ 20, 21

*Kerry v. Din*,
  135 S. Ct. 2128 (2015) ...............................................................................22

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ...................................................................................22

*Korematsu v. United States*,
  323 U.S. 214 (1944) ...................................................................................23

*Korematsu v. United States*,
  584 F. Supp. 1406 (N.D. Cal. 1984) .........................................................24

*Larson v. Valente*,
  456 U.S. 228 (1982) .....................................................................................6

*McCreary Cty. v. ACLU*,
  545 U.S. 844 (2005) ........................................................... 7, 17, 18, 19

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
  722 F.3d 591 (4th Cir. 2013) .......................................................................4

*Nken v. Holder*,
  556 U.S. 418 (2009) .....................................................................................5

*Plessy v. Ferguson*,
  163 U.S. 537 (1896) ...................................................................................31

*Printz v. United States*,
  521 U.S. 898 (1997) ...................................................................................18

iv

EXHIBIT 2
Page 78

*Santa Fe Indep. Sch. Dist. v. Doe*,
    530 U.S. 290 (2000) ...................................................................6, 7

*Sarsour v. Trump*,
    No. 1:17cv00120, 2017 WL 1113305 (E.D. Va. Mar. 24, 2017) .......................16

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    135 S. Ct. 2507 (2015) ................................................................8

*Wallace v. Jaffree*,
    472 U.S. 38 (1985) ......................................................................7

*Washington v. Seattle Sch. Dist. No. 1*,
    458 U.S. 457 (1982) ..................................................................17

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................... 1, 12, 24

*Winter v. Nat'l Res. Defense Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................4, 22

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ..................................................................20

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .............................................................. passim

Cal. Const. art. I, § 4 ...............................................................3, 30

Cal. Const. art. I, §§ 7-8, 31 ...........................................................30

Cal. Const. art. I, § 31 ................................................................30

Conn. Const. art. I, § 3 .................................................................3

Conn. Const. art. VII ...................................................................3

Del. Const. art. I, § 1 ..................................................................3

Ill. Const. art. I, § 17 ................................................................30

Ill. Const. art. I, § 3 ...............................................................3, 30

v

EXHIBIT 2
Page 79

Iowa Const. art. I, § 3 ........................................................................................3

Mass. Const. art. II .............................................................................................3

Mass. Const. art. III ............................................................................................3

Md. Const. Decl. of Rts. art. 36 .........................................................................3

Me. Const. art. I, § 3 ..........................................................................................3

N.C. Const. art. I, § 13 .......................................................................................3

N.M. Const. art. II, § 11 .....................................................................................3

N.Y. Const. art. I, § 3 .........................................................................................3

Or. Const. art. I, §§ 2-3 ......................................................................................3

R.I. Const. art. I, § 3 ...........................................................................................3

Va. Const. art. I, § 16 .........................................................................................2

Vt. Const. ch. 1, art. 3 ........................................................................................3

Wash. Const. art. I, § 11 .....................................................................................3

**STATUTES**

8 U.S.C. § 1152(a) ............................................................................................20

12 William Waller Hening,
   *The Statutes at Large* 86 (1823) ..................................................................2

Cal. Civ. Code § 51, subd. (b) ..........................................................................30

Cal. Gov't Code §§ 11135-11137 .....................................................................30

Cal. Gov't Code §§ 12900-12996 .....................................................................30

Conn. Gen. Stat. § 46a-60 .................................................................................30

740 ILCS 23/5(a)(1) ..........................................................................................30

775 ILCS 5/1-102(A) ........................................................................................30

775 ILCS 5/10-104(A)(1) ..................................................................................30

vi

EXHIBIT 2
Page 80

5 Me. Rev. Stat. Ann. § 784 ..................................................................30

5 Me. Rev. Stat. Ann. §§ 4551-4634 ....................................................30

Md. Code Ann., State Gov't § 20-606 ...................................................30

Mass. Gen. L. ch. ch. 93, § 102 ............................................................30

Mass. Gen. L. ch. 151B, §§ 1, 4 ...........................................................30

Or. Rev. Stat. § 659A.006(1) ................................................................30

R.I. Gen. Laws § 28-5-7(1)(i) ...............................................................30

9 Vt. Stat. Ann. §§ 4500-07 ..................................................................30

21 Vt. Stat. Ann. § 495 .........................................................................30

## RULES

Fed. R. Evid. 401(a) ..............................................................................18

Fed. R. Evid. 402 ..................................................................................18

## TREATISES

Protecting the Nation From Foreign Terrorist Entry Into the United
   States, Executive Order 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017)........... passim

Protecting the Nation From Foreign Terrorist Entry Into the United
   States, Executive Order 13,780 (Mar. 6, 2017) .......................................... passim

## OTHER AUTHORITIES

Abha Bhattarai, *Even Canadians Are Skipping Trips to the U.S.
   After Trump Travel Ban*, Wash. Post (Apr. 14, 2017).........................................28

1 A.E. Dick Howard, *Commentaries on the Constitution of Virginia*
   (1974) ....................................................................................................2

Anna Maria Barry-Jester, *Trump's New Travel Ban Could Affect
   Doctors, Especially In The Rust Belt And Appalachia*,
   FiveThirtyEight (Mar. 6, 2017)............................................................29

EXHIBIT 2
Page 81

Azadeh Ansari, *FBI: Hate crimes spike, most sharply against Muslims*, CNN (Nov. 15, 2016) ............................................................31

Coll. Bd., *2016-17 Tuition and Fees at Public Four-Year Institutions*..................26

*Contributions of New Americans in Illinois*, New Am. Econ., 2, 10 (Aug. 2016) ........................................................................................28

Decl. of Eric Sherzer, *Hawai'I v. Trump*, No. 1:17cv00050, ECF No. 154-3 (D. Haw. Mar. 13, 2017).....................................................27

Decl. of Michael F. Collins, M.D., *Louhghalam v. Trump*, No. 1:17cv10154, ECF No. 52-2 (D. Mass. Feb. 2, 2017).........................................26

Decl. of Ross D. Lewin, *Hawai'i v. Trump*, No. 1:17cv00050, ECF No. 154-3 (D. Haw. Mar. 13, 2017)............................................. 26, 27

Derek Hawkins, *Worried about Trump's Travel Ban, Canada's Largest School District Calls Off U.S. Trips*, Wash. Post (Mar. 24, 2017)..........................................................................................27

Inst. of Int'l Educ., *Int'l Students* (2015-16)............................................25

James Madison, Memorial & Remonstrance Against Religious Assessments (June 20, 1785) ..................................................................2

Kathy Frankovic, *The Revised Travel Ban, an Issue of Religious Freedom or One of Party Identification*, YouGov (Mar. 21, 2017)...................31

Katie Reilly, *Read President Trump's Response to the Travel Ban Ruling: It 'Makes Us Look Weak,'* Time (Mar. 16, 2017)...................................14

Linda Givetash, *Girl Guides of Canada Cancels All Trips to U.S. Over Trump's Travel Ban*, Huffington Post (Mar. 13, 2017).............................27

Miles Bryan, *10 Prospective UIC Students Ineligible to Enroll Due to Travel Ban*, WBEZ (Mar. 6, 2017)..................................................25

Randy Capps and Karina Fortuny, *Integration of Immigrants in Maryland's Growing Economy*, Urban Inst. (Mar. 2008) ...................................28

Stephanie Saul, *Amid 'Trump Effect' Fear, 40% of Colleges See Dip in Foreign Applicants*, N.Y. Times (Mar. 16, 2017) ...........................................25

U.S. D.O.J., *Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases* (May 20, 2011)....................23

## INTERESTS OF AMICI

The Amici States urge this Court to affirm the district court's preliminary injunction barring enforcement of § 2(c) of Executive Order 13,780 (EO-2). Section 2(c) bans for at least 90 days the entry of citizens from six overwhelmingly Muslim countries. Like its now-rescinded predecessor, Executive Order 13,769 (EO-1), EO-2 was issued to implement as nearly as possible the Muslim-travel ban that President Trump promised as a candidate. Some of the Amici are litigating their own challenges to EO-1 and EO-2.[1] Others have filed amicus briefs supporting those efforts.[2] All are adversely affected by the ban.

Allowing the travel ban to take effect would cause irreparable harm. It would block entry by law-abiding students, teachers, workers, and tourists from the six majority-Muslim countries. It would harm our citizens, lawful permanent residents, and resident visa holders, many of whom have family members and loved ones who would be presumptively denied entry. And it would amplify the

---

[1] *See Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017); *Aziz v. Trump*, No. 1:17cv116, 2017 WL 580855, at *1 (E.D. Va. Feb. 13, 2017) (granting Virginia's preliminary-injunction motion against EO-1).

[2] N.Y. Amicus Br. (15 States and D.C.), *Washington*, ECF No. 58-2; Ill. Amicus Br. (13 States and D.C.), *Hawai'i v. Trump*, No. 1:17cv00050, 2017 WL 1011673 (D. Haw. Mar. 15, 2017), ECF No. 154-3; Ill. Amicus Br. (16 States and D.C.), *Aziz*, ECF No. 84.

1

EXHIBIT 2
Page 84

message of fear and intimidation communicated to our Muslim communities by a President who has promised to single out Muslims for disfavored treatment.

The Amici States have a unique perspective, not only because these injuries are being inflicted on our State institutions and residents, but also because our State constitutions prohibit the government from preferring one religion over another or punishing someone on account of their religious beliefs.  The section of Virginia's Constitution that protects religious freedom "brought together in one place Madison's and Jefferson's classic statements on religious liberty."[3]  The first sentence comes from Madison's Memorial and Remonstrance Against Religious Assessments, which recognized that religion "can be directed only by reason and conviction, not by force or violence," and must be left to the "conscience" of each person.[4]  The second sentence, from Jefferson's Bill for Religious Liberty, states that "no man … shall … suffer on account of his religious opinions … in matters of religion, and that the same shall in no wise diminish enlarge or affect their civil capacities."[5]  The Supreme Court has recognized that because "Madison and

---

[3] 1 A.E. Dick Howard, *Commentaries on the Constitution of Virginia* 292 (1974). *See also* Va. Const. art. I, § 16.

[4] Memorial & Remonstrance Against Religious Assessments ¶ 1, *reprinted in Everson v. Bd. of Educ*., 330 U.S. 1, 64 (1947) (appendix).

[5] An act for establishing religious freedom (ch. 34, 1785), 12 William Waller Hening, *The Statutes at Large* 86 (1823).

2

EXHIBIT 2
Page 85

Jefferson played such leading roles" in the "drafting and adoption" of the religion clause of the First Amendment, those provisions have the "same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute" for religious freedom.[6]  Today, the Amici States' constitutions *all* enshrine identical or similar protections.[7]

The Amici States urge the Court to affirm the preliminary injunction because (1) the district court correctly determined that Plaintiffs are likely to succeed in showing that § 2(c) has the purpose of excluding Muslims and therefore violates the Establishment Clause of the First Amendment; (2) the balance of hardship tilts decidedly in Plaintiffs' favor because Defendants failed to adduce any evidence that they would be harmed by temporarily preserving the status quo that existed before EO-2; and (3) the public interest—including the interests of the States and their residents—strongly favors enjoining an unconstitutional executive order that

---

[6] *Everson*, 330 U.S. at 13.  *See also id*. at 11-13 (describing drafting history); *id*. at 33 (Rutledge, J., dissenting) ("No provision of the Constitution is more closely tied to or given content by its generating history than the religious clause of the First Amendment."); *id*. at 33-40 (recounting that history).

[7] *See* Cal. Const. art. I, § 4; Conn. Const. art. I, § 3; *id*. art. VII; Del. Const. art. I, § 1; Ill. Const. art. I, § 3; Iowa Const. art. I, § 3; Me. Const. art. I, § 3; Md. Const. Decl. of Rts. art. 36; Mass. Const. arts. II, III; N.M. Const. art. II, § 11; N.Y. Const. art. I, § 3; N.C. Const. art. I, § 13; Or. Const. art. I, §§ 2-3; R.I. Const. art. I, § 3; Vt. Const. ch. 1, art. 3; Wash. Const. art. I, § 11.

3

EXHIBIT 2
Page 86

fulfills the President's campaign promise to block Muslims from entering the country.

## ARGUMENT:
## THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN GRANTING THE PRELIMINARY INJUNCTION

This Court "review[s] the district court's decision to grant a preliminary injunction for abuse of discretion, assessing its factual determinations for clear error and its legal conclusions de novo."[8]  The decision "will not be disturbed on appeal unless the record shows an abuse of that discretion, regardless of whether the appellate court would, in the first instance, have decided the matter differently."[9]  Whether to issue a preliminary injunction is guided by the four-factor test in *Winter v. Natural Resources Defense Council, Inc.*, under which the movant must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[10]

---

[8] *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (same).

[9] *Centro Tepeyac*, 722 F.3d at 188 (citation omitted).

[10] *Id.*  (quoting *Winter*, 555 U.S. 7, 20 (2008)).

4

EXHIBIT 2
Page 87

As for Defendants' request for a stay pending appeal of the preliminary injunction, they—not Plaintiffs—bear the burden of showing that a stay is warranted by the same four factors, the two "most critical" being Defendants' need to show that they are "likely to succeed on the merits" of their appeal and "will be irreparably injured absent a stay."[11]

## I.   The district court did not abuse its discretion in finding that Plaintiffs are likely to prove that EO-2 violates the Establishment Clause.

Because they did not deny the truth of Plaintiffs' evidence of religious animus, Defendants cannot show that the district court committed clear error or abused its discretion when evaluating Plaintiffs' evidence of an Establishment Clause violation.  Although Defendants urge this Court to ignore some of Plaintiffs' factual evidence, they do not dispute the *legal consequence* of a finding that President Trump acted with animus towards Muslims.[12]  Put simply, EO-2 violates the Establishment Clause if President Trump's primary purpose in issuing it was to keep his campaign promise to ban Muslims from entering the country.

### A.   A law is invalid when its predominant purpose is to disadvantage a particular religion.

The Establishment Clause of the First Amendment prohibits any "law

---

[11] *Nken v. Holder*, 556 U.S. 418, 433-34 (2009).

[12] *See, e.g.*, J.A.722:4-9.

respecting an establishment of religion, or prohibiting the free exercise thereof."[13]
Crucial to this case are three core Establishment Clause principles.

First, "the First Amendment forbids an official purpose to disapprove of a
particular religion."[14]  The Amendment imposes an "absolute" prohibition on the
government's adoption of "programs or practices … which 'aid or oppose' any
religion."[15]

Second, even where a challenged law is facially neutral, it violates the
Establishment Clause if it is enacted for a religious purpose.  "Official action that
targets religious conduct for distinctive treatment cannot be shielded by mere
compliance with the requirement of facial neutrality."[16]  Thus, in *Board of
Education of Kiryas Joel Village School District v. Grumet*, the Court invalidated a
state statute defining a facially neutral school-district boundary because the
legislative history showed that the district was drawn to benefit a particular

---

[13] U.S. Const. amend. I.

[14] *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532
(1993) (collecting cases).

[15] *Larson v. Valente*, 456 U.S. 228, 246 (1982) (quoting *Epperson v. Arkansas*, 393
U.S. 97, 106 (1968)).

[16] *Hialeah*, 508 U.S. at 534.  *See also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S.
290, 307 n.21 (2000) ("Even if the plain language … were facially neutral, the
Establishment Clause forbids a State to hide behind the application of formally
neutral criteria and remain studiously oblivious to the effects of its actions.")
(citation omitted).

EXHIBIT 2
Page 89

religious sect.[17]  The Court emphasized there that "our analysis does not end with the text of the statute at issue."[18]

Third, the Court made clear in *McCreary County v. ACLU* that the presence of a secular purpose will not save a law where the secular purpose is "*merely secondary* to a religious objective," such that the law was in fact enacted with "a *predominantly* religious purpose."[19]  "When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference.  But it is nonetheless the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one.'"[20]

To be sure, "[o]ne consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage."[21]  This "presents no incongruity, however, because purpose matters."[22]  Nor does the potential difficulty of discerning purpose insulate facially neutral actions from

---

[17] 512 U.S. 687, 699, 702 (1994).

[18] *Id.* at 699.

[19] 545 U.S. 844, 862, 864 (2005) (emphasis added).

[20] *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 75 (1985) (O'Connor, J., concurring in the judgment)).

[21] *McCreary*, 545 U.S. at 866 n.14.

[22] *Id.*

scrutiny. As Justice Alito recently noted, "[n]o one thinks that those who harm others because of protected characteristics should escape liability by conjuring up neutral excuses."[23] Indeed, "federal judges have decades of experience sniffing out pretext."[24]

These principles show that the district court's central legal ruling was correct: facially-neutral government action violates the Establishment Clause "[i]f a religious purpose for the government action is the predominant or primary purpose, and the secular purpose is 'secondary.'"[25] As the Acting U.S. Solicitor General has conceded, that predominant-purpose test applies here.[26]

### B.    The evidence of President Trump's anti-Muslim animus was overwhelming and unrebutted.

The district court did not abuse its discretion in concluding that Plaintiffs are likely to succeed in proving an Establishment Clause violation because the unrebutted evidence of the President's anti-Muslim animus is sufficient to discredit both EO-1 and EO-2. Then-candidate Trump labeled the immigration policy he announced while campaigning in December 2015 "Preventing Muslim

---

[23] *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2550 (2015) (Alito, J., dissenting) (citing *Hialeah*, 508 U.S. at 541-42).

[24] *Id*.

[25] J.A.795.

[26] J.A.722:4-9.

EXHIBIT 2
Page 91

Immigration."[27]  He urged "a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what the hell is going on."[28]  He insisted that "Islam hates us."[29]  He supported heavy surveillance of mosques and databases to track all Muslims.[30]  He repeatedly stated his belief that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country."[31]  And he justified his proposed Muslim ban by invoking the example of internment camps during World War II, saying that "what I am doing is no different than what FDR – FDR's solution for Germans, Italians, Japanese, you know, many years ago."[32]

On July 24, 2016, when asked whether his shift in focus from Muslims to Middle Eastern countries reflected a retreat from his proposed Muslim ban, Trump said,

> [I] actually don't think it's a rollback.  In fact, you could
> say it's an expansion.  I'm looking now at territories.
> People were so upset when I used the word Muslim.  Oh,
> you can't use the word Muslim.  Remember this.  And

---

[27] J.A.346.

[28] J.A.341.

[29] J.A.516.

[30] J.A.473.

[31] J.A.522.

[32] J.A.513.

Case 2:19-cv-10956-DMG-RAO   Document 24   Filed 01/24/20   Page 93 of 158   Page ID #:481
Appeal: 17-1351   Doc: 153      Filed: 04/19/2017    Pg: 20 of 45

I'm okay with that, because I'm talking territory instead
of Muslim.[33]

On December 21, 2016, after attacks in Germany and Turkey, Trump claimed that

he had been "proven to be right" and stated that "[y]ou know my plans."[34]

The President's anti-Muslim statements did not cease on January 20, 2017,

when he swore an oath to uphold the Constitution.  One week after taking office,

he claimed that Muslims had been given preferences for immigration over

Christians, which "was very, very unfair.  So we are going to help them."[35]  In

announcing EO-1 later that day, he read the title—"'Protection of the Nation from

Foreign Terrorist Entry into the United States'"—and added "We all know what

that means."[36]  It was no abuse of discretion to interpret that comment to refer

derogatorily to Muslims.[37]

Strong circumstantial evidence also corroborated that EO-1 was driven

predominantly by anti-Muslim animus, rather than genuine security concerns.  EO-

1 did not result from the usual process in which the Executive Branch develops

national-security policies based on "(1) specific, credible threats based on

--------

[33] J.A.481.

[34] J.A.506.

[35] J.A.462.

[36] J.A.403.

[37] J.A.797-98.

individualized information, (2) the best available intelligence and (3) thorough interagency legal and policy review."[38]  Instead, it was written by White House policy staff without vetting by the Department of Homeland Security, the State Department, the Department of Defense, or the National Security Council.[39]  Two days after its issuance, presidential advisor Rudolph Giuliani revealed that the President had sought his help to craft a Muslim ban that would withstand judicial scrutiny: "when [Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together.  Show me the right way to do it legally.'"[40]

The stated security justification for EO-1 also corroborated its discriminatory origins.  The order invoked the terrorist attacks of September 11 to justify a 90-day ban on entry by citizens of Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen.[41]  But *none* of the terrorists came from those countries, and the countries from which they actually hailed were not covered by the travel ban.[42]  Indeed, Defendants did not rebut the National Security Experts' declaration below

---

[38] J.A.666.

[39] J.A.384, 397.

[40] J.A.508.

[41] J.A.438.

[42] J.A.665 (National Security Experts' Declaration).

11

EXHIBIT 2
Page 94

that "[s]ince September 11, 2001, not a single terrorist attack in the United States

has been perpetrated by aliens from the countries named in the Order."[43]

On February 3, a federal district court judge in Washington State entered a

temporary restraining order against EO-1, which the Ninth Circuit declined to

stay.[44]  On February 13, Judge Brinkema of the Eastern District of Virginia issued

a preliminary injunction against enforcement of the travel ban in Virginia.[45]  Judge

Brinkema canvassed much of the same evidence described above and concluded

that Virginia had "produced unrebutted evidence supporting its position that it is

likely to succeed on an Establishment Clause claim."[46]  She noted that "[t]he

'Muslim ban' was a centerpiece of the president's campaign for months, and the

press release calling for it was still available on his website as of the day this

Memorandum Opinion is being entered."[47]

On February 16, the Government informed the Ninth Circuit that the

President intended "to rescind [EO-1] and replace it with a new, substantially

---

[43] *Id.*

[44] *Washington v. Trump*, No. 17cv141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) (Robart, J.), *stay denied*, 847 F.3d 1151 (9th Cir. 2017), *rehearing en banc denied*, 2017 WL 992527 (9th Cir. Mar. 15, 2017).

[45] *Aziz*, 2017 WL 580855, at *11.

[46] *Id.* at *8.

[47] *Id.*

EXHIBIT 2
Page 95

revised Executive Order to eliminate what the panel erroneously thought were constitutional concerns."[48]  But EO-2 was not issued until March 6.  Defendants did not dispute that part of the delay was to capitalize on positive publicity the White House perceived after the President's March 1 address to Congress.[49]  That delay further undermines the President's national-security justification.

That EO-2's scope is different from EO-1's does not eliminate the taint of its discriminatory origins.  EO-2 keeps the travel ban for six of the seven countries covered by EO-1, except that it now exempts citizens of those countries who are lawful permanent residents or resident visa holders in the United States on the order's effective date.  EO-2 states that this change is designed to save the government from "spending additional time pursuing litigation" by "exclud[ing] … aliens that have prompted judicial concerns."[50]  Because the drafters so readily deleted these provisions, it is a fair inference that the deleted provisions were never motivated or supported by valid security concerns.

Additional evidence also supported the district court's conclusion that Plaintiffs would likely succeed in proving that EO-2 was driven by the same

---

[48] Suppl. Br. on En Banc Consideration at 4, *Washington v. Trump*, No. 17-35105, ECF No. 154, http://cdn.ca9.uscourts.gov/datastore/general/2017/02/16/17-35105%20-%20Government%20supplemental%20brief.pdf.

[49] J.A.537.

[50] EO-2, § 1(i).

13

EXHIBIT 2
Page 96

religious animus as its predecessor.  Senior White House Policy Advisor Stephen Miller said that EO-2 would implement the "same basic policy outcome" as EO-1;[51] White House Press Secretary Sean Spicer said that the "principles of the [original] executive order remain the same";[52] and President Trump himself admitted that EO-2 was "a watered down version of the first one."[53]

Still more evidence bolsters the conclusion that the national-security concerns mentioned in EO-2 are pretextual.  EO-2 omits all references to the September 11 attacks—the stated justification for EO-1—but still describes each of the original seven nations as a "state sponsor of terrorism"[54] and lists general concerns about security in those countries.[55]  The "[r]ecent history" that EO-2 specifies, however, seriously undercuts Defendants' security claims:

- EO-2 cites two Iraqis convicted in 2013 of terrorism-related felonies, but the travel ban *exempts* Iraq altogether;[56]

---

[51] J.A.579.

[52] J.A.379.

[53] Katie Reilly, *Read President Trump's Response to the Travel Ban Ruling: It 'Makes Us Look Weak,'* Time (Mar. 16, 2017), http://time.com/4703622/president-trump-speech-transcript-travel-ban-ruling/.

[54] § 1(d).

[55] § 1(e)(i)-(vi).

[56] § 1(h).

- EO-2 cites the 2014 conviction of a naturalized *American* citizen who was brought to the United States as a "child" from Somalia (when he was one or two years old),[57] but EO-2 does not apply to naturalized Americans either; and

- EO-2 cites 300 persons under investigation who entered the United States as refugees, but without saying if they came from the banned countries[58]—something the White House declined to answer when pressed[59]—and without mentioning that 300 is a tiny fraction of the total number of annual terrorism assessments.[60]

The government has also never offered any national-security justification for resetting to zero the original 90-day travel ban imposed by EO-1. The ostensible purpose of the 90-day period was "to reduce investigative burdens to relevant agencies" as they conduct their internal review of procedures.[61] The Acting U.S. Solicitor General admitted below that the review process began upon issuance of EO-1.[62] Yet when EO-2 was issued more than seven weeks after EO-1, it started the 90-day period anew. Defendants do not say why. That reset strongly suggests that the President was simply seeking to fulfill his campaign promise to ban Muslims, for the same 90-day period he planned under EO-1.

---

[57] *Id.*; J.A.552-53.

[58] § 1(h).

[59] J.A.379.

[60] J.A.414 (identifying 11,667 assessments during four-month period from December 2008 through March 2009).

[61] EO-1, § 3(c); EO-2, § 2(c).

[62] J.A.728:10-18.

15

EXHIBIT 2
Page 98

In short, the district court did not abuse its discretion in concluding that the evidence "provide[s] a convincing case that the purpose of [EO-2] remains the realization of the long-envisioned Muslim ban."[63]  To be sure, another district court reached a different conclusion, finding the changes to EO-2 sufficient to purge the taint of religious animus behind EO-1.[64]  But the question here is not whether a different judge or even this Court "would, in the first instance, have decided the matter differently."[65]  Rather, this Court must sustain the preliminary injunction so long as it is within "the sound discretion of the trial court."[66]  The record confirms that Judge Chuang's assessment of the merits was amply supported by the unrebutted evidence before him.

C.     **The President's campaign statements are admissible.**

Defendants are wrong to insist that the Court must ignore the President's pre-inaugural promises to ban the entry of Muslims.  Even if the Court were to do so, the district court's decision was supported by ample post-inauguration evidence, including statements by Trump, Giuliani, Miller, and Spicer.  But Defendants' argument that the Court may not consider campaign statements is

---

[63] J.A.799.

[64] *Sarsour v. Trump*, No. 1:17cv00120, 2017 WL 1113305, at *12 (E.D. Va. Mar. 24, 2017) (Trenga, J.).

[65] *Centro Tepeyac*, 722 F.3d at 188 (citation omitted).

[66] *Id.* (citation omitted).

16

EXHIBIT 2
Page 99

meritless.  As in *McCreary*, Defendants are not entitled to have the Court "ignore perfectly probative evidence; they want an absentminded objective observer, not one presumed to be familiar with the history of the government's actions and competent to learn what history has to show."[67]  That approach "bucks common sense," for "reasonable observers have reasonable memories, and our precedents sensibly forbid an observer 'to turn a blind eye to the context in which [the] policy arose.'"[68]

Defendants also wrongly suggest that no precedent allows a court to determine official motive by examining the statements of a private citizen who is not yet a government actor.  In *Washington v. Seattle School District No. 1*, for instance, the Supreme Court found evidence of racial motive in the private proponents' campaign statements supporting an otherwise facially-neutral statewide initiative to restrict busing.[69]  Courts have looked to party platforms to discern the purpose of legislative enactments,[70] and they routinely consider the

---

[67] 545 U.S. at 866.

[68] *Id.* (citation omitted).

[69] 458 U.S. 457, 463, 471 (1982).

[70] *See, e.g.*, *California v. United States*, 438 U.S. 645, 663-64 (1978) (relying on statements in party platforms as evidence of Reclamation Act's intended purpose and meaning).

17

EXHIBIT 2
Page 100

private citizens' statements in *The Federalist* as "indicative of the original understanding of the Constitution."[71]  Our "common sense" likewise tells us that Trump's pre-election promise to ban Muslims is "perfectly probative evidence" of his motive.[72]

Though a fact finder might choose to give less evidentiary weight to a campaign statement compared to the official's words and deeds after taking office, that choice goes to the campaign statement's weight, not its admissibility. "Relevant evidence is admissible" unless prohibited by the Constitution, federal statute, or the rules of evidence.[73]  Defendants have identified no such barrier here. Evidence is "relevant if … it has any tendency to make a fact more or less probable than it would be without the evidence."[74]  The President's campaign promise to ban Muslim travel is admissible because it makes it more likely that the President *intended* to ban Muslim travel when he signed executive orders that have the effect of banning Muslim travel.

---

[71] *Printz v. United States*, 521 U.S. 898, 910 (1997).

[72] *McCreary*, 545 U.S. at 866.

[73] Fed. R. Evid. 402.

[74] Fed. R. Evid. 401(a).

EXHIBIT 2
Page 101

### D.   Limiting the travel ban to six overwhelming Muslim countries does not cleanse the taint of religious animus.

Contrary to Defendants' claims, EO-2 is not cleansed of its anti-Muslim animus because it applies only to six countries that account for just 10% of the world's Muslims.[75]  Defendants have given fair warning that "the travel ban may be expanded after the 90 days expire and that other countries could be added to the list."[76]  But even if the travel ban is not expanded, a plausible way to target Muslims is to pick countries like these six, which have "overwhelmingly Muslim populations that range from 90.7% to 99.8%."[77]  As the *Hawai'i* court found, it takes "no paradigmatic leap to conclude that targeting these countries likewise targets Islam."[78]  And that court was right to add that "[t]he illogic of the Government's contentions is palpable.  The notion that one can demonstrate animus toward any group of people only by targeting all of them at once is fundamentally flawed."[79]  The test under *McCreary* is whether EO-2 was issued for the predominant purpose of disadvantaging Muslims, not whether it succeeded

---

[75] Br. of Appellants at 44.

[76] J.A.377.

[77] *Hawai'i*, 2017 WL 1011673, at *12.

[78] *Id*.

[79] *Id*.

in harming *all* Muslims.  "It is a discriminatory purpose that matters, no matter how inefficient the execution."[80]

### E.     The President cannot be empowered by Congress to violate the Establishment Clause.

The President's statutory authority to restrict entry by aliens under 8 U.S.C. § 1152(a), though undoubtedly broad, cannot insulate him from this Establishment Clause challenge; quite simply, Congress cannot authorize the President to violate the Constitution.  As the Supreme Court made clear in *Zadvydas v. Davis*, Congress's "plenary power" over immigration "is subject to important constitutional limitations."[81]  For example, in *INS v. Chadha*, the Court held that Congress's plenary power over immigration did not enable it to ignore the Constitution's structural requirements of bicameralism and presentment.[82]  "The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty."[83]

---

[80] *Aziz*, 2017 WL 580855, at *9.

[81] 533 U.S. 678, 695 (2001).

[82] 462 U.S. 919, 945-46, 951 (1983).

[83] *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

20

EXHIBIT 2
Page 103

The Establishment Clause is another limitation on the exercise of federal power.[84]  Just as Congress cannot exercise its plenary power over immigration in a manner that violates the Constitution, Congress's delegation of its immigration authority to the President also cannot empower him to violate the Constitution. "[W]hat is challenged here is whether [the President] has chosen a constitutionally permissible means of implementing that power."[85]  Targeting Muslims on account of their religion plainly violates the Establishment Clause.

Defendants likewise misplace their reliance on the limited reviewability of consular decisions involving individual visa applicants.  Even in that narrow context, the Supreme Court has left open the availability of judicial review to "look behind" the officer's proffered reasons if the claimant makes "an affirmative showing of bad faith on the part of the consular officer" that is "alleged with

---

[84] *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 614 (2007) (plurality) (noting that a party with standing could challenge an executive agency's "bulk purchases of Stars of David, crucifixes, or depictions of the star and crescent for use in its offices or for distribution to the employees or the general public"); *id.* at 639-40 (Souter, J., dissenting) ("[N]o one has suggested that the Establishment Clause lacks applicability to executive uses of money."); *Agostini v. Felton*, 521 U.S. 203, 244 (1997) (Souter, J., dissenting) (describing the Establishment Clause as among the Constitution's "structural and libertarian guarantees").

[85] *Chadha*, 462 U.S. at 940-41.

EXHIBIT 2
Page 104

sufficient particularity."[86]  That standard would be satisfied if it applied here

because the evidence of the President's anti-Muslim animus is overwhelming.

## II.  The district court did not abuse its discretion in balancing the equities and determining that an injunction serves the public interest.

In addition to correctly finding that Plaintiffs are likely to succeed on their

constitutional claims, the district court did not abuse its discretion in its analysis of

the other *Winter* factors.  *See Centro Tepeyac*, 722 F.3d at 191 (permitting balance

of equities and public interest to be "jointly considered" and "deeming those

'factors established when there is a likely First Amendment violation'").  In light

of the evidence that an injunction poses no harm to national security—and the

absence of any contrary evidence in the record—the travel ban's demonstrable

inequity justifies an injunction to protect the public interest and prevent injury to

Plaintiffs and others throughout the Nation, including the Amici States.

### A.  Defendants produced no evidence that the injunction would harm national security.

The district court did not err in balancing the equities in Plaintiffs' favor

because Defendants introduced no evidence to rebut the declaration of Plaintiffs'

National Security Experts that maintaining the status quo pending litigation "would

---

[86] *Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring); *accord Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (requiring "facially legitimate *and bona fide* reason") (emphasis added).

EXHIBIT 2
Page 105

not jeopardize national security."[87]  So the district court acted well within its discretion in concluding that "Defendants … have not shown, or even asserted, that national security cannot be maintained without an unprecedented six-country travel ban, a measure that has not been deemed necessary at any other time in recent history."[88]

Defendants ask the Court to take the President's word that the Executive Order is needed to protect national security, and to ignore the abundant evidence that the Order was motivated by religious animus that eclipses any genuine national-security concern.  This is not the first time that a court has been asked to accept the Government's national-security justifications on blind faith in the face of serious constitutional problems.[89]  From this country's experience with internment camps for law-abiding Japanese Americans, President Trump inexplicably draws the conclusion that targeting Muslims is permissible.[90]  But the true lesson of *Korematsu* is that "the shield of military necessity and national

---

[87] J.A.667.

[88] J.A.809.

[89] *See Korematsu v. United States*, 323 U.S. 214 (1944); U.S. D.O.J., *Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases* (May 20, 2011), https://www.justice.gov/opa/blog/confession-error-solicitor-generals-mistakes-during-japanese-american-internment-cases.

[90] J.A.513.

EXHIBIT 2
Page 106

security must not be used to protect governmental actions from close scrutiny and accountability."[91]  It took 40 years to vacate Fred Korematsu's convictions based on "substantial support in the record that the government deliberately omitted relevant information and provided misleading information in papers before the court."[92]  History teaches that the President's claims should be entitled to appropriate respect, but not to unquestioning acceptance.

**B.     The injunction is necessary to prevent harm to States' proprietary interests.**

As other courts considering EO-1 and EO-2 have recognized, the travel ban "would substantially injure the States,"[93] among others, by causing State universities to "suffer monetary damages and intangible harms" and causing State treasuries to "suffer a loss of revenue."[94]

_Harm to State colleges and universities_.  The timing of the preliminary injunction coincides with the culmination of public universities' annual recruitment of students and faculty for the fall semester.  Even a temporary reinstatement of the travel ban would discourage international candidates in the six countries from

---

[91] _Korematsu v. United States_, 584 F. Supp. 1406, 1420 (N.D. Cal. 1984).

[92] _Id_.

[93] _Washington_, 847 F.3d at 1169 (addressing EO-1).

[94] _Hawai'i_, No. 1:17cv00050, 2017 WL 1011673 at *9 (addressing EO-2), _reaffirmed_, 2017 WL 1167383, at *4 (D. Haw. Mar. 29, 2017).

24

EXHIBIT 2
Page 107

accepting offers of admission or employment.  "Nearly 40 percent of colleges are reporting overall declines in applications from international students," with the "biggest decline" from the Middle East.[95]  Any reinstatement would materially reduce acceptances, because foreign students will choose schools in Canada or elsewhere for fear they will be denied entry to the United States.  For example, the ban would affect enrollment decisions of approximately half of all students newly admitted to University of Illinois at Chicago's civil engineering doctoral program.[96]

More than 15,000 students from the six countries attended U.S. colleges and universities during the 2015-16 academic year.[97]  Each prospective student deterred by the travel ban represents, on average, a loss of $24,930 in annual

---

[95] Stephanie Saul, *Amid 'Trump Effect' Fear, 40% of Colleges See Dip in Foreign Applicants*, N.Y. Times (Mar. 16, 2017), https://www.nytimes.com/2017/03/16/us/international-students-us-colleges-trump.html?_r=0.

[96] Miles Bryan, *10 Prospective UIC Students Ineligible to Enroll Due to Travel Ban*, WBEZ (Mar. 6, 2017), https://www.wbez.org/shows/wbez-news/10-prospective-uic-students-ineligible-to-enroll-due-to-travel-ban/d29224a4-fb11-4184-a8a9-f03fb45a3be1.

[97] Inst. of Int'l Educ., *Int'l Students* (2015-16), https://www.iie.org/Research-and-Insights/Open-Doors/Data/International-Students/All-Places-of-Origin/2015-16.

tuition and fees, plus revenue from student housing and living expenses.[98]  The

travel ban would also harm recruitment of faculty and researchers, many in

specialized fields.  For example, the University of Maryland relies on "more than

200 graduate students, post-doctoral fellows, and faculty from the six … countries"

to staff its science laboratories.[99]

    *Harm to State medical institutions*.  EO-2's travel ban threatens States'

public hospitals, which employ physicians and medical residents, research faculty,

and postdoctoral researchers from the designated countries.  Qualified individuals

from designated countries have accepted job offers from Amici States' hospitals,

but must await visa approval and are uncertain if or when they can start work.[100]

Moreover, uncertainty created by EO-1 and EO-2 has had "a profound chilling

effect" on international students' applications to State hospitals' residency

programs and interposes "a major disincentive for hospitals to select foreign

---

[98] Coll. Bd., *2016-17 Tuition and Fees at Public Four-Year Institutions*, https://trends.collegeboard.org/college-pricing/figures-tables/2016-17-state-tuition-and-fees-public-four-year-institutions-state-and-five-year-percentage.

[99] Decl. of Ross D. Lewin, *Hawai'i*, No. 1:17cv00050, ECF No. 154-3, Ex. F at 8 & n.6 (D. Haw. Mar. 13, 2017).

[100] *See, e.g.*, Decl. of Michael F. Collins, M.D., *Louhghalam v. Trump*, No. 1:17cv10154, ECF No. 52-2, ¶ 9 (D. Mass. Feb. 2, 2017).

26

EXHIBIT 2
Page 109

nationals for their residency programs."[101]   The consequent risks of understaffing medical facilities threaten grave harm to the States and their inhabitants.

   *Lost tax revenues*.  Even before its implementation, EO-2 has cost Amici States significant tax revenues.  Foreign students, tourists, and business visitors contribute to our State treasuries, not only by direct payments, such as tuition and fees, but also through tax receipts from businesses they patronize.  EO-2 blocks thousands of travelers from entering Amici States, thereby halting their tax contributions.

   The broader chilling effect on tourism will be much more extensive. Reports suggest a significant downturn in travel to the United States, both from the six countries and from other countries whose residents view the travel ban as an "unwelcome" sign.  For instance, EO-2 has prompted Canada's largest school district and one of its nationwide youth organizations to suspend U.S. travel.[102]   An

---

[101] Decl. of Eric Sherzer, *Hawai'i v. Trump*, No. 1:17cv00050, ECF No. 154-3, Ex. I, ¶ 15 (D. Haw. Mar. 13, 2017).

[102] Derek Hawkins, *Worried about Trump's Travel Ban, Canada's Largest School District Calls Off U.S. Trips*, Wash. Post (Mar. 24, 2017), https://www.washingtonpost.com/news/morning-mix/wp/2017/03/24/worried-about-trumps-travel-ban-canadas-largest-school-district-calls-off-u-s-trips/?utm_term=.c7d12d1b6019; Linda Givetash, *Girl Guides of Canada Cancels All Trips to U.S. Over Trump's Travel Ban*, Huffington Post (Mar. 13, 2017), http://www.huffingtonpost.ca/2017/03/13/girl-guides-of-canada-cancelling-u-s-trips-due-to-uncertain-entry-rules_n_15345468.html.

EXHIBIT 2
Page 110

estimated 4.3 million fewer people are expected to visit the United States this year, "resulting in $7.4 billion in lost revenue…. Next year, the fallout is expected to be even larger, with 6.3 million fewer tourists and $10.8 billion in losses."[103]

_Lasting harm to States' economies_.  The ban also threatens more profound long-term economic harm.  The ban's perceived bigotry threatens Amici States' ability to continue attracting and retaining foreign professionals, entrepreneurs, and companies that are veritable mainstays of our economies.  For example, foreign-born residents comprise 22.1% of entrepreneurs and 37.7% of the software developers in Illinois;[104] and at least 27% of scientists, 21% of health care practitioners, and 19% of mathematicians and computer specialists in Maryland.[105]

---

[103] Abha Bhattarai, _Even Canadians Are Skipping Trips to the U.S. After Trump Travel Ban_, Wash. Post (Apr. 14, 2017), https://www.washingtonpost.com/business/capitalbusiness/after-trumps-travel-ban-tourism-outfits-say-that-brand-usa-has-taken-a-hit/2017/04/14/d0eebf4e-158e-11e7-833c-503e1f6394c9_story.html.

[104] _See Contributions of New Americans in Illinois_, New Am. Econ., 2, 10 (Aug. 2016), http://www.newamericaneconomy.org/wp-content/uploads/2017/02/nae-il-report.pdf.

[105] Randy Capps and Karina Fortuny, _Integration of Immigrants in Maryland's Growing Economy_, Urban Inst. (Mar. 2008), http://www.urban.org/sites/default/files/publication/31521/411624-Integration-of-Immigrants-in-Maryland-s-Growing-Economy.pdf.

C.     **The injunction is necessary to prevent harm to States' quasi-sovereign and sovereign interests.**

Reinstating the travel ban would also cause serious injury to States' quasi-sovereign interests in protecting residents' '"health and well-being—both physical and economic'"—and '"securing residents from the harmful effects of discrimination."'[106]

_Harm to residents' medical care._  EO-2 will impair State residents' access to medical care, particularly in underserved communities.  According to the Immigrant Doctors Project, approximately 7,000 doctors in the United States attended medical schools in the six designated countries.[107]  These physicians, who "account for more than 14 million patient visits a year," are "more likely to work in underserved areas" and "practice in areas of medicine facing shortages, such as pediatrics and psychiatry ...."[108]  EO-2 casts doubt on visa renewals for many of

---

[106] _Aziz v. Trump_, No. 1:17cv116, 2017 WL 465918, at *5 (E.D. Va. Feb. 3, 2017) (quoting _Alfred L. Snapp & Son., Inc. v. Puerto Rico_, 458 U.S. 592, 607, 609 (1982)).

[107] _See_ https://immigrantdoctors.org/; Anna Maria Barry-Jester, _Trump's New Travel Ban Could Affect Doctors, Especially In The Rust Belt And Appalachia_, FiveThirtyEight (Mar. 6, 2017), https://fivethirtyeight.com/features/trumps-new-travel-ban-could-affect-doctors-especially-in-the-rust-belt-and-appalachia/.

[108] Barry-Jester, _supra_ note 107.

29

EXHIBIT 2
Page 112

these physicians and imposes a presumption that other physicians from the designated countries will be denied entry to the United States.

*Harm to States' enforcement of antidiscrimination laws.* EO-2 threatens to undermine Amici States' constitutional and statutory commitments to tolerance and diversity. Each State has an interest in "securing observance of the terms under which it participates in the federal system,"[109] including the Establishment Clause. "It was in large part to get completely away from … systematic religious persecution that the Founders brought into being our Nation," with an express "prohibition against any governmental establishment of religion" to protect religious beliefs from "the pressures of government for change each time a new political administration is elected to office."[110]

To safeguard our residents' rights, Amici States have adopted constitutions and other laws that protect against discrimination, including laws prohibiting our residents, businesses, and state and local governments from conditioning employment and other opportunities on national origin and religion.[111] EO-2

---

[109] *Snapp*, 458 U.S. at 607-08

[110] *Engel v. Vitale*, 370 U.S. 421, 433, 429-30 (1962).

[111] *See, e.g.*, Cal. Const. art. I, §§ 4, 7-8, 31; Cal. Gov't Code §§ 11135-11137, 12900-12996; Cal. Civ. Code § 51, subd. (b); Conn. Gen. Stat. § 46a-60; Ill. Const. art. I, §§ 3, 17; 740 ILCS 23/5(a)(1); 775 ILCS 5/1-102(A); 775 ILCS 5/10-104 (A)(1); 5 Me. Rev. Stat. Ann. §§ 784, 4551-4634; Mass. Gen. L. ch. 151B, §§ 1, 4; id. ch. 93, § 102; Md. Code Ann., State Gov't § 20-606; Or. Rev. Stat.

30

EXHIBIT 2
Page 113

offends these core expressions of State sovereignty and undermines the States' strong interest in discouraging messages of religious bias.

Indeed, it bears mentioning that this case is taking place at a time when anti-Muslim hate crimes are on the rise.[112]  In *Plessy v. Ferguson*, Justice Harlan condemned racial segregation because "the common government of all [should] not permit the seeds of race hate to be planted under the sanction of law."[113]  EO-1 and EO-2 similarly have planted the seeds of anti-Muslim hate under the sanction of Presidential proclamations, as recognized by a majority of the public, who perceive EO-2 as "meant to target Muslims."[114]

### D.   Preventing constitutional violations serves the public interest.

As this Court reaffirmed in its *en banc* decision in *Centro Tepeyac*, "'upholding constitutional rights surely serves the public interest'"; indeed, the government "'is in no way harmed by issuance of a preliminary injunction which

---

§ 659A.006(1); R.I. Gen. Laws § 28-5-7(1)(i); 9 Vt. Stat. Ann. §§ 4500-07; 21 Vt. Stat. Ann. § 495.

[112] Azadeh Ansari, *FBI: Hate crimes spike, most sharply against Muslims*, CNN (Nov. 15, 2016), http://www.cnn.com/2016/11/14/us/fbi-hate-crime-report-muslims/.

[113] 163 U.S. 537 (1896) (Harlan, J., dissenting).

[114] Kathy Frankovic, *The Revised Travel Ban, an Issue of Religious Freedom or One of Party Identification*, YouGov (Mar. 21, 2017), https://today.yougov.com/news/2017/03/21/revised-travel-ban-religion-and-party/.

EXHIBIT 2
Page 114

prevents [it] from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction.'"[115]

## CONCLUSION

Madison warned that when the government favors one religion over another, it changes our polity from one "offering an asylum to the persecuted and oppressed of every … Religion" to one that becomes "itself a signal of persecution."[116]  The unrebutted evidence below shows that EO-1 and EO-2 seek to fulfill the President's promise to ban Muslims from entering the country.  Accordingly, the district court did not abuse its discretion by enjoining the travel ban pending a trial on the merits.

Respectfully submitted,
THE STATES OF VIRGINIA,
MARYLAND, CALIFORNIA, CONNECTICUT,
DELAWARE, ILLINOIS, IOWA, MAINE,
MASSACHUSETTS, NEW MEXICO, NEW
YORK, NORTH CAROLINA, OREGON,
RHODE ISLAND, VERMONT, AND
WASHINGTON, AND THE DISTRICT OF
COLUMBIA

MARK R. HERRING
*Attorney General of Virginia*
202 North Ninth Street
Richmond, Virginia 23219

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202

---

[115] 722 F.3d at 191 (citation omitted).

[116] *Everson*, 330 U.S. at 68 (quoting Madison's Remonstrance, ¶ 9).

32

EXHIBIT 2
Page 115

XAVIER BECERRA
*Attorney General of California*
P.O. Box 944255
Sacramento, California  94244

GEORGE JEPSEN
*Attorney General of Connecticut*
55 Elm Street
Hartford, Connecticut  06106

MATTHEW P. DENN
*Attorney General of Delaware*
Carvel State Building, 6th Floor
820 North French Street
Wilmington, Delaware  19801

LISA MADIGAN
*Attorney General of Illinois*
100 West Randolph Street, 12th Floor
Chicago, Illinois  60601

TOM MILLER
*Attorney General of Iowa*
1305 E. Walnut Street
Des Moines, Iowa  50319

JANET T. MILLS
*Attorney General of Maine*
6 State House Station
Augusta, Maine  04333

MAURA HEALEY
*Attorney General of Massachusetts*
One Ashburton Place
Boston, Massachusetts  02108

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street, N.E.
Salem, Oregon  97301

ERIC T. SCHNEIDERMAN
*Attorney General of New York*
120 Broadway, 25th Fl.
New York, New York  10271

JOSH STEIN
*Attorney General of North Carolina*
9001 Mail Service Center
Raleigh, North Carolina  27699

PETER F. KILMARTIN
*Attorney General of Rhode Island*
150 S. Main Street
Providence, Rhode Island  02903

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
109 State Street
Montpelier, Vermont  05609

ROBERT W. FERGUSON
*Attorney General of Washington*
1125 Washington Street S.E.
P.O. Box 40100
Olympia, Washington  98504

KARL A. RACINE
*Attorney General for the District of
Columbia*
441 4th Street, N.W.
Washington, D.C. 20001

EXHIBIT 2
Page 116

HECTOR BALDERAS
*Attorney General of New Mexico*
408 Galisteo Street
Santa Fe, New Mexico  87501


By: _____/s/_____          By: _____/s/_____
STUART A. RAPHAEL                     STEVEN M. SULLIVAN
  *Solicitor General of Virginia*      *Solicitor General of Maryland*
TREVOR S. COX                         Office of the Attorney General
  *Deputy Solicitor General*           200 Saint Paul Place, 20th Floor
MATTHEW R. MCGUIRE                    Baltimore, Maryland  21202
  *Assistant Solicitor General*        ssullivan@oag.state.md.us
Office of the Attorney General         (410) 576-6427
202 North Ninth Street
Richmond, Virginia 23219
sraphael@oag.state.va.us
(804) 786-7240


## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P.

32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a

proportionally spaced font, and that it complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B), because it contains 6,487 words, excluding the parts

exempted by Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

/s/
_____
Stuart A. Raphael

**CERTIFICATE OF SERVICE**

I certify that on April 19, 2017, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.  In accordance with the Court's April 10, 2017 Order (Dkt. 108), sixteen (16) additional paper copies will be hand-delivered to the Court.

<div align="right">

/s/
_____
Stuart A. Raphael

</div>

# EXHIBIT 3

EXHIBIT 3
Page 119

1
2
3
4
5
6                        UNITED STATES DISTRICT COURT
7                      SOUTHERN DISTRICT OF CALIFORNIA
8

9   CALIFORNIA TRUCKING                    Case No.:  3:18-cv-02458-BEN-BLM
10  ASSOCIATION, et al.,
                                            **ORDER GRANTING TEMPORARY**
11                          Plaintiffs,     **RESTRAINING ORDER**
12  v.

13  ATTORNEY GENERAL XAVIER
    BECERRA, et al.,
14
                            Defendants,
15
    INTERNATIONAL BROTHERHOOD
16
    OF TEAMSTERS,
17
                     Intervenor-Defendant.
18

19

20       On December 24, 2019, Plaintiffs filed a motion for temporary restraining order,

21  seeking to enjoin Defendants from enforcing Assembly Bill 5 ("AB-5") as to any motor

22  carrier operating in California, pending this Court's resolution of Plaintiffs' motion for a

23  preliminary injunction, which is set for hearing on January 13, 2020.  Having considered

24  the parties' arguments set forth in Plaintiffs' supporting papers, as well as Defendants' and

25

26

27

28

                                    1

EXHIBIT 3
Page 120

1  Intervenor-Defendant's opposition papers, the Court finds that Plaintiffs' requested

2  temporary restraining order is warranted.[1]

3      As applied to the motor carrier context, AB-5, which takes effect on January 1, 2020,

4  provides a mandatory test for determining whether a person driving or hauling freight for

5  another contracting person or entity is an independent contractor or an employee for all

6  purposes under the California Labor Code, the Industrial Welfare Commission wage

7  orders, and the Unemployment Insurance Code.  *See* Cal. Labor Code § 2750.3(a)(1).

8  Under AB-5's test (the "ABC test"), an owner-operator is presumed to be an employee

9  *unless* the motor carrier establishes each of three requirements:

10

11      (A) The person is free from the control and direction of the hiring entity in
           connection with the performance of the work, both under the contract for
12          the performance of the work and in fact.

13      (B) The person performs work that is outside the usual course of the hiring
14          entity's business.

15      (C) The person is customarily engaged in an independently established trade,
16          occupation, or business of the same nature as that involved in the work
17          performed.

18  *Id.*  In support of their motion, Plaintiffs argue that Prong B is both expressly and impliedly

19  preempted by the Federal Aviation Administration Authorization Act of 1994

20  ("FAAAA").[2]  The FAAAA prohibits any state from "enact[ing] or enforc[ing] a law,

21  regulation, or other provision having the force and effect of law related to a price, route, or

22

23

24  _____

25      [1] The Office of the Los Angeles City Attorney's motion for leave to file an amicus
    brief opposing Plaintiffs' motion for temporary restraining order is **DENIED**.  Doc. 72.
26      [2] Plaintiffs also argue that AB-5 violates the Dormant Commerce Clause.  For
    purposes of this motion, only, because the Court is persuaded by the likelihood of
27  Plaintiffs' success on the FAAAA preemption ground, it declines to address Plaintiffs'
    alternative challenges to AB-5.
28

2

1   service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C.

2   § 14501(c)(1).

3         Pursuant to Federal Rule of Civil Procedure 65, the Court finds that a temporary

4   restraining order is warranted.  At this early stage of the proceedings and within the brief

5   amount of time available, Plaintiffs have carried their burden for purposes of emergency

6   relief to show (1) that they are likely to succeed on the merits, (2) likely to suffer irreparable

7   harm in the absence of relief, (3) that the balance of equities tips in their favor, and (4) that

8   their requested relief is in the public interest.  *See Winter v. Natural Resource Defense*

9   *Council*, 555 U.S. 7, 20 (2008).

10        Specifically, Plaintiffs have shown that AB-5's Prong B is likely preempted by the

11  FAAAA because AB-5 effectively mandates that motor carriers treat owner-operators as

12  employees, rather than as the independent contractors that they are.  In other words,

13  because contrary to Prong B, drivers perform work *within* "the usual course of the [motor

14  carrier] hiring entity's business," drivers will never be considered independent contractors

15  under California law.  *See also Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 964 (9th Cir. 2018)

16  (recognizing that "*American Trucking* stands for the obvious proposition that an 'all or

17  nothing' rule requiring services to be performed by certain types of employee drivers . . .

18  was likely preempted.") (citing *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

19  1046, 1053-56 (9th Cir. 2009)).

20        Further, Plaintiffs have established that imminent, irreparable harm is likely because

21  without significantly transforming their operations to treat independent contracting drivers

22  as employees for all specified purposes under California laws and regulations, they face

23  the risk of governmental enforcement actions, as well as criminal and civil penalties.  *See,*

24  *e.g.*, Cal. Unemp. Ins. Code § 2117; Cal. Labor Code § 1199.5; Cal. Labor Code §§ 226.6

25  and 226.8.  Moreover, the Court is persuaded that Plaintiffs have standing.  To bring a

26  claim in federal court requires that plaintiffs establish at an irreducible minimum an injury

27  in fact; that is, there must be some threatened or actual injury resulting from the putatively

28  illegal action.  *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988)

<div align="center">3</div>

<div align="right">3:18-cv-02458-BEN-BLM</div>

EXHIBIT 3
Page 122

1   (internal quotations and citations omitted).  The requirement is met here as the law is aimed

2   directly at Plaintiffs.  If their interpretation of the statute is correct, Plaintiffs will have to

3   risk criminal prosecution or take significant and costly compliance measures.  The State

4   has not suggested that the newly enacted law will not be enforced.  Indeed, as recently as

5   December 23, 2019, Defendants expressly declined to withhold enforcement of AB-5, even

6   for a short time.  Thus, Plaintiffs have alleged an actual and well-founded fear that the law

7   will be enforced against them.  This is sufficient for standing in a pre-enforcement

8   challenge.  *See id*.; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014)

9   (Petitioners in pre-enforcement challenge demonstrated an injury in fact sufficient for

10   Article III standing).

11        Finally, as to the remaining *Winter* factors, the Court finds the equities weigh in

12   favor of granting the requested temporary restraining order and that it is in the public

13   interest.  That is particularly so given that AB-5 provides an alternative should the ABC

14   test be struck down.  *See* Cal. Labor Code § 2750.3(a)(3) (mandating that should the ABC

15   test be struck down, the pre-AB-5 test will apply).  The Court finds that Plaintiffs lack any

16   other adequate legal remedy to preserve the status quo over the brief period of time before

17   the Court can address their preliminary injunction motion.  Accordingly, Plaintiffs' *ex*

18   *parte* motion for a temporary restraining order is **GRANTED**.  It is further **ORDERED**:

19        1.   Defendant Xavier Becerra, in his official capacity as the Attorney General of

20   the State of California, Julia A. Su, in her official capacity as the Secretary of the California

21   Labor and Workforce Development Agency, Andre Schoorl, in his official capacity as the

22   Acting Director of the Department of Industrial Relations of the State of California, Lilia

23   Garcia Brower, in her official capacity as the Labor Commissioner of the State of

24   California, and Patrick Henning, in his official capacity as Director of the California

25   Employment Development Department are temporarily enjoined from enforcing Assembly

26   Bill 5 ("AB-5") as to any motor carrier operating in California, pending this Court's

27   resolution of Plaintiffs' motion for a preliminary injunction.

28        2.   Because there is no realistic likelihood of harm to Defendants from

EXHIBIT 3
Page 123

1 | temporarily enjoining enforcement of AB-5, a security bond is not required.

2

3 | **IT IS SO ORDERED.**

4 | Date: December 31, 2019

_____

5 | HON. ROGER T. BENITEZ

United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3:18-cv-02458-BEN-BLM

EXHIBIT 3
Page 124

# EXHIBIT 4

EXHIBIT 4
Page 125

1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                  SOUTHERN DISTRICT OF CALIFORNIA
8

9   CALIFORNIA TRUCKING                  Case No.:  3:18-cv-02458-BEN-BLM
10  ASSOCIATION, et al.,
                                         **ORDER GRANTING**
11                          Plaintiffs,  **PRELIMINARY INJUNCTION**
12  v.
13  ATTORNEY GENERAL XAVIER
    BECERRA, et al.,
14                          Defendants,
15
16  INTERNATIONAL BROTHERHOOD
    OF TEAMSTERS,
17                  Intervenor-Defendant.
18

19      Plaintiffs California Trucking Association, Ravinder Singh, and Thomas Odom
20  move for a preliminary injunction.  Having carefully considered the parties' arguments, the
21  motion is **GRANTED**.

22                    **I.      BACKGROUND**
23      The following facts are taken from the Second Amended Complaint and the
24  declarations filed related to Plaintiffs' preliminary injunction motion.[1]  Plaintiff California
25
26  _____
27      [1] Plaintiffs and Intervenor filed various declarations and numerous evidentiary
    objections, Docs. 56, 74.  Notably, "a preliminary injunction is customarily granted on the
28  basis of procedures that are less formal and evidence that is less complete than in a trial on

                                    1
                                                    3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 126

1   Trucking Association ("CTA") is an association of licensed motor-carrier companies that
2   manage, coordinate, and schedule the movement of property throughout California.  Many
3   of CTA's motor-carrier members contract with owner-operators as independent
4   contractors.  Plaintiff Ravinder Singh is one example.  He owns and operates his own truck,
5   and he contracts as an independent contractor with different motor carriers and brokers in
6   California to perform various trucking services.  Plaintiff Thomas Odom also owns and
7   operates his own truck.  He contracts as an independent contractor with a national motor
8   carrier to haul property within California and between California and Texas.

9        For decades, the trucking industry has used an owner-operator model to provide the
10  transportation of property in interstate commerce.  That model generally involves a
11  licensed motor carrier contracting with an independent contractor driver to transport the
12  carrier-customer's property.  The volume of trucking services needed within different
13  industries can vary over time based on numerous factors.  For example, in the agriculture
14  industry, demand for trucking services varies depending on the time of year, the price at
15  which the produce can be sold, the available markets, the length of the growing season,
16  and the size of the crop, which itself varies based on temperature, rainfall, and other factors.
17  Motor carriers offer many types of trucking services, including conventional trucking, the
18  transport of hazardous materials, refrigerated transportation, flatbed conveyance,
19  intermodal container transport, long-haul shipping, movement of oversized loads, and
20  more.  Motor carriers meet the fluctuating demand for highly varied services by relying
21  upon independent-contractor drivers.

22
23  _____
24

25  the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Thus, "the Federal
26  Rules of Evidence do not strictly apply to preliminary injunction proceedings."  *Disney Entertainment, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd.*
27  869 F.3d 848 (9th Cir. 2017).  Moreover, evidentiary issues at this stage properly go to
28  weight rather than admissibility, *see id.* at 966, and the Court can easily assess the weight of the evidence without the parties' arguments.

3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 127

1    Individual owner-operators use a business model common in both California and
2    across the country.  They typically buy or lease their own trucks, a significant personal
3    investment considering that the record reflects a single truck can cost in excess of
4    $100,000.  *See, e.g.*, Doc. 54-2 at 5.  Then, the owner-operators typically work for
5    themselves for some time to build up their experience and reputation in the industry.  Once
6    the owner-operator is ready to expand their business, they contract for or bid on jobs that
7    require more than one truck, at which time, the owner-operator will subcontract with one
8    or more other owner-operators to complete the job.  Many individual owner-operators have
9    invested in specialized equipment and have obtained the skills to operate that equipment
10   efficiently.

11   Whether certain laws and regulations in the California Labor Code apply to truck
12   drivers, generally, depends on their status as employees or independent contractors.  *S.G.*
13   *Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).  For nearly
14   three decades, California courts have used a test, based on the *Borello* decision, to
15   determine whether workers are correctly classified as employees or independent
16   contractors.  *See id.* at 341.  The *Borello* standard considers the "right to control work," as
17   well as many other factors, including (a) whether the worker is engaged in a distinct
18   occupation or business, (b) the amount of supervision required, (c) the skill required, (d)
19   whether the worker supplies the tools required, (e) the length of time for which services
20   are to be performed, (f) the method of payment, (g) whether the work is part of the regular
21   business of the principal, and (h) whether the parties believe they are creating an employer-
22   employee relationship.  *Id.* at 355.  In April of 2018, the California Supreme Court replaced
23   the *Borello* classification test for Wage Order No. 9 with the "ABC test."  *Dynamex*
24   *Operations West v. Superior Court*, 4 Cal. 5th 903 (2018).

25   California's Assembly-Bill 5 ("AB-5") codified the ABC test adopted in *Dynamex*
26   and expanded its reach to contexts beyond Wage Order No. 9, including workers'
27   compensation, unemployment insurance, and disability insurance.  As applied to the motor
28   carrier context, AB-5 provides a mandatory test for determining whether a person driving

<div align="center">3</div>

or hauling freight for another contracting person or entity is an independent contractor or an employee for all purposes under the California Labor Code, the Industrial Welfare Commission wage orders, and the Unemployment Insurance Code. *See* Cal. Labor Code § 2750.3(a)(1). Under AB-5's ABC test, an owner-operator is presumed to be an employee *unless* the motor carrier establishes each of three requirements:

> (A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.
>
> (B) The person performs work that is outside the usual course of the hiring entity's business.
>
> (C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

AB-5 also includes certain exceptions that were not part of the *Dynamex* test, including an exception for "business-to-business contracting relationship[s]."[2] *Id.* at § 2750.3(a)(1)(e). The statute additionally provides that "[i]f a court of law rules that the three-part [ABC] test . . . cannot be applied to a particular context" due, for example, to federal preemption, "then the determination of employee or independent contractor status in that context shall instead be governed by [*Borello*]." *Id.* at § 2750.3(a)(1)(3).

On September 18, 2019, California Governor Gavin Newsom signed AB-5 into law. AB-5 went into effect on January 1, 2020. On December 2, 2019, Plaintiffs filed their motion for a preliminary injunction with a hearing set for December 30, 2019. When the Court continued the hearing to January 13, 2020, Plaintiffs filed a motion for a temporary restraining order on December 24, 2019. After considering the parties' arguments in their

---

[2] The statute identifies numerous exempted occupations to which *Borello*, rather than the ABC test, will continue to apply. The exempted occupations include doctors, lawyers, accountants, investment advisers, commercial fishermen, and others. *See* Cal. Labor Code § 2750.3(b)(1)-(6). Motor carriers are not exempted.

EXHIBIT 4
Page 129

briefing, the Court granted the temporary restraining order and enjoined Defendants from enforcing AB-5 as to any motor carrier operating in California until this Court's resolution of Plaintiffs' motion for a preliminary injunction.  On January 13, 2020, the Court heard argument on Plaintiffs' motion for a preliminary injunction.  At the hearing, the Court extended the temporary restraining order until the date of the Court's decision on Plaintiffs' motion.  For the following reasons, the Court finds a preliminary injunction is warranted.

## II.   DISCUSSION

In support of their motion for preliminary injunction, Plaintiffs argue they are highly likely to show AB-5 is preempted by the FAAAA and by the Dormant Commerce Clause. According to Plaintiffs, unless the Court enjoins Defendants from enforcing AB-5, its members will suffer irreparable injury, including constitutional injuries, as well as enforcement actions imposing civil and criminal penalties.  The State Defendants oppose, contending that Plaintiffs are unlikely to succeed on the merits of their claims, that Plaintiffs' delay in seeking injunctive relief undermines their claim of irreparable injury, and that the public interest weighs in the State Defendants' favor.  Intervenor-Defendant International Brotherhood of Teamsters opposes on the same grounds as the State Defendants but with the additional contention that Plaintiffs CTA and Odom lack standing.[3]  Accordingly, as a threshold matter, the Court first addresses Plaintiffs' standing and then the four elements required for a preliminary injunction.

### A. Article III Standing

"One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue." *Trump v. Hawaii*, 138 S.Ct. 2392, 2416 (2018).  To demonstrate Article III standing, a plaintiff must show a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547-48 (2016).  "At least one plaintiff

---

[3] Throughout this Order, the Court refers to the State Defendants and Intervenor-Defendant collectively as "Defendants."

5

EXHIBIT 4
Page 130

1   must have standing to seek each form of relief requested, and that party bears the burden
2   of establishing the elements of standing with the manner and degree of evidence required
3   at the successive stages of the litigation." *City & Cty. of San Francisco v. U.S. Dept. of*
4   *Homeland Security*, 944 F.3d 773, 786-87 (9th Cir. 2019) (internal quotation marks and
5   citations omitted).  "At this very preliminary stage, plaintiffs may rely on the allegations
6   in their Complaint and whatever other evidence they submitted in support of their
7   preliminary-injunction motion to meet their burden." *Id.* at 787.

8        Intervenor attacks Plaintiffs' standing on three grounds, none of which have merit.
9   First, Intervenor argues that Plaintiffs lack standing because they do not establish the ABC
10   test *will* be used against them, and thus, they do not establish the requisite actual or
11   imminent injury.  For the same reasons discussed in the Court's Order granting Plaintiffs'
12   temporary restraining order, the Court disagrees.  Plaintiffs have satisfied the imminent
13   injury requirement where, assuming their interpretation of AB-5 is correct, they face the
14   choice of either implementing significant, costly compliance measures or risking criminal
15   and civil prosecution. *See, e.g.*, Cal. Unemp. Ins. Code § 2117; Cal. Labor Code § 1199.5;
16   Cal. Labor Code §§ 226.6 and 226.8.  Indeed, as recently as December 23, 2019,
17   Defendants expressly declined to withhold enforcement of AB-5, even for a short time.
18   That is sufficient for standing in a pre-enforcement challenge. *See, e.g., Susan B. Anthony*
19   *List v. Driehaus*, 573 U.S. 149, 168 (2014) (finding petitioners in pre-enforcement
20   challenge demonstrated an injury-in-fact sufficient for Article III standing); *see also id.* at
21   158 ("When an individual is subject to [the threatened enforcement of a law], an actual
22   arrest, prosecution, or other enforcement action is not a prerequisite to challenging the
23   law.").

24        Next, Intervenor contends that to show a concrete injury, CTA must definitively
25   show that some of its members' drivers would be classified as independent contractors
26   under the pre-AB-5 *Borello* classification test.  The Court is not persuaded that such proof
27   is required at this very preliminary stage.  In other words, Plaintiffs need not show with
28   complete certainty that a CTA member would be harmed by the ABC test but not by the

<div align="center">6</div>

EXHIBIT 4
Page 131

1  *Borello* test; rather, plaintiffs "need only establish a *risk* or *threat* of injury to satisfy the

2  actual injury requirement." *City & Cty. of San Francisco*, 944 F.3d at 787 (quoting *Harris*

3  *v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004) (emphasis in original)).  CTA has

4  done so here by claiming that many of its members contract with independent-contractor

5  drivers, who can no longer be classified as independent contractors under the ABC test.

6        Regardless, even if CTA were held to the higher standard proposed by Intervenor,

7  CTA would satisfy it.  In response to Intervenor's challenge, CTA offers evidence showing

8  that some of its members' drivers have been classified as independent contractors under

9  *Borello* or tests like *Borello*.[4]  Furthermore, Intervenor's apparent position—that CTA

10  members' drivers will always be classified as employees under *Borello* and thus, the new

11  ABC test's classification of them as employees cannot harm them—is undermined by the

12  Ninth Circuit's own observations about the two tests.  *See, e.g., California Trucking Ass'n*

13  *v. Su*, 903 F.3d 953, 964 (9th Cir. 2018) (distinguishing *Borello* test as "contrary" to ABC

14  tests adopted in other states because under *Borello*, "[w]hether the work fits within the

15  usual course of an employer's business is one factor among many—and not even the most

16  important one") ("[T]he *Borello* standard does not compel the use of employees or

17  independent contractors.").  Accordingly, the Court finds that, at this very preliminary

18  stage, Plaintiffs have carried their burden to show some of its members face the risk of

19  having their drivers, who would be classified as independent contractors under *Borello*,

20  instead be misclassified as employees under the ABC test.

21

22  ───────────────

23        [4] Plaintiffs' request for judicial notice of Exhibits A-C [Doc. 73-3] is GRANTED.

24  "[A] court may take judicial notice of its own records in other cases, as well as the records
    of an inferior court in other cases." *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir.

25  1980).  The Court is not persuaded by Intervenor's arguments opposing judicial notice,
    particularly where Plaintiffs offered their evidence in response to Intervenor's attack on

26  their standing.  Nonetheless, Intervenor's request for judicial notice, [Doc. 78], is

27  GRANTED for the same reasons as Plaintiffs' request, but Intervenor's cases do not

28  compel a different conclusion as to Plaintiffs' standing.

3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 132

1   Finally, Intervenor argues that CTA lacks "associational standing" because it has not

2 identified any single CTA member who will be injured by use of the ABC test to determine

3 whether drivers are employees.  In support, Intervenor cites *Summers v. Earth Island Inst.*,

4 which held that an association has standing to represent its members' interests when "at

5 least one identified member had suffered or would suffer harm."  555 U.S. 488, 498 (2009).

6 Intervenor further reasons that, if Defendants were enjoined from enforcing the ABC test,

7 employment status would be decided based on the prior *Borello* test.  Thus, again,

8 Intervenor contends that because CTA does not submit evidence that any of its members'

9 drivers are *not* employees under *Borello*, there is no evidence that the ABC test injures a

10 single CTA member.

11   The Court disagrees.  "[A]n association has standing to bring suit on behalf of its

12 members when: (a) its members would otherwise have standing to sue in their own right;

13 (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither

14 the claim asserted nor the relief requested requires the participation of individual members

15 in the lawsuit."  *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343

16 (1977).  Associational standing is present here where CTA claims that many of its members

17 use independent-contractor drivers to provide interstate trucking services to customers in

18 California and other states, and that, as a result, those members have a concrete interest in

19 knowing whether they must fundamentally change their longstanding business structure by

20 shifting to using only employee drivers when operating within California.

21   Moreover, *Summers* is distinguishable from CTA's case.  *Summers* involved a

22 dispute about a timber project that had settled, and "no other project [was] before the court

23 in which respondents were [even] threatened with injury in fact."  *Summers*, 555 U.S. at

24 491-92.  Unlike *Summers*, the dispute here facing CTA's members is still very much alive

25 because without preliminary injunctive relief, AB-5 will apply to them and likely be

26 enforced against CTA's members to the full extent of the law.  The Ninth Circuit, too, has

27 expressed doubt that "*Summers*, an environmental case brought under the National

28 Environmental Policy Act, stands for the proposition that an injured member of an

<div align="center">8</div>

3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 133

1   organization must always be specifically identified in order to establish Article III standing

2   for the organization." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir.

3   2015).  The Ninth Circuit explained:

> where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.

9   *Id.*   Such is the case here.   Intervenor offers no reason why it cannot address the

10  predominately legal claims brought by CTA without the identification of a particular CTA

11  member.  Thus, for the previous reasons, the Court is satisfied that Plaintiffs have standing

12  at this very preliminary stage.[5]

13  **B. Preliminary Injunction**

14  "Generally, the purpose of a preliminary injunction is to preserve the status quo and

15  the rights of the parties until a final judgment issues in the cause."  *City & Cty. of San*

16  *Francisco*, 944 F.3d at 789.  Plaintiffs can obtain a preliminary injunction where they

17  establish four factors: "(1) that [they are] likely to succeed on the merits, (2) that [they are]

18  likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of

19  equities tips in [their] favor, and (4) that an injunction is in the public interest."  *Id.* at 788-

20  89 (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)).  In the alternative, however, "'serious

21  questions going to the merits' and a balance of hardship that tips sharply towards the

22  plaintiff[s] can support issuance of a preliminary injunction, so long as the plaintiff[s] also

---

25  [5] At the January 13, 2020 oral argument, Plaintiffs' counsel clarified that they seek
26  relief only as to their motor carrier members.  Thus, the Court need not consider
    Intervenor's challenge to owner-operator Odom's standing.  Odom's standing bears no
27  relevance on whether the Court can enjoin enforcement of AB-5's ABC test as to motor
28  carriers because Odom is not a motor carrier.

9

EXHIBIT 4
Page 134

1   show[] that there is a likelihood of irreparable injury and that the injunction is in the public

2   interest." *Id.* at 789 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th

3   Cir. 2011)).

4           1.  Likelihood of Success on the Merits

5           To prevail on their motion for a preliminary injunction, Plaintiffs must establish, at

6   a minimum, that there are "serious questions" on the merits of at least one of their

7   challenges to AB-5's ABC test.  *See Cottrell*, 632 F.3d at 1135.  For the following reasons,

8   Plaintiffs have done so with their FAAAA preemption challenge.[6]

9           Within the FAAAA, Congress included an express preemption provision, which

10  provides that states "may not enact or enforce a law, regulation, or other provision having

11  the force and effect of law related to a price, route, or service of any motor carrier . . . with

12  respect to the transportation of property."   49 U.S.C. § 14501(c)(1).   The preemption

13  provision is a broad one.  "The phrase 'related to' embraces state laws 'having a connection

14  with or reference to' carrier 'rates, routes, or services,' whether directly or indirectly." *Cal.*

15  *Trucking Ass'n v. Su*, 903 F.3d 953, 960 (9th Cir. 2018).  As the Ninth Circuit has

16  explained, "[t]here can be no doubt that when Congress adopted the FAAA Act, it intended

17  to *broadly* preempt state laws that were 'related to a price, route or service' of a motor

18  carrier."  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1053 (9th Cir.

19  2009) (emphasis added).

20          Similarly, the First Circuit has explained that Congress had "dual objectives" for

21  adopting a "broad reach" by copying the language of the Airline Deregulation Act of 1978

22  into the FAAAA's preemption clause: (1) "to ensure that the States would not undo federal

23  deregulation with regulation of their own" and (2) "to avoid a patchwork of state service-

24  determining laws, rules, and regulations."  *Schwann v. FedEx Ground Pkg. System, Inc.*,

25

26  _____

27      [6] For purposes of preliminary injunctive relief, Plaintiffs have satisfied this prong
    based on the FAAAA preemption ground.  Thus, the Court declines at this time to analyze
28  Plaintiffs' alternative Dormant Commerce Clause challenge to AB-5.

                                        10

                                                              3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 135

1   813 F.3d 429, 436 (1st Cir. 2016) (internal quotation marks and citations omitted).  To be

2   sure, the breadth of the FAAAA's preemption clause "does not mean the sky is the limit":

3   "Congress did not intend to preempt laws that implement California's traditional labor

4   protection powers, and which affect carriers' rates, routes, or services in only *tenuous*

5   ways."  *Su*, 903 F.3d at 960-61 (emphasis added) (citing *Dilts v. Penske Logistics, LLC*,

6   769 F.3d 637, 647-50 (9th Cir. 2014) (meal and rest break laws) and *Californians for Safe*

7   *& Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998)

8   (prevailing wage law)); *see also id.* at 960 ("[T]he FAAAA does not preempt state laws

9   that affect a carrier's prices, routes, or services in only a tenuous, remote or peripheral

10  manner with no significant impact on Congress's deregulatory objectives.") (internal

11  quotation marks omitted).  Still, where a state law "significantly impacts a carrier's prices,

12  routes, or services," it is "forbidden."  *Id.*

13          Whether the FAAAA preempts AB-5 and its ABC test is a matter of first impression

14  in this circuit, but Ninth Circuit jurisprudence touching on the issue strongly suggests

15  preemption.  For example, in *American Trucking Associations, Inc. v. City of Los Angeles*,

16  the Ninth Circuit reversed the district court's denial of American Trucking Association's

17  ("ATA") motion for a preliminary injunction and even took the unusual step of remanding

18  with instructions to the district court to issue a preliminary injunction.  559 F.3d 1046,

19  1060-61 (9th Cir. 2009).  ATA contended that the FAAAA preempted various provisions

20  in the Port's mandatory concession agreements for drayage trucking services at ports.  As

21  to the provision requiring motor carriers to use employee drivers rather than independent-

22  contractor drivers, the Ninth Circuit concluded it could "hardly be doubted" that the

23  FAAAA preempted the provision and that, unless the Port could demonstrate an exception

24  to the FAAAA's preemption provision applied, the motor carriers would likely prevail on

25

26

27

28

EXHIBIT 4
Page 136

1   their challenge.[7]  *Id.* at 1053.  The Ninth Circuit went on to conclude that the concession

2   agreement's provision requiring the "phasing out" of thousands of independent contractors

3   "is one likely to be shown to be preempted."  *Id.* at 1056.

4        *California Trucking Association v. Su* offers additional guidance.  903 F.3d 953 (9th

5   Cir. 2018).  There, the Ninth Circuit considered whether the FAAAA preempted the

6   *Borello* multi-factor test for distinguishing between employees and independent

7   contractors.  In so doing, the Ninth Circuit noted the "obvious proposition" for which

8   *American Trucking* stood: "that an 'all or nothing' rule requiring services be performed by

9   certain types of employee drivers . . . was likely preempted [by the FAAAA]."  *Id.* at 964.

10  The court then distinguished the *Borello* test as "wholly different from [the provision at

11  issue in] *American Trucking*" because neither the *Borello* standard or "the nature of the

12  *Borello* standard compell[ed] the use of employees to provide certain carriage services."

13  *Id.*  The Ninth Circuit distinguished the *Borello* test from the ABC test adopted in other

14  states, noting "the application of which courts have then held to be preempted."  *Id.*  It did

15  so by explaining that, "[l]ike *American Trucking*, the 'ABC' test may effectively compel a

16  motor carrier to use employees for certain services because, under the 'ABC' test, *a worker*

17  *providing a service within an employer's usual course of business will never be considered*

18  *an independent contractor*."  *Id.* (emphasis added).  The court further explained that, under

19  *Borello* and in contrast to the ABC test, "whether the work fits within the usual course of

20  an employer's business is *one* factor among many—and not even the most important one."

21  *Id.* (emphasis added).

22        Although not binding on this Court, the First Circuit's recent analysis of an ABC

23  test identical to California's is persuasive.  In *Schwann v. FedEx Ground Package System,*

24

25

26

27        [7] Here, Defendants do not argue a similar exception to the FAAAA's preemption
        provision applies to the ABC test; instead, they contend the ABC test does not fall within
28      the broad scope of the FAAAA's preemption provision.

12

EXHIBIT 4
Page 137

1   *Inc.*, the First Circuit held the FAAAA preempted Massachusetts' ABC test's Prong B as

2   applied to FedEx.[8]   813 F.3d 429 (1st Cir. 2016).   In so holding, the First Circuit reasoned:

3       The regulatory interference posed by Plaintiffs' application of Prong 2 is not

4       peripheral.  The decision whether to provide a service directly, with one's own employee, or to procure the services of an independent contractor is a

5       significant decision in designing and running a business. . . . Such an

6       application of state law poses a serious potential impediment to the achievement of the FAAAA's objectives because a court, rather than the

7       market participant, would ultimately determine what services that company

8       provides and how it chooses to provide them.

9   *Id.* at 438.

10          Together, these cases show that the FAAAA likely preempts "an all or nothing" state

11   law like AB-5 that categorically prevents motor carriers from exercising their freedom to

12   choose between using independent contractors or employees.  *See also Bedoya v. Am.*

13   *Eagle Express Inc.*, 914 F.3d 812, 824 (3d Cir. 2019) (holding New Jersey's ABC test is

14   not preempted by the FAAAA because contrary to Massachusetts' test, it includes an

15   "alternative method for reaching independent contractor status—that is, by demonstrating

16   that the worker provides services outside of the putative employer's 'places of business,'"

17   and "[n]o part of the New Jersey test categorically prevents carriers from using independent

18   contractors.").   Yet, that is precisely the case here.   Because contrary to Prong B,

19   independent-contractor drivers necessarily perform work *within* "the usual course of the

20    

21       [8] In both statutes, Prong B is the Achilles heel.  California's Prong B is identical to

22   the preempted Massachusetts test because neither test permits an alternative method for

23   using an independent-contractor driver.  *Cf. Bedoya v. Am. Eagle Express Inc.*, 914 F.3d

24   812, 824 (3d Cir. 2019) (finding New Jersey's ABC test not preempted by FAAAA because

25   New Jersey test provided an alternative method by which a motor carrier could still use

26   independent contractors via the additional clause: "*or* [performs such service] outside of

27   all the places of business of [the employer]") (emphasis added) (distinguishing between

28   Massachusetts' ABC test by explaining "[t]he Massachusetts statute does not include New Jersey's alternative method for reaching independent contractor status—that is, by demonstrating that the worker provides services outside of the putative employer's 'places of business'").

1   [motor carrier] hiring entity's business," drivers who may own and operate their own rigs
2   will *never* be considered independent contractors under California law.[9]  Thus, it follows
3   that Prong B of the ABC test requires motor carriers to artificially reclassify all
4   independent-contractor drivers as employee-drivers for all purposes under the California
5   Labor Code, the Industrial Welfare Commission wage orders, and the Unemployment
6   Insurance Code.  *See* Cal. Labor Code § 2750.3(a)(1).  Indeed, the Ninth Circuit has already
7   acknowledged the likelihood of such a test being preempted by the FAAAA.  *See Su*, 903
8   F.3d at 964 ("Like *American Trucking*, the 'ABC' test may effectively compel a motor
9   carrier to use employees for certain services because, under the 'ABC' test, *a worker*
10  *providing a service within an employer's usual course of business will **never** be considered*
11  *an independent contractor*.") (emphasis added).

12      Notably, the first and only court thus far to consider an FAAAA preemption
13  challenge to AB-5 agreed.  On January 8, 2020, the Los Angeles Superior Court ruled that
14  because the ABC test effectively prohibits motor carriers from using independent
15  contractors to provide transportation services, the test has a significant, impermissible
16  effect on motor carriers' "prices, routes, and services," and thus, is preempted by the
17  FAAAA.  *The People of the State of California v. Cal Cartage Transportation Express,*
18  *LLC*, Case No. BC689320 (Los Angeles Superior Court January 8, 2020).  Moreover, other
19  district courts considering FAAAA preemption challenges to California's ABC test, albeit

20

21  ───────────────

22      [9] During the January 13, 2020 hearing, the Court repeatedly invited Defendants to
23  explain how the ABC test was not an "all or nothing" test.  Specifically, the Court invited
    them to explain how a motor carrier could contract with an independent owner-operator as
24  an independent contractor, rather than as an employee, under the ABC test.  Neither the
25  State nor Intervenor could provide an example.  Instead, Defendants repeatedly asserted
    that a broker company that did not perform trucking work could plausibly contract with an
26  independent owner-operator.  Brokers, however, are *not* motor carriers.  Accordingly, the
27  Court observes that the ABC test appears to be rigged in such a way that a motor carrier
    *cannot* contract with independent contractor owner-operators without classifying them as
28  employees.

14

EXHIBIT 4
Page 139

under the pre-AB-5 *Dynamex* standard, have applied similar logic and found the FAAAA preempts Prong B. *See, e.g., B&O Logistics, Inc. v. Cho*, 2019 WL 2879876, at *2-4 (C.D. Cal. April 15, 2019) (holding "*Su*, *American Trucking*, and *Schwann* collectively establish that the FAAAA preempts a state law that categorically requires a motor carrier to hire employees—and not independent contractors—as drivers. Here, the B prong of *Dynamex*'s ABC test would require Plaintiff to reclassify Defendant as an employee for the purposes of California's wage orders (which regulate, *inter alia*, minimum wages, maximum hours, and meal and rest breaks) because Defendant performs work that is in the usual course of Plaintiff's business (*i.e.*, transporting property)," and thus, "Plaintiff may seek a declaration that the B prong is preempted by the FAAAA"); *Valadez v. CSX Intermodal Terminals, Inc.*, 2019 WL 1975460, at *7-8 (N.D. Cal. March 15, 2019) (finding the FAAAA preempts Prong B of the ABC test in *Dynamex* in part because Prong B "effectively prevents motor carriers from using independent contractors to perform services within their usual course of business," and "*Su* strongly indicates that a state law that would prevent a motor carrier, like Defendant, from hiring independent contractors, rather than employees, to perform its services would be preempted by the FAAAA"); *Alvarez v. XPO Logistics Cartage LLC*, 2018 WL 6271965, at *4-5 (C.D. Cal. Nov. 15, 2018) (relying in part on *Su* and finding "the ABC test [as adopted in *Dynamex*] 'relates' to a motor carrier's services in more than a 'tenuous' manner and is therefore preempted by the FAAAA"); *contra. Henry v. Central Freight Lines, Inc.*, 2019 WL 2465330, at *5 (E.D. Cal. June 13, 2019) (holding the FAAAA does not preempt the *Dynamex* ABC test because "[t]he *Dynamex* ABC test is a general classification test that does not apply to motor carriers specifically and does not, by its terms, compel a carrier to use an employee or an independent contractor."); *Western States Trucking Ass'n v. Schoorl*, 377 F. Supp. 3d 1056, 1070-71 (E.D. Cal. 2019) (relying on *Dilts* to hold the FAAAA does not preempt *Dynamex*'s ABC test); *Phillips v. Roadrunner Intermodal Svcs.*, 2016 WL 9185401, at *4-7 (C.D. Cal. Aug. 16, 2016) (same).

EXHIBIT 4
Page 140

1    Defendants offer a variety of arguments against FAAAA preemption, but none are
2    persuasive.  For example, Defendants argue that *Su* and *American Trucking* have no
3    bearing on the ABC test.  In so doing, however, Defendants attempt to characterize the
4    ABC test as "not requir[ing] that motor carriers—or anyone at all—transition from
5    independent contractors to employees," but "[i]nstead, [as] merely provid[ing] the
6    applicable test to assess whether a worker is an independent contractor or an employee."
7    Doc. 55 at 18.  Defendants' curious argument is that "the ABC test itself imposes no legal
8    obligations" because it only sets forth the test for determining whether California's labor
9    laws apply to a worker.  Doc. 58 at 19.  Although it is technically true that nothing in the
10   ABC test prohibits motor carriers from contracting with independent contractors, that
11   argument merely poses a distinction without a difference.  Put another way, it is true that
12   the statute does not expressly state that motor carriers *cannot* contract with independent
13   contractors, but Prong B permits motor carriers to contract with independent contractors
14   *only if* they classify and treat those independent contractors *as employees* under California
15   law.

16   The Court is similarly unpersuaded by Defendants' contention that this Court lacks
17   the ability to consider whether AB-5 is preempted because, according to Defendants, the
18   ABC test is merely a "test for employment."  Doc. 58 at 19.  According to Defendants,
19   "[t]he question for purposes of Plaintiffs' FAAAA preemption claim is . . . whether
20   *California's employment laws* that attach through the ABC test are preempted," rather than
21   the ABC test, itself.  Doc. 58 at 19 (emphasis added).  To support their theory, Defendants
22   rely upon the unpublished district court opinion from which the parties appealed in *Su*.
23   That opinion, however,  is both not binding and lacks persuasive value, particularly in light
24   of the Ninth Circuit's decision.  *See Su*, 903 F.3d at 955 (distinguishing *Borello* standard
25   from Massachusetts ABC test by explaining "the ABC test may effectively compel a motor
26   carrier to use employees for certain services because, under the ABC test, a worker
27   providing a service within an employer's usual course of business will never be considered
28   an independent contractor").  Contrary to Defendants' position, the Court finds that "the

16

3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 141

1    question is not whether the FAAAA preempts California's wage orders [and other
2    employment laws]; rather, it is whether [AB-5's] ABC test—used to interpret the wage
3    orders [and other employment laws]—is preempted." *Alvarez v. XPO Logistics Cartage*
4    *LLC*, 2018 WL 6271965, at *5 (C.D. Cal. Nov. 15, 2018).

5            Next, Defendants argue that the FAAAA's preemption provision does not apply to
6    the ABC test because, according to Defendants, that test is a "law of general applicability."
7    First, to the extent Defendants posit that a law of general applicability cannot be preempted,
8    they are incorrect. *See Su*, 903 F.3d at 966 ("This is not to say that the general applicability
9    of a law is, in and of itself, sufficient to show it is not preempted.") (citing *Morales v. Trans*
10   *World Airlines, Inc.*, 504 U.S. 374, 386 (1992)).  For the same reason, the Court rejects
11   Defendants' reliance on *People ex rel. Harris v. Pac Anchor Transp., Inc.*, 59 Cal. 4th 772
12   (2014).   Contrary to Defendants' reading, *Pac Anchor* does not foreclose FAAAA
13   preemption of the ABC test.  As the Los Angeles Superior Court reasoned, "the better
14   reading of *Pac Anchor* is not that laws of general applicability are always immune from
15   FAAAA preemption.   Rather, *Pac Anchor* left open the possibility that state laws
16   prohibiting motor carriers from using independent owner-operator truck drivers might be
17   preempted—and even suggested that they would." *Cal Cartrage*, Case No. BC689320, at
18   11.  Still, "[w]hile general applicability is not dispositive, . . . it is a relevant consideration
19   because it will likely influence whether the effect on prices, routes, and services is tenuous
20   or significant." *Su*, 903 F.3d at 966.  The Ninth Circuit further explained that "[w]hat
21   matters is not solely that the law is generally applicable, but where in the chain of a motor
22   carrier's business it is acting to compel a certain result (e.g., a consumer or workforce) and
23   what result it is compelling (e.g., a certain wage, non-discrimination, a specific system of
24   delivery, a specific person to perform the delivery)." *Id.*  Here, the Court is not persuaded
25   that the ABC test is a law of general applicability, but even if it were, Plaintiffs have shown
26   the ABC test is still likely preempted by the FAAAA because it compels a certain result—
27   by "compel[ling] a motor carrier to use employees for certain services." *Id.* at 964.

28

3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 142

1    Defendants argue that *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 649 (9th Cir.

2    2014) and *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152

3    F.3d 1184, 1189 (9th Cir. 1998) require the opposite conclusion.  The preemption issues in

4    those cases, however, are significantly different from the preemption issue raised here.

5    *Dilts* and *Mendonca* concerned workers that had already been properly classified as

6    "employees."  In *Dilts*, the Ninth Circuit held that *specific* California Labor Code

7    protections for employees—meal and rest break laws—were not preempted by the FAAAA

8    because they were "normal background rules for almost *all* employers doing business in

9    the state of California" and did not, either directly or indirectly "set prices, mandate or

10   prohibit certain routes, or tell motor carriers what services they may or may not provide,

11   either directly or indirectly."  *Dilts*, 769 F.3d at 647 (emphasis in original); *see also*

12   *Mendonca*, 152 F.3d at 1187-89 (holding FAAAA did not preempt California's prevailing

13   wage law as applied to employees); *Ridgeway et al. v. Walmart, Inc.*, Case No. 17-15983

14   (9th Cir. Jan. 6, 2020) (holding FAAAA did not preempt California's wage law requiring

15   trucking company to pay minimum wages for driver rest time during which the company

16   retains control over the driver because the law did not set prices, mandate or prohibit certain

17   routes, or tell motor carriers what services they may provide).

18   In contrast, the present case concerns the test used to *classify* workers for the purpose

19   of determining whether *all* of California employment laws do or do not apply, rather than

20   a small group of those laws, such as the meal break regulations in *Dilts*.  Thus, the

21   combined effect of all such laws has a significant impact on motor carriers' prices, routes,

22   or services.  Accordingly, *Dilts* and other similar cases are distinguishable because they

23   focus on whether discrete wage-and-hour laws and regulations had more than a tenuous

24   impact on motor carriers' prices, routes, or services, not whether the combined impact of

25   applying all of California's employment laws to independent owner-operators had more

26   than a tenuous impact on motor carriers' prices, routes, or services.  Moreover, while *Dilts*

27   reasoned that "applying California's meal and rest break laws to motor carriers would *not*

28   contribute to an impermissible 'patchwork' of state-specific laws, defeating Congress's

18

EXHIBIT 4
Page 143

1  deregulatory objectives," the ABC test certainly would.  *Dilts*, 769 F.3d at 647 (emphasis

2  added).  By effectively prohibiting motor carriers from contracting with independent-

3  contractor drivers, AB-5 and its ABC test would transform California into its own patch in

4  the very "patchwork" of state-specific laws Congress intended to prevent.[10]

5          Finally, the Court is not persuaded by Intervenor's brief, conclusory argument that

6  "Plaintiffs fail to establish that motor carriers cannot avail themselves of AB-5's business-

7  to-business exception."  Doc. 58 at 25.  To the extent Intervenor contends a motor carrier

8  could contract with an independent contractor under AB-5's business-to-business

9  exception, Intervenor has not shown how that is possible.  Further, like the Los Angeles

10 Superior Court, this Court is skeptical that motor carriers could, in fact, avail themselves

11 of that exception, particularly where the State Defendants, who are tasked with enforcing

12 AB-5, do not expressly concede that the exception would apply.[11]  Accordingly, the Court

13 adopts the thorough reasoning of the Los Angeles Superior Court's January 8, 2020 order

14 rejecting that argument.  *See Cal Cartrage*, Case No. BC689320, at 12-14 (rejecting

15 plaintiff's argument that the "business-to-business" exception saves AB-5 from FAAAA

16 preemption as applied to motor carriers).

17         The Court finds AB-5's ABC test has more than a "tenuous, remote, or peripheral"

18 impact on motor carriers' prices, routes, or services, particularly in light of our Ninth

19 Circuit jurisprudence casting serious doubt on the type of "all or nothing rule" that AB-5

20 implements.  Thus, for the previous reasons, Plaintiffs have carried their burden at this

21 preliminary stage of showing a likelihood of success on the merits as to their FAAAA

22

23         [10] The Court is aware of only one state, Massachusetts, that has adopted an identical

24 ABC test to that adopted in California's AB-5.  Notably, the First Circuit struck down the

25 identical Massachusetts test as preempted by the FAAAA.  *See Schwann v. FedEx Ground Package System, Inc.*, 813 F.3d 429 (1st Cir. 2016).

26         [11] In fact, until the January 13, 2020 hearing, the State Defendants were silent on the

27 business-to-business exception.  During the hearing, for the first time, the State Defendants

28 expressed that the exception could potentially apply to motor carriers, but not that it definitively would.

EXHIBIT 4
Page 144

1   preemption challenge.    In the alternative, Plaintiffs have certainly raised "serious

2   questions" going to the merits.

3        2. Irreparable Harm

4        As to the second element, the Court finds Plaintiffs have carried their burden to show

5   the likelihood of irreparable harm.  As this Court previously concluded at the temporary

6   restraining order stage, Plaintiffs have shown that irreparable harm is likely because

7   without significantly transforming their business operations to treat independent-contractor

8   drivers as employees for all specified purposes under California laws and regulations, they

9   face the risk of governmental enforcement actions, as well as criminal and civil penalties.

10   *See, e.g.*, Cal. Unemp. Ins. Code § 2117; Cal. Labor Code § 1198.5; Cal. Labor Code §§

11   226.6 and 226.8.[12]  Just as the Ninth Circuit noted in *American Trucking*, "motor carriers

12   are being put to a kind of Hobson's choice, not entirely unlike that which faced the airlines

13   in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)." *American Trucking*, 559

14   F.3d at 1057 (9th Cir. 2009).  In *Morales*, several states' attorneys general set out to

15   regulate airline advertising and the compensation of passengers who gave up their seats on

16   overbooked flights. *Morales*, 504 U.S. at 379.  Noting that the attorneys general "had made

17   clear that they would seek to enforce the challenged portions of the guidelines," the

18   Supreme Court observed that injunctive relief is available where there exists a threat of

19   imminent proceedings of a criminal or civil nature against parties who are affected by an

20   unconstitutional act. *Id.* at 380-81.  The Supreme Court further opined that the respondents

21   faced "a Hobson's choice: continually violate the Texas law and expose themselves to

22   potentially huge liability; or violate the law once as a test case and suffer the injury of

23

24   ───────────────

25        [12] Defendants' contention that any irreparable harm is undermined by Plaintiffs'
26   delay in moving for preliminary injunctive relief does not require a different conclusion.
     It is true that Plaintiffs could have moved for a preliminary injunction within weeks, rather
27   than months, of AB-5's adoption in September 2019, but the Court is not persuaded that a
28   two month delay in filing the motion wholly undermines their showing of irreparable harm.

20

3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 145

1   obeying the law during the pendency of the proceedings and any further review." *Id.* at
2   381.

3          Similarly, in remanding to the district court to issue a preliminary injunction, the
4   Ninth Circuit in *American Trucking* found the motor carriers faced a sort of Hobson's
5   choice because "a very real penalty attaches to the motor carriers regardless of how they
6   proceed," and "[t]hat is an imminent harm." *American Trucking*, 559 F.3d at 1058.  Here,
7   motor carriers wishing to continue offering the same services to their customers in
8   California must do so using only employee drivers, meaning they must significantly
9   restructure their business model, including by obtaining trucks, hiring and training
10  employee drivers, and establishing administrative infrastructure compliant with AB-5.  The
11  only alternative available to motor carriers is to violate the law and face criminal and civil
12  penalties.  The Court is satisfied that Plaintiffs have shown a likelihood of irreparable injury
13  without injunctive relief.

14          3.  Balance of Equities; The Public Interest

15          If after the preliminary injunction stage, the Court finds that AB-5 is preempted by
16  the FAAAA, motor carriers will have suffered harm due to AB-5's application to and
17  enforcement against them. *See American Trucking*, 559 F.3d at 1059 (finding the balance
18  of equities and public interest weighed in favor of motor carriers, explaining, "[W]e have
19  outlined the hardships that motor carriers will suffer if, as is likely, many provisions of the
20  Concession agreements are preempted and are, thus, being imposed in violation of the
21  Constitution").  On the other side of the scale, Defendants have legitimate concerns about
22  preventing the misclassification of workers as independent contractors.  Nonetheless, with
23  or without the ABC test, California still maintains numerous laws and regulations designed
24  to protect workers classified as employees and to prevent misclassification, and the pre-
25  AB-5 *Borello* standard will continue as the applicable classification test. *See* Cal. Labor
26  Code § 2750.3(a)(3) (mandating that should a court rule that the ABC test cannot be applied
27  to a particular context, the pre-AB-5 *Borello* test will apply).  Thus, on balance, the
28  hardships faced by Plaintiffs significantly outweigh those faced by Defendants.

<div align="center">21</div>

<div align="right">3:18-cv-02458-BEN-BLM</div>

EXHIBIT 4
Page 146

1   Similarly, the Court finds that the public interest supports preliminary injunctive

2   relief.  The Court recognizes the Legislature's public interest in protecting misclassified

3   workers, which it attempted to further address with AB-5.  That public interest, however,

4   "must be balanced against the public interest represented in Congress's decision to

5   deregulate the motor carrier industry, and the Constitution's declaration that federal law is

6   to be supreme."  *American Trucking*, 559 F.3d at 1059-60.  Therefore, the public interest

7   tips sharply in Plaintiffs' favor.

8                               **III.   CONCLUSION**

9       FAAAA preemption is broad but not so broad that the sky is the limit: states retain

10   the ability to execute their police power with laws that do not significantly impact rates,

11   routes, or services.  Here, however, there is little question that the State of California has

12   encroached on Congress' territory by eliminating motor carriers' choice to use independent

13   contractor drivers, a choice at the very heart of interstate trucking.  In so doing, California

14   disregards Congress' intent to deregulate interstate trucking, instead adopting a law that

15   produces the patchwork of state regulations Congress sought to prevent.  With AB-5,

16   California runs off the road and into the preemption ditch of the FAAAA.  Accordingly,

17   Plaintiffs' motion for a preliminary injunction is **GRANTED**.

18       It is further **ORDERED**:

19       1.      Defendant Xavier Becerra, in his official capacity as the Attorney General of

20   the State of California, Julia A. Su, in her official capacity as the Secretary of the California

21   Labor and Workforce Development Agency, Andre Schoorl, in his official capacity as the

22   Acting Director of the Department of Industrial Relations of the State of California, Lilia

23   Garcia Brower, in her official capacity as the Labor Commissioner of the State of

24   California, and Patrick Henning, in his official capacity as Director of the California

25   Employment Development Department are temporarily enjoined from enforcing Assembly

26   Bill 5's ABC test, as set out in Cal. Labor Code § 2750.3(a)(1), as to any motor carrier

27   operating in California, pending the entry of final judgment in this action.

28       2.      Because there is no realistic likelihood of harm to Defendants from granting

1  a preliminary injunction as to the enforcement of AB-5's ABC test, a security bond is not

2  required.

3     **IT IS SO ORDERED.**

4

5  Date: January 16, 2020

6                                    HON. ROGER T. BENITEZ
                                     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

3:18-cv-02458-BEN-BLM

EXHIBIT 4
Page 148

# EXHIBIT 5

EXHIBIT 5
Page 149

CAND-ECF

ADRMOP,CLOSED,E-Filing,REFSET-EDL

## U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:04-cv-02842-WHA

First Franklin Financial Corporation v. Franklin First Financial, Ltd.
Assigned to: Hon. William Alsup
Cause: 15:1125 Trademark Infringement (Lanham Act)

Date Filed: 07/14/2004
Date Terminated: 02/16/2005
Jury Demand: Plaintiff
Nature of Suit: 840 Trademark
Jurisdiction: Federal Question

### Plaintiff

**First Franklin Financial Corporation**
*a Delaware corporation*

represented by **Patrick Guevara**
952 School Street
No 159
NAPA, CA 94559
United Sta
(707) 999-3239
Email: patrick@guevaraesq.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Everitt George Beers**
McNichols Randick O'Dea & Tooliatos LLP
5000 Hopyard Road
Suite 400
Pleasanton, CA 95488-3348
925-460-3700
Fax: 925-460-0969
Email: ebeers@mcnicholslaw.com
*ATTORNEY TO BE NOTICED*

**Kevin Richard Martin**
Martin APC
1939 Harrison Street
Suite 290
Oakland, CA 94612
(510) 444-7600
Email: kevin@martinapc.com
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Franklin First Financial, Ltd.**
*a New York corporation*

represented by **Dickerson M. Downing**
Morgan & Finnegan, LLP
3 World Financial Center
New York, NY 10281
212-415-8700
Fax: 212-415-8701

EXHIBIT 5
Page 150

1/24/2020                                         CAND-ECF

Email: ddowning@morganfinnegan.com
*ATTORNEY TO BE NOTICED*

**Eric Nord Hoover**
Morgan & Finnegan
44 Montgomery Street, Ste. 2550
San Francisco, CA 94104
415-676-5820
Email: ehoover@morganfinnegan.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/14/2004 | 1 | COMPLAINT against Franklin First Financial, Ltd. ( Filing fee $ 150, receipt number 5510441.). Filed by First Franklin Financial Corporation. (sis, COURT STAFF) (Filed on 7/14/2004) Additional attachment(s) added on 8/10/2004 (sis, COURT STAFF). Additional attachment(s) added on 8/10/2004 (sis, COURT STAFF). (Entered: 07/16/2004) |
| 07/14/2004 | | Summons Issued as to Franklin First Financial, Ltd.. (sis, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/16/2004) |
| 07/14/2004 | 2 | ADR SCHEDULING ORDER: Case Management Statement due by 9/30/2004. Case Management Conference set for 10/14/2004 11:00 AM. (Attachments: # 1)(sis, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/16/2004) |
| 07/14/2004 | | CASE DESIGNATED for Electronic Filing. (sis, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/16/2004) |
| 09/30/2004 | 3 | CASE MANAGEMENT STATEMENT *AND PROPOSED ORDER* filed by First Franklin Financial Corporation. (Guevara, Patrick) (Filed on 9/30/2004) (Entered: 09/30/2004) |
| 10/19/2004 | 4 | Minute Entry: Initial Case Management Conference held on 10/14/2004 before William Alsup (Date Filed: 10/19/2004). Further Case Management Conference set for 11/4/2004 11:00 AM. (Court Reporter Debra Pas.) (dt, COURT STAFF) (Date Filed: 10/19/2004) (Entered: 10/19/2004) |
| 11/02/2004 | 5 | AMENDED COMPLAINT *FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, CYBERPIRACY AND FOR INJUNCTIVE RELIEF* against Franklin First Financial, Ltd.. Filed by First Franklin Financial Corporation. (Guevara, Patrick) (Filed on 11/2/2004) (Entered: 11/02/2004) |
| 11/05/2004 | 6 | Minute Entry: Further Case Management Conference held on 11/4/2004 before William Alsup (Date Filed: 11/5/2004). Case Management Statement due by 11/29/2004. Further Case Management Conference set for 12/2/2004 11:00 AM. Plaintiff has served the summons and complaint. Defendant is (possibly) represented by attorney, Neil Greenburg, 900 Merchant Concourse, Suite 214, Westbury, NY 11590. Plaintiff shall notify the defendant that a further case management conference has been set.(Court Reporter Sahar McVickar.) (dt, COURT STAFF) (Date Filed: 11/5/2004) (Entered: 11/05/2004) |
| 11/05/2004 | 7 | ORDER TO APPEAR FOR CASE MANAGEMENT CONFERENCE, set for 12/2/2004 11:00AM. Signed by Judge William Alsup on 11/5/04. (Attachments: # 1 Certificate of Service)(dt, COURT STAFF) (Filed on 11/5/2004) (Entered: 11/05/2004) |
| 11/30/2004 | 8 | CLERK'S NOTICE Rescheduling Initial Case Management Conference set for 12/2/2004 02:30 PM. (dt, COURT STAFF) (Filed on 11/30/2004) (Entered: 11/30/2004) |
| 11/30/2004 | 9 | JOINT CASE MANAGEMENT STATEMENT *FOR DECEMBER 2, 2004 HEARING* |

EXHIBIT 5
Page 151

| | | |
|---|---|---|
| | | filed by First Franklin Financial Corporation. (Guevara, Patrick) (Filed on 11/30/2004) (Entered: 11/30/2004) |
| 12/03/2004 | 10 | CASE MANAGEMENT SCHEDULING ORDER: ORDER REFERRING CASE to Magistrate Judge Elizabeth D. Laporte for Mediation/Settlement. Discovery due by 5/27/2005. Jury Trial set for 10/11/2005 07:30 AM. Motions due by 7/14/2005. Pretrial Conference set for 9/26/2005 02:00 PM. Signed by Judge William Alsup on 12/3/2004. (whasec, COURT STAFF) (Filed on 12/3/2004) (Entered: 12/03/2004) |
| 12/03/2004 | 11 | Minute Entry: Initial Case Management Conference held on 12/2/2004 before William Alsup (Date Filed: 12/3/2004), CASE REFERRED to Magistrate Judge Laporte for Settlement Conference. Discovery due by 5/27/2005. Motions due by 7/14/2005. Final Pretrial Conference set for 9/26/2005 02:00 PM. Jury Trial set for 10/11/2005 07:30 AM. (Court Reporter Catherine Luciano.) (dt, COURT STAFF) (Date Filed: 12/3/2004) (Entered: 12/03/2004) |
| 12/07/2004 | 12 | CERTIFICATE OF SERVICE by First Franklin Financial Corporation (Guevara, Patrick) (Filed on 12/7/2004) (Entered: 12/07/2004) |
| 12/13/2004 | 13 | STIPULATION *RE EXTENSION OF TIME IN WHICH TO FILE ANSWER* by First Franklin Financial Corporation. (Guevara, Patrick) (Filed on 12/13/2004) (Entered: 12/13/2004) |
| 12/14/2004 | 14 | ORDER approving 13 Stipulation filed by First Franklin Financial Corporation, (whalc1, COURT STAFF) (Filed on 12/14/2004) (Entered: 12/14/2004) |
| 12/17/2004 | 15 | Certificate of Interested Parties or Entities (Hoover, Eric) (Filed on 12/17/2004) Modified on 12/20/2004 (sis, COURT STAFF). (Entered: 12/17/2004) |
| 12/17/2004 | 16 | MOTION to Transfer Case filed by Franklin First Financial, Ltd.. Motion Hearing set for 1/27/2005 08:00 AM. (Attachments: # 1 # 2 # 3 # 4)(Hoover, Eric) (Filed on 12/17/2004) (Entered: 12/17/2004) |
| 12/22/2004 | 17 | STIPULATION *for Plaintiff to Amend First Amended Complaint* by First Franklin Financial Corporation. (Guevara, Patrick) (Filed on 12/22/2004) (Entered: 12/22/2004) |
| 12/22/2004 | 18 | AMENDED COMPLAINT *SECOND* against Franklin First Financial, Ltd.. Filed by First Franklin Financial Corporation. (Attachments: # 1 Exhibit US Trademark Registration 1,843,185# 2 Exhibit Defendant's Website# 3 Exhibit U.S. Trademark Registration 1,929,915)(Guevara, Patrick) (Filed on 12/22/2004) (Entered: 12/22/2004) |
| 12/23/2004 | 19 | ORDER approving 17 Stipulation filed by First Franklin Financial Corporation. Signed by Judge Alsup on 12/23/04. (whalc1, COURT STAFF) (Filed on 12/23/2004) (Entered: 12/23/2004) |
| 12/23/2004 | 20 | MOTION for Preliminary Injunction filed by First Franklin Financial Corporation. Motion Hearing set for 1/27/2005 08:00 AM. (Attachments: # 1 Memorandum of Points and Authorities# 2 Proposed Order Order for Preliminary Injunction# 3 Affidavit Declaration of L Andrew Pollock# 4 Affidavit Declaration of Amy Witmer# 5 Affidavit Declaration of Patrick Guevara# 6 Supplement Request for Judicial Notice)(Guevara, Patrick) (Filed on 12/23/2004) (Entered: 12/23/2004) |
| 12/29/2004 | 21 | Ex Parte MOTION to Continue *the hearing date for plaintiff's motion for preliminary injunction* filed by Franklin First Financial, Ltd.. Motion Hearing set for 1/27/2005 08:00 AM. (Hoover, Eric) (Filed on 12/29/2004) (Entered: 12/29/2004) |
| 12/29/2004 | 22 | Ex Parte MOTION to Continue *the hearing date for plaintiff's motion for preliminary injunction* filed by Franklin First Financial, Ltd.. Motion Hearing set for 12/30/2004 10:00 AM. (Hoover, Eric) (Filed on 12/29/2004) (Entered: 12/29/2004) |

EXHIBIT 5
Page 152

| 12/29/2004 | 23 | Memorandum in Opposition *to Defendant's Ex Parte Motion to Continue Hearing of Motion for Preliminary Injunction* filed byFirst Franklin Financial Corporation. (Guevara, Patrick) (Filed on 12/29/2004) (Entered: 12/29/2004) |
|---|---|---|
| 01/04/2005 | 24 | Memorandum in Opposition *to Defendant's Ex Parte Motion to Stay Plaintiff's Motion for Preliminary Injunction (Amended)* filed byFirst Franklin Financial Corporation. (Guevara, Patrick) (Filed on 1/4/2005) (Entered: 01/04/2005) |
| 01/05/2005 | 25 | ORDER denying defendant's motion to continue the hearing date for plaintiff's motion for preliminary injunction by Judge Alsup denying 21 Motion to Continue, denying 22 Motion to Continue (whalc1, COURT STAFF) (Filed on 1/5/2005) (Entered: 01/05/2005) |
| 01/05/2005 | 26 | Minute Entry: Telephone Conference re Motion Hearing held on 1/5/2005 before William Alsup (Date Filed: 1/5/2005) re 22 Ex Parte MOTION to Continue *the hearing date for plaintiff's motion for preliminary injunction* filed by Franklin First Financial, Ltd.(Date Filed: 1/5/2005). Ordered After Hearing: Defendants opposition shall be filed by 1/7/05. (Court Reporter Debra Pas.) (dt, COURT STAFF) (Date Filed: 1/5/2005) (Entered: 01/05/2005) |
| 01/06/2005 | 27 | MOTION to Dismiss for Lack of Jurisdiction *or in the Alternative to Transfer* filed by Franklin First Financial, Ltd.. Motion Hearing set for 2/10/2005 08:00 AM. (Attachments: # 1 # 2 # 3 # 4 # 5)(Hoover, Eric) (Filed on 1/6/2005) (Entered: 01/06/2005) |
| 01/07/2005 | 28 | Memorandum in Opposition *to Plaintiff's Preliminary Injunction Motion* filed byFranklin First Financial, Ltd.. (Attachments: # 1 Declaration# 2 Declaration# 3 Exhibit part of exhibit one# 4 Exhibit remainder of exhibit one# 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 # 10)(Hoover, Eric) (Filed on 1/7/2005) (Entered: 01/07/2005) |
| 01/07/2005 | 29 | Memorandum in Opposition *to Defendant's Motion to Transfer Venue* filed byFirst Franklin Financial Corporation. (Attachments: # 1 Affidavit Declaration of S. Corsi# 2 Affidavit Declaration of A. Witmer# 3 Affidavit Declaration of P. Guevara# 4 Proposed Order Proposed Order Denying Motion to Transfer)(Guevara, Patrick) (Filed on 1/7/2005) (Entered: 01/07/2005) |
| 01/07/2005 | 30 | CLERK'S NOTICE Rescheduling Motion Hearing Motion Hearing set for 1/27/2005 02:00 PM. (dt, COURT STAFF) (Filed on 1/7/2005) (Entered: 01/07/2005) |
| 01/07/2005 | 31 | Memorandum in Opposition *to Plaintiff's Motion for Preliminary Injunction -- with TOC and TOA which were omitted from prior version* filed byFranklin First Financial, Ltd.. (Hoover, Eric) (Filed on 1/7/2005) (Entered: 01/07/2005) |
| 01/13/2005 | 32 | Reply Memorandum *in Support of Motion to Transfer* filed byFranklin First Financial, Ltd.. (Attachments: # 1 Declaration# 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 # 7)(Hoover, Eric) (Filed on 1/13/2005) (Entered: 01/13/2005) |
| 01/13/2005 | 33 | Reply to Opposition *By Defendant to Plaintiff's Motion for Preliminary Injunction* filed byFirst Franklin Financial Corporation. (Attachments: # 1 Affidavit Declaration of S. Corsi In Support of Reply# 2 Affidavit Declaration of P. Guevara In Support of Reply) (Guevara, Patrick) (Filed on 1/13/2005) (Entered: 01/13/2005) |
| 01/18/2005 | 34 | MOTION for leave to appear in Pro Hac Vice, Dickerson M. Downing, Esq. filed by Franklin First Financial, Ltd.. (sis, COURT STAFF) (Filed on 1/18/2005) (Entered: 01/19/2005) |
| 01/18/2005 | | Received Order re 34 MOTION for leave to appear in Pro Hac Vice by Franklin First Financial, Ltd.. (sis, COURT STAFF) (Filed on 1/18/2005) (Entered: 01/19/2005) |
| 01/20/2005 | 35 | Memorandum in Opposition *to Defendant's Motion to Dismiss the Second Amended Complaint or to Transfer the Action* filed byFirst Franklin Financial Corporation. |

EXHIBIT 5
Page 153

(Guevara, Patrick) (Filed on 1/20/2005) (Entered: 01/20/2005)

| 01/24/2005 | 36 | STIPULATION re 16 MOTION to Transfer Case, 20 MOTION for Preliminary Injunction *To Continue Hearing Date* by Franklin First Financial, Ltd.. (Attachments: # 1 Proposed Order Proposed Order re Stipulation to Continue Hearing)(Downing, Dickerson) (Filed on 1/24/2005) (Entered: 01/24/2005) |
| 01/24/2005 | 37 | ORDER continuing hearing re 20 MOTION for Preliminary Injunction filed by First Franklin Financial Corporation, 16 MOTION to Transfer Case filed by Franklin First Financial, Ltd. Signed by Judge Alsup on 1/24/05. (whalc1, COURT STAFF) (Filed on 1/24/2005) (Entered: 01/24/2005) |
| 01/25/2005 | 39 | AMENDED MOTION for leave to appear in Pro Hac Vice, Dickerson M. Downing, Esq. filed by Franklin First Financial, Ltd.. (sis, COURT STAFF) (Filed on 1/25/2005) (Entered: 01/27/2005) |
| 01/26/2005 | 38 | ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY PRO HAC VICE [Dickerson M. Downing] by Judge William Alsup, granting 34 Motion for Pro Hac Vice. (dt, COURT STAFF) (Filed on 1/26/2005) (Entered: 01/26/2005) |
| 01/27/2005 | 40 | Reply to Opposition re 27 MOTION to Dismiss for Lack of Jurisdiction *or in the Alternative to Transfer* filed byFranklin First Financial, Ltd.. (Attachments: # 1 Affidavit Declaration of Alex McTague# 2 Affidavit Declaration of Michael Davidson# 3 Affidavit Declaration of Bernard Wilens)(Downing, Dickerson) (Filed on 1/27/2005) (Entered: 01/27/2005) |
| 02/10/2005 | 41 | Minute Entry: Motion Hearing held on 2/10/2005 before William Alsup (Date Filed: 2/10/2005) re 20 MOTION for Preliminary Injunction filed by First Franklin Financial Corporation, 27 MOTION to Dismiss for Lack of Jurisdiction *or in the Alternative to Transfer* filed by Franklin First Financial, Ltd., 16 MOTION to Transfer Case filed by Franklin First Financial, Ltd. Motions Taken Under Submission. By noon on 2/14/05, a letter shall be sent listing the proper plaintiffs. (Court Reporter Sahar McVickar.) (dt, COURT STAFF) (Date Filed: 2/10/2005) (Entered: 02/10/2005) |
| 02/10/2005 | 42 | ORDER denying plaintiff's motion for preliminary injunction by Judge Alsup (signed 2/10/05)denying 20 Motion for Preliminary Injunction. (whalc1, COURT STAFF) (Filed on 2/10/2005) (Entered: 02/10/2005) |
| 02/15/2005 | 43 | NOTICE of Voluntary Dismissal *Without Prejudice* by First Franklin Financial Corporation (Guevara, Patrick) (Filed on 2/15/2005) (Entered: 02/15/2005) |
| 02/16/2005 | 44 | ORDER GRANTING VOLUNTARY DISMISSAL WITHOUT PREJUDICE. Signed by Judge William Alsup on 2/16/05. (dt, COURT STAFF) (Filed on 2/16/2005) (Entered: 02/16/2005) |

EXHIBIT 5
Page 154

# EXHIBIT 6

EXHIBIT 6
Page 155



← **Tweet**

**Jeff Perry** @apexsnow · Jan 20
Saw this today as I walked into @Walmart. The worst part is people sign these things without actually understanding what they are signing. Education is so important please don't sign things you don't understand. #AB5 @LorenaSGonzalez #preserveAB5 This hurts not helps drivers.

6 · 7 · 22

**Dave Craige** @davecraige · Jan 20
😔

Did you get a chance to respectfully talk to him?

1 · 3

**Jeff Perry** @apexsnow · Jan 20
Yeah we went back and forth for about 15 minutes with a crowd. Thankfully no one stuck around to sign his petition when it was all over and done. He tried bringing up truck drivers and writers as defense of his petition to which I said "That's not what your click bait signs say"

2 · 5

**Lorena** @LorenaSGonzalez · Jan 20
The initiative only applies to TNCs and DNCs. It exempts those app based programs no one else.

2 · 4

**Jeff Perry** @apexsnow · Jan 20
As I've seen people attack AB5 I keep thinking there is an actual real ignorance to the problem here. #AB5 only came about in response to a need. A need created by exploitive companies like @Uber. #AB5 isn't the enemy here and exempting them would be incredibly stupid.

21 · 1 · 7

**Mary Williams** @ponderer57 · Jan 20
I appreciate the intention of AB-5, actually. But is there a way to amend it so as not to hurt small businesses & freelancers? After losing my gig, I can't even collect unemployment now!

1 · 2

**Lorena**
@LorenaSGonzalez

Replying to @ponderer57 @apexsnow and 3 others

You may actually be able to claim UI if you were previously misclassified (which if they stopped using you may be the case). If you want more info, DM me and we can help.

11:55 PM · Jan 20, 2020 · Twitter for iPhone

# EXHIBIT 7

EXHIBIT 7
Page 157



EXHIBIT 7
Page 158