1  Daniel Rockey (SBN 178604)
   Alexandra C. Whitworth (SBN 303046)
2  Thomas Kinzinger (SBN 323889)
   **BRYAN CAVE LEIGHTON PAISNER LLP**
3  Three Embarcadero Center, 7th Floor
   San Francisco, CA  94111-4070
4  Telephone:    (415) 675-3400
   Facsimile:     (415) 675-3434
5  Email: dan.rockey@bclplaw.com
           alex.whitworth@bclplaw.com
6
7  Attorneys for Keisha Broussard,
   Daniel Rutka, Raymond Frazier, and
   LaMar Wilder

8

9          **IN THE UNITED STATES DISTRICT COURT**

10        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11                    **WESTERN DIVISION**

12

| 13 | LYDIA OLSON, et al., | Case No. 2:19-cv-10956-DMG-RAO |
| 14 | Plaintiffs, | **AMICUS CURIAE BRIEF OF  CALIFORNIA ON-DEMAND CONTRACTORS KEISHA BROUSSARD, DANIEL RUTKA, RAYMOND FRAZIER, AND LAMAR WILDER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 15 | vs. | |
| 16 | STATE OF CALIFORNIA, et al., | |
| 17 | Defendants. | |

Hon. Dolly M. Gee

Date: February 7, 2020
Time: 2:00 p.m.
Courtroom:   8C, 8th Floor
Action Filed: December 30, 2019
Trial Date: Not set

18
19
20
21
22
23
24
25
26
27
28

*(left margin vertical text)* BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

601543248.7

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................. 1

II.     ARGUMENT .................................................................................... 3

        A.      Amici Will Be Irreparably Harmed If They Are Involuntarily
                Reclassified as Employees. ............................................................ 4

                1.      Partnering With App-Based Platforms as an Independent
                        Contractor Preserves Economic Freedom and Flexibility. ................ 4

                2.      Amici would be negatively and irreparably harmed by
                        enforcement of AB5. .................................................................. 6

        B.      AB 5's arbitrary and irrational targeting of on-demand workers is unfair,
                unconstitutional, and harms those who have chosen to perform on-
                demand work relative to other workers. ........................................... 9

        C.      Enforcement of AB 5 will yield broader negative repercussions to
                workers and the economy as a whole. ............................................. 10

III.    CONCLUSION ................................................................................ 12

601543248.7

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011)...................................................................... 3

*Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Servs., Inc.,*
    80 F. Supp. 3d 1058 (C.D. Cal. 2015) ........................................................ 3

*Skinvisible Pharmaceuticals, Inc. v. Sunless Beauty, Ltd.,*
    No. 2:11-CV-1591 JCM CWH, 2012 WL 1032549 (D. Nev. Mar. 27,
    2012) ............................................................................................................ 3

*Westlands Water Dist. v. U.S. Dept. of Interior,*
    No. CIV. F00-7124 WWDLB, 2001 WL 34094077 (E.D. Cal. Mar. 22,
    2001) ............................................................................................................ 3

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................................ 3

**Statutes**

Cal. Lab. Code, § 2750.3 ................................................................................... 9

Cal. Lab. Code, § 2750.3(x) ............................................................................ 10

Cal. Lab. Code, § 2750.3(c)(2)(B)(ix) ............................................................ 10

**Regulations**

20 C.F.R. § 404.430 ........................................................................................... 8

20 C.F.R. § 404.434 ........................................................................................... 7

20 C.F.R. § 404.1080 ......................................................................................... 7

**Other Authorities**

"How We Deduct Earnings From Benefits," Social Security Administration,
    *available at* https://www.ssa.gov/planners/retire/whileworking.html ...... 7, 8

Wright, A. Miller & M. Kane, Fed. Practice and Procedure § 2948 (2d
    ed.1995)......................................................................................................... 3

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

ii

601543248.7

## I.   INTRODUCTION

Amici curiae Keisha Broussard, Daniel Rutka, Raymond Frazier, and LaMar Wilder are independent contractors ("Amici") who use the platforms created by Uber, Postmates, and other technology companies to earn a living or supplement their income, and whose livelihood, independence, and quality of life will be detrimentally and irreparably harmed if California Assembly Bill 5 ("AB 5") is enforced as its sponsors intend.  Amici join in the legal arguments advanced in Plaintiffs' motion for preliminary injunction,[1] but write separately to focus the Court's and the parties' attention on the serious consequences that enforcement of AB 5 will have on Amici and thousands of other Californians who depend upon the flexibility and economic freedom that their status as independent contractors makes possible.

Amici have reviewed the brief filed by the Attorney General in opposition to Plaintiffs' request for a preliminary injunction and were disheartened to see that the government focuses almost entirely on the harm to the Company Plaintiffs; largely ignoring the very real and immediate impact that enforcement of AB 5 is likely to have on the thousands of individuals across California that are most directly affected by the statute. According to the Bureau of Labor Statistics, 79 percent of independent contractors prefer their work arrangement to traditional employment.[2]  Yet, the manner in which the government seeks to enforce AB 5 against the Company Plaintiffs would likely force Amici and thousands of other drivers to relinquish their independent contractor status and become employees in order to receive the economic benefits they derive from using the Postmates or Uber platforms.  Amici write to give a voice to these individuals whose lives will be turned upside down if the requested injunction is not issued.

---

[1] Plaintiffs Lydia Olson and Miguel Perez are referred to herein as the "Individual Plaintiffs." Postmates, Inc., and Uber Technologies, Inc. are referred to as the "Company Plaintiffs."

[2] *See* Declaration of Alexandra C. Whitworth ("Whitworth Decl.") Exh. A, "Contingent and Alternative Employment Arrangements – May 2017," Bureau of Labor Statistics, *available at* https://www.bls.gov/news.release/pdf/conemp.pdf.

Bryan Cave Leighton Paisner LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA  94111-4070

601543248.7

Amici Keisha Broussard and Daniel Rutka have relied on the Postmates app for approximately three years to earn a steady income while they pursue their creative passions and take care of their families. Ms. Broussard is an aspiring actress and mother of a pre-teenage daughter, who depends upon the money she earns using the Postmates app to supplement her income while retaining the flexibility to drop everything on short notice to attend an audition or accept a role. If she were forced to become an employee, she would be presented with a Hobson's choice between abandoning her dream of becoming a successful actress, and making enough money to support herself and her daughter. Mr. Rutka is a freelance screenwriter with an unpredictable income stream who also cares for a close family member recently diagnosed with cancer. Traditional employment would not allow Mr. Rutka to earn the supplemental income he needs to make ends meet, while retaining the flexibility to take time off to escort his loved one to doctor's visits and for treatment.

Mr. Frazier is a recent retiree who elected to take early retirement to preserve his health. A key factor in his decision to take early retirement was the ability to work as an independent contractor using the Uber platform to supplement his social security benefits. Being a self-employed driver allows him to work as much or as little as he wants and—critically—to avoid exceeding the cap on earnings that would have the effect of reducing his social security benefits. Being involuntarily converted into an employee would likely cost him thousands of dollars in lost social security benefits and force him out of retirement; negatively affecting his health and well-being.

These are just a few of the stories playing out across California as AB 5 goes into effect, which vividly illustrate the serious consequences of this misguided and haphazardly-constructed bill. While purporting to protect workers, AB 5 will in fact do the opposite: it will impose untold and unrecompensable hardship on thousands of Californians. Amici urge the Court to maintain the status quo by granting Plaintiffs' motion for a preliminary injunction, thereby preserving the economic freedom upon which Amici rely to earn a living, pursue their dreams, and take care of their families.

601543248.7

## II.    ARGUMENT

A plaintiff seeking a preliminary injunction must establish that he or she is likely to succeed on the merits, is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his or her favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the "sliding scale" approach adopted by the Ninth Circuit, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Courts in the Ninth Circuit have also explained that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered . . . ." *Westlands Water Dist. v. U.S. Dept. of Interior*, No. CIV. F00-7124 WWDLB, 2001 WL 34094077, at *7C (E.D. Cal. Mar. 22, 2001) (quoting Wright, A. Miller & M. Kane, Fed. Practice and Procedure § 2948.1, p. 139 (2d ed.1995)); *see also Skinvisible Pharmaceuticals, Inc. v. Sunless Beauty, Ltd.*, No. 2:11-CV-1591 JCM CWH, 2012 WL 1032549, at *2 (D. Nev. Mar. 27, 2012).  In deciding whether the likelihood of irreparable harm has been demonstrated, the court can consider hearsay and evidence presented by *amici*.  *See, e.g.*, *Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1072 (C.D. Cal. 2015) ("It is well established that trial courts can consider otherwise inadmissible evidence in deciding whether or not to issue a preliminary injunction.").

Amici write here specifically to address the most important of these elements—and the one that affects them most acutely—the threat of irreparable harm.  As explained below, allowing AB 5 to be enforced against the Company Plaintiffs as the Attorney General intends would strip Amici of the ability to decide when, how much, and on what platform they will drive, robbing them of the economic freedom and flexibility they depend upon to pursue their dreams and provide for their families.  The harm caused by enforcement of AB 5 will be felt by Amici and thousands of other similarly situated

3

Californians in myriad ways that cannot be undone by a final decision on the merits of Plaintiffs' Complaint.

**A.    Amici Will Be Irreparably Harmed If They Are Involuntarily Reclassified as Employees.**

**1.    Partnering With App-Based Platforms as an Independent Contractor Preserves Economic Freedom and Flexibility.**

Many ride-share and on-demand delivery drivers use app-based platforms in addition to traditional employment to supplement their income; nearly half describe having more than one job as a *choice* to earn extra money or for some other voluntary reason.[3] According to one survey, more than 80 percent of drivers who partner with Uber drive fewer than 35 hours per week.[4]  The "evidence suggests [that on-demand] jobs are in many cases supplementing traditional employment, not replacing it."[5]  Importantly, being forced to convert from independent contractor to employee would be contrary to the wishes of the majority of rideshare app workers, who rely upon the freedom and flexibility that their status as an independent contractor permits.

Media reports indicate that students are among those who benefit the most from the flexibility to determine their own schedules because they often have irregular class schedules, studying for exams one week and on break the next, but may not be able to continue pursuing their education absent a steady and predictable side job.  Akamine Kiarie, a student at Cal State, drives using the Lyft platform between classes to enable him to pay for school and living expenses.[6]  Akamine explains that the flexibility of app work

---

[3] Whitworth Decl. Exh. B, Jonathan Rothwell, *Earning income on the side is a large and growing slice of American life*, SF Gate (December 25, 2019) https://www.sfgate.com/business/article/Earning-income-on-the-side-is-a-large-and-growing-14930724.php.

[4] Whitworth Decl. Exh. C, Jonathan V. Hall & Alan B. Krueger, *An Analysis of the Labor Market for Uber's Driver-Partners in the United States*, Working Paper, Industrial Relations Section, https://dataspace.princeton.edu/jspui/handle/88435/dsp010z708z67d (last visited Feb 4, 2020).

[5] *Id.*

[6] Whitworth Decl. Exh. D, Akamine Kiarie, *How California's new 'gig economy' law undermines my livelihood*, SF Chronicle (Dec. 3, 2019),

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

601543248.7

1  made his dream of going to college a reality, by giving him the option to choose when,

2  where, and how long he drives.[7]

3      Independent contractor work also allows people who already have traditional

4  employment to supplement their income.  Given the high cost of living in this state, even

5  with full-time employment, many Californians need supplemental income from part-time

6  work to make ends meet, cover unforeseen expenses, or simply to enjoy extra luxuries like

7  a meal at a nice restaurant.  Jason Scalese is a Californian concerned by the passage of AB

8  5 and the possible negative effect its enforcement could have.  He shared on Twitter that

9  he would sometimes use the supplemental income from app work "to avoid going into

10  savings to pay a new or unexpected bill."[8]  Recently Jason has been driving for DoorDash

11  to supplement income from his consulting business, but he previously has made extra

12  money teaching tennis, which is another freelance job not excepted by AB 5.[9]

13      Independent contractor driving work also provides opportunity for immediate, as-

14  needed income.  For people who experience temporary lapses in income, like Maria

15  Rodriguez, a single mother of three who was furloughed without pay, app work provided

16  immediate income when she needed it.[10]  Maria shares that in her work as a secretary at a

17  school, she is a proud union member, but when her full-time job fails to cover her

18  expenses, she relies on readily available app work "to pick up extra income that doesn't

---

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

https://www.sfchronicle.com/opinion/openforum/article/How-California-s-new-gig-economy-law-14876952.php.

[7] *Id.*

[8] Whitworth Decl. Exh. E, Jason Scalese (@coachscalese), Twitter (Jan. 20, 2020), https://twitter.com/coachscalese/status/1219401745639464960?s=20.

[9] *Id.*; *see also* Whitworth Decl. Exh. F, Jimmy Girot, *How will California Bill AB 5 impact the club industry?*, Club Automation (Sept. 23, 2019), https://www.clubautomation.com/how-will-california-bill-ab-5-impact-the-club-industry.

[10] Whitworth Decl. Exh. G, Maria Rodriguez, *Opinion: AB 5 Removes Flexibility of Rideshare Work, But Voters Can Weigh-In*, Times of San Diego (Jan. 3, 2020) https://timesofsandiego.com/opinion/2020/01/03/ab-5-removes-flexibility-of-rideshare-work-but-voters-can-weigh-in/.

5

601543248.7

come with the demands of a second job."[11]  For Maria, AB 5 would take away the lifeline she turns to when unexpected lapses in income make paying the bills a challenge.

### 2.      Amici would be negatively and irreparably harmed by enforcement of AB5.

Amici consider themselves part of the supermajority of users of on-demand app-based platforms who prefer to remain independent contractors, with all the flexibility and autonomy that entails.  Amici's status as independent contractors, rather than employees, allows them to decide when and for how long they want to drive on any given day, to make their own schedules, and to take an hour, a day, or a week off if and when they choose.  It allows them to use multiple platforms if they desire, selecting the one that allows them to earn the most revenue at any given time, or that best fits their particular circumstances.  Reclassification as employees would harm Amici and similarly situated individuals because they would lose the flexibility and supplemental income that comes with on-demand work.

Amicus Broussard is a Los Angeles-based aspiring actress who relies upon the Postmates platform to supplement her income and to help provide for her and her pre-teen daughter.  Income from acting is sporadic and unreliable, and she is unable to predict when she may need to attend an audition; often on short notice in the middle of a weekday.  *See* Broussard Decl. ¶ 3.  Thus, she generally works for a couple hours in the morning, so she can spend quality time with her daughter or go to an audition in the afternoon, and then drive for a few more hours in the evening.  *Id.* ¶ 4.  She considers her ability to drive as much or as little as she want, when and where she wants, while making enough money to pay her bills to be "a blessing" that allows her to pursue her dream of becoming a successful actress while also earning enough money to support herself and her daughter.  *Id.* ¶ 5.  Ms. Broussard rarely works a full 40 hours a week, and prefers the flexibility to work anywhere between 20 and 40 hours per week on the days of the week and at the times of day that work for her otherwise busy life.  *Id.* ¶ 6.  The income she earns from the

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

---

[11] *Id.*

6

1   Postmates app allows her to pay her bills, and the flexible hours allowed her to

2   homeschool her daughter for a period of time.  Now that her daughter is in a traditional

3   school, on-demand work allows Ms. Broussard to be home after school to help her with

4   her homework.  *Id*. ¶ 4.

5        Amicus Rutka also lives in Los Angeles and works as a freelance screenwriter.  *See*

6   Rutka Decl. ¶ 1.  Mr. Rutka has driven using the Postmates platform for approximately

7   three years to supplement the often sporadic income he receives from his screenwriting

8   gigs.  *Id*. ¶ 2.  Although Mr. Rutka often chooses to drive more than 20 hours per week, he

9   generally completes those hours in just three days, leaving the remainder of the work week

10  to focus on his screenwriting.  *Id*. ¶ 4.  In addition to his screenwriting and app-driving,

11  Mr. Rutka assists in the care of a close family member who was recently diagnosed with

12  cancer.  *Id*. ¶ 3.  Partnering with Postmates as an independent contractor allows him the

13  flexibility to drive his family member to the frequent doctor appointments and for

14  treatment; something that would be difficult or impossible with a full-time job as an

15  employee.  Mr. Rutka also typically chooses to drive only two to three weeks during the

16  month, a benefit that traditional employment would not afford.  *Id*. ¶ 4.

17       Amicus Frazier chose to take early retirement from his traditional employment due

18  to the physical strain his job was taking on his body.  *See* Frazier Decl. ¶ 2.  As an early

19  retiree, Mr. Frazier receives social security benefits and is permitted to supplement the

20  income received from social security, but is subject to income limitations imposed by the

21  Social Security Administration ("SSA").  *Id*. ¶ 4.  For every two dollars of "excess

22  earnings" early retirees such as Frazier earn, the SSA will reduce their social security

23  benefit by $1.[12]  As a self-employed driver accepting rides on the Uber platform, the

24  determination of whether Frazier has excess earnings is made on the basis of his "net self-

25  employment earnings," after deductions of all allowable business expenses.[13]  If Frazier

26  _____

27  [12] See 20 CFR §404.434; *see also* "How We Deduct Earnings From Benefits," Social Security
    Administration, at https://www.ssa.gov/planners/retire/whileworking.html

28  [13] See 20 CFR §404, 430, §404.1080.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

were forced to work as an employee, the excess earnings determination would be based upon his full wages, any bonuses, and vacation pay; deductions are not taken into account.[14]   Frazier believes that reclassification would have him exceed the SSA limitations on early retirement income by a margin that would negate most, if not all, of his benefits. *Id.* ¶ 4-5.  Put simply, being involuntarily converted to an employee could cost him as much as $2,000 in monthly earnings.  When Frazier decided to retire early and spend more time driving, he specifically relied upon Uber's Terms of Service, pursuant to which he and Uber agreed that he was an independent contractor, and thus self-employed. As Mr. Frazier explained, "Uber made it perfectly clear to me 3 1/2 years ago when I started driving that I would be self-employed and provided resources to help me effectively navigate that world."  *Id.* ¶ 6.  Furthermore, being able to drive whenever he wants allows him to optimize his earnings to stay under the excess earnings limitations, something he would be unable to do in most traditional jobs as an employee.  Involuntarily converting Mr. Frazier into an employee would deprive him of this ability and cause him economic and potentially even physical harm.  As Mr. Frazier explains, "I could be forced right out of retirement and have to 'gut it out' for the next 4 1/2 years till I reach full retirement age where the limitations drop off."  *Id.* ¶ 5.  He claims that Uber is the "most perfect supplemental gig for a retiree ever invented."  *Id.* ¶ 6.

Amicus Wilder has been a self-employed driver using the Uber platform and other platforms for approximately four years.  *See* Wilder Decl. ¶ 2.  Wilder values his independent contractor status because it gives him the flexibility to drive when feels like it, and to choose not to drive when he is feeling "sluggish."  Mr. Wilder likes being independent because it allows him to choose where and on what platform he wants to drive.  *Id.* ¶ 3.  He prefers to provide longer-haul trips and has found that driving for Uber in Malibu, rather than other platforms, or in Los Angeles, offers him better opportunities for longer and more profitable rides.  *Id.* ¶ 4.  He believes that if required to become an

---

[14] 20 C.F.R. § 404.430; *see also* "How We Deduct Earnings From Benefits," Social Security Administration, *available at* https://www.ssa.gov/planners/retire/whileworking.html

employee, he is likely to lose the freedom to decide when and where he can drive.  Mr. Wilder also likes being able to take off whenever he wants to go out of town, without having to ask permission or work around a set schedule.  If forced to drive as an employee, Mr. Wilder would stop driving and look for other work.  *Id*. ¶ 6.  Mr. Wilder believes that other drivers would as well, significantly reducing the supply of drivers on the platform and hurting those who use Uber to get around.  *Id*. ¶ 7.

> **B.** **AB 5's arbitrary and irrational targeting of on-demand workers is unfair, unconstitutional, and harms those who have chosen to perform on-demand work relative to other workers.**

Plaintiffs' Motion explains in detail how AB 5 irrationally targets network companies and on-demand app workers, and Amici support the arguments made therein. (ECF 14-1 at 7-11.)  But Amici feel it is important to further highlight how they in particular have been unfairly and arbitrarily targeted relative to other workers who have been exempted from AB 5, solely because of the type of work for which they are qualified and have chosen to perform.

AB 5 includes a long list of industries or professions that are exempted from its provisions.  Although ostensibly aimed at exempting licensed professions and other occupations that have traditionally been considered self-employment, the statute is instead a hodge-podge of occupations, without rhyme or reason, and seemingly determined by which groups had the most effective lobbyists.  Unlike many of those who have been exempted from the law, on-demand contractors are a disparate group, with varying backgrounds and circumstances; including freelancers, students, homemakers and caregivers, and some who prefer to drive full-time as their primary occupation.  Unlike doctors, dentists, lawyers, insurance brokers, or accountants, on-demand drivers are not represented by powerful lobbyists who can horsetrade votes for exemptions.  And although some proponents have attempted to justify the exemptions as singling out learned or licensed professions, AB5 also exempts marketing professionals, graphic designers,

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

9

601543248.7

Bryan Cave Leighton Paisner LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070

payment processing agents, and enrolled agents.[15]  Notably, AB 5 also exempts freelance writers and photographers so long as they submit no more than 35 times per year.[16]  On-demand workers who partner with network company apps drew an even shorter straw than freelance journalists.  Despite being "freelance" in at least as many ways as journalists, app workers are not be given the opportunity to perform 35 rides per year per app; they are prohibited from completing even a single one without being subject to the law.

More troubling is that already-marginalized groups are likely to be those most negatively affected by AB 5.  Kristen Lopez, a freelance writer based in Los Angeles, uses a wheelchair and worries that "even if she were offered a full-time job, her disability would preclude her from taking it."[17]  She explains that "'[t]he job market is already uneven if you're a disabled person, and freelance writing is the one place where I don't feel limited by my disability.'"[18]  Similar effects are likely to be felt by other marginalized communities who face difficulties in finding and keeping traditional employment.

### C.    Enforcement of AB 5 will yield broader negative repercussions to workers and the economy as a whole.

In addition to the harm suffered by individual drivers described above, AB 5 could have broad-reaching consequences affecting the community of freelancers and society as a whole.  Plaintiffs explain in their Complaint that AB 5 would result in many fewer drivers, as only a "lucky few" could be brought on as employees.  (ECF 1 at 9).  The remainder—those who were necessarily least able to secure employment as one of the "lucky few"—will be left without the flexible, supplemental income that brings them the financial stability they would be unable to obtain elsewhere.  People like Maria Rodriguez, who

---

[15] Lab. Code, § 2750.3

[16] Lab. Code, § 2750.3(c)(2)(B)(ix), (x).

[17] Whitworth Decl. Exh. H, David Wagner, *Here's How AB5, California's New Freelancer Law, Could Affect You*, LAist (Dec. 31, 2019), https://laist.com/2019/12/31/ab5_california_gig_economy_workers_uber_lyft_freelance_writers_musicians_dynamex_lorena_gonzalez.php.

[18] *Id.*

601543248.7

already has full-time employment, are unlikely to even seek full employment status. It is precisely the fact that app work is not a true "second job" that she finds so valuable about the set-up.[19] Others, like Mr. Frazier, might consider starting their own transportation company. But not only would that endeavor be expensive—requiring him to take out debt to finance advertising, overhead, and incorporation costs—it would also be risky because he would not have the reliable source of customers that are provided by platforms like Uber.

If AB 5 is enforced as intended, even the lucky few given the opportunity to continue as employees for network companies will be harmed by their diminished ability to work with the application that is most beneficial to them on an hour-to-hour or even minute-to-minute basis. As the Complaint points out, many app–based contractors use multiple apps simultaneously. (ECF 1 at 4). Ms. Broussard's and Mr. Rutka's experiences bear this out: both have tried different apps to see which they like best. This practice is so widespread that third party applications have been created to make it easier for app-based contractors to manage multiple apps from the road. While contractors may do this to "maximize[e] their potential for earnings during the time period that they choose to make themselves available[,]" (ECF 1 at 4), it also has the effect of causing the various app companies to compete for customers in real time. As independent contractors, app-based contractors have the ability to choose which app is most convenient for them with regard to payment, time commitment, and a variety of other factors. For example, if an independent contractor dislikes any aspect of one of the apps, he or she can simply switch to one of the many competitors currently in the field. If AB 5 is enforced against network companies, however, contractors who previously operated in a frictionless market that allowed them to switch between applications to their own benefit will no longer be able to simply leave if the arrangement is inconvenient or less attractive. Rather, app-based contractors that area involuntarily converted to employees will be tied to their employer,

---

[19] Whitworth Decl. Exh. G, Rodriguez, *supra*, note 10.

601543248.7

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

which necessarily diminishes each individual's bargaining power.

## III.    CONCLUSION

If AB 5 is enforced against Plaintiffs and others like them, many Californians, including Amici, will be left without the flexible, supplemental income on which they depend.  Ms. Broussard may be forced to choose between her acting career and traditional employment; indeed, she may be forced to find a different job altogether, depriving her of her dream of becoming a successful actress and spending precious afternoons helping her daughter with her homework.  Mr. Rutka may have to choose between taking traditional employment or taking care of his sick family member.  And Mr. Frazier may have to come out of early retirement, to the detriment of both his physical health and his emotional well-being.  None of these very serious and very direct harms can be remedied by an eventual decision on the merits of Plaintiff's motion.  Amici urge the Court to take into account the extreme hardship likely to be endured by Amici and scores of other Californians trying to make ends meet if the injunction requested by Plaintiffs in this case is not granted.

Dated:   February 4, 2020

**BRYAN CAVE LEIGHTON PAISNER LLP**


By: /s/ Alexandra C. Whitworth
      Alexandra C. Whitworth
Attorneys for Keisha Broussard, Daniel Rutka,
LaMar Wilder, and Raymond Frazier

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

12