1  BRUCE J. SARCHET, Bar No. 121042
   bsarchet@littler.com
2  MICHAEL J. LOTITO, Bar No. 108740
   mlotito@littler.com
3  JAMES A. PARETTI, JR.
   jparetti@littler.com
4  LITTLER MENDELSON, P.C.
   500 Capitol Mall
5  Suite 2000
   Sacramento, CA  95814
6  Telephone: 916.830.7200
   Facsimile:  916.561.0828
7
   Attorneys for *Amici Curiae*
8  CHAMBER OF COMMERCE OF
   THE UNITED STATES OF AMERICA,
9  ENGINE ADVOCACY, AND TECHNET

10

11                 UNITED STATES DISTRICT COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13

14 LYDIA OLSON, MIGUEL PEREZ,        Case No.  2:19-cv-10956-DMG-RAO
   POSTMATES INC., and UBER
15 TECHNOLOGIES, INC.,               **BRIEF *AMICI CURIAE* IN
                                     SUPPORT OF PLAINTIFFS'
16              Plaintiff,           MOTION FOR A PRELIMINARY
                                     INJUNCTION**
17 v.
                                     Judge:        Hon. Dolly M. Gee
18 STATE OF CALIFORNIA; XAVIER       Hearing Date: February 7, 2020
   BECERRA, in his capacity as Attorney   Time:     2:00 P.M.
19 General of the State of California; and
   "JOHN DOE," in his official capacity,
20
                Defendant.
21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

1

# TABLE OF CONTENTS

2

PAGE

3

I.    INTEREST OF AMICI CURIAE ......................................................... 1

4

II.   SUMMARY OF ARGUMENT ............................................................ 2

5

III.  ARGUMENT ..................................................................................... 3

6

      A. Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief. ........... 5

7

      B. The Public Interest Strongly Favors A Preliminary Injunction. .................. 11

8

IV.   CONCLUSION ............................................................................... 17

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

i.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978)...........................................................................4

*Associated General Contractor v. Coal. for Econ. Equity*,
    950 F.2d 1401 (9th Cir. 1991) ..........................................................5

*California Trucking Association v. Becerra*,
    No. 3:18-cv-02458-BEN-BLM, 2020 WL 248933 (Jan. 16, 2020)....... 10

*City & Cty. of San Francisco v. U.S. Dept. of Homeland Security*,
    944 F.3d 773 (9th Cir. 2019) ............................................................3

*Dynamex Operations West v. Superior Court*,
    416 P.3d 1 (Cal. 2018).................................................................4, 5

*Fowler Packing Co., Inc. v. Lanier*,
    844 F.3d 809 (9th Cir. 2016) ............................................................3

*Garrett v. City of Escondido*,
    465 F. Supp. 2d 1043 (S.D. Cal. 2006) .......................................... 10

*Lawson v. Grubhub, Inc.*,
    302 F. Supp. 3d 1071 (N.D. Cal. 2018)..............................................5

*Merrifield v. Lockyer*,
    547 F.3d 978 (9th Cir. 2008) ............................................................3

*Valle del Sol, Inc. v. Whiting*,
    732 F.3d 1106 (9th Cir. 2013) ..........................................................5

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................3

**Statutes**

California Labor Code § 226.7 ....................................................................7

California Labor Code § 512 .......................................................................7

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

i.

California Labor Code § 553 ...................................................................................... 10

California Labor Code § 2080 ...................................................................................... 8

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

ii.

For the reasons set forth herein, *Amici Curiae* the Chamber of Commerce of the United States of America, Engine Advocacy, and TechNet respectfully urge this court to grant Plaintiffs' Motion for a Preliminary Injunction and enjoin defendants from enforcing AB 5 against them, or otherwise causing it to be enforced against them, pending final judgment.

## I.      INTEREST OF AMICI CURIAE[1]|

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

Engine Advocacy ("Engine") is a non-profit technology policy, research, and advocacy organization that bridges the gap between policymakers and startups, working with government and a community of high-technology, growth-oriented startups across the nation to support the development of technology entrepreneurship.

---

[1] No counsel for a party in this litigation authored this brief in whole or in part. No person or entity, other than *amici* or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

Engine conducts research, organizes events, and spearheads campaigns to educate elected officials, the entrepreneur community, and the general public on issues vital to fostering technological innovation.  Engine seeks to bring to the court's attention the particularly severe burdens that would fall on early-stage companies in the absence of a preliminary injunction in this case.

TechNet is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes 83 dynamic American businesses ranging from startups to the most iconic companies on the planet and represents over three million employees and countless customers in the fields of information technology, e-commerce, the sharing and gig economies, advanced energy, cybersecurity, venture capital, and finance. TechNet seeks to bring to the Court's attention the significant harm to its member businesses and the state's economy if a preliminary injunction does not issue in this case.

## II.   SUMMARY OF ARGUMENT

In September 2019, the State of California adopted Assembly Bill 5 ("AB 5"), which purports to cure the "harm" and "unfairness" to workers who are "exploited" when they are classified as independent contractors rather than employees under state labor and wage and hour laws.  AB 5, Section 1(b), (d).  But AB 5 has already had precisely the *opposite* effect, making it more difficult for countless workers (and

would-be workers) to earn their livelihood.  The law likewise harms businesses, the consuming public, and the state's economy writ large.  For these reasons, the court should grant plaintiffs' request for a preliminary injunction.

## III.   ARGUMENT

As explained in their brief, plaintiffs have established each of the four preliminary injunction factors.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  For starters, they are likely to succeed on the merits of their claims; at a minimum, they have raised "serious questions going to the merits" of their claims, justifying injunctive relief.  *City & Cty. of San Francisco v. U.S. Dept. of Homeland Security*, 944 F.3d 773, 789 (9th Cir. 2019) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

As the Ninth Circuit has recognized, regulatory exclusions that are irrational, arbitrary, or serve illegitimate purposes violate the Fourteenth Amendment's Equal Protection Clause.  *See, e.g.*, *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815-16 (9th Cir. 2016) (inclusion of exceptions in legislation solely for the purpose of obtaining support of organized labor violates Equal Protection); *Merrifield v. Lockyer*, 547 F.3d 978, 986 (9th Cir. 2008) (irrational exclusions contained in statute violates Equal Protection).  AB 5 denies covered businesses the equal protection of the laws because it singles out "gig" economy workers and other particular industries and business models—the ones that unions want to target for organizing drives—for unfavorable regulatory treatment without any legitimate or rational basis (other than

the capriciousness of the unions).

Moreover, AB 5 dramatically restricts the freedom of businesses and individuals to contract with one another to set the terms and conditions of their labor, unlawfully "impairing the Obligation of Contracts."  U.S. Const., Art. I, § 10.  The Contracts Clause prohibits States from substantially impairing contractual rights without sufficient justification.  *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) (Contract Clause imposes limits on state abridging existing contractual relationships even when exercising otherwise legitimate police power).  AB 5 violates that constitutional prohibition.

Plaintiffs have accordingly met their burden of establishing that they are likely to succeed on the merits of their claims.

The balance of the equities also favors the plaintiffs.  *See* Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Docket No. 14-1, at 22-23.  *Amici* focus their brief on the irreparable harm in the absence of injunctive relief and the strong public interest favoring such relief.

To be clear, *amici* do not contend that AB 5 applies to any particular Plaintiff, that a Company Plaintiff's workers would (or should) be classified as statutory employees under AB 5, or that the Company Plaintiffs cannot meet the ABC test in EITHER AB 5 or *Dynamex Operations West v. Superior Court*, 416 P.3d 1 (Cal. 2018).  In fact, in a pre-AB 5 case, another federal district court in California recently ruled that a worker who used an online platform comparable to Plaintiff Postmates's

platform was properly classified as an independent contractor under California law. *See Lawson v. Grubhub, Inc.*, 302 F. Supp. 3d 1071 (N.D. Cal. 2018).  Many of the same factors analyzed by the court in *Lawson* are part of the analysis required by AB5's ABC test.  *Compare id.* at 1083, *with Dynamex*, 416 P.3d at 36-40.

### A. Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief.

And it is not even necessary to decide or assume that AB 5 does require reclassification of workers using either Company's apps for purposes of adjudicating their motion for injunctive relief:  the imminent threat of governmental enforcement (even if unsuccessful), and the accompanying prospect of potential civil and criminal penalties, are sufficient to establish irreparable harm.  *See Valle del Sol, Inc. v. Whiting*, 732 F.3d 1106, 1029 (9th Cir. 2013) ("credible threat" of unconstitutional statute's enforcement establishes likelihood of irreparable harm).  Indeed, it is well established in this Circuit that the likely deprivation of constitutional rights constitutes an irreparable injury.  *See, e.g.*, *id.*; *Associated General Contractor v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) ("We have stated that '[a]n alleged constitutional infringement will often alone constitute irreparable harm.'" (quoting *Goldies's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984))).

But even beyond the constitutional harm, the threat of enforcement of AB 5, backed by both civil and criminal penalties, threatens the livelihood of hundreds of thousands of workers and businesses by decreasing the flexibility of workers who

have *chosen* to work as independent contractors.  In 2020, during an era of historically low unemployment, workers certainly could choose to enter the workforce as a traditional W-2 employee.  This was noted in a 2018 study from Beacon Economics:

> The argument that alternative work arrangements are a sub-optimal form of employment for workers is harder to make at a time when the national unemployment rate stands at multi-decade lows.  While it may be possible to make the case that workers who are engaged in alternative work arrangements might seek more standard types of employment when the economy is operating below capacity, it is difficult to make this claim as the economy nears full employment.  In other words, in a growing economy, workers should be much more able to find the types of employment they seek, subject to their qualifications.

Christopher Thornberg *et al.*, *Understanding California's Dynamex Decision*, Beacon Economics (2018), p. 6.

Many workers in California and throughout the country have continued to work as independent contractors.  In a 2005 report, the Bureau of Labor Statistics (BLS) surveyed contractors, and concluded that:  "The majority of independent contractors (82 percent) preferred their work arrangement to a traditional job."  U.S. Dep't of Labor, Bureau of Labor Statistics, *Contingent and Alternative Employment Relationships* (July 2005).  And BLS found similar results in its 2017 survey:  "Independent contractors overwhelmingly prefer their work arrangement (79 percent) to traditional jobs.  Fewer than 1 in 10 independent contractors would prefer a traditional work arrangement."   U.S. Dep't of Labor, Bureau of Labor Statistics, *Contingent and Alternative Employment Relationships* (May 2017).

The BLS surveys show that for many years independent contractors prefer their

work arrangements to traditional W-2 employment, and in this highly favorable job market, these workers could freely switch to W-2 jobs if they so choose.   AB 5 largely denies workers this choice, forcing them to choose between their livelihoods and employment relationships which they neither want nor need.

Traditional employment arrangements will irreparably harm contractors by requiring that they give up the flexibility and freedom to be their own boss which independent contracting provides.  Mobile platforms such as the Uber and Postmates apps operate in a way that is incommensurate with an employment relationship between the platform company and the driver or courier.  The app establishes an online marketplace for users to find one another other and transact for services.

California's employment rules do not map well onto such a platform.  For example, the California Wage Orders require employers to provide an uninterrupted 10-minute rest period to employees for every four hours worked, or major fraction thereof.  *See, e.g.*, IWC Order 5-2001, Section 12.  Failure to provide the required rest period results in a penalty of one hour of pay, due to the employee.  California Labor Code § 226.7.  California Labor Code § 512 also requires that employees receive a duty-free, uninterrupted 30-minute meal period before the end of the fifth hour of work.  Again, failure to provide the required rest period triggers a penalty of one hour of pay, due to the employee.  California Labor Code § 226.7.  So for an eight-hour work day, employees must be away from their homes and families for at least eight and a half hours per day.

Yet another example is that employers must reimburse their employees for business expenses.  See California Labor Code § 2080.  This makes remote work complicated—employers potentially must reimburse those who work at home for such things as home internet access, furniture, heat, and electricity, and rent.  As a result, employers naturally significantly limit remote work.

These restrictions limit when, where, and how California employees work, making it impossible for them to have true flexibility.  By contrast, independent contractors can work as many or as few hours in a day, with as many or as few breaks, as they choose.  They can eat when they like so they can end work when they want and pursue other endeavors, such as spending more time with their family.  And they are much freer to choose where they work because they cover their own expenses.  AB 5 largely eliminates this work-life flexibility which independent contractors enjoy.

Moreover, businesses such as the Plaintiffs here are confronted with difficult compliance questions and draconian civil and criminal penalties if they make the wrong choice.  For example, how do California's meal-and-break requirements apply where a putative "employee" performs services throughout the workday for a series of different companies?  Many "gig" economy workers "multi-app,"—*i.e.*, they use multiple online platforms simultaneously to find their customers.  Which, if any, company must provide the required breaks?  If a multi-apping worker uses his or her car to perform services for numerous companies for various purposes throughout the day—say, delivering groceries in the afternoon, passengers during rush hour, and

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

restaurant meals in the evening—which company or companies must reimburse mileage and other business-related expenses?  These difficult legal questions will inevitably arise, and the state labor code carries very serious consequences for potentially "wrong" answers.   Insofar as AB 5 directly threatens the viability of such platform-based services, it likewise threatens the financial viability of new and fledgling businesses that rely on them and the many early-stage platform startups that are not parties to this litigation but face significant harms from AB 5.  Injunctive relief is appropriate to halt each of these ongoing injuries.

Moreover, businesses such as the Plaintiffs here are confronted with difficult compliance questions and draconian civil and criminal penalties if they make the wrong choice.  For example, how do California's meal-and-break requirements apply where a putative "employee" performs services throughout the workday for a series of different companies?  Many "gig" economy workers "multi-app," completing tasks for several platform-based companies each day.  Which, if any, company must provide the required breaks?  If a multi-apping worker uses his or her car to perform services for numerous companies for various purposes throughout the day—say, delivering groceries in the afternoon, passengers during rush hour, and restaurant meals in the evening—which company or companies must reimburse mileage and other business-related expenses?  These difficult legal questions will inevitably arise, and the state labor code carries very serious consequences for potentially "wrong"

answers.[2]  Insofar as AB 5 directly threatens the viability of such platform-based services, it likewise threatens the financial viability of new and fledgling businesses that rely on them and the many early-stage platform startups that are not parties to this litigation but face significant harms from AB 5.  Injunctive relief is appropriate to halt each of these ongoing injuries.

Indeed, federal courts in the Ninth Circuit have already recognized that AB 5's civil and criminal penalties, and the threat of their enforcement, constitute irreparable harm justifying preliminary injunctive relief.  *See California Trucking Association v. Becerra*, No. 3:18-cv-02458-BEN-BLM, 2020 WL 248933, at *10-11 (Jan. 16, 2020); *see also Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1052 (S.D. Cal. 2006) (holding that threats of enforcement are sufficient to establish irreparable harm).

**B.     The Public Interest Strongly Favors A Preliminary Injunction.**

As detailed above, AB 5 is already harming workers, businesses, consumers, and the entire California economy.

The innovative business models used by Company Plaintiffs significantly enhance social welfare.  They provide goods and services to consumers more efficiently, at lower prices.   For example, on-demand ride-sharing services provide faster and more efficient transportation than traditional medallion-based taxi services.

---

[2] For example, in addition to steep civil penalties, the California Labor Code imposes criminal penalties for failure to pay required overtime pay, *see* Cal. Lab. Code § 553, and minimum wage, *see id. §* 1199, to workers classified as employees (including those who would be newly classified as employees under AB 5).

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

10.

*See, e.g.,* "Faster and Cheaper: How Ride-Sourcing Fills a Gap in Low-Income Los Angeles Neighborhoods," BOTEC Corporation, July 2015, available at http://botecanalysis.com/wp-content/uploads/2017/02/Uber-LA-Report.pdf (last accessed January 27, 2020).  The growth of platform-based on-demand rideshare services has likewise reduced drunk driving.  *See* James Sherk, "The Rise of the Gig Economy:  Good for Workers and Consumers," Heritage Foundation (October 6, 2016) (citing Brad Greenwood and Sunil Wattal, "Show Me the Way to Go Home: An Empirical Investigation of Ride Sharing and Alcohol Related Motor Vehicle Homicide," Temple University Fox School of Business Research Paper No. 15-054, January 29, 2015, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2557612), available at https://www.heritage.org/jobs-and-labor/report/the-rise-the-gig-economy-good-workers-and-consumers#_ftn21 (last accessed January 27, 2020)).

AB 5 undermines these public benefits, threatening enforcement actions that increase Company Plaintiffs' costs, which the consuming public will ultimately bear through higher prices.  Plaintiffs have supplied ample evidence of AB 5's economic harm from potentially requiring platform-based companies to reclassify their workers as full-blown employees.  *See generally* Declaration of Justin McCrary in Support of Plaintiffs' Motion for Preliminary Injunction, Docket No. 19.

This harm goes far beyond direct costs to companies, or lost earnings to workers.  For example, platform-based services may facilitate greater competition.  A large, national chain restaurant may enjoy the economies of scale and name

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

11.

recognition needed to maintain a workforce of dedicated delivery drivers.  But a new, independent restaurant with slim profit margins may be unable to afford to hire a delivery employee, even on only a part-time basis.  But that same restaurant, at a fraction of the cost, can subscribe with any number of platform-based delivery services to deliver their meals to a wide range of customers.  Because AB 5 directly threatens the viability of such platform-based services, it likewise threatens the financial viability of new and fledgling businesses that rely on them.

An analysis done earlier this month by the Chamber makes clear that the harmful effects on the "gig" economy of state regulation like AB 5 are not limited solely to workers or the platform-based companies that they utilize.  On the contrary, they harm a far broader swath of the economy and even government itself:

> Logically, platform holders would have to make some changes to their models.  If gig workers become employees, they will be subject to state wage-and-hour laws.  Platform holders will become responsible for providing an hourly minimum wage and overtime.  So to ensure they can continue making a profit, platform holders will have to take more control over when where gig employees work. . . .

> And these controls will necessarily change the nature of gig work—often to the detriment of gig workers.  Military spouses, transitioning service members, ex-offenders, students, parents, and moonlighters may no longer have access to the gig economy.  *Legislators will have closed an avenue for millions of Americans to supplement their incomes or sustain themselves when they are in between jobs.  In that sense, they may actually be raising costs for the state, which may need to provide social services to people who no longer have alternative work opportunities.  And they will, perhaps, have smothered a nascent industry in its cradle.*

U.S. Chamber of Commerce Employment Policy Division, *Ready, Fire, Aim:  How*

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

12.

*State Regulators Are Threatening the Gig Economy*, at 36-37 (emphasis added) (attached hereto as Exhibit B, and available at:  https://www.uschamber.com/report/ready-fire-aim-how-state-regulators-are-threatening-the-gig-economy-and-millions-of-workers (last accessed January 27, 2020)).

The threat of AB 5's enforcement is already causing harm to the livelihood of hundreds of thousands of workers in California.  California State Assemblyman Kevin Kiley has collected the testimony of these victims in the recently published *AB 5 STORIES:  Testimonials of Californians Who Have Lost Their Livelihoods* (attached hereto as Exhibit A, and available at https://ad06.asmrc.org/sites/default/files/districts/ad06/files/AB5%20Booklet_0.pdf (last accessed January 29, 2020)).  Just a small sampling of these accounts makes clear that AB 5 has already wreaked, and continues to threaten, irreparable collateral harm to workers and small businesses alike.

• Ryan:  "I am the owner of a pediatric therapy company.  We provide work to approximately 40 ICs who want to see a few clients in addition to their full time jobs.  *This law would force me to let go of all 40 ICs as I cannot afford to pay them*."

• Jan:  "I'm an older woman with two teaching credentials living in a small county who cannot find employment outside of independent contractor online teaching jobs.  *One company has already announced they will no longer contract with California teachers.  I care for a disabled husband.  I will lose my home if I cannot work for those companies*."

• Ernie:  "I'm retired and at age 75 the freelance writing I do for several publications is an important supplemental income source for me and my family.  I'm good at what I do and produce about 200 articles a year.  *Yesterday I was notified that my work is being cut in half and I am losing one column entirely*

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

13.

*because I submit more than the arbitrary 35 to that publication.*"

- Cori:  "AB 5 is detrimental to my small blog.  Hiring contractors to do small things for me here and there is how I make it work.  I cannot ask all of those contractors to become employees.  It is unsustainable.  *I will have to look out of state for help.*"

- Hope:  "*This bill will devastate the services the Deaf community receive.*  Almost all of the American Sign Language Interpreters that work in the community are Independent Contractors.  We get the bulk of our work through agencies that work like clearing houses that send out the work.  We set our pay and take the work if we want or don't want."

- Donna:  "I am a bandleader and work with 20 different musicians through the course of the year.  Some I will use once some 15-20 times.  *The costs of making them employees, work comp, payroll costs etc. will put me out of business.*"

- Andrea:  "I'm a freelance writer who writes dozens of pieces for various clients each month.  I did my writing through a content mill, which has now blocked California writers from communicating with any new clients and is limiting us to 34 articles per year for the clients we already had.  For perspective, I often wrote more than 34 articles per MONTH for ONE of my clients alone.  I am now losing these clients, many of whom I've worked with for years.  I was incredibly happy with my work life prior to AB 5.  *I made enough money to satisfy my needs, and I was able to work when I wanted and take time off when I wanted, something I needed due to my chronic health problems.*"

- Susan:  "I am a tax preparer.  I prepare corporate and partnership returns for mostly entertainment clients.  *If they are forced to become employees of the studios, I lose my business.*  I've had some of my clients for 30 years."

- Marsha:  "I lost my job of 12 years as a medical transcriptionist because of AB 5.  Many in this profession value the flexibility in hour and working from home more than employee status.  *Now I have no money at all.*"

- Andi:  "Just lost my ability to earn a living because of California Assembly Bill 5.  My freelance brokerage company says that they have to let California authors go.  *Almost a decade of hard work gone in an instant.  I can't stop crying.  Right before Christmas.*"

(Emphases added.)  These examples demonstrate how, contrary to its stated purpose,

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

14.

AB 5 has caused workers and small businesses serious and sometimes devastating financial and personal harm.  Because of AB 5, much less work is available.  Clients no longer do business with contractors, threatening their economic security.  AB 5 also removed essential flexibility in their working arrangements that allowed them to care for ailing family members or otherwise balance work and life commitments. Small and independent businesses are likewise suffering, as the threat of AB 5 enforcement forces them to dramatically restructure their businesses in unsustainable ways.

Additional economic harm from AB 5 is already well documented, as California businesses close and businesses (and workers) leave the state to pursue their livelihood free of AB 5's reach.  *See, e.g.,* Karen Anderson, "Another Voice: Assembly Bill 5 harms hundreds of industries and professions," *Sacramento Business Journal* (January 24, 2020) (describing how AB 5 has led to closures of businesses, outflux of California independent contractors, and relocation of California platform-based employers); Nellie Bowles & Noam Scheiber, "California Wanted to Protect Uber Drivers.  Now It May Hurt Freelancers," *New York Times* (December 31, 2019) (detailing deleterious effects of AB 5 on freelance workers, including writers, translators, transcriptionists, performers, and clergy); Max Willens, "'It definitely limits our options': Under AB 5, publishers and freelancers see costs rise," *Digiday* (January 17, 2020) (cataloging negative economic impact of AB 5 on freelance writers and publishers that engage them).

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

15.

A preliminary injunction against the enforcement of AB 5 as applied to the Plaintiffs therefore would advance the public interest.

**IV.   CONCLUSION**

For the foregoing reasons, the Chamber respectfully urges this court to grant Plaintiffs' Motion for a Preliminary Injunction and enjoin defendants from enforcing AB 5 against them, or otherwise causing it to be enforced against them, pending final judgment.

Dated:   February 4, 2020

*/s/ Bruce J. Sarchet*
BRUCE J. SARCHET, Bar No. 121042
MICHAEL J. LOTITO, Bar No. 108740
JAMES A. PARETTI, JR.

LITTLER MENDELSON, P.C.

Attorneys for *Amici Curiae*
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
ENGINE ADVOCACY
TECHNET

LITTLER MENDELSON, P.C.
500 Capitol Mall
Suite 2000
Sacramento, CA  95814
916.830.7200

16.

# EXHIBIT A



# *the following are stories of californias who have been*



#AB5STORIES

*negatively*

*impacted by ab 5.*

#AB5STORIES

# Cori

"AB5 is detrimental to my small blog. Hiring contractors to do small things for me here and there is how I make it work. I cannot ask all of those contractors to become employees. It is unsustainable. I will have to look out of state for help."

#AB5STORIES



#AB5STORIES

# Elyse

"As a person with a disability, freelance writing is the only way I have been able to make a living and have a viable career. AB5 will not only rob people like me of having dignity and a source of income."



# Lucy

"As an Independent contractor Interpreter I work for multiple agencies and have the freedom to

work when I want and as much as I want. I love what I do and AB5 will drastically limit the work I

#AB5STORIES

can perform. I can get a job with benefits and payroll deductions, but I prefer to work as an

independent contractor because it's more lucrative and flexible."





# Baofeng

"I am a freelance translator. Two major clients just locked me out of vendor portals, just because I live in California. Over 90% of my income is from these two companies."

#AB5STORIES



#ABSTORIES

# Amber

"I love being my own boss, contributing to multiple publications, controlling my own schedule, being flexible enough to take time off whenever my young son needs me. If one of my clients offered me a full-time W-2 job, I'd probably say no. Luckily, I haven't yet been directly impacted by AB5. But I do have a solid client that's started offering me smaller pieces of work, so I worry about hitting that



#AB5STORIES

35-pays and treats me well, due to an arbitrary limit.submission limit. It'd be a shame if I had to turn down work, from a client that "

# Eddie

"I use my own tools to work in the entertainment industry and have to drive approx 30,000 miles a year. All of these are write offs that I depend on to stay in business. Take that away and my family is homeless including my 11 month old baby."

#AB5STORIES



# Stephany

"I quit my tech job 4.5 years ago to shear sheep and write. In mid 2017, I moved my grandmother to California. She is completely cognitively and physically impaired. I love my life, independence, business, and family. The state should not be able to take those away."



#AB5STORIES

# Anonymo



#AB5STORIES

# us

"I am an online teacher hired as an IC. The company I work for is based in China....they have

already stated that they will no longer hire CA teachers."

**# A B 5 S T O R I E S**

# Donna

"I am a bandleader and work with 20 different musicians through the course of the year. Some I will use once some 15-20 times. The costs of making them employees, work comp, payroll costs etc. will put me out of business."



#AB5STORIES

# Lorri

"Independent court and deposition reporters! We freelance for several firms, set our own

schedule, don't need benefits. Want to stay independent!"



#AB5STORIES



# Claire

"I am a translator and work as an independent contractor for many years, for only one company.

I was told by email 20 days ago that I won't be able to work for them anymore, starting in

January. It's my only income and I love what I do."



#AB5STORIES

# Anonymo



# us

"I write more than 35 freelance articles in a month, and this bill would cap me at less than that for

a year. And it will not force anyone to hire me on staff."

**#AB5STORIES**

# Nancy

"I'm a pharmacist who's lost my position as an IC who performs inspections of pharmacies across the country for compliance to standards of safe practices in nonsterile and sterile compounding."





#AB5STORIES

# Melissa

"My husband is a band leader. Can't get paid to play music on the weekends anymore because according to AB5 he'd have to make the singer, drummer, and bass player employees of the band."



#AB5STORIES



# Susan

"I am a tax preparer. I prepare corporate and partnership returns for mostly entertainment clients. If they are forced to become employees of the studios, I lose my business. I've had some of my clients for 30 years."



#AB5STORIES

# Micaela

"Translation business-owner here. I have the option to contract translators elsewhere. But I would rather be able to continue contracting with excellent CA-based translators. AB5 brings a lot of uncertainty. Without an exception, we may be forced to contract outside CA."



#AB5STORIES



# Mayan

"Please understand that my mother, a translator and interpreter for over 30 years, will no longer be allowed to speak for immigrants in the court system because of AB 5."

#AB5STORIES



# Alexis

"Please fix AB 5 so that I may continue to put food on my table as

I struggle to rebuild my home in Paradise. Still displaced after the Camp Fire."

#AB5STORIES



# Andi

"Just lost my ability to earn a living because of California Assembly Bill 5. My freelance brokerage

company says they have to let California authors go. Almost a decade of hard work gone in an

# A B 5 S T O R I E S

instant. I can't stop crying.

Right before Christmas.**"**



# Rebecca

"Today, along with literally HUNDREDS of my colleagues, I was told that I can no longer hold a paid position at SB Nation. California, you're breaking my heart (and taking my money)."

#AB5STORIES



# Whitson

"I cannot begin to explain the stress this has put on me and my family. I know there are no

guarantees in this business. I could lose clients to layoffs, or to a recession. But I never thought

#AB5STORIES

the government would just take work away from me arbitrarily.**"**



# Mallory

"I have been a professional journalist since 2005. I have worked fulltime and freelanced for a

significant amount of years in my career. Most recently, I was laid off from a full-time editor

position Bustle in November and due to AB-5, many of the publications that were initially

interested in

me freelancing for them stopped being interested."



#AB5STORIES



# Travis

"I am an independent contractor working in the film and television industry who's had plenty of

sleepless nights worrying about the future of my business. If AB 5 is not overturned, I don't

# A B 5 S T O R I E S

believe small service businesses such as mine have a future in this state.**"**



# Jennifer

"I am a freelance Spanish interpreter and have been certified since 2012. AB 5 will dismantle our industry's decades-old, proven independent contractor model and force us to adopt an unsustainable alternative which will drive many language professionals to leave our thriving careers and deprive limited English proficient individuals of their right to receive services in their primary language."



#AB5STORIES

# Marsha

"I lost my job of 12 years as a medical transcriptionist because of AB5. Many in this profession value the flexibility in hours and working from home more than employee status. Now I have no money at all."

#AB5STORIES



# Kirk

"After 27 years in construction trucking, own a home, raised 2 boys, own $250,000 worth of CARB

LEGAL equipment. AB 5 will put me out of business!"

# A B 5 S T O R I E S



# Laura

"This hurts the Deaf community because of the complications in hiring and retaining qualified sign

language interpreters."



# A B 5 S T O R I E S



# Connie

"This affects my ability to work (and provide for my family as a single parent) in the Courts in

multiple counties."

**#AB5STORIES**



# Austin

"I am a full-time employee at a corporation in California, but I work as a freelance writer on the side for supplemental income. I enjoy my job as a writer, and I am very grateful of the publication I produce content for, as they

#AB5STORIES

have allowed me to maintain a flexible schedule and have afforded me the opportunity to be paid to do something I love.

After learning about how AB 5 will not only affect my livelihood, but that of hundreds of thousands of other Californians, it makes me sick to my stomach."



# Susan

"I have been an independent contractor working as a court reporter for over 30 years. The opportunity to be an employee has always been available to me, but I chose freelancing because it afforded me the opportunity to put my family first, before my job."

#AB5STORIES



# Julie

"I am an American Sign Language interpreter for the Deaf a majority of the work we do is as

independent contractors since many locations only need our services occasionally. There is

already a scarcity

#AB5STORIES

of qualified interpreters. This bill makes getting assignments covered even more difficult which

means more Deaf people will be left without communication access."



# Maria

"I won't be able to work as an American Sign Language interpreter. I work freelance and I have

now been removed from all agencies I worked for in my capacity as interpreter."



# Stephanie

"AB 5 is detrimental to the well being of my Deaf clients as well as my right to earn a living the

way I want to. I'm losing so much work because agencies can't afford to keep all of their sign

#AB5STORIES

language interpreters on as employees.**"**



# Michael

"With this law, I'd never have been able to make the short films I have in the past. For aspiring filmmakers trying to break in, this is death."



# Claudia

"I'm a freelance language professional (translator) and my corporate clients are dropping my translation services starting this month."

#AB5STORIES



# Hope

"This bill will devastate the services the Deaf community receive. Almost all the American Sign

Language Interpreters that work in the community are Independent Contractors. We get the bulk

of our work through

#AB5STORIES

agencies that work like clearing houses that send out the work. We set our pay and take the work

if we want or don't want."



# Ernie

"I'm retired and at age 75 the freelance writing I do for several publications is an important

supplemental income source for me and my family. I'm good at what I do and produce abut 200

articles a year. Yesterday I was notified that my work is being cut in half and I am losing one

column entirely because I submit more than the arbitrary 35 to that publication."

#AB5STORIES



# Jay

"I have been a PR/Marketing Communications freelancer since 1992 and this legislation greatly impacts my ability to work."

**#AB5STORIES**



# Kelly

"I'm a freelance writer supporting myself and a family in Los Angeles, and AB5 directly impacts

how I can do that, as well as thousands of my colleagues."

# A B 5 S T O R I E S



# Anthony

"I currently serve the courts as a certified Interpreter (Independent Contractor). Interpreters were

among the list of "losers" who did not get an exemption from AB5 and as a consequence, we are

# A B 5 S T O R I E S

all in a state of chaos, knowing that the law makes it impossible for us to resume doing our work."



# Katherine

"I am an online English teacher hired as an independent contractor... In no way shape or form does it benefit me, in actuality it is detrimental to my financial well being."



# John

"I have been a freelancer for 35 years and am in several areas of work, some of which are

adversely affected by AB5. I've had as many as 15 1099s in some years - it'll be impossible to have

#AB5STORIES

that many W-2s and I'll not be able to deduct business expenses."



# Jan

"I'm an older woman with two teaching credentials living in a small county who cannot find employment outside of independent contractor online teaching jobs. One company has already announced they will no longer contract with California teachers. I care for a disabled husband.

I will lose my home if I cannot work for these companies."

#AB5STORIES



# Katherine

"I am independent contractor for multiple companies and have been for over 6 years. This allowed me to be at home to care for my elderly parents. Because companies would rather err on the side of caution and not

#AB5STORIES

deal with the headache I'm backed into a corner and going to have to take a job outside of the

home again and just hope nothing happens to them while I'm

40+ hours a week!"



# Wendy

**"**As a freelance journalist, this bill is devastating to me and my ability to earn enough money to

support myself.**"**



# Connie

"The AB 5 law has now taken away my limited options for employment . I am not medically cleared to return to the

workforce, I have problems standing and walking which severely impact my ability to find employment. My company as well

as many other online teaching companies are now choosing to not work with California teachers. I have a bachelors degree

#AB5STORIES

as well as a teaching credential I am not a victim, I choose to work as an independent contractor because it is what suits my life best at this moment. AB 5 is taking away my choices and my livelihood away. I tried to apply to other companies and was told that they

can no longer work with Californians, as of January 1, 2020 I will be unemployed and stand a chance of losing everything I have and becoming homeless because of this new law."



# Jessica

"I am an independent contractor for a company based in China. They recently announced they are no longer partnering with new California independent contractors. The current CA contractors are feeling like our jobs are in jeopardy."

#AB5STORIES



# Andrea

"I'm a freelance writer who writes dozens of pieces for various clients each month. I did my writing through a

content mill, which has now blocked California writers from communicating with any new clients and is limiting



#AB5STORIES

us to 34 articles per year for the clients we already had. For perspective, I often wrote more than 34 articles per MONTH for ONE of my clients alone.

I'm now losing these clients, many of whom I've worked with for years. I was incredibly happy with my work life prior to AB 5. I made enough money to satisfy my needs, and I was able to work when I wanted and take time off when I wanted,



something I needed due to my chronic health problems."

# Willow

"I am a freelance writer and filmmaker, and AB5 directly impacts my ability to work, and my ability

to hire film crew members!"

#AB5STORIES



# Linda

"I have successfully been freelancing for over 20 years. My job has allowed me to care for my

mother and raise my son. This legislation now has the potential to destroy my writing business and

#AB5STORIES

the businesses of many of my colleagues.**"**



# Nicole

"I am a professional in the photography and video industry. This bill is already costing me work as advertising agencies and clients are choosing to shoot out of state and hire non-Californians. I hold a degree in film production and have spent my entire career building a list of clients so that I can remain flexible to take care of my family and spend time with my husband who is a first responder."

# A B 5 S T O R I E S



# Amy

"I'm a freelance writer who's worked for a decade at my craft. AB 5 has essentially left me without

any work."

#AB5STORIES



# Richard

"Musician. Multiple venues stating they're worried about hiring live entertainment until the

details regarding AB5 are 'sorted out'."

#AB5STORIES



# Hsiao-Yu

"Software engineer contractor was my previous job and I loved it. Now AB 5 took it away."

#AB5STORIES



# Jennifer

"I own and run a very small business as a postpartum doula and Lactation educator and I enjoy being independent and autonomous. AB



# A B 5 S T O R I E S

5 limits me if I need/want to hire people as my business grows."



# Catherine

"It takes away job flexibility for my sons to work while they are in college."



# Kathleen

"My work as an independent is threatened, I am retired but like to supplement my income by

picking up a few jobs during the year."

#AB5STORIES



# Elizabeth

"As a mobile Notary Signing Agent, I am in limbo with this disastrous law."

#AB5STORIES



# Ryan

"I am the owner of a pediatric therapy company. We provide work to approximately 40 ICs who

want to see a few clients in addition to their full time jobs. This law would force me to let go of



# A B 5 S T O R I E S

all 40 ICs as I cannot afford to pay them.**"**



# Karen

"I am currently working as a freelance food delivery driver and if this bad law is not appealed, then I would lose my livelihood and trying to find a good paying job at the age of 54 is nearly impossible due to age discrimination."

#AB5STORIES



# Carla

"As a stay at home mother of three I rely on being an independent contractor and working from

home. AB 5 hurts my family, it takes food off our tables and necessities for my children."

#AB5STORIES



# Janet

" There is no way my clients are going to hire me as an employee to work on sporadic projects

during the year, so I will lose the ability to augment my social security and I'm not eligible for SNAP

benefits. I'm 67

#AB5STORIES

years old, on Social Secutity and if I can't find a full time job at this point, I can't pay the rent and

eat!"



# Walter

"I am an actor, singer, and storyteller, active throughout San Diego County. AB 5 is impacting my ability to work."

#AB5STORIES



# Rachel

"I am a freelance musician and teacher living in Los Angeles. Much of my performance

income is non-Union and I am hired to perform for each organization maybe once or twice a

year. I am very

**#AB5STORIES**

concerned that my performance income will dry up, given the vast majority of arts

organizations will not be able to comply with AB5 and make musicians employees, nor does

that make any sense given the business model."



# Rebekah

"I am a Pediatric Occupational Therapist with 23 years of experience in my field. Since starting a family, I have enjoyed the flexibility of working as a private contractor. Because of AB 5, this is no longer possible."

#AB5STORIES



# Christine

"I've already lost two writing jobs and I'm on the verge of losing a third.

I will have no income source. I've lived in California my entire life, but am considering moving to

Nevada."

#AB5STORIES



# Gail

"I am a sign language interpreter and have worked self employed for almost 20 years. This impacts

my livelihood by not letting agencies give me work."

#AB5STORIES



# Nicolas

"I am a freelance musician. Some of the theater companies I work for are either cancelling shows or having to make some adjustments that are not sustainable in the long run."

#AB5STORIES



# Scott

"AB 5, within a week of it's implementation, has already destroyed countless jobs in CA. As a

music professional it has the potential to put me out of business and decimate my industry."

# A B 5 S T O R I E S



# Marina

"I'm a certified court interpreter. I have been freelancing for 15 years and very happy doing that.

What I like about freelancing is that I only work for the good agencies (that pay well), I can work as much or as little

**#AB5STORIES**

as I want to spend time with my 3 year old. This law is destroying my wonderful work/life

combo."



# Robin

"My husband and I are both freelance professionals. Both of us have taken a huge financial hit. We have 3 children to provide for."

#AB5STORIES



# George

"I'm a self-employed freelance composer working from home, making just barely enough to

survive. On occasion I will hire musicians to come in and do recording, doesn't make sense to have

#AB5STORIES

them be an employee if I only hire them for a few hours at a time."



# Marisa

"I just moved to California from the east coast. I work in film/media production, and Los Angeles is a "gig based" economy particularly in the film industry! I can't find regular work now as I was already making near minimum wage as a Production Assistant (though I'm not struggling to pay rent by any means, as with typical overtime the pay levels out well). Positioning myself as an S-corp or LLC to jump through hoops for this law will cost more than it would benefit me. I'm now forced to look for full-time jobs (which are scarce!) just to avoid dealing with AB 5."

#AB5STORIES



# Paul

"I've been a freelance writer and editor for 25 years. Working freelance has allowed me to raise my

daughter from the day she came home from the hospital to the present (she's 10), pick and choose both the

work I do and the hours and days

#AB5STORIES

I do it, and work with incredible employers who have (with very few exceptions)

ALWAYS had my best interests at heart. AB5 will force me to leave jobs that I've held for over a decade

and join a growing pool of other freelancers who are grabbing at the few freelance jobs that will be left

for us."



# Marlene

"AB 5 has impacted my life. I am self employed by choice. I do not want to be an employee nor do I want to lose my tax exemptions as a company. I should not be forced into employment relationships with my clients, most of which will not hire me anymore if they are forced to become my employers. This law will destroy my business."



**#AB5STORIES**



# Tracy

"I am an ASL interpeter and work for several agencies. By being able to work for different

agencies I can meet the needs of the Deaf community . With this bill I would no longer be able

#AB5STORIES

to work as I do and the Deaf community would suffer."



# Susan

"As a freelance court reporter, AB 5 has upended my career. I have been working as an

independent contractor since January of 1992. I WANT to be an independent contractor. In any

given year, I can work with 10, 15, 20, even 30 different agencies to help cover calendar. Some I

may only work for once. Some a handful of times. I do not want to be

an employee of any of the agencies. I want to set my own hours, what depositions I choose to

report, where I choose to work."

#AB5STORIES



# Julia

"I am a freelance writer based in L.A. A couple years ago, I started freelancing - a change that allowed me to work from my own home, on my own hours, and own schedule. I now write for multiple publications and

#AB5STORIES

companies and, for the first time, feel in control of my mental health and livelihood. AB 5 threatens this and the thought of giving up my business devastates me. My work means everything to me. It is not a question - if AB5 were to take my work away, I'd have to move. It simply would not be an option to stay



here."

# Nikki

"I'm a freelance musician and a realtor. I'm 90% self employed. ALL of my freelance work is independently contracted and I have over 30+ clients and vendors (annually) who I provide services for. THIS LAW DOES NOT HELP ME. In turn, it actually makes it very difficult for me to do any sort of work for these 30+ clients without them having to provide benefits for me."

#AB5STORIES



# Deborah

"I'm a 67-year-old grandmother living on Social Security. Up until Jan 1st I was also an online

transcriptionist earning approx $200 a month in much needed additional income. I love the work

and it is a perfect

#AB5STORIES

fit for workfrom-home situations, however due to AB 5, California residents were dropped by the

world-wide company I was working for."



# Ryland

"With the implementation of AB5, I, as a musician, producer, and contractor, will not be hiring anyone this year so long as AB5 is in effect. I cannot afford the added expenses. Additionally, several companies I work for I are struggling to determine how to remain afloat as they are service based and do not bring in hefty profits beyond what the team members are paid."

#AB5STORIES



# Jessica

"As a freelance court reporter, I choose when to work, what jobs to take, and how to

transcribe testimony. I do not want to be an employee. As a new mom I can tell agencies that I

only want

**#AB5STORIES**

afternoon work or only morning work, or that I only want to work on Tuesdays and Thursdays.

As an employee, I would not get to pick a schedule that works for me."



#AB5STORIES

# Nelly

"As a Single mom of 3, I depend on all my freelance work that I get medical interpreting to help

meet ends. I make just enough to cover all my bills."



# Sylvia

"I am an independent musician, and I run the Non-profit community orchestra, Southland

Symphony. We are attempting to shift to a model to comply, but there is a very real chance that we will not be able

#AB5STORIES

to sustain our operation with these new costs and requirements. We provide music for our community, provide free admission to our concerts for those who cannot afford tickets, perform for several city events each year, and more.

But we may not be able to continue unless this bill is repealed."



# John

"I'm a freelance composer in the film industry and consistently employ musicians throughout the year, in addition to my own freelance employment. If this comes down as onerous as it appears to be, I will have not choice but to leave the state I was born and raised in and/or increase my employment of oversea musicians and out of state musicians."

#AB5STORIES



# Danielle

"I am a freelance court reporter in California. We are not part of the gig economy. We are highly trained and skilled and work for various court reporting firms, law firms and courthouses. We make our own schedule

#AB5STORIES

and accept the work we choose. We are no way employees with the many firms we work for.

Classifying freelance court reporters as employees will affect our livelihood in a negative way."



# Jamie

"I am a freelance licensed stenographer/court reporter licensed by the state of California. AB5 will impact my livelihood in so many ways.

I choose to be an independent contractor."

#AB5STORIES



# Jennifer

"I have been a self employed sign language interpreter for 40 years. If I have to follow AB 5, I

wouldn't been able to work anymore, since I'm getting close to retirement age. I love my

#AB5STORIES

work, I love choosing my own schedule, and interpreters are in high demand.**"**



# Tricia

"I am a freelance court reporter, licensed by the State of California. I have been an independent contractor for

25 years, business license issued by City of San Diego. My clients are reporting agencies. I choose my

assignments, negotiate my own rates, provide my own equipment, set my own schedule, and invoice over 30

clients (agencies) a year. I am now being told by my clients that they cannot do business with me unless I

incorporate. I am a sole proprietor

and have decided a corporation is not best for me, but I will be driven into bankruptcy if I don't."



#AB5STORIES



# Candi

"I have two children to support and AB 5 would be financially detrimental for my family. The

ability to be an independent and name my own rates has allowed me to make ends meet to

#AB5STORIES

support my family.**"**



#ABSSTORIES

# Michele Ann

"I have spent most of my adult life creating a career as a freelance writer. I have non-traditional skills that would

#AB5STORIES

prevent me from being hired by a newspaper but I have a longterm newspaper client for just this reason, I have skills staff writers do not have. If I were to lose this gig (about 110 articles a year), everything, including my ability to write books (I've written 24 so far) would fall apart."



# Vivien

"I am a freelance press photographer. The 35 submission cap silences me."

#AB5STORIES



# Lorraine

"I may be losing my job as an independent contractor doing transcribing for almost 30 years. AB5

is life-destroying."

#AB5STORIES



# Elizabeth

"I am a Certified Shorthand Reporter in the State I'd California who will be adversely affected by

AB5. As a licensed professional, I do not want or need to be classified as an employee since I work



#AB5STORIES

for many agencies reporting depositions and court hearings and can set my own rates and job

schedule.**"**



# Kristen

"I am a freelance sign language interpreter. AB5 only hurts my profession by not allowing us the flexibility we need to be able to create and manage our own schedules to accept the jobs we need and are qualified for. We do not wish to work as employees nor will that structure fit how our career operates. It will likely drive up service costs while we are paid less which will hurts thousands of Deaf and Hard of Hearing individuals who will not be able to get adequate services or any services at all. We could be pushed out of state to even find adequate work which will worsen the issue that we don't have enough qualified interpreters to fill all areas of need."

#AB5STORIES



**# A B 5 S T O R I E S**

# Lisa

"I am a Certified Shorthand Reporter. For my whole career, 24 years, I've been an independent contractor. I love being independent. I accept/decline work as it fits into my life and my family's life."



# Haana

"I am a music producer and it unnecessarily complicates every aspect of my business currently as a

sole proprieter.  This bill will be the death of the music industry in CA."

# AB5STORIES



# Coleen

"As an independent freelance Certified Shorthand Reporter (CSR), AB5 is going to put me and the firms I work for out of business.  We as freelance CSRs have always been independent contractors.  It allows us to

#AB5STORIES

have a flexible schedule, to work for multiple agencies when we want to, so we have time for our

family and other commitments."



#ABSTORIES

# Angel

"This law will negatively effect my ability to manage my business.  All of my contractors work for me about 2 hours out of each month, there is no way I can keep up with the amount of paperwork in turning them into employees.  This law will ruin my business."

#AB5STORIES



# Kerry

"I have been working as a freelance court reporter since 1999.  I also do transcription and scoping

works.  I should be able to continue the career I have established for the last 21 years."

#AB5STORIES



# Lourdes

"I am an independent freelance court reporter who loves being able to work whenever I choose.

As a mother of two very young children, this bill will definitely impact my livelihood on being able



#AB5STORIES

to provide for my family.**"**



# Sandy

"I'm a self employed muscian, bandleader and instructor. If I have to do payroll for my band members, it will most likely make it unfeasible to continue to do work as a musician."

#AB5STORIES



# Colleen

"I am a court reporter in California that does depositions. I do work for many different firms. Two firms have already notified me that they can no longer give me work. I am the one who supports my family, and

#AB5STORIES

I have been doing this work for over 30 years. I'm not sure what to do now..."



# Calista

"I am a terminal manager for a transportation company that leases owner operators to transport

mobile offices and manufactured homes. Due to this law, the company I work for will be closing my

terminal and cancelling the California based owner operators leases."

#AB5STORIES



# Jennifer

"I am a freelance American Sign Language interpreter, and the only way for our industry to

successfully deliver quality interpretation and translation services to members of the deaf

community is to

#AB5STORIES

allow our long-standing business structure to remain intact. AB5 would cause serious harm to the

provision of interpretation and translation services to deaf individuals."



# Orson

"I am an operatic tenor and artist. The implementation of this law would greatly affect my

ability to bring awareness and inspiration to the communities at large."

#AB5STORIES



# Josh

"(AB5) is devastating for opera singers in California. I hire hundreds of singers and musicians per

year, and this bill may cut that number in half, or force us to close all together."

#AB5STORIES



# Amy

"I am an independent contractor physical therapist by choice so that I can work part time and care for my child. Please repeal AB5 because it will take a lot of moms out of the work force."

# A B 5 S T O R I E S



# Kaitlyn

"Having recently moved to California, I've been relying heavily on freelance writing as a source of income. With the passing of AB5, I have just been locked out of my freelance writing platforms,

#AB5STORIES

and am left to scramble to find other means to pay my bills.**"**



# Rosemary

"I am a freelance Sign Language interpreter with a very specialized skill set that I have worked many years to develop. AB5 hinders my ability to meet a specific language need in the deaf community by blocking agencies from hiring me when and as needed."



# Andrew

"As a nurse anesthesiologist, I have found AB5 to limit my ability to have multiple contracts and

affect my business negatively. Those I contract with no longer feel safe offering a 1099 contract

#AB5STORIES

to me; however, neither of us are interested in a W2. This inhibits my ability to be competitive

in the field."



# Joe

"I am a freelancer. Freelancing has been necessary for me in California to make ends meet and support my family. Having read the text of (AB5), I fear it will be too difficult to find companies who are willing to utilize my services.

I may be unable to continue working with some of my current clients."

**#AB5STORIES**



# Misti

"Due to the passing of AB5, I had to quit working as a licensed massage therapist. Being an

independent contractor at a chiropractors office, I do not have the money to be setting up a

# A B 5 S T O R I E S

business right now."



#AB5STORIES

# Lee

"My wife and I are independent insurance adjusters. AB5 is having huge and negative impacts on our profession."



# Cris

"I am a freelance sign language interpreter. To force interpreters to become employees is to

endanger their livelihood and self determination, and also endangers the availability of

#AB5STORIES

interpreters for the deaf community."



# Elizabeth

"I have a disability which makes flexible hours essential to my ability to earn income.  My health has improved when I can freelance more and get out of the set schedule and being in an office. Now the one thing I can predictably and successfully earn income with is disappearing.  This law is hurting all of us who need to work flexible and irregular schedules for all kinds of family and health reasons."

#AB5STORIES



# Jeff

"I am a picture editor in the entertainment industry.  The amount of companies that now deny

loan out services has grown and it is affecting earnings."

# A B 5 S T O R I E S



# Alicia

"I just got my first notice that because of AB5 I won't be paid for a big comedy show I'm

promoting - but I have to do the show anyway in order to get more shows.  This could cripple my

#AB5STORIES

performing career.**"**



#ABSTORIES

# Renee

"The last few months have been an emotional roller coaster because of AB5.  As a small business in the entertainment transcription and translation field I've utilized the skills of local transcription specialists.  It pained me to tell my California transcribers that I could no longer work with them.

The law is causing chaos, grief, fear and anger in the CA freelance community."

#AB5STORIES



# Lynn

"I am a transcriptionist.  I work from home and I love it.  Just recently, without notice, the companies I work for were forced to cut off all their California workers.  They are still operating,

#AB5STORIES

because they have transcriptionists all over the world working for them.  But those of us in

California just lost our livelihood."



# Rene

"I am a freelance certified stenographer.  I've been working as an independent contractor for over 30 years.  This is the only way deposition reporters can operate and be viewed as independent, nonbiased parties in litigation."

#AB5STORIES



# Andi

"As a highly skilled and educated freelancer, this law adversely impacts my ability to provide for

my family.  My work as a freelancer allows me to homeschool and contribute to my household

financially.  This

#AB5STORIES

law greatly impacts us and as a result, I am considering a move out of my native state so that we

may continue to provide for our family."



# Gwen

"I have been a freelance certified stenographer since 1986.  I work for as many as 15-20 different agencies in any given year reporting pre-trial depositions.  I am trained for nothing else.  It would be devastating for me.  I would not be able to be an employee because that would mean I was not impartial, which a court stenographer absolutely must be.  The burden it would be on the legal industry needs to be considered as well as the harm to all freelance reporters working in the state."



# Elisabeth

"I am an independent, reporter-owned court reporting business and working freelance reporter.

This AB5 is killing my business."



#AB5STORIES



# Kathryn

"I am (was) a transcriber working from home.  I am a senior citizen living on a very small fixed income and absolutely need the little bit of money I earned as an independent contractor.  AB5 has



#AB5STORIES

devastated my life.  I don't know how I will be able to pay my bills and afford to live."



# Jennifer

"I am a freelance Spanish interpreter and choose to be independent. I contract with about 40 Language Services Companies each year, subcontract from 10 to 15 colleagues and have a handful of direct clients. I have already received a couple new contracts from the Language Services Companies with indemnity sections that place the burden for enforcement of AB5 on the individual interpreters. If I refuse to sign these contracts, I will lose out on an estimated $8,000 of income in 2020. AB5 will dismantle our industry's decades-old, proven independent contractor model and force us to adopt an unsustainable alternative which will drive many language professionals to leave our

#AB5STORIES



thriving career. **"**

# Cindy

**"**I have been a sign language interpreter for 30 years. I have been self-employed for 25 of those

years. If AB5 is not

#AB5STORIES

repealed, it will seriously affect my income in a negative way. As a self-employed person I control how much I charge per hour and hopw many hours I work on any given day. AB5 will take away the freedom that I have had for 25 years to live and work in a way that works for me."



# Marianne

"As a freelance reporter, I do not work with one firm exclusively due to where I reside. I need to work with multiple court reporting firms all over the state. If AB5 is not repealed, there will be many freelance court reporters who will retire."

#AB5STORIES



# Julia

"I am a translator and certified interpreter for State and Federal Courts, and have been an independent contractor in California for almost 30 years. Some of my clients retain my services only a few times

**#AB5STORIES**

per year. We provide a professional and fundamental service to our community. Far from

protecting us, AB5 is the reason many interpreters and translators already started losing their

jobs."





# Kyle

"I am a freelance writer working for a number of publications. AB5 would absolutely gut my work

load, cutting my pay by 70% and leaving me unable to pay bills to support my family."

#AB5STORIES



# Jeffrey

"I've been doing writing and editing work as a remote-working independent contractor for

nearly three years now. In anticipation of AB5, my employer stopped renewing the contracts of

#AB5STORIES

California workers. I haven't been able to find work since then.**"**



# Jayson

"I'm an independent owner operator in the trucking industry. With the passage of AB5, my 25 years worth of work will be destroyed."



# Jeffrey

"I've been doing writing and editing work as a remote-working independent contractor for

nearly three years now. In anticipation of AB5, my employer stopped renewing the contracts of

#AB5STORIES

California workers. I haven't been able to find work since then."



# Jayson

"I'm an independent owner operator in the trucking industry. With the passage of AB5, my 25 years worth of work will be destroyed."

#AB5STORIES



# Michelle

"I am a nail technician renting a space in a very tiny hair salon. I am my sole provider and this bill will put me out of business."

#AB5STORIES



# Joshua

"I am a freelance musician who will be severely affected by this bill. If clubs and restaurants are hit with the extra expenses of making every musician they hire "employees," they will simply opt for strictly

#AB5STORIES

prerecorded music. Essentially, creatives will be completely squeezed out of the California

economy."



# Steven

"I am a freelance musician. If left as-is, this bill will be the death blow to my career, my colleague's careers, and my industry."

#AB5STORIES



#AB5STORIES



# Tim

"I am an orchestra manager for one of the hundreds of 501(c)(3) organizations that provide cultural events to enhance the lives of our local citizens. AB5 will decimate this enriching bunch of organizations."

**#AB5STORIES**



# Katherine

"I'm a freelance court reporter. There is no way I can do my job and make the money I have been

making if I'm working as an employee for one agency. Doing so would be cutting my earnings by

#AB5STORIES

$40,000 to $60,000 a year!**"**





# Kim

"I am a freelance, independent contractor California Certified Shorthand Reporter. It is very important to me that I remain an independent contractor as I require the flexibility that being an independent contractor provides. Being treated as employees would not only be detrimental to freelance court reporter's work lives, but also to our personal lives."



#AB5STORIES



# Stacy

"I am a consumer who has had the cost of AB5 passed onto me. I take music lessons. The music

company that provides the lessons through the use of independent contractors has passed their

costs of having to

#AB5STORIES

hire these independent contractors as employees onto me. The cost of my lessons has increased as

a result of AB5, I may have to cancel them.**"**



# Kate

"I have a social media management business and am at a point where I no longer do all the work myself. I have 4 clients and am already burning out physically and mentally. However, I need to take on more clients in order to make a livable income. Without contractors helping me, I will not be able to do so. My business will suffer and so will my ability to make enough money to pay my bills because i cannot afford to hire them as employees."

#AB5STORIES



#AB5STORIES

# Shonna

"I had to close my company of 10 years due to the AB5 law! It has destroyed my finances, and I had to lay off 20 people. It is very difficult to keep up a small business for many people at this point."

#AB5STORIES



# Ernie

"I have been a columnist for several publications. When AB5 was adopted my workload was

essentially cut in half. I lost one column entirely and was cut back to 35 annually on a second

for one

**#AB5STORIES**

publication. For a second publication, my work was cut to 35. This has been a significant loss of

income for me."



# David

"I'm a journalist and seven-time published author. I freelance as a means to supplement my income and feed my family, but now I can't contribute to my own blog and I'm missing out on $1,000 per month."

**#AB5STORIES**



# Dave

"Until AB5 erased my income, I was a successful freelance writer. Several of my largest and most

lucrative clients stopped working with me on January 1, causing my income to plummet."

#AB5STORIES



# Ryan

"I'm an entertainer who performs mostly at private events. When I am already booked, I send out

2 other people to perform. I signed contracts with clients and took deposits back in 2018-19 for

shows in 2020. The

#AB5STORIES

budgets were set. Now having to pay for workers comp, payroll taxes, accountants, payroll company, sick days, I stand to lose $89,000 in 2020."



# Esther

"I am a freelance interpreter, I help people who do not speak English communicate with their medical providers. I am a proud senior, capable of being independent and self sufficient. AB5 leaves me out of work."

#AB5STORIES



# Anne

"Since being laid off in 2016, I've managed to build a steady stream of income through freelance writing and consulting. Because I don't have to commute, I am more productive and earn more. I'm also grateful for the flexibility to work while still being able to spend plenty of time with my young child. Due to the high cost of child care, I cannot afford to take a full-time job—but working for myself has made it

**#AB5STORIES**

possible for me to be a good worker and a good parent. However, due to AB5, I'm at risk of losing my main client and only consistent and predictable source of income. Many companies are simply choosing not to work with California freelancers, instead abandoning longstanding professional relationships only because of AB5. The ripple effects of AB5 mean lost wages

and lost opportunity not just for freelancers, but for the fellow workers we employ. If I lose my clients, my husband and I will no longer be able to afford our home."



# Connie

"I am a transcriptionist. All the transcription work is now going out of state. No transcription company in California will use us, and the transcription companies out of state won't use us. We are out of work because of AB5."

#AB5STORIES



# John

"I am a guest orchestral conductor. I depend on my contractor status to maintain sustainable fees,

while not fleecing orchestras. Because of this bill, I just lost my first scheduled job with an

orchestra - $9000

#AB5STORIES

that would have put a dent in my student loans, or helped pay my insurance, or paid for food and

shelter is now gone - all because of AB5."



# Angel

"I run a small entertainment company and use about 300 contractors through the course of the year. Some I will use once some 15-20 times. The costs of making them employees, work comp, payroll costs etc. will put me out of business."



# Janet

"As an independent songwriter, AB5 gravely endangers my ability to earn a living."

#AB5STORIES



# Aedan

"I'm a 27 year old freelance writer and my heart is broken. As is, full-time positions within media

companies are a rarity — and now the two that I primarily do freelance contributions for have let

me go because of

#AB5STORIES

AB5. This not only has stripped me of an opportunity to pursue my passion and make some

semblance of money from it, but it's extremely disheartening to those who pay their bills (and

taxes)."



#AB5STORIES

# Angelica

"I became a certified interpreter just last year. Finding agencies is hard and now the few I know are asking me to become incorporated, until I get a business license/corporation, I cannot work. I haven't worked as an interpreter so far in January. My bills are starting to add up."

#AB5STORIES



# Stephanie

"I am an American Sign Language Interpreter who has already lost work after AB5 was passed. Many

agencies that I contract with cannot afford to make us all employees so my contracts were terminated. I

chose this

#AB5STORIES

profession knowing that the majority of my work would be as an independent contractor and I was okay with that. Now, after 10-plus years in the field, I don't have any say in what jobs I take because there aren't any for me to choose from. What's worse is my Deaf clientele won't have as many interpreters to choose



from and there are already not enough of us in this field."

# Myrna

"I started working with a company doing remote dental billing in January of 2018 to supplement my Social Security check. I am 66 and I really loved staying home and doing my job in the field that I'm good at. Now I am told I have to get an LLC which I cannot afford to keep being an independent contractor with them. So I have lost my job and my income that was helping me stay in my home and on my feet."

#AB5STORIES



# Eddie

"As a freelance musician and sound engineer, I am hired by various groups for either or both of my professional services. None of which am I an employee nor should I be because there is no guaranteed 40

#AB5STORIES

hours of work per work or otherwise. Moreover, my wife and I have adapted our lives, especially in regards to our children, to not have to pay much in babysitting because my

flexible schedule allows me to work when I want and be home when I want. Becoming an employee somewhere would do far more bad than good for us."



# Jessica

"I have been an American Sign Language interpreter for the deaf for half my life. Many agencies I work with are letting go of all ties with ICs and hiring a skeleton crew of employees to cover some of their work. Others are shutting down. I am now down to very, very few options to feed my family. From someone who has worked full time my entire career, I'll be very lucky if I can work even part time now."

#AB5STORIES



# Ellen

"I am a Dance Teacher and Choreographer working in several different schools and community

centers, with contracts that last generally between six weeks and three months. AB5 will kill my

#AB5STORIES

livelihood of more than 30 years."



# Charles

"For the past three years, I've worked as a freelance writer producing translations for one client and copywriting for dozens of clients through a referral service. As a result of AB5, I've been reduced to 34 submissions a year from well over 700 by the referral service, which is about 60% of my income."

#AB5STORIES



# Carole

" I am a long-time freelance writer. One of my best clients dropped me at the beginning of 2020. I

lost several thousand dollars last year from this outlet for my work. Also, I am having more trouble

than usual placing

#AB5STORIES

stories in general. Unfortunately, I am not going to be able to make up this money with my

profession, so my only choice might be to attempt another line of work."



# Rebekah

"I am a Pediatric Occupational Therapist with over 20 years experience in my field. When my husband and I started a family, we decided that I would leave my full time school district position (As a W-2 employee, benefits, retirement, etc.) in favor of the flexibility of being an independent contractor. When my children were very young, I worked two days a week. I was almost able to recoup my full time pay! A few years ago, one of my school district positions switched back to an employee status. I remained an IC for another company that I work for. Our state organization, the Occupational Therapy Association of CA, sought an exemption from AB5. That obviously wasn't granted. I cannot pass the ABC test, as I provide a service similar to what the contracting agency that I contract with provides. Contract based therapy services- whether it's Occupational or Physical Therapy, or Speech-Language Pathology, are mandated by IDEA. There are times, especially in small rural school districts, that contracting for services makes sense. I have been given the option to become a W2 employee. I will lose out on hourly wages, my take home pay will be lower, and will not have the tax benefits of being an independent contractor."



**#AB5STORIES**



# Gerald

"I am a 58-year-old freelance musician and graphic artist. I have been earning all or part of my

income as an independent contractor since I was seventeen-years-old. AB5, as it is currently



#AB5STORIES

written, is already losing me work and causing an unfair burden related to trying to work as a

freelancer."



# Sarah

"I have been a full time small business owner and artist for 10 years and this law is hurting small businesses. This law makes it difficult for small businesses to hire independent writers, graphic designers, virtual assistants, marketing reps, and other necessary Gig work that helps small businesses to be able to grow. It's going to take the arts, music, literature, and culture out of our lives by forcing artists to either incorporate, which is extremely cost prohibitive in California, or to stop producing art, meaning that the patrons of the arts will lose access to art programming that enriches the lives of the people in our communities. People who choose to work as Freelance workers have chosen this path because they want the flexibility to set their own hours and rates and work when they want and they will no longer be able

to excel in their creative fields under AB5. This law hurts the lower and middle class people who have side gigs, creative gigs, or are trying to launch their own small business."



**#AB5STORIES**



# Timothy

"With this new AB5 law, it will be REALLY difficult for me as a small marketing/ad agency owner to grow and scale. I cannot give other creative professionals job opportunities. I cannot afford to put employees on

#AB5STORIES

payroll until my business becomes steady enough to where I can hire full-time staff. Most of the

freelancers we hire do not even want to be considered employees. They love the creative

freedom!"



# Rachele

"I am a stay at home mom of twin boys. Being able to work from home has allowed me to support my family and raise the boys. I was a medical transcriptionist. Because of this new law I will now need to obtain employment outside of my home which will be very difficult as I have been out of the workforce for 10 years, working from home. I will also now need to obtain daycare for the boys, costing several hundred a month."

#AB5STORIES



# RL

"I have been a freelance cartoonist for a small newspaper for 25 years. With these new rules, most smaller publications would never hire a cartoonist as an employee. With the 35 submission limit, I can't even do a

**#AB5STORIES**

weekly cartoon anymore. The income I receive helps to augment my social security and under AB5

I would get a $3000 per year pay cut."



# Alexis

"I am a professional, independent sign language interpreter. I work as an independent contractor and set my own schedule. AB 5 threatens unfairly and adversely affects my ability to function as an independent contractor."

#AB5STORIES



# Loralyn

"I have been a Sign Language Interpreter for more than 30 years. As I near retirement age, the

concept of losing my means of earning a living is devastating."

#AB5STORIES



# Robin

"Working as a freelance writer, editor, and recipe developer has allowed me to be at home to take

care of my young son and to maintain steady work and income. I have happily worked for myself

providing services

#AB5STORIES

to multiple clients for nearly 20 years. I have built a successful business for myself, but I have

already lost one lucrative contract this year because of AB5 and I fear that others will follow."



# Zenab

"I am an Arabic Interpreter and a mother. I have been working as a freelance independent contractor for over 19 years. I am a professional that worked very hard to achieve my educational goals to be recognized in my field of work. There is a very high demand for Arabic interpreters in our community and not enough professionals. Now, and because of AB5, we are not able to do our jobs and duties towards our community. I had over 5 letters from agencies in the first week of 2020 telling me they are not going to work with me as freelancers due to AB5. I am very frustrated because I am no longer able to do what I love and no longer able to provide for myself and my family in California. I might have to move out to be able to live a decent life."



#AB5STORIES



# Tina

"My small staffing business is significantly impacted as a result of this. My Independent

Contractors (ICs) have taken a significant cut in pay, my business has taken a reduction in

# A B 5 S T O R I E S

profitability and I am losing clients as a result."



# Lauren

"I'm new to the writing world, but freelance writing for the past year has been my dream come true. I've loved everything about it, but especially the freedom. I wrote what I wanted, when I wanted, for who I wanted. I controlled my income, my schedule, and choose my subjects. Now, in order to continue living my humble writing dream, I have to consider leaving my home; the state I grew up in, my parents grew up in, and my grandparents grew up in. That makes me incredibly sad."

# A B 5 S T O R I E S



# Reina

"For a retired performing artist who simply would like to receive a little compensation to be able to pay myself and other retired performing artists who work with me, this bill is most disturbing, frustrating, discouraging and literally career-ending for my little performing group. My performing friends and I simply want to give back to our community by performing at retirement homes and local club organizations. We

#AB5STORIES

do it because we love it. Not for a paycheck. Not for retirement benefits. Because of AB5, I will need to stop inviting people to perform with me for a little stipend, or I will need to simply stop paying them and let them volunteer their time. Yes, of course they would be willing to volunteer, but they work hard to learn music and dances. I would just like to honor them by paying them something. And I doubt that my performers, who may earn a whopping $500 a year, would be interested in getting a business license."



# Nancy

"I am an optometrist and mother of two. AB5 has slashed my income by 30 percent overnight. Why weren't optometrists given an exemption when other medical doctors were? This is unfair! Doctors have historically worked as independent contractors. This gives us the flexibility to work at multiple locations that need us.

We do not need or want to be any part of this bill. We are not exploited workers. We are professionals that are happy being independent contractors. Being contractors allows us to deliver medical care efficiently and economically. This bill will drive up the cost of health care which is already too high."



#AB5STORIES



# Jared

"AB5 forced me to shut down my business over night and fundamentally changed the way my industry has to

do business. I went from making about $80,000 a year in home services to a minimum wage employee doing

the exact same job. Being self employed I was able to insure myself for far less than a company can. I can no

# A B 5 S T O R I E S

longer invest in my business to grow it for my children or write off the expenses of doing so. My family trade is gone. I have gone from planning to work only 4 days a week to spend more time with my kids to not knowing if I can make ends meet working 7 days."



# Kristin

"As a professional classical soprano, I rely on multiple gigs collectively for income as an independent contractor. Making a living with one full-time job in the opera field rarely exists. I've already lost all work starting this year because of this poorly written bill as the projects I was contracted to sing have been cancelled. Students and freelancers rely upon the freedom to be able to earn income via these short term contracts - they don't want to be employees. As a board member for a mid-tier non-profit Opera company, we would be unable to produce operas going forward under the AB5 labor laws. We exist in order to expose communities to this art form, either free of charge or for a very nominal ticket price. We obtain our revenue via small grants, fundraisers, benefit concerts, silent auctions and ticket sales in

order to just break even and pay our singers, conductors, etc. Our contractors rely on our projects, in addition to others in order to collectively supplement them with opportunities and income."



# A B 5 S T O R I E S



# Tuomas

"I've been a successful freelance translator in California for over 20 years but now AB5 threatens to make me unemployed. I've already lost several clients because of it. I offer Finnish language services to tens of language service

#AB5STORIES

companies all over the United States and none of these companies would consider hiring me as an

employee for the small amount of intermittent work I do for each individual client – nor would I want to

be hired or classified as an employee. I want to decide my clients, projects, rates and ways to operate. I'm

in this business because of the freedom it offers. ”



# Rosanne

"I am I am a professional singer, and I also do transcription work to earn m living. Because of this bill I am now unemployed. If it trickles over into my music gigs, I plan on leaving California. This has been absolutely devastating to me and has left me scrambling to try to find a job. This has turned my world upside down."

#AB5STORIES



# Jean

"I have been a contract tech writer in the medical device industry for 15 years. Because I can't

afford to live in the Bay Area, I live on the central coast and contract for companies in the SF Bay

Area where medical

#AB5STORIES

device industry thrives. My last project ended in December. I am now unemployed with no

prospects thanks to ab5. This is devastating. I have no idea how I'm

going to pay my mortgage and stay affloat. Gig jobs will now be given to writers living outside the

state."



# Jessica

"I am a transcriptionist. I homeschool my kids. I attend college with a double major. I provide childcare for my grandson. I was in no way exploited by the company I contracted with. I made $60 per 1 hour audio file. I paid taxes and had benefits. I chose my own hours. I built my whole life around independent contracting. It was all taken away. How will I continue to provide childcare, homeschooling, and pursue my degree now?"



# Court

"My wife and I are freelance event entertainers who do live caricatures. Since AB5 went into effect Jan. 1, we have received no inquiries to book with any corporate clients, which is very unusual. Event entertainment is our primary source of income. And it seems to be drying up. Companies seem to be staying away from any vendors and suppliers if they are in California because they don't want to risk violating this law. Also,

**#AB5STORIES**

this law forces us to hire all of our local colleagues who work with us at events as employees, even if we only use them for a single event once a year, which is often the case. Likewise, all of these other artists would have to make me and my wife their employees if we ever help them out at an

event. For a local network of people to all simultaneously be each others' employees and employers at the same time is insane. But that's what AB5 would force us to do, or we risk fines that would bankrupt us."



# Larry

"I have a full time job, but I supplement my income as a sound engineer and video editor in order to support my disabled wife. I'm the sole provider in our household. I'm losing freelance work and necessary income thanks to AB5. I'm considering moving out of CA, and taking my wife away from her family just to be able to stay financially afloat."

#AB5STORIES



# Carol

"I lost my home in the Camp Fire of 2018. The only silver lining I had was that I didn't lose my

livelihood as so many others did because I'm able to work remotely from anywhere. AB5 put an

end to that. Still

#AB5STORIES

displaced, my income has been severely diminished. This makes it so much harder to get back

home. Rebuilding costs have more than doubled since the fire, and

my insurance already doesn't cover my entire loss. Now I will have to divert some of those

proceeds just to live."



# Jennifer

"On January 1st, I and dozens of my other freelance transcription colleagues were unceremoniously and swiftly laid off. I had blinked at the new computer monitor I had just purchased with my transcription earnings when I had logged into my work email that day. Laid off? I leaned back in my ergonomic chair and rested my feet on my new mini work desk. The month of January was the month that I had budgeted and calculated that I could start paying off family members, student loans, get a car, and sign my daughter up for dance lessons. I had been asked a few months prior to join a medical team for the company I was contracting with and finally, finally, I was making big strides and sighing in relief. That day, I almost threw up. After years of not even scraping by I had finally found my little niche. Being a single mom I had been lost but decided to freelance transcribe while my daughter went to preschool paid for by the state. I can say it was a literal life-saver and every day I was waking up thanking this great country with it's freedom to freelance and build a pretty great life from the ground-up."

#AB5STORIES



# Anna

"I'm a telephonic interpreter. I work as an independent contractor with several companies,

servicing both government and commercial sectors. Literally, on 01/01/20, my account was frozen

with one of my

#AB5STORIES

companies, demanding that I form a CORPORATION and sign my contract ANEW as one. No, they dont let me be just a DBA. Another company also just put me into an inactive status due to AB5 without giving any further explanations."



# Daniel

"I am a chiropractor in California. I was just terminated from my wonderful independent contract, 10 hour/week job. The company cited AB-5. I've had this job for 10 years. The job allowed me flexibility to take care of my three special-needs kids. Now it's gone."

#AB5STORIES



# Cathleen

"The ability to work independently provides me as a single mother of multiple children with

special needs flexibility to earn livable wages. Minimum wage, workman's comp, paid leave, and

other provisions in a

#AB5STORIES

traditional employee setting are the trade-offs for that schedule flexibility that I CHOOSE to not

have by working independently. AB5 does not protect the working middle class. It severely cripples

it!"





"I'm a freelance photographer that essentially now lost supplemental income because of AB5."

# A B 5 S T O R I E S



# Mary

"For the past several years I have put my Master's degree to work doing online research and writing executive summaries that match with market and industry trends. I can do the summaries when available from my home computer (around my children's school schedule) where and when I want. I get paid per summary and can choose how many I want to complete. This side "gig" had paid for my older children's tuition in college. I have paid state and federal taxes on these earnings. This has now dried up

**#AB5STORIES**

as my employer (a small business) does not want to deal with California's

convoluted AB5 and why should they when there are 49 states with contractors to chose from. Not only am I out my earnings

but CA will have to do without the taxes I paid on them as well."



# Tamara

"I am a Certified Shorthand Reporter licensed within the state of California. I have been an independent contractor for 35 years as well as run a small firm. This decision has been nothing short of devastating to myself and the professional reporters with whom I have had a wonderful business-to-business working relationship for years. The cumbersome expense, needless hours attaining business licenses, S-Corp filing, creating business banking accounts, as well as the unknown future of our profession is weighing quite heavily."

#AB5STORIES



# Lloyd

"As a tech startup owner. This law has been deviation to say the least. I have only been in business

for 2 yrs and for the most part been very successful. When this law was announced all the contacts

#AB5STORIES

we had with multiple companies from all over the place instantly ended.**"**



# Fredina

"I am a small owner operator (IC) AND I have worked for decades with hundreds of other small owner operators (ICs) in order to compete with the BIG Trucking companies in our field, AB5 outlaws my ability to work with these "like" ICs rendering us powerless to compete and therefore making it impossible to remain profitable."

#AB5STORIES



# A B 5 S T O R I E S

# EXHIBIT B



**U.S. CHAMBER OF COMMERCE**
Employment Policy Division

# Ready, Fire, Aim

## How State Regulators Are Threatening the Gig Economy and Millions of Workers and Consumers



January 2020

# Contents

**06**  **The Historical Roots of the Gig Economy**

**10**  **Defining the Gig Economy**

**18**  **Criticisms of the Gig Economy**

**22**  **State Efforts to Regulate the Gig Economy**

**30**  **Effects of State Regulation on the Gig Economy**

**38**  **Options for the Gig Economy**

# Ready, Fire, Aim

## How State Regulators Are Threatening the Gig Economy and Millions of

## Workers and Consumers

### A White Paper Prepared for the U.S. Chamber of Commerce[1]

Few workplace phenomena have captured the public's imagination like the "gig economy." In only a few short years, companies like Uber, Lyft, TaskRabbit, Postmates, Instacart, and others have remade whole industries. They have offered unprecedented flexibility to workers and unprecedented convenience to consumers. Better still, they have provided an avenue back into the workforce for millions of Americans, such as military spouses, transitioning service members, and ex-offenders  who can sometimes have difficulty connecting with the traditional labor market and nine-to-five jobs. They have provided extra income for workers in traditional jobs, served in some ways as an informal safety net, provided mobility to seniors and those with disabilities, and even saved lives by reducing drunk driving.

But not everyone has welcomed the gig economy's rise. Labor advocates have criticized it for leaving workers without the job protections or benefits often associated with full-time employment. Academics have attacked it for undermining the formal social safety net and disadvantaging businesses that hire traditional employees. And legislators have accused it of misclassifying workers and starving state treasuries of much-needed funds.

What these critics miss, however, is that gig work is not a new phenomenon. People have been working independently of an "employer" and providing each other goods and services directly for centuries. Conceptually, these platforms are not so different from the historical marketplace, or even newer innovations like newspaper want-ads. They differ only in their unprecedented efficiency and scale, mediated through modern technology.

Nevertheless, lawmakers have pursued policies, such as AB 5 in California, that threaten this emerging and innovative industry along with the benefits the gig economy has brought to workers and consumers. Their efforts range from modest reforms, like putting limits on gig workers' contracts, to grand social experiments, like reclassifying all gig workers as employees.

These more radical efforts fail on their own terms. Once their rhetoric is boiled away, it becomes clear that they do not even begin to solve the problems they set out to address. They cannot, for example, guarantee that gig workers will share the same protections as full-time employees. Many of those protections kick in only once a person works for a certain period, and since many, if not most, gig workers use platforms on a part-time basis, they often work too infrequently to qualify. Other protections depend on federal law; and for federal-law purposes, gig workers will remain independent contractors for the foreseeable future.[2]

---

1   Tammy McCutchen and Alex MacDonald are attorneys in the Washington, DC office of Littler Mendelson P.C. Ms. McCutchen previously served as the Wage & Hour Administrator at the U.S. Department of Labor.

2   Some lawmakers, of course, have proposed changes at the federal level as well. For example, the Protecting the Right to Organize (PRO) Act, H.R. 2474, 116th Cong. (2019) would adopt an ABC-style test to determine who qualifies as an employee under the National Labor Relations Act. See id. § 4(a)(2) (proposing to amend 29 U.S.C. § 152(3)).

———— *"Lawmakers can address concerns around gig workers while preserving the gig model itself. They can expand access to benefit systems like association health and retirement plans."*

Worse, even if these efforts succeed in extending employment protections to gig workers, they will do more harm than good. Today, workers value gig work most for its flexibility. They like working when they want, where they want, and as much as they want. They like being their own boss. But that flexibility evaporates when states apply their wage-and-hour laws. Those laws require companies to pay workers a minimum hourly wage, as well as overtime compensation. Once companies face these regulations and costs, they will no longer be able to let workers choose when and where to work. They will have to schedule workers at the places and times when the opportunity for revenue is greatest. They will also become more selective in whom they let onto their platforms. The flexibility and low barriers of entry that once marked the gig economy will become a thing of the past.

It doesn't have to be this way. Lawmakers can address concerns around gig workers while preserving the gig model itself. However, before doing so, especially with respect to traditional employee benefits, they must obtain data to ensure that any proposals are what gig workers want and need and do not do more harm than good. They can expand access to benefit systems like association health and retirement plans. They can extend civil-rights protections to independent contractors. They can create workers'-compensation funds for gig workers, and all of this can be done without creating full-blown employment relationships. Any of these measures would address concerns about the gig economy while avoiding any lasting damage to this nascent industry.

Some states are moving in the right direction. More should. If we want to preserve what is good about the gig economy, we have to fashion regulatory solutions for the twenty-first century. We simply cannot continue to rely on existing employment models alone.





# The Historical Roots of the Gig Economy

When we discuss the gig economy, we often treat it as a new phenomenon. But in fact, it has deep historical parallels. People have been working independently and providing goods and services to one another for centuries. Understanding this history can help us understand how the gig economy fits into the modern workplace.

### The Tradition of Independent Work

The classic independent worker was the small farmer. Roman society, for one, lionized the independent farmer as the ideal citizen.[1] These farmers owned the land they worked and supported themselves—and the state— through their production. They persisted into medieval Europe, where farms often operated as independent enterprises.[2]

This dynamic survived into fifteenth century England, where what we know today as master–servant law began to emerge. Contemporaries used the word *servant* in at least two senses: one broad, one narrow.[3] Used broadly, the term denoted anyone providing services to another person.[4] Used

---

[1] See Stephanie A. Nelson, God and the Land: The Metaphysics of Farming in Hesiod and Vergil 89 (1998) (quoting Cato the Elder, De Agricultura 1.1); Praecipitia in Ruinam: The Decline of the Small Roman Farmer and the Fall of the Roman Republic, 92 Int'l Soc. Sci. Rev. 1, 7 (2016) (noting that Roman contemporaries called farming the "most highly respected" occupation).

[2] See Andrea Komlosy, Work: The Last 1,000 Years 57 (Jacob K. Watson & Loren Balhorn trans., Verso 2018) (describing late medieval farms as small enterprises).

[3] Robert J. Steinfeld, The Invention of Free Labor: The Employment Relation in English and American Law and Culture, 1350–1870, at 18–19 (1991).

[4] Id. at 20.

narrowly, it distinguished dependent workers from independent ones.[5]

In contrast to servants were laborers and artificers—the precursors of modern independent workers. They worked for multiple masters, sometimes several at a time.[6] They supplemented their income through other activities, such as farming their own land and performing craft work.[7]

Because of this independence, they were not considered "in the service" of another person, and were thus not "servants" in the narrow sense.[10]

**Ready, Fire, Aim** How State Regulators Are Threatening the Gig Economy

## The Industrial Revolution and the Centralization of Work

In the mid-nineteenth century, the Industrial Revolution transformed the English and American economies. Increasingly, businesses produced goods in centralized and mechanized workshops— i.e., factories.[8] These factories changed the nature of work itself. No longer did a single worker build a product from start to finish.[12] Instead, the production process was broken down into its constituent parts, of which a given worker learned only one.[13] Workers increasingly specialized and, in the estimation of some, degraded their skills.[14]

Workers also lost much of their autonomy. Industrial businesses controlled not only workers' activities, but also their time.[15] Time became the new measure of labor.[16] Businesses also increasingly found the local labor supply too thin and imported workers from afar.[17] Unlike pre-industrial craftsmen, these imported workers owned neither the premises where they worked nor the tools they used.[18] As a result, they depended more and more on a single enterprise for their livelihood.[19]

It is here that the modern concept of the "job" took form.[20] Before industrialization, people thought of work as an assignment that needed to be done.[21] But afterward, they began to think of it as a steady supply of income generated by repeatedly performing the same or similar tasks.[22] People began to see themselves not as masters, servants, or laborers, but as "employers" and "employees."[23] Indeed, it is in this period that the word "employee" was first used in printed sources.[24]

The trend toward centralization continued throughout the nineteenth century. The size of the average workshop exploded, and the cottage industry began to disappear.[25] To take one example, shoes were once made in small workshops where workers assembled the entire product.[26] But by the 1870s, the industry was dominated by large plants, which divided production into thirty or forty

See Herbert Applebaum, The Concept of Work: Ancient, Medieval, and Modern 419 (1992). 13  Id.

14   Id. at 410.

15   Id. at 339, 419 ("[T]he informality of the small workshop was given up in favor of a time-oriented discipline, involving tighter, more systematic, and more centralized methods of management. Individual skill disappeared in the face of complex, automatic tools and machinery.").

16   Id.

17   Komlosy, supra note 4, at 158.

18   Applebaum, supra note 12, at 414.

19   Id.

20   Richard Donkin, The History of Work at 66–67 (Palgrave 2010).

21   Id.

22   Id. at 66 ("The job was changing, almost imperceptibly, from a piece of work that needed doing, to something that began to be perceived as a constant source of employment and income packaged by the parameters of time.").

23   Id.

24   Employee, Oxford English Dictionary (marking the earliest use of the word employee in 1814) ("Baron De Reck . . . has not permitted the slightest change of persons under him, and all the Saxon employees remain in office.").

25   Applebaum, supra note 12, at 419.

26   Id.

27   Id.

28   Id.

[5] Id. at 19 (explaining that narrow usage applied only to dependent, live-in servants).

[6] Id. at 35–36.

[7] Id. at 35.

[10] Id. at 40.

[8] Id. at 2, 158.

subdivisions.[27] These plants could employ hundreds of workers, none of whom knew how to make an entire shoe.[28] In this way, industrialization separated workers even further from their independent forebears.

## The Modern Workforce and the Triumph of the "Job"

In the twentieth century, paid employment outside the home—typically for a single employer—predominated over other forms of work.[9] Independent craft work all but disappeared.[10] People flooded into cities, severing family and social ties as they went.[31] They worked in ever larger shops and offices in increasingly regimented roles.[11] Employers studied their workers and applied scientific management principles, causing even office work to take on characteristics of the factory.[12] Workers everywhere began to specialize, work in shifts, and sell their labor in units of time.[34]

Government regulation reinforced this trend.[35] In the United States, Congress passed three landmark laws that still shape how Americans think about work: the Social Security Act,[36] the National Labor Relations Act (NLRA),[37] and the Fair Labor Standards Act (FLSA).[38] Each of these laws extended new benefits to workers, but only those who qualified as "employees."[39] That move reinforced the idea of work as paid employment. The FLSA in particular regimented the way employees sold their labor to employers, dictating the minimum price for labor and setting the standard units of measurement.[40]

Employment became as much a matter of law as of social norms.[41]

As regulation increased, worker autonomy fell. As the historian Ronald Donkin wrote in his *History of Work*, the modern worker became "rooted to the spot."[42] He "came to work at a set time, he worked to a set pace that could be increased at the employer's will, and if he thought at all while working, it was of other things, far beyond the workplace."[43] The American worker had become, in other words, less akin to Jefferson's yeoman farmer than to the traditional English servant.

Yet not all workers fell within these confines. Even as the modern idea of a "job" entrenched itself, much of the workforce continued to work independently. There were, of course, independent contractors. Whole industries, such as the taxi industry, remained dominated by such workers. And other workers continued to run autonomous or semi-autonomous enterprises. Indeed, many of these small-business owners were independent farmers—carrying on a tradition as old as work itself.

It is into this world that the gig economy emerged. To understand how the gig economy relates to what came before, and what may come next, we must begin by defining it.

---

35   See Komlosy, supra note 4, at 177 (discussing the role of state regulation in shaping twentieth-century conceptions of the workplace).

36   Pub. L. 74-271, 49 Stat. 620 (1935) (codified at 42 U.S.C. ch. 7), 37  49 Stat. 449 (1935) (codified at 29 U.S.C. §§ 151–69).

38   52 Stat. 1060 (1938) (codified at 29 U.S.C. § 201–19).

39   See, e.g., 29 U.S.C. § 152(3) (defining "employee"); 29 U.S.C. § 203(e)(1) (same); 42 U.S.C. § 410 (defining "employment").

40   See, e.g., 29 U.S.C. §§ 206 (establishing a minimum hourly wage), 207 (establishing maximum hours beyond which overtime compensation must be paid).

41   See Komlosy, supra note 4, at 177 (explaining that the new understanding of employment was "anchored through legal definitions"); 42 Donkin, supra note 20, at 148. 43  Id.

---

9   Komlosy, supra note 4, at 176.

10  Applebaum, supra note 12, at 517. 31 Komlosy, supra note 4, at 176.

11  Applebaum, supra note 12, at 419.

12  Id. at 420; Komlosy, supra note 4, at 176. 34 Donkin, supra note 20, at 66–67.





# Defining the Gig Economy

*"If we want to preserve what is good about the gig economy, we have to fashion regulatory solutions for the twenty-first century. We simply cannot continue to rely on existing employment models alone."*

### What do we mean by the "gig economy"?

Though much ink has been spilled over the gig economy, there is still no accepted definition. Some definitions include all person-to-person commerce: everything from Uber rides to yard sales.[13] Others focus only on digital platforms, confining their scope to transactions mediated through an app- or web-based marketplaces.[14] Yet for the purposes of studying gig workers, even this definition is too broad. It includes not only workers providing services, but also people who sell goods on eBay or rent out rooms through Airbnb.[15]

While these people and marketplaces raise their share of policy questions, those questions are not the focus of this paper. This paper focuses on workers providing services through gig platforms and their relationship with the platform holders. To that end, when we use the term "gig economy," we mean the one-to-one exchange of goods and services between service providers and endmarket customers facilitated by virtual-marketplace companies (or "platform holders").

Of course, even within this definition, conditions may vary from virtual marketplace to virtual marketplace. The experience of a driver using Uber's platform differs in some ways from the experience of someone using Lyft's, just as the experience of someone using Postmates' platform may not perfectly match that of someone using Instacart.

Even so, it is possible to describe some general features common to this type of gig work. For example, the work almost always involves a triangular relationship between the service provider, the platform holder, and the customer.[16]

---

[13] See Report on the Economic Well-Being of U.S. Households in 2018, Bd. of Governors of the Fed. Reserve Sys. (May 2019), https://www.federalreserve.gov/publications/2019-economic-well-being-of-us-households-in-2018-employment.htm [hereinafter "Federal Reserve Report"] (defining gig work as informal, infrequent paid activities that are personal service activities, such as child care, house cleaning, or ride sharing, as well as goods-related activities, such as selling goods online or renting out property, and including both online and offline activities).

[14] See JPMorgan Chase & Co. Inst., Paychecks, Paydays, and the Online Platform Economy: Big Data on Income Volatility (2016) [hereinafter "JPMorgan Report"] (studying both digital labor platforms, like Uber, and digital capital platforms, like Airbnb and eBay).

[15] Id.

[16] See Deepa Das Acevedo, Who Are the Gig Economy Workers?, Regulatory Review (April 9, 2019), https://www.theregreview.org/2019/04/09/das-acevedo-who-are-gig-economy-workers/ (describing common gig arrangements).

## *"The worker, on the other hand, enjoys the ability to work when and where she wants. She can choose which jobs to take and can work on her own schedule. She can even use multiple platforms simultaneously."*

The service provider starts by signing up through the platform holder's system and conveying a willingness to provide a type of service.[17] The customer also signs up and indicates a desire to receive the service.[49] The platform holder then matches the worker to the customer, and in exchange, keeps a share of the customer's payment.[50]

This relationship benefits its participants through convenience and flexibility. The customer can quickly and easily find someone willing to perform the service she needs. The worker, on the other hand, enjoys the ability to work when and where she wants. She can choose which jobs to take and can work on her own schedule.[51] She can even use multiple platforms simultaneously.[52] She might, for example, monitor both Lyft and Uber to find the most desirable ride requests.[53]

She might even monitor multiple platforms for different types of services: a food-delivery platform to pick up an initial gig and a ride-hailing platform to make some extra money on the way back.[54]

Gig work also attracts workers through its low barriers to entry. While many platforms require workers to complete background checks, they do not strictly limit the number of workers providing services through their systems. Nor do they evaluate workers once the workers start providing services. They leave evaluations to the customers, who can rate their experiences with the workers.[55] In the aggregate, these ratings signal to other customers how good a worker's service is.[56] The ratings therefore help good workers attract new customers. And in some cases, they help the platform holder maintain a minimum level of quality on the platform: workers with low ratings or multiple complaints may be denied access.[57]

50   Id.; see also Terms of Service, Uber.com, https://www.uber.com/legal/terms/us/ (last visited Oct. 20, 2019) (setting out terms of service for driver–partners).

51   See NLRB Office of the Gen. Counsel, Advice Memorandum, Case Nos. 13-CA-163062, 14 CA-158833, 29-CA-177483, at 7 (April 16, 2019) [hereinafter "NLRB Gen. Counsel Memo"] (describing work arrangements of Uber partner–drivers).

52   See U.S. Dep't. of Labor, Wage & Hour Div., Op. Letter FLSA2019-6, at 2 (April 29, 2019) [hereinafter "Wage & Hour Div. Op. Letter"] (describing work arrangements at one particular gig platform).

53   Id. (explaining that workers may operate through multiple platforms at once).

54   Id.

55   NLRB Gen. Counsel Memo, supra note 51, at 11 (describing customer-rating system).

56   Id.

57   See Acevedo, supra note 47 (describing how some platforms use low ratings to remove service providers).

## *"Courts and agencies have generally found gig workers to be properly classified as independent contractors.*

Because the platform holders exercise little control over the work performed, most gig workers are classified as independent contractors.[18] In other

17   Id.  49

Id.

18  See, e.g., NLRB Gen. Counsel Memo, supra note 51, at 13 (finding that Uber driver–partners were independent contractors); Wage & Hour Div. Op. Letter, supra note 52, at 9 (finding gig workers at unnamed gig platform were independent contractors); Razak v. Uber Techs., Inc., No. CV 16-573, 2018 WL 1744467, at *1 (E.D.

Pa. Apr. 11, 2018) (finding that Uber drivers were independent contractors under federal and Pennsylvania law); McGillis v. Fla Dep't of Econ. Opportunity, 210 So. 3d 220, 226 (Fla. Dist. Ct. App. 2017) (finding that Uber drivers were independent contractors because, among other things, the

words, they operate as independent contracting parties, not as employees of the platform holder.[19]

As we will see, that classification has sparked much debate. But as a legal matter, it is sound. The legal test for determining who is an employee varies from statute to statute and state to state; and even within a single state, small changes in the facts can change the result. But in general, the tests have historically focused on control: if the hiring party controls not only the result of the work, but also the manner of its performance, the worker is an employee.[20] Other common considerations are whether the worker owns her tools, whether the worker has special skills, how the worker is paid, and how long the worker and business maintain their relationship.[21]

Because these tests are multifaceted and flexible, results can be inconsistent. But with a few exceptions, courts and agencies have generally found gig workers to be properly classified as independent contractors.

The gig economy, then, consists of independent workers providing services directly to consumers through digital marketplaces. Gig platform holders mediate that exchange, but do not provide the services themselves. We know more and more workers are providing services this way. But that raises the question: exactly how many?

## How big is the gig economy?

Estimates on the gig economy's size vary wildly—in part because of disagreements over the definition. For example, in 2018, the U.S Department of Labor's

Bureau of Labor Statistics published its first study in thirteen years tracking "contingent and alternative employment arrangements."[22] The study defined "contingent workers" as "those who do not have an explicit or implicit contract for continuing employment."[23] Overall, the Bureau found that these workers represented 1.3% to 3.8% of the U.S. workforce—down from 1.8% to 4.1% in February 2005.[64]

The study also looked at other "alternative work arrangements," including independent contractors.[24] This figure dropped from 2005, falling from 10.7 million to 10.1 million workers (about 6.9% of the workforce).[66]

These results, however, almost surely understate the gig economy's size. The survey asked workers only about their "primary" jobs—i.e., their primary source of income.[67] By doing so, it excluded "moonlighters"; i.e., people who use gig work as a secondary source of income.[68] And other data suggest that moonlighters may comprise most the gig workforce—perhaps the vast majority.[69] So the Bureau's survey may have missed more gig workers than it recorded.

Still, the Bureau is not alone in estimating that only a sliver of the American workforce participates in gig work. In 2015, the economists Lawrence Katz and Alan Krueger studied survey data from multiple sources and concluded only half a percent of all workers participated in gig work.[70] Similarly, the investment bank JPMorgan estimated in 2016 that only 4% of working adults participated in gig work over a three-year period.[71]

drivers "work[ed] at their own direction" and the company provided "no direct supervision"); Varsity Tutors LLC v. Indus. Claim Appeals Office, 2017 COA 104, ¶¶ 50, 62, 2017 WL 3184555, at *7–8 (Colo. Ct. App. July 27, 2017) (holding that tutors who connected to potential students through online platform were independent contractors—not employees of the company operating the platform—because the company exercised "minimal supervision over the tutors' work").

[19] See Razak, 2018 WL 1744467, at *5 (observing that drivers effectively operated "independent transportation companies").

[20] Wage & Hour Div. Op. Letter, supra note 52, at 7–8 (examining indicia of control to determine whether the worker was an independent contractor or employee).

[21] See id. at 6–8 (examining control factors); Razak, 2018 WL 1744467, at *8 (setting out eight factors); IRS Pub. 15-A, at 7–8 (2019), https://www.irs.gov/pub/irs-pdf/p15a.pdf (setting out factors under common-law test).

[22] U.S. Dep't of Labor, Bureau of Labor Statistics, Contingent and Alternative Employment Relationships (June 2018) [hereinafter "BLS Survey"].

[23]

i

d.
a
t
9.
6
4
I
d.
a
t
1.

[24] id. at 1–2. 66 Id.

But other surveys suggest that gig work is more widespread. In May 2019, the Board of Governors of the Federal Reserve System published its annual Report on the Economic Well-Being of U.S. Households.[72] The Board found that one in three U.S. adults had engaged in at least one gig activity in the prior year.[73] In other words, the Board found nearly ten times the number of gig workers than the Bureau of Labor Statistics found, and sixty times the number Katz and Krueger found.

Yet for our purposes, the Board's number likely overstates the gig economy at least as much as the Bureau understates it. Of the workers who told the Board they had done some gig work, about a third said they sold items on eBay.[74] These were not workers providing services through a digital platform; they were people disposing of surplus goods. And when the Board asked workers whether they had used a website or mobile app to connect with a customer, only 3% said yes.[75]

67   Id. at 9; but see  Stephane Kasriel, The Government's Brand-New Gig Economy Data is Already Outdated, Fast Company (June 7, 2018), https://www.fastcompany.com/40582118/the-governments-brand-new-gig-economy-data-is-already-outdated (criticizing the Bureau's methodology).

68   See Kasriel, supra note 67 (arguing that the Bureau's "methodology probably undercounts the size of the freelance economy").

69   See, e.g., JPMorgan Report, supra note 45, at 24 (reporting that most workers use income from gig work to supplement their primary sources of income).

70   Lawrence F. Katz & Alan B. Kruger, The Rise and Nature of Alternative Work Arrangements in the United States, 1995-2015 (RAND & Princeton Univ., March 29, 2016).

71   See JPMorgan Report, supra note 45, at 5.

72   Federal Reserve Report, supra note 44.

73   Id.

74   Id.

75   Id.

Even more bullish than the Board, the firm UpWork has estimated that 36% of the U.S. workforce has engaged in some type of freelancing—and that more than half of working millennials have done so.[76] UpWork also expects freelancing to make up more than half of the total workforce by 2027.[77] The survey defines freelancers as any individual who has engaged in supplemental, temporary, project or contract-based work within the past 12 months. For our purposes, however, it is impossible to say how many of these freelancers will be gig workers because UpWork's report does not segregate gig workers into a separate category.[78]

Other researchers have approached the issue by tracking IRS form 1099s.[79] Individuals use Form 1099-MISC to report income outside traditional employment.[80] Gig workers often use it to report their earnings from gig work.[81] Perhaps unsurprisingly, then, the number of 1099s filed since 2000 has risen by more than 22%.[82] And over the same period, taxpayers filed about 3.5% fewer Form W-2s—the form used to report income from traditional employment.[83] From this data, researchers at the George Mason University Mercatus Center concluded that freelancing and other forms of independent contracting have accounted for nearly a third of all jobs added in the new century.[84]

The researchers also found, however, that this trend began before the gig economy truly took off. The companies commonly thought to embody the gig economy—Uber Lyft, DoorDash, and the like—launched between 2009 and 2013.[85] But 1099 filings began to rise as early as 2000.[86] So it's impossible to attribute the entire increase in 1099s to gig companies alone.[87] Indeed, the researchers speculate that these companies may be less a cause of the increase in 1099s than a symptom.[88] That is, the companies grew so quickly because there was already a large independent labor force ready to provide services through their platforms.[89] They did not create this workforce; they merely absorbed it.[90]

Ultimately, although the data offer no clear answer on the gig economy's size, they offer a few modest conclusions. First, they suggest that the gig economy likely falls somewhere between the 1.8% suggested by the Bureau of Labor Statistics and the 36% suggested by UpWork.

76   Freelancers Predicted to Become the U.S. Workforce Majority within a Decade, with Nearly 50% of Millennial Workers Already Freelancing, Annual "Freelancing in America" Study Finds, UpWork.com (Oct. 17, 2017), https://www.upwork.com/press/2017/10/17/ freelancing-in-america-2017/ [hereinafter "UpWork Survey"].

77   Id.

78   Id.

79   See Eli Dourado & Christopher Koopman, Evaluating the Growth of the 1099 Workforce, Mercatus Ctr., George Mason Univ. (Dec. 10, 2015), https://www.mercatus.org/publication/evaluating-growth-1099-workforce.

80   Id.

81   Id.; see also Katz & Krueger, supra note 70, at 10.

82   Dourado & Koopman, supra note 79.

83   Id.84  Id.

85   Id. (reporting that Uber launched in 2009); Katie Warren, How Lyft's Cofounders, Logan Green and John Zimmer, Went from Organizing Carpools on College Campuses to Running a Ride-Hailing Company Worth $29 Billion, Business Insider (March 29, 2019), https://www.businessinsider.com/lyft-cofounders-logan-green-john-zimmer-career-path-success-2019-3 (reporting that Lyft launched in 2012); The DoorDash Story, Medium.com (Oct. 4, 2013), https://medium.com/@DoorDash/the-doordash-storyb370c2bb1e5f (reporting that DoorDash was founded in 2013).

86   Dourado & Koopman, supra note 79.

87   Id.

88   Id.89  Id.

90   Id. ("Insofar as sharing-economy firms provide innovative and efficient ways to implement and manage those nontraditional arrangements, they are promoting economic inclusion for workers who now find fewer opportunities in the traditional labor market.").

## *"Gig workers are also more likely to work part time. According to the Board of Governors survey, the most common reason people do gig work is to supplement an existing income source."*

The Bureau's survey excluded all moonlighters and therefore missed a large part of the gig workforce;[25] but if more than a third of working adults were doing gig work, we would see a more significant rise in 1099 filings.[26] Second, whatever its size, we know the gig economy is growing.[27][28]

The JPMorgan survey showed a near fifty-fold increase in gig work over three years;[29] and anecdotally, we have learned that companies like Uber and Lyft continue to grow exponentially.[30] Every month, they add thousands of service providers as more and more people use their platforms.[31] Yet the question remains: Who are these individuals?

### Who are the gig workers?

To date, no comprehensive survey has captured all gig workers. As a result, no consensus exists on their economic, demographic, or social profiles. The data do, however, show certain trends.

First, gig workers tend to be younger than the average worker. The Bureau of Labor Statistics found that workers in contingent and alternative working relationships were twice as likely to be under age 25 as other workers.[32] Similarly, the Board of Governors of the Federal Reserve found that workers in younger age cohorts were much more likely to have done some gig work.[33] While 37% of workers ages 18 to 29 reported some gig work in the prior year, only 27% of workers 45 to 59 did so.[34] Workers over 60 were even less likely to report doing gig work, with only 21% saying they had.[100]

Gig workers are also more likely to work part time. According to the Board of Governors survey, the most common reason people do gig work is to supplement an existing income source.[35] About 37% of respondents gave supplemental income as their top reason for using gig platforms.[36] By comparison, only 18% said they used gig work as their primary source of income.[37] And nearly twothirds of gig workers under age 30 said they were in school, suggesting that they gravitated toward gig work to accommodate their class schedules.[38]

[25] See Kasriel, supra note 67.

[26] See Dourado & Koopman, supra note 79 (reporting a 22% rise in 1099 filings, some of which predated major gig companies).

[27] See Charles Colby & Kelly Bell, The On-Demand Economy Continues to Grow, Rockbridge (April 5, 2018), https://rockresearch.com/ on-demand-economy-continues-to-grow (reporting that gig economy attracted 41.5 million customers who spent $75.7 billion for on-demand products and services in 2017, a 66% increase in consumers and 55% increase in spending over the prior year); Charles Colby & Kelly Bell, The On-Demand Economy Is Growing, and Not Just for the Young and Wealthy, Harvard Business Rev. (April 14,
[28] ), https://hbr.org/2016/04/the-on-demand-economy-is-growing-and-not-just-for-the-young-and-wealthy (citing the 2016 National Technology Readiness Survey finding more than 22.4 million consumers spent about $57.6 billion for on-demand products and services).

[29] JPMorgan Report, supra note 45, at 21.

[30] See Keith Cunningham-Parmeter, From Amazon to Uber: Defining Employment in the Modern Economy, 96 Boston Univ. L. Rev. 1673, 1686 (2016) (citing Ellen Huet, Uber Is Adding "Hundreds of Thousands" of New Drivers Every Month, Forbes (June 3, 2015), http:// www.forbes.com/sites/ellenhuet/2015/06/03/uber-addinghundreds-of-thousands-of-new-drivers-every-month/#1f94f5df4212[https:// perma.cc/5ZGN-W87D]).

[31] Id.

[32] BLS Survey, supra note 62, at 3.

[33] Federal Reserve Report, supra note 44.

[34]  Id.   100
Id.

[35] Id.

[36] Id.

[37] Id.

[38]  Federal Reserve Report, supra note 44.

# *"The data show that gig workers are, by and large, happy with their working arrangements."*

The Board also found that few respondents turned to gig work consistently.[105] Only a third said they had performed gig work in all or most months in the past year.[106] They described their compensation from gig work as only a "modest" percentage of their total income.[107] The median amount of hours spent on gig work per month was five.[108]

Similar data can be seen in particular regions or industries. For example, the New York City Taxi and Limousine Commission tracks the daily trips taken by for-hire drivers.[109] In 2018, it reported that while taxi drivers were taking on average 91 trips per week, drivers using Uber were taking only 44—less than half.[110] That disparity suggests that unlike taxi drivers, drivers using Uber were working mostly part time.

On earnings, reliable data are scarce. The Bureau of Labor Statistics found that independent contractors earned "roughly similar" compensation to that of workers in "traditional" employment relationships: traditional employees earned $884 per week, while independent contractors earned $851 per week.[111] But again, that comparison omits most gig workers, as it includes only "primary"

jobs, not secondary sources of income.[112] It also includes all independent contractors, not just those who use online gig platforms.[113]

In its own survey, JPMorgan found that income from gig work typically rose and fell in negative correlation with income from other sources.[114] That finding suggests that people turn to gig work to smooth out fluctuations in their primary incomes.[115] JPMorgan also found that the median gig worker earned $533 per month from gig work—about a third of the worker's total income.[116]

The data show that gig workers are, by and large, happy with their working arrangements. The Bureau of Labor Statistics found that eight in ten independent contractors preferred their gig work to "traditional" employment.[117] Only one in ten said they would prefer a traditional job.[118] Similarly, UpWork found that 69% of freelancers viewed their work positively.[119] These workers valued above all the flexibility to choose their own projects as well as their place and time of work.[120] They enjoyed the additional income gig work brought and felt a sense of entrepreneurial pride: they liked being their "own boss."[121]

---

105  Id. (reporting that "[m]any adults who engage in gig work use it to supplement their income"). 106  Id.

107  Id. 108  Id.

109  See Committee on For-Hire Vehicles, Council of the City of New York, Report on Int. Nos. 144, 634, 838, 854, 855 & 856 (April 30, 2018).

110  Id. at 7, 10.

111  BLS Survey, supra note 62, at 8.

112  See Kasriel, supra note 67.

113  See BLS Survey, supra note 62, at 8.

114  JPMorgan Report, supra note 45, at 23–26.

115  Id.

116  Id. at 24.

117  BLS Survey, supra note 62, at 3.

118  Id.

119  UpWork Survey, supra note 76.

120  See id.; see also James Sherk, The Rise of the "Gig" Economy: Good for Workers and Consumers, The Heritage Foundation Backgrounder No. 3143, at 4 (Oct. 7, 2016) (reporting that 87% of Uber driver–partners said they worked with Uber "to be my own boss and set my own schedule"). 121  See Sherk, supra note 120, at 4.





# Criticisms of the Gig Economy

As the gig economy has grown, platform holders have become some of the most visible companies in the country, if not the world. But this rise has not been welcomed by everyone. Labor advocates, academics, and some legislators have all criticized the gig business model—most vociferously for its perceived effects on gig workers. They claim that gig companies are exploiting workers, undermining traditional employment, and even profiting at the expense of "good actors" who classify their workers as employees.

Looking past the hyperbole, however, the criticisms largely boil down to three concerns: misclassification, instability, and a lack of benefits.

## Misclassification

First, the critics claim that the gig economy is built on "misclassification."[39] Again, most gig workers are classified as independent contractors. Critics often claim that this classification is incorrect: under existing legal standards, they say, gig workers should be considered the employees of gig platform holders.[40] They assume—data notwithstanding[41]—that gig

---

[39] See, e.g., Seth F. Harris & Alan B. Krueger, A Proposal for Modernizing Labor Laws for Twenty-First Century Work: The "Independent Worker," The Hamilton Project 7 (2015) (arguing that businesses may try to misclassify their gig workers to cover their costs); A.B. 5, 2019–20 Sess., preamble (Cal 2019) (arguing that reform efforts were necessary because of widespread misclassification).

[40] See Cunningham-Parmeter, supra note 95, at 1677 (arguing that judges construe the control test too narrowly out of a fear that

"just about everyone" would be considered an employer under a broader reading).

[41] See, e.g., Aspen Institute Economic Opportunities Program, Working in America: The 1099 Workforce and Contingent Workers at 1 (2015) (reporting that 79% of on-demand providers work on-demand part time); Katz & Krueger, supra note 70, at 11 (reporting that more than

workers earn most or all of their income from gig work; and as a result, the workers are effectively beholden to platform holders. The critics argue that this dependence should result in an employment relationship, even if the relationship hasn't qualified under traditional legal tests.[42]

public coffers.[130] Legislators and advocates in California claim that the state is losing between $2 billion and $7 billion in tax revenue each year because of misclassification.[131]

The critics emphasize several effects this perceived misclassification has on the workers and society. First, they argue, if workers are not classified as employees, they do not enjoy protection under traditional employment and labor laws.[43] Most of these laws—for example, Title VII, the NLRA, the FLSA, and the Family Medical Leave Act (FMLA)—apply only to employees.[127] As independent contractors, gig workers fall outside the laws' coverage.[128]

New Jersey recently sent Uber a $650 million bill for unemployment and disability insurance taxes, claiming the company misclassified drivers as independent contractors.[132]

Third, critics argue that as independent contractors, gig workers lack the bargaining power to improve their own lots.[133] Independent contractors have no right to join labor unions or bargain collectively.[134] Nor do platform holders have any obligation to

127  See 29 U.S.C. § 152(3) (defining employee for purposes of the NLRA); 29 U.S.C. § 202(e)(1) (defining employee under the FLSA); 42 U.S.C. § 2000e(f) (defining employee under Title VII); 29 U.S.C. § 2611(2)(A) (defining eligible employee under the FMLA).

128  Cunningham-Parmeter, supra note 95, at 1686; Stephen F. Befort, Labor and Employment Law at the Millennium: A Historical Review and Critical Assessment, 43 B.C. L. Rev. 351, 416 (2002) (arguing that workers classified as independent contractors fall outside the regulatory safety net).

129  See Cunningham-Parmeter, supra note 95, at 1686; National Employment Law Project, Fact Sheet: Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries (July 2015), https://www.nelp.org/wp-content/uploads/Independent-Contractor-Costs.pdf.

130  See Middleton, supra note 125, at 571 (arguing that misclassification deprives government of tax revenues).

131  See, e.g., S.B. 5690, 66th Leg., 2019 Reg. Sess. § 2 (Wash. 2019). (arguing that misclassification costs the state $2 billion per year); Christian Britschgi, New Employment Regulations Could Destroy California's Gig Economy, Reason.com (June 3, 2019), https://reason.com/2019/06/03/new-employment-regulations-could-destroy-californias-gig-economy/ (reporting that California legislators passed AB 5 to recoup roughly $6.5 billion per year in new employment taxes); Ashley Cullins, Hollywood Faces "Devastating" Costs from California Bill Targeting Gig Economy, Hollywood Reporter (June 19, 2019), https://www.hollywoodreporter.com/news/ hollywood-faces-devastating-costs-state-bill-targeting-uber-1219575 (reporting that AB 5 aimed at solving "misclassification," which legislators estimated cost California $7 billion per year).

132  See Chris Opfer, Uber Hit With $650 Million Employment Tax Bill in New Jersey, BloombergLaw.com (November 14, 2019), https://news.bloomberglaw.com/daily-labor-report/uber-hit-with-650-million-employment-tax-bill-in-new-jersey.

133  See Befort, supra note 128, at 419; Harris & Krueger, supra note 122, at 2 (advocating an extension of collective-bargaining rights to gig workers).

134  See Harris & Krueger, supra note 122, at 2; 29 U.S.C. § 152(3) (excluding independent contractors from coverage under the NLRA).

135  See 29 U.S.C. § 152(3).

136  See Harris & Krueger, supra note 122, at 2 (arguing that legislators should extend collective-bargaining rights to gig workers).

137  See Government Accountability Office, Contingent Workforce: Size, Characteristics, Earnings, and Benefits, GAO-15-168R (2015).

138  See Abdullahi Muhammed, Does the Gig Economy Really Lead to Higher Job Insecurity?, Forbes (Jan. 24, 2019), https://www.forbes.com/sites/abdullahimuhammed/2019/01/24/does-the-gig-economy-really-contribute-to-higher-job-insecurity/#76840a774328 (reviewing arguments that gig economy causes job insecurity).

Second, critics argue that when gig workers are classified as independent contractors, states lose out on tax revenue. States tax the employment relationship in various ways, including payroll taxes, unemployment taxes, and workers' compensation taxes. These taxes do not apply to independent contractors.[129] What's more, businesses do not withhold income taxes from their payments to independent contractors. The responsibility for paying those taxes lies with the independent contractor, who, critics argue, may be less likely to report his or her income. So when businesses classify workers as independent contractors, the argument follows, they starve the state of revenue that should be feeding the

recognize or bargain with a collection of gig workers.[135] Gig workers must therefore bargain with platform holders one on one.[136]

### Instability

Related to this lack of bargaining power, the critics claim, is a lack of stability—both economic and legal. Gig workers are not shift workers: they have no assigned work hours, and so no way to accurately predict their income from week to week. Critics point out that gig workers are more likely than other workers to worry about whether their

half of Uber driver–partners work between 1 and 15 hours per week).

42  See Cunningham-Parmeter, supra note 95, at 1674 (arguing that companies should be considered employers when they "meaningfully influence working conditions"); Jennifer Middleton,

Contingent Workers in A Changing Economy: Endure, Adapt, or Organize?, 52 N.Y.U. Rev. L. & Soc. Change 557, 568–69 (1996) (criticizing traditional legal tests as being open to manipulation).

43  See id. at 1686.

jobs will last.[137] Such worries could cause them to make economic choices geared toward the short term. As gig work makes up a larger and larger share of the economy, such short-term decision-making could skew the economy and society in unexpected directions—or so the critics claim.[138]

Nor, the critics say, do gig workers always know whether they are employees or independent contractors. Because the traditional employment tests involve multi-factor balancing, even lawyers struggle to predict how courts will evaluate some work relationships.[44] This analysis is even more difficult for the average gig worker, who is likely to be young, inexperienced, and lacking any legal training.[140]

### Lack of Benefits

Finally, critics focus on the difficulty some gig workers have in securing benefits, such as health insurance, retirement coverage and workers' compensation.

In the U.S., most individuals under age 65 obtain health care coverage from their employer.[141]  Unlike employees, some gig workers may be responsible for their own benefits.[142] However, under the definition used in this paper (namely, workers providing services through gig platforms) many gig workers do not use gig work as the primary source of income, and may well get these benefits from their primary employer or another source, such as Tricare, Medicare, or a spouse.

Critics also argue that the platform providers are "free riding" on traditional employers—in this case those who are providing coverage for gig workers through their primary jobs.  In addition, they continue, the platform providers that do not classify gig workers as employees have an advantage over traditional employers with 50 or more full-time equivalent employees because such employers are subject to the Patient Protection and Affordable Care Act (ACA) employer mandate that requires employers to either provide affordable and adequate health care coverage to full-time employees (generally those who work more than 30 hours per week) or possibly pay a penalty[143] (this particular argument ignores the fact that many gig workers do not work the requisite hours to be classified as full time under the ACA).

These criticisms have sparked calls for reform in many states and localities. The efforts at carrying those reforms into effect are the subject of our next section.

---

141  See Sarah R. Collins, et al., Health Insurance Coverage Eight Years After the ACA, The Commonwealth Fund (Feb. 7, 2019), https://www.commonwealthfund.org/publications/issue-briefs/2019/feb/health-insurance-coverage-eight-years-after-aca (reporting that "[m]ore than half of Americans under age 65 — about 158 million people — get their health insurance through an employer").

142  See Gig Economy Protections: Did the EU Get It Right?, Wharton, Univ. of Penn. (May 6, 2019), https://knowledge.wharton.upenn.edu/article/eu-gig-economy-law/ (stating that gig workers, such as those who work with platform providers, "don't enjoy health care benefits for themselves or their families", but ignoring the fact that many may have primary employment with another employer that provides coverage). However, the portion of the study from the US focused on self-employed individuals, which, as noted previously, is broader than this paper's definition.

143  See Harris & Krueger, supra note 122, at 6 (arguing that gig companies should pay "five percent of independent workers' earnings (net of commissions) to support health insurance subsidies in the exchanges as a solution to the free rider problem and to support health insurance.") This argument, however, ignores that most "gig workers" do not work the requisite hours to be classified as full time under the ACA.

---

44  See Middleton, supra note 125, at 568–69. 140  See Befort, supra note 128, at 419.





# State Efforts to Regulate the Gig Economy

As criticisms of the gig economy have taken hold in statehouses across the country, lawmakers have proposed a multiplicity of new regulatory regimes, ranging from small administrative tweaks to broader-reaching legislation. The most radical of these efforts has emerged in California, where lawmakers adopted an employment test that raises a significant threat to the gig model—a narrowed "ABC" test.[45]

## California and the ABC Test

In 2018, the California Supreme Court handed down its opinion in *Dynamex v. Superior Court*,[46] an epochal decision that sparked what may prove to be the most consequential labor-market shift in modern history. The decision involved the definition of "employ" under California's wage orders, which govern minimum wages, overtime, and working conditions in certain industries.[146] California had historically followed a multi-factor test, focusing on whether the hiring entity had the right to control the worker.[47] *Dynamex* scrapped

that test in favor of a restrictive ABC test.[48]

Under California's ABC test, a worker is presumed to be an employee. If the hiring entity wants to classify the worker as anything else, it must prove that the worker satisfies three criteria:

1. the worker is free from control and direction in connection with the service performed;

2. the worker performs the service outside the usual course of the hiring entity's business; and

3. the worker is customarily engaged in an independently established trade, occupation, profession, or business of the same type involved in the service being performed.[49]

The worker must satisfy each of these criteria.[50] If the worker fails any one, she will be considered an employee.[51]

---

45  Our summary of the existing federal and state tests for employee versus independent contractor status covers over 400 pages, and thus cannot be included in any detail here.  Federal law includes three separate tests: the IRS 20-factor test; the economic reality test that applies under the Fair Labor Standards Act; and the Darden common law test applicable to all other employment laws.  All are multi-factor balancing tests. States may have different test under different laws also – under tax, unemployment, workers' compensation, wage and hour, and equal employment laws.  Some of the state laws follow the IRS 20-factor test or the FLSA economic reality test, or have adopted different multi-factor balancing tests.  Other state laws use the traditional "ABC" test, which requires that three conjunctive requirements be met before a worker can be classified as an independent contractor; but, a few states have adopted a narrowed ABC test or a different conjunctive with multiple required factors.  Some state laws presume independent contractor status if the parties so state in a contract.  Other states presume employment status. This tangle of federal and state laws makes compliance in all jurisdictions by national employers challenging.  The appendix places current state laws into six categories: the IRS 20-factor test, the economic reality test, other multi-factor balancing test, the traditional ABC test, a narrowed ABC test, and other conjunctive tests.

46  416 P.3d 1 (Cal. 2018), reh'g denied (June 20, 2018). 146  Id. at 5.

47  See S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations, 769 P.2d 399, 407 (Cal. 1989) (adopting multi-factored common-law-style test).

48  Dynamex, 416 P.3d at 35–36.

49  Id.

50  Id.

51  Id. at 35–36, 40.

## "Dynamex sparked widespread concern and some confusion in the business community, including among gig companies."

*Dynamex* sparked widespread concern and some confusion in the business community, among gig companies.[52] Of chief concern was whether the test would apply retroactively.[53] The U.S. Court of Appeals for the Ninth Circuit first held that the decision was retroactive, but later withdrew its opinion and certified the issue to the California Supreme Court.[54] In the interim, two lower California appellate courts held that *Dynamex* did apply retroactively.[55]

Ostensibly trying to resolve this confusion, the California Legislature stepped in. But it did more than simply codify *Dynamex.*

After a chaotic legislative process in which intense lobbying led legislators to carve out a menagerie of exemptions, the Legislature enacted a bill adopting the ABC test not only for wage orders, but for all purposes under California's Labor Code, including unemployment and workers' compensation.[56]

That move could result in the reclassification of nearly two million workers—10% of California's workforce,[57] which could include many gig workers.[58] While the law's reach is by no means limited to gig workers, they seem to have been the legislature's primary target: most discussions leading up to the final vote centered on them. Some large platform holders publicly stated that they believed their service providers would still pass the new, stricter test.[59] These same companies also pledged $90 million to overturn AB 5 through a ballot measure—the Protect AppBased Services Act.[60][61]

The ABC test is not, of course, entirely new. About twenty states already use it for unemployment purposes.[161] A handful of other states have adopted it for broader purposes, including wage-and-hour law.[162]

---

[52]  See, e.g., Britschgi supra note 131; Nicole Karlis, How California's Gig Economy Bill Will Affect the Rest of the Country, Salon.com (July 13, 2019), https://www.salon.com/2019/07/13/how-californias-gig-economy-bill-will-affect-the-rest-of-the-country/ (reporting on fallout from Dynamex and subsequent legislative efforts).

[53]  See Erin Mulvaney, Dynamex Ruling Applies Retroactively, Another California Court Says, Bloomberg Law (Oct. 9, 2019) (reporting on subsequent decisions determining retroactivity of Dynamex).

[54]  See Vasquez v. Jan-Pro Franchising Int'l, Inc., No. 17-1609 (9th Cir. July 22, 2019) (withdrawing prior panel decision and certifying question to California Supreme Court).

[55]  See Gonzales v. San Gabriel Transit, Inc., No. B282377, 2019 CA App Lexis 989 (Cal. App. 2d Dist. Oct. 08, 2019); Garcia v. Border Transp. Grp., LLC, 239 Cal. Rptr. 3d 360 (Cal. App. 2018).

[56]  See A.B. 5, 2019–20 Sess. (Cal. 2019).

[57]  See, e.g., 2 Million California Gig Workers Face Uncertain Future Under Assembly Bill 5, Times of San Diego (Sept. 7, 2019), https://timesofsandiego.com/business/2019/09/07/2-million-california-gig-workers-face-uncertain-future-under-assembly-bill-5/; Judy Lin, From Strip Clubs to Strip Malls, How 2 Million Workers Could be Sept Up in a Bill Aimed at the Gig Economy, Cal Matters (June 30, 2019), https://calmatters.org/economy/2019/06/california-dynamex-gig-worker-classification-independent-contractors-uber-lyftstrippers-truckers-freelancers/; see also A.B. 5, 2019–20 Sess., preamble (Cal. 2019) (estimating that the bill will reclassify "several million" workers).

[58]  See 2 Million California Gig Workers Face Uncertain Future Under Assembly Bill 5, Times of San Diego (Sept. 7, 2019).

[59]  Id.

[60]  See Kate Conger & Noam Scheiber, California Bill Makes App-Based Companies Treat Workers as Employees, N.Y. Times (Sept. [61]  , 2019), https://www.nytimes.com/2019/09/11/technology/california-gig-economy-bill.html; Kate Conger, Uber, Lyft and DoorDash Pledge $90 Million to Fight Driver Legislation in California, N.Y. Times (Aug. 29, 2019), https://www.nytimes.com/2019/08/29/technology/uber-lyft-ballot-initiative.html?auth=login-email&login=email&module=inline; Jeremy B. White, Uber, Lyft Pitch Landmark California Worker Proposal—and Tech Industry's First Ballot Threat, Politico (Oct. 29, 2019), https://www.politico.com/states/california/story/2019/08/29/uber-lyft-pitch-landmark-california-worker-proposal-and-tech-industrys-first-ballot-threat-1160752. See Section IV.A, infra, for more discussion of the Protect App-Based Drivers and Services Act.

These states include New Jersey,[163] Massachusetts,[164] and Connecticut.[165]

Other states are considering the same approach that California took with A.B. 5. For example, in the 2019 legislative session, lawmakers in Washington State introduced the "Employee Fair Classification Act."[166] That bill would have adopted a new, stricter form of the ABC test.[167] Businesses would not only have had to satisfy the ABC prongs; they would also have had to show that the worker filed a schedule of expenses with the IRS and registered an active account with the state Department of Revenue.[168]

If a business could not prove the worker did these things, it could be liable for "misclassification"—an offense carrying civil penalties and fees.[169]

Similar legislation was introduced in Oregon[170] and Kentucky.[171] In the latter state, House Bill 355 would have adopted the ABC test for wageand-hour purposes; and like the Washington bill, it would have imposed penalties and fees for "misclassification."[172] Workers would also have been able to bring an independent cause of action for misclassification, for which they could recover liquidated damages, costs, and attorneys' fees.[173]

---

161  See Rebecca Smith, Washington State Considers ABC Test for Employee Status, Nat'l Emp. L. Project (Jan. 28, 2019), https://www.nelp.org/blog/washington-state-considers-abc-test-employee-status/ (summarizing state laws using ABC test—including California, Washington, Idaho, Nevada, Arizona, New Mexico, Colorado, Nebraska, Oklahoma, Louisiana, Minnesota, Illinois, Iowa, Indiana, Ohio, Alabama, Georgia, Pennsylvania, Maryland, New Jersey, New York, Vermont, Rhode Island, Connecticut, New Hampshire, Massachusetts, and Maine).

162  Id.

163  See N.J. Admin. Code § 43:21-19(i)(6)(A)–(C) (adopting ABC test under state wage-payment law); Hargrove v. Sleepy's, LLC, 106 A.3d 449, 458 (N.J. 2015) (adopting ABC test under state wage-and-hour law).

164  See Mass. Gen. Laws ch. 149, § 148B(a)(1)–(3) (adopting ABC test under state wage-and-hour law).

165  See Conn. Dep't of Labor, Joint Enforcement Commission on Employee Misclassification (April 20, 2010), https://www.ctdol.state.ct.us/wgwkstnd/JEC/WorkerMisClassFAQs.pdf.

166  See S.B. 5690, 66th Leg., 2019 Reg. Sess. (Wash. 2019).

167  Id. § 4(8)(a).

168  Id. § 4(9).

169  Id. § 7. So far, the bill has generated opposition from both sides of the ideological divide. Even traditionally liberal groups worry that it will convert independent professionals leasing space from other professionals into employees. See Protect Washington State's Small Businesses. Oppose 1515, 5513, 1601 and 5690, Change.org, https://www.change.org/p/washington-state-house-protectssmall-washington-state-s-small-businesses-oppose-1515-5513-1601-and-5690 (opposing H.B. 5690); HB 1601, SB 5690—Universal Worker Protections Act, Nat'l Fed'n of Indep. Bus. (Feb. 2019), https://www.nfib.com/assets/UWPA-independent-contractors-HB-1601SB-5690-1.pdf (same).

170  H.B. 2498, 80th Leg., 2019 Reg. Sess. (Or. 2019).

171  See H.B. 355, 2019 Reg. Sess. (Ky. 2019).

172  Id. §§ 1, 2(1)(f). 173  Id.

## *"Perhaps the biggest battleground will be New York, where advocates are already pushing for AB 5–style legislation."*

More legislation of this type is likely on the way. Perhaps the biggest battleground will be New York, where advocates are already pushing for  AB 5–style legislation.[174] Commentators expect fierce lobbying and legislative debates, perhaps on the same or a larger scale than those seen around AB 5.[175]

In the meantime, states have launched other efforts to regulate the industry—most of them less radical than wholesale reclassification, but still potentially disruptive to the gig model. We examine those efforts next.

### Extending Coverage to Independent Contractors

Rather than reclassify gig workers across the board, some jurisdictions are simply extending employment-style rules to independent contractors. New York City has been particularly active in this space. In May 2018, it directed its Taxi and Limousine Commission to set a minimum per-trip payment for ride-sharing services.[176] This minimum payment must be enough to ensure that ride-share drivers earn at least as much per hour as taxi drivers.[177] And that amount must be at least the minimum wage.[178]

Other states have extended their antidiscrimination laws to independent contractors. Maryland took that step in April 2019,[179] and Tennessee[180] considered a similar bill in the same legislative session.

Still other states are trying to extend coverage by creating a new classification for workers. According to media reports, New York lawmakers plan to introduce legislation to create "dependent workers."[181] These workers would enjoy at least some of the same benefits as employees, though exactly which ones is so far unclear.[182] New York considered a similar bill in 2019, though that version would not have extended

benefits automatically; it would have directed the state department of labor to study the issue first.[183]

The concept of a third class of workers is not original to New York. It comes from a paper by Seth Harris, President Obama's Deputy Labor Secretary, and economist Alan Krueger, where the authors proposed extending civil-rights protections and collective-bargaining rights to dependent workers, including many gig workers.[184] The authors also proposed allowing gig companies to withhold employment taxes and make payroll-tax contributions for these workers without creating a full-blown employment relationship.[185]

174  See Chris Opfer & Keshia Clukey, New York Said to Become Next Battleground for Gig Worker Law, Bloomberg Law (Oct. 9, 2019) (reporting advocates are pushing New York lawmakers to adopt something like California's AB 5).
175  Id.; see also H.R. 8721, 2019–20 Reg. Sess. (N.Y. 2019) (proposing to adopt ABC test for unemployment purposes).
176  NYC Int. No. 856.
177  Id.
178  Id.
179  H.B. 679, 2019 Reg. Sess. (Md. 2019).
180  H.B. 387, 110th Gen (Tenn. 2019).
181  See Opfer & Clukey, supra note 174.
182  See id. (reporting that the details of the bill have not yet been released).
183  Id. (citing A.B. 8343, 2019–20 Reg. Sess. (N.Y. 2019)).
184  See Harris & Krueger, supra note 122, at 1–2. 185  Id. at 6.

## "In the meantime, some lawmakers are aiming their efforts at the contractual relationship between gig workers and platform holders."

They did not, however, recommend covering these workers under state wage-and-hour laws, which they saw as incompatible with the gig model.[62] How much of this proposal ends up in the New York bill remains to be seen.

In the meantime, some lawmakers are aiming their efforts at the contractual relationship between gig workers and platform holders. In New York City, lawmakers passed the Freelance Isn't Free Act, which requires companies to reduce their agreements with independent contractors to writing.[63] It also requires companies to pay contractors on the date listed in the contract.[64] If no date is listed, they must pay within 30 days after the contractor provides the services.[65] Companies that fail to pay on time face civil penalties and liquidated damages.[190]

This model may be catching on. In 2019, the city of Minneapolis considered a similar law containing nearly identical payment and penalty provisions.[191]

The law would bar companies from refusing to pay a "freelance worker" within the time specified in the contract.[192]

Freelance workers could sue to enforce this requirement; and if they won, they could recover fees, costs, and liquidated damages.[193] But importantly, like the New York City law, the Minneapolis proposal disclaims any intent to reclassify independent contractors as employees.[194]

Finally, other states are testing ways to extend workers' compensation to gig workers. Again, New York is out in front. It established the "Black Car Fund," a nonprofit organization providing workers compensation to for-hire drivers.[195] The fund now boasts more than 70,000 participants.[196] Similarly, in Massachusetts, Uber itself launched a pilot program allowing drivers to buy into a workers' compensation

62  Id. at 2.
63  N.Y. City Adm. Code tit. 20, ch. 10.
64  Id.
65  Id.

fund.[197] The fund offers injured drivers up to $1 million to cover medical costs and lost earnings.[198]

190  Id.; see also  Nancy Cremins, The On-Demand Economy Continues to Grow, but Legal Consequences Abound for Employers and Employees in the U.S. and Abroad, Boston Bar J. (Feb. 2, 2018), https://bostonbarjournal.com/tag/lyft/ (describing efforts by cities to regulate gig economy, including the Freelance Isn't Free Act).

191  See Minneapolis Ordinance No. 2019-00699.

192  Id.

193  Id.194  Id.

195  See Who We Are, Black Car Fund, http://www.nybcf.org/about (last visited Oct. 21, 2019).

196  Id.

197  See Cremins, supra note 190 (reporting on Uber pilot program). 198  Id.

## "At the federal level, both the Department of Labor's Wage and Hour Division and the National Labor Relations Board's general counsel issued opinions finding that gig workers were properly classified as independent contractors"

### Maintaining the Status Quo

A few other states have moved in the opposite direction. For example, Florida now designates for-hire drivers on digital platforms as independent contractors if they meet certain criteria.[66] The Florida law mirrors similar measures passed in other states,[67] most of which create a classification "safe harbor" when certain criteria are met.[68] Common criteria include that the driver does not have to accept particular tasks, does not have to work at any

First, the Wage and Hour Division concluded in an opinion letter that workers on an unnamed gig platform were independent contractors under the FLSA.[71] The Division reasoned that as a matter of "economic realities," the workers worked for their customers, not the platform holder.[72] The platform holder served largely as a referral service.[73] It exercised little control over the services provided, and so could not be considered an employer.[74]

Soon after, in a case involving drivers using the Uber platform, the Board's general counsel concluded that the drivers were properly classified as independent

66  See H.B. 221, 2017 Leg. (Fla. 2017).

67  These states include Alaska, Arizona, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Rhode Island, South Dakota, Tennessee, Texas, Utah, West Virginia, Wisconsin, and Wyoming. See Gali Racabi, TNC and MC State Laws: Preemption of Local Government Regulations and Treatment of Employment Status of Drivers (Oct. 2018) (collecting state laws preserving the status of drivers participating in transportation network companies' platforms as independent contractors as long as certain conditions are met).

68  See, e.g., Ariz. Rev. Stat. § 23-1603 (presuming that virtual-marketplace contractors are independent contractors when specified conditions are met); Colo. Rev. Stat. § 40-10.1-602 (specifying that virtual-marketplace contractors "need not" be considered employees); Mich. Comp. Laws Serv. § 257.2137 (specifying that "transportation network company drivers" are independent contractors when certain criteria are satisfied); Mo. Rev. Stat. § 387.432 (specifying that transportation network companies (TNCs) are not employers of driver–partners unless the parties agree otherwise in writing).

71  Wage & Hour Div. Op. Letter, supra note 52, at 9.

72  Id. at 7.

73  Id.

74  Id. at 7–9.

particular time or location, and is not limited to using one platform at a time.[69]

At the federal level, both the Department of Labor's Wage and Hour Division and the National Labor Relations Board's general counsel issued opinions finding that gig workers were properly classified as independent contractors.[70] These opinions reinforce that, by traditional measures, gig workers are not employees.

contractors under the NLRA.[75] The general counsel applied the common-law test, under which the "animating principle" is "whether the position presents the opportunities and risks inherent in entrepreneurialism."[76] The general counsel emphasized that Uber's model allowed drivers to schedule their own work: drivers could work when they wanted and however much they wanted, and so controlled their own opportunities for profit or loss.[77]

*"The general counsel emphasized that Uber's model allowed drivers to schedule their own work: Drivers could work when they wanted and however much they wanted, and so controlled their own*
*opportunities for profit or loss."*

For its part, Uber exercised none of the control typical of an employment relationship.[78] It did not require drivers to work at certain places or times, nor did it evaluate the drivers' performance: it left that task to customers, who could rate their experiences with drivers through the Uber app.[79] Altogether, this system left the drivers independent from Uber's control and, therefore, properly classified as independent contractors.[80]

---

[69] See authorities cited in note 200, supra.

[70] See NLRB Gen. Counsel Memo, supra note 51, at 13; Wage & Hour Div. Op. Letter, supra note 52, at 9.

[75] NLRB Gen. Counsel Memo, supra note 51, at 13.

[76] Id. at 4.

[77] Id. at 7–8, 10.

[78] Id. at 11–12.

[79] Id. at 11.

[80] Id. at 13.

The approach reflected in these opinions marks a shift from the prior administration's view. In 2015, the Department of Labor issued an interpretive bulletin advising that most workers were employees.[81] While purporting to apply the economic-realities test, it reached a result contrary to prevailing classification practices in the gig economy.[82] After the 2016 election, however, the Department withdrew the bulletin.[83] So at least for now, as a matter of federal law, it seems that gig workers will remain independent contractors.

---

[81]  See U.S. Dep't of Labor, Wage & Hour Div., Administrator's Interpretation No. 2015-1 (2015).

[82]  Id.

[83]  See Press Release, U.S. Dep't of Labor, Office of Public Affairs, U.S. Secretary of Labor Withdraws Joint Employment, Independent Contractor Informal Guidance (June 7, 2017), https://www.dol.gov/newsroom/releases/opa/opa20170607 (announcing withdrawal of prior guidance).





# Effects of State Regulation on the Gig Economy

_____

*"These new laws overshoot their ostensible goals and will likely hurt those they are designed to help—either by reducing the availability of gig work or eliminating the work's most attractive features"*

Unsurprisingly, some of these state regulatory approaches are better designed than others. While some have taken a prudent, incremental approach, others aim to effect wide-scale economic and social change in one stroke. These broader efforts, such as California's AB 5, pose more danger than their proponents are willing to admit. These new laws overshoot their ostensible goals and will likely hurt those they are designed to help—either by reducing the availability of gig work or eliminating the work's most attractive features. Worse, they fail to address the problems supposedly motivating them in the first place. These failures stem largely from the faulty assumptions underlying their approach—in particular, the assumption that lawmakers can "fix" the gig economy simply by transforming gig workers into employees.

**Efforts to reclassify gig workers as employees are based on false premises.**

**Misclassification.** Again, proponents of wide-scale reclassification efforts like AB 5 argue that reforms are necessary to address "misclassification."[84] But this argument puts the tail before the dog. Whether a worker is an independent contractor or an employee depends, of course, on whether the worker meets the existing legal definitions. Businesses classify workers by applying existing standards. If those standards show that the worker is an independent contractor, and the business classifies the worker accordingly, no "misclassification" occurs.

[84]  See, e.g., A.B. 5, § 1, 2019–20 Sess. (Cal. 2019) (citing harms to "misclassified" workers); S.B. 5690, 66th Leg., 2019 Reg. Sess. (Wash. 2019) (arguing that ABC test is necessary to address misclassification).

Traditional legal tests often classify gig workers as independent contractors.[85] Those tests ask whether the worker operates independently of gig platforms; focusing mainly on how much control the platform holder exercises.[219] Applying that framework, both the Wage and Hour Division and the National Labor Relations Board's general counsel have found that gig workers were independent contractors[220]—as have many courts.[221] So under existing tests, platform holders have done nothing wrong by legally classifying gig workers as independent contractors.  Put simply, there is no "misclassification."[222]

But ultimately, what the critics object to is not how platform holders are applying existing law. When they say that platform holders are misclassifying workers, they do not mean that gig workers are employees under current legal standards. Gig workers are *properly* classified under those standards; it is the standards themselves that critics object to as flawed.[223]

**Undermining traditional employment.**
Reclassification proponents also presume there is something inherently wrong with gig platforms' business model. They claim that by relying on independent contractors, gig companies put businesses that classify their workers as employees at a competitive disadvantage.[225] These competitive pressures, they argue, may cause other business to abandon the traditional employment model, which could ultimately undermine the social safety net.[226]

But this hyperbole does not match the data. Businesses are not abandoning traditional employment in droves.[227] While the gig economy is surely growing, it remains a small fraction of the overall labor market.[228] By some estimates, it still includes less than half a percent of all workers.[229] Yet even if one assumes, as this paper does, that those estimates undercount the gig economy, traditional employment still dwarfs gig work by any measure.[230] Indeed, even gig-economy companies maintain healthy workforces of traditional employees as

---

220  See NLRB Gen. Counsel Memo, supra note 51, at 13; Wage & Hour Div. Op. Letter, supra note 52, at 9.

221  See, e.g., Razak, 2018 WL 1744467, at *1 (finding that Uber drivers were independent contractors under federal and Pennsylvania law); McGillis, 210 So. 3d at 226 (finding that Uber drivers were independent contractors because, among other things, the drivers "work[ed] at their own direction" and the company provided "no direct supervision"); Varsity Tutors LLC, 2017 WL 3184555, at *7–8.

222  Of course, because gig work arrangements change from platform to platform, some gig workers may work less independently than others. Whether any given worker qualifies as an employee depends on that worker's circumstances.

223  See, e.g., Cunningham-Parmeter, supra note 95, at 1674 (arguing that companies should be considered employers when they "meaningfully influence working conditions"); Middleton, supra note 125, at 568–69 (criticizing traditional legal tests as open to manipulation).

224  See Middleton, supra note 125, at 571 (arguing that misclassification is widespread under current legal standards); S.B. 5690, 66th Leg., 2019 Reg. Sess. (Wash. 2019) (citing misclassification as a reason to adopt ABC test).

225  See, e.g., A.B. 5, § 1(b), 2019–20 Sess. (Cal. 2019) (citing the "loss to the state of needed revenue from companies that use misclassification to avoid obligations such as payment of payroll taxes, payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance"); Mass. Office of the Attorney Gen., An Advisory from the Attorney General's Fair Labor Division on M.G.L. c. 149, s. 148B 2008/1, at 1 (2008) [hereinafter "Mass AG Advisory Op."] 226 See  Mass AG Advisory Opinion, supra note 225, at 1.

227  See Dourado & Koopman, supra note 79 (observing that W-2 filings still dwarf 1099 filings).

228  See, e.g., Katz & Krueger, supra note 70, at 17 (concluding that only half a percent of American workers participated in gig work).

229  Id.

230  See Federal Reserve Report, supra note 44 (reporting that while nearly a third of workers reported participating in some type of gig work, only three percent reported using a web- or app-based platform to connect with customers).

---

But in these terms, "misclassification" is a misnomer. There is no archetypal employee. The distinction between an employee and an independent contractor is a social and legal construct. How the federal and state governments define these terms is a policy judgment. If lawmakers choose to transform gig workers into employees, they are choosing to change the rules of the road.

They are not, contrary to their assertions,[224] addressing widespread misconduct by gig companies.

software code writers, marketers, finance, and so on.

Even other types of alternative working relationships still dwarf gig work.[231] More workers still participate in on-call work and work through temp agencies than work through online platforms.[232] The gig economy is simply too small to pose any systemic threat to the traditional employment model.

Nor is there evidence that, even in these small portions, gig work is replacing traditional employment. It is true that, by some estimates,

---

alternative work arrangements have accounted for a great deal of American job growth over the last decade.[233] But there is no evidence that gig work's growth has come at the expense of traditional employment. The American labor market has been becoming less dynamic for decades; companies were creating jobs at slower rates before there ever was an Uber or a Lyft.[234] These companies, then, are likely less a cause of slow job growth than a symptom.[235] Gig companies did not undermine the traditional labor market; they provided new opportunities to workers.[236]

But these revenues do not represent new money: they have to come from somewhere. Most likely, they will come out of workers' pockets. When economists examine the effects of increased payroll taxes, they often find that employers ultimately pass those taxes on to workers, usually by reducing wages.[242] And the costs not passed to workers will be passed to the consumer. It is not, then, platform holders who will provide new revenues to the state: it is ordinary taxpayers, the consumer and the worker.[243] In this sense, reclassification acts as a hidden tax increase for everyone.

_____

231  See BLS Survey, supra note 62, at 1 (estimating that 10.1 percent of workers participated in any form of alternative working arrangements).

232  See id.

233  See Katz & Krueger, supra note 70, at 7.

234  Dourado & Koopman, supra note 79.

235  Id.

236  Id. ("These companies are able to offer employment on more flexible terms only because there is a willing supply of workers eager to accept them. Without the nontraditional arrangements offered by the sharing economy, workers would be worse off.").

237  See Cunningham-Parmeter, supra note 95, at 1684 (citing rapid growth of gig companies as evidence of their pernicious effects).

238  Indeed, if traditional employment were as attractive to all workers as the critics believe, classifying workers as independent contractors would put gig companies at a competitive disadvantage. Workers would abandon gig platforms at the first opportunity to enter the traditional workforce. The "problem" would correct itself.

239  See Mass AG Advisory Op., supra note 225, at 1.

240  See A.B. 5, § 1(b), 2019–20 Sess. (Cal. 2019).

241  S.B. 5690, 66th Leg., 2019 Reg. Sess. (Wash. 2019).

242  See Sherk, supra note 120, at 5 (reporting that when companies are forced to pay increased payroll taxes, they offset wages by a nearly equal amount).

243  Id.

244  See Jay M. Feinman, The Development of the Employment at Will Rule, 20 Am. J.L. Hist. 118, 118 (1976).

245  In recent years, some jurisdictions have enacted "predictive scheduling" laws requiring specified notice before scheduling an employee for work (or canceling an employee's shift). See, e.g., S.B. 828, 79th Legl. Assembly, 2017 Reg. Sess. (Ore. 2018) (adopting predictive-scheduling requirements). But these laws remain the exception; and indeed, their very existence shows that employment alone does not guarantee any stability in hours or work schedules.

Reformers do not grapple with these data when they criticize gig companies. Instead, they assume that the companies' success itself proves that the companies enjoy some unfair advantage.[237] But boiled down, this assumption shows only that gig companies have worked within the law to fashion innovative business models. That these models succeed is not an indictment of their progenitors, but an endorsement.[238]

**Lost revenues.** Finally, reclassification proponents assume that reclassification is necessary to recover "lost" tax revenue.[239] In California, AB 5's proponents openly lamented the billions of dollars gig platforms "cost" the state by classifying their workers as independent contractors.[240] Legislators in Washington State likewise emphasized the additional revenue the state would collect after widespread reclassification.[241]

**Stability.** Reclassification proponents also overestimate the stability traditional employment offers. The default rule in the United States is employment at will: either an employer or an employee can terminate the relationship at any time and for any reason not specifically prohibited by law.[244] And employment guarantees no minimum hours or set schedule.[245]

So in some ways, an employee enjoys less stability than an independent contractor. The employee is at the employer's beck and call; her schedule is subject to the employer's whims. The gig worker, by contrast, can count on being able to log in through the platform of her choice to earn income when she needs to. She therefore enjoys greater freedom and greater predictability.

Employees do, of course, enjoy some legal rights that independent contractors do not. But again, these rights rarely guarantee a continued job. Nothing stops an employer from cutting hours or headcount to

adjust to market conditions. Making gig workers into employees will not insulate them from those risks.

## Reclassification efforts fail to address the major criticisms of the gig economy.

These logical failings might be forgivable if reclassification efforts fixed the problems they were meant to solve. Unfortunately, they do not.

It is true that gig workers report concerns about benefits and job stability, even while expressing a

supplement to their other sources of income.[250] It is likely, then, that many gig workers will never qualify for employment benefits tied to working consistently on a platform over a period of time. Unemployment benefits also fall in this category.[251]

Nor, indeed, will reclassification at the state level automatically qualify workers for protections at the federal level. As we have seen, federal law continues to use traditional employment tests, like the common-law test and the economic-realties test.[252]

And under those tests, most gig workers will

---

248   See JPMorgan Report, supra note 45, at 23 (reporting that only 56% of workers who performed gig work in a given month also reported it in the next month).

249   See Federal Reserve Report, supra note 44 (finding that only 30% of workers earning money from gig activities earned money from those activities in all or most months of the year, and that the median number of hours was five).

250   See, e.g., JPMorgan Report, supra note 45, at 24.

251   Middleton, supra note 125, at 572 (noting that many states require employees to work for 20 weeks before qualifying for unemployment benefits). See also id. at 575 ("Therefore, workers who move in and out of the workforce or who work part-time may not be eligible to receive social security retirement benefits or disability insurance, despite having paid into the system.").

252   See Wage & Hour Div. Op. Letter, supra note 52, at 4 (citing Parrish v. Premier Directional Drilling, L.P., 917 F.3d 369, 379–80 (5th Cir. 2019); Saleem v. Corp. Transp. Grp., Ltd., 854 F.3d 131, 138–40 (2d Cir. 2017); Keller v. Miri Microsystems LLC, 781 F.3d 799, 806–07 (6th Cir. 2015)).

---

preference for flexible work. Were reclassification able to preserve this flexibility while extending benefits and job protections, it might be worth the trade-off. In reality, however, it does little to move the needle on these issues. Instead, it will likely undermine the gig model while extending few if any benefits to gig workers.

**No automatic protections.** Proponents of reclassification often assume that making a worker an employee automatically gives the worker all the benefits traditionally associated with employment.[86] But a more careful analysis belies that assumption.

For starters, not every employee qualifies for every employment benefit. To take one example, the Family Medical Leave Act protects an employee's leave only after the employee works 1,250 hours in a 12-month period.[247] Many gig workers will likely never meet that threshold.

They tend to engage in gig work only sporadically: one study showed that half of all workers who earned income through an online labor platform in a given month earned no income from a similar platform in the next month.[248] That finding matched other studies, which have shown that few gig workers use gig platforms consistently.[249] To the contrary, they more often turn to gig work only to

continue to be independent contractors, no matter how they are classified under state law.[253] Furthermore, many assume that an employee that is reclassified under state law automatically would be covered under an employer-sponsored benefit plan, such as a health or retirement plan. However, Section 514 of the Employee Retirement Income Security Act of 1974, as amended (ERISA) likely would preempt any state law requiring coverage, and an employer would be free to define "employee" within the confines of ERISA.

This result is particularly important for collective-bargaining purposes. Proponents of reclassification have often cited the need to allow gig workers to bargain collectively with platform holders as a way to correct imbalances in bargaining power.[254] But collective bargaining remains chiefly the domain of federal law.[255] And as long as gig workers remain independent contractors under federal law, collective bargaining by gig workers will remain legally suspect. Further, even if the right to organize were granted, gig workers might decide to exercise their federally protected right not to unionize, as

---

86   See, e.g., A.B. 5, § 1(e), 2019–20 Sess. (Cal. 2019). 247   29 U.S.C. § 2611(2)(A).

most American private-sector employees have done.

To illustrate the point, in 2015, Seattle adopted the nation's first law extending collectivebargaining rights to for-hire drivers working for gig platforms.[255] Business groups immediately challenged the law on two grounds. First, they argued, the local law was preempted by federal labor law.[257] The NLRA preempts all state laws regulating either a subject covered by federal labor law or a subject Congress meant to leave unregulated.[258] And because Congress explicitly excluded independent contractors from the

NLRA's definition of *employee*, the challengers argued, states could not give them bargaining rights without interfering with Congress's design.[259] Second, the Sherman Antitrust Act forbids combinations in restraint of trade.[260] By allowing what were in effect independent businesses to combine and bargain collectively, the city had licensed a price-fixing cartel.[261]

While the Ninth Circuit ultimately rejected the preemption argument,[262] it found merit in the antitrust argument.[263] The city admitted that allowing drivers to set prices collectively would ordinarily violate the Sherman Act, but it argued that its ordinance was exempt from that Act under an exception for state action.[264] The court disagreed. The state-action rule did not apply when private actors supervised the anticompetitive activity.[265]

253  See id.; NLRB Gen. Counsel Memo, supra note 51, at 13 (finding Uber driver–partners to be independent contractors under federal labor law).

254  See Harris & Krueger, supra note 122, at 2 (advocating extending collective-bargaining rights to "dependent workers"). Cf. also Dynamex, 416 P.3d at 32.

255  See Chamber of Commerce of U.S. v. Brown, 554 U.S. 60, 65 (2008) (explaining that the NLRA preempts state and local laws regulating conduct also regulated by the NLRA).

256  See Chamber of Commerce of the U.S. of Am. v. City of Seattle, 890 F.3d 769, 775 (9th Cir. 2018) (citing Seattle Mun. Code § 6.310.735(H)(1)).

257  Id.

258  See Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 138 (1976) (explaining that the NLRA preempts states from regulating conduct Congress meant to leave unregulated); San Diego
    Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 245 (1959) ("When an activity is arguably subject to s 7 or s 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."). 259 City of Seattle, 890 F.3d at 775. 260 15 U.S.C. § 1.

261  City of Seattle, 890 F.3d at 775.

262  The Ninth Circuit's opinion hardly resolves the preemption question. In the past, the Supreme Court has proven willing to read NLRA preemption more widely than the circuit court. See, e.g., Brown, 554 U.S. at 75–76 (reversing Ninth Circuit to hold that California statute forbidding recipients of state funds to use the funds "to assist, promote, or deter union organizing" was preempted by the NLRA).

263  City of Seattle, 890 F.3d at 789–90.

264  Id. at 780–81. 265 Id. at 790.

**"Platform holders will become responsible for providing an hourly minimum wage and overtime."**

And the city failed to show that state actors exercised any authority over the terms negotiated between the drivers and gig platforms.[87] To the contrary, those terms would be controlled by private, non-state parties.[88]

Any similar law would face the same legal challenges. It is unlikely, then, that states can give gig workers the right to bargain collectively simply by changing their designation under state law. Instead, doing so will likely require a change in federal law—an unlikely result in the near term.[89]

**Undermining the gig model.** In survey after survey, gig workers report that the primary benefit of gig work is flexibility. They gravitate to gig work because it allows them to make their own schedules and choose their own projects.[90] They like feeling like their own boss.[91] And for many of them, this is not simply a preference: they may be students, parents, or workers with other full-time jobs.[92]

Proponents of reclassification assume that gig work would retain these features even after workers become employees. The evidence, however, suggests the opposite.

Logically, platform holders would have to make some changes to their models. If gig workers become employees, they will be subject to state wage-and-hour laws.[93] Platform holders will become responsible for providing an hourly minimum wage and overtime.[94] So to ensure they can continue making a profit, platform holders will have to take more control over when and where gig employees work.[95] They will have to limit the time gig workers can spend working and schedule the workers at places and times where opportunities for revenue are greatest.[96] Gig employees will therefore no longer control their own schedules or projects or where they work; they will become more like shift workers.[97]

*"The traditional trade-off in employment relationships has always been security for control. If states force platform holders
to provide the security associated with employment, they should expect platform
holders to exercise the corresponding control."*

---

[87] Id.

[88] Id.

[89] See NLRB Gen. Counsel Memo, supra note 51, at 13 (finding drivers using Uber's platform to be independent contractors under federal labor law).

[90] See, e.g., Tito Boeri, et al., Social Protection for Independent Workers in the Digital Age, European Conference of Fondazione Rodolfo Debenedetti Pavia 45 (2018) (reporting that the most common reason workers choose gig work is to complement existing income sources, work from home, and have flexible hours).

[91] Sherk, supra note 120, at 4.

[92] See, e.g., id. (reporting that 87% of Uber drivers work part time); Federal Reserve Report, supra note 44 (reporting that large numbers of gig workers are also enrolled in school); JPMorgan Report, supra note 45, at 24 (finding that most gig workers use gig work to supplement income from other sources).

[93] See, e.g., Dynamex, 416 P.3d at 35–36 (adopting ABC test under state wage orders); A.B. 5, § 1(e), 2019–20 Sess. (Cal. 2019) (explaining that one purpose of reclassifying workers is to provide them with rights under state wage-and-hour law).

[94] Cf. NYC Int. No. 856 (requiring ride-sharing services to provide driver–partners with a minimum hourly wage).

[95] See Sherk, supra note 120, at 7 (projecting that if gig companies are forced to convert their workers into employees, they will take more control over the workers' schedules).

[96] Id.

[97] Id.

Gig companies may also more strictly control access to their platforms. Today, one of the gig economy's primary benefits is its low barrier to entry.[98][99] Platform holders have an incentive to open their platforms to as many workers as possible; doing so improves utility and convenience for consumers by increasing their options. But once platform holders have to guarantee wages and other benefits, they will behave more like traditional employers and be more selective about whom they partner with. They will have to ensure that every new service provider can generate enough revenue to justify his or her wages and benefits, and that will make them more careful about offering work opportunities."

We should not be surprised by this result. The traditional trade-off in employment relationships has always been security for control. If states force platform holders to provide the security associated with employment, they should expect platform holders to exercise the corresponding control.

And those controls will necessarily change the nature of gig work—often to the detriment of gig workers.[100] Military spouses, transitioning service members, ex-offenders, students, parents, and moonlighters may no longer have access to the gig economy.[101] Legislators will have closed an avenue for millions of Americans to supplement their incomes or sustain themselves when they are in between jobs. In that sense, they may actually be raising costs for the state, which may need to provide social services to people who no longer have alternate work opportunities. And they will, perhaps, have smothered a nascent industry in its cradle.[102]

---

[98]  See Harris & Krueger, *supra* note 122, at 7 (observing that Uber drivers tend to be younger than taxi drivers and attributing that phenomenon in part to lower barriers of entry).

[99]  *Cf.* Dourado & Koopman, *supra* note 79 (noting that dynamism in the traditional labor market has declined for decades, and that gig companies are likely picking up the slack) ("Insofar as sharing-economy firms provide innovative and efficient ways to implement and manage those nontraditional arrangements, they are promoting economic inclusion for workers who now find fewer opportunities in the traditional labor market.").

[100]  See Sherk, *supra* note 120, at 7.

[101]  Id.

[102]  Id. at 1.





# Options for the Gig Economy

Before coming up with solutions in search of problems, lawmakers should first determine if gig work, namely, workers providing services through gig platforms, is the problem or if there are other ways to provide health insurance, retirement coverage, workers' compensation, and unemployment insurance to independent contractors and self-employed individuals.  And to answer this question, more data is needed to determine if gig workers are engaging with marketplace platforms because they expect benefits from the work, or if they simply want supplemental or other income, which seems to be the case. Unfortunately, by looking to change classification standards, some cities and states are trying to provide benefits to gig workers who may not even want or need them and ignoring existing coverage options for independent contractors and self-employed individuals.

### Exploring Coverage under Current Options

Before creating new programs, lawmakers should look at existing benefit options for gig workers who actually need coverage and explore why such individuals are not using these options. As noted in previous sections, a majority of Americans under age 65 receive their health care coverage from their employers. The ACA was an attempt to

_____

expand coverage in the individual market through market reforms, premium subsidies for individuals and families with income below 400% of the federal poverty level, and Medicaid expansion at a state's option. Of course, the ACA is not without its problems, and as premiums have increased (combined with other factors), coverage in the individual market has begun to decrease.

Outside the ACA, the administration has pursued additional health care options. In 2018, final regulations were issued for Association Health Plans (AHPs), which would allow small businesses to band together and buy group coverage otherwise available only to large employers. The regulations also would allow health plans to include working business owners who employed no other people.[282]

Many Americans have access to retirement benefits through their employer.  However, there also are a variety of savings vehicles available in the individual market, such and traditional Individual Retirement Accounts (IRAs), and Roth IRAs – both of which have tax advantages.  Selfemployed individuals may also establish a solo 401(k), which allows higher contribution amounts than an IRA.

282 See Definition of Employer under Section 3(5) of ERISA—Association Health Plans, 83 Fed. Reg. 28912 (June 21, 2018).  The rule has been challenged in court by a coalition of states.

*"Lawmakers could allow self-employed individuals to buy into plans on the same terms offered to employers. Individuals would enjoy the savings the plans offer while preserving their independence from any single employer."*

In addition, in July 2019, the Department of Labor issued its final rule on Association Retirement Plans

(ARPs), which would allow small businesses to band together to offer their employees retirement

coverage.  Like AHPs, ARPs also include working owners.

Expanding AHPs and ARPs further to allow self-employed gig workers who do not consider themselves to be business owners to participate in such plans could allow them to buy into plans on the same terms offered to employers. Individuals would enjoy the savings the plans offer while preserving their independence from any single employer. Gig workers could continue to use multiple platforms as frequently or infrequently as they wanted without putting their benefits at risk.[283] However, such a change likely would require Congressional action.

### Contributions by Platform Holders.

Of course, even if policymakers succeed in expanding access to association plans, affordability may still be a concern, as it is with the ACA Exchanges.  In addition to the tax advantages of employer-provided coverage, employers also generally provide a portion of the premium for health care coverage, which is not includible as

income[284] Independent contractors, by contrast, pay the entire cost of coverage (unless eligible for an Exchange subsidy).[285] However, self-employed individuals are allowed a deduction for the cost of coverage under Internal Revenue Code Section 162(l).

Some states are exploring the idea of allowing gig platforms to contribute to a worker's retirement or health coverage without risking an employment relationship. For example, a recently introduced Washington State bill would require platform holders to contribute a percentage of the fees they collect from consumers to a nonprofit thirdparty benefit provider.[286] This provider would guarantee qualifying workers health coverage, paid time off, and retirement benefits, as well as any other benefit it decides to offer.[287]  Workers could receive contributions from more than one platform holder and could carry their benefits with them from job to job.[288]  Before considering such an option, however, lawmakers should ensure that this does not undermine gig workers' ability to earn supplemental income and force platform providers to pay for coverage that may not be needed.

283   See, Bruce Sarchet et al., Littler Mendelson, P.C., AB 5: The Great Employment Experiment—A Littler Workplace Policy Institute Report (2019), https://www.littler.com/publication-press/publication/ab-5-great-california-employment-experiment-littler-workplacepolicy (arguing that expansion of association-based health and retirement plans would "help decouple access to these benefits from traditional employment and address one of the most common concerns about independent contracting").

284   According to the Kaiser Family Foundation 2019 Employer Health Benefit Survey, in 2019, covered workers contributed 18% of premiums for single coverage and 30% for family coverage.  See 2019 Employer Health Benefits Survey, Section 6, Published Sept.
           25, 2019 available at https://www.kff.org/report-section/ehbs-2019-section-6-worker-and-employer-contributions-for-premiums/

285   See BLS Survey, supra note 62, at 8 (noting that workers in alternative work arrangements seldom receive health insurance through their jobs).

286   Universal Worker Protections Act, H.R. 1601 (2019–2020).

287   Id. § 29. 288  Id.

## *"If policymakers want to preserve gig workers' flexibility while also expanding access to benefits, they should first determine if such expansion is needed, what current options are available, and whether new proposals may do more harm than good."*

Platform holders have been open to these ideas as well.  Following the passage of AB 5 in California, a group of gig companies sponsored the Protect App-Based Drivers and Services Act, a ballot initiative designed to protect workers' independence while also providing them with certain benefits.[289] Among other things, the Act would require platform

holders to provide healthcare subsidies to Cover California similar to those received by employees.[290]  The level of subsidy would depend on how many hours the individual provided services through a particular platform.[291] Like the Washington bill, the Act would allow the individual to collect subsidies from multiple platform holders and carry benefits from job to job.[292]

Collectively, these types of proposals are being considered because it is perceived that gig workers may have less access to benefits than employees do. However, we lack data to support this contention. If policymakers want to preserve gig workers' flexibility while also expanding access to benefits, they should first determine if such expansion is needed, what current options are available, and whether new proposals may do more harm than good.

## Crafting Worker Protections to Fit the Gig Model

Beyond benefits, some jurisdictions are finding ways to protect gig workers without converting them into employees. To date, three general approaches have emerged: regulating the independent-contractor relationship, extending statutory protections to independent contractors, and setting up separate funds to protect independent contractors.

**Regulating the Contract Relationship.** New York City's Freelancing Isn't Free Act, discussed above, offers a good example of the first approach. While the Act explicitly disavows any intent to change independent contractors into employees, it requires companies contracting with individuals to follow certain guidelines.[293] For example, the companies must pay the amounts they owe to independent contractors by a given date or face civil penalties.[294] This type of approach—building protections into the contractual relationship to prevent abuse—preserves the gig model while addressing concerns about the imbalances in bargaining power between gig workers and platform holders.[295]

**Extending Protections to Independent Contractors.** In other states, lawmakers have simply extended existing worker protections outside the employment relationship. For example, Maryland recently tweaked its anti-discrimination laws to cover independent contractors.[103] Few objections can be raised against requiring platform holders not to discriminate on the basis of protected categories like race or sex. Nothing about antidiscrimination laws upsets the gig model, and nothing about such laws interferes with worker flexibility.[297]

**Setting up separate funds for independent contractors.** Still other states are experimenting with workers' compensation funds to protect independent contractors. Here again, New York offers a model—the Black Car Fund,[298] discussed above. States could go even further by allowing platform holders to contribute to such funds without turning their independent contractors into full-blown employees.[299] Again, most platform holders avoid offering any type of coverage because they fear creating an employment relationship.[300] By eliminating that risk, states would motivate gig companies to contribute voluntarily as a benefit of using their platforms.

## Studying and Experimenting with the Gig Economy

The gig economy remains new and changing. Its largest company, Uber, came into existence only ten years ago. Much remains to be understood about the gig economy's potential and risks. So before burying the field in a blizzard of regulation, lawmakers should make sure they understand the lay of the land.

Today, however, some states are taking a readyshoot-aim approach. They are trying to fit a twenty-first century phenomenon into a twentiethcentury model. What they should be doing instead is studying the problem. While many states have launched "misclassification" studies,[301] the gig economy's problem is not misclassification. In fact, policy makers know so little about the gig economy that they don't know what its problems really are. Lawmakers need more comprehensive data.

289 Protect App-Based Drivers and Services Act (2019), https://protectdriversandservices.com/wp-content/uploads/2019/10/ProtectApp-Based-Drivers-Services-Act_Annotated.pdf?ref=article_inline; see also Sebastian Herrera, Uber, Lyft Unveil Ballot Initiative to Counter California Gig-Economy Law, Wall Street J. (Oct. 29, 2019), https://www.wsj.com/articles/uber-lyft-unveil-ballot-initiative-tocounter-california-gig-economy-law-11572386291 290 Id. § § 7454(a)(1)–(2).

291  Id.

292  Id. § 7454(f).

293  See N.Y. City Adm. Code tit. 20, ch. 10.

294  Id.

295  Befort, supra note 128, at 419.

103 H.B. 679, 2019 Reg. Sess. (Md. 2019).

297  See Harris & Krueger, supra note 122, at 5 ("[P]roviding protection against workplace discrimination would help ensure neutrality between employment relationships and independent worker relationships while providing more-expansive protection against discriminatory acts in the workplace and labor market.").

298  Who We Are, Black Car Fund, http://www.nybcf.org/about (last visited Oct. 21, 2019).

299  Cf. Boeri et al., supra note 269, at 59 (proposing the creation of "shared security accounts").

300  Sherk, supra note 120, at 7.

301  See, e.g., S.B. 493, 80th Leg. (Nev. 2019) (proposing to create a misclassification task force); HB 716, 2019 Sess. (Pa. 2019) (same).

The most obvious candidate to provide this data is the Bureau of Labor Statistics. The Bureau, however, cannot simply rerun its 2017 contingent-worker survey. For the reasons already discussed, that survey failed to capture large swaths of the gig workforce. By focusing on "primary" jobs, it left out all part-timers, moonlighters, and people looking only to supplement other sources of income.[104] Any future surveys must therefore include both workers who use digital platforms as their primary sources of income and those who use the platforms only occasionally. The data suggests that more gig workers fall into the latter category than the former.[105] Such data would also likely indicate that gig workers are not seeking benefits from platform providers, but are instead seeking supplemental income.

By capturing the whole gig workforce, we may begin to understand the incentives driving people to gig work, as well as the economic headwinds they face. Only with the full picture will lawmakers and regulators be better equipped to tackle the problems that critics believe plague the gig economy. And only then can we create a regulatory regime made for the gig economy of the twenty-first century.

# Appendix

## Summary of State Independent Contracting Laws

State laws on independent contractor status are a confused morass and changing rapidly. Most states have different standards under different laws – wage and hour, workers' compensation, unemployment, equal employment opportunity, workplace safety, and/or tax laws may each have different requirements.  Some of these laws are "balancing tests," which include a number of factors for courts to consider and determine

---

104  See Kasriel, supra note 67 (criticizing Bureau for crafting its survey to cover only primary jobs)

105  See, JPMorgan Report, supra note 45, at 24 (finding that most gig workers use gig work only to supplement other sources of income).

independent contractor status considering the totality of the circumstances.

## Balancing Tests

Other laws are "conjunctive tests," with three or more required factors all of which must be met for a worker to be classified as an independent contractor. Based on a detailed survey of independent contractor standards in every state, below we roughly classify the tests under different state laws (as they existed as of the publication of this paper) into three types of balancing tests and three types of conjunctive tests.

### The IRS 20-factor balancing test considers the following factors:

1. **Instructions:** If the person for whom the services are performed has the right to require compliance with instructions, this indicates employee status.

2. **Training:** Worker training (e.g., by requiring attendance at training sessions) indicates that the person for whom services are performed wants the services performed in a particular manner (which indicates employee status).

3. **Integration:** : Integration of the worker's services into the business operations of the person for whom services are performed is an indication of employee status.

4. **Services rendered personally: :** If the services are required to be performed personally, this is an indication that the person for whom services are performed is interested in the methods used to accomplish the work (which indicates employee status).

**Hiring, supervision, and paying assistants:** If the person for whom services are performed hires, supervises or pays assistants, this generally indicates employee status. However, if the worker hires and supervises others under a contract pursuant to which the worker agrees to provide material and labor and is only responsible for the result, this indicates independent contractor status.

5. **Continuing relationship:** A continuing relationship between the worker and the person for whom the services are performed indicates employee status.

**Set hours of work:** The establishment of set hours for the worker indicates employee status.

6.

7.

*"State laws on independent contractor status are a confused morass and changing rapidly. Most states have different standards under different laws – wage and hour, workers' compensation, unemployment, equal employment opportunity, workplace safety, and/ or tax laws may each have different requirements."*

8. **Full time required:** If the worker must devote substantially full time to the business of the person for whom services are performed, this indicates employee status. An independent contractor is free to work when and for whom he or she chooses.

9. **Doing work on employer's premises:** If the work is performed on the premises of the person for whom the services are performed, this indicates employee status, especially if the work could be done elsewhere.

10. **Order or sequence test:** If a worker must perform services in the order or sequence set by the person for whom services are performed, that shows the worker is not free to follow his or her own pattern of work, and indicates employee status.

11. **Oral or written reports:** A requirement that the worker submit regular reports indicates employee status.

12. **Payment by the hour, week, or month:** Payment by the hour, week, or month generally points to employment status; payment by the job or a commission indicates independent contractor status.

13. **Payment of business and/or traveling expenses.** If the person for whom the services are performed pays expenses, this indicates employee status. An employer, to control expenses, generally retains the right to direct the worker.

14. **Furnishing tools and materials:** The provision of significant tools and materials to the worker indicates employee status.

15. **Significant investment:** Investment in facilities used by the worker indicates independent contractor status.

16. **Realization of profit or loss:** A worker who can realize a profit or suffer a loss as a result of the services (in addition to profit or loss ordinarily realized by employees) is generally an independent contractor.

17. **Working for more than one firm at a time:** If a worker performs more than de minimis services for multiple firms at the same time, that generally indicates independent contractor status.

18. **Making service available to the general public:** If a worker makes his or her services available to the public on a regular and consistent basis, that indicates independent contractor status.

19. **Right to discharge:** The right to discharge a worker is a factor indicating that the worker is an employee.

20. **Right to terminate:** If a worker has the right to terminate the relationship with the person for whom services are performed at any time he or she wishes without incurring liability, that indicates employee status.

| States Laws Adopting the IRS 20-Factor Test | |
|---|---|
| **Alabama** | Unemployment, Tax |
| **Arizona** | Tax |
| **Arkansas** | All |
| **Connecticut** | Tax |
| **Delaware** | Tax |
| **District of Columbia** | Tax |
| **Florida** | Tax |
| **Georgia** | Tax |
| **Hawaii** | Tax |
| **Idaho** | Tax, Wage & Hour |
| **Illinois** | Tax |
| **Indiana** | Tax, Workers' Comp |
| **Iowa** | Tax |
| **Maryland** | Tax |
| **Massachusetts** | Tax |
| **Michigan** | Tax, Unemployment |
| **Minnesota** | Tax |
| **Mississippi** | Tax |
| **Missouri** | Tax, Unemployment |
| **Nebraska** | Tax |
| **New York** | Tax |
| **North Carolina** | Tax |
| **Pennsylvania** | Tax |
| **Rhode Island** | Tax, Unemployment |
| **Tennessee** | All except Workers' Comp |
| **Texas** | Unemployment, Wage & Hour |

| Utah | Tax |
|---|---|
| **Virginia** | Unemployment, Tax |
| **West Virginia** | Tax |
| **Wisconsin** | Tax |

**The FLSA economic reality test balances  the following seven (7) factors:**

1.  The extent to which the services rendered are an integral part of the principal's business.

2.  The permanency of the relationship.

3.  The amount of the alleged contractor's investment in facilities and equipment.

4.  The nature and degree of control by the principal.

5.  The alleged contractor's opportunities for profit and loss.

| State Laws Adopting the FLSA Economic Reality Test | |
|---|---|
| **Alaska** | Wage & Hour |
| **District of Columbia** | Wage & Hour |
| **Florida** | EEO, Wage & Hour |
| **Illinois** | MW & OT |
| **Iowa** | MW & OT |
| **Louisiana** | Unemployment |
| **Michigan** | EEO, Wage & Hour |
| **Ohio** | Wage & Hour |
| **Pennsylvania** | Wage & Hour |
| **Tennessee** | Workers' Compr |
| **Washington** | Wage & Ho |

6.  The amount of initiative, judgment, or foresight in open market competition with others required for the success of the claimed independent contractor.

7.  The degree of independent business organization and operation.

**The federal common law "control" test (the "Darden test") balances twelve (12) factors to determine the amount of control a company has over the independent contractor:**

1. The contractor's right to control when, where, and how the individual performs the job.

10. Whether the individual's work is part of the regular business of the contractor..

| State Laws Adopting The Common Law "Control" Or Other Balancing Test | |
|---|---|
| Alabama | Common Law |
| Alaska | Workplace Safety |
| Arizona | All except Tax |
| Connecticut | EEO, Workers' Comp |
| Delaware – | EEO, Wage & Hour, Workers' Comp |
| District of Columbia | EEO, Unemployment, Workers' Comp |
| Florida | EEO, Unemployment |
| Hawaii | Workers' Comp |
| Idaho | Workers' Comp |
| Illinois | Workers' Comp |
| Indiana | Wage Payment |
| Iowa | EEO, Unemployment, Wage Payment, Workers' Comp |
| Kansas | EEO, Unemployment, Wage & Hour, Workers' Comp |
| Kentucky | EEO, Unemployment, Wage & Hour, Workers' Comp |
| Louisiana | EEO, Wage Payment |
| Maryland | Wage & Hour, Workers' Comp |
| Massachusetts | EEO, Workers' Comp |

2. The skill required for the job.

11. Whether the contractor is in business..

3. The source of the instrumentalities and tools.

12. The provision of employee benefits to the individual.

4. The location of work.

5. The duration of the relationship between the parties.

6. Whether the contractor has the right to assign additional projects to the individual.

7. The extent of the individual's discretion over when and how long to work.

8. The method of payment.

9. The contractor's role in hiring and paying assistants.

| State Laws Adopting The Common Law "Control" Or Other Balancing Test  Continued | |
| --- | --- |
| Minnesota | EEO, Unemployment, Wage & Hour, Workers' Compensation |
| Mississippi | Unemployment, Wage & Hour |
| Missouri | EEO, Wage & Hour, Workers' Comp |
| Montana | All |
| Nebraska | EEO, MW & OT, Workers' Comp |
| Nevada | Workers' Comp |
| New Jersey | EEO, Tax, Workers' Comp |
| New Mexico | Tax, Workers' Comp |
| New York | EEO, Unemployment, Wage & Hour, Workers Comp |
| North Carolina | EEO, Unemployment, Wage & Hour, Worker's Comp |
| North Dakota | EEO, Unemployment, Wage & Hour, Workers' Comp |
| Ohio | EEO, Tax, Unemployment, Workers' Comp |
| Oklahoma | All |
| Oregon | EEO, Wage & Hour |
| Pennsylvania | Workers' Comp |
| Rhode Island | Wage & Hour, Workers' Comp |
| South Carolina | All |
| South Dakota | EEO |
| Texas | EEO |
| Vermont | EEO |
| Virginia | Workers' Comp |
| Washington | EEO, Workplace Safety |
| West Virginia | Wage & Hour, Workplace Safety |
| Wisconsin | EEO |
| Wyoming | EEO |

## Conjunctive Tests

**The traditional state "ABC" test requires all three of the following:**

a. The individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact;

b.

c.

The service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and

The individual is customarily engaged in an independently established trade, occupation, or profession.

| State Laws Adopting the Traditional ABC Test | |
|---|---|
| Alaska | Unemployment |
| Colorado | All (A&C prongs only) |
| Connecticut | Wage & Hour, Unemployment |
| Delaware | Unemployment |
| Hawaii | Unemployment |
| Idaho | Unemployment (A&C prongs only) |
| Illinois | EEO, Unemployment, Wage Payment |
| Indiana | MW & OT (A&C prongs only), Unemployment |
| Kansas | Tax (A&C prongs only) |
| Maryland | Unemployment |
| Massachusetts | Unemployment |
| Nebraska | Unemployment, Wage Payment |
| New Hampshire | Unemployment |
| New Jersey | Unemployment, Wage & Hour |
| New Mexico | Unemployment |
| Pennsylvania | Unemployment (A&C prongs only |
| South Dakota | Unemployment, Wage & Hour, Workers Comp (A&C only) |
| Utah | Unemployment (A&C prongs only) |
| Vermont | Unemployment, Tax, Wage & Hour |
| Washington | Unemployment (may also apply 6-part conjunctive test) |
| West Virginia | Unemployment |

**Two states have adopted a narrowed "ABC" test, which eliminates the option under the B prong for a company to classify a worker as independent contractor if they perform work outside of the company's places of business:**

a.   the person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;

b.   The person performs work that is outside the usual course of the hiring entity's business;

c.   The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

| States Adopting the Narrow ABC Test | |
| --- | --- |
| California | All |
| Massachusetts | Wage & Hour |

**Other state laws have adopted some other multi-factor conjunctive test.**

| State Laws Adopting Other Multi-Factor Conjunctive Test | |
| --- | --- |
| Alaska | Workers' Comp |
| Florida – Workers' Comp | Workers' Comp |
| Georgia –Unemployment, Workers' Comp | Workers' Comp |
| Louisiana – Workers' Comp | Workers' Comp |
| Maine – All | All |
| Michigan – Workers' Comp | Workers' Comp |
| Nevada – All (two alternative tests, including the traditional ABC test) | All |
| New Hampshire – Wage & Hour, Workers' Comp | Workers' Comp |
| Oregon – Unemployment, Tax, Workers' Comp | Workers' Comp |
| Texas – Workers' Comp | Workers' Comp |
| Utah – Workers' Comp | Workers' Comp |
| Vermont – Workers' Comp | Workers' Comp |
| Washington – Unemployment, Workers' Comp | Unemployment, Workers' Comp |
| West Virginia – Workers' Comp | Workers' Comp |
| Wisconsin – Unemployment, Worker's Comp | Unemployment, Workers' Comp |
| Wyoming – Unemployment, Workers' Comp | Unemployment, Workers' Comp |



**U.S. CHAMBER OF COMMERCE**
Employment Policy Division