UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | ***Lydia Olson, et al. v. State of California, et al.*** | Page | 1 of 24 |
|---|---|---|---|

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

Proceedings:  **IN CHAMBERS - ORDER RE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [14]**

On January 8, 2020, Plaintiffs Lydia Olson, Miguel Perez, Postmates Inc. ("Postmates"), and Uber Technologies, Inc. ("Uber")[1] filed a Motion for Preliminary Injunction requesting that the Court enjoin the enforcement against Plaintiffs, pending final judgment, of any provision of California Assembly Bill 5 2019 ("AB 5"), a recently enacted law pertaining to the classification of employees and independent contractors.  [Doc. # 14.]  The Motion has been fully briefed, and the Court held a hearing on February 7, 2020.  [Doc. ## 21, 23.][2]  For the reasons stated below, the Court **DENIES** Plaintiffs' Motion.

# I.
# FACTUAL AND PROCEDURAL BACKGROUND[3]

California courts have long grappled with the challenges of defining the line between an employee and an independent contractor.  Two years ago, in its unanimous decision in *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018), the California Supreme Court described

---

[1] The Court refers to Olson and Perez collectively as the "Individual Plaintiffs" and Uber and Postmates collectively as the "Company Plaintiffs."

[2] On February 4, 2019, individuals described as "California On-Demand Contractors" Keisha Broussard, Daniel Rutka, Raymond Frazier, and Lamar Wilder filed a brief as *amici curiae* in support of Plaintiff's Motion for Preliminary Injunction.  [Doc. # 27.]  The next day, the Chamber of Commerce of the United States of America, Engine Advocacy, and TechNet also filed a brief as *amici curiae* in support of Plaintiff's Motion.  [Doc. # 44.]

[3] The following facts are based on judicially noticeable documents and the sworn declarations Plaintiffs submitted in support of their Motion, not on the unverified allegations in Plaintiffs' Complaint.  *See, e.g.*, *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) ("A verified complaint or supporting affidavits may afford the basis for a preliminary injunction[.]"); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (3d ed. 2019) ("Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 2 of 24 |
|---|---|---|---|

the distinction between an independent contractor and employee—and the importance of that distinction—in this way:

> Under both California and federal law, the question whether an individual worker should properly be classified as an employee or, instead, as an independent contractor has considerable significance for workers, businesses, and the public generally.  On the one hand, if a worker should properly be classified as an employee, the hiring business bears the responsibility of paying federal Social Security and payroll taxes, unemployment insurance taxes and state employment taxes, providing worker's compensation insurance, and, most relevant for the present case, complying with numerous state and federal statutes and regulations governing the wages, hours, and working conditions of employees.  The worker then obtains the protection of the applicable labor laws and regulations.  On the other hand, if a worker should properly be classified as an independent contractor, the business does not bear any of those costs or responsibilities, the worker obtains none of the numerous labor law benefits, and the public may be required under applicable laws to assume additional financial burdens with respect to such workers and their families.

*Id.* at 912–13 (footnote omitted).  The California Supreme Court noted that "[t]he basic objective of wage and hour legislation and wage orders is to ensure that such workers are provided at least the minimal wages and working conditions that are necessary to enable them to obtain a subsistence standard of living and to protect the workers' health and welfare."  *Id.* at 952.   It therefore adopted a "very broad definition of the workers who fall within the reach of the wage orders."[4]  *Id.*

That broad definition is known as the "ABC" test, a standard used in numerous jurisdictions in different contexts to determine a worker's classification.  *Id.* at 916.  Under the ABC test, a worker is considered an employee unless the hiring entity establishes that the worker (a) is "free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact"; (b) "performs work that is outside the usual course of the hiring entity's business"; and (c) is "customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity."  *Id.* at 916–17.  *Dynamex* applied the ABC test to all employers and workers covered by California Industrial Wage Commission ("IWC") wage orders.  *Id.* at 964.

---

[4] "In California, wage orders are constitutionally-authorized, quasi-legislative regulations that have the force of law." *Id.* at 914.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | | Date | February 10, 2020 |
|---|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | | Page | 3 of 24 |
|---|---|---|---|---|

On September 18, 2019, Defendant the State of California enacted AB 5, which codifies *Dynamex*'s holding and adopts the ABC test for all provisions of the California Labor Code, the Unemployment Insurance Code, and IWC wage orders, with numerous exemptions. *See* A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019); Cal. Lab. Code § 2750.3. For such statutory exemptions, AB 5 provides that the multifactor test of independent contractor status established in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989), remains in effect. *See* Cal. Lab. Code § 2750.3(b)–(h). The listed occupations, industries, or types of work relationships are subject to additional criteria in order to be exempted from application of the ABC test and include, among others: licensed professionals such as doctors and lawyers, commercial fishermen, contractors and subcontractors in the construction industry, business-to-business service providers, travel agents, graphic designers, freelance writers, aestheticians, and business entities providing referred services as home cleaners, dog walkers, or tutors. *See id.* Under AB 5, certain city attorneys may bring injunctive actions, and reclassified employers may be subject to pre-existing Labor and Unemployment Insurance Code provisions penalizing some violations as misdemeanors. *See id.* § 2750.3(j); A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019).

On December 30, 2019, Plaintiffs filed the instant lawsuit alleging that AB 5 violates the U.S. and California Constitutions and seeking declaratory, injunctive, and other relief from the State and Defendant Xavier Becerra, in his capacity as Attorney General of California. [Doc. # 1.] Postmates and Uber are both headquartered in San Francisco, California, and are commonly referred to as "on-demand economy," "network economy," "platform," or "gig economy" companies that use technology to respond to a customer's immediate or specific need. *See* Compl. at ¶ 3; Andres Decl. at ¶ 3 [Doc. # 17]; Rosenthal Decl. at ¶ 5 [Doc. # 18]; McCrary Decl. at ¶ 14 n.1 [Doc. # 19].

Postmates provides and maintains an online marketplace and mobile platform (the "Postmates App") that connects local merchants, consumers, and drivers[5] to facilitate the purchase, fulfillment, and—when applicable—delivery of goods from merchants (oftentimes restaurants) to consumers. Andres Decl. at ¶4. When consumers place orders of goods for delivery through the Postmates App, nearby drivers receive a notification and can choose whether to pick up and complete the requested delivery. *Id.* at ¶¶ 4–5. According to Postmates, more than 300,000 drivers in California currently make deliveries through the Postmates App, and "the vast majority" of those drivers "provide delivery services only intermittently and for

---

[5] Postmates' Director of Trust and Safety and Insurance Operations describes drivers as "independent contractor couriers." *See, e.g.*, Andres Decl. at ¶ 2. The Court has not been asked to decide whether Postmates' couriers are independent contractors or employees under AB 5, *Dynamex*, *Borello*, or any other law, and opts to describe the couriers as "drivers."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | | Date | February 10, 2020 |
|---|---|---|---|---|
| Title | *Lydia Olson, et al. v. State of California, et al.* | | Page | 4 of 24 |

short periods of time." *Id.* at ¶ 6. For drivers, there are no set schedules or requirements for minimum hours or deliveries. *Id.* at ¶ 7. Drivers use their own vehicles and determine their own appearance and routes, and they may do other work for other employers. *Id.* at ¶¶ 9–11. Drivers who wish to make deliveries through the Postmates App must sign the "Fleet Agreement," which currently explains, *inter alia*, that the driver is "an independent provider of delivery services" and that Postmates and the driver do not have an employer-employee relationship. *Id.* at ¶¶ 12–15.

Uber provides at least two "digital marketplaces" to connect individual consumers with those willing to service them—the UberEats mobile platform (the "UberEats App") and the Uber rideshare mobile platform (the "Uber Rides App"). Rosenthal Decl. at ¶¶ 6–8. The UberEats App, like Postmates, connects local merchants, consumers, and drivers to facilitate customers' food orders for delivery. *Id.* at ¶ 8. The Uber Rides App has different interfaces for customers seeking a ride ("riders") and for drivers seeking riders. *Id.* at ¶¶ 7, 12–15. According to Uber, more than 395,000 drivers in California have used Uber platforms to provide services in the year beginning October 1, 2018. *Id.* at ¶ 9. Drivers can choose when and where they drive and accept or reject requests as they see fit. *Id.* at ¶¶ 14–15, 18–19. To use the driver version of the Uber Rides app, drivers must agree to Uber's Technology Services Agreement (the "Rasier Services Agreement"), which provides, *inter alia*, that Uber is "a technology services provider that does not provide transportation services" and that the drivers operate as independent contractors, not employees. *Id.* at ¶¶ 20–29. UberEats drivers must also agree to a Technology Services Agreement (the "Portier Services Agreement") with similar provisions. *Id.* at ¶¶ 30–39.

Plaintiff Lydia Olson is a driver for Uber, and Plaintiff Miguel Perez is a driver for Postmates and, occasionally, Uber Rides and UberEats. Olson Decl. at ¶ 5 [Doc. # 15]; Perez Decl. at ¶¶ 2, 4–5 [Doc. # 16]. Olson owns a consulting business and at times takes care of her husband, who suffers from multiple sclerosis. Olson Decl. at ¶¶ 2–3. She attests that she intentionally chooses to work as an independent contractor for the flexibility and autonomy, as well as to help stabilize her fluctuating income. *Id.* at ¶¶ 4–5, 8–12. Similarly, Perez attests that he chose on-demand work to avoid driving a truck during the graveyard shift, to take on more family responsibilities, and to increase his income. Perez Decl. ¶¶ 3–8, 18. Neither Individual Plaintiff wants to be an employee of Uber or Postmates, and both express concerns about the grave impact of AB 5 on their lives. *Id.* at ¶¶ 19–20; Olson Decl. at ¶¶ 10, 12.

AB 5 went into effect on January 1, 2020. On January 8, 2020, Plaintiffs filed the instant Motion requesting that this Court enjoin Defendants from enforcing AB 5 against Company Plaintiffs.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | ***Lydia Olson, et al. v. State of California, et al.*** | Page | 5 of 24 |
|---|---|---|---|

## II.
## JUDICIAL NOTICE

Both sides seek judicial notice of various documents.  Federal Rule of Evidence 201 permits a court to take judicial notice of facts not subject to reasonable dispute and "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 824 n.3 (9th Cir. 2011) (citing Fed. R. Evid. 201(b)).  Defendants seek judicial notice of:

    (1) The Order Denying Temporary Restraining Order in *American Society of Journalists and Authors, Inc. v. Becerra*, No. CV 19-10645-PSG (C.D. Cal. Jan. 3, 2020);
    (2) The October 29, 2019 initiative submitted to the California Attorney General's Office entitled "the Protect App-Based Drivers and Services Act."  [Doc. # 21.]

Plaintiffs seek judicial notice of:

    (1) Plaintiffs' Motion for Provisional Relief in *Regents of University of California v. U.S. Department Homeland Security*, No. CV 17-05211-WHA (N.D. Cal. Jan. 9, 2018);
    (2) Brief of State Amicus Curiae in *International Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017);
    (3) Order Granting Temporary Restraining Order, *California Trucking Association v. Becerra*, No. CV 18-02458-BEN (BLMx) (S.D. Cal. Dec. 31, 2019);
    (4) Order Granting Preliminary Injunction, *California Trucking Association v. Becerra*, No. CV 18-02458-BEN (BLMx) (S.D. Cal. Jan. 16, 2020);
    (5) Docket Report, *First Franklin Financial Corp. v. Franklin First Financial, Ltd.*, 356 F. Supp. 2d 1048, CV No. 04-02842-WHA (N.D. Cal. 2005);
    (6) Tweet by @LorenaSGonzalez, Twitter (Jan. 20, 2020, 11:55 p.m.), https://twitter.com/LorenaSGonzalez/status/1219528872351322114;
    (7) Tweet by @LorenaSGonzalez, Twitter (Jan. 20, 2020, 11:35 p.m.), https://twitter.com/LorenaSGonzalez/status/1219523961517527040.  [Doc. # 24.]

    Courts "may take judicial notice of 'matters of public record.'"  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted).  Documents on file in federal or state courts are considered undisputed matters of public record.  *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).  Courts take notice of the existence of such filings, not the truth of the facts recited therein.  *Lee*, 250 F.3d at 689–90.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 6 of 24 |
|---|---|---|---|

The Court hereby **GRANTS** both requests for judicial notice regarding Assemblymember Gonzalez's Tweets and the fact that the court documents were filed, but not of the facts asserted in the court documents. The Court also *sua sponte* takes notice of the Tweets and media reports referred to in the Complaint and the moving papers, as those documents' existence cannot reasonably be disputed. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" (citations omitted)). The Court also *sua sponte* takes notice of legislative history cited by Defendants at oral argument. *See* Assemb. Comm. Rep., AB 5, 2019–2020 Reg. Sess. (Cal. July 10, 2019). Because the Court does not rely on the "Protect App-Based Drivers and Services Act" in its analysis below, the Court **DENIES as moot** Defendants' request for judicial notice of that document.

## III.
## DISCUSSION

A plaintiff seeking a preliminary injunction must show that (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is also appropriate under the Ninth Circuit's "sliding scale" approach when a plaintiff raises "serious questions going to the merits" and demonstrates that "the balance of hardships tips sharply in the plaintiff's favor," in addition to showing the final two *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). The Supreme Court has cautioned that "[a]n injunction is an exercise of a court's equitable authority," which should not be invoked as a matter of course, and "a court should be particularly cautious when contemplating relief that implicates public interests." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).

In the Ninth Circuit, the four "elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Cottrell*, 632 F.3d at 1131. The Court assesses each factor *seriatim*.

## A.  Likelihood of Success on the Merits

Plaintiffs' Complaint contains 10 claims against Defendants for violations of the U.S. Constitution's Ninth Amendment and Equal Protection, Due Process, and Contract Clauses and the California Constitution's "Baby Ninth Amendment" and Inalienable Rights, Equal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | | Date | February 10, 2020 |
|---|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | | Page | 7 of 24 |
|---|---|---|---|---|

Protection, Due Process, and Contract Clauses.  [Doc. # 1.]  Plaintiffs' Motion for Preliminary Injunction focuses on AB 5's alleged discrimination against Plaintiffs in violation of Equal Protection, deprivation of Individual Plaintiffs' substantive due process right to pursue their chosen professions, and impairment of contracts between Individual and Company Plaintiffs.  *See, e.g.*, Mot. at 9–10 [Doc. # 14].[6]  The Court therefore addresses only these claims.

Under the sliding scale approach, Plaintiffs must demonstrate at a minimum "that serious questions going to the merits were raised."  *Cottrell*, 632 F.3d at 1134–35.  For the reasons stated below, the Court does not find likelihood of success on the merits or that sufficiently serious questions have been raised as to the merits of these claims.

### 1. AB 5 is rationally related to a legitimate state interest and did not target gig economy companies in violation of Equal Protection

The Fourteenth Amendment's Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws[.]'"  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

Plaintiffs argue that AB 5 targets gig economy companies and workers and treats them differently from similarly situated groups.  Mot. at 16–17.  The parties appear to agree that AB 5 does not warrant "some form of heightened review" because it implicates no fundamental right or suspect classification.  *Nordlinger v. Hahn*, 505 U.S 1, 10 (1992); *see* Mot. at 16; Opp. at 14–15.  Accordingly, the Court need only determine whether, under the Equal Protection Clause, the statute rationally furthers "a legitimate state interest."  *Nordlinger*, 505 U.S. at 10.  Under the rational review test, a statute bears "a strong presumption of validity," and "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'"  *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  The Equal Protection inquiry does not license the Court to "'judge the wisdom, fairness, or logic of legislative choices,'" and it ends if the Court finds a "'plausible reason[] for [California's] action.'"  *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016) (quoting *Beach Commc'ns*, 508 U.S. at 313–14)).  Plaintiffs therefore bear the heavy burden of demonstrating that AB 5 irrationally targets gig economy companies and workers.

---

[6] All page references herein are to page numbers inserted in the header of the document by the CM/ECF filing system.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | | Date | February 10, 2020 |
|---|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | | Page | 8 of 24 |
|---|---|---|---|---|

Section 1 of AB 5 sets forth a statement of purpose that describes "[t]he misclassification of workers as independent contractors [as] a significant factor in the erosion of the middle class and the rise in income inequality." A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019). The Legislature's stated intent in enacting AB 5 is:

> to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave.

*Id.*

The statement of purpose also explicitly provides that "[b]y codifying the California Supreme Court's landmark, unanimous *Dynamex* decision, this act restores these important protections to potentially several million workers who have been denied these basic workplace rights that all employees are entitled to under the law." *Id.* The State's asserted interest in protecting exploited workers to address the erosion of the middle class and income inequality thus appears to be based on a "reasonably conceivable state of facts that could provide a rational basis" for any ostensible targeting of gig economy employers and workers.[7] *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004) (quoting *Beach Commc'ns*, 508 U.S. at 313); *see Nordlinger*, 505 U.S. at 11 (finding the state interest legitimate "so long as there is a plausible policy reason for the classification" and "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker"). Given this plausible reason for enacting AB 5, the Court's inquiry could end here. *See Fowler Packing*, 844 F.3d at 815.

But Plaintiffs argue that AB 5 does not rationally further that asserted governmental interest because its numerous exemptions "roll[] back *Dynamex* for the wage order claims of" workers who would otherwise be covered by *Dynamex*. Reply at 7 [Doc. # 23]. Asserting that many of the employers and workers in the exempted industries are "similarly situated to Plaintiffs," Plaintiffs proffer the example that "an individual who chooses to earn income by direct selling Tupperware is exempt, and yet, if that same person earns extra income by offering driving services, there is no exemption." *Id.* This example overlooks AB 5's requirement that a direct salesperson must meet additional conditions described in Section 650 of the

---

[7] The Legislature's choice is entitled to such deference on rational basis judicial review that it "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 9 of 24 |
|---|---|---|---|

Unemployment Insurance Code, and ignores the practical differences between direct selling and gig economy driving. Cal. Lab. Code § 2750.3(b)(5); *see* Cal. Unemp. Ins. Code § 650 (defining direct salespersons in part as individuals who attempt to sell products in a buyer's home and not in a retail or wholesale establishment). It is rational to infer that direct salespersons exert independence and control in choosing their sales targets and locations and how they interact with customers in closing their sales. Moreover, outside salespersons have been exempt from wage orders under California law long before AB 5. Cal. Lab. Code § 1171 ("The provisions of this chapter . . . shall not include any individual employed as an outside salesman[.]"); IWC Wage Order No. 7-2001(1)(C), *codified at* Cal. Code Regs. Tit. 8, § 11070(1)(C) ("The provisions of this order shall not apply to outside salespersons.").

In addition, referring to AB 5's "service provider" exemption, Plaintiffs argue that "there is no material difference between providing local 'moving' of items from one's home [to which AB 5 does not apply] and local delivery of items to one's home [to which AB 5 does apply]." Reply at 11; *see* Cal. Lab. Code § 2750.3(g)(2)(C). But that exemption covers only "a business entity, who performs services for a client through a referral agency," not "individual workers." Cal. Lab. Code § 2750.3(g)(3). Thus, one material difference between a local moving company which may be exempted from AB 5 and a Postmates delivery driver who may be covered by AB 5 is the moving company's entity status. Plaintiffs also ignore the numerous additional criteria to be met by any business entity providing services, such as tutoring (if the person develops and teaches their own curriculum) and pet boarding (a regulated industry under the California Health and Safety Code section 122386), including "set[ting] its own rates for services performed, without deduction by the referral agency" and "deliver[ing] services to the client under service provider's name, rather than under the name of the referral agency." *Id.* at § 2750.3(g)(1).[8]

These examples are thus dissimilar from the classification rejected in *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008), in which the government "undercut its own rational basis for the licensing scheme by excluding [plaintiff] from the exemption." *Id.* at 992. In that case, the Ninth Circuit found no rational explanation to require certain pest controllers dealing with mice or pigeons to obtain a license relating to pesticide use, while similar pest controllers dealing with bats or squirrels were exempted from the licensing requirement, despite being *more* likely

---

[8] In their Complaint and Reply, Plaintiffs also argue that AB 5 is irrational because "some types of workers are excluded (e.g., a delivery truck driver delivering milk) while others performing substantively identical work are not excluded (e.g., a delivery truck driver delivering juice)." Reply at 9– 0 (quoting Compl. ¶ 24). Plaintiffs appear to be referring to the longstanding provision of the California Unemployment Insurance Code—also found in a regulation of the Internal Revenue Service—that "an agent-driver or commissioner-driver engaged in distributing . . . beverages (other than milk)" is considered an employee. *See* Cal. Unemployment Ins. Code § 621(c)(1)(A); 26 CFR § 31.3121(d)-1(d)(1)(i). No milkman exemption is contained in AB 5, which modified Unemployment Insurance Code section 621 solely to describe the ABC test and utilize gender-neutral nouns.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | | Date | February 10, 2020 |
|---|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | | Page | 10 of 24 |
|---|---|---|---|---|

than the former group to encounter pesticides. *Id.* at 988, 992. Plaintiffs have not shown that their work arrangements are so similar to exempted work arrangements that exempting Uber and Postmates from AB 5's application would further the State's interest in preventing misclassification of independent contractors. Thus, they have not borne their heavy burden of showing that AB 5's exemption of other categories of industries and workers "contradicts the purposes of the prevailing wage law." *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1066 (9th Cir. 2018).

Plaintiffs' reliance on *Fowler Packing* is also unavailing. There, the Ninth Circuit held that the only conceivable explanation for "carve-outs" making three or four specific employers ineligible for a "safe harbor" affirmative defense against a piece-rate wage law was to procure the support of a labor union. 844 F.3d at 816 ("[W]e cannot conceive of a legitimate interest that would explain this decision."); *see also Allied Concrete*, 904 F.3d at 1066 (describing the exemption in *Fowler Packing* as "clearly suggest[ing] improper favoritism"). It is true that Defendants' Opposition does not provide specific justifications for every exemption in AB 5, besides the broad exemption for licensed professionals such as architects and dentists. *See* Opp. at 20. But "the burden is on plaintiffs to negate 'every conceivable basis' which might have supported the distinction between exempt and non-exempt entities." *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1086 (9th Cir. 2015) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012)).

To explain the exemptions, Defendants point to the traditional distinctions between independent contractors and employees. AB 5 maintains exemptions of workers who were previously exempted under *Dynamex*—workers in the "administrative, executive, or professional category" and "outside salespersons." 4 Cal. 5th at 925 n.8. In addition, the Assembly Committee on Labor & Employment noted that AB 5 needed to account for other types of typical independent contractors. *See* Assemb. Comm. Rep., AB 5, 2019 – 2020 Reg. Sess., at 8 (Cal. July 10, 2019). The Committee focused on "occupation-by-occupation rules" based on a framework consisting of: market strength (*i.e.*, if there are finite numbers of skilled practitioners), rate setting, relationship between contractor and client, and "technological neutrality" (*i.e.*, making no distinction between the Yellow Pages and an internet-based intermediary connecting contractor and client and asking instead "if the intermediary is . . . deriving disproportionate benefits from the relationship"). *Id.* at 8–12.

There are rational explanations for AB 5's exemptions under this framework, because the work relationships described therein require business organization, skill, self-direction, self-pricing, shorter or less frequent work terms, a distinct location, specific type of work, and other hallmarks of independent status. *See Dynamex*, 4. Cal. at 932–35 (discussing *Borello*, 48 Cal.3d

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 11 of 24 |
|---|---|---|---|

at 355–56). Plaintiffs have not negated Defendants' argument that "the Legislature had ample basis to determine that in certain occupations, independent contractor status was lawful and did not cause the systemic harm . . . associated with misclassification."[9]  Opp. at 19 n.9.  Nor have Plaintiffs offered evidence showing that legislators could not have reasonably conceived AB 5's stated purpose to be true—*i.e.*, that the legislation aimed to alleviate "the erosion of the middle class and the rise in income inequality" and that the ABC test is rationally related to reducing misclassification.[10]  A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019).  Without "'judg[ing] the wisdom, fairness, or logic of legislative choices,'" the Court finds that AB 5 furthers the State's legitimate interest in addressing misclassification.  *Fowler Packing*, 844 F.3d at 815 (quoting *Beach Commc'ns*, 508 U.S. at 313–14)).

Instead of negating every conceivable basis for AB 5's exemptions, Plaintiffs argue that the statute is "inexplicable by anything but animus toward the class it affects," Mot. at 20 (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)), based in part on the bill's sponsor's alleged refusal to consider an exemption for gig economy companies.  Reply at 10.  Plaintiffs assert that AB 5's supporters "did their best to limit the scope of the law *only* to the network companies" and that AB 5 "leave[s] nearly all non-app-based independent workers out in the cold."  Mot. at 13, 19.  But that argument is plainly belied by the expansive language of the statute, which applies to "a person providing labor or services for remuneration," unless that person meets the ABC test or satisfies an exemption.[11]  Cal. Lab. Code § 2750.3(a)(1), (b).  In addition, the Ninth

---

[9] At the hearing, Plaintiffs cited an online article to argue that an ABC test exemption for newspaper carriers codified in a different bill, AB 170, was motivated solely by political favoritism and is thus illegitimate. Plaintiffs have not explained why a separately-passed bill undercuts the validity of AB 5 or why there is no other conceivable reason, other than political favoritism, why a local newspaper delivery person should not be exempt from the ABC test.  The Legislature's framework for determining exemptions appears to apply with equal vigor to the delivery of newspapers, which is not a growing industry.

[10] Plaintiffs say that it is "incorrect" that "*Dynamex*'s ABC test is a benefit to the middle class and an engine of income equality," but offer no data to support that position.  Reply at 10.  The declaration of economist Justin McCrary discusses the benefits of the gig economy and costs associated with implementing AB 5, but does not address the broader and more pervasive problem of misclassification across the California economy.  *See generally* McCrary Decl.  Accordingly, "Plaintiffs have not met their high burden of convincing us that these legislative facts 'could not reasonably be conceived to be true by the governmental decisionmaker.'"  *Allied Concrete*, 904 F.3d at 1061 (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979)).

[11] In a declaration submitted by Plaintiffs, McCrary noted that "well over one million independent contractors in California" could be reclassified under AB 5, a number far greater than the number of drivers claimed by Uber and Postmates.  McCrary Decl. at ¶ 37.  Plaintiffs also submitted a series of Tweets by Assemblymember Gonzalez stating, "A majority of folks affected by the bill are construction workers, janitors, child care providers, home healthcare workers, nail salon technicians, delivery drivers & other lower wage service workers."  Stoker Decl., Ex. C (Tweet by @LorenaSGonzalez, Twitter (Jan. 5, 2020)).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | | Date | February 10, 2020 |
|---|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | | Page | 12 of 24 |
|---|---|---|---|---|

Circuit has held that a plaintiff cannot prove invidious discrimination simply by alleging that legislators responded to lobbying efforts, because "[a]ccommodating one interest group is not equivalent to intentionally harming another." *Gallinger v. Becerra*, 898 F.3d 1012, 1020–21 (9th Cir. 2018) (finding no impermissible animus in statute's exemption for retired police officers after "political pressure" resulting from "potent lobbying efforts by the law enforcement community."). The right to lobby is "constitutionally protected." *Id*. at 1021. Furthermore, even if legislators refused to make any exemptions for gig economy companies, Plaintiffs have not shown that their choice is illegitimate. The Supreme Court has observed that "'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.'" *RUI One Corp.*, 371 F.3d at 1155 (quoting *Beach Commc'ns*, 508 U.S. at 316).

Plaintiffs correctly point out, however, that the record contains some evidence that AB 5 targeted Company Plaintiffs and other gig economy companies, and that some lawmakers' statements specifically complained about Uber.[12] But such targeting, even if it rises to the level

---

In addition, one University of California, Berkeley study cited by Defendants in their Opposition notes that although "[t]he lion's share of media attention surrounding AB 5 has gone to the law's effects on on-demand labor platforms like Uber and Lyft . . . , these workers represent just a fraction of independent contractors, most of whom work across a diverse range of occupations such as janitors, hair stylists, and childcare providers." Sarah Thomason, Ken Jacobs, and Sharon Jan, *Estimating the Coverage of California's New AB 5 Law*, UC Berkeley Labor Center (Nov. 12, 2019), http://laborcenter.berkeley.edu/estimating-the-coverage-of-californias-new-ab-5-law/. Using data from the 2017 American Community Survey by the U.S. Census Bureau, the study's authors concluded that (1) of all California workers who are independent contractors as their primary job, AB 5 applies the ABC test to the 64 percent of potentially misclassified independent contractors who work as janitors, truck drivers, retail workers, and childcare providers, among other occupations; (2) the ABC test applies, except when strict criteria are met, to the 27 percent of independent contractors who are construction workers, barbers, designers, writers, and sales representatives, among others; and (3) the ABC test does not apply to the 9 percent of independent contractors who are real estate agents, lawyers, accountants, and doctors, among others. *Id.*

[12] California Assemblymembers, including AB 5's sponsor Assemblymember Lorena Gonzalez, have publicly criticized rampant misclassification at gig economy companies and explained that AB 5 would address the gig economy's perceived exploitation of workers. *See* Compl. at ¶¶ 15–18, 63–68 (collecting Tweets and news articles). For example, Assemblymember Gonzalez published an op-ed in the *Washington Post* on September 11, 2019 entitled "The gig economy has costs. We can no longer ignore them." that specifically named Uber among other companies that "skirt labor laws, exploit working people and leave taxpayers holding the bag." *See id.*at ¶ 16 (citing Lorena Gonzalez, *The Gig Economy Has Costs. We Can No Longer Ignore Them.*, Wash. Post (Sept. 11, 2019), https://www.washingtonpost.com/opinions/2019/09/11/gig-economy-has-costs-we-can-no-longer-ignore-them/). Assembly Speaker Anthony Rendon, the principal coauthor of the bill, Tweeted in July 2019: "The gig economy is nothing new. It's a continuation of hundreds of years of corporations trying to screw over workers. With #AB5, we're in a position to do something about that." *See id.* at ¶ 65a (citing @Rendon63rd, Twitter (July

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 13 of 24 |
|---|---|---|---|

of animus toward gig economy companies, does not establish an Equal Protection violation where the statute addresses legitimate concerns of deleterious misclassification of workers in many industries, not just the gig economy.  Under rational basis review, where a statute classifies a "politically unpopular group [that] is not a traditionally suspect class, a court may strike down the challenged statute under the Equal Protection Clause 'if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment.'"  *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200–01 (9th Cir. 2018) (quoting *Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 598 (9th Cir. 1990)) (emphasis added).  Because Plaintiffs have failed to meet their burden to show that they are a "politically unpopular group" as construed in the case law and that AB 5 serves no legitimate governmental purpose, *see Beach Commc'ns*, 508 U.S. at 314, the statute survives rational basis review.[13]

The Court concludes that no serious questions exist as to Plaintiffs' likelihood of success on the merits on their Equal Protection claims, and this factor therefore weighs against granting Plaintiffs' Motion.

### 2.    AB 5 does not deprive gig economy workers of the right to pursue their chosen occupation

The California and U.S. Constitutions also prohibit California from depriving any person of "life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1; Cal. Const. art I, § 7(a).  Courts have recognized a liberty interest based on some "generalized due process right to choose one's field of private employment," but that right is "subject to reasonable government regulation." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999).  The line of cases establishing a liberty interest in pursuing a chosen profession "'all deal[] with a complete

10, 2019, 4:40 p.m.), https://twitter.com/Rendon63rd/status/1149101100928159744).  The Court notes that many of the legislators' statements selected by Plaintiffs appear to refer to Uber, Postmates, and other gig economy companies as examples of a larger problem of misclassification by corporations, not as the sole targets of AB 5.

[13] Examples of politically unpopular groups cited by Plaintiffs include lesbian, gay, and bisexual individuals targeted by a Colorado constitutional amendment, *see Romer v. Evans*, 517 U.S. 620, 634 (1996), and mentally disabled individuals, where building a group home for such individuals required a unique special use permit, *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 444 (1985).  In *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973), the Supreme Court concluded, based on legislative history, that an exclusion from the Food Stamp Act was solely motivated by animus toward politically unpopular "hippies."  *Id.* at 534.  Far from being politically unpopular, the burgeoning demand for gig companies' services stems from their widespread acceptance by consumers.  More importantly, AB 5 is distinguishable from the invalidated state actions in *Romer*, *Cleburne*, and *Moreno* not only because a legitimate state interest in addressing misclassification exists, but because AB 5's text and legislative history make clear that it was not enacted to target solely gig economy companies.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 14 of 24 |
|---|---|---|---|

prohibition of the right to engage in a calling[.]'" *Franceschi v. Yee*, 887 F.3d 927, 938 (9th Cir. 2018) (quoting *Conn*, 526 U.S. at 292).

Because this vocational liberty interest is not a fundamental right, the Court needs only to determine "whether the legislation has a 'conceivable basis' on which it might survive constitutional scrutiny." *Dittman v. California*, 191 F.3d 1020, 1031 (9th Cir. 1999); *see also id.* at 1031 n.5 ("The [Supreme] Court has never held that the 'right' to pursue a profession is a *fundamental* right, such that any state-sponsored barriers to entry would be subject to strict scrutiny."). For the reasons stated above, AB 5 survives rational basis review because it conceivably furthers the State's legitimate interest in preventing misclassification of millions of workers.

In any event, AB 5 is not a "complete prohibition" on Individual Plaintiffs' ability to pursue any profession. *Conn*, 526 U.S. at 292. Indeed, Uber and Postmates insist that their drivers qualify as independent contractors even under the ABC test. *See* Compl. at ¶ 19; Rosenthal Decl. at ¶ 56. And Olson and Perez can still work as independently contracted drivers if they satisfy the ABC test or fall under an exemption, such as the one discussed *supra* which exempts business entities providing services through referral agencies. *See* Cal. Lab. Code § 2750.3(g)(2). *Cf. Franceschi*, 887 F.3d at 938 (holding that an attorney's due process claim failed "for the obvious reason that the [contested government action] does not operate as a complete prohibition on his ability to practice law, which it must to violate substantive due process"). Even if Individual Plaintiffs' employment status would change under AB 5, they potentially could still pursue their line of work, provided that their employers compensate them properly and allow them to have flexible work schedules. Plaintiffs' due process claim is thus unlikely to succeed.[14]

---

[14] Similarly, Plaintiffs' claim of "violation of the California Constitution's Inalienable Rights Clause," which appears to be rooted in similar arguments about AB 5's effect on Individual Plaintiffs' right to pursue their chosen profession, is also unlikely to succeed on its merits. *See* Mot. at 20; Compl. at 38. California and federal courts have found that Article I, Section 1 of the California Constitution, which provides that "[a]ll people are by nature free and independent and have inalienable rights," indicates mere principles and does not create a private right of action. *See Bates v. Arata*, No. C 05-3383 SI, 2008 WL 820578, at *4 (N.D. Cal. Mar. 26, 2008), *order clarified sub nom. Bates v. San Francisco Sheriff's Dep't*, No. C 05-3383 SI, 2008 WL 961153 (N.D. Cal. Apr. 7, 2008); *Clausing v. San Francisco Unified Sch. Dist.*, 221 Cal. App. 3d 1224, 1237 (1990).

The Court's analysis of the likelihood of success on the merits of the federal due process claim also applies with equal force to the due process claim under the California Constitution. *See Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1116 (E.D. Cal. 2012) ("California's Due Process Clause is 'identical in scope with the federal due process clause.'" (quoting *Owens v. City of Signal Hill*, 154 Cal. App. 3d 123, 127 n.2 (Cal. Ct. App. 1984)).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 15 of 24 |
|---|---|---|---|

### 3.      Enforcement of AB 5 does not unconstitutionally impair Plaintiffs' contracts

The Contract Clause bars states from passing any "Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Similarly, the California Constitution prohibits the Legislature from enacting a "law impairing the obligation of contracts." Cal. Const. art I, § 9. "Although the text of the Contract Clause is 'facially absolute,' the Supreme Court has long held that 'its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people.'" *RUI One Corp.*, 371 F.3d at 1147 (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (internal quotation marks omitted)). Unless a challenged statute impairs a state's own contractual obligations, determining whether a statute violates the Contract Clause involves a three-step inquiry: (1) "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship"; (2) whether the state has "a significant and legitimate public purpose behind the [law], such as the remedying of a broad and general social or economic problem"; and (3) "whether the adjustment of the 'rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.'" *Id.* (quoting *Energy Reserves Grp.*, 459 U.S. at 411–13).

The threshold inquiry—whether the state law substantially impairs a contractual relationship—has three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). Plaintiffs assert that each component is easily met because Olson and Perez signed agreements with Uber and Postmates stating that they were independent contractors, and AB 5 substantially alters those agreements to "*eliminate* the very *essence* of Plaintiffs' contractual bargain" and reclassify Olson and Perez as employees. Mot. at 22.

The existence of contractual relationships between Company Plaintiffs and their drivers is clear. But Uber and Postmates have explicitly stated that AB 5 does not require them to reclassify their drivers as employees. Plaintiffs' Complaint and Motion refer to "forced classification" as if Uber's and Postmates' drivers necessarily transform into employees under AB 5. Yet in their Complaint, Uber and Postmates also assert that, even under the ABC test, their drivers are independent contractors. *See* Compl. at ¶ 19 ("Company Plaintiffs maintain that (among other things) they are not hiring entities under AB 5 and can establish that app-based independent service providers are not employees under the ABC test."). According to Uber's Director of Strategic Operational Initiatives, "AB 5 does not require Uber to treat the independent drivers and delivery persons as employees because, *inter alia*, Uber does not 'hire'

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 16 of 24 |
|---|---|---|---|

these independent service providers and these independent service providers are not employees under the 'ABC test' adopted by AB 5." Rosenthal Decl. at ¶ 56. Postmates' Director of Trust and Safety and Insurance Operations attests that "Postmates would not need to make . . . changes to its business model . . . absent the threat of AB 5 being enforced against Postmates." Andres Decl. at ¶ 46. Over one year since *Dynamex* issued and over one month since AB 5's effective date, Uber and Postmates still assert that the ABC test does not affect the status of their drivers. Accordingly, their contractual relationships with drivers are not at all impaired, much less substantially impaired.

Moreover, when entering the Postmates Agreement, Rasier Services Agreement (for Uber Rides drivers), and/or Portier Services Agreement (for Uber Eats drivers), Plaintiffs reasonably should have expected that the terms setting forth a driver's contractor status were not independently determinative of employment classification. According to the Ninth Circuit, "California law is clear that '[t]he label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced.'" *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 989 (9th Cir. 2014) (quoting *Borello*, 48 Cal. 3d at 349)). Under the prior *Borello* standard for determining employment status, "[w]hat matters is what the contract, in actual effect, allows or requires." *Id.* Nothing in *Dynamex* or AB 5 alters this approach. Olson and Perez thus cannot expect to be considered independent contractors solely because their contracts with Uber and Postmates say so.

In addition, a court is less likely to find substantial impairment when a state law "was foreseeable as the type of law that would alter contract obligations." *Energy Reserves Grp.*, 459 U.S. at 416. Each of the contracts at issue here was entered into in the wake of foreseeable potential enforcement of the ABC test to Company Plaintiffs' drivers. Uber last updated its Rasier Services Agreement on November 25, 2019. *See* Rosenthal Decl., Ex. A at 17; Ex. B at 45. The Postmates Agreement is effective as of May 11, 2019. *See* Andres Decl., Ex A at 17. Both contracts were updated after April 2018, when the California Supreme Court issued *Dynamex*. In fact, the Rasier Services Agreement was updated after AB 5 was passed, when Company Plaintiffs were certainly aware that the ABC test could apply to their drivers' contracts. And, though Uber's Portier Services Agreement was last updated on August 26, 2016, *see* Rosenthal Decl., Ex. B at 45, several courts had already opined by August 2016 that Uber drivers could plausibly be considered employees despite contractual language. *See Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 783 (N.D. Cal. 2016) (holding at motion to dismiss stage that plaintiff drivers "alleged sufficient facts that an employment relationship may plausibly exist"); *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1138 (N.D. Cal. 2015) (finding a triable issue of fact on whether Uber drivers are employees—the case ultimately settled). Plaintiffs thus

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 17 of 24 |
|---|---|---|---|

should have foreseen that the independent contractor status of drivers set forth in their contracts could be challenged, regardless of whether AB 5 was enacted.

In response, Plaintiffs cite to inapposite cases that find substantial impairment of existing contracts based on statutes that applied *retroactively*. *See, e.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250–51 (1978) (finding that a pension law substantially impaired contracts where it would have retroactively modified compensation that an employer had agreed to pay for the past 11 years); *In re Workers' Comp. Refund*, 46 F.3d 813, 818 (8th Cir. 1995) (finding that a retroactively applied statute changing who received payment of any excess insurance premiums "destroy[ed] the insurance companies' reasonable expectations"); *Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1006 (4th Cir. 1980) (finding that a retroactively applied statute severely limiting an insurer's ability to terminate an agency relationship substantially impaired existing insurer-agent contracts that permitted easy termination). AB 5 does not apply retroactively such that Uber and Postmates would be required to pay back wages, payroll taxes, unemployment insurance premiums, and other sums based on prior misclassification of workers under the ABC test. Instead, AB 5 applies to work performed after January 1, 2020. The Court therefore finds that if any impairment of contractual relationships exists at all, it is minimal, not substantial.

Even if Plaintiffs could establish a substantial impairment, the Court finds, for similar reasons set forth *supra*, Part III.A.1, that Plaintiffs cannot successfully answer the second question of whether the State had "a significant and legitimate public purpose . . . of remedying a broad and general social or economic problem." *Energy Reserves Grp.*, 459 U.S. at 411–12. The Court notes that "[t]he more severe the impairment, the more searching the examination of the legislation must be." *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1098 (9th Cir. 2003). But even under this heightened review, Plaintiffs have not shown that AB 5 does not serve a significant and legitimate public purpose. The Ninth Circuit has stated, in an unrelated Contract Clause challenge to a living wage ordinance, that "[t]he power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power." *RUI One Corp.*, 371 F.3d at 1150. In that case, the Ninth Circuit upheld an ordinance that required employers to provide employees higher wages and improved benefits immediately, rather than after signing new contracts incorporating the ordinance's terms. *Id.* The court noted that "'[s]tates possess broad authority under their police powers to regulate the employment relationship to protect workers within the State," such as through "minimum and other wage laws [and] laws affecting occupational health and safety." *Id.* (quoting *Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)). Similarly, AB 5 is an exercise of the State's police power to protect workers aimed at remedying what it perceives to be a broad economic and social problem. The text of AB 5, echoing the California Supreme Court in *Dynamex*, targets

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | | Date | February 10, 2020 |
|---|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | | Page | 18 of 24 |
|---|---|---|---|---|

misclassification as "a significant factor in the erosion of the middle class and the rise in income inequality." A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019). Thus, even if Plaintiffs can show substantial impairment of contracts, AB 5 satisfies the public purpose test imposed in a Contract Clause challenge. No serious questions exist as to the merits of Plaintiffs' Contract Clause claims.

In sum, Plaintiffs have not shown either a likelihood of success on the merits or that serious questions exist as to any of their claims highlighted in this motion.[15] Accordingly, *Winter*'s first factor weighs heavily against granting the preliminary injunction.

**B.      Irreparable Harm**

Plaintiffs "'[must] demonstrate that irreparable injury is likely in the absence of an injunction,' not merely that it is possible." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (quoting *Winter*, 555 U.S. at 22).[16]

As discussed *supra* Part III.A.3, statements by Uber and Postmates directors and in Plaintiffs' Complaint indicate that, without the threat of enforcement, Uber and Postmates would not take any action under AB 5 and would not suffer any irreparable injury from "forced reclassification." *See* Compl. at ¶ 19; Rosenthal Decl. at ¶ 56; Andres Decl. at ¶ 46.

Regardless of how the ABC test in fact applies to their drivers, Uber and Postmates have asserted a fear of enforcement and litigation based on the statute and lawmakers' statements. *See* Compl. at ¶ 18. AB 5 specifically provides city attorneys with the authority to bring injunctive actions against companies and exposes them to potential criminal penalties under the California Labor Code and Unemployment Insurance Code for violators. *See* Cal. Lab. Code § 2750.3(j);

---

[15] This conclusion is not at odds with another district court's finding of likelihood of success on the merits of a trucking association's challenge to AB 5. *See Cal. Trucking Ass'n v. Becerra*, No. CV 18-02458-BEN, 2020 WL 248993 at *10 (BLMx) (S.D. Cal. Jan. 16, 2020). In that case, plaintiff raised serious questions regarding whether the Federal Aviation Authorization Administration Act of 1994 preempted *any* state legislation relating to aspects of the trucking industry. *Id.* No similar argument is available to Plaintiffs, whose claims rest on alleged constitutional violations, rather than preemption.

[16] Plaintiffs are correct that "'an alleged constitutional infringement will often alone constitute irreparable harm.'" *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (quoting *Assoc. Gen. Contractors v. Coal. For Econ. Equity*, 950 F.2d, 1401, 1412 (9th Cir. 1991)). But where the "constitutional claim is too tenuous," courts need not give plaintiffs "such a presumption of harm." *Assoc. Gen. Contractors*, 950 F.2d at 1412 (citation and internal quotation marks omitted). Based on the foregoing analysis of Plaintiffs' slim likelihood of success on the merits, the Court does not accord Plaintiffs the presumption of irreparable harm.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 19 of 24 |
|---|---|---|---|

A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019).  And in November 2019, after AB 5's passage but before its effective date, Assemblymember Gonzalez issued a Tweet saying:

> [Use of arbitration] has been a huge problem.  Attorneys have sued, settled, walked away & never demanded proper classification of the workers.  It's what Uber told me they'd continue to do under #AB5.  That's why we ask the 4 big city City Attorneys offices to file for injunctive relief on 1/1/20.

Stoker Decl., Ex. A (Tweet by @LorenaSGonzalez, Twitter (Nov. 21, 2019, 8:05 a.m.)). Company Plaintiffs point to this Tweet and others to indicate Defendants' intent to enforce AB 5 against them.  *See* Mot. at 27–28.

When plaintiffs are faced with "Hobson's choice" of "continually violat[ing]" a law and exposing themselves to "potentially huge liability" or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review," the Ninth Circuit has found imminent harm.  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)).  If Uber and Postmates do not reclassify workers as employees, they could be subject to more litigation and the threat of criminal penalties.  If the ABC test is found to require the reclassification of their drivers, Uber and Postmates would also suffer significant harms associated with restructuring their businesses.  *See* Andres Decl. at ¶¶ 36–38; Rosenthal Decl. at ¶ 64; *see also Cal. Trucking*, 2020 WL 248993, at *11 (finding that irreparable harm exists where plaintiffs may violate AB 5 unless they "restructure their business model, including by obtaining [equipment], hiring and training employee drivers, and establishing administrative infrastructure").  In addition, although mere financial harms are normally not considered irreparable, the payroll taxes and other sums Uber and Postmates would pay to the State and federal government for reclassified or newly hired employees would not be recoverable due to sovereign immunity.  *See Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers) ("If expenditures cannot be recouped, the resulting loss may be irreparable."); *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (finding purely economic harms constituted irreparable harm because plaintiff would be barred from recovering monetary damages from the defendant tribe due to tribal sovereign immunity).

Because Company Plaintiffs insist that the ABC test would not affect their drivers' employment statuses, any irreparable injury based on a costly business restructuring process and unrecoverable expenditures is speculative.  *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | | Date | February 10, 2020 |
|---|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | | Page | 20 of 24 |
|---|---|---|---|---|

harm.").[17]  Moreover, even in the absence of AB 5, Company Plaintiffs remain subject to potential liability and enforcement of wage and hour laws pursuant to the *Dynamex* decision. But because Company Plaintiffs point to evidence of the imminent threat of enforcement by state actors and exposure to criminal liability, the Court finds that they have established some measure of irreparable harm stemming from threatened municipal enforcement actions.

Olson and Perez do not, however, face a similar Hobson's choice.  Though they assert that they would suffer unrecoverable financial losses and lose customer goodwill, freedom, financial stability, and work satisfaction if Uber and Postmates reclassify them as employees, those harms are speculative so long as the Company Plaintiffs maintain that AB 5 does not apply to them.  *See* Olson Decl. at ¶¶ 10, 12; Perez Decl. at ¶¶ 19–20; Rosenthal Decl. at ¶ 56.  AB 5 does not subject individual workers to any threat of enforcement or litigation.  And, as Defendants note, "AB 5 does not compel a 'forced reclassification,' but instead provides the applicable standard to ascertain whether an individual is an employee or an independent contractor."  Opp. at 26.  The declarations by Uber and Postmates directors indicate that Company Plaintiffs may not enact drastic "forced reclassification" measures that irreparably harm Olson and Perez.  For instance, Postmates' Director of Trust and Safety and Insurance Operations states that "*[i]f* AB 5 were enforced against Postmates in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy as employees, Postmates *could be* required to significantly alter its current business model." Andres Decl. at ¶ 38 (emphasis added).  Displaying only slightly more urgency, Uber's Director of Strategic Operational Initiatives attests that though AB 5 does not change Uber's independent contractors' classification, "*if* AB 5 were enforced against Plaintiffs in a manner consistent with the sponsors' stated intent . . . , [Uber] would have to make radical changes to its business model."  Rosenthal Decl. at ¶¶ 56–57 (emphasis added).  The alleged harm to Olson and Perez— as well as to the individual *amici* Uber and Postmates drivers—would therefore stem from Company Plaintiffs' response to AB 5 only if the statute is interpreted and enforced in a specific manner, not from automatic application of AB 5 to their employment statuses or threatened or

---

[17] Defendants argue that Plaintiffs' delay in seeking a preliminary injunction against AB 5's enforcement, when AB 5 was enacted in September 2019 and *Dynamex* has governed worker classification in all wage order-covered industries since April 2018, "indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction."  *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 897 (N.D. Cal. 2019) (citation omitted).  But in the Ninth Circuit, "delay is but a single factor to consider in evaluating irreparable injury," and "courts are 'loath to withhold relief solely on that ground.'"  *Id.* (quoting *Arc of Cal.*, 757 F.3d at 990). Accordingly, Plaintiffs' four-month delay in seeking an injunction against AB 5's enforcement does not undermine the irreparable harm analysis described above.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 21 of 24 |
|---|---|---|---|

actual enforcement actions.[18]  And, in fact, *Dynamex* contemplates that "if a business concludes that it improves the morale and/or productivity of a category of workers to afford them the freedom to set their own hours or to accept or decline a particular assignment, the business may do so while still treating the workers as employees."  4 Cal. 5th at 961.  Thus, even if AB 5 enforcement actions require reclassification of gig economy drivers, Company Plaintiffs could still offer Olson and Perez flexibility and freedom while treating them as employees.  The harm that Olson, Perez, and individual *amici* assert therefore seems merely possible, not probable.  *See Arc of Cal. v. Douglas*, 757 F.3d at 990.[19]

Arguing that an injunction would irreparably harm the State, Defendants assert that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  Opp. at 27–28 (quoting *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (citation omitted); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) (order) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined.").  But the Ninth Circuit has distanced itself from this understanding of a state's irreparable injury.  *See Latta v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014) ("Individual justices, in orders issued from chambers, have expressed the view that a state suffers irreparable injury when one of its laws is enjoined.  No opinion for the Court adopts this view."  (internal citations omitted)).  In light of this ambiguous direction, the Court notes that any irreparable injury to Defendants would be mitigated by the fact that even if a preliminary injunction were granted, *Dynamex* still applies the

---

[18] At the hearing, Plaintiffs' counsel cited to *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469 (C.D. Cal. 2012), and *Nelson v. National Aeronautics & Space Admin.*, 530 F.3d 865 (9th Cir. 2008), *rev'd and remanded*, 562 U.S. 134 (2011), to support a finding of irreparable harm to Individual Plaintiffs based on stress and uncertainty.  *Yue* appears highly fact-bound to insurance benefits, whose very purchase is intended to engender peace of mind.  *Nelson* notes that "the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress"—as described above, however, the loss of Individual Plaintiffs' jobs is speculative at this point.  530 F.3d at 882.  Regardless, a finding of Individual Plaintiffs' irreparable harm based on current or prospective emotional distress and instability would not alter the outcome of this Order, given the unlikelihood of success on the merits.

[19] In their declarations, *amici curiae* Keisha Broussard, Raymond Frazier, Daniel Rutka, and LaMar Wilder assert that they will be harmed only *if* Uber or Postmates classifies them as employees under AB 5.  *See, e.g.*, Broussard Decl. at ¶ 7 ("If I am forced to work as a regular employee, I might have to choose between my acting career and spending time with my daughter on one hand, and holding a regular job on the other."); Frazier Decl. at ¶ 5 ("Being involuntarily converted to an employee would likely cost me thousands of dollars in lost Social Security benefits and force me to come back out of retirement."); Rutka Decl. at ¶ 6 ("If I can no longer work as an independent contractor, I may have to choose between taking a regular job or taking care of my sick family member."); Wilder Decl. at ¶ 5 ("If I am required to become an employee, I will lose the freedom to decide when and where I can drive.").

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 22 of 24 |
|---|---|---|---|

ABC test to all workers covered by IWC wage orders.  And, given that the State's interests are collapsed with those of the public when balancing the equities, *see infra* Part IV.C, the Court will examine the harms to Defendants when analyzing the third and fourth *Winter* factors.

The irreparable harm factor must weigh sharply in Plaintiffs' favor to prevail, since "'the required degree of irreparable harm increases as the probability of success decreases.'"  *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (quoting *Nat. Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007)).  Here, Uber and Postmates have demonstrated a likelihood of irreparable harm based on the threats of enforcement against them by city attorneys and the availability of criminal penalties.  But this showing is offset somewhat by the fact that the Company Plaintiffs may still face private enforcement actions under *Dynamex*, even in the absence of AB 5.  As no enforcement or non-speculative reclassification measures apply to individual drivers, Olson and Perez have not demonstrated the likelihood, rather than the mere possibility, of irreparable harm.  Accordingly, this factor weighs slightly in Plaintiffs' favor.

**C.       Balance of Equities and Public Interest**

When the government is a party, the final two preliminary injunction factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Plaintiffs must still "establish that 'the balance of equities tips in [their] favor.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).  But "[i]n exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

California enacted AB 5 to address misclassification and its public consequences through the ABC test.  *See* A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019); Opp. at 29.  *Dynamex* noted the following public benefits to applying the ABC test:  "ensuring low income workers' wages and conditions despite their weak bargaining power"; "ensuring that . . . responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices"; and ensuring that the public is not "left to assume responsibility for the ill effects to workers and their families resulting from substandard wages or unhealthy and unsafe working conditions."  4 Cal. 5th at 952–53.  Because "AB 5 was enacted after a full legislative process, including discussion about its impact and the necessity for it, and negotiation with various stakeholders including industry, labor, and others," showing the public's favor for the legislation," Defendants argue that the public's interest in enforcing the legislation outweighs private parties' interests in enjoining it.  Opp. at 29–30.  The Court agrees that "[t]he public

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-10956-DMG (RAOx) | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 23 of 24 |

interest may be declared in the form of a statute" and is not served by the preliminary injunction Plaintiffs seek. *Golden Gate Rest. Ass'n*, 512 F.3d at 1127 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.4, at 207 (2d ed. 1995)); *see also id.* ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (quoting *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) (internal quotation marks omitted))).

Plaintiffs assert public benefits to enjoining enforcement that weigh slightly in their favor. In one concrete example, a 2019 study found that Uber's rideshare service decreased the use of per capita ambulance services by at least 6.7 percent, likely reducing public spending on medical transportation costs. McCrary Decl. at ¶ 34. In another example, a 2015 study found that Uber's entry into California reduced alcohol-related motor vehicle homicides. *See* Br. of *Amici Curiae* U.S. Chamber of Commerce, Engine Advocacy, and TechNet at 15 (citing Brad Greenwood & Sunil Wattal, *Show Me the Way to Go Home: An Empirical Investigation of Ride Sharing and Alcohol Related Motor Vehicle Homicide*, Temple University Fox School of Business Research Paper No. 15-054 (Jan. 29, 2015), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2557612) [Doc. # 44]. According to Plaintiffs, AB 5's enforcement will decrease the number and availability of drivers, which presumably could reduce Uber's impact on medical transportation costs and drunk driving. McCrary Decl. at ¶ 42. Plaintiffs also argue that prices for gig economy services will increase, harming consumers as well as gig economy workers. *Id.* at ¶¶ 42–47. More generally, Plaintiffs argue that the equities balance in their favor, since AB 5 attempts to roll back technology, "[f]orcing companies to make major changes to their operations—leaving California an aberration in their global businesses—only to see them potentially reversed once the Court adjudicates the merits of Plaintiffs' challenges would greatly disserve all Californians who use their apps." Reply at 30 (citing Andres Decl. at ¶¶ 41–47; Rosenthal Decl. at ¶¶ 57–66). But because this argument is premised on their claims' success on the merits—an outcome that the Court has already determined to be unlikely—it does not militate in favor of Plaintiffs on the final two preliminary injunction factors.

Furthermore, evidence submitted by Plaintiffs indicates that according to academic studies, "a majority of workers do not value scheduling flexibility" and only a "substantial share"—by inference, less than a majority—"are willing to give up a large share of their earnings to avoid employer discretion in setting hours." McCrary Decl. at ¶ 26. This statement by Plaintiffs' expert indicates that of the 395,000 or more drivers for Uber and/or Postmates, a majority may favor—or at least be neutral to—the application of AB 5 to their worker classification. To be sure, Olson, Perez, and individual *amici* attest that being classified as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-10956-DMG (RAOx)** | Date | February 10, 2020 |
|---|---|---|---|

| Title | *Lydia Olson, et al. v. State of California, et al.* | Page | 24 of 24 |
|---|---|---|---|

employees would be financially devastating and upend their schedules and expectations. *See, e.g.*, Perez Decl. ¶¶ 8, 18–20; Olson Decl. at ¶¶ 10, 12; *see also* Br. of *Amici Curiae* U.S. Chamber of Commerce, Engine Advocacy, and TechNet at 10 (citing U.S. Dep't of Labor, *Contingent and Alternative Employment Relationships*, Bureau of Labor Statistics, (May 2017) (79 percent of independent contractors prefer their work arrangement). The Court does not doubt the sincerity of these individuals' views, but it cannot second guess the Legislature's choice to enact a law that seeks to uplift the conditions of the majority of non-exempt low-income workers rather than preserve the status quo for the smaller subset of workers who enjoy independent contractor status.

When "an injunction is requested which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Stormans*, 586 F.3d at 1139 (quoting *Weinberger*, 456 U.S. at 312–13). Considering the potential impact to the State's ability to ensure proper calculation of low income workers' wages and benefits, protect compliant businesses from unfair competition, and collect tax revenue from employers to administer public benefits programs, the State's interest in applying AB 5 to Company Plaintiffs and potentially hundreds of thousands of California workers outweighs Plaintiffs' fear of being made to abide by the law.

In light of the foregoing, the Court concludes that the balance of equities and the public interest weigh against the issuance of injunctive relief.

## IV.
## CONCLUSION

Plaintiffs have not shown serious questions going to the merits—the critical factor in determining whether to issue a preliminary injunction—and, though Company Plaintiffs have shown some measure of likelihood of irreparable harm, the balance of equities and the public interest weigh in favor of permitting the State to enforce this legislation. Accordingly, the *Winter* factors weigh against enjoining enforcement of AB 5 against Uber and Postmates, and the Court therefore **DENIES** Plaintiffs' Motion.

**IT IS SO ORDERED**.