GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
    TEvangelis@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
    BEvanson@gibsondunn.com
HEATHER L. RICHARDSON, SBN 246517
    HRichardson@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA,
    SBN 254433
    DManthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
    JLipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Tel: 415.393.8200
Fax: 415.393.8306

Attorneys for Plaintiffs Lydia Olson, Miguel Perez,
Postmates Inc., and Uber Technologies, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LYDIA OLSON, et al.,<br><br>                Plaintiffs,<br><br>    v.<br><br>XAVIER BECERRA, et al.,<br><br>                Defendants. | **CASE NO.  2:19-cv-10956-DMG-RAO**<br><br>**OPPOSITION TO DEFENDANTS'<br>MOTION TO DISMISS**<br><br>Judge:          Hon. Dolly M. Gee<br>Hearing Date:  May 22, 2020<br>Time:         9:30 a.m.<br>Courtroom:   8C, 8th Floor<br>Trial Date:    Not set<br>Action Filed:  December 30, 2019 |

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ........................................................................................ 1

FACTUAL ALLEGATIONS ....................................................................... 2

LEGAL STANDARD .................................................................................. 5

ARGUMENT ............................................................................................... 6

   I.     Plaintiffs Have Stated Their Constitutional Claims ........................... 6

       A.    AB 5 Violates Equal Protection Because It Does Not Rationally Relate to Any Legitimate Government Interest ................................. 6

          1.    AB 5 Does Not Further a Legitimate Government Interest ...................................................................... 6

          2.    The Only Plausible Explanations for AB 5 Are Not Legitimate .................................................................. 10

       B.    Forced Reclassification Would Deprive Individual Plaintiffs of the Right to Pursue Their Occupations ....................................... 12

          1.    The Due Process Clause Protects This Right ..................... 12

          2.    The Inalienable Rights Clause and the Ninth Amendment ........................................................... 15

       C.    Plaintiffs State a Contracts Clause Claim ............................. 18

          1.    Forced Reclassification Impairs Plaintiffs' Contractual Relationship .................................................... 18

          2.    AB 5 Targets Plaintiffs' Contractual Relationship ............ 22

          3.    Forcing On-Demand Workers into Traditional Employment Is Not a Reasonable or Appropriate Way to Advance the Legislature's Goals ................................... 23

   II.     In the Alternative, the Court Should Grant Leave to Amend ...................... 25

CONCLUSION .......................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aaron v. Aguirre*,
    2006 WL 8455871 (S.D. Cal. Dec. 13, 2006) ..........................................21

*Alatraqchi v. Uber Techs., Inc.*,
    No. 11-42020-CT (Labor Comm. Aug. 1, 2012) ....................................20

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978).........................................................19, 21, 22, 23

*Am. Acad. of Pediatrics v. Lungren*,
    16 Cal. 4th 307 (1997) .............................................................16

*Asdourian v. Araj*,
    38 Cal. 3d 276 (1985) ..............................................................10

*Ass'n of Los Angeles City Attorneys v. City of Los Angeles*,
    2012 WL 12887541 (C.D. Cal. Nov. 20, 2012) ....................................25

*Barman v. Union Oil Co. of California*,
    50 F. App'x 824 (9th Cir. 2002) ...................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................5

*Billings v. Hall*,
    7 Cal. 1 (1857) ......................................................................17

*Brown v. New York*,
    975 F. Supp. 2d 209 (N.D.N.Y. 2013) ....................................23, 24, 25

*C.T. v. Redondo Beach Unified Sch. Dist.*,
    2019 WL 1557431 (C.D. Cal. Apr. 10, 2019).........................................16

*Chodos v. W. Publ'g Co.*,
    292 F.3d 992 (9th Cir. 2002) ......................................................25

*City of Carmel-By-The-Sea v. Young*,
    2 Cal. 3d 259 (1970), *invalidated* ..............................................16

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985).................................................................9

## TABLE OF AUTHORITIES
(*continued*)

Page(s)

*City of New Orleans v. Dukes*,
 427 U.S. 297 (1976)........................................................................... 11

*Clausing v. San Francisco Unified Sch. Dist.*,
 221 Cal. App. 3d 1224 (1990) ..................................................... 15, 16

*Clayton v. Steinagel*,
 885 F. Supp. 2d 1212 (D. Utah 2012) ............................................... 14

*Conn v. Gabbert*,
 526 U.S. 286 (1999)........................................................................... 13

*Cont'l Illinois Nat'l Bank & Tr. Co. of Chicago v. State of Wash.*,
 696 F.2d 692 (9th Cir. 1983) ...................................................... 18, 21

*Cornwell v. Hamilton*,
 80 F. Supp. 2d 1101 (S.D. Cal. 1999) ......................................... 12, 14

*Cotter v. Lyft, Inc.*,
 60 F. Supp. 3d 1067 (N.D. Cal. 2015)............................................... 20

*Craigmiles v. Giles*,
 312 F.3d 220 (6th Cir. 2002) ...................................................... 12, 15

*Dittman v. California*,
 191 F.3d 1020 (9th Cir. 1999) .......................................................... 13

*Dynamex Operations West, Inc. v. Superior Court of Los Angeles*,
 4 Cal. 5th 903 (2018)................................................................ 3, 4, 14

*Engquist v. Oregon Dep't of Agriculture*,
 478 F.3d 985 (9th Cir. 2007) ............................................................ 13

*Equip. Mfrs. Inst. v. Janklow*,
 300 F.3d 842 (8th Cir. 2002) ............................................................ 23

*In re Eric J.*,
 25 Cal. 3d 522 (1979) ......................................................................... 9

*Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*,
 880 F.3d 450 (9th Cir. 2018) ........................................................ 6, 13

*Fowler Packing Co., Inc. v. Lanier*,
 844 F.3d 809 (9th Cir. 2016) ............................................................ 11

## TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Franceschi v. Yee*,
887 F.3d 927 (9th Cir. 2018) ....................................................... 15

*Ganley v. Claeys*,
2 Cal. 2d 266 (1935) ................................................................... 12

*Garris v. Hanover Ins. Co.*,
630 F.2d 1001 (4th Cir. 1980) ............................................... 18, 21

*Greene v. Dayton*,
806 F.3d 1146 (8th Cir. 2015) ..................................................... 21

*Griswold v. Connecticut*,
381 U.S. 479 (1965).............................................................. 17, 18

*Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*,
326 F. Supp. 2d 1128 (E.D. Cal. 2003) .......................................... 1

*Hu v. City of New York*,
927 F.3d 81 (2d Cir. 2019) ............................................................ 7

*Huong Que, Inc. v. Luu*,
150 Cal. App. 4th 400 (2007) ...................................................... 15

*Int'l Refugee Assistance Project v. Trump*,
373 F. Supp. 3d 650 (D. Md. 2019)........................................... 1, 14

*Jacobs v. Centennial Ins. Co.*,
978 F.2d 1265 (9th Cir. 1992) ..................................................... 10

*Legend Night Club v. Prince George's Cty. Bd. of License Comm'rs*,
2009 WL 926989 (D. Md. Apr. 1, 2009), *aff'd sub nom. Legend Night
Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ............................... 12

*Local 101 of the Am. Fed'n of State, Cty. & Mun. Employees v. Brown*,
2015 WL 5316296 (N.D. Cal. Sept. 11, 2015)............................... 20

*Matsuda v. City & Cty. of Honolulu*,
512 F.3d 1148 (9th Cir. 2008) ..................................................... 22

*McDonald's Corp. v. Nelson*,
822 F. Supp. 597 (S.D. Iowa 1993), *aff'd sub nom. Holiday Inns
Franchising, Inc. v. Branstad*, 29 F.3d 383 (8th Cir. 1994).......... 21, 23, 24

# TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Merrifield v. Lockyer*,
  547 F.3d 9781 (9th Cir. 2008) ............................................................. 6, 7

*Moss v. Secret Serv.*,
  572 F.3d 962 (9th Cir. 2009) .................................................................. 25

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ................................................................ 25

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) .................................................................. 5

*O'Connor v. Uber Technologies, Inc.*,
  82 F. Supp. 3d 1133 (N.D. Cal. 2015) ..................................................... 20

*Owens v. Kaiser Found. Health Plan, Inc.*,
  244 F.3d 708 (9th Cir. 2001) .................................................................. 25

*Parr v. Mun. Court*,
  3 Cal. 3d 861 (1971) ........................................................................ 6, 11

*Payton v. City of Santa Clara*,
  132 Cal. App. 3d 152 (1982) .................................................................. 16

*PDK Labs Inc. v. Ashcroft*,
  338 F. Supp. 2d 1 (D.D.C. 2004) ............................................................ 13

*Purdy & Fitzpatrick v. State*,
  71 Cal. 2d 566 (1969) ........................................................................... 12

*Retired Employees Ass'n v. County of Sacramento*,
  2012 WL 1082807 (E.D. Cal. Mar. 31, 2012) ................................... 1, 7, 22

*Ross v. City of Berkeley*,
  655 F. Supp. 820 (N.D. Cal. 1987) ................................... 18, 20, 22, 23, 24

*S. California Edison Co. v. City of Laguna Beach*,
  2017 WL 4480827 (C.D. Cal. July 28, 2017) .......................................... 25

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*,
  48 Cal. 3d 341 (1989) ............................................................................. 4

*San Diego Police Officers' Ass'n v. Aguirre*,
  2005 WL 3180000 (S.D. Cal. Nov. 5, 2005) ............................................ 19

# TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Sateriale v. R.J. Reynolds Tobacco Co.*,
    697 F.3d 777 (9th Cir. 2012) ....................................................................5

*Sonoma Cty. Org. of Pub. Employees v. Cty. of Sonoma*,
    23 Cal. 3d 296 (1979) ............................................................................19

*Southern California Gas v. City of Santa Ana*,
    336 F.3d 885 (9th Cir. 2003) ..................................................................24

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) ..................................................................12

*Stamas v. Cty. of Madera*,
    2010 WL 2556560 (E.D. Cal. June 21, 2010) ...........................................1

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ..................................................................5

*State of Nev. Employees Ass'n, Inc. v. Keating*,
    903 F.2d 1223 (9th Cir. 1990) ................................................................24

*Timbs v. Indiana*,
    139 S. Ct. 682 (2019) .............................................................................18

*Thomson v. HMC Grp.*, No. 13-03273-DMG, 2014 WL 12589312
    (C.D. Cal. Feb. 18, 2014) .........................................................................6

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973).............................................................................6, 11

*University of Hawaii Prof. Assembly v. Cayetano*,
    183 F.3d 1096 (9th Cir. 1999) ................................................................24

*Western States Trucking Ass'n v. Schoorl*,
    377 F. Supp. 3d 1056 (E.D. Cal. 2019) ..................................................14

*White v. Davis*,
    13 Cal. 3d 757 (1975) ............................................................................16

*In re Workers' Comp. Refund*,
    46 F.3d 813 (8th Cir. 1995) .........................................................20, 21, 22

*Wynn v. New York City Hous. Auth.*,
    2015 WL 4578684 (S.D.N.Y. July 29, 2015).............................................7

## TABLE OF AUTHORITIES
### (*continued*)

**Statutes**                                                                                                     Page(s)

California Assembly Bill 5 § 1 ............................................................................... 3, 4, 7

California Labor Code § 2750.3 .......................................................................... 4, 8, 10

**Other Authorities**

Anthony Sanders, *Baby Ninth Amendments and Unenumerated Individual Rights in State Constitutions Before the Civil War*, 68 MERCER L. REV. 389, 433 (2017) ........................................................................................ 17

Bill Analysis, Assembly Committee on Labor and Employment (July 5, 2019), https://tinyurl.com/y9bv5vbr ................................................................. 8

Randy Barnett, *The Ninth Amendment: It Means What It Says*, 85 TEX. L. REV. 1, 13 (2006) ................................................................................. 17

1 Marsh & Finkle, *Marsh's California Corporation Law* § 2.4 (3d ed. 1990) .................................................................................................... 10

Sen. Comm. on Labor, Pub. Emp't, and Ret., AB5, 2019-20 Reg. Sess., at 8 (Cal. July 8, 2019) .................................................................................. 8

Timothy Sandefur, *The Right to Earn a Living*, 6 CHAP. L. REV. 207, 210 (2003) .................................................................................................... 16

# INTRODUCTION

California Assembly Bill 5 ("AB 5") treats similarly situated groups disparately without a rational basis; it denies Individual Plaintiffs Lydia Olson and Miguel Perez their right to pursue their chosen occupation; and it dramatically impairs contracts that form the foundation of the on-demand economy.   The facts supporting these constitutional challenges are alleged at length and in detail in Plaintiffs' First Amended Complaint ("FAC"), yet the government glosses over or ignores them.  The government attempts to defend the constitutionality of AB 5 in the abstract, without ever grappling with the way it discriminates or upsets the lives of many like Individual Plaintiffs.

And because a "Rule 12(b)(6) motion is a challenge to the sufficiency of the pleadings, … [w]hether defendants had a rational basis" will often entail—as it does here—"factual determinations not properly before the Court in a motion to dismiss." *Stamas v. Cty. of Madera*, 2010 WL 2556560, at *6 (E.D. Cal. June 21, 2010). "[I]t is not the court's task on a motion to dismiss to determine whether defendant's actions were rationally related to its legitimate interest." *Retired Employees Ass'n v. County of Sacramento*, 2012 WL 1082807, at *6 (E.D. Cal. Mar. 31, 2012); *see*, *e.g.*, *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 326 F. Supp. 2d 1128, 1137–38 (E.D. Cal. 2003) (denying motion to dismiss equal protection claim because whether entities are "similarly situated" is a factual question needed to "properly evaluate the claim").  The denial of a preliminary injunction on the question of whether governmental action had a rational basis does not determine whether a plaintiff has *stated a claim* under the same test.  *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d  650, 674–75 (D. Md. 2019).  That is especially so where, as here, the complaint has been amended since the preliminary injunction decision to allege more facts.

*First*, AB 5's discriminatory classifications *contradict* the law's stated purposes. For the non-exempt industries and occupations, AB 5 ratchets up the standard for classifying workers as independent contractors.   But for the exempt workers, AB 5 actually *ratchets down* the standard for wage-order claims, making it *more likely* that

they will be classified as independent contractors. There is no rational basis for this disparate treatment, particularly for the similarly situated exempt and non-exempt groups of workers.

*Second*, compelling Ms. Olson and Mr. Perez to be "employees" would violate their right to choose their occupation. The complaint alleges detailed facts showing that working in the on-demand field is an entirely separate line of work from being a delivery or transportation employee. Forcing workers to be employees bears no rational relationship to the legislature's stated goal to reduce inequality.

*Third*, forced reclassification would shred the contracts at the heart of Plaintiffs' business models—contracts that secure their independent, flexible relationship.

The Court should deny the government's motion to dismiss.

## FACTUAL ALLEGATIONS

### I. Independent Service Providers Like Individual Plaintiffs Use On-Demand Apps to Find Clients

Individual Plaintiffs Lydia Olson and Miguel Perez are two independent service providers who have used online marketplace apps developed by Postmates, Uber, and other on-demand companies to build thriving livelihoods to support the needs of their families. Dkt. 59 (FAC) ¶¶ 95–106.

Ms. Olson runs two businesses—a consulting company and a driving business, for which she uses the services of multiple apps, including Uber. FAC ¶¶ 95–97. As her own boss, she sets her schedule. *Id.* ¶¶ 96–97. This flexibility is essential for Ms. Olson because she also provides care for her husband, who suffers from multiple sclerosis. *Id.* ¶¶ 96–98. As an independent service provider, she can provide necessary financial support to her family while ensuring that she can also care for her husband at a moment's notice. *Id.* ¶¶ 96–99. Mr. Perez, unhappy in his previous occupation driving a truck during the graveyard shift, built his own delivery business primarily using Postmates, as well as other platforms like Caviar, Grubhub, DoorDash, and UberEats. *Id.* ¶¶ 100–06. Because of the extra money he has made running his own delivery business using on-demand apps, his wife was able to quit her job to spend more time

with family.  *Id.* ¶¶ 103–04.  Both Ms. Olson and Mr. Perez built their businesses to be their own bosses, and neither wants to be someone's employee.  *Id.* ¶¶ 8–9, 95–106.

Ms. Olson's and Mr. Perez's stories are not unique; millions of app-based independent service providers have similar stories of independence, autonomy, and flexibility gained through work using the apps of on-demand companies like Company Plaintiffs.  *See* FAC ¶¶ 5, 90.  These companies develop proprietary app-based technology to refer independent service providers to customers seeking goods and services.  *Id.* ¶¶ 3, 107, 119.  On-demand companies do not provide these goods or services themselves; rather, the companies develop the technology platforms that make it easier, faster, and less expensive for potential customers to connect almost instantaneously with independent service providers as demand naturally fluctuates.  *Id.* ¶¶ 1013.  These online marketplaces are one of the most significant economic and technological innovations in the past decade worldwide.  *Id.* ¶¶ 3, 14.

The foundation of these online marketplaces is the independent contractor agreements between the on-demand companies and those who use the apps.  FAC ¶¶ 29, 108, 111, 121, 124.  These agreements provide enormous flexibility to independent service providers, who are permitted to work when and where they wish, are not required to observe a duty of loyalty to the on-demand companies, and are permitted to use multiple apps at once ("multi-apping") to increase their income.  *Id.* ¶¶ 6, 92–93.

## II.   California Enacts Assembly Bill 5

According to AB 5's statement of purpose, its intent is "to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave."  AB 5 § 1(e).  AB 5 does so by purporting to "codify the decision of the California Supreme Court" in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018), and to "clarify the decision's application in state law."  *Id.* § 1(d).

*Dynamex* adopted the three-factor "ABC test" to determine whether a worker is an independent contractor or an employee for purposes of the California Industrial Welfare Commission's wage orders. 4 Cal. 5th at 964. AB 5 *extends* the ABC test from just wage-order claims to the entirety of the California Labor Code and the California Unemployment Insurance Code. AB 5 § 2750.3(a)(1); FAC ¶¶ 50–51. This changes the classification standard for a host of California employment-related obligations. FAC ¶ 51. AB 5 authorizes the Attorney General and local officials to bring an enforcement action for injunctive relief "to prevent the continued misclassification of employees as independent contractors." AB 5 § 2750.3(j); FAC ¶ 53.

## A. AB 5's Exemptions

AB 5 does not apply uniformly in California, but rather exempts a laundry list of occupations. Despite asserting that "potentially several million workers" have been denied "basic workplace rights" under *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341, 354–55 (1989) (AB 5 § 1(e)), for those exempted occupations, AB 5 rolls back existing law governing wage-order claims and *reinstates* that more flexible alternative "control-of-the-work" test from *Borello*.

The final version of the statute exempted millions of workers, spanning all sorts of vocations, skill levels, income, education, and sophistication. FAC ¶ 61. AB 5 contains certain criteria that must be met to obtain an exemption, but it does not exempt all who meet those criteria. Instead, for no discernible reason, it exempts specific industries and workers who meet those criteria while denying exemptions to others who also meet them. *E.g.*, *id.* ¶ 63 ("A picture hanger who meets certain criteria is exempted, but not a picture framer who meets the same criteria.").

The jumbled medley of exemptions was the result of extensive lobbying efforts. The lobbying became so overt that—at the urging of AB5's sponsor, Assemblymember Lorena Gonzalez, and her staff—the California Labor Federation circulated a one-page form that business groups could complete to request an exemption from the statute. FAC ¶ 77. Even after AB 5's passage, the exemptions continue to grow. The legislature

provided a last-minute exemption from AB 5 for the newspaper industry with the passage of AB 170. *Id.* ¶ 83. And the legislature is considering dozens of bills creating even more carve-outs for specific industries. *Id.* ¶ 84.

### B. AB 5's Sponsors Targeted On-Demand Companies

The reason for the disparate treatment is clear: AB 5's sponsors targeted on-demand companies and exempted others for political motives. *E.g.*, FAC ¶¶ 2, 18, 78–85. Assemblymember Gonzalez vowed that on-demand companies would not make the list of exemptions, pledging: "It's not going to happen." FAC ¶ 82. After AB 5 passed, she tweeted that she had "fought so hard for #AB5 with no gig carve-outs." *Id.* And she has since made clear that, although she is open to considering further exemptions, she would not consider an exemption or other relief for on-demand companies. *Id.* ¶ 83.

On-demand companies offered multiple proposals to address the legislature's stated concern of ensuring wages, benefits, and protections for independent service providers in the on-demand economy, but the legislature rejected them out of hand. FAC ¶ 163. Instead, AB 5's sponsors made clear throughout the legislative process—and to this day—that they target the on-demand companies. *Id.* ¶¶ 79, 80. The bill's lead author and sponsor has publicly "ask[ed] the 4 big City Attorneys offices to file for injunctive relief on 1/1/20" against on-demand companies, and at least one city attorney has already stated an intent to "do the job." *Id.* ¶ 54.

### LEGAL STANDARD

A complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In resolving a motion to dismiss, a court "[c]onstru[es] the complaint in the light most favorable to the plaintiffs, and draw[s] all reasonable inferences from the complaint in the plaintiffs' favor." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 787 (9th Cir. 2012). If "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216–

17 (9th Cir. 2011).  Resolution of factual questions is inappropriate.  *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008); *Thomson v. HMC Grp.*, 2014 WL 12589312, at *3 (C.D. Cal. Feb. 18, 2014) (declining to dismiss a claim that required a "detailed factual analysis"; the defendants' argument was "premature" and needed to be "raised at summary judgment").

## ARGUMENT

The government's motion to dismiss does not grapple with the plausible and detailed facts Plaintiffs allege, which must be taken as true and which more than state plausible claims for relief.

## I. Plaintiffs Have Stated Their Constitutional Claims

### A. AB 5 Violates Equal Protection Because It Does Not Rationally Relate to Any Legitimate Government Interest

The Equal Protection Clause demands that any legal classifications between similarly situated classes be "rationally related to a legitimate government interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973); *accord*, *e.g.*, *Parr v. Mun. Court*, 3 Cal. 3d 861, 864 (1971).

AB 5 creates different legal standards for similarly situated groups, arbitrarily ratcheting *up* the legal standard for some industries and ratcheting it *down* for those not lucky enough to receive an exemption.  This scheme contradicts AB 5's asserted purposes by reinstating for wage-order claims the very *Borello* standard that AB 5's sponsors have decried as insufficient.

### 1. AB 5 Does Not Further a Legitimate Government Interest

Even under deferential rational basis review, the court must "apply a two-tiered inquiry."  *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018).  It must first "determine whether the challenged law has a legitimate purpose" and then "address *whether the challenged law promotes that purpose.*"  *Id.* (emphasis added); *Merrifield v. Lockyer*, 547 F.3d 978, 990-91 (9th Cir. 2008) (invalidating regulation when the government "undercut its own rational

basis" by including the targeted group but excluding the other).

AB 5's text contains only a single purported justification: "to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law." AB 5 § 1(e). But its exemptions contradict this purpose: If the goal was to broadly address misclassification by ratcheting *up* the legal standard for determining whether a worker is an employee, then it was irrational to ratchet *down* the legal standard for the dozens of exempted businesses and occupations—taking the legal standard the legislature apparently preferred (*Dynamex*) and removing it for wage-order claims, reinstating the legal standard the legislature apparently deemed insufficient (*Borello*). *See* FAC ¶¶ 25–26, 64. There is no rational reason for contradicting AB 5's stated purpose in this way. And there is no rational reason for a law purportedly of general applicability to subject different groups to *different tests*. *See Merrifield*, 547 F.3d at 991 (law violated equal protection because it contained an exemption that "single[d] out" "similarly situated" industries).

There is no dispute that AB 5 treats the two groups (the exempted and unexempted) disparately, but the government never articulates a rational basis for that disparate treatment. The government thus utterly fails to show that the similarity of the groups that AB 5 treats disparately can be resolved *on the pleadings*. *See*, *e.g.*, *Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019) ("[I]t is precisely in light of the inquiry's fact-intensive nature that we have cautioned against deciding whether two comparators are similarly situated on a motion to dismiss."); *Wynn v. New York City Hous. Auth.*, 2015 WL 4578684, at *5 (S.D.N.Y. July 29, 2015) ("[W]hether two people are similarly situated is usually a question of fact for the jury."); *Retired Employees Association*, 2012 WL 1082807, at *6 (denying motion to dismiss when plaintiffs alleged that county "created distinct classifications amongst its retirees (not based on age or length of service) absent any rational basis or legitimate governmental interest").

For instance, the government repeatedly cites an Assembly committee analysis

that explains, "[r]ecent research … finds some of the highest misclassification rates in the economy's growth industries, including home care, janitorial, trucking, construction, hospitality, security, and the app-based 'on demand' sector."  Mot. 4, 12 (citing Bill Analysis, Assembly Committee on Labor and Employment (July 5, 2019), https://tinyurl.com/y9bv5vbr).  But Plaintiffs allege that AB 5 *specifically exempts* innumerable workers that fall within these very "growth industries" mentioned in the report—including workers in the "construction" industry like construction truckers (AB 5 § 2750.3(f)(8)) and subcontractors (*id.* § 2750.3(f)), workers in the "janitorial" industry like house cleaners (*id.* § 2750.3(2)(C)), and workers in the "hospitality" industry like errand runners, event planners, and travel agents (*id.*; FAC ¶ 65).  Whether Plaintiffs are similarly situated to workers in exempted industries is a question of fact, and the government does not have any explanation for these alleged divergences.

The government also relies on a Senate committee report setting forth what the report called the "hallmarks of independent status."  *See* Sen. Comm. on Labor, Pub. Emp't, and Ret., AB5, 2019-20 Reg. Sess., at 8 (Cal. July 8, 2019).  The four asserted criteria were: (1) market strength (being "able to control their working conditions free from coercion and intimidation"); (2) rate setting (being "able to set their own rates for their labor, without interference from another entity"); a (3) contractor-client relationship ("a direct relationship" and an ability to "communicate directly to resolve any questions or concerns, and use the structure of the contract to resolve any disputes"); and (4) "technological neutrality."  *Id.*  But this report issued months *before* dozens of exemptions were added to AB 5, and Plaintiffs allege specific facts showing that many of the later added exemptions defy these purported justifications.  FAC ¶ 66 ("[Y]ard cleaners and picture hangers do not engage in high-paying professions exerting 'market strength.'  Many exempted professions do not set their own rates.  And construction contractors do not always 'maximize[s] rate setting and market position' for theirs subcontractors and 'improve[s] contractor earnings compared to other contractors or employees' when many select their subcontractors based on minimum bids.").

Plaintiffs also allege in detail how Individual Plaintiffs themselves satisfy the same "hallmarks of independent status" the government uses to justify the exemptions. App-based independent service providers are free from the direction and control of on-demand companies because they can freely choose when, where, and how long to logon to on-demand companies' platforms and which routes to accept to maximize earnings. *Id.* ¶ 67. For example, Ms. Olson works shorter and more infrequent terms than employees, logging on to Uber's platform only when needed to supplement her primary income, and Mr. Perez has built his own business in part by developing innovative strategies to deal with unique delivery opportunities and challenges in his community— all examples of the sort of business organization, skill, and self-direction discussed in the report. *Id.* ¶ 72. They also can exercise control over the rates and fares they charge and accept by taking advantage of pricing during periods of high customer demand and choosing between competitor apps to maximize earnings in a given area. *Id.* And their relationship with on-demand companies meets the criteria discussed in the report. *Id.* For example, both Company Plaintiffs ensure that independent service providers are paid in a timely manner (no later than one week after performing services), help them maximize their rates and market position by implementing peak pricing during times of high demand, and assist them in disputes with customers. *Id.*

There is no rational basis for the legislature applying the *Dynamex* ABC test to drivers and delivery persons, but displacing the ABC test for wage-order claims and reinstating *Borello* for picture hangers, house cleaners, and dog walkers. Likewise, there is no rational basis for requiring, as AB 5 does, workers to meet certain conditions to get an exemption as a "referral agency" but only exempting sixteen, highly specific industries that meet those conditions. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("[A]ll persons similarly situated should be treated alike."); *In re Eric J.*, 25 Cal. 3d 522, 531 (1979) ("[P]ersons similarly situated with respect to the legitimate purpose of the law receive like treatment." (quotation omitted)). This is especially true here, given Plaintiffs' allegations in the amended complaint that

numerous workers are similarly situated in all relevant respects to those exempted. FAC ¶ 70 (alleging AB 5 exempts, for example, "yard cleaners (but not yard mowers), persons who perform minor home repairs (but not persons who perform minor office or car repairs), house cleaners (but not house sitters or office cleaners), pool cleaners (but not chimney cleaners), picture hangers (but not picture framers), furniture assemblers (but not furniture repairers), and dog walkers and groomers (but not groomers of other animals)"). There is no basis for disregarding Plaintiffs' well-pleaded factual allegations that these groups are situated similarly, but treated disparately, under AB 5.

The government claims that in fashioning the exemptions the legislature sought to carve out "truly independent business[es]" by distinguishing between individuals and "business entit[ies]" (Mot. 11), but that distinction is illusory. Many of the exemptions require that a worker be a "sole proprietor, partnership, limited liability company, limited liability partnership, or corporation." AB 5 § 2750.3(g)(1). This is no requirement at all. FAC ¶ 71. Under California law, a "sole proprietor" is not a separate legal entity from an individual. *See Jacobs v. Centennial Ins. Co.*, 978 F.2d 1265 (9th Cir. 1992) ("Formation of a sole proprietorship … does not entail the formation of a separate entity." (citing 1 Marsh & Finkle, *Marsh's California Corporation Law* § 2.4 (3d ed. 1990); *Asdourian v. Araj*, 38 Cal. 3d 276, 284–85 (1985))).[1] And even if this were a substantive distinction, Plaintiffs allege that both Individual Plaintiffs operate their own independent businesses. FAC ¶¶ 97, 102.

There is no rational basis for the exemptions' contradiction of AB 5's stated purposes or their discriminatory treatment of similarly situated persons.

### 2. The Only Plausible Explanations for AB 5 Are Not Legitimate

The *real* explanation for AB 5's exemptions is that the bill's sponsors were laser focused on the on-demand companies and needed to curry the necessary political favors

---

[1] Indeed, two City Attorneys recently made this very point about the exemption. *See* LA & Oakland City Attorneys Br. 9–10, *Cal. Trucking Assoc. v. Becerra*, No. 20-55105 (9th Cir. Mar. 18, 2020) (Dkt. 30-1).

for the bill to become law.  FAC ¶ 57 ("The legislature added these carve-outs to AB 5 solely for interest groups, labor, and specific industries, many of which have historically donated heavily to the campaigns for AB 5's co-sponsors.").  Those are not legitimate government interests.  *See Parr*, 3 Cal. 3d at 864 ("expressions of hostility or antagonism to certain groups" violate equal protection); *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016) (reversing grant of motion to dismiss and holding that legislatures may not draw arbitrary lines to "protect" favored groups' "expectations" or "respond to the demands of a political constituent").

Plaintiffs point to a bevy of hostile, public statements showing the expressed purposes articulated by AB 5's sponsors (*e.g.*, FAC ¶¶ 79–80 (Assemblymember Gonzalez called Uber's Chief Legal Counsel "full of sh*t")), and a strident willingness to accommodate labor groups favored by its author (*e.g.*, *id.* ¶ 77 (alleging a powerful labor organization circulated a one-page "opt out" form to allow business groups to request an exemption from Assemblymember Gonzalez, who declared, "I am the union")).  Legislatures may not draw arbitrary lines to express irrational animus (*see Moreno*, 413 U.S. at 534 (invalidating law designed to target a disfavored group)), or "protect" or "respond to the demands of a political constituent" (*Fowler*, 844 F.3d at 815; *id.* at 812–13, 816 (reversing dismissal of an equal protection challenge to carve-outs designed solely to "procure [a labor union's] support in passing [the] legislation")).

The government defends AB 5 because it "is generally applicable to all employment arrangements except those that are specifically exempted" (Mot. 11), but in *Moreno*, the Court struck down a statute intended "to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program."  413 U.S. at 534.  The statute, however, swept up more than just "hippies" by making various other groups of individuals also ineligible for food stamps. *Id.* at 530–32.  Nevertheless, the Supreme Court invalidated the statute because "the challenged classification simply d[id] not operate so as rationally to further" its stated purpose.  *Id.* at 537.

Of course, legislatures "may implement their program step by step … [by]

adopting regulations that only partially ameliorate a perceived evil." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). But AB 5 is the *opposite* of a "step by step" solution to a perceived problem: It codifies what was once a generally applicable test to wage-order claims but walks back that test, exemption by exemption, for wide swaths of the workforce. *See Legend Night Club v. Prince George's Cty. Bd. of License Comm'rs*, 2009 WL 926989, at *5 (D. Md. Apr. 1, 2009), *aff'd sub nom. Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ("[T]here is no appropriate deference to the legislature inasmuch as there is nothing that credibly supports the proposition that the Legislation was partial amelioration of an evil.").

### B. Forced Reclassification Would Deprive Individual Plaintiffs of the Right to Pursue Their Occupations

"*Any* limitation on the opportunity" to earn a living "impedes the achievement of economic security, which is essential for the pursuit of life, liberty and happiness; courts sustain such limitations only after *careful scrutiny*." *Purdy & Fitzpatrick v. State*, 71 Cal. 2d 566, 579 (1969) (emphases added). And the "legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations." *Ganley v. Claeys*, 2 Cal. 2d 266, 268 (1935); *see, e.g.*, *Craigmiles v. Giles*, 312 F.3d 220, 223–29 (6th Cir. 2002) (law imposing irrational requirements to obtain a license to sell caskets violated the Due Process Clause); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 221–27 (5th Cir. 2013) (same). AB 5 does exactly that.

### 1. The Due Process Clause Protects This Right

Forcing Ms. Olson and Mr. Perez to be employees would irrationally violate their right to pursue their chosen occupation. *See* FAC ¶¶ 72, 95–106, 131, 146–66; *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1114 (S.D. Cal. 1999) (invalidating California's regulations that practitioners of African hair braiding obtain cosmetology license when mandated curriculum had little overlap with practice of hair braiding, thus demonstrating that required curriculum was "not a rational exercise of licensure to the practice of

Plaintiffs' desired profession").   The government argues that only "a complete prohibition of the right to engage in a calling" implicates the right, and AB 5 "merely establishes the standard for ascertaining, for any occupation, whether a worker is an employee or an independent contractor under California law."  Mot. 15–17.

This argument ignores Plaintiffs' factual allegations.  The amended complaint alleges that "[b]eing one's own boss, as Plaintiff Olson, Plaintiff Perez, and many other app-based independent service providers choose to do, is a fundamentally different occupation than driving as an employee on an inflexible shift" and "AB 5 is a complete prohibition on exercising the right to pursue this occupation."  FAC ¶ 155.[2]  Forced reclassification would prevent Plaintiffs "from entering into their chosen work arrangements—that of independent service providers," by "mak[ing] [them] into employees rather than business owners."  FAC ¶ 156.  Working for someone else, bound by "duties that bind employees, such as the duty of loyalty," is fundamentally different from being able to choose whether to work or not work "without requesting permission or even telling anyone," and owing a duty to no boss but yourself.  *Id.* ¶¶ 104, 156.  Ms. Olson and Mr. Perez each run their own businesses, which entails activities like

---

[2]  The government relies on *Conn v. Gabbert*, 526 U.S. 286 (1999), for the proposition that only a "complete prohibition" triggers the Due Process Clause.  In fact, *Conn* held only that the "brief interruption" of the claimant's "daily routine as a result of … execution of a search warrant" did not violate the right to pursue one's occupation.  *Id.* at 292–93.   The Supreme Court simply used the phrase "complete prohibition" to distinguish this doomed claim—that a quick search deprived him of his right to pursue his occupation—from the claims in three earlier cases that involved the same right.  *See id.* at 292; *see also PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 9 & n.12 (D.D.C. 2004) ("*Conn* did not purport to articulate a higher standard to prove a deprivation of a liberty interest.  Rather, the case narrowly held that the plaintiff's particular, and peculiar, claim lacked merit.").   This case is also nothing like the licensure regulation in *Dittman v. California*, 191 F.3d 1020, 1031–32 (9th Cir. 1999), which required medical professionals to be current on child support and to have "good moral character" and "the financial wherewithal to answer liability claims."  Another of Defendants' Due Process cases, *Erotic Service Provider Legal Education & Research Project v. Gascon*, 880 F.3d 450, 459 (9th Cir. 2018), merely "hold[s] there is no constitutional right to engage in illegal employment, namely, prostitution."   Transporting passengers and goods is legal.   And their final case, *Engquist v. Oregon Dep't of Agriculture*, 478 F.3d 985, 997 (9th Cir. 2007), concerns an alleged positive right to a government job—a situation where judicial review is "more constrained" than here.

"cultivating relationships with local merchants," "choosing the best or most profitable routes," "developing innovative strategies to gain an advantage over the competition," and "exercis[ing] control over the rates and fares they charge and accept." *Id.* ¶¶ 72, 98, 102.   They chose this occupation, rather than choosing to be employees, in full knowledge of these essential differences. *Id.* ¶¶ 99, 105.  Thus, the alleged facts show that being a business owner is not merely a different "classification" but a wholly different occupation.  *Contra* Mot. 16.[3]  These allegations must be accepted as true at the pleading stage. *See International Refugee Assistance*, 373 F. Supp. 3d at 675.

Courts have refused to dismiss claims when presented with similar allegations. For example, *Cornwell* rejected the government's argument that African hair braiding is a form of cosmetology, rather than its own occupation, and therefore could be subject to the reasonable regulations that apply to cosmetology.  80 F. Supp. 2d at 1106 (the government "interests stated assume the critical contention at issue—i.e., that natural hair care is part of the profession of cosmetology"); *see also*, *e.g.*, *Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012).

The impairment here is even more obvious than the licensing laws invalidated in *Cornwell*, *Clayton*, *Craigmiles*, and *St. Joseph Abbey*.  The requirement to become an employee is not merely an unreasonable hoop through which one must jump—it is a fundamental reordering of one's occupation and change in profession.

It is no answer to say that Uber and Postmates could offer drivers some degree of "flexibility and autonomy" even if they were forced to hire them as employees (Mot. 17)—most clearly because the complaint alleges the opposite. *E.g.*, FAC ¶¶ 92,

---

[3] Defendants' own case, *Western States Trucking Ass'n v. Schoorl*, 377 F. Supp. 3d 1056 (E.D. Cal. 2019), shows that AB 5 is a sweeping change from prior law.  *Western States* noted that *Dynamex* permits a company to hire an independent contractor; the company might just need to pay the contractor according to the wage order interpreted in *Dynamex*.  *Id.* at 1072.  *Dynamex* did *not* set a general test for when a worker is an "employee" instead of an "independent contractor"; it did *not* abrogate the common law test for employment, but merely interpreted the "suffer or permit to work" language of the wage order.  4 Cal. 5th at 953.  By contrast, AB 5 means a worker *cannot be an independent contractor* unless she meets the ABC test.

114, 116, 117, 132, 156.  Plaintiffs allege that Uber and Postmates could *not* offer the same degree of flexibility and autonomy if they were forced to treat their users as their employees—and that they could not hire all of their users as employees anyway.  *E.g.*, *id.* ¶¶ 92, 130–36.  This is true because a relatively flexible employee is still an employee, not an independent service provider for the on-demand industry.  An employee earns wages, rather than developing strategies to make profits.  And an employee cannot use multiple competing apps in violation of her "duty not to compete" with her employer.  *E.g.*, *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414, 416 (2007); FAC ¶ 92.  Indeed, the government recognizes that an employer-employee relationship is fundamentally incompatible with the on-demand economy "business model[]."  Mot. 17.  It seeks to stamp out that business model, and force Company Plaintiffs into a wholly different line of work.  *E.g.*, FAC ¶¶ 107–29, 155–56, 159–63.

The government does not bother to argue that AB 5's deprivation of the right to pursue one's chosen occupation is rational.  The complaint alleges it is not.  If enforced as its sponsors urge, it could gut the livelihoods of hundreds of thousands and harm millions of customers.  *See*, *e.g.*, FAC ¶¶ 4–14, 90–136, 157, 163–64.  Forcing people to choose an employment relationship or nothing would *erode* "the middle class" and *further* "income inequality."  Mot. 3, 9, 10; *see* FAC ¶¶ 130–31.[4]  AB 5's "adverse effect" on the very problems it was supposedly designed to solve shows it is irrational and violates the Due Process Clauses.  *E.g.*, *Craigmiles*, 312 F.3d at 226.

### 2.  The Inalienable Rights Clause and the Ninth Amendment

Contrary to Defendants' argument (at 21–24), other clauses also protect the right to pursue a chosen occupation; they are not meaningless throat-clearing.

*First*, California's Inalienable Rights Clause "*is* self-executing and supports a cause of action for an injunction"—as the very case Defendants cite holds.  *Clausing v.*

---

[4]  *Franceschi v. Yee*, 887 F.3d 927, 938 (9th Cir. 2018), rejected the argument that revocation of a driver's license violated the plaintiff's right to work because he could still use "services such as Lyft or Uber."  If enforced in line with its sponsors' intent, AB 5 would preclude self-employed drivers from providing *exactly these services*.

*San Francisco Unified Sch. Dist.*, 221 Cal. App. 3d 1224, 1238 (1990).[5]  "California courts have held that Article I, Section 1 of the California Constitution is self-executing, and thus a private citizen may seek injunctive relief if a public entity violates his or her right."  *E.g.*, *C.T. v. Redondo Beach Unified Sch. Dist.*, 2019 WL 1557431, at *2 (C.D. Cal. Apr. 10, 2019).   Indeed, the California Supreme Court has held that the Inalienable Rights Clause "is intended to be self-executing, i.e., that the constitutional provision, in itself, creates a legal and enforceable right … for every Californian."  *White v. Davis*, 13 Cal. 3d 757, 775 (1975) (quotation marks omitted); *accord*, *e.g.*, *Payton v. City of Santa Clara*, 132 Cal. App. 3d 152, 154 (1982) (reversing demurrer on Inalienable Rights Clause claim for this reason).   Accordingly, the California Supreme Court has relied on the Inalienable Rights Clause in recognizing individual rights in a pre-enforcement challenge to a new California statute.   *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 314, 322–24, 334 (1997).   *Lungren* explicitly held that the California Constitution offers broader constitutional protections than the United States Constitution, and therefore that U.S. Supreme Court cases upholding similar statutes were inapposite.  *Id.* at 324–28, 341.  Likewise, Defendants' case, *City of Carmel-By-The-Sea v. Young*, 2 Cal. 3d 259, 271–72 (1970), *invalidated* a statute that had nothing to do with the rights to marry, travel, or associate—but rather required public officials to disclose all investments over $10,000.  And that was *before* the People expanded the Inalienable Rights Clause in a constitutional amendment two years later.

*Second*, the right to pursue a chosen occupation is an ancient, fundamental, and natural right that the People retained when they formed the governments of California and the United States.   *See* Timothy Sandefur, *The Right to Earn a Living*,

---

[5]  *Clausing* also held that the declaration of a *positive* "right to obtain safety and happiness" is not "self-executing in the sense that it gives rise, in and of itself, to a private right of action *for damages* or an *affirmative duty* on the part of the state to take particular steps to guarantee the enjoyment of safety or happiness by all citizens."  221 Cal. App. at 1238 n.6.  Plaintiffs here allege that the State has violated their *negative* rights to "liberty," "property," and "privacy" *free from government interference*, and seek an *injunction* against this violation.

6 CHAP. L. REV. 207, 210 (2003) (at common law, "[t]he right to support oneself by a lawful calling was not only central to the health of the state, but to the lives of citizens"). It is therefore protected by the Ninth Amendment to the U.S. Constitution and its parallel in Article I, Section 24 of the California Constitution.   The Framers of the U.S. Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments.   *See* Randy Barnett, *The Ninth Amendment: It Means What It Says*, 85 TEX. L. REV. 1, 13 (2006) (recounting text and history showing that the Ninth Amendment protects "individual natural rights" and "put[s] the burden of justification" on the government "whenever legislation restricts the exercise of liberty").   The same is true of the California Constitution.   *See Billings v. Hall*, 7 Cal. 1, 16 (1857) (Burnett, J., concurring) ("[T]here are certain inherent and inalienable rights of human nature that no government can justly take away"; only "some of these rights have been enumerated in our State Constitution"; but "in the language of that instrument, '[t]his enumeration of rights shall not be construed to impair or deny others retained by the people.'"); Anthony Sanders, *Baby Ninth Amendments and Unenumerated Individual Rights in State Constitutions Before the Civil War*, 68 MERCER L. REV. 389, 433 (2017) ("The history of the adoption of Baby Ninths before the Civil War demonstrates that they were intended to protect individual rights.").   At the very least, the Ninth Amendment rules out Defendants' argument that these rights are not protected from government interference:   The Amendment "was proffered to quiet expressed fears that a bill of specifically enumerated rights could not be sufficiently broad to cover all essential rights."   *Griswold v. Connecticut*, 381 U.S. 479, 488–89 (1965) (Goldberg, J., joined by Warren, C.J., and Brennan, J., concurring).[6]

---

[6] Defendants' argument that the Ninth Amendment has not yet been incorporated against the States (Mot. 22) is faulty for three reasons:   *First*, it does not need to be "incorporated"; by its terms, it speaks of rights "retained by the people" when they form government, be it State or federal.   Indeed, *Griswold* was a challenge to *State* regulation.   381 U.S. at 484 (majority op.) (relying on the Ninth Amendment).   *Second*, if incorporation were necessary, the Ninth Amendment easily would qualify as it

### C.   Plaintiffs State a Contracts Clause Claim

"Parties seeking relief [under the Contracts Clause] must demonstrate (1) that there has been a substantial impairment of a contractual relationship; (2) that the impairment is not justified by a significant and legitimate public purpose; or if so justified, then (3) that the impairment is not based upon reasonable conditions or of a character appropriate to the public purpose justifying the legislation's adoption." *Ross v. City of Berkeley*, 655 F. Supp. 820, 827 (N.D. Cal. 1987) (punctuation omitted).

The facts Plaintiffs allege show that, if enforced to compel reclassification, AB 5 unconstitutionally would upset thousands of on-demand economy contracts.

### 1.   Forced Reclassification Impairs Plaintiffs' Contractual Relationship

The complaint alleges detailed facts showing how mandating a rigid employer-employee arrangement upends the most "critical feature of Plaintiffs' total contractual relationship" (FAC ¶ 178) by "eliminat[ing] the … flexibility … currently guaranteed under [Plaintiffs'] existing" independent "arrangements." *Cont'l Illinois Nat'l Bank & Tr. Co. of Chicago v. State of Wash.*, 696 F.2d 692, 697–98 (9th Cir. 1983) (Contracts Clause violation where law impaired "central aspects" of the bargain undermining "the centerpiece of the entire [contractual] arrangement"); *Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1006 (4th Cir. 1980) (law "severely modif[ied a] contract[]" contrary to Contracts Clause where the rights at issue amounted to "critical feature[s] of [the parties'] total contractual relationship"); *Ross*, 655 F. Supp. at 828–29 (law unconstitutional where it eliminated one of "the most essential bargained-for components of … [the parties'] agreement"); FAC ¶¶ 9, 111, 125, 178, 182.

Individual Plaintiffs put a premium on the autonomy the parties' contracts guarantee, and in fact seek out on-demand work because it provides crucial autonomy lacking in employment relationships. *E.g.*, FAC ¶¶ 3–10, 65, 92–93, 123, 201; *id*. ¶ 58

---

protects exactly those "fundamental" rights so "deeply rooted" that the people retain them when they form government. *Timbs v. Indiana*, 139 S. Ct. 682, 690 (2019). And *third*, California's Baby Ninth Amendment certainly applies to the State in any event.

1    ("[t]he Service Agreements … maintain[] … [the] flexible and autonomous constituency

2    of independent service providers who work when they want, as much as they want, and

3    where they want").  Company Plaintiffs rely on that flexibility to efficiently match and

4    price, in real-time, its on-demand services for independent delivery persons and

5    customers, and losing it would have untold impact on their longevity.  *E.g.*, *id.* ¶ 91

6    ("Company Plaintiffs … built their businesses by creating apps, websites, and other

7    technologies for the on-demand economy"; it "is because independent service providers

8    have the flexibility, freedom, and independence to pick and choose which jobs they want

9    to perform and when they want to perform them that the business model has been so

10    successful"); *id.* ¶¶ 11, 14, 21–22, 29, 91, 94, 110–18, 124–33, 174–75, 179–87.

11        As even the government acknowledges, "Company Plaintiffs' business models

12    are unable to provide that flexibility and autonomy while treating the Individual

13    Plaintiffs as employees."  Mot. 17.  If Defendants can use AB 5 to ban the independent

14    contractor relationship at the heart of Plaintiffs' contracts, that would gut the central

15    terms of hundreds of thousands of critical contracts.  Courts repeatedly have found

16    Contracts Clause violations in far more mild contractual impositions, including in the

17    employment context.  *Contra* Mot. 20; *e.g.*, *Allied Structural Steel Co. v. Spannaus*,

18    438 U.S. 234, 242–44 (1978) (invalidating pension funding charge to pension benefits);

19    *Sonoma Cty. Org. of Pub. Employees v. Cty. of Sonoma*, 23 Cal. 3d 296, 308–09 (1979)

20    (wage law unconstitutional because "[a]n increase in wages is frequently the very heart

21    of an employment contract").  That is all that is required at this stage.  The court in *San

22    Diego Police Officers' Ass'n v. Aguirre*, 2005 WL 3180000 (S.D. Cal. Nov. 5, 2005),

23    for instance, concluded that even cursory allegations that the law at issue "unlawfully

24    deprived, eliminated or reduced … benefits" required pursuant to plaintiffs' contracts

25    "properly alleged … substantial[] impair[ment]," and therefore denied a motion to

26    dismiss a Contracts Clause claim.  *Id.* at *8.

27        The government argues that because employer-employee relations are "highly

28    regulated," AB 5's impairment of Plaintiffs' agreements was foreseeable.  Not so.

*First*, the complaint alleges clearly that AB 5 is an unprecedented—and thus unexpected—regulation of the on-demand industry. *In re Workers' Comp. Refund*, 46 F.3d 813, 819 (8th Cir. 1995) (courts examine "the regulated nature of [the] *industry* in which a party is contracting") (emphasis added). No law or judicial order ever has compelled the on-demand industry to adopt the traditional employment model; to the contrary, judicial and administrative authorities have *ratified* the parties' bargain, solidifying their contractual expectations. FAC ¶¶ 19, 23, 185.[7] Because no "positive law encompassing the contract at the time of its execution provid[ed] sufficient notice" the contracts were invalid, these expectations were legitimate. *Ross*, 655 F. Supp. at 829; *see Local 101 of the Am. Fed'n of State, Cty. & Mun. Employees v. Brown*, 2015 WL 5316296, at *7 (N.D. Cal. Sept. 11, 2015) ("declin[ing] to find as a matter of law at this stage of the proceedings that Plaintiff cannot assert a Contract Clause claim" given allegations that the state had not previously "mandat[ed] limits to retirement benefits for employees of local agencies at the time the [contract] was negotiated"). That courts consistently have found substantial impairment of contracts in heavily regulated areas of commerce—including employee pensions, insurance, nursing home rates, franchise and rental agreements—confirms dismissal at this early stage is improper.

*Second*, even where it "is indisputable that … the … industry [at issue] has traditionally been subjected to state regulation," courts ask whether "the *particular* contractual relationship … involved has, as such, ever been caught up in the general scheme of regulation." *Garris*, 630 F.2d at 1007 (emphasis added). AB 5, "which

---

[7] In light of this overwhelming authority, the State's outlier decision from a "California Labor Commissioner determin[ing] that … one of Plaintiff Uber's drivers was misclassified as an independent contractor nearly five years ago" (Mot. 18 n.8) would not change these expectations, let alone as a matter of law. In fact, a different California Labor Commission decision concluded those drivers were independent contractors. *Alatraqchi v. Uber Techs., Inc.*, No. 11-42020-CT (Labor Comm. Aug. 1, 2012). And that "[m]ultiple court decisions have rejected attempts by app-based employers to dismiss claims that their drivers are employees," Mot. at 18 n.8 (citing *O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133, 1138 (N.D. Cal. 2015); *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067 (N.D. Cal. 2015)), simply confirms this question turns on "issues of fact."

focuses on the business relationships between [Plaintiffs], is much different from the type of regulation existing at the time the Act became effective." *McDonald's Corp. v. Nelson*, 822 F. Supp. 597, 606 (S.D. Iowa 1993), *aff'd sub nom. Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383 (8th Cir. 1994).[8]   Although Defendants assert that *employment generally* is "heavily regulated" (Mot. 18), Plaintiffs' "particular" on-demand arrangement was relatively "unregulated prior to [AB 5's] enactment"; *only* AB 5 attempts to force wholesale reclassification on them. *Workers' Compensation*, 46 F.3d at 819; *accord Allied Structural Steel*, 438 U.S. at 250 (parties reasonably relied on pension terms despite Minnesota's history of regulation of other aspects of employee compensation, such as wages and disability benefits).   As explained above, even *Dynamex* allowed independent contractor arrangements to persist—as Defendants' own case, *Western States*, shows.  *See supra* at 14 n.3.

  *Third*, private parties are not charged with prescient knowledge of future legislation where doing so would "in a very practical sense" "destr[oy]" or otherwise "render[] valueless" "central aspects" of their bargain.   *Continental Illinois*, 696 F.2d at 697–98.  Given Plaintiffs' allegations that forced reclassification would do just that, it is clear that Plaintiffs did not, and could not, "foresee" this sweeping "potential enforcement of the [traditional] ABC [employment] test.'"  Mot. 19.  That is true regardless of whether AB 5 applies retroactively to work completed "before January 1, 2020," by destroying alike the *pre-existing* contracts at the heart of Plaintiffs' relationship *going forward*.

  *Fourth*, because the impairment analysis turns on the parties' reasonable expectations, courts are loath to dismiss as a matter of law such inherently factual claims, instead concluding they are "more suitable for a motion for summary judgment" if not

---

[8]   *Greene v. Dayton*, 806 F.3d 1146 (8th Cir. 2015), is not to the contrary.  The court merely held that plaintiffs did not have a reasonable expectation in certain "previously negotiated terms and conditions of employment" given preexisting laws regulating those terms.  *Id.* at 1150.  Here, however, no law put Plaintiffs on notice that the government would act to upend the basis of their businesses.

trial. *Aaron v. Aguirre*, 2006 WL 8455871, at \*9–10 (S.D. Cal. Dec. 13, 2006) ("den[ying] defendants' motion to dismiss plaintiff's Contract Clause claim[s]": "The extent of [a contractual] modification is subject to a 'reasonableness' standard, but this is an intensely factual question that cannot be determined in a vacuum" and one "better suited for resolution at the summary judgment stage"); *see*, *e.g.*, *Matsuda v. City & Cty. of Honolulu*, 512 F.3d 1148, 1155 (9th Cir. 2008) (remanding for district court to evaluate "whether the ordinance impaired th[e] contractual relationship and whether such impairment was substantial" because "the parties are in disagreement and the record is not fully developed"); *Barman v. Union Oil Co. of California*, 50 F. App'x 824, 827 (9th Cir. 2002) (concluding "[t]he district court erred in holding as a matter of law that" terms at issue "were not essential terms to these parties in their negotiations"; rather, "factual issues remain[ed]" to determine if the "contact clause … [wa]s material"); *Retired Employees Association*, 2012 WL 1082807, at \*4 ("[i]t is not for the court to decide on this motion to dismiss whether" a contract right giving rise to reasonable expectations "can be implied under the circumstances of this case").

### 2. AB 5 Targets Plaintiffs' Contractual Relationship

Given the severity of the impairment alleged here, the Court's review is not "deferential." Mot. 18, 20. While "'[m]inimal alteration of contractual obligations may end the inquiry at its first stage'[,] '[s]evere impairment, on the other hand, will push the inquiry into a careful examination of the nature and purpose of the state legislation.'" *Ross*, 655 F. Supp. at 827–28 (quoting *Allied Structural Steel*, 438 U.S. at 245). This Court must *carefully* and *critically* examine AB 5's purported justification.

Plaintiffs allege that "AB 5's narrow focus on Company Plaintiffs demonstrates that AB 5 was not enacted to protect any broad societal interest" (*id.* ¶ 193), but instead to "directly target[] and adjust[] the[ir] contractual obligations." *Ross*, 655 F. Supp. at 833 ("[u]nlike a broad rule of general conduct impacting incidentally on the leases in question, it applies exclusively and explicitly to the contractual obligations of the narrow group"); *Workers' Compensation*, 46 F.3d at 821 ("Despite its sweeping language about

benefitting the broad societal interest or class, the statute[] … benefits only a selected few."). AB 5 proponents admit that the statute's "overall purpose … is specifically to adjust the balance of power between contracting parties"—the very "type of legislative enactment [the courts have consistently] … struck down" under the Contracts Clause. *Ross*, 655 F. Supp. at 832–33; *McDonald's*, 822 F. Supp. at 608–09 (collecting sources); *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002) ("leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest"). Indeed, "legislators who voted for AB 5 have publicly and repeatedly stated that their purpose in supporting the statute is to force network companies to change the classification of workers who use their technology … and thus restructure their businesses." FAC ¶ 17; *accord id.* ¶¶ 3, 65, 185, 189.

### 3. Forcing On-Demand Workers into Traditional Employment Is Not a Reasonable or Appropriate Way to Advance the Legislature's Goals

Even if the government's interest were legitimate, the Court must ensure that the severity of the "impairment is … reasonable" and "appropriate" to advance "the public purpose justifying [the legislation's] adoption." *Ross*, 655 F. Supp. at 827 (citation omitted). The same "careful examination" "governing the State's interest and purpose" applies to "the reasonableness of the measures employed to achieve the legislation's objectives." *Id.* at 832 (quoting *Allied Structural Steel*, 438 U.S. at 245).[9]

The government incants—without elaboration—that AB 5's goal was to "protect workers." But "at this stage of the litigation" the complaint "ple[a]d[s] sufficient facts suggesting that" severely impairing Plaintiffs' relationship is neither "reasonable" nor "necessary" to further the interest in "protecting workers." *Brown v. New York*, 975 F. Supp. 2d 209, 240 (N.D.N.Y. 2013). The complaint explains that, given AB 5's exemptions and the express intent of its drafters, the law by design and effect targets *on-*

---

[9] Contrary to the government's suggestion (Mot. 20), this searching standard is unchanged even though AB 5 impairs the obligations of private parties, rather than those of "the state of California." *E.g.*, *Ross*, 655 F. Supp. at 832; *Allied Structural Steel*, 438 U.S. at 245.

*demand economy* contracts to send to the shredder.  FAC ¶¶ 3, 17, 65, 185, 189.  While AB 5's purpose is to "protect" those on-demand workers, the complaint makes clear that they do not want, and for that reason do not seek, the very trappings accompanying traditional employment AB 5 makes law.  *Id.* ¶¶ 3–10, 65, 92–93, 123, 201.  Mandating that relationship *harms* these targeted workers—not only by removing this desired option entirely, but also by forcing Company Plaintiffs to restructure and ultimately eliminate many of those work opportunities on which they have come to rely.  *Id.* ¶¶ 11, 14, 21–22, 29, 91, 94, 110–18, 124–33, 174–75, 179–87.

Particularly given it is *the government's* ultimate burden to demonstrate that the restrictions are "reasonable and necessary to fulfill an important public purpose" (*University of Hawaii Prof. Assembly v. Cayetano*, 183 F.3d 1096, 1106–07 (9th Cir. 1999)), the government's "[b]road reference to an economic problem"—like "protecting workers" (Mot. 19)—"does not speak to the policy consideration and tailoring that is required to pass scrutiny under plaintiffs' Contracts Clause challenge." *Brown*, 975 F. Supp. 2d at 240; *McDonald's*, 822 F. Supp. at 608–09 ("The state asserts that the unfair practices of some franchisors can harm consumers and other businesses, but it has not described the harm sufficiently for purposes of Contract Clause analysis."); *Southern California Gas v. City of Santa Ana*, 336 F.3d 885, 896 (9th Cir. 2003) (granting summary judgment against city where city asserted "in a conclusory fashion" that ordinance imposing fees on gas company was "reasonable," "especially since [the city] has the burden of establishing reasonableness").  The legislature needed to "seriously consider[] any less restrictive alternatives"; instead, it rejected out of hand proposals to guarantee benefits for workers while maintaining their autonomy as independent contractors.  *Ross*, 655 F. Supp. at 834 ("The undisputed factual record before the court gives no indication that the City seriously considered any less restrictive alternatives to the permanent prohibition of owner occupancy."); *State of Nev. Employees Ass'n, Inc. v. Keating*, 903 F.2d 1223, 1228 (9th Cir. 1990) (the "State did not address plaintiffs' suggested alternatives"); *e.g.*, FAC ¶ 163 (describing how AB 5

sponsors rejected "multiple proposals [from on-demand companies] that would ensure the protections for independent service providers AB 5 purports to guarantee" while preserving key components of parties' bargain).

At a minimum, these failings confirm that further factual development is necessary. *Brown*, 975 F. Supp. 2d at 240 ("resolution of the issues surrounding [the State's] fiscal crisis and economic situation will involve questions not appropriately resolved on a motion to dismiss"); *Ass'n of Los Angeles City Attorneys v. City of Los Angeles*, 2012 WL 12887541, at *9 (C.D. Cal. Nov. 20, 2012) ("Whether the [impairment] w[as] actually 'reasonable and necessary' cannot be determined until there has been further factual development of the record. Consequently, the court denies defendant's motion to dismiss plaintiff's Contract Clause claims."); *S. California Edison Co. v. City of Laguna Beach*, 2017 WL 4480827, at *6 (C.D. Cal. July 28, 2017) (declining to dismiss Contracts Clause claim).

## II.   In the Alternative, the Court Should Grant Leave to Amend

Should the Court determine that the FAC pleads insufficient facts on any of the claims asserted, it should grant leave to amend. *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001); *Moss v. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) ("Dismissal without leave to amend is improper unless it is clear … that the complaint could not be saved by any amendment.").[10]

## CONCLUSION

The Court should deny the motion or, in the alternative, grant leave to amend.

April 24, 2020                                    By: */s/ Theane Evangelis*

                                                     Theane Evangelis

---

[10] The government relies on *Chodos v. W. Publ'g Co.*, 292 F.3d 992 (9th Cir. 2002), but the Ninth Circuit there upheld the district court's denial of a *second* motion to amend a complaint, and only after noting that the motion to amend was filed after undue tactical delay. *Id.* at 1003. Here, Plaintiffs' only amendment came as of right, without delay. "It is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joshua S. Lipshutz
Blaine H. Evanson
Heather L. Richardson
Dhananjay S. Manthripragada

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Plaintiffs*