1   GIBSON, DUNN & CRUTCHER LLP
    THEANE EVANGELIS, SBN 243570
2     TEvangelis@gibsondunn.com
    BLAINE H. EVANSON, SBN 254338
3     BEvanson@gibsondunn.com
    HEATHER L. RICHARDSON, SBN 246517
4     HRichardson@gibsondunn.com
    DHANANJAY S. MANTHRIPRAGADA,
5     SBN 254433
      DManthripragada@gibsondunn.com
6   333 South Grand Avenue
    Los Angeles, CA  90071-3197
7   Tel.: 213.229.7000
    Fax: 213.229.7520
8
    JOSHUA S. LIPSHUTZ, SBN 242557
9     JLipshutz@gibsondunn.com
    555 Mission Street, Suite 3000
10  San Francisco, CA  94105-0921
    Tel.: 415.393.8200
11  Fax: 415.393.8306

12  Attorneys for Plaintiffs
    Lydia Olson, Miguel Perez,
13  Postmates Inc., and Uber Technologies, Inc.

14

15                  UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
16

17  LYDIA OLSON; MIGUEL PEREZ;
    POSTMATES INC.; and UBER          CASE NO.  2:19-cv-10956-DMG-RAO
18  TECHNOLOGIES, INC.,

19                  Plaintiffs,         SECOND AMENDED COMPLAINT
                                        FOR DECLARATORY, INJUNCTIVE,
20          v.                          AND OTHER RELIEF

21  XAVIER BECERRA, in his capacity as  DEMAND FOR JURY TRIAL
    Attorney General of the State of
22  California and personal capacity; and
    "JOHN DOE," in his official capacity,  Hon. Dolly M. Gee
23
                    Defendants.
24

25          Plaintiffs Lydia Olson and Miguel Perez (together, "Individual Plaintiffs"), and

26  Postmates  Inc.  ("Postmates")  and  Uber  Technologies,  Inc.  ("Uber")  (together,

27  "Company Plaintiffs") file this Second Amended Complaint for declaratory, injunctive,

28  and other relief determining that California's worker-classification framework enacted

through Assembly Bills 5 ("AB 5"), 170 ("AB 170"), and 2257 ("AB 2257") is unconstitutional. AB 5, AB 170, and AB 2257, individually and together, violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, the Contracts and State Bill of Attainder Clauses of Article I of the United States Constitution, and the Equal Protection, Due Process, Contracts, and Bill of Attainder Clauses of the California Constitution.[1] The People of the State of California have approved Proposition 22, superseding these laws' application to Plaintiffs, but Defendants and the legislators behind AB 5 have thumbed their noses at the People's will (and the initiative statute they approved) and are continuing to enforce these unconstitutional and superseded laws against Plaintiffs.

## INTRODUCTION

1.      Plaintiffs bring this lawsuit to protect their constitutional rights and defend their fundamental liberty to pursue their chosen work as independent app-based drivers and network companies.

2.      California's legal framework for worker classification was not rationally related to protecting workers. AB 5 and AB 170's sponsors targeted network companies under a guise of protecting workers generally, but with AB 2257 they removed all pretense. Taken together, AB 5, AB 170, and AB 2257 singled out network companies like Company Plaintiffs and app-based drivers like Individual Plaintiffs, and treated them differently from similarly situated businesses and workers with no rational basis for the classifications the statutes drew. Defendants have been enforcing these laws against Plaintiffs, obtaining an injunction against Plaintiff Uber that was affirmed on appeal in part because the laws targeted the gig economy and the California Court of Appeal presumed they required Uber to reclassify drivers who use its apps as employees rather than independent contractors.

---

[1] Plaintiffs preserve the right to appeal the dismissal with prejudice of their claims that California's worker-classification law also violates the Ninth Amendment to the United States Constitution and the "Baby Ninth" and Inalienable Rights provisions of the California Constitution.

3.      On November 3, 2020, the People of the State of California decisively approved Proposition 22.  Their stated purpose was "[t]o protect the basic legal right of Californians to choose to work as independent contractors with rideshare and delivery network companies throughout the state" from "recent legislation [that] has threatened to take away the flexible work opportunities of hundreds of thousands of Californians, potentially forcing them into set shifts and mandatory hours, taking away their ability to make their own decisions about the jobs they take and the hours they work."  Accordingly, Prop 22 provides that "an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's relationship with a network company," "[n]otwithstanding any other provision of law."

4.      Several of the People's representatives have not heeded the voters' clear command.   Defying the People's codified intention that app-based drivers be independent contractors, Defendant Attorney General Xavier Becerra and other State officials have continued their efforts to enforce now-superseded AB 5, AB 170, and AB 2257 against Plaintiffs.  Defendant Becerra and other officials are continuing their enforcement action, brought under these laws, against Plaintiff Uber.  And they are defending the preliminary injunction they have obtained against Uber, requiring reclassification, in that enforcement action—even though the law now provides that drivers who use Uber are independent contractors.  Just three days after Prop 22's approval, on November 6, 2020, the California Division of Labor Standards Enforcement within the Department of Industrial Relations filed an amended complaint alleging that Uber is violating the worker-classification laws that no longer apply to Uber under Prop 22.  And only two days after Prop 22's approval, on November 5, 2020, the San Francisco District Attorney declined to withdraw its request for a preliminary injunction against network company DoorDash Inc., which seeks to require DoorDash to reclassify app-based drivers who use its app as employees—arguing it is possible that "there is still very much a piece of the preliminary injunction that is alive" under AB 5—in spite of Prop 22 dictating precisely the opposite.

Gibson, Dunn &
Crutcher LLP

3

5.     Accordingly, even though AB 5, AB 170, and AB 2257 have been superseded, Plaintiffs are forced to maintain this action to protect themselves from Defendants' enforcement of these unconstitutional laws.  Defendants' continued persistence in enforcing AB 5, despite the approval of Prop 22, is an affront to the will of the voters and an effort to undermine the democratic process.  It is also an affront to the California and U.S. Constitutions.

6.     The purported purpose of AB 5 was to protect workers by codifying the ABC test, which *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018), had adopted as an interpretation of the Industrial Wage Commission's wage orders.  Sponsors of AB 5 stated that *Dynamex* was an important decision that increased protections for workers who had been misclassified under the previous and more flexible standard articulated in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989).

7.     But this supposed purpose of increasing worker protections was contradicted by the laws themselves.  Before AB 5, *Dynamex* applied the ABC test to the wage order claims of all workers, but AB 5 superseded *Dynamex* for the millions of workers the statute exempted, and reinstated the very *Borello* standard that the sponsors of AB 5 claim resulted in misclassification.  Then, in AB 170 and AB 2257, those same sponsors added dozens of *new* exemptions, rolling back the ABC test for millions *more* California workers.  In particular, AB 2257 dramatically expanded the exemption for referral agencies and service providers—while AB 5's referral agency exemption applied to a specific list of referral agencies, AB 2257 exempted any and all referral agencies that met its requirements, except for a handful of disfavored referral agencies like Plaintiffs.  *See* Cal. Lab. Code § 2777(b)(2)(B) ("Under this subparagraph, referrals for services may include, but are not limited to ….").

8.     The sponsors of these laws removed all doubt that they were targeting Plaintiffs by singling them out and excluding them from the expanded referral agency exemption in AB 2257.  Network companies like Company Plaintiffs would naturally

be considered a "referral agency" under the plain interpretation of that language. But when AB 2257's sponsors noticed that service providers who use Plaintiffs' apps qualified for the "referral agency" exemption because they run errands, they revised the statute to exclude them. Thus, even as AB 2257 dramatically expanded the breadth of the referral agency exemption, it added new language providing that referrals for services "do not include" "delivery, courier, [or] transportation" services. *See* Cal. Lab. Code § 2777(b)(2)(C).

9. AB 2257's revisions to the "referral agency" exemption deepened and broadened the irrationality of the classifications drawn in AB 5. *All* referral agencies were made subject to the *Borello* standard, so long as they meet a few requirements—*unless* they provided "transportation" or "delivery" services (among a handful of other disfavored groups). There was no rational basis for the distinctions the law drew among workers who are positioned identically as to the amount of control in their position, their bargaining power, their ability to control their own rate of pay, and the nature of the relationship between themselves and their customers.

10. For instance, under the revised version of the referral agency exemption, service providers who use errands-based apps like TaskRabbit (on-demand help with everyday tasks, such as handyman work) and Wag! (on-demand dog walking) were explicitly made subject to the *Borello* standard under the referral agency exemption, while service providers who used the Uber and Postmates apps still had to argue the ABC test did not apply to them. There was no rational reason to treat these apps differently when they rely on nearly identical business models. In fact, the apps are so similar that Wag! is sometimes referred to as "Uber for dogs."[2]

---

[2] *See, e.g.*, Ruth Brown, *'Uber for dogs' app has lost 3 NYC pooches in a month*, N.Y. Post (Mar. 9, 2018), https://nypost.com/2018/03/09/uber-for-dogs-app-has-lost-3-nyc-pooches-in-a-month/ (referring to "Wag" as "the app known as 'the Uber of dog-walking'"); Dante Ramos, *Can 'Uber for dogs' overcome the fear of strangers?*, Bos. Globe (July 13, 2018), https://www.bostonglobe.com/opinion/2018/07/13/can-uber-for-dogs-overcome-fear-strangers/sd7ojO1ZrVs5iITTvblkPL/story.html ("Wag is like Uber: a dispatching app … within a given market ….").

Gibson, Dunn &
Crutcher LLP

11.     The laws further undercut their supposed purpose of protecting workers by exempting the very groups their sponsors identified as particularly vulnerable.  In an official report published months before most of the exemptions were added, the Assembly Committee on Labor Employment claimed that "some of the highest misclassification rates [occur] in the economy's growth industries."  Yet AB 5 *specifically exempted* many workers in these same "growth industries," including some workers in the construction, janitorial, and hospitality industries like errand runners, event planners, and travel agents.  And AB 170 added a further exemption for newspaper carriers, even though its author believed that exempting them would lead to the "continue[d] … misclassif[ication]" of "historically misclassified" workers, such as "women of color."[3]  She explained that while the exemption was "shameful" and "play[ed] … games with workers' lives,"[4] it was "a condition of AB5's passage."[5]

12.     Applying the (dubious) principle articulated by the sponsors of AB 5, AB 170, and AB 2257—that the ABC test protects workers from the misclassification that occurred under the *Borello* test—the law made millions of workers *worse off*.  That is not a rational law.

13.     By singling out Plaintiffs for disfavored treatment, the law violated the equal protection clauses of both the California Constitution and the Fourteenth Amendment to the United States Constitution.  Even the California Court of Appeal has held the laws' sponsors like "Assemblywoman Gonzalez and others" had publicly acknowledged that it "targeted" Plaintiffs.  Those statements further show that the laws' numerous exemptions were included solely to obtain the necessary political support to

---

[3]  Katy Grimes, *How Assemblywoman Lorena Gonzalez was Forced to Author AB 170 and Voted NO on Her Own Bill*, Cal. Globe (Sept. 16, 2019), https://californiaglobe.com/section-2/how-assemblywoman-lorena-gonzalez-was-forced-to-author-ab-170-and-voted-no-on-her-own-bill/.

[4]  @LorenaSGonzalez, Twitter (Oct. 1, 2020, 10:53 a.m.), https://twitter.com/LorenaSGonzalez/status/1311725354856275969.

[5]  Katy Grimes, *How Assemblywoman Lorena Gonzalez*, *supra* note 3.

*(Cont'd on next page)*

punish Plaintiffs. The laws' sponsors have also repeatedly exhibited animus towards Plaintiffs and an intent to single out and punish Plaintiffs. For example, the author of the law, Assemblywoman Gonzalez, described Uber as engaging in "wage theft" and said that Uber's general counsel was "full of sh*t,"[6] while Assembly Speaker Anthony Rendon called the gig economy "f—g feudalism, all over again."[7] With AB 5, Rendon explained, California's lawmakers were "in a position to do something about that."[8]

14. Defendants brought their first enforcement action under AB 5 against Plaintiff Uber to enjoin it to treat all of the independent drivers who use its ridesharing app as its employees—even though those drivers have always been independent contractors and the vast majority of them did not want to be reclassified—and on an emergency interim basis. The California Superior Court and the Court of Appeal rejected all of Plaintiff Uber's arguments that the law did not apply to it and/or that it satisfied the ABC test, in part based on those courts' reading of AB 5's legislative history as singling out Plaintiffs for disfavored treatment under those laws.

15. On November 3, 2020, the People soundly rejected AB 5, AB 170, and AB 2257's disparate treatment of Plaintiffs by approving Prop 22.[9] The voters found that

---

[6] @MikeBlountSac, Twitter (Sept. 18, 2019, 12:22 p.m.), https://twitter.com/mikeblountsac/status/1174403405478936578 (quoting Assemblywoman Gonzalez; alteration in original); Lorena Gonzalez, *The Gig Economy Has Costs. We Can No Longer Ignore Them*, Wash. Post., Sept. 11, 2019, https://www.washingtonpost.com/opinions/2019/09/11/gig-economy-has-costs-we-can-no-longer-ignore-them/.

[7] Miriam Pawel, *You Call It the Gig Economy. California Calls It "Feudalism,"* N.Y. Times (Sept. 12, 2019), https://www.nytimes.com/2019/09/12/opinion/california-gig-economy-bill-ab5.html; *Aaron Abeytia, Calif. Assembly Speaker Calls Gig Economy 'F*****g Feudalism,'* KMJ Now (July 10, 2019), https://www.kmjnow.com/2019/07/10/assembly-bill-5-aaron-abeytia-report-7-10-19 (quoting Speaker Rendon).

[8] Anthony Rendon (@Rendon63rd), Twitter (July 10, 2019, 4:40 p.m.), https://twitter.com/rendon63rd/status/1149101100928159744?lang=en.

[9] Although the final tally has not yet been certified, every major news outlet has called it as approved. *See, e.g.*, Kate Conger, *Uber and Lyft Drivers in California Will Remain Contractors*, N.Y. Times (Nov. 4, 2020), https://www.nytimes.com/2020/11/04/technology/california-uber-lyft-prop-

*(Cont'd on next page)*

Gibson, Dunn & Crutcher LLP

although "[h]undreds of thousands of Californians" depend on app-based rideshare and delivery platforms "as a means of earning income while maintaining the flexibility to decide when, where, and how they work" and app-based rideshare and delivery platforms benefit "[m]illions of California consumers and businesses, and our state's economy as a whole," AB 5, AB 170, and AB 2257 "threatened to take away the flexible work opportunities of hundreds of thousands of Californians, potentially forcing them into set shifts and mandatory hours, taking away their ability to make their own decisions about the jobs they take and the hours they work."[10]   Prop 22 clarifies that service providers who use rideshare and delivery apps are independent contractors, while also requiring rideshare and delivery platform companies to offer a wide range of new protections and benefits for those independent service providers.

16.    Although Prop 22 clarifies that AB 5, AB 170, and AB 2257 do not apply to Plaintiffs and "an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's relationship with a network company" if four conditions are met,[11] Defendants continue irrationally to pursue enforcement of the superseded statutes against Plaintiff Uber and other network companies, rejecting the will of the voters and demonstrating Defendants' continued targeting of Plaintiffs and intent to single out and punish them.   Defendants also have already indicated that they will "continue to seek penalties for the time between January and the certification of the election results" in these suits brought under AB 5, AB 170, and AB 2257.[12]

---

22.html; Taryn Luna, *California Voters Approve Prop. 22, Allowing Uber and Lyft Drivers to Remain Independent Contractors*, L.A. Times (Nov. 4, 2020), https://www.latimes.com/california/story/2020-11-03/2020-california-election-tracking-prop-22; Carolyn Said, *Proposition 22, California Gig-Work Ballot Measure Backed by Uber and Lyft, Passes*, San Fran. Chron. (Nov. 4, 2020), https://www.sfchronicle.com/politics/article/Proposition-22-California-gig-work-ballot-15699651.php.

[10]   Proposition 22 art. 1.

[11]   *Id.* art. 2.

[12]   Conger, *supra* note 9.

17. The laws as they are being enforced violate the Bill of Attainder Clauses of the United States and California Constitutions by singling out a person or class for punishment. The California Court of Appeal explicitly has held that the legislators who drafted and voted for AB 5 set out to "target" particular gig companies based on their statements that these gig companies are blameworthy and deserving of censure.

18. Although AB 5, AB 170, and AB 2257 do not apply to Plaintiffs after Prop 22, and Prop 22 makes app-based drivers independent contractors, Defendants are still trying to use AB 5, AB 170, and AB 2257 to force Plaintiffs to reclassify app-based drivers as employees. Forced reclassification would violate the due process clauses of the California Constitution and the Fourteenth Amendment to the United States Constitution because it would bar independent service providers who obtain referrals from technology platforms from exercising their constitutional right to pursue their occupation of choice. These service providers have a constitutional right not to be forced to be employees when they wish to remain independent. And network companies have a constitutionally protected interest in running their businesses free from unreasonable governmental interference, including from statutes that irrationally classify and target them as a politically disfavored group.

19. Enforcement of AB 5, AB 170, and AB 2257 is legally impermissible not only under Prop 22, but also under the Contracts Clauses of the United States and California Constitutions. The on-demand economy is built upon a structure of contracts in which consumers are connected via apps with independent service providers, not employees. Company Plaintiffs entered into millions of contracts with app-based drivers (including with Individual Plaintiffs) in reliance on the pre-AB 5 framework. Forced reclassification, or imposing liability in contravention of the contracts, would completely upend this contractual landscape, and—at the very least—substantially impair the existing contractual relationships, rendering many of them invalid, and forcing Company Plaintiffs to enter into new contracts with dramatically different obligations. There is no significant and legitimate public purpose motivating this gutting

of contractual expectations—only unjustified animus.

20.    For these reasons and those set forth below, the Court should declare that AB 5, AB 170, and AB 2257 are unconstitutional and invalid, and cannot be enforced against Plaintiffs.  Such a declaration and injunction are needed to stop Defendants' lawsuits seeking injunctions, damages, penalties, restitution, and other relief through the enforcement of a patently unconstitutional law against Plaintiffs.

## **PARTIES**

21.    Plaintiff Lydia Olson is a driver who resides in Antelope, California and uses the Uber platform to get leads for passenger requests to transport passengers in the Sacramento and San Francisco Bay areas.

22.    Plaintiff Miguel Perez is an independent courier who resides in Canyon Country, California, and uses the Postmates platform to get leads for delivery requests in the Los Angeles County area.

23.    Plaintiff Postmates is a network company that operates an online marketplace and mobile app-based platform that connects individual consumers seeking to order food or other goods with local merchants (such as restaurants and retail stores), and if the consumer seeks delivery of an order, with independent couriers who use the Postmates platform to receive delivery referral notifications and choose whether to accept the consumer's offer to pick up and complete the requested delivery.

24.    Plaintiff Uber is a network company that licenses and operates online and mobile app-based platforms that connect individuals in need of goods or services with those willing to provide them.

25.    Defendant Xavier Becerra is being sued in his official capacity as the Attorney General of California.  In that capacity, he has authority to enforce AB 5, as amended by AB 170 and AB 2257.

26.    Defendant "John Doe" is a placeholder designation for any unidentified California official who has authority, or purports to have authority, to enforce AB 5 (as amended by AB 170 and AB 2257) against Plaintiffs, in the event that additional

Gibson, Dunn &
Crutcher LLP

officials must be included as defendants in this lawsuit in order to afford Plaintiffs complete relief.

## JURISDICTION AND VENUE

27.     This civil action arises under the United States Constitution and the Fourteenth Amendment thereof, the California Constitution, and 42 U.S.C. § 1983.

28.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

29.      This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) to redress deprivations "under color of any State law, statute, [or] ordinance ... of any right, privilege or immunity secured by the Constitution of the United States ...."

30.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 57.

31.     Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

32.     Venue is proper in this district under 28 U.S.C. § 1391(b).

33.     An actual controversy exists between the parties concerning the constitutionality and validity of California's worker-classification framework, as put into law by AB 5, AB 170, and AB 2257. A declaration that the statute is invalid and/or an injunction against its enforcement would resolve the controversy.

34.     A permanent injunction enjoining Defendants from enforcing the AB 5, AB 170, and AB 2257 worker-classification framework against Plaintiffs would protect Plaintiffs' constitutional rights after this proceeding ends.

## FACTS

**I.     The On-Demand Economy, Including Plaintiffs' Platforms, Offers Unprecedented Freedom and Flexibility to Independent Service Providers.**

35.     The on-demand economy allows independent service providers like Lydia Olson and Miguel Perez, along with others like them, to use the services offered by platform companies to earn money when and where they want, with unprecedented independence and flexibility. These earning opportunities have been made possible by

mobile applications operated by platform companies that connect consumers requesting certain services with independent providers of those services. Platform companies that operate these apps, like Plaintiffs, are sometimes referred to as "app-based platforms," "network companies," or "multi-sided platform companies." Such multi-sided platform companies are well-recognized and unique businesses that "offer[] different products or services to two [or more] different groups who both depend on the platform to intermediate between them." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018).

36.     Independent service providers choose to work in the modern app-based on-demand economy as a means of earning a substantial or supplementary income while maintaining the right to decide when, where, and how they work. Hundreds of thousands of Californians choose to provide these services—such as providing transportation to a passenger or delivering food, groceries, and other goods—and enjoy an unprecedented level of flexibility and freedom without the restrictions, limitations, and burdens of traditional employment.

37.     Independent service providers are able "to integrate work into their existing lifestyles, to manage it along with other work, and to assemble what amounts to a form of income insurance," thereby gaining the ability "to create their own financial stability."[13] For example, an aspiring comedian might choose to perform transportation services referred through an app so that she can attend an audition without checking with her boss. A student might choose to use a platform for delivery referrals to earn money between classes. A retiree might choose to use an app's referrals to supplement fixed income and for social interaction. A military spouse might choose to work in the on-demand economy to help ease the burdens of frequent relocation. Others might choose it as a way to supplement "traditional" full-time work or to bridge the gap between salaried positions. Many also have turned to the on-demand economy in the midst of a

---

[13]  Intuit and Emergent Research, *Dispatches from the New Economy: The On-Demand Economy Worker Study*, at 4-5 (June 2017), https://fdocuments.us/document/dispatches-from-the-new-economy-the-on-the-underlying-dynamics-affecting-the.html.

personal or public crisis, such as the pandemic, to fill income gaps caused by furloughs, layoffs, or slowdowns. Others have chosen to leave traditional employment situations specifically to be their own boss, earn more money, and enjoy the benefits and flexibility of on-demand work. In short, these independent workers can work as much, or as little, as they want in order to accommodate family, social, professional, academic, and other commitments.

38. Because app-based work empowers individuals to generate income on a flexible schedule, "[m]any people choose this mode of work, even when they have other options."[14] Even when the country was experiencing record low levels of unemployment, hundreds of thousands of Californians flocked to on-demand work. Instead of a daily commute, an outdated workplace hierarchy, and the daily grind of an inflexible 9-to-5 job, these workers enjoy the freedom to be their own bosses, set their own hours, and earn income whenever they want. Many workers and businesses likewise have turned to the flexibility and freedom of the on-demand economy since the recent global pandemic shut down in-person dining in restaurants and eliminated many jobs.[15] The on-demand economy has kept many families and merchants afloat during the pandemic, and contributed to public efforts to combat the spread of the disease by providing a means to locate app-based drivers willing to provide safe and affordable transportation or food delivery options, among many other benefits.

39. Many such app-based drivers also choose to "multi-app"—i.e., simultaneously use the apps of several app-based multi-sided platform companies. By using multiple apps at the same time (e.g., Uber, Postmates, Grubhub, and DoorDash) app-based drivers can more easily find service requests to perform, including multiple service requests at the same time, thereby maximizing their potential for earnings during the time period that they choose to make themselves available.

---

[14] Intuit and Emergent Research, *supra* note 13, at 3.

[15] Editorial Board, *The Gig Economy to the Rescue*, Wall St. J. (Mar. 18, 2020), https://www.wsj.com/articles/the-gig-economy-to-the-rescue-11584573142.

Gibson, Dunn & Crutcher LLP

40.     Ms. Olson, for example, holds an MBA from the University of California, Davis, and was employed in several management positions before becoming an independent business owner in 2011.  She runs a consulting firm that works with small businesses and churches.  Shortly after Ms. Olson started her consulting business, her husband was diagnosed with multiple sclerosis, and she was grateful that, as an independent business owner, she had the flexibility to take time off to care for him when needed.  In addition to her consulting work, Ms. Olson began using the Uber and Lyft apps for driving referrals to supplement her primary income while still maintaining the flexibility to support her husband after she experienced a sudden and temporary lull in her consulting business a couple years ago that was a potential catastrophe for her family.  Given her husband's illness and the fact that she has little or no notice of when she will have to take time off to care for him, as well as her consulting business, Ms. Olson could not give up the flexibility that she has as an independent service provider in exchange for a more traditional work arrangement.  But she can utilize the app when she is able to work to earn significant income with no prior notice to anyone, including one weekend where she made $2,000 in three days.

41.     Mr. Perez likewise has relied on the freedom and flexibility he has as an independent contractor to support his family.  He once drove a big rig as a commercial, class A truck driver for FedEx on a regular graveyard shift.  He disliked the inflexible schedule and long hours because of how little time he got to spend with his wife and children, and he found that he was constantly getting injured on the graveyard shift.  Mr. Perez's dissatisfaction led him to look for other work, and he decided to experiment with running his own on-demand business on his own terms by accepting referrals for consumers looking for rides or deliveries from several on-demand apps.  Now running his own delivery business, Mr. Perez gets to decide when he starts work and when he stops.  He is able to be his own boss and tailor his work to be present for all the important life events for his children.  He chooses which apps to use that meet his needs and can switch between them seamlessly and in his sole determination about which works best

for him.  And he has nearly doubled his earnings from when he was a truck driver, allowing his wife to quit her job and spend more time with their daughter.

42.    The app-based on-demand economy has also benefited consumers.  The advanced technologies of app-based platform companies like Company Plaintiffs have reduced the costs for consumers associated with finding and hiring independent service providers, eliminated barriers to enter markets with high initial setup costs, increased convenience for independent service providers and consumers, and lowered prices for numerous services by making it easy to connect independent service providers directly with paying consumers.  As a result, consumers "have flocked to these networked services because of the added convenience, lower prices, and higher quality services."[16] Millions of California consumers, brick and mortar businesses, and the state's economy as a whole have benefited from the services of the on-demand economy.

43.    Some of the many benefits to consumers, small businesses, and the public from the on-demand economy include providing convenient and affordable transportation, reducing impaired and drunk driving, improving mobility and access to local merchants for seniors and individuals with disabilities, providing new transportation options for families who cannot afford a vehicle, fostering growth of small businesses that are able to reach a broader market, and providing new, affordable, and convenient consumer-outreach options for local businesses and their patrons.

44.    These benefits to workers, consumers, merchants, and the public as a whole have been fueled by network companies, like Company Plaintiffs, creating and operating platforms that instantly connect independent service providers willing to perform a service with consumers willing to pay for the service.  For example, among other apps, Plaintiff Uber operates an app-based platform that connects consumers looking for a ride with drivers looking for such riders.  Plaintiff Postmates operates an app-based platform

---

[16]  Will Rinehart, *The Modern Online Gig Economy, Consumer Benefits, and the Importance of Regulatory Humility*, American Action Forum (Nov. 19, 2015), https://www.americanactionforum.org/research/the-modern-online-gig-economy-consumer-benefit-and-the-importance-of-regula/.

Gibson, Dunn &
Crutcher LLP

that connects (i) consumers wishing to purchase goods (such as food) with (ii) merchants and (iii) independent couriers willing to deliver the purchased goods. Other platform companies operate online platforms that match independent service providers with persons willing to pay someone to perform any multitude of other services.

45.   Importantly, the only services that platform companies provide are technology services provided through their platforms, such as matching services, payment processing, mapping, and data analytics that they provide to users on all sides of their platforms. Neither Company Plaintiff hires drivers or delivery persons, just like they do not hire the riders or consumers who use their platforms. They are technology companies that create and operate multi-sided platform apps, which facilitate the connection of consumers, merchants, and independent service providers, so that consumers (or businesses) can hire an independent service provider (or operator) to perform particular services.

46.   Platform companies have been an engine of economic growth, innovation, and work opportunities in California, across the country, and around the world.

47.   Instead of embracing how the on-demand economy has empowered workers, benefited consumers, and fueled economic growth, Defendants and some California legislators have irrationally attacked particular platforms. This irrational hostility towards certain platforms in the on-demand economy, and Plaintiffs in particular, led to the passage of AB 5, AB 170, and AB 2257. California Assemblywoman Lorena Gonzalez, who has been the most vocal about her animus towards Plaintiffs, was the lead drafter, sponsor, and proponent of the bills.

**II.   Assembly Bill 5's Sponsors Profess to Codify and Extend the Reach of the *Dynamex* "ABC Test."**

48.   On December 3, 2018, Assemblywoman Gonzalez introduced AB 5. AB 5's statement of purpose claims that "misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality." AB 5 § 1(c). According to the bill, its intent is "to ensure workers

who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave." *Id.* § 1(e).

49.    In a thinly veiled attempt to conceal AB 5's sponsors' irrational intent to target and harm platform companies, the bill purported to do this by "codify[ing] the decision of the California Supreme Court" in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018), and "clarify[ing] the decision's application in state law."  AB 5 § 1(d).  But the statute does much more than that.

50.    *Dynamex* adopted a three-factor test—or "ABC test"—to determine whether a worker is an independent contractor or an employee for purposes of the California Industrial Welfare Commission's wage orders.  4 Cal. 5th at 956–57.  The wage orders are "quasi-legislative regulations" that "impose obligations relating to the minimum wages, maximum hours, and a limited number of very basic working conditions (such as minimally required meal and rest breaks) of California employees." *Id.* at 913–14 & n.3.

51.    The wage order at issue in *Dynamex* imposes wage and hour obligations for companies that "employ" workers, which the wage order defines as "to engage, suffer, or permit to work."  Construing that specific language, *Dynamex* concluded that workers are presumed to be employees for purposes of the wage order unless three conditions are met:

A.  The individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact;

B.  The service is performed outside the usual course of the business of the employer; and

C.  The individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

4 Cal. 5th at 957.

Gibson, Dunn &
Crutcher LLP

17

52.     Although *Dynamex* applied the ABC test solely for purposes of California's wage orders, AB 5 went much further, codifying the ABC test for not only wage orders but also for the entirety of the California Labor Code *and* the California Unemployment Insurance Code.  *Compare Garcia v. Border Transp. Grp., LLC*, 28 Cal. App. 5th 558, 561, 570 (2018) (explaining that "*Dynamex* did not purport to [apply] in every instance where a worker must be classified as either an independent contractor or an employee," and that "*Dynamex* does not apply" to "non-wage-order claims" (emphasis omitted)).

53.     Specifically, Section 2 of AB 5 added a new provision to Article 1 of the California Labor Code, § 2750.3, that incorporates the ABC test verbatim.  Section 3(i) of AB 5 amended the definition of "employee" in the Labor Code by linking that definition to the new Section 2750.3.  And Section 4 of AB 5 amended Section 606.5 of the Unemployment Insurance Code to incorporate the definition of "employee" in Section 621 of the Code—a provision that, in turn, Section 5 of AB 5 amends to also incorporate *Dynamex*'s ABC test.  The Unemployment Insurance Code requires employers to pay unemployment insurance contributions for all of their employees.  *See* Cal. Unemp. Ins. Code §§ 976, 977.  Employers must also account for administrative costs associated with withholding unemployment insurance taxes, paying them over to the State, keeping extensive records of these transactions, and complying with recurring reporting requirements.  *See id.* §§ 13020, 13021.

54.     AB 5 also transformed employment regulations regarding the withholding of taxes into potential sources of criminal liability.  Any employer who fails to withhold or pay these taxes, regardless of intent, could be guilty of a misdemeanor and subject to fines up to $1,000 for each occurrence and up to one year of imprisonment.  *Id.* § 2118.  Additionally, employers who fail to comply with numerous Unemployment Insurance Code provisions and regulations are potentially liable for dozens of penalties.  *See generally* Cal. Emp't Dev. Dep't, Penalty Reference Chart (2018), https://www.edd.ca.gov/pdf_pub_ctr/de231ep.pdf.  Just a handful of examples include fines for failing to report the hiring of a new or rehired "employee" within the prescribed

time limit (Cal. Unemp. Ins. Code § 1088.5(e)); failing "to file a report of wages of each of [its] workers on magnetic media or other electronic means" (*id.* § 1114(b)); filing a false statement of withholdings to an "employee" (*id.* § 13052); or failing to supply a required "identifying number" (*id.* § 13057(a)).

55.     AB 5 stated that it may be enforced by the California Attorney General or "a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association." AB 5 § 2(j).  The lawsuits could seek injunctive relief "to prevent the continued misclassification of employees as independent contractors," "[i]n addition to any other remedies available." *Id.*

56.     Assemblywoman Lorena Gonzalez, the bill's lead sponsor, publicly "ask[ed] the 4 big City Attorneys offices to file for injunctive relief on 1/1/20" against Company Plaintiffs under AB 5.[17]  Several months later, Defendants filed for injunctive relief and monetary remedies against Uber.

### III.   The Exemptions in Assembly Bill 5 Rolled Back the *Dynamex* ABC Test for Millions of Workers.

57.     AB 5 spent only a few lines adopting *Dynamex*'s ABC test for the California Labor Code and California Unemployment Code, and the remaining several pages outlining a litany of exemptions to the ABC test—reinstating the *Borello* test that AB 5's sponsors claimed was insufficient protection for workers.  Thus, despite its stated intent of *guaranteeing* basic rights of employees to all workers by expanding application of the ABC test, the vast majority of the statute was a morass of complicated provisions *exempting* dozens of occupations from that test.  This haphazard scheme manifestly contradicted its stated purpose.

---

[17]   @LorenaSGonzalez, Twitter (Nov. 21, 2019, 8:05 a.m.), https://twitter.com/lorenasgonzalez/status/1197546573158158336.

Gibson, Dunn & Crutcher LLP

58.    AB 5 did not identify any data, studies, reports, or other justification or explanation for any of these exemptions.

59.    In fact, many of the exemptions directly contradict the legislative findings regarding the most vulnerable industries and occupations.  For instance, in an official report published months before most of the exemptions were added, the Assembly Committee on Labor Employment claimed that "some of the highest misclassification rates [occur] in the economy's growth industries, including home care, janitorial, … construction, hospitality, security, and the app-based 'on demand' sector."  Bill Analysis, Assembly Comm. on Labor and Emp't, AB 5, at 2 (Cal. July 5, 2019).  Yet AB 5 *specifically exempted* many workers in these same "growth industries," including some workers in the "construction" industry like construction truckers (§ 2750.3(f)(8)) and subcontractors (§ 2750.3(f)), workers in the "janitorial" industry like house cleaners (§ 2750.3(g), (g)(2)(C)),[18] and workers in the "hospitality" industry like errand runners, event planners, and travel agents (*id.*).

60.    The legislature added these carve-outs to AB 5 solely for interest groups, labor unions, and specific industries, many of which have historically donated heavily to the campaigns of AB 5's co-sponsors.

61.    Under Section 2(a)(2) of the statute, the exempted workers are governed by the alternative "control-of-the-work" test from *Borello*—*not* the *Dynamex* ABC test.  The *Borello* test uses a multi-factor balancing analysis—where no one factor is dispositive—to determine whether a worker is an employee or an independent contractor.  Courts applying this test already had concluded that app-based drivers are independent contractors, not employees.  *See*, *e.g.*, *Lawson v. Grubhub Inc.*, 302 F. Supp. 3d 1071, 1093 (N.D. Cal. 2018) (concluding after a bench trial that a worker who provided delivery services to customers via Grubhub "was an independent contractor" and "not an employee" under the *Borello* test).  And regulatory authorities have held that

[18]  House cleaners are no longer exempt, after AB 2257.

Gibson, Dunn & Crutcher LLP

they are not employees.  FLSA2019-6, Op. Letter from Keith E. Sonderling, Acting Administrator, Wage and Hour Division, U.S. Dep't of Labor (Apr. 29, 2019) at 7, https://www.dol.gov/whd/opinion/FLSA/2019/2019_04_29_06_FLSA.pdf (independent service providers are not "employees" under federal law).  Signaling that the exemptions were meant to allow independent contractor relationships to continue for the exempted businesses, Assemblywoman Gonzalez stated that *Borello* "was weighted heavily against … trying to prove misclassification."[19]

62.    The exemptions were not just an incremental or piecemeal approach to remedying purported worker misclassification.  They *eliminated* the *Dynamex* standard for the wage order claims of millions of exempted workers to which *Dynamex* previously applied.  The *Dynamex* rule applied generally to all wage order claims.  Under AB 5, these workers' claims are now subject to the *Borello* standard that AB 5's sponsors said provides insufficient protection to workers.  AB 5, AB 170, and AB 2257 even state that the exemptions that "would relieve an employer from liability … shall apply retroactively to existing claims and actions to the maximum extent permitted by law."  AB 5 § 2(i)(2); AB 170 § 1(i)(2); AB 2257 § 2785(b).  The exemptions thus removed *Dynamex*'s more burdensome and restrictive standard for significant segments of the California economy.  For example, more than 2.2 million direct sellers are exempted under just one exemption.[20]  If AB 5's sponsors believed that *Borello* "was weighted heavily against … trying to prove misclassification" and their purpose in authoring AB 5 was to prevent misclassification caused by this more flexible standard, it was irrational to add these exemptions, which glaringly defy, and directly contradict, that logic.

---

[19]  @LorenaSGonzalez, Twitter (Dec. 25, 2019, 10:57 a.m.), https://twitter.com/LorenaSGonzalez/status/1209911130522406913?s=20.

[20]  Press Release, Direct Selling Ass'n, Direct Selling Association Applauds Direct Seller Exemption in California AB 5 (Sept. 26, 2019), https://www.dsa.org/events/news/individual-press-release/direct-selling-association-applauds-direct-seller-exemption-in-california-ab-5.

63.     The statutory exemptions carved out many types of specifically chosen workers that bear the traditional hallmarks of independent contractors, but did not carve out many others possessing the exact same characteristics, including app-based drivers who use network companies' platforms.

64.     AB 5's exemptions included:

    a.  <u>Workers engaged in occupations requiring licenses</u>, *see* AB 5 § 2(b)(1)–(4), (6), including:

        i.  licensed insurance agents and other individuals requiring an insurance license;[21]

        ii.  licensed individuals in the medical profession (physicians, surgeons, dentists, podiatrists, psychologists, and veterinarians), so long as they are providing medical or professional services to or by a health care entity;[22]

        iii.  licensed attorneys, architects, engineers, private investigators, and accountants;

        iv.  registered or licensed securities broker-dealers or investment advisers; and

        v.  commercial anglers working on American (but not foreign) vessels.

    b.  <u>Direct sales workers as described in Section 650 of the California Unemployment Insurance Code</u>.  AB 5 § 2(b)(5).

        i.  A direct sales salesperson generally is anyone "engaged in the trade or business of primarily in person demonstration and sales

---

[21]  Specifically, "[a] person or organization who is licensed by the Department of Insurance pursuant to Chapter 5 (commencing with Section 1621), Chapter 6 (commencing with Section 1760), or Chapter 8 (commencing with Section 1831) of Part 2 of Division 1 of the Insurance Code."  AB 5 § 2(b)(1).

[22]  AB 5 exempted from the provision concerning medical occupations "employment settings currently or potentially governed by collective bargaining agreements."  AB 5 § 2(b)(2).

Gibson, Dunn & Crutcher LLP

presentation of consumer products, including services or other intangibles, in the home."   Cal. Unemployment Ins. Code § 650(a).

c. Professional service providers, *see* AB 5 § 2(c)(2)(B)(i)–(xi), including those who provide:

    i.  marketing services;

    ii.  human resources services;

    iii.  travel agent services;

    iv.  graphic design services;

    v.  grant writing services;

    vi.  fine artist services;

    vii.  services of agents licensed by the U.S. Treasury to practice before the IRS;

    viii.  payment processing agent services;

    ix.  photography or photojournalist services;

    x.  services provided by a freelance writer, editor, or newspaper cartoonist;[23] and

    xi.  services provided by a licensed esthetician, electrologist, manicurist, barber, or cosmetologist.

d. Real estate licensees and repossession agencies. AB 5 § 2(d)(1)–(2).

e. "[B]usiness-to-business contracting relationship[s]," subject to certain conditions.  AB 5 § 2(e).

f. Contractors and subcontractors in the construction industry, subject to certain conditions.  AB 5 § 2(f).

---

[23] This exemption applied to a "freelance writer, editor, or newspaper cartoonist who does not provide content submissions to the putative employer more than 35 times per year." AB 5 § 2(c)(2)(B)(x).

g. <u>Subcontractors providing construction trucking services</u>—*i.e.*, "hauling and trucking services provided in the construction industry"—subject to certain conditions.  AB 5 § 2(f)(8).

h. <u>Referral agencies and service providers</u>, subject to certain conditions.  AB 5 § 2(g).

i. <u>Motor clubs and individual motor club service providers</u>.  AB 5 § 2(h).

65.    There was no rhyme or reason to these nonsensical exemptions.  Some were so ill-defined or entirely undefined that it is impossible to discern what they include or exclude.  Others excluded some types of workers (e.g., dog groomers), but not others performing substantively identical work (e.g., groomers of other animals who also do not fit within AB 5's definition of "animal services").  For example, it made no sense to exempt certain workers depending on what *type* of license they have.  Drivers who transport passengers and use the Uber app for black car referrals, for instance, obtain government-issued business licenses for their transportation businesses.  Yet AB 5 treated them differently from other independent workers who must obtain licenses for *their* businesses like real estate agents, subcontractors providing construction trucking service, or numerous other service providers who use referral agencies—all of whom have substantially similar training, accreditation, and industry-protective considerations to the drivers and couriers who use the Uber and Postmates apps.  There was no rational basis for such disparate treatment.

66.    Many of AB 5's exemptions were wholly arbitrary.  For example, a commercial fisherman is exempt when working on an American vessel, but not a foreign vessel.  *See* AB 5 § 2(b)(6).  A picture hanger who meets certain criteria is exempted, but not a picture framer who meets the same criteria.  *See id.* § 2750.3(g)(2)(C).  And a freelance editor or writer was exempt if she published 35 submissions per year per "putative employer," but not if she published 36.  *See id.* § 2(c)(2)(B)(x).  When asked about this 35-submission cutoff, Assemblywoman Gonzalez said:  "Was it a little

arbitrary? Yeah."[24] News articles reported that "employers and workers in other industries including truck drivers, therapists, and entertainers [were] unclear how AB 5 w[ould] affect them, leading some to take precautionary measures and others to say they hope[d] a court w[ould] clarify the matter soon."[25]

67.    AB 5's exemptions contradict its stated purpose. If the purpose of AB 5 was to prevent perceived widespread misclassification and address income inequality by ratcheting *up* the legal standard for worker classification, then it was irrational to ratchet *down* the legal standard for the dozens of exempted businesses and occupations and millions of California workers—taking the legal standard the Legislature apparently preferred (*Dynamex*) and removing it for wage order claims, reinstating the legal standard the Legislature apparently deemed insufficient (*Borello*).

68.    The exemptions also undercut all of the legitimate rationales that could theoretically be derived from the claims put forth in its legislative history. For example, in an official report published months before most of the exemptions were added, the

---

[24] Katie Kilkenny, *"Everybody Is Freaking Out": Freelance Writers Scramble to Make Sense of New California Law*, The Hollywood Reporter (Oct. 17, 2019), https://www.hollywoodreporter.com/news/everybody-is-freaking-freelance-writers-scramble-make-sense-new-california-law-1248195 (internal quotation marks omitted) (quoting Assemblywoman Gonzalez). It already has triggered companies such as Vox Media to announce they are ending contracts with hundreds of freelancers in California. *See, e.g.*, Megan McArdle, *How a law aimed at Uber and Lyft is hurting freelance writers*, Washington Post (Dec. 19, 2019), https://www.washingtonpost.com/opinions/2019/12/19/how-law-aimed-uber-lyft-is-hurting-freelance-writers/; James Barrett, *Democrat Behind Law That Just Got Hundreds Of Writers Fired Says It's 'Not All Bad,' Gets Smacked, Apologizes*, Daily Wire (Dec. 17, 2019), https://www.dailywire.com/news/sb-nation-writers-lose-jobs-because-of-new-california-law-democrat-behind-law-says-its-not-all-bad-gets-smacked-apologizes. This aspect of the law is challenged in a lawsuit pending in this Court. *See American Society of Journalists and Authors, Inc. v. Becerra*, No. 2:19-cv-10645 (C.D. Cal. filed Dec. 17, 2019). That lawsuit and outcry prompted Assemblywoman Gonzalez to solicit ideas for ways to carve-out even more workers—but not those who use on-demand apps—on Twitter, less than two weeks before the law took effect. @LorenaSGonzalez, Twitter (Dec. 19, 2019, 9:47 a.m.), https://twitter.com/ LorenaSGonzalez/status/1207719056272310273.

[25] Christine Mai-Duc & Lauren Weber, *It Isn't Just Uber: California Prepares for New Gig Worker Rules...and Confusion*, Wall St. J. (Dec. 17, 2019), https://www.wsj.com/articles/confusion-in-california-as-gig-worker-law-set-to-take-effect-11576590979.

Assembly Committee on Labor Employment claimed that "some of the highest misclassification rates" occurred in certain industries and yet exempted workers in many of those same industries.  And there also is no rational reason for those workers in these industries who are not exempted to be subject to different tests and standards under AB 5, while identically situated workers in these industries with the same working conditions are not, and the legislative record cannot support any such disparate treatment of Plaintiffs from those exempted in these industries.

69.    Another report in the legislative history by the Senate Committee on Labor, Employment and Retirement claims that all of the exemptions are justified by a set of "occupation-by-occupation rules" that purportedly support exempting a select few industries.  *See* Sen. Comm. on Labor, Pub. Emp't, and Ret., AB 5, 2019–20 Reg. Sess., at 8 (Cal. July 8, 2019).  The four asserted criteria are "market strength," "rate setting," "relationship between contractor and client (such as whether a company 'maximize[s] rate setting and market position' for its contracting service providers)," and "technological neutrality."  This report was issued months before dozens of AB 5's exemptions were added, and those later-added exemptions both undermine these purported justifications *and* irrationally discriminate among similarly situated workers. For example, yard cleaners and picture hangers do not engage in high-paying professions exerting "market strength."  Many exempted professions do not set their own rates. Construction contractors do not always "maximize rate setting and market position" for their subcontractors and "improve contractor earnings compared to other contractors or employees" when many select their subcontractors based on minimum bids.[26]  And certainly none of these factors distinguish on-demand workers who find leads for dog-walking or yard cleaning through referral agencies from on-demand workers who find

---

[26] *See* Diana Ramos, *Bid Like a Winner: The Master Builder's Guide to Construction Bidding*, smartsheet.com (Nov. 3, 2017), https://www.smartsheet.com/construction-bidding ("In order to create successful construction bids, remember the industry golden rules: Start with highly accurate cost estimates, and submit the lowest bid of all the competing contractors.").

leads for performing other types of services, but were not granted an express exemption in AB 5.

70.     Independent service providers who obtain referrals through technology platforms exhibit all the indicia of independent contractors upon which the report from the Senate Committee on Labor, Employment and Retirement claims to justify the exempted industries.  They are free from the direction and control of platform companies because they retain full autonomy to use network companies' platforms to find leads when and where they please and to choose from among those leads as they see fit, whether that means choosing the most profitable routes or declining routes that take them outside the specific locations in which they choose to work.  Like the examples given in the report, they can choose to work with their own set of clients and turn down certain customers or businesses that do not meet their business models, and they exercise control over the rates and fares they charge and accept.  In the same way, they maintain bargaining power by choosing when to login or logout based on customer demand and the available rates and which competitor apps to use based upon the best earning potential in the areas in which they choose to find leads.  Likewise, the nature of the relationship between network companies and independent service providers meets the criteria discussed in the report.  For example, both Company Plaintiffs ensure that independent service providers are paid in a timely manner (no later than one week after performing services), and help independent service providers maximize their rates and market position by facilitating peak pricing during times of high demand and assisting independent service providers in disputes with customers.  Thus, it is irrational to carve out a few favored classes purportedly on the basis of these criteria and refuse to exempt many others, including network companies and app-based drivers, that satisfy as many or more of these criteria than the exempted groups.

71.     In fact, this same committee report acknowledged that the law should exhibit "[t]echnological [n]eutrality" in that independent service providers in the sharing economy should not be treated differently from those working for traditional businesses

solely on the basis of the technology they use to find customers. *Id.* at 10. Yet the exemptions directly contradicted this by applying *Borello* to favored traditional workers while applying *Dynamex* to certain independent service providers who use app-based platforms and are similar in all relevant respects.

72.     For example, there is no rational reason why an individual who chooses to earn income by direct selling Tupperware is exempt, and yet, if that same person earns extra income by offering driving services, there was (prior to Prop 22) no exemption. AB 5 exempts direct sellers who meet the conditions for exclusion from the definition of "employment" set out in Section 650 of the Unemployment Insurance Code. AB 5 § 2750.3(b)(5). But these direct sellers are similarly situated to independent service providers in all relevant respects. Each retain control over the customers they work with, where and when they work, and how they interact with their customers. Moreover, independent service providers like Ms. Olson and Mr. Perez meet both of the requirements in Section 650 of the Unemployment Insurance Code for exemption from the definition of "employment." First, "all of the remuneration" for the services performed by them "is directly related" to "the performance of services," rather than "to the number of hours" they work. Cal. Unemployment Ins. Code § 650(b). Second, their services are performed "pursuant to a written contract" that provides that they "will not be treated as an employee with respect to those services for state tax purposes." *Id.* § 650(c). Yet these direct sellers are subject to the more flexible *Borello* standard while independent service providers were subject to the more rigid *Dynamex* standard. And like these workers, since the inception of platform companies, on-demand workers have never been classified as employees and have settled expectations in their status as independent contractors.

73.     The same is true for a yard cleaner, pool cleaner, dog groomer, dog walker, or local mover eligible under the referral agency exemption. *See* AB 5 § 2(g). Many app-based drivers meet the various criteria set out in the exemption, just as the exempted independent workers do: They are sole proprietors, totally free from the direction and

control of network companies, meet licensing requirements where applicable, provide services in their own name, use their own vehicles, are free to maintain their own clienteles without any restrictions, free to use competitor platforms, free to accept or reject clients and set their own hours, and are not penalized for rejecting leads.  Yet certain types of service providers who use apps to find customers (like those who use Company Plaintiffs' apps) were not exempted prior to Prop 22, while yard cleaners, dog groomers, dog walkers, pool cleaners, and local movers were (and are).  These exempted workers are indistinguishable from app-based drivers, who were not exempted— including, but not limited to, in their bargaining power, their ability to control their own rate of pay, and the nature of the relationship between the worker and the client.  The exemptions of similarly situated workers and not others is wholly irrational.  Such exempted on-demand work like yard cleaning, dog grooming, pool cleaning, or mowing also does not require distinctly different training, accreditation, or industry-specific considerations than the work excluded from the exemption, and such exempted work is not subject to any particular unique idiosyncrasies such as infrequent demand for such services as compared to the non-exempted categories of work.

74.    Further, the various exemptions in AB 5 provided criteria for obtaining the carve-out, but then went on to name only specific workers and industries eligible for the exemption, thereby excluding many other similarly situated workers and industries who also meet all of those criteria without any rational reason for doing so.  For example, the "referral agency" exemption listed ten requirements a service provider must meet in order for a business doing business with the service provider to qualify as an exempted "referral agency":

- The service provider must be a sole proprietor, partnership, limited liability company, limited liability partnership, or corporation;

- The service provider is free from the control and direction of the referral;

- The service provider has a business license, business tax registration, or state contractor's license, if required by law;

- The service provider delivers services to the client under service provider's name, rather than under the name of the referral agency;

- The service provider provides its own tools and supplies to perform the services;

- The service provider is customarily engaged in an independently established business of the same nature as that involved in the work performed for the client;

- The service provider maintains a clientele without any restrictions from the referral agency and the service provider is free to seek work elsewhere, including through a competing agency;

- The service provider sets its own hours and terms of work and is free to accept or reject clients and contracts;

- The service provider sets its own rates for services performed, without deduction by the referral agency; and

- The service provider is not penalized in any form for rejecting clients or contracts.

AB 5 § 2(g).  App-based drivers are similarly situated with workers eligible for this exemption in all relevant respects:

- As individuals doing business in California, they are sole proprietors.

- They are free from the control and direction of platform companies.

- They meet applicable licensing requirements.

- They provide services under their own name, which is displayed prominently on network company platforms and made clear to customers.

- They use their own vehicles.

- They own their own independently established businesses providing the same services they provide to customers using network company platforms to connect with them.

- They are free to work elsewhere, including through competing platforms, and are free to maintain a clientele without any restrictions.

- They set their own hours and terms of work and are free to accept or reject clients.

- They exercise control over the rates and fares they charge and accept.

- They are not penalized in any way for rejecting leads.

75.     Yet network companies and app-based drivers were excluded from the exemptions, which were given to handpick sixteen highly specific industries, including photographers (but not photojournalists), tutors (but not language interpreters), yard cleaners (but not arborists), persons who perform minor home repairs (but not persons who perform minor office or car repairs), house cleaners (but not house sitters or office cleaners), pool cleaners (but not chimney cleaners), picture hangers (but not picture framers), furniture assemblers (but not furniture repairers), and dog walkers and groomers (but not groomers of other animals who also do not fit within AB 5's definition of "animal services").[27]  It was irrational for the Legislature to protect these chosen few favored industries while excluding countless others who can and do meet the same exact criteria specified in the exemption.

76.     The requirement that a service provider be a "business entity" defined as a "sole proprietor, partnership, limited liability company, limited liability partnership, or corporation" was no limitation at all, and was not a rational justification for exempting some handpicked service providers and excluding others.  Any person doing business in California as an individual, including independent service providers who use app-based platforms, are sole proprietors under California law.  For example, Ms. Olson and Mr. Perez are business entities under AB 5's definition, and therefore are no different from those who are exempted under the referral agency exemption.

77.     Like many of the exempted service providers named in the referral agency exemption, app-based drivers bear all the hallmarks of independent contractors.  They exhibit self-direction by exerting independence and control of their work by choosing when, how, and where they do business, and they have the freedom to innovate in order to stand out in the marketplace.  They also exert the same independence and control in choosing how to interact with their customers.  For example, Mr. Perez has built his own

---

[27]  In response to pressure from interest groups, the Legislature has since added additional exemptions for photojournalists and language interpreters (along with many other occupations).  *See* AB 2257.

delivery business by cultivating relationships with local merchants from which he regularly delivers.  They exhibit skill by choosing the best or most profitable routes and developing innovative strategies to gain an advantage over the competition.  For example, Mr. Perez has developed creative ways to deal with unique delivery opportunities and challenges in his community.  Over time, he has learned the best ways to find customer parking and restaurant parking.  He has also learned shortcuts, streets to avoid during the day, and which areas have a lot of merchants that customers want deliveries from.  He knows which restaurants to accept deliveries from and which to avoid, because for example they take too long to prepare food.  All of that comes from the skill and experience he has developed by running his own business.  Moreover, by choosing when to login and provide services, they exhibit self-pricing.  And they exercise control over the rates and fares they charge and accept.  They also have the ability to work shorter or less frequent terms.  For example, Ms. Olson logs in to the Uber app only on an as-needed basis, when she needs supplemental income from her driving business.  She often starts using the Uber app on the spur of the moment when it suits her schedule and abruptly stops when her husband needs her.  And they exert independence and control over their work location.  Like others, Ms. Olson chooses her own areas to drive, and she can and does decline passengers when they are requesting trips that are inconvenient for her or outside her desired work location.  Put simply, independent service providers exhibit all the traditional characteristics of independent contractors, and they do not differ materially from the exempted independent contractors.  Yet AB 5 arbitrarily picked winners and losers among service providers whose work shares these same characteristics.

78.     Similarly, the occupational exemptions carve out a handpicked class of medical professionals like podiatrists, psychologists, and veterinarians, AB 5 § 2750.3.(b)(2), but not many other similarly situated medical professionals like occupational therapists, speech therapists, optometrists, nurse practitioners, physician assistants, radiation therapists, licensed professional clinical counselors, marriage and

family therapists, licensed clinical social workers, respiratory therapists, audiologists, and cardiopulmonary perfusionists.

79.     Moreover, even assuming *arguendo* that the exemptions identify some industries in which the nature of the relationship between companies and service providers makes it more likely that workers in those industries will satisfy a given test regarding their classification as employees or independent contractors, there is no rational reason to apply a *different test* to those industries.   Applying a different test altogether stacks the deck against the targeted companies, and attempts to choose winners and losers arbitrarily.

80.     AB 5 also provided temporary exemptions for handpicked industries, naming them specifically while giving no other industry additional time to comply with its sweeping obligations.   These include newspaper delivery persons exempted until 2021 (AB 170 § 1(b)(7)), certain construction subcontractors exempted until 2022 (AB 5 § 2(f)), licensed manicurists exempted until 2022 (*id.* § 2(c)), and commercial fisherman exempted until 2023 (*id.* § 2(b)(6)).   There is no rational reason to grant these industries and service providers a temporary reprieve while requiring immediate compliance from all disfavored industries and service providers.   Rather, these reprieves are purely the result of political pressure.

81.     Assemblywoman Gonzalez, the author of AB 170, admitted that she "had no other choice" but to add the exemption for newspaper carriers "as a condition of AB5's passage," even though she believed it would cause "continue[d] … misclassif[ication]" of "historically misclassified" workers, such as "women of color."[28]  Assemblywoman Gonzalez's bill exempts newspaper carriers from the ABC test, subjecting them to the more lenient *Borello* standard, even though she admitted that

---

[28]  Katy Grimes, *How Assemblywoman Lorena Gonzalez*, *supra* note 3.

*(Cont'd on next page)*

Gibson, Dunn & Crutcher LLP

"newspapers have lost nearly every case brought by carriers under *Borello*."[29]   "It's shameful that we play these games with workers' lives," she said after her exemption passed, "no matter how much we love journalism."[30]   Company Plaintiffs requested a similar temporary exemption, but the Legislature denied it.

82.    The Legislature included the exemptions and temporary reprieves as political favors or to politically favored groups without any valid legislative purpose or rational basis, to the detriment of certain disfavored platform companies.   At least one legislator warned during the debate over AB 5's passage that the legislation "undermines the principle of equal treatment under the law and deprives many Californians the right to be their own bosses, by exempting some industries over others."[31]

83.    In the months preceding the passage of AB 5, the California Labor Federation circulated a one-page form that business groups could complete to request an exemption from the statute.   These "opt out" forms were the idea of Assemblywoman Gonzalez's staff and her staff, in turn, worked to amend the bill to create additional exemptions based upon the relative interest from labor groups in the specific businesses seeking an exemption.   This process played out repeatedly and is responsible for the irrational and arbitrary results of the final bill.[32]   Assemblywoman Gonzalez touted the fact that the bill represents the union's bare political interests to irrationally benefit

---

[29] @LorenaSGonzalez, Twitter (Oct. 1, 2020, 10:53 a.m.), https://twitter.com/LorenaSGonzalez/status/1311725906914734080.

[30] @LorenaSGonzalez, Twitter (Oct. 1, 2020, 10:53 a.m.), https://twitter.com/LorenaSGonzalez/status/1311725906914734080.

[31] Katie Grimes, *California's Independent Contractors Are About to Become Dependent Employees – or Unemployed*, Cal. Globe (Dec. 17, 2019), https://californiaglobe.com/section-2/californias-independent-contractors-are-about-to-become-dependent-employees-or-unemployed/.

[32] In addition, Assemblywoman Gonzalez has promised a "part 2 to the bill," apparently to add more exemptions for politically favored groups. @LorenaSGonzalez, Twitter (Nov. 21, 2019, 7:45 a.m.), https://twitter.com/lorenasgonzalez/status/1197541485056409611?s=12.

*(Cont'd on next page)*

friends and harm others, explaining at the time of its passage in the California Assembly that "I am a Teamster …. I am the union."[33]

## IV. California Legislators Confirm in Public Statements That They Intended to Target Certain Disfavored Platform Companies.

84.   Despite the enormous benefits they have created for app-based drivers, consumers, and the public at large, network companies remain politically unpopular among California legislators and the law enforcement officials charged with enforcing their laws.  In the weeks immediately before and after the California Legislature passed AB 5 on September 11, 2019, the primary supporters of the statute, and the interest groups that lobbied for it, repeatedly disparaged certain companies in the on-demand economy and confirmed that their purpose in promoting and voting for the statute was to target and harm those network companies and benefit unions.

85.   For example, AB 5's sponsor, Assemblywoman Gonzalez, stated that AB 5 was directed at network companies, with comments such as the following:

   a.  On September 9, 2019, while defending AB 5, Assemblywoman Gonzalez accused network companies like Uber and Postmates of engaging in "wage theft."[34]

   b.  On September 11, 2019, Assemblywoman Gonzalez criticized network companies like Uber and Postmates, stating that they "rely on a contract workforce" and, according to her, AB 5 will stop such "gig economy companies" from relying on independent contractors.[35]

---

[33]   @LorenaSGonzalez, Twitter (May 30, 2019, 7:23 a.m.), https://twitter.com/lorenasgonzalez/status/1134087876390428672?s=21.

[34]   @LorenaSGonzalez, Twitter (Sept. 9, 2019, 7:29 p.m.), https://twitter.com/LorenaSGonzalez/status/1171234109999341569.

[35]   Lorena Gonzalez, *The Gig Economy Has Costs. We Can No Longer Ignore Them*, Wash. Post (Sept. 11, 2019), https://www.washingtonpost.com/opinions/2019/09/11/gig-economy-has-costs-we-can-no-longer-ignore-them/.

*(Cont'd on next page)*

c.  On September 12, 2019, Assemblywoman Gonzalez stated that California has "allowed a great many companies—including 'gig' companies such as Uber … to rely on a contract workforce, which enables them to skirt labor laws, exploit working people and leave taxpayers holding the bag."[36]

d.  On September 18, 2019, Assemblywoman Gonzalez stated that Uber's Chief Legal Counsel is "full of sh*t."[37]

e.  On September 26, 2019, Assemblywoman Gonzalez proposed legislation that would mandate that Uber publicly disclose sensitive information in its internal investigations.

f.  On November 21, 2019, in response to a tweet specifically mentioning Uber, Assemblywoman Gonzalez publicly asked the City Attorneys in California's four largest cities to immediately file for injunctive relief under AB 5 on January 1, 2020.[38]  She later clarified that the goal was to target "large companies" that run such platforms.[39]

g.  On November 25, 2019, Assemblywoman Gonzalez encouraged independent service providers to file unemployment insurance claims.[40]

---

[36]  Glenn Jeffers, *Legislature OKs Bill To Curb "Gig" Workers; Uber Vows To Ignore*, Daily Journal (Sept. 12, 2019), https://www.dailyjournal.com/articles/354215; *see also* George Skelton, *Labor Won Big With Bill To Rewrite California Employment Law—But It's Flawed*, L.A. Times (Sept. 12, 2019), https://www.latimes.com/california/story/2019-09-11/skelton-ab5-independent-contractors-california-employment-law.

[37]  @MikeBlountSac, Twitter (Sept. 18, 2019, 12:22 p.m.), https://twitter.com/mikeblountsac/status/1174403405478936578 (quoting Assemblywoman Gonzalez; alteration in original).

[38]  @LorenaSGonzalez, Twitter (Nov. 21, 2019, 8:05 a.m.), https://twitter.com/LorenaSGonzalez/status/1197546573158158336?s=20.

[39]  @LorenaSGonzalez, Twitter (Dec. 25, 2019, 10:12 a.m.), https://twitter.com/LorenaSGonzalez/status/1209899767355961344?s=20.

[40]  @LorenaSGonzalez, Twitter (Nov. 25, 2019, 2:21 p.m.), https://twitter.com/LorenaSGonzalez/status/1199090860329033728?s=20;          @LorenaSGonzalez, *(Cont'd on next page)*

h.  On November 27, 2019, Assemblywoman Gonzalez took sides in a pending litigation, opposing Uber's effort to enforce its arbitration agreement with drivers.[41]

i.  On December 29, 2019, the *Los Angeles Times* reported that Assemblywoman "Gonzalez said she is open to changes in the bill next year, including an exemption for musicians—but not for app-based ride-hailing and delivery giants."[42]

j.  On February 13, 2020, Assemblywoman Gonzalez retweeted a post by a labor organization claiming that network companies like Uber and Postmates "ARE KILLING OFF SMALL RESTAURANT BUSINESSES WHILE STEALING CLIENTELE" and calling them "HORRENDOUS."[43]

86.  Other lawmakers who supported AB 5 similarly attacked specific network companies and made clear that their vote was focused on network companies like Plaintiffs.

a.  On July 10, 2019, California Assembly Speaker Anthony Rendon defended AB 5 by stating that "[t]he gig economy is ... a continuation of hundreds of years of corporations trying to screw over workers," and

---

Twitter (Nov. 25, 2019, 1:22 p.m.), https://twitter.com/LorenaSGonzalez/status/1199075844888489984?s=20.

[41]  @LorenaSGonzalez, Twitter (Nov. 27, 2019, 4:16 a.m.), https://twitter.com/LorenaSGonzalez/status/1199663397123579905?s=20.

[42]  Margot Roosevelt, *New Labor Laws Are Coming to California. What's Changing in Your Workplace?*, L.A. Times (Dec. 29, 2019), https://www.latimes.com/business/story/2019-12-29/california-employment-laws-2020-ab5-minimum-wage.

[43]  @TheAllianceOrg, Twitter (Feb. 13, 2020, 11:42 a.m.), https://twitter.com/TheAllianceOrg/status/1228041894086602752.

*(Cont'd on next page)*

asserted that, with AB 5, "we're in a position to do something about that."[44]

    b. On September 7, 2019, California State Assemblywoman Buffy Wicks advocated for AB 5 and stated that "just because your employer uses a smartphone app, doesn't mean they should be able to misclassify you as an independent contractor."[45]

87. The California Attorney General (Defendant Becerra), along with the City Attorneys of Los Angeles, San Diego, and San Francisco, responded to Ms. Gonzalez's call and sought injunctive relief against Uber. The trial court granted their motion for a preliminary injunction.[46] In its order affirming the preliminary injunction, the California Court of Appeal found that "the[] statements by Assemblymember Gonzalez and others are consistent with" the conclusion "that the Legislature 'targeted' ride-sharing companies."[47]

88. Representatives from the California Labor Foundation, which was the principal lobbying group supporting AB 5, similarly attacked certain network companies while lobbying legislators to pass the bill:

    a. On September 11, 2019, the California Labor Foundation tweeted a link to a *New York Times* article titled: "Take That 'Gig' and Shove It: A

---

[44] @Rendon63rd, Twitter (July 10, 2019, 4:40 p.m.), https://twitter.com/Rendon63rd/status/1149101100928159744; *see also* Miriam Pawel, *You Call It the Gig Economy. California Calls It "Feudalism,"* N.Y. Times (Sept. 12, 2019), https://www.nytimes.com/2019/09/12/opinion/california-gig-economy-bill-ab5.html.

[45] @BuffyWicks, Twitter (Sept. 7, 2019, 6:57 a.m.), https://twitter.com/BuffyWicks/status/1170335312758706177?s=20.

[46] *People v. Uber Techs., Inc.*, 2020 WL 5440308, *18 (Cal. Super. Ct. Aug. 10, 2020).

[47] *People v. Uber Techs., Inc.*, 2020 WL 6193994, at *16 n.18 (Cal. Ct. App. Oct. 22, 2020).

*(Cont'd on next page)*

Gibson, Dunn & Crutcher LLP

California bill would make it harder for companies like Uber to take advantage of workers."[48]

   b.  On September 13, 2019, the California Labor Foundation tweeted a statement about AB 5 that said:  "We cannot allow technology to be used as an excuse to exploit workers."[49]

   c.  On September 18, 2019, the California Labor Foundation's Legislative Director tweeted a quotation from an article that said:  "California has the highest poverty rate of any state.  Gig jobs are part of this travesty.  By rejecting the exploitative gig business model, this victory is the most significant action against poverty, precarity & homelessness in recent memory."[50]

89.   These well-funded lobbying efforts accomplished their mission to target network companies for irrational treatment:  As enacted, AB 5 spent the majority of its text exempting dozens of occupations from its reach—after spending just a few words on its purported purpose of codifying *Dynamex*.  Absent from the long list of exemptions were the network companies targeted by its sponsors.  That was no accident.  Gonzalez vowed from the beginning that network companies would not make the list: "It's not going to happen," she pledged.[51]  And after AB 5 passed, she tweeted in celebration that she had "fought so hard for #AB5 with no gig carve-outs."[52]

---

[48] @CaliforniaLabor, Twitter (Sept. 12, 2019, 1:11 p.m.), https://twitter.com/CaliforniaLabor/status/ 1172241240903094273.

[49] @CaliforniaLabor, Twitter (Sept. 13, 2019, 7:33 a.m.), https://twitter.com/CaliforniaLabor/status/ 1172518612482981888.

[50] @Unionista27, Twitter (Sept. 18, 2019, 7:42 a.m.), https://twitter.com/unionista27/status/ 1174332775215714304.

[51] Margot Roosevelt, *California Bill Curbing Use of Contractors Would Not Exempt Uber, Lyft, Other Tech Firms*, L.A. Times (Mar. 26, 2019), https://www.latimes.com/business/la-fi-uber-lyft-employee-contractor-bill-20190326-story.html.

[52] @LorenaSGonzalez, Twitter (Sept. 22, 2019, 12:16 p.m.), https://twitter.com/LorenaSGonzalez/status/1175851372526194689.

*(Cont'd on next page)*

Gibson, Dunn &
Crutcher LLP

90.     On January 6, 2020, in response to additional lobbying, Assemblywoman Gonzalez introduced a new bill, AB 1850 (which eventually became AB 2257 to ensure it would become immediately effective upon passage under a special rule), that would expand the exemption for photographers, photojournalists, freelance writers, editors, and newspaper cartoonists by lifting the 35-submission limit for those industries.   On February 6, 2020, she announced that she would "be rolling out a number of asks, initiatives and bill language to help ease the implementation of AB5" for selected businesses based on "hundreds of meetings" with interest groups.[53]   Yet again, these proposed changes included no consideration of an exemption or other relief for network companies like Company Plaintiffs, whom she irrationally disfavored.

91.     In addition, the Legislature proceeded to consider more than 30 bills that would amend AB 5, including dozens creating additional carve-outs for favored industries or workers, which were eventually added to AB 2257 as well.  *See*, *e.g.*, SB 963, 2019-20 Reg. Sess. (Cal. 2020) (referees and umpires in youth sports).   Still, AB 5's sponsors remained unwilling to even consider such an exemption for network companies and app-based drivers.

92.     Their efforts to readily add exemptions for myriad industries while simultaneously refusing even to consider an exemption for the disfavored companies in the gig economy demonstrate their willingness to drastically narrow AB 5's application—in contravention of its stated purpose—so long as it still burdens the targets of their irrational animus.   AB 5, AB 170, and AB 2257's chief sponsor, Assemblywoman Gonzalez, made that clear, stating during the legislative debate over AB 2257's revisions that she would consider specific amendments to the bill's voluminous exemptions only if there was no way that "*Uber* will [be able to] just say"

---

[53]  @LorenaSGonzalez, Twitter (Feb. 6, 2020, 1:14 p.m.), https://twitter.com/LorenaSGonzalez/status/1225528217487978503.

*(Cont'd on next page)*

Gibson, Dunn &
Crutcher LLP

it might fall within them.[54]   Among the "numerous" "explicit[] exempt[ions]" for "business sectors, professions, and commercial relationships," the California Court of Appeal noted a "conspicuous absence of an express exemption for ride-sharing companies," and had "little doubt the Legislature contemplated that those who drive for Uber and Lyft would be treated as employees under the ABC test."[55]

93.    Assemblywoman Gonzalez's reaction to Prop 22 also reflects the animus she harbors towards Plaintiffs.  She changed her name on Twitter to "Lorena #NoOnProp22," and stated that she is "proud to stand .... against" the sponsors of Prop 22, whom she called "greedy billion-dollar corporations that want to cheat [workers]."[56] She said that Uber is "coming for every middle class job left in America,"[57] and has "never done anything willfully to help [its] workforce."[58]  She "liked" tweets calling Uber a "venture-capital monstrosit[y]"[59] and comparing its business model to Auschwitz[60] and to a trolley running over workers gagged and bound to the tracks.[61]

---

[54] Cal. S. Comm. on Labor, Pub. Emp't, & Ret., at 1:47:20-1:147:48 (Aug. 5, 2020) (statement of Lorena Gonzales), https://www.senate.ca.gov/media/senate-labor-public-employment-retirement-committee-20200805/audio.

[55] *People v. Uber Techs., Inc.*, 2020 WL 6193994, at *11, *16 (Cal. Ct. App. Oct. 22, 2020).

[56] @LorenaSGonzalez,   Twitter   (Oct.   14,   2020,   6:21   p.m.), https://twitter.com/LorenaSGonzalez/status/1316549690544910336.

[57] @LorenaSGonzalez,   Twitter   (Oct.   2,   2020,   8:38   a.m.), https://twitter.com/LorenaSGonzalez/status/1312054302802731008.

[58] @LorenaSGonzalez,   Twitter   (Oct.   15,   2020,   9:10   p.m.), https://twitter.com/LorenaSGonzalez/status/1316954691700461568.

[59] @MattLech,   Twitter   (Oct.   15,   2020,   1:47   p.m.), https://twitter.com/MattLech/status/1316843148056854529.

[60] @RickPaulas,   Twitter   (Oct.   15,   2020,   11:42   a.m.), https://twitter.com/RickPaulas/status/1316811652373852160.

[61] @daguilarcanabal,   Twitter   (Oct.   15,   2020,   10:05   a.m.), https://twitter.com/daguilarcanabal/status/1316787307777724417.

*(Cont'd on next page)*

Gibson, Dunn &
Crutcher LLP

She retweeted another tweet (in which her picture appears) claiming that "Prop 22 supports slave labor."[62]

94.     In short, the principal legislative supporters and lobbyists behind AB 5 have had one goal in mind:  target network companies for disfavored treatment.[63]

**V.    California Legislators Pass AB 2257 to Further Exempt Millions More California Workers, Including Many Referral Agencies, While Expressly Excluding Referral Agencies That Facilitate Transportation, Courier, or Delivery Services.**

95.     AB 2257 added a laundry list of new occupations, rolling back the protections of the ABC test for millions more California workers.  *See* AB 2257 §§ 1, 2 (repealing Cal. Lab. Code § 2750.3 and replacing it with new sections containing new exemptions).

96.     AB 2257 created several entirely new categories of exemptions while expanding others.  The new categories include:

> a.  The following occupations related to sound recordings or musical compositions:
>
>> i.   recording artists, subject to certain conditions;
>>
>> ii.  songwriters, lyricists, composers, and proofers;
>>
>> iii. managers of recording artists;

---

[62] @shamannwalton, Twitter (Oct. 12, 2020, 10:36 a.m.), https://twitter.com/shamannwalton/status/1315707953769410560.

[63] This animus is a widely recognized fact.  *See, e.g.*, David Brunori, *Contractors, Employees and the Sharing Economy:  SALT in Review*, Law360.com (Sept. 20, 2019), https://www.law360.com/tax-authority/articles/1201352/contractors-employees-and-the-sharing-economy-salt-in-review ("While [AB 5] does not actually say it, it is clearly aimed at modern companies like Uber and Lyft—and increasingly more businesses in the sharing economy space."); Bonnie Kristian, *How California's New Gig Economy Law Could Put Freelancers Out of Business* (Oct. 24, 2019), https://theweek.com/articles/873453/how-californias-new-gig-economy-law-could-freelancers-business ("A.B. 5's primary target is gig employers like ridesharing apps Uber and Lyft, whose drivers are classified as contract workers, not employees."); Rachel Uranga, *Port Truckers Brake for AB 5*, L.A. Bus. J. (Oct. 4, 2019), https://labusinessjournal.com/news/2019/oct/04/port-truckers-brake-ab5logistics-companies-drivers/ ("AB5 takes direct aim at ride-share services Uber Technologies Inc. and Lyft Inc ….").

iv.  record producers and directors;

v.  musical engineers and mixers engaged in the creation of sound recordings;

vi.  musicians engaged in the creation of sound recordings, subject to certain conditions;

vii.  vocalists, subject to certain conditions;

viii.  photographers working on recording photo shoots, album covers, and other press and publicity purposes;

ix.  independent radio promoters; and

x.  any other individual engaged to render any creative, production, marketing, or independent music publicist services related primarily to the creation, marketing, promotion, or distribution of sound recordings or musical compositions.  *See* Cal. Lab. Code § 2780(a)(1)(A)–(J).

b. Musicians or musical groups participating in single-engagement live performance events, subject to certain conditions.  *See id.* § 2780(b).

c. Individual performance artists, subject to certain conditions.  *See id.* § 2780(c)(1).

d. The relationship between data aggregators and individuals providing feedback to data aggregators, subject to certain conditions.  *See id.* § 2782(a).

e. "[T]he relationship between two individuals where[] each individual is acting as a sole proprietor or separate business entity … performing work pursuant to a contract for purposes of providing services at the location of a single-engagement event," subject to certain conditions.  *Id.* § 2779.

97.  AB 2257 expanded the exemption for licensed professions to include the following additional occupations:

Gibson, Dunn & Crutcher LLP

a. "[P]erson[s] who provide[] underwriting inspections, premium audits, risk management, or loss control work for the insurance and financial service industries." *Id.* § 2783(a).

b. Licensed landscape architects. *See id.* § 2783(c).

c. Manufactured housing salespeople. *See id.* § 2783(f).

d. People working for foreign exchange programs. *See id.* § 2783(i).

e. Amateur umpires, referees, and other competition judges. *See id.* § 2783(j).

98. AB 2257 also expanded the exemption for contracts for professional services to include services provided by:

a. Videographers and photo editors, subject to certain conditions. *See id.* § 2778(b)(2)(I)(i).

b. Photographers, photojournalists, videographers, and photo editors when providing content to a digital content aggregator. *See id.* § 2778(b)(2)(I)(ii).

c. Translators, copy editors, and illustrators, subject to certain conditions. *See id.* § 2778(b)(2)(J).

d. Content contributors, advisors, producers, narrators, and cartographers who provide services for journals, books, periodicals, evaluations, or other publications, or for educational, academic, or instructional works in any format or media, subject to certain conditions. *See id.* § 2778(b)(2)(K).

e. "Master class" teachers. *See id.* § 2778(b)(2)(M).

f. Appraisers. *See id.* § 2778(b)(2)(N).

g. Registered, licensed professional foresters. *See id.* § 2778(b)(2)(O).

99. AB 2257 also expanded the exemption for occupations subject to the Business and Profession Code to include home inspectors as defined in Section 7195 of the Business and Professions Code. Cal. Lab. Code § 2778(b)(2).

Gibson, Dunn &
Crutcher LLP

100.  AB 2257 also expanded the exemption for business-to-business contracts to include contracts between businesses and public agencies and businesses and quasi-public corporations.  *Id.* § 2776(a).

101.  Finally, AB 2257 dramatically expanded the exemption for referral agencies and service providers, expressly including *any and all* referral agencies that meet its requirements except a handful of disfavored referral agencies like Plaintiffs (*see id.* § 2777(b)(2)(B) ("Under this subparagraph, referrals for services shall include, *but are not limited to* …." (emphasis added))), and adding the following enumerated services expressly exempted:

       a.  Web design,

       b.  Consulting,

       c.  Youth sports coaching,

       d.  Caddying,

       e.  Wedding planning,

       f.  Wedding and event vendors, and

       g.  Interpreting services.

*See id.*

102.  Like AB 5, AB 2257 continued to single out Plaintiffs for disfavored treatment while making its sponsors' irrational targeting even more express.  Even as AB 2257 dramatically expanded the breadth of the referral agency exemption, it also added new language providing that referrals for services "do not include" "delivery, courier, [or] transportation" services.  *Id.* §§ 2777(b)(2)(C), 2779(c).  This language was added specifically to exclude companies like Plaintiffs, after this Court had previously noted that "[f]ood delivery for Uber Eats and Postmates would likely fall under" the referral exemption for "people who run errands."  Prelim. Inj. Hr'g Tr. at 9:5–7; *see also* Cal. Lab. Code § 2777(b)(2)(B) ("[R]eferrals for services shall include … errands ….").

103.  But for the irrational exclusion in AB 2257, Plaintiffs would have fallen within the AB 5 version of the referral exemption because picking people up and

1  dropping them off, picking up food, and delivering groceries are all "errands," and all
2  the other referrals exemption criteria were met.

3      104.   This new version of the referral agency exemption arbitrarily excluded
4  Uber and Postmates while exempting other errands-based apps like TaskRabbit (on-
5  demand help with everyday tasks, including cleaning and handyman work) and Wag!
6  (on-demand dog walking).   All four platform apps are designed to refer customers
7  looking for services to service providers willing to provide them.   The service providers
8  who use TaskRabbit and Wag! have the same patterns of use as the "drivers" and
9  "couriers" who use Uber and Postmates; some of the service providers use the apps to
10  work roughly the same number of hours as they would at a traditional 9-to-5 job, while
11  others use them only occasionally.   The relationship between the service providers and
12  their customers who connect via the apps is also the same:   While some customers
13  develop relationships with particular service providers, most just log into the app to find
14  whoever is available when they happen to need the service.   In fact, the apps are so
15  similar that Wag! is sometimes referred to as "Uber for dogs."[64]   There is simply no
16  rational basis for treating Uber and Postmates differently from other errands-based apps
17  or the specified and limitless other types of platforms that will now qualify for exemption
18  under the open-ended structure of the referral agency exemption.

19      105.   The exemption for tutors was also expanded to include not only those who
20  develop and teach their own curriculum, but also those who "teach[] curriculum that is
21  proprietarily and privately developed, or provide[] private instruction or supplemental
22  academic enrichment services by using their own teaching methodology or techniques."
23  *Id.* § 2777(b)(5).   The new, expanded exemption even covers tutors who teach school-

24

25
26  [64] *See, e.g.*, Ruth Brown, *'Uber for Dogs' App Has Lost 3 NYC Pooches in a Month*, N.Y. Post (Mar. 9, 2018), https://nypost.com/2018/03/09/uber-for-dogs-app-has-lost-3-nyc-pooches-in-a-month/ (referring to "Wag" as "the app known as 'the Uber of dog-walking'"); Dante Ramos, *Can 'Uber for Dogs' Overcome the Fear of Strangers?*, Bos. Globe (July 13, 2018), https://www.bostonglobe.com/opinion/2018/07/13/can-uber-for-dogs-overcome-fear-strangers/sd7ojO1ZrVs5iITTvblkPL/story.html ("Wag is like Uber: a dispatching app … within a given market ….").
27
28

1    created curriculums, so long as the tutors do not contract with the schools to teach

2    students in a classroom setting. *Id.*

3         106.   *All* of these millions of newly exempted workers have lost the purported

4    protection they once enjoyed under the *Dynamex* decision and are now subject to the

5    *Borello* standard that AB 5's sponsors said was insufficient to protect workers.  This

6    morass of exemptions simply underscores that the Legislature's purpose in passing these

7    amendments was to harm Plaintiffs, not protect workers.  Indeed, it even went so far as

8    to ensure that untold and unidentified referral agencies that have not even been created

9    yet would be exempt from the law so long as they were not Plaintiffs.

10        107.   AB 2257 further reenacted most of the irrational distinctions of AB 5 and

11   minted a laundry list of new ones, picking winners and losers between similarly situated,

12   and *even identical*, occupations.   For example, the law exempts "photographer[s],

13   photojournalist[s], videographer[s], or photo editor[s]" who meet certain conditions, but

14   not "photographer[s], photojournalist[s], videographer[s], or photo editor[s]" who meet

15   those same conditions, but happen to work in the "motion picture[]" industry.  Cal. Lab.

16   Code § 2778(b)(2)(I)(i).   AB 2257 also exempts "photographers" who shoot "album

17   covers" (Cal Lab. Code § 2780(a)(1)(H)), but not "photographers" who work in "[f]ilm

18   or television" (Cal. Lab. Code § 2780 (a)(2)(A)).   And while AB 2257 does *not* exempt

19   "publicists" (Cal. Lab. Code § 2780(a)(2)(B)), it *does* exempt "*independent music*

20   *publicists*" (Cal. Lab. Code § 2780(a)(1)(J)).   Similarly, musical groups performing in

21   single-engagement live events are exempt if they're a rock band, a jazz ensemble, or a

22   choir, but not if they're a symphony orchestra.  Cal. Lab. Code § 2780(b)(1)(A).  Brass

23   bands who perform at live, single-engagement events are exempt if they perform in a

24   stadium, but not if they perform at an amusement park.  *Id.*  And musicians who perform

25   at live, single-engagement events are exempt if they perform in ballets, but not if they

26   perform in musical theatre productions.  *Id.*  There is simply no rational explanation for

27   treating these similar, and even *identical*, occupations differently, particularly when they

28   meet the same conditions.

108.   Like AB 5, AB 2257 also relies on arbitrary cut-offs.   Musical groups headlining single-engagement live performance events are exempt if there are 1,500 spectators, but not if there are 1,501.  Cal. Lab. Code § 2780(b)(1)(B).   They are also exempt if they perform at a festival that sells 18,000 tickets per day, but not if they perform at a festival that sells 18,001.  Cal. Lab. Code § 2780(b)(1)(C).

109.   And yet, in commenting on the preliminary injunction that almost shut down Uber and Lyft in California based on AB 5, Assemblywoman Gonzalez stated that "no one [wa]s forcing Uber and Lyft to throw hundreds of thousands of workers out in the cold," and that it would be a "[s]hame on th[ose] corporations" and "a mean-spirited tactic" for them to seek any "special exemption" from AB 5 or AB 2257.[65]   She further exhorted that "Uber & Lyft can quit crying now & work on reclassifying their drivers as employees," again declaring "[s]hame on them" for highlighting the job losses that would result from the enforcement of AB 5 against them in the manner she intended.[66] These comments, among others, stand in stark contrast to her treatment of other industries and reveal her intent to target and harm only network companies by the passage of AB 5.

110.   Assemblywoman Gonzalez further has said the intent of AB 5 was to target disfavored network companies like Plaintiffs and the new exemptions were meant to exclude groups that were merely "caught up" by that objective.  She promised AB 2257 would "provide relief for individuals and individual areas that really did get caught up" and to "fix" AB 5 to focus on "companies like Uber and Lyft."[67]

---

[65]  Laura Acevedo, *Uber, Lyft Could Shut Down in California Over AB5*, ABC News (Aug. 20, 2020), https://www.10news.com/news/local-news/uber-lyft-could-shut-down-in-california-over-ab5.

[66]  Matt Reynolds, *Uber and Lyft Avoid Shutdown After Court Delays Injunction*, Am. Bar Ass'n (Aug. 21, 2020), https://www.abajournal.com/news/article/uber-and-lyft-avoid-shutdown-after-court-delays-injunction.

[67]  Cal. Assemb. Comm. on Labor & Emp't, at 32:50–33:17, 34:39–35:49 (May 20, 2020) (statement of Lorena Gonzalez), https://www.assembly.ca.gov/media/assembly-labor-employment-committee-20200520/audio.

Gibson, Dunn & Crutcher LLP

111.   For example, AB 2257 removed the 35-article limit for journalists and freelance writers in response to a lawsuit brought by them in part under the Equal Protection Clauses of the United States and California Constitutions, apparently in recognition that AB 5's exemption was entirely irrational and AB 5 might be found unconstitutional as a result.  *See* Cal. Lab. Code § 2778(b)(2)(J).

112.   In the words of Assemblywoman Gonzalez, the purpose behind AB 2257 was to "provide relief to the writers who reached out to me.  They were right.  I was wrong.  We're trying to make sure they can fulfill their situation as soon as possible.  The musicians who work so hard.  …  We never intended for a band member to be another band member's employee if they're … just playing on the weekends or here and there.  You know, we are working through these."[68]  She touted that the new and expanded exemptions would provide "[m]ore flexibility for musicians, journalists, photographers, creatives, interpreters & translators."[69]

113.   The Legislature also made AB 2257's new exemptions retroactive and took extraordinary "urgency" legislative measures to ensure the bill's multitude of new exemptions and specific exclusion of Plaintiffs from the revised referral agency exemption would provide immediate relief to all the newly exempted categories and prevent Plaintiffs from asserting the referral agency exemption as part of their defense strategy in ongoing and active AB 5 litigation, as Plaintiffs had been doing to that point.

114.   As one California senator warned during the bill's passage, AB 2257 "den[ied] … the equal protection of the laws" because, as "[legislators] [had] been saying … all along," the bill "picked winners and losers," creating carveouts for some, while "leav[ing] out … thousands" of others.[70]

---

[68]   *Id.* at 2:02:26–2:03:06.

[69]   @LorenaSGonzalez, Twitter (Sept. 4, 2020, 3:27 a.m.), https://twitter.com/lorenasgonzalez/status/1302010300615417856.

[70]   Cal. Senate Floor Session, at 5:17:40–5:18:19 (August 31, 2020) (statement of Patricia Bates), https://www.senate.ca.gov/media/senate-floor-session-20200831/audio.

**VI.   Substantial Civil and Criminal Penalties May Attach to State and Private Enforcement Actions against Plaintiffs.**

115.   As explained above, AB 5 codified the ABC test in a new Section 2750.3 of the Labor Code, which AB 2257 renumbered as Section 2775(b) of the Labor Code. Dozens of provisions of the Labor Code provide criminal penalties for violations, in addition to any civil penalties that also may attach.

116.   A few examples of the criminal penalties in the Labor Code that network companies could be threatened with if Defendants continue to try to enforce AB 5, now as amended by AB 2257, against them in the manner consistent with the sponsors' stated intent include:

    a.  Labor Code § 553: Misdemeanor for violation of provisions related to overtime, meal periods, alternative workweeks, makeup work time, and rest days.

    b.  Labor Code § 1199: Misdemeanor punishable by a fine and/or imprisonment for up to 30 days for failing to pay minimum wage.

    c.  Labor Code § 225: Misdemeanor for violating certain provisions regarding wage withholdings.

    d.  Labor Code § 226.6: Misdemeanor punishable by a fine of up to $1,000 and/or imprisonment of up to one year for failing to comply with itemized paystub requirements.

    e.  Labor Code § 227: Felony punishable by imprisonment of up to five years and/or a fine of up to $1,000 for failing to make certain required payments to a health or welfare fund, pension fund, vacation plan, or similar benefit fund.

117.   AB 5 also extended the ABC test to the Unemployment Insurance Code, which imposes civil penalties for various violations, including:

Gibson, Dunn &
Crutcher LLP

a. Unemployment Insurance Code § 1088.5(e): Fine of $24 per employee for failing to report the employee's hire within a specified time.

b. Unemployment Insurance Code § 1112(a): Penalty of 15% for failure to pay unemployment contributions when due.

c. Unemployment Insurance Code § 1126.1: Fine of $100 per unreported employee for failure to register as an employer.

118. The Private Attorneys General Act also authorizes employees to sue to recover civil penalties for Labor Code violations, including misclassification. *See* Cal. Labor Code § 2698 *et seq.* Employees may sue on behalf of themselves, other employees, or the State of California. In addition to seeking any civil penalties that the Labor and Workforce Development Agency may assess under the Labor Code, the Act allows the private plaintiffs to seek a civil penalty of $100 "for each aggrieved employee per pay period" for an "initial violation," and $200 "for each aggrieved employee per pay period for each subsequent violation." *Id.* § 2699(f)(2).

119. The Labor Code further allows the Labor Commissioner to seek similar penalties. On August 5, 2020, the Labor Commissioner sued Plaintiff Uber in reliance on AB 5's arbitrary classifications, seeking such damages and penalties. *Garcia-Brower v. Uber Techs., Inc.*, No. RG 20070281 (Cal. Sup. Ct. Alameda Cty).

## VII. The People of California Approve Proposition 22.

120. On November 3, 2020, the People of California decisively approved Prop 22, repudiating AB 5's and AB 2257's disparate treatment of Plaintiffs. Although the final tally has not yet been certified, it stands at 58.5% Yes with 100% of precincts reporting, and every major news outlet has called it as approved.[71] "Results will be

---

[71] Cal. Sec'y of State, *State Ballot Measures - Statewide Results*, https://electionresults.sos.ca.gov/returns/ballot-measures (last visited Nov. 9, 2020); *e.g.*, Kate Conger, *Uber and Lyft Drivers in California Will Remain Contractors*, N.Y. Times (Nov. 4, 2020), https://www.nytimes.com/2020/11/04/technology/california-uber-lyft-prop-

*(Cont'd on next page)*

Gibson, Dunn & Crutcher LLP

certified by December 11, 2020."[72]  Prop 22 will take effect on "the fifth date after the Secretary of State files the statement of the vote."[73]

121.   Prop 22's core purpose is "to protect the basic legal right of Californians to choose to work as independent contractors with rideshare and delivery network companies throughout the state."[74]   In approving Prop 22, the voters found that "[h]undreds of thousands of Californians" are using app-based rideshare and delivery platforms "as a means of earning income while maintaining the flexibility to decide when, where, and how they work."[75]  These workers include, for example, "parents who want to work flexible schedules while children are in school; students who want to earn money in between classes; retirees who rideshare or deliver a few hours a week to supplement fixed incomes and for social interaction; military spouses and partners who frequently relocate; and families struggling with California's high cost of living that need to earn extra income."  And the People reaffirmed that "[m]illions of California consumers and businesses, and our state's economy as a whole, also benefit from the services of people who work as independent contractors using app-based rideshare and delivery platforms."[76]   These many benefits include "convenient and affordable transportation for the public, reducing impaired and drunk driving, improving mobility for seniors and individuals with disabilities, providing new transportation options for

---

22.html; Taryn Luna, *California Voters Approve Prop. 22, Allowing Uber and Lyft Drivers to Remain Independent Contractors*, L.A. Times (Nov. 4, 2020), https://www.latimes.com/california/story/2020-11-03/2020-california-election-tracking-prop-22; Carolyn Said, *Proposition 22, California Gig-Work Ballot Measure Backed by Uber and Lyft, Passes*, San Fran. Chron. (Nov. 4, 2020), https://www.sfchronicle.com/politics/article/Proposition-22-California-gig-work-ballot-15699651.php.

[72] Alex Padilla, *What to Expect During the California Vote Count Process*, Oct. 29, 2020, https://admin.cdn.sos.ca.gov/press-releases/2020/ap20-107.pdf.

[73] Cal. Const. art. II § 10(a).

[74] Proposition 22 art. 1 (adding Cal. Bus. & Prof. Code § 7450).

[75] *Id.*

[76] *Id.*

*(Cont'd on next page)*

Gibson, Dunn & Crutcher LLP

families who cannot afford a vehicle, and providing new affordable and convenient delivery options for grocery stores, restaurants, retailers, and other local businesses and their patrons."[77]

122.    The voters further found that, despite the overwhelming benefits of app-based independent work, "recent legislation" like AB 5 and AB 2257 "has threatened to take away the flexible work opportunities of hundreds of thousands of Californians, potentially forcing them into set shifts and mandatory hours, taking away their ability to make their own decisions about the jobs they take and the hours they work."[78]    Thus, "[p]rotecting the ability of Californians to work as independent contractors throughout the state using app-based rideshare and delivery platforms is necessary" to preserve their autonomy and independence and "preserv[e] access to app-based rideshare and delivery services that are beneficial to consumers, small businesses, and the California economy."[79]

123.    Accordingly, Prop 22 classifies service providers who use rideshare and delivery apps to find leads, like Ms. Olson and Mr. Perez, as independent contractors. Specifically, it provides that "an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's relationship with a network company" if four conditions are met: (1) the network company "does not unilaterally prescribe" when drivers "must be logged into the" app; it (2) "does not require the app-based driver to accept any specific rideshare service … request"; it (3) "does not restrict the app-based driver from performing rideshare services" using other apps; and it (4) "does not restrict the app-based driver from working in any other lawful occupation or business."[80]    Thus, independent service providers who use Company Plaintiffs' apps are

---

[77]  *Id.*

[78]  *Id.*

[79]  *Id.*

[80]  *Id.* art. 2.

independent contractors, not employees.  Prop 22 explicitly displaces previous law on this point:  App-based drivers are independent contractors "notwithstanding any other provision of law, including, but not limited to, the Labor Code, the Unemployment Insurance Code, and any orders, regulations, or opinions of the Department of Industrial Relations or any board, division, or commission within the Department of Industrial Relations"—i.e., notwithstanding AB 5, AB 170, and AB 2257 (or any other provision of law).[81]

124.  Prop 22 also recognizes that app-based independent service providers "deserve economic security."[82]  Thus, in addition to protecting their freedom, Prop 22 provides these service providers with a wide range of new benefits and protections not available under current law.  These include minimum compensation levels, insurance to cover on-the-job injuries, automobile accident insurance, health care subsidies for qualifying drivers, protection against harassment and discrimination, and mandatory contractual rights and appeal processes.[83]

**VIII. Defendants Are Enforcing California's Irrational Worker-Classification Scheme Against Plaintiffs, Flying in the Face of the People's Expressed Will.**

125.  California legislative and executive officials are nonetheless attempting to nullify the People's will, enshrined into law through Prop 22, by continuing to attempt to enforce the now-superseded AB 5, AB 170, and AB 2257 against Plaintiffs.

126.  Assemblywoman Gonzalez explicitly added authorization for the city attorneys of California's largest cities to bring enforcement actions under AB 5 against Plaintiffs—later expanded in AB 2257 to include district attorneys as well.

127.  On May 5, 2020, California Attorney General (Defendant Becerra), along with city attorneys, brought an action against Plaintiff Uber and Lyft under AB 5,

---

[81] *Id.*

[82] *Id.* art. 1.

[83] *See id.* art. 4.

1    seeking reclassification of all on-demand workers who use their rideshare apps from

2    independent workers to employees, restitution, and penalties.

3         128.   On June 25, 2020, Defendants also sought an unprecedented mandatory

4    preliminary injunction under AB 5 against Plaintiff Uber (as well as network company

5    Lyft) to force the immediate reclassification of all app-based drivers who use their

6    rideshare platforms to employees.  They did not cite a single case from any jurisdiction

7    that had ever ordered such a mass reclassification of any group of workers on a

8    preliminary basis before a full and fair trial and fact-gathering.  Defendant Becerra has

9    not brought a similar action against any other type of platform company.

10        129.   Plaintiffs have always asserted and continue to assert that AB 5's worker-

11   classification scheme is a vague and incoherent statute that does not accomplish what its

12   sponsors have stated they sought to achieve.  Plaintiffs maintain that (among other

13   things) they are not and never were hiring entities under its classification scheme and

14   can establish that the independent service providers who use their platforms are not

15   employees under the ABC test.[84]

16        130.   Nevertheless, the enforcers of California worker-classification laws (such

17   as Defendant Becerra) have sought irrationally to enforce the statutes against Plaintiff

18   Uber and continue to threaten to do the same against Plaintiff Postmates—even after the

19   People decisively approved Prop 22.

20

21

_____

22   [84] In arbitrations in California and New York, Plaintiffs have prevailed in establishing
     that the app-based drivers who use their platforms are not employees under the "ABC
23   test."   The federal government has likewise concluded that independent service
     providers are not employees under the Federal Labor Standards Act or the National
24   Labor Relations Act.  *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter
     FLSA2019-6, at 7 (Apr. 29, 2019) (recognizing that app-based on-demand workers
25   are "independent contractors" under the Fair Labor Standards Act); Advice
     Memorandum from Jayme L. Sophir, Assoc. Gen. Counsel, Div. of Advice, Nat'l
26   Labor Relations Bd. to Jill Coffman, Reg'l Dir., Region 20, Nat'l Labor Relations
     Bd. 15 (Apr. 16, 2019) (concluding that UberX and UberBLACK drivers are
27   independent contractors under the National Labor Relations Act).  Nothing in this
     Complaint should be read to waive or forfeit any argument Plaintiffs would make in
28   an enforcement action brought against them under AB 5 or otherwise.

*(Cont'd on next page)*

Gibson, Dunn &
Cruther LLP

131.   In particular, on August 10, 2020, the San Francisco Superior Court entered a preliminary injunction against Uber that, among other things, "enjoined and restrained [Uber and Lyft] from reclassifying their Drivers as independent contractors" under AB 5 "[d]uring the pendency of th[e] action."[85]   The California Court of Appeal affirmed the trial court's order, even after recounting evidence of various harms to Uber, drivers, and the public, and in spite of its assumption that "the harm to defendants could be fairly considered grave or irreparable."[86]

132.   Although Prop 22 classifies independent service providers who use app-based rideshare and delivery apps as independent contractors *going forward*, Defendants still intend to seek penalties for the time period prior to Prop 22's approval.[87]   For example, even after Prop 22's approval, Defendants continue to litigate their enforcement action against Uber and Lyft, and there are private suits brought under these unconstitutional laws still pending against Plaintiffs.[88]

133.   And Defendants have not agreed to vacate the *forward-looking* injunction they received under AB 5—even though the injunction cannot stand under Prop 22.  To the contrary, three days *after* the voters overwhelmingly passed Prop 22, the California Labor Commissioner filed an amended complaint in a wage-and-hour suit against Plaintiff Uber that continues to seek forward-looking injunctive relief to force Uber to

---

[85]   *People v. Uber Techs., Inc.*, 2020 WL 5440308, at *18 (Cal. Super. Ct. Aug. 10, 2020).

[86]   *People v. Uber Techs., Inc.*, 2020 WL 6193994, at *1, *20, *22 & n.22 (Cal. Ct. App. Oct. 22, 2020).

[87]   Conger, *supra* note 9 (indicating that the state will "continue to seek penalties for the time between January and the certification of the election results.").

[88]   *See* Joel Rosenblatt, Robert Wilkens-Iafolla, & Erin Mulvaney, *Uber Won Its Prized Contractor Status for Drivers. Now What?*, Bloomberg (Nov. 4, 2020), https://www.bloomberg.com/news/articles/2020-11-04/uber-won-its-prized-contractor-status-for-drivers-now-what?sref=YPmZkkO0 (quoting attorney who has repeatedly sued network companies like Uber for alleged misclassification as opining that the "majority" of service providers who use ride-sharing and delivery apps "can still sue" for claims arising before Prop 22's approval).

*(Cont'd on next page)*

Gibson, Dunn & Crutcher LLP

56

treat drivers as employees based on AB 5.  And two days *after* Prop 22 passed, the San Francisco District Attorney's Office refused to withdraw its motion for a preliminary injunction to force another network company to reclassify app-based drivers—arguing that, notwithstanding the decision of the voters of California, it is possible "there is still very much a piece of the preliminary injunction that is alive" under AB 5.[89]  Defendants' persistent enforcement of AB 5, after Prop 22 superseded it, is an affront to the will of the People and to the democratic process the California Constitution enshrined as a direct means for the People to supersede the whims of government officials.

134.   The ongoing enforcement of the now-superseded worker-classification scheme against Plaintiffs is imposing economic, administrative, and other costs on Plaintiffs.  Defendants have obtained a preliminary injunction against Plaintiff Uber based on that unconstitutional law that would (at minimum) cause the loss of millions of earning opportunities for Californians who rely on the apps and (at minimum) immediately restrict more than 158,000 drivers from using Plaintiff Uber's rideshare app alone.  Although that injunction cannot stand in light of Prop 22, Defendants have not agreed to withdraw the injunction.  And Defendants continue to try to enforce the law against Uber, seeking penalties for alleged violations of AB 5 and AB 2257 prior to Prop 22's approval.

135.   Assemblywoman Gonzalez likewise has refused to accept the outcome of the passage of Prop 22 and continues to threaten Plaintiffs publicly with new "ideas" to target and punish them.  Specifically, after California voters decisively adopted Prop 22, she went on a Twitter rant professing that she had "ideas" to further target Plaintiffs and would continue to fight *specifically* against Plaintiff Uber (by name) "in CA and

---

[89]  Hannah Albarazi, *DoorDash Judge Calls Prop 22 "Game Changer" in California's Suit*, Law360 (Nov. 6, 2020).

*(Cont'd on next page)*

Nationally."[90]   She further retweeted several posts from "No on Prop 22" campaign organizations (and an individual who frivolously sued Uber to try to impose a prior restraint on Uber's political speech in support of Prop 22 on the cusp of the election), asserting Uber had not "seen the last of us" and "the fight isn't over."[91]   And she called into question the validity of the voters' choice for Prop 22 and the election results, stating the "modern-day transportation barons" "abused" "the initiative process in California" and implied that it was "dangerous" to allow them to participate "in politics."[92]   She also retweeted or liked several claims that specifically stated app-based drivers still "should be employees," affirming she believed "[e]very Californian should be personally embarrassed by this vote," and accusing Plaintiff Uber (by name) of owing hundreds of millions of dollars to California despite Prop 22 and demanding it "pay up."[93]   She further retweeted a satirical article she claimed got it "more or less" right that Prop 22 allowed "Uber, Lyft to Categorize Workers as Car Parts."[94]

## IX.   Defendants Are Irreparably Harming Plaintiffs.

136.   Defendants' efforts to enforce the now-superseded worker-classification scheme against Company Plaintiffs is imposing economic, administrative, and other

---

[90]   @LorenaSGonzalez, Twitter (Nov. 4, 2020 6:24 a.m.), https://twitter.com/LorenaS Gonzalez/status/1323994571466928128; *id.* (Nov. 3, 2020 9:59 p.m.), https://twitter. com/LorenaSGonzalez/status/1323867505815740417.

[91]   @wedriveprogress (Nov. 4, 2020 12:11 p.m.), https://twitter.com/wedriveprogress /status/1324066797755101184; *id.* (Nov. 4, 2020 12:09 p.m.), https://twitter.com/ wedriveprogress/status/1324066297815072768.

[92]   @LorenaSGonzalez, Twitter (Nov. 5, 2020, 7:52 p.m.), https://twitter.com/LorenaS Gonzalez/status/1324545260672802816.

[93]   *See, e.g.*, @LorenaSGonzalez, Twitter (Nov. 5, 2020, 3:26 p.m.) (retweet from @gigworkersrise), https://twitter.com/GigWorkersRise/status/13244782719673057 28; @LorenaSGonzalez, Twitter (Nov. 5, 2020, 3:55 p.m.), https://twitter.com/ saraflocks/status/1324485564238737408 (liking tweet from @saraflocks); @LorenaSGonzalez, Twitter (Nov. 4, 2020, 9:55 p.m.), https://twitter.com/ncougoule/status/1324228802377998339 (liking tweet from @ncougoule).

[94]   @LorenaSGonzalez, Twitter (Nov. 4, 2020, 7:42 p.m.), https://twitter.com/LorenaS Gonzalez/status/1324180263174172672.

Gibson, Dunn & Crutcher LLP

costs on network companies such as Plaintiff Uber.  Defending against enforcement actions brought under unconstitutional statutes that explicitly do not apply to Plaintiffs is costing untold sums of money and attention.

137.   Moreover, Defendants are, incredibly, still seeking to force reclassification of app-based drivers as employees—in spite of the People's clear, decisive, and legally binding pronouncement that "an app-based driver is an independent contractor." Compelled reclassification of drivers who use the Uber app would force Uber to discontinue operations in California for a significant period of time.  This discontinuation will cause the loss of millions of earning opportunities for Californians who rely on the apps and (at minimum) immediately restrict more than 158,000 drivers from using Plaintiff Uber's rideshare app alone.  For some companies, the burdens of restructuring their businesses and the potential penalties from the threatened enforcement of the classification framework could force them to stop doing business in California.

138.   Company Plaintiffs, and many other similarly situated companies in California and across the country, built their businesses by creating apps, websites, and other technologies for the on-demand economy.  These companies operate on-demand app-based platforms that connect those willing to pay for a service with those willing to provide it.  It is because independent service providers have the flexibility, freedom, and independence to pick and choose which jobs they want to perform and when they want to perform them that the business model has been so successful.  Inevitably, forced reclassification would eliminate the flexibility and entrepreneurship that is the foundation of platform-based work.

139.   Forced reclassification of workers who use Company Plaintiffs' platforms would harm many app-based drivers who need or prefer to provide services on their own schedules via the platforms that network companies operate—directly contrary to the People's expressed will "[t]o protect the basic legal right of Californians to choose to work as independent contractors with rideshare and delivery network companies

throughout the state" and "[t]o protect the individual right of every app-based rideshare and delivery driver to have the flexibility to set their own hours for when, where, and how they work."

140.   App-based drivers currently enjoy the freedom and flexibility to use multiple competitor apps simultaneously to maximize income, a practice known as "multi-apping."  Multi-apping is fundamentally impossible in an employer-employee relationship for a number of reasons.  An employee owes her employer a duty of loyalty—that is, undivided allegiance during the term of the relationship.  *Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 41 (1987); *Erhart v. BofI Holding, Inc.*, 387 F. Supp. 3d 1046, 1055 (S.D. Cal. 2019); *see also* Cal. Lab. Code § 2863 ("An employee who has any business to transact on his own account, similar to that [e]ntrusted to him by his employer, shall always give the preference to the business of the employer.").  Multi-apping by an employee would breach this duty.

141.   In addition, employers track the hours their employees work in order to pay them for all time worked and ensure compliance with minimum-wage requirements. Doing so would be impossible if an employee was multi-apping to simultaneously obtain delivery referrals from the Postmates app and rideshare referrals from the Uber app, because there would be no way to determine, for example, which company would be responsible for the time the worker waits between leads.  To ensure compliance with these wage laws, companies would either have to forbid multi-apping or establish rigid work schedules during which employees could only work using one app.  They would need to ensure maximum utilization for any time that the service provider could claim to be working, including by ensuring adequate demand for the services provided by the worker in the location and at the time that the worker was on the clock.  In all cases, reclassification would destroy the flexibility app-based drivers enjoy to quickly move between platforms to find the best work.

142.   And even absent multi-apping, network companies would have to adopt set schedules to avoid potential liability associated with periods during which employees

were logged into their apps but waiting for work or doing something else in case the right lead came along.  Employees would be incentivized to log in but decline work requests, if doing so increased the number of hours they were counted as working.  To combat this, network companies would have to require workers to schedule their work shifts in advance and accept a minimum percentage of requests during that shift.  These would further reduce worker flexibility and discretion.

143.   The compelled reclassification that Defendants seek would force many on-demand drivers "right out of a stable income stream."[95]  For example, according to one study, requiring Company Plaintiffs to reclassify app-based drivers as employees and to adopt formal work schedules for those new employees would lead to fewer earning opportunities for nearly one million workers and the loss of 80–90 percent of available on-demand work opportunities in California.[96]  Plaintiff Uber likewise estimates around 158,000 drivers in California would instantly lose access to its app under an employment model.  The displacement of hundreds of thousands of workers, including Individual Plaintiffs, who rely on the current arrangement and for whom the performance of this work is possible only if they maintain agency over the conditions in which they choose to do this work would cause them irreparable injury and immeasurable harms.

144.   In particular, each Plaintiff would suffer substantial economic and non-economic harm, as explained in more detail below.

**A.     Lydia Olson**

145.   Lydia Olson is an independent driver who uses the Uber app (and other apps) to find passengers.

---

[95]   Kristian, *supra* note 63.

[96]   David Lewin et al., *Analysis of Driver Job Losses if Gig Economy Companies Must Re-Classify Drivers as Employees Rather than Independent Contractors* 1, 3 (May 14, 2020), https://protectdriversandservices.com/wp-content/uploads/2020/05/BRG-REPORT-JOB-LOSS-SUMMARY-MAY-14-2020_FINAL.pdf; *see also* Beacon Economics LLC, *How Many Drivers Would Lyft Recruit Under a Traditional Work Arrangement?  An Analysis* 2 (Aug. 2019), https://images.kusi.com/wp-content/uploads/2019/09/Beacon-Economics-August-2019.pdf.

146.   Ms. Olson needs the flexibility that comes with being an independent service provider.  She takes care of her husband, who has multiple sclerosis.  Given his illness, it is not always foreseeable when she will be needed.  In the past, she has taken several days, or even weeks, off from work to care for him.  Thus she requires not only a stable and consistent income, but also flexibility in her hours.  It would be much harder—and perhaps impossible—to be able to care for her husband when she needs to, if she were an employee.  Ms. Olson holds an MBA from the University of California, Davis; has personal experience as an employee in several management positions; and, based on her experience, does not believe a position as an employee would provide her the flexibility she needs.

147.   Ms. Olson runs her own consulting company.  This business varies substantially in terms of how many hours it demands from her.  To help stabilize her income, she uses the Uber app to connect with riders.  As an app-based driver, when the consulting business is slower, she can pick up more opportunities on the Uber app.  When it is busier, she can use the app less frequently—or stop entirely, and pick it up again when she has more time.  She values the ability to use Uber to supplement her income as needed, sometimes a little and sometimes a lot.  That would not be possible if she had a fixed schedule, needed to work a certain number of hours per week, or was prevented from working a certain number of hours in a given week.

148.   Ms. Olson could not work for Uber as an employee.  Given her husband's illness and the fact that she has little or no notice of when she will have to take time off to care for him, she could not give up the flexibility that she has as an independent contractor.  However, her family depends on the income she makes using the Uber app.  Her consulting business does not provide guaranteed income, so her driving business provides a level of financial stability that she and her husband need.

**B.    Miguel Perez**

149.   Plaintiff Miguel Perez is a courier who uses the Postmates app to run his own delivery business.

150.  Mr. Perez previously drove a truck on the graveyard shift for FedEx Corporation.  He did not feel safe working overnight and did not like the rigidity of working a regular shift.

151.  Mr. Perez now runs his own delivery business primarily using Postmates, although he also uses many other platforms like Caviar, Grubhub, DoorDash, and Uber Eats when he finds fewer or less convenient referrals on Postmates.

152.  Mr. Perez earns approximately double what he previously earned driving for FedEx and feels safer as a result of not having to work the graveyard shift.  Because of the extra money he has made running his own delivery business, his wife was able to quit her job to spend more time with family.  Additionally, because Mr. Perez earns his income working for himself, he can deduct his business expenses from his taxes.

153.  Mr. Perez values the flexibility of working for himself.  He can take off whenever he wants to spend time with his family—whether for vacations or just to see his son play little league baseball—without requesting permission or even telling anyone.  He never has to go into an office or attend trainings or meetings.  He also can accept or decline delivery requests at his option and often does so if a delivery address is too far away, it looks like it will take too long before the food is ready, or parking will be a big problem.  He has learned the streets and merchants in the Los Angeles area well, and he sets his own pace and uses his own strategy to get deliveries to his customers efficiently.

154.  Mr. Perez does not want to work as someone else's employee again.  That would upend his life.  He would have to give up his delivery business and go back to driving a truck for a set shift.  That would deprive him of the freedom that he values and his family needs.  He also worries that he may not be able to get his business back.  The amount of harm he would suffer if he cannot be an independent on-demand worker would not be calculable in dollars and cents.  No amount of money can give him his freedom and flexibility back.

Gibson, Dunn &
Crutcher LLP

63

1    **C.    Postmates**

2    155.    Postmates is a network company that operates an online marketplace and

3    mobile platform connecting local merchants, consumers, and independent couriers to

4    facilitate the purchase, fulfillment, and, when applicable, local delivery of anything from

5    takeout to grocery goods from merchants to the consumers.  When the consumers place

6    delivery requests from the local merchants, such as restaurants or grocery stores, through

7    Postmates' App, nearby independent couriers receive a notification and can choose

8    whether to accept the consumer's offer to pick up and complete the requested delivery.

9    156.    To begin making deliveries using the Postmates app, a courier must, among

10   other things, execute a "Fleet Agreement," which provides: "The Parties intend this

11   Agreement to create the relationship of principal and independent contractor and not that

12   of employer and employee."

13   157.    Each courier is free to use the Postmates app as much or as little as he or

14   she wants—there is no set schedule, minimum-hours requirement, or minimum-delivery

15   requirement.  When a customer requests a delivery using the Postmates app, the app

16   sends basic information about the delivery request to the closest available couriers, who

17   may accept, reject, or ignore the request.  It is entirely up to them.

18   158.    Postmates relies on the independent contractor relationship recognized in

19   its contracts with couriers and enshrined in Prop 22.  An employment model would

20   seriously harm Postmates' business, including by impacting its ability to add

21   independent couriers to its platform.  This could reduce earning opportunities for

22   thousands of independent couriers in California and impact the fluid nature in which

23   Postmates' marketplace is able to meet consumer and independent courier supply and

24   demand in real time.

25   159.    Postmates' business model is built around operating an online platform that

26   connects merchants and consumers willing to pay for delivery services with independent

27   couriers willing to provide those services.  The Fleet Agreement is critical to Postmates'

28   business:  It is the mechanism by which Postmates maintains its relationships with a

skilled, flexible, and autonomous constituency of delivery service providers who work when they want, as much as they want, and where they want.

160.   Although the Postmates app operates in cities throughout the world and facilitates millions of deliveries each day, Postmates has about only 1,200 actual employees.   These employees are dedicated to sales, engineering, analytics, strategy, design, support (of merchants, couriers, and other aspects of the platform), and other functions.   Postmates' business is not staffed or structured to provide delivery services; to hire, schedule, and manage a large workforce of employee couriers; or to maintain and provide a comprehensive array of employment benefits.   An employment model would require Postmates to spend significant amounts in restructuring and staffing fees alone to construct the management and human resources infrastructure necessary to run a delivery services company, instead of a technology company with independent contractors.

161.   Additionally, Postmates' existing business model does not include any management of the independent delivery couriers in the performance of their tasks, and Postmates would have to train, retrain, discipline, and supervise the conduct of purported employee couriers in the performance of their deliveries to ensure conformity with Postmates' policies and applicable laws.

162.   An employment model would be incompatible with the flexibility attendant in their current contracts with Postmates.   The vast majority of daily deliveries that the Postmates app facilitates occur around typical meal times.   Because of the requirements in California law related to the scheduling of employee shifts, meal periods, and rest breaks, among other requirements, Postmates would be unable to ensure an efficient functioning of its platform at peak times with an employee courier system and would suffer from increased administrative and labor costs during periods with few delivery requests.

163.   Postmates relies on independent couriers having the flexibility and autonomy to pick and choose when they want to login to the Postmates app.   Postmates

1   is not responsible for ensuring that there are enough couriers in a given location to satisfy

2   demand and does not have the administrative and staffing infrastructure to do so.

3       **D.    Uber**

4       164.   Uber is a network company that develops proprietary software used to

5   create digital marketplaces, operated through app-based platforms.  Through the use of

6   proprietary algorithms, the Uber apps connect individuals in need of goods or services

7   with those willing to provide them.

8       165.   The most widely used Uber marketplace is operated through the Uber Rides

9   apps.  Riders download the Uber Rider app and independent drivers download the Uber

10  Driver app, and in combination, the apps connect riders to vehicles operated by app-

11  based drivers.  The Uber Rides apps are used in cities throughout the world and facilitate

12  the transportation of millions of riders each day.  Using the Uber Rider app, riders can

13  connect with available transportation providers based on their location, offering a variety

14  of transportation options.

15      166.   To begin using the Uber Driver app, any driver must, among other things,

16  execute a "Platform Access Agreement," which provides, in its very first section: "The

17  relationship between the parties is solely as independent business enterprises" and "[t]his

18  is not an employment agreement and you are not an employee."

19      167.   There is no typical driver who uses the Uber Driver app.  Drivers have a

20  number of individual choices that will determine their work circumstances.   Each

21  independent driver is free to use the Uber Driver app as much or as little as he or she

22  wants—there is no set schedule, minimum-hours requirement, or minimum-ride or

23  minimum-delivery requirement.  Drivers use their own vehicles and tools, manage their

24  own vehicle maintenance, oversee their own appearance and manner of serving riders,

25  and determine their own driving routes and other aspects of the rides they give to riders.

26      168.   Many drivers who use the Uber Driver app provide transportation services

27  to earn supplemental income when convenient for them while working as an employee

28  of an employer.   Other drivers accept referrals using the Uber Driver app when

convenient for them and work one or more freelance jobs, such as a property manager, realtor, or graphic designer.  Still other drivers have no employer and selectively accept referrals from the Uber Driver app, perhaps because they care for a loved one who is sick, they have small children, or they have other commitments that prevent them from regularly accepting referrals.  *See* Uber Driver Decls., *Colopy v. Uber Techs. Inc.*, No. CV-13-03826-EMC (N.D. Cal. Sept. 24, 2020), ECF Nos. 96–113; Evangelis Decl. Ex. 3, *Colopy*, No. CV-19-06462-EMC, ECF No. 95 (chart compiling declarations, demonstrating heavy variation across drivers who use the Uber app); Uber Driver Decls., *People v. Uber Tech., Inc.*, No. CGC-20-584402 (S.F. Sup. Ct.).

169.   An employment model would be inconsistent with Uber's Technology Services Agreement with drivers, deprive many part-time drivers of the opportunity to accept referrals from the Uber Drivers app, and force Uber to make radical changes to its business model.

170.   Uber's business model is built around operating an online platform that connects those willing to pay for rides or deliveries with those willing to provide those rides or deliveries through the Uber apps.  Uber's Service Agreements with drivers and delivery persons are critical to Uber's business:  They are the mechanism by which Uber maintains its relationships with a flexible and autonomous constituency of independent service providers.

171.   Although the Uber apps operate in cities throughout the world and facilitate the transportation of millions of riders and deliveries each day, Uber has only around 6,000 actual employees in California, most of whom are dedicated to technology product development—i.e., developing and operating the Uber apps and other technologies. Uber's business is not staffed or structured to provide transportation or delivery services or to hire, schedule, and manage a large workforce of drivers or delivery persons.

172.   Uber also relies on app-based drivers having the flexibility and autonomy to pick and choose when they want to login to the Uber apps.  Uber is not responsible

Gibson, Dunn &
Crutcher LLP

67

1   for ensuring that there are enough drivers or delivery persons in a given location to

2   satisfy demand.

3                                        * * *

4          173.   App-based drivers are independent contractors, as the People recognized in

5   approving Prop 22.  That is so for good reason:  An employment model would reduce

6   income-earning opportunities and create inequality and harm the middle class, in direct

7   contradiction of AB 5's stated purpose.  Many app-based drivers like Plaintiff Olson

8   participate in the sharing economy to supplement their primary sources of income, make

9   up for financial shortfalls, or find work between jobs.  But forced reclassification would

10  make workers choose between becoming an employee or not working at all, when many

11  cannot find work as an employee, cannot work as an employee because they already

12  have a full-time position, or, like Plaintiff Olson and Plaintiff Perez, cannot become an

13  employee without giving up their businesses.

14         174.   Reducing the number of drivers would mean longer wait times and reduced

15  service areas for consumers, undermining the on-demand marketplace of Uber and other

16  network companies.  Whereas app-based drivers can currently choose to take an on-

17  demand opportunity (or not) wherever they happen to be, an employment model is

18  invariably based on set shifts in a dedicated location during set hours.

19         175.   Moreover, the contracts between many network companies and app-based

20  drivers treat—and/or explicitly classify—the workers as independent contractors.  These

21  contracts make clear that the companies do not have certain obligations to the workers

22  as employees under the Labor Code, and also that the app-based drivers do not have the

23  same obligations to the network companies as they would if those companies were

24  traditional "employers."

25

26

27

28

Gibson, Dunn &
Crutcher LLP

176.    Independent contractor status, enshrined into law in Prop 22, also ensures that on-demand workers can "claim federal income tax deductions for business expenses" and other tax deductions.[97]

## COUNT I

### Declaratory Relief:  Violation of the U.S. Constitution's Equal Protection Clause

177.    Plaintiffs incorporate all other paragraphs of this Complaint.

178.    California's "worker classification scheme" as embodied by AB 5, AB 170, and AB 2257 (together, "worker classification scheme") violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because it never advanced a legitimate governmental interest and it drew classifications between network companies and non-network companies without a rational basis for distinguishing between the two groups.

179.    The worker-classification scheme is not rationally related to its stated purposes of protecting workers.  To the contrary—AB 5, AB 170, and AB 2257 remove millions of workers from the protection of the ABC test that they previously enjoyed under *Dynamex*, subjecting them instead to the *Borello* test, which the bills' sponsors claim is inadequate to protect workers.  If the California Legislature's goal in enacting these amendments was truly to extend broadly the rule of *Dynamex* in order to protect workers from perceived harms caused by purported misclassification, the statute would not contain dozens of exemptions from the ABC test—all of which affirmatively revoke the application of the ABC test that these workers received in wage order claims under the *Dynamex* decision—and the Legislature would not have rushed to seek hundreds of new exemptions for all but Plaintiffs in a revised bill just a few months later.  It would also not have specifically exempted workers in industries perceived to have higher misclassification rates, such as the construction, janitorial, and hospitality industries,

---

[97] Howard Gleckman, *Will California's New Labor Law Change the Way Gig Workers Are Taxed?*, Tax Policy Ctr. (Sept. 20, 2019), https://www.taxpolicycenter.org/taxvox/will-californias-new-labor-law-change-way-gig-workers-are-taxed.

Gibson, Dunn & Crutcher LLP

including a new *specific* exemption for such workers who use referral agencies (like Plaintiffs) to perform such services as housekeeping, picture hanging, pool cleaning, yard cleanup, or home cleaning (among others).  And it would not have handpicked workers in some industries who meet certain criteria while exempting workers similarly situated in all respects who also meet those same criteria, applying the more flexible *Borello* standard to some and applying the *Dynamex* standard to others for no identifiable reason.

180.   Where, as here, the breadth of the statute is so discontinuous with the reasons offered for it that the statute is inexplicable by anything but animus toward the class it is designed to harm, the statute lacks a rational relationship to legitimate state interests.   And where, as here, the exclusion of thousands of workers from the purportedly less flexible ABC standard for the purpose of wage orders is inconsistent with the state's asserted interest even taken on its own terms for passing the law, the law violates equal protection.

181.   The statutes also drew irrational distinctions between app-based drivers and others that perform work similar in all relevant respects, disfavoring app-based drivers relative to others who enjoyed exemptions.   Laws unconstitutionally singling out a certain class of citizens for disfavored legal status or general hardships are rare. California's worker-classification scheme is such an exceptional and invalid form of legislation.

182.   The pretextual nature of California's proffered explanations for the classification scheme's differential treatment is apparent from the face of the statutes. There is no rational distinction between network companies and many of the other companies granted exemptions under AB 5, and especially not between Plaintiffs and the platform companies exempted through the Legislature's revisions to AB 5's referral agency exemption by AB 2257.  The California legislators' focus on subjecting certain platform companies to the ABC test, and their willingness to grant a laundry list of exemptions for other categories of companies in order to spare those types of companies

the costs and burdens of complying with the classification scheme, demonstrates irrational animus against network companies in violation of their equal protection rights. This type of singling out, in connection with a rationale so weak that it undercuts the principle of non-contradiction, fails to meet even the relatively easy standard of rational basis review.

183.   And any such proffered explanation is easily undone by the Legislature's rapid response to the chaos and economic destruction caused by AB 5 to exempt dozens upon dozens of other occupations accidentally caught up by their first attempt through AB 2257's additional amendments, as well as their decision to revise AB 5's referral agency exemption (which this Court had previously indicated might apply to Plaintiffs) to establish expressly a blanket exemption for almost all other referral agency business models except Plaintiffs' (and a few other politically unpopular groups).

184.   Plaintiffs are a politically disfavored group within the California government, similar to other disfavored groups (such as "hippies," civilian gun owners, companies disfavored by unions, and Planned Parenthood) that the Supreme Court and lower courts have protected against disparate treatment in legislation.

185.   Strict scrutiny review applies because the worker-classification scheme was designed to burden, and—in spite of Prop 22—Defendants still seek to use it to burden, the fundamental rights of network companies and workers to pursue their chosen profession and determine when and how they earn a living.

186.   In addition, there is no rational basis for targeting network companies for disfavored treatment.  AB 5 and AB 2257 ostensibly exempted business-to-business services, freelance writers, grant writers, graphic designers, insurance agents, direct sellers, manicurists, hair dressers, real estate agents, recording artists, musicians, songwriters, composers, record producers, musical engineers, interpreters, independent radio promoters, film and independent production crews, publicists, proofers, competition judges, and independent service providers who use platforms to find leads for customers looking for graphic design, web design, photography, tutoring, consulting,

youth sports coaching, wedding or event planning, minor home repair, moving, home cleaning, errands, furniture assembly, animal services, dog walking, dog grooming, picture hanging, pool cleaning, or yard cleanup, captioning, and interpreting and translating services (among untold others).  Yet the independence, autonomy, and other characteristics these types of workers enjoy are similar in all relevant respects to the independent service providers who use Plaintiffs' app-based platforms.

187.   Not only is animus toward the on-demand economy the only *possible* explanation for the express exemption of a litany of similarly situated companies but not network companies, but it is also the *actual* explanation for the scheme.  The public record is filled with statements by California legislators who voted for the bill, including the sponsor of AB 5, attacking network companies specifically, targeting such companies in their support of AB 5, stating their view that AB 5 will stop the purported "unscrupulous" business practices of such companies, and urging government officials and even private citizens to sue them.

188.   This sort of malicious, irrational, and plainly arbitrary action by state officials defeats California's worker-classification law under the rational relation test.

189.   The manner in which AB 5's exemptions were created further confirms that the statute violates the Equal Protection Clause.  Many exemptions resulted from "back door" deals and political favors to industry groups—i.e., not a valid legislative purpose.[98]  For example, of all the truckers in California, only truckers who haul construction materials and tow truck drivers who tow disabled vehicles *for motor clubs* are exempted.  Network companies also sought an express exemption as the statute was moving through the California legislature, but were denied exemptions, while the Legislature then sought to ensure exemptions for untold other referral agencies and platform companies and hundreds of other companies who complained they had been

---

[98] *See* Skelton, *supra* note 36 ("How do you qualify for an exemption?  Answer: pressure and persistence.  Better also hire a lobbyist.  And, of course, it helps to be a political supporter." (internal quotation marks omitted)).

caught up in the legislators' scheme to harm and eliminate Plaintiffs' business instead. None of these dozens upon dozens of exempted companies are distinguished from network companies like Plaintiffs in any rational way—Plaintiffs are independent businesses engaged with other independent businesses run by independent service providers, these independent service providers are not performing work that is more dangerous than any of the many exempted occupations (such as home repair and moving furniture), and their business is already subject to extensive rules and regulations for its performance by the California Public Utilities Commission.

190.   Yet Defendants invoked "unions [being] down"—the same unions who lobbied for and drafted AB 5's exemptions—as a reason for Defendants' enforcement of AB 5 against Uber and Lyft specifically.  The principal sponsor of AB 5, and AB 2257's numerous exemptions for other similarly situated companies, declared she is acting as the arm for the unions to such an extent that she represents herself to be the union.  And there is no other conceivable explanation for these numerous other specific carve-outs but to secure the support of these same unions by targeting Plaintiffs for disparate and unfair treatment.

191.   Legislatures may not draw lines for the purpose of arbitrarily excluding individuals, including by doing so as a concession to one constituent but not another, when there is no other rational basis for doing so.  Yet, the sponsors of AB 5 included the exemptions solely in response to the demands of powerful interest groups.

192.   Moreover, although its legislative proponents claim that the statute would prevent "exploitation" of independent service providers, if the worker-classification scheme continues to be enforced against Plaintiffs, as Defendants have said they intend to do, it will punish them for contracting with other businesses while simultaneously carving out a laundry list of exemptions for dozens of classes of independent contractors who are, by the logic employed by AB 5's proponents, equally "exploited" by the businesses with whom they contract.  By the sponsors' logic, the worker-classification scheme makes it more likely that workers in the exempted businesses will be

Gibson, Dunn &
Crutcher LLP

"exploited," given that the statute excludes those workers from the *Dynamex* standard they would otherwise be subject to for certain wage order claims. Thus, California's worker classification scheme is so discontinuous with the reasons offered for it that it is inexplicable by anything but animus toward the class it is designed to affect, lacks a rational relationship to legitimate state interests, and violates equal protection.

193.   The public record is replete with evidence showing that California legislators supported the worker-classification scheme in an effort to isolate and harm certain platform companies, if not put them out of business. Indeed, its sponsors, public officials enforcing the scheme against Uber, and the lobbying groups who pressed its passage all have expressly stated that their intention was to put Uber out of business in California.

194.   The legislature's circuitous path to legitimate ends, when a direct path is available, shows that California's worker-classification scheme lacks a rational basis. If California wanted to provide independent service providers access to certain benefits and protections, it could have passed more direct and less-restrictive measures to achieve that end. Indeed, network companies presented multiple proposals that would ensure the protections for independent service providers the classification law purports to guarantee. For example, network companies advocated for legislation that would allow for creation of an independently administered "portable benefits" fund into which all rideshare companies would pay.[99] The fund would pay for a series of benefits chosen by drivers, including paid sick leave, paid time off, and disability coverage if a driver could not work due to an accident while driving.[100] Independent service providers would

---

[99] *See, e.g.,* Open Letter from David Rolf, President, SEIU 775, Dara Khosrowshahi, CEO, Uber, & Nick Hanauer, Founder, Civic Venture Partners, *An Open Letter to Business, Labor and Government: Building a Portable Benefits System for Today's World* (Jan. 23, 2017), https://ubernewsroomapi.10upcdn.com/wp-content/uploads/2018/01/Portable-Benefits-Principles-FINAL.pdf.

[100] *See* Uber Commc'ns & Policy Team, *Moving Work Forward in California*, Medium (Aug. 29, 2019), https://medium.com/uber-under-the-hood/moving-work-forward-in-california-7de60b6827b4.

Gibson, Dunn &
Crutcher LLP

own these benefits and keep them irrespective of what type of on-demand work they performed. The voters ultimately enacted a similar system, via Prop 22, after the Legislature rejected it out of animus towards network companies.

195. Network companies also submitted a proposal for a policy that would ensure independent service providers earn a minimum of approximately $21 per hour while on a trip, including the costs of their average expenses; receive access to benefits like paid time off, sick leave, and compensation if they are injured while driving on referrals received on a network platform; and have a collective voice to advocate on their behalf on decisions about their work.[101] Yet the classification scheme's sponsors refused to consider these proposals at all while considering and enacting exemptions for many other workers. Again, the voters had to step in, guaranteeing earnings of at least 120% of local minimum wage (plus $.30 per mile). This plainly demonstrates that the true purpose of the sponsors is to destroy the on-demand business model for Plaintiffs, not protect workers. And the multitude of additional AB 2257 exemptions since added for dozens upon dozens of other occupations, as well as the blanket exemption for referral agencies except those who facilitate transportation or delivery services (among a handful of other disfavored groups), confirmed this irrational and illegitimate intent. The fact that the laws' sponsor (and Defendants) refuse to accept the will of the People of the State of California as expressed through Prop 22's passage and continue to threaten Plaintiffs by name for continued disfavored treatment confirms the animus behind these laws.

196. The malicious and arbitrary purpose of the statutes—combined with the back-room dealing that led to their laundry list of irrational exemptions—creates a "wholly arbitrary" standard in violation of equal protection.

197. Plaintiffs have no adequate remedy at law.

---

[101] Uber, *Stand up for drivers and ridesharing* (last visited Mar. 3, 2020), https://p2a.co/H9gttWA.

## COUNT II
### Declaratory Relief:  Violation of the California Constitution's Equal Protection Clause

198.   Plaintiffs incorporate all other paragraphs of this Complaint.

199.   For substantially the same reasons as described in Count I, AB 5 violates Article 1, Section 3(b)(4) of the California Constitution.

200.   California businesses have a constitutionally protected interest in operating free from unreasonable governmental interference.  Businesses are therefore protected from baseless or invidiously discriminatory standards and have a right to be free from excessive and unreasonable government conduct intentionally directed toward them to force them out of business.

201.   Plaintiffs will be deprived of equal protection under the law in violation of the California Constitution if AB 5 is enforced against them.

## COUNT III
### Declaratory Relief:  Violation of the U.S. Constitution's Due Process Clause (Right to Pursue Chosen Occupation)

202.   Plaintiffs incorporate all other paragraphs of this Complaint.

203.   California's worker-classification scheme violated the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution.  Contrary to law, Defendants are still attempting to use the worker-classification scheme to compel reclassification of app-based drivers as employees.  That would prevent Plaintiff Olson and Plaintiff Perez from pursuing their chosen occupation as business owners in the sharing economy, and it would transform Company Plaintiffs from technology platform companies into taxi and delivery companies.

204.   Being one's own boss, as Plaintiff Olson, Plaintiff Perez, and many other independent service providers choose to do, is a fundamentally different occupation than driving as an employee on an inflexible shift.  Forced reclassification, as Defendants have sought (and obtained against Uber via a preliminary injunction they are still defending in spite of Prop 22), would be a complete prohibition on exercising the right

to pursue this occupation as an independent service provider who uses apps to facilitate the transportation of passengers or deliveries.  It also would infringe the rights of network companies, app-based drivers, and customers to make contracts governing their occupations and purchases, and to associate with one another.  The freedom to enter into their own work agreements, and to buy services from willing sellers, are of paramount importance to network companies, on-demand drivers, and customers.  The right to pursue their chosen occupation is the very essence of on-demand drivers' and network companies' personal freedom and opportunity.

205.   Forced reclassification would deprive network companies and app-based drivers of these rights by forbidding them from entering into their chosen work arrangements—that of independent service providers, with the flexibility and autonomy that entails.  The sponsors of the law still seek to destroy the chosen occupation of app-based drivers and network companies—to make app-based drivers like Plaintiff Perez and Plaintiff Olson into employees rather than business owners, and to make technology companies like Uber and Postmates into transportation or delivery companies.  And in doing so, they would impose massive obligations on both network companies—which must comply with a host of laws governing employers—and app-based drivers—who must comply with duties that bind employees, such as the duty of loyalty to one's employer.

206.   In addition, mandatory reclassification would not only replace app-based drivers' chosen working relationships with an entirely different one, but it also would force many app-based drivers out of their lines of work entirely, because network companies cannot hire even a small fraction of these app-based drivers as an employees.  Individual Plaintiffs could not continue to work as part-time app-based drivers under an employment model.  In fact, Uber and Lyft both declared that they would be forced to shut down their ridesharing platforms entirely in California if the preliminary injunction issued against them under California's worker-classification scheme went into effect and forced them to reclassify app-based drivers who use their platform apps as employees,

1  and the mayors of two of California's largest cities recognized these businesses would
2  be wiped out without a stay of that preliminary injunction.

3       207.   The interference with, and deprivation of, these rights is unreasonable and
4  arbitrary.  The worker-classification law is not narrowly tailored to any compelling
5  governmental interest, nor is it the least restrictive means to serve any such end.  It is
6  not even rationally related to any legitimate governmental interest.  It has no substantial
7  relation to the public, health, safety, or morals, or to the general welfare, and it is not
8  congruous with any legitimate purpose the government may proffer.  For example, the
9  law is unrelated to serving any interest in worker protection because it outlaws working
10  relationships of the workers' own choosing and undermines their flexibility and
11  autonomy by imposing rigid and duty-laden employer-employee relationships on the on-
12  demand economy, especially since the amendments to AB 2257 exempted similarly
13  situated independent service providers who utilize other apps.  Any overlap with
14  traditional employment is both minimal and irrelevant.

15       208.   The worker classification standard is not a rational fit for the on-demand
16  economy; rather, it impedes the convenience and flexibility that are at its heart.
17  Moreover, it plainly does not serve consumer needs; the actual incidence of any harm
18  the government could proffer is extremely rare.  Rather, California's worker-
19  classification scheme, especially as amended by AB 2257, is motivated by animus
20  towards certain parts of the on-demand economy and its occupations, and a desire to
21  protect politically favored constituents.  These purposes show that any proffered rational
22  basis for AB 5 is illusory.  The voters recognized this in rejecting the application of the
23  worker classification standard to network companies and on-demand drivers.  Yet
24  Defendants are defying the People's will and attempting to enforce it anyway.

25       209.   Put simply, forced reclassification would force app-based drivers like Mr.
26  Perez and Ms. Olson to change their occupation from "business owner" to "employee"—
27  a fundamental change that will affect their lifestyle, earning capacity, and ability to care
28  for their loved ones.  And such a reclassification would transform Company Plaintiffs

from technology companies that develop apps into driver and delivery companies that have to manage fleets of drivers and couriers. That is not simply a change in classification; it is a dramatic reordering of Individual Plaintiffs' occupations and Company Plaintiffs' businesses.

210. California businesses have a constitutionally protected interest in operating free from unreasonable governmental interference. Businesses are therefore protected from baseless or invidiously discriminatory standards and have a right to be free from excessive and unreasonable government conduct intentionally directed toward them to force them out of business.

211. The public record is replete with evidence showing that California legislators supported the worker-classification scheme in an effort to isolate and harm certain platform companies, if not put them out of business. Indeed, its sponsors, public officials enforcing the scheme against Uber, and the lobbying groups who pressed its passage all have expressly stated that their intention is to put Uber out of business in California and eliminate the ability of Individual Plaintiffs to work in their chosen occupation and run their own independent transportation or delivery businesses.

212. The Legislature's circuitous path to legitimate ends, when a direct path is available, shows that California's worker-classification scheme lacks a rational basis. If California wanted to provide app-based drivers access to certain benefits and protections, it could have passed more direct and less-restrictive measures to achieve that end. Indeed, network companies presented multiple proposals that would ensure the protections for independent service providers the classification law purports to guarantee, as explained above. The malicious and arbitrary purpose of the statute—combined with the back-room dealing that led to its laundry list of irrational exemptions—creates a "wholly arbitrary" standard in violation of due process.

## COUNT IV
### Declaratory Relief:  Violation of the California Constitution's Due Process Clause
### (Right to Pursue Chosen Occupation)

213. Plaintiffs incorporate all other paragraphs of this Complaint.

Gibson, Dunn &
Crutcher LLP

79

214.   For substantially the same reasons set forth in Count II, AB 5, and as amended by AB 2257, violates the Due Process Clause of Article I, Section 7 of the California Constitution.

## COUNT V

### Declaratory Relief:  Violation of the U.S. Constitution's Contracts Clause

215.   Plaintiffs incorporate all other paragraphs of this Complaint.

216.   Article 1, Section 10 of the United States Constitution provides:  "No state shall … pass any … Law impairing the Obligation of Contracts."

217.   Company Plaintiffs are parties to valid contracts with the app-based drivers who use their apps, including Individual Plaintiffs.  These contracts establish that the workers are independent contractors for the purposes of their work found by using the app-based platforms of the Company Plaintiffs.

218.   Enforcement of the now-superseded worker-classification scheme (whether to impose liability or to compel reclassification) would substantially impair existing contracts these existing contracts between Company Plaintiffs and the app-based drivers who use their apps, including Company Plaintiffs' contracts with Individual Plaintiffs (as well as any new contracts required by Prop 22).  It would severely modify key contractual rights in those contracts (such as various rights to flexibility), and would impose new obligations to which the parties did not voluntarily agree to undertake, such as a duty of loyalty, unemployment coverage, and other employment benefits.  It would eliminate the very essence of the contractual bargain in these existing contracts, interfere with the reasonable expectations under these existing contracts, and eliminate the primary value of those contracts.  The classification of app-based drivers as independent contractors under the existing contracts between Company Plaintiffs and app-based drivers, including Individual Plaintiffs, is a critical feature of Plaintiffs' total contractual relationship.

219.   Plaintiffs expected that their contracts establishing an independent contractor relationship, rather than an employer-employee one, would maintain their

value for many reasons. Before the recent amendments to California's worker-classification law, California courts repeatedly had affirmed that similar provisions were suitable to establish and maintain an independent contractor relationship and that workers who used Company Plaintiffs' apps (and similar platform apps for delivery and transportation services) were properly classified as independent contractors. *See*, *e.g.*, *Lawson v. Grubhub Inc.*, 302 F. Supp. 3d 1071, 1093 (N.D. Cal. 2018) (holding that a driver who used the Grubhub platform to perform deliveries is an "independent contractor" under California law); *cf.* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2019-6 (Apr. 29, 2019). Plaintiffs did not, and could not, expect or anticipate AB 5, AB 170, and AB 2257's purported changes to the law when they entered into their contracts. These expectations were reasonable, both because no court had ever required Uber, Postmates, or any other platform company to reclassify independent service providers, and also because judicial and regulatory authorities had held that they are not employees. *Dynamex* did not overturn Plaintiffs' expectations that their contracts were valid. *Dynamex* merely interpreted the "suffer or permit to work" language in the Industrial Wage Commissions wage orders. It did not forbid independent contractor relationships; it merely affected how much a company must pay its independent contractors.

220. Indeed, the drafter of AB 5, AB 170, and AB 2257, Lorena Gonzalez, stated that the pre-AB 5 test "was weighted heavily against workers or agencies trying to prove misclassification"—i.e., in favor of upholding the contractual relationships the parties had voluntarily entered into—and that was why the bills were necessary. Given the admitted purpose of the new classification scheme's sponsors to overturn past law upholding contracts and instead force reclassification, enforcement of that scheme would substantially impair those contractual relationships. Plaintiffs' reasonable expectation in the enforcement of their contracts thus extended far beyond the labels the parties placed on their relationship in these contracts to the substantive nature of the contracts, the basic rights of those contracts, and the heart of their very bargain, and this

ensures that the imposition of the classification scheme on them would be a substantial burden on their pre-existing contracts.

221.   California law further had developed the *Borello* test over decades under the common law, and it was extremely well-established as the proper means for determining whether an employment relationship existed between a worker and any company under California law and that the appropriate substantive division of control in a contract and in fact between a worker and a putative employer sufficiently established an independent contractor—rather than employment—relationship between them. Plaintiffs' contracts are in writing and in fact easily satisfied that standard.  And certainly Plaintiffs could not have foreseen the Legislature would purport to do so while exempting and rolling back the same rules as applied to similarly situated workers who utilize platforms to facilitate their provision of other similar services—and thus for absolutely no legitimate state purpose and solely to target and disadvantage Company Plaintiffs.

222.   The classification of app-based drivers, including Individual Plaintiffs, as independent contractors in the existing contracts between Company Plaintiffs and app-based drivers, including Individual Plaintiffs, had "obvious value" and was a significant factor in Company Plaintiffs' bargaining expectations when entering into these contracts.

223.   The worker-classification scheme is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose for all of the reasons expressed above.

224.   The worker-classification scheme has no legitimate public purpose because the statute was enacted to target and harm specific platform companies like Company Plaintiffs.

225.   The worker-classification scheme's impairment of the existing contracts between Company Plaintiffs and app-based drivers, including Individual Plaintiffs, was

not drawn with moderation and reason because it was drawn with the spirit to target and harm Company Plaintiffs.

226.   The worker-classification scheme's irrational exemptions demonstrate California did not exercise the police power in passing it, but instead sought to provide a benefit to special interests while harming Company Plaintiffs.

227.   The worker-classification scheme does not reasonably advance the purpose of protecting workers because its exemptions leave numerous workers outside of its scope without any rational rhyme or reason.

228.   The worker-classification scheme's narrow focus on Company Plaintiffs demonstrates that it was not enacted to protect any broad societal interest.

229.   The worker-classification scheme's ostensible legislative purpose of helping workers is "suspect" because the Legislature excluded similarly situated workers without explaining the necessity for such exemptions to advance its legislative purpose—especially given the hundreds of additional exemptions now added to it by AB 2257 and the catch-all exemption of all platform companies except Company Plaintiffs (and others like them in the disfavored group of network companies—platform companies for delivery and transportation services).

230.   The forced reclassification the scheme's sponsors intended would unreasonably and substantially impair the existing contracts between Company Plaintiffs and app-based drivers, including Individual Plaintiffs, because an evident and more moderate course would have served the State's purported purpose equally well.

231.   If forced reclassification of independent service providers, including Individual Plaintiffs, as employees were necessary to protect workers, then the California Legislature would not have irrationally exempted from reclassification, without explanation, numerous categories of independent service providers that are similarly situated to Individual Plaintiffs.

Gibson, Dunn &
Crutcher LLP

83

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VI

### Declaratory Relief:  Violation of the California Constitution's Contracts Clause

232.   Plaintiffs incorporate all other paragraphs of this Complaint.

233.   For substantially the same reasons as described in Count V, enforcement of AB 5 against Company Plaintiffs as intended by the statute's sponsors also would violate Article I, Section 9 of the California Constitution, which provides that a "law impairing the obligation of contracts may not be passed."

## COUNT VII

### Declaratory Relief:  Violation of the United States Constitution's State Bill of Attainder Clause

234.   Plaintiffs incorporate all other paragraphs of this Complaint.

235.   California's worker-classification scheme violates Article I, Section 10 of the U.S. Constitution, which provides that "[n]o State shall … pass any Bill of Attainder."

236.   The worker-classification scheme violates this prohibition because it is intended to single out gig companies for disparate treatment and punishment, without a trial, and is intended to force gig companies to incur the crippling financial, administrative, reputational, competitive, and other burdens, while sparing other companies from the same adverse treatment.

237.   The sponsors of AB 5, AB 170, and AB 2257 left no doubt of their intent to single out gig companies for harm.  That targeted class is easily ascertained—and has in fact been ascertained—by the California media and public.  The chief sponsor of AB 5 referred by name to Plaintiff Uber on the floor, stating she would not add any language to exempt other favored companies if Uber could plausibly assert that language could apply to it.

238.   The worker-classification scheme is intended to inflict punishment on the network-company class by crushing network companies with staggering costs.

Gibson, Dunn &
Crutcher LLP

239.   By aiming to force reclassification and thereby nullify network companies' valid contracts with independent service providers, the worker classification scheme operates as a confiscation of property.

240.   The worker-classification scheme is designed to punish network companies.

241.   The sponsors of AB 5, AB 170, and AB 2257 publicly and repeatedly announced their verdict that "unscrupulous" and "bad actor" gig companies had "skirted labor laws," "exploited" and "misclassified" workers, and engaged in "wage theft" or even "slavery."

242.   Less burdensome alternatives would have achieved any of the scheme's supposed nonpunitive purposes.   AB 5's stated purpose of codifying *Dynamex* could have been achieved by simply codifying *Dynamex* rather than exempting nearly everyone except gig companies from its holding.   And worker protection can be achieved in myriad less burdensome ways—for example, by creating a portable-benefit fund or an intermediate category for app-based drivers as the voters of California have now done.

243.   If forced reclassification of independent service providers were necessary to protect workers, the California Legislature would not have exempted numerous categories of similarly situated independent service providers.   And California would not have singled out Plaintiffs and sought extraordinary and wholly unprecedented preliminary relief against them that Defendants knew would destroy their business model and livelihoods.

## COUNT VIII
### Declaratory Relief:  Violation of the California Constitution's
### Bill of Attainder Clause

244.   Plaintiffs incorporate all other paragraphs of this Complaint.

245.   For substantially the same reasons as described in Count VII, enforcement of AB 5 against Plaintiffs as intended by the statute's sponsors also would violate Article

I, Section 9 of the California Constitution, which provides that "[a] bill of attainder … may not be passed."

### COUNT IX
### Injunctive Relief

246.   Plaintiffs incorporate all other paragraphs of this Complaint.

247.   Defendants should be preliminarily and permanently enjoined from enforcing AB 5 against Company Plaintiffs.

248.   If the continued enforcement of the worker-classification scheme were to force the reclassification of Individual Plaintiffs from independent contractors to employees, Individual Plaintiffs would suffer severely and irreparably.   Individual Plaintiffs both rely heavily on this independence and flexibility for their income, and because they care for ailing and struggling family members.   Absent an injunction, they will suffer severe irreparable harm.

249.   If required to reclassify app-based drivers as employees, in contravention of Prop 22, Company Plaintiffs would incur immediate injury for which there is no adequate remedy at law, including because the statute violates their constitutional rights, threatens their business models, and forces them to incur unrecoverable administrative and compliance costs.   Constitutional violations constitute *per se* irreparable harm.

250.   Forced reclassification also would require Company Plaintiffs to retrain staff, consult with legal counsel, and develop new compensation, benefits, and other policies.   And the enforcement of AB 5 against Uber has already caused substantial harms that cannot be recovered.

251.   These injuries would result directly from enforcement of AB 5 in a manner consistent with the sponsors' stated intent to require reclassification of workers in the on-demand economy against Company Plaintiffs, cannot be adequately compensated by money damages, and would be irreparable absent preliminary and permanent injunctive relief.

252.   These injuries are preventable and redressable with appropriate injunctive relief that prevents Defendants from giving effect to or enforcing the statute against Company Plaintiffs.

253.   The balance of harms weighs in favor of injunctive relief.  Defendants cannot claim an interest in the enforcement of an unconstitutional law.  Nor can they plausibly claim harm from an injunction prohibiting enforcement of a statute that purports merely to clarify preexisting law—especially a statute that, after Prop 22, explicitly does not apply to Plaintiffs.

254.   The public interest favors injunctive relief because many members of the public depend on their contractor status as a way to earn income without the burdens and rigid demands of a traditional 9-to-5 job.

255.   Moreover, depriving the public of the ability to transact with on-demand contractors would increase prices, increase wait times, and reduce access to important services, particularly in low-income and rural areas.

## PRAYER FOR RELIEF

Plaintiffs ask this Court to order appropriate relief, including, but not limited to, the following:

    A. enter a judgment declaring that California's AB 5, AB 170, and AB 2257 are invalid and unenforceable against Plaintiffs because enforcement as intended by the statute's sponsors would violate the equal protection clauses of the United States Constitution and the California Constitution;

    B. enter a judgment declaring that California's AB 5, AB 170, and AB 2257 are invalid and unenforceable against Company Plaintiffs because enforcement as intended by the statute's sponsors would violate the due process clauses of the California Constitution and the Fourteenth Amendment to the United States Constitution;

    C. enter a judgment declaring that California's AB 5, AB 170, and AB 2257 are invalid and unenforceable against Company Plaintiffs because

enforcement would violate the contracts clauses of the United States Constitution and/or the California Constitution;

D. enter a preliminary injunction, pending final resolution of this action, enjoining Defendants from taking any action to enforce California's AB 5, AB 170, or AB 2257, against Company Plaintiffs;

E. enter a permanent injunction enjoining Defendants from taking any action to enforce California's AB 5, AB 170, or AB 2257 against Company Plaintiffs;

F. award Plaintiffs the costs of defending against any enforcement action brought pursuant to, or any unconstitutional imposition of a penalty imposed under, California's AB 5, AB 170, or AB 2257;

G. grant Plaintiffs an award of reasonable attorney's fees under 42 U.S.C. § 1988; and

H. grant Plaintiffs such additional or different relief as the Court deems just and proper.

Dated: November 9, 2020

By: */s/ Theane Evangelis*
Theane Evangelis
Attorney for Plaintiffs

Gibson, Dunn &
Crutcher LLP

88

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs demand trial by jury on all issues so triable.

3

4

Dated:  November 9, 2020

5

6

7

By:  */s/ Theane Evangelis*
Theane Evangelis

8

Attorney for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28