**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LYDIA OLSON; MIGUEL PEREZ; POSTMATES, INC., (Successor Postmates LLC); UBER TECHNOLOGIES, INC., *Plaintiffs-Appellants,* | No. 21-55757 D.C. No. 2:19-cv-10956- DMG-RAO |
| v. STATE OF CALIFORNIA; ROB BONTA,* in his capacity as Attorney General of the State of California, *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted July 13, 2022
San Francisco, California

Filed March 17, 2023

_____

* Rob Bonta is substituted for his predecessor Xavier Becerra, former Attorney General of the State of California.  See Fed. R. App. P. 43(c)(2).

Before:  Johnnie B. Rawlinson and Danielle J. Forrest, Circuit Judges, and Morrison C. England, Jr.,[**] Senior District Judge.

Opinion by Judge Rawlinson

## SUMMARY[***]

### Civil Rights

The panel affirmed in part and reversed in part district court orders dismissing Plaintiffs' Second Amended Complaint and denying Plaintiffs' motion for a preliminary injunction, and remanded, in an action seeking to enjoin the State of California and the California Attorney General from enforcing California Assembly Bill 5 ("A.B. 5"), as amended by California Assembly Bills 170 and 2257.

A.B. 5, as amended, codified the "ABC test" adopted by the Supreme Court of California in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018), to categorize workers as employees or independent contractors for the purposes of California wage orders.  A.B. 5, as amended, however, incorporated numerous exemptions into its provisions.

---

[**] The Honorable Morrison C. England, Jr., Senior United States District Judge for the Eastern District of California, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel first held that, even under the fairly forgiving rational basis review, Plaintiffs plausibly alleged that A.B. 5, as amended, violated the Equal Protection Clause for those engaged in app-based ride-hailing and delivery services.  Thus, Plaintiffs plausibly alleged that the primary impetus for the enactment of A.B. 5 was the disfavor with which the architect of the legislation viewed Uber, Postmates, and similar gig-based business models.  Additionally, Plaintiffs plausibly alleged that their exclusion from the wide-ranging exemptions, including for comparable app-based gig companies, could be attributed to animus rather than reason.  The district court therefore erred by dismissing Plaintiffs' equal protection claim.

The panel held that the district court correctly dismissed Plaintiffs' due process claims because Plaintiffs failed to plausibly allege that A.B. 5, as amended, completely prohibited them from exercising their "right to engage in a calling."  In addition, Plaintiffs' allegations did not plausibly allege that A.B. 5, as amended, would bar plaintiffs Olson and Perez from continuing their work as "business owners in the sharing economy" with network companies that were exempted from A.B. 5, as amended.

The panel held that A.B. 5, as amended, did not violate the Contract Clause because it neither interfered with Plaintiffs' reasonable expectations nor prevented them from safeguarding or reinstating their rights.  Plaintiffs' Bill of Attainder claims likewise failed because Plaintiffs did not plausibly allege that A.B. 5, as amended, inflicted punishment on them.

Addressing the district court's denial of Plaintiffs' motion for a preliminary injunction, the panel noted that the district court's order was based on allegations contained in

the Initial Complaint, which did not include Plaintiffs' allegations regarding facts—namely the passage of A.B. 2257 and Proposition 22—that did not exist when the Initial Complaint was filed.  The panel therefore remanded for the district court to reconsider Plaintiffs' motion for a preliminary injunction, considering the new allegations contained in the Second Amended Complaint.

## COUNSEL

Theane Evangelis (argued), Blaine H. Evanson, Heather L. Richardson, Dhananjay S. Manthripragada, and Alexander N. Harris, Gibson Dunn & Crutcher LLP, Los Angeles, California; for Plaintiffs-Appellants.

Jose A. Zelidon-Zepeda (argued), Deputy Attorney General; Mark Beckington and Tamar Pachter, Supervising Deputy Attorneys General, Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the Attorney General, San Francisco, California; for Defendant-Appellee.

Scott A. Kronland and Stacey M. Leyton, Altshuler Berzon LLP, San Francisco, California, for Amici Curiae International Brotherhood of Teamsters, Service Employees International Union California State Council, and United Food and Commercial Workers Union Western States Council.

# OPINION

RAWLINSON, Circuit Judge:

Lydia Olson (Olson), Miguel Perez (Perez), Uber, Inc. (Uber) and Postmates, Inc. (Postmates, and collectively Plaintiffs) appeal the district court's orders denying their motion for a preliminary injunction and dismissing their Second Amended Complaint.

Plaintiffs filed this action to enjoin the State of California and the Attorney General of California (Defendants), from enforcing California Assembly Bill 5, 2019 Cal. Stats. Ch. 296 (A.B. 5), as amended by California Assembly Bill 170, 2019 Cal. Stats. Ch. 415 (A.B. 170) and California Assembly Bill 2257, 2020 Cal. Stats. Ch. 38 (A.B. 2257, and collectively A.B. 5, as amended), against them. A.B. 5, as amended, codified the "ABC test" adopted by the Supreme Court of California in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018).[1] A.B. 5, as amended, however, incorporated numerous exemptions into its provisions.

Plaintiffs' Second Amended Complaint requested an injunction on the grounds that—as applied to Plaintiffs— A.B. 5, as amended, violates: the Equal Protection Clauses, the Due Process Clauses, the Contract Clauses, and the Bill of Attainder Clauses of the United States and California Constitutions.

---

[1] The effect of the "ABC test" was to include more workers in the category of "employee" as opposed to that of "independent contractor." *Dynamex*, 4 Cal. 5th at 964.

This case consolidates Plaintiffs' appeals of: 1) the district court's order granting Defendants' motion to dismiss Plaintiffs' Second Amended Complaint; and 2) the district court's order denying Plaintiffs' motion for a preliminary injunction.

We have jurisdiction under 28 U.S.C. § 1291. Reviewing *de novo*, we REVERSE the district court's dismissal of Plaintiffs' equal protection claims, but AFFIRM the dismissal of the due process, contract clause, and bill of attainder claims. We REMAND the district court's order denying Plaintiffs' motion for a preliminary injunction for reconsideration consistent with this opinion.

## I. Background

### A. The *Dynamex* Decision

In 2018, the Supreme Court of California adopted the aforementioned "ABC test" to categorize workers as employees or independent contractors for the purposes of California wage orders. *Dynamex*, 4 Cal. 5th at 957. Under the ABC test, workers are presumed to be employees, and may only be classified as independent contractors if the hiring entity demonstrates:

> (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established

trade, occupation, or business of the same nature as the work performed.

*Id.* (citations omitted) (emphases in the original).[2]

## B. Statutory Background

In 2019, the California Legislature passed A.B. 5. The expressed intent of the Legislature in enacting A.B. 5 was to:

> ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave.

A.B. 5 § 1(e). To effectuate its expressed intent, A.B. 5 codified *Dynamex*, *see id.*, and its presumption that "a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor, unless the hiring entity" makes the requisite showing under the ABC test. A.B. 5 § 2(a)(1); *see also Dynamex*, 4 Cal. 5th at 967. A.B. 5 also expanded *Dynamex's* application beyond wage orders to California's Labor and Unemployment Insurance Codes. *See id.*

---

[2] Prior to *Dynamex*, California courts primarily determined whether a worker was an employee or an independent contractor by applying the multi-factor balancing test adopted in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989). *See Dynamex*, 4 Cal. 5th at 931-32.

However, A.B. 5 exempted a broad swath of workers from the *Dynamex* presumption. *See id.* § 3(b).  These statutory exemptions included: California licensed insurance businesses or individuals; physicians and surgeons; dentists; podiatrists; psychologists; veterinarians; lawyers; architects; engineers; private investigators and accountants; registered securities broker-dealers and investment advisers; direct sales salespersons; commercial fishermen working on American vessels for a limited period; marketers; human resources administrators; travel agents; graphic designers; grant writers; fine artists; payment processing agents; certain still photographers or photo journalists; freelance writers, editors, or cartoonists; certain licensed estheticians, electrologists, manicurists, barbers or cosmetologists; real estate licensees; repossession agents; contracting parties in business-to-business relationships; contractors and subcontractors; and referral agencies and their service providers.  *See* A.B. 5 § 2.  A.B. 5 also left open the possibility of court-created exemptions.  *See id.* § 2(a)(3).

Within a year of its enactment, A.B. 5 was amended by A.B. 170 and A.B. 2257.  Both bills exempted even more workers from the *Dynamex* presumption.  A.B. 170 added exemptions for "[a] newspaper distributor working under contract with a newspaper publisher . . . and a newspaper carrier working under contract either with a newspaper publisher or newspaper distributor."  A.B. 170 § 1(b)(7).  A.B. 2257 added exemptions for recording artists; songwriters, lyricists, composers, and proofers; managers of recording artists; record producers and directors; musical engineers and mixers; vocalists; musicians engaged in the creation of sound recordings; photographers working on recording photo shoots, album covers, and other press and publicity purposes; and independent radio promoters.  *See*

A.B. 2257 § 2, 2780.  A.B. 2257 also reduced application of the existing exemption for referral agencies.  *See id.*, § 2, 2777.

### C. Factual Background

It is undisputed that the enactment of A.B. 5 was largely driven by a perceived need to curb reported abuses in the gig economy, particularly rideshare companies and analogous platforms. The sponsor of A.B. 5, California Assemblywoman Lorena Gonzalez, published a Washington Post Op-Ed in which she proclaimed that A.B. 5 would "guarantee . . . workers the normal rights and privileges—and benefits— enjoyed by most employees" that "'gig' companies such as Uber, Lyft, DoorDash, Handy and others" do not provide to "'gig' workers." *See* Lorena Gonzalez Opinion, *The Gig Economy Has Costs.  We can No Longer Ignore Them*, Wash. Post (Sept. 11, 2019).[3]  According to a December 2019 Los Angeles Times Article, Assemblywoman Gonzalez was "open to changes in [A.B. 5] next year, including an exemption for musicians — but not for app-based ride-hailing and delivery giants."  Margot Roosevelt, *New Labor Laws Are Coming to California.  What's Changing in Your Workplace?* (*New Labor Laws*), L.A. TIMES (Dec. 29, 2019).[4]  California Assemblyman Anthony Rendon tweeted, "[t]he gig economy is nothing new.  It's a continuation of hundreds of years of corporations trying to screw over workers.  With [A.B. 5], we're in a position to do something about that."  Anthony Rendon, @Rendon63rd,

---

[3] https://www.washingtonpost.com/opinions/2019/09/11/gig-economy-has- costs-we-can-no-longer-ignore-them/

[4] https://www.latimes.com/business/story/2019-12-29/California-employment-laws-2020-ab5-minimum-wage

TWITTER (July 10, 2019, 4:40 PM).[5]   Addressing A.B. 5, Assemblywoman Buffy Wicks tweeted, "I believe all workers should benefit from the hard-fought protections won by unions — just because your employer uses a smartphone app, doesn't mean they should be able to misclassify you as an independent contractor."   Buffy Wicks, @BuffyWicks, TWITTER (Sept. 7, 2019, 6:57 AM).[6]

### D. Plaintiffs

Postmates is "a network company that operates an online marketplace and mobile platform connecting local merchants, consumers, and independent couriers to facilitate the purchase, fulfillment, and, when applicable, local delivery of anything from takeout to grocery goods from merchants to the consumers."   Consumers may request delivery from local merchants (including restaurants and grocery stores) through Postmates' Mobile Application (Postmates' App).   When such a request is made, a nearby courier will receive a notification and "can choose whether to accept the consumer's offer to pick up and complete the requested delivery."

To serve as a courier on Postmates' App, an individual must execute a "Fleet Agreement" to establish the individual and Postmates' relationship as independent contractor and principal (rather than employee and employer).   A courier on Postmates' App may use the platform "as much or as little as he or she wants—there is no set schedule, minimum-hours requirement, or minimum-delivery requirement," and

---

[5] https://twitter.com/Rendon63rd/status/1149101100928159744

[6] https://twitter.com/BuffyWicks/status/1170335312758706177

couriers are free to choose whether to "accept, reject, or ignore" delivery requests.

Perez uses Postmates' App to "run his own delivery business."  He "values the flexibility of working for himself," and does not want to work as "someone else's employee again."

Uber is also a network company that operates a digital marketplace through its own mobile application-based platforms (Uber Apps).  Uber uses its Uber apps to "connect individuals in need of goods or services with those willing to provide them."  Uber's most popular marketplace is housed on two distinct apps:  the Uber Rider App, which allows riders to "connect with available transportation providers based on their location" and the Uber Driver App, which, in conjunction with the Uber Rider App, connects available app-based drivers to those requesting rides.  Prior to utilizing the Uber Driver App, a driver must "execute a 'Platform Access Agreement,' which provides, in its very first section: 'The relationship between the parties is solely as independent enterprises' and '[t]his is not an employment agreement and you are not an employee.'"  As with Postmates, a driver is free to use the Uber Driver App "as much or as little as he or she wants—there is no set schedule, minimum-hours requirement, or minimum-ride or minimum-delivery requirement."  Drivers provide and maintain their own equipment.

Olson is a California-based driver who "uses the Uber platform to get leads for passenger requests to transport passengers in the Sacramento and San Francisco Bay areas."  Olson would be unable to work for Uber if she were to be reclassified as an employee under A.B. 5 because she depends on "the flexibility that comes with being an

independent service provider," as she serves as her husband's primary caretaker.

### E. Procedural History

####   1. *The Initial Complaint and Motion for a Preliminary Injunction.*

Plaintiffs jointly filed a complaint on December 30, 2019 (the Initial Complaint), seeking declaratory, injunctive, and other relief based on the unconstitutionality of A.B. 5. Plaintiffs also filed a motion for a preliminary injunction in connection with their claims based on the denial of their rights under the Equal Protection, Due Process, and Contract Clauses.  In support of their motion, Plaintiffs and their *amici* filed several declarations, including:  declarations from Patricia Cartes Andres, Postmates' Director of Trust and Safety and Insurance Operations, and Brad Rosenthal, Uber's Director of Strategic Operational Initiatives, regarding the companies' respective business models; declarations from drivers who use the Uber Drivers App, and couriers who use the Postmates App, including Olson and Perez; and a declaration and expert report from economist Justin McCrary.  Plaintiffs also provided tweets from Assemblywoman Gonzalez, the principal sponsor and proponent of A.B. 5, discussing A.B. 5 and Uber;[7] articles and reports concerning the anticipated effect A.B. 5 would have on the "gig economy"; and testimonials from Californians negatively affected by A.B. 5.

The district court denied Plaintiffs' motion for preliminary injunctive relief.  *See Olson v. California*, No.

---

[7] One example was a tweet directed at Assemblywoman Gonzalez reminding her that A.B. 5 was "aimed at Uber/Lyft."

CV-1910956-DMG (RAOx), 2020 WL 905572 (C.D. Cal. Feb. 10, 2020) (*Olson I*).  The district court noted that for a plaintiff to succeed on a motion for a preliminary injunction, the plaintiff must show that "(1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest." *Id*. at *4 (*citing Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).

Beginning with the likelihood of success, the district court determined that Plaintiffs were unlikely to succeed on the merits of their claims and failed to raise "sufficiently serious questions" on the merits. *Id.* at *5.

The district court specifically found that A.B. 5 was related to a legitimate state interest and did not target gig economy companies in violation of their equal protection rights. *See id.* at *5.  The district court rejected Plaintiffs' argument that A.B. 5 does not rationally further the government's interest in the proper classification of workers, given its numerous exemptions. *See id.* at *6.  Rather, the district court concluded that A.B. 5's exemptions were supported by rational explanations. *See id.* at *8.  The district court also rejected Plaintiffs' argument that the exemptions contained in A.B. 5 could only be explained by improper animus against gig companies because:  (1) the "expansive language of the statute" negated that argument; (2) discrimination cannot be proven by simply pointing to lobbying efforts, which are "constitutionally protected"; and (3) "reform may take one step at a time," so the refusal to give an exemption to gig companies was not, in and of itself, improper. *Id.* at *8 (citations omitted).  Although the district court conceded that "the record contains some evidence that [A.B.] 5 targeted [Uber, Postmates] and other gig economy

companies, and that some lawmakers' statements specifically complained about Uber," it found that the evidence did not rise to the level of demonstrating "an Equal Protection violation where the statute addresses legitimate concerns of deleterious misclassification of workers in many industries, not just the gig economy." *Id.* at *9.

Next, the district court found that A.B. 5 did not deprive gig workers of the right to pursue a career, in violation of due process. *See id.* at *10. The district court reasoned that for a statute to infringe on a plaintiff's "vocational liberty interest," it must completely prohibit a plaintiff from engaging in a calling. *Id.* The district court concluded that A.B. 5 was not a complete prohibition on the right to pursue a calling because (1) Uber and Postmates insist that their drivers are independent contractors even under the ABC test; (2) Olson and Perez could be independent contractors if they meet the ABC test or fall under an exemption, such as the "referral agency" exemption; and (3) even if Olson and Perez are reclassified as employees, they can still drive for Uber and Postmates so long as those companies "compensate them properly and allow them to have flexible work schedules." *Id.*

Finally, the district court found that A.B. 5 did not unconstitutionally impair Plaintiffs' contracts. *See id.* at *11–13. The district court again pointed to Uber and Postmates' position that A.B. 5 did not require them to reclassify their drivers, and thus "their contractual relationships with drivers are not at all impaired, much less substantially impaired." *Id.* at *11. The district court further concluded that "Plaintiffs reasonably should have expected that the terms setting forth a driver's contractor status were not independently determinative of employment classification," and thus, should have foreseen that their

contracts could have been altered by laws like A.B. 5. *Id.* at
*11–12. The district court also noted that even if A.B. 5
substantially impaired Plaintiffs' contracts, Plaintiffs are
unlikely to succeed on the merits of their contract clause
claims because they failed to show "that [A.B.] 5 does not
serve a significant and legitimate public purpose." *Id.* at
*12.

On the irreparable harm element, the district court
conceded that Uber and Postmates "established some
measure of irreparable harm stemming from threatened
municipal enforcement actions," but ultimately found that
the harm was mitigated by the possibility of "flexibility and
freedom" that could be offered to drivers as employees. *Id.*
at *14. The district court considered any potential harm
stemming from business restructuring and unrecoverable
expenditures "speculative" because Uber and Postmates
maintained that the ABC test does not apply to them. *Id.*
The district court determined that Olson and Perez were not
subject to the same enforcement actions as Uber and
Postmates, and that their alleged "unrecoverable financial
losses" and loss of "customer goodwill, freedom, financial
stability, and work satisfaction" were speculative in light of
Uber's and Postmates's position that A.B. 5 does not apply
to them. *Id.*

Addressing the remaining two preliminary injunction
elements—balancing of the equities and public interest—the
district court found that "the State's interest in applying
[A.B.] 5 to [Uber and Postmates] and potentially hundreds
of thousands of California workers outweighs Plaintiffs' fear
of being made to abide by the law." *Id.* at *16. The district
court acknowledged Olson's, Perez's, and *amici's* contention
"that being classified as employees would be financially
devastating and upend their schedules and expectations." *Id.*

The district court nonetheless also pointed to evidence from Plaintiffs' own expert that "'a majority of workers do not value scheduling flexibility' and only a 'substantial share'— by inference, less than a majority—'are willing to give up a large share of their earnings to avoid employer discretion in setting hours.'" *Id.* Accordingly, the district court declined to "second guess the Legislature's choice to enact a law that seeks to uplift the conditions of the majority of non-exempt low-income workers rather than preserve the status quo for the smaller subset of workers who enjoy independent contractor status." *Id.*

Plaintiffs appealed this decision and we heard argument in that case on November 18, 2020. However, on November 3, 2020, shortly before argument, Proposition 22 (Prop. 22) was adopted through California's ballot initiative process. The initiative was aimed at protecting "the basic legal right of Californians to choose to work as independent contractors with rideshare and delivery network companies throughout the state" from "recent legislation [that] has threatened to take away the flexible work opportunities of hundreds of thousands of Californians, potentially forcing them into set shifts and mandatory hours, taking away their ability to make their own decisions about the jobs they take and the hours they work." To effectuate this protection, Prop. 22 classified app-based drivers as independent contractors "and not as [] employee[s] or agent[s] with respect to the app-based driver's relationship with a network company," "[n]otwithstanding any other provision of law."

Given the then-recent passage of Prop. 22, we requested a joint supplemental brief and status report from the parties addressing: whether Prop. 22 mooted the appeal; the status of any enforcement actions pending against Plaintiffs that might be affected by the passage of Prop. 22; any pending

legal challenges to Prop. 22; the prospect of future enforcement actions against Plaintiffs under A.B. 5; and any other relevant pending matter or information. The Joint Supplemental Brief was filed on December 10, 2020. In the brief, the parties agreed that the appeal was not mooted by the passage of Prop. 22.

> 2. *The Second Amended Complaint and Defendant's Motion to Dismiss.*

Shortly before we heard argument on Plaintiffs' appeal of the district court's order denying their motion for a preliminary injunction, Plaintiffs filed their Second Amended Complaint.[8] The Second Amended Complaint updated Plaintiffs' original claims to incorporate the amendments to A.B. 5 made by A.B. 2257. It alleged that A.B. 5, as amended, violates state and federal Equal Protection Clauses, Due Process Clauses, Contract Clauses, and Bill of Attainder Clauses.

Defendant moved to dismiss Plaintiffs' Second Amended Complaint for failure to state a claim on which relief could be granted, and the district court granted Defendant's motion in its entirety, with prejudice. *See Olson II*, 2021 WL 3474015 at \*10.

---

[8] Plaintiffs' First Amended Complaint was dismissed by the district court with leave to amend its Equal Protection, Due Process, and Contract Clauses claims. Although the district court incorporated this order by reference in its order dismissing the Second Amended Complaint, Plaintiffs do not independently challenge dismissal of the First Amended Complaint. *See Olson v. Bonta*, No. CV-1910956-DMG (RAOx), 2021 WL 3474015 at \*1 (C.D. Cal. July 16, 2021) (*Olson II*).

### a. Equal Protection Claims

The district court dismissed Plaintiffs' Equal Protection claims after concluding that A.B. 5, as amended, is "rationally related to [California's] interest in protecting workers." *Id.* at *2. The district court incorporated by reference its previous dismissal of Plaintiffs' Equal Protection claims, as pled in the First Amended Complaint. *See id.* The district court then addressed "four categories of *new* factual allegations" in the Second Amended Complaint: "(1) [A.B.] 5 bill sponsor Assemblywoman Lorena Gonzalez's comments about exempting the work relationships of newspaper workers under [A.B.] 170; (2) possible exemptions of the work relationships of gig economy companies TaskRabbit and Wag! under [A.B.] 5; (3) Assemblywoman Gonzalez's animus toward Uber; and (4) the policy pronouncements of Prop 22." *Id.* at *3 (emphasis in the original).

The district court rejected Plaintiffs' allegations that the one-year delay in the effective date of A.B. 5 for newspaper distributors lacked a reasonable explanation. *Id.* The district court reasoned that Assemblywoman Gonzalez's statement that "newspapers have lost nearly every case brought by carriers under [*Borello*]," implied that "even under the old *Borello* multifactor standard for determining employment status, newspaper workers have been able to show that they are properly classified as employees, not contractors." *Id.* (citations and internal quotation marks omitted). Thus, the district court concluded, the one-year exemption for newspaper distributors and carriers, "where newspaper workers arguably were already protected even under the old *Borello* test, does not undermine the rationality of a legislative scheme aimed at remedying misclassification in industries *not* satisfactorily covered by *Borello*." *Id.*

(emphasis in the original).  The district court also noted that
the newspaper industry faced idiosyncratic concerns such
that the Legislature concluded it would be "desirable to give
newspaper publishers more time to address misclassification
concerns." *Id.*

Second, the district court rejected Plaintiffs' allegations
that the exemption of TaskRabbit and Wag! from the
mandates of A.B. 5, as amended (without similarly
exempting Plaintiffs) demonstrates that the bill lacks a
rational basis. *Id.* at *4.  The district court concluded that
Plaintiffs' allegations that Uber and Postmates' business
models are "nearly identical" to those of TaskRabbit and
Wag!, *id.*, suggested that A.B. 5, as amended, "did *not*
arbitrarily target app-based network companies," rather than
supported Plaintiffs' contention that this disparate treatment
"undercuts the State's own rational basis" argument.  *Id.*
(citation and alterations omitted) (emphasis in the original).
The district court found the California Legislature's decision
to exempt some app-based referral agencies but not others,
based on the services the referral agencies provide, to be a
"deliberate choice" that was consistent with the legislative
history of A.B. 5, as amended.  *Id.*  The district court
reasoned that there are "rational differences between
exempted errand-running and dog-walking and non-
exempted passenger and delivery driving," such that any
disparate treatment on this basis does not give rise to an
equal protection violation. *Id.* at *5.

The district court was unpersuaded by Plaintiffs'
allegations that statements made by Assemblywoman
Gonzalez evidenced an irrational animus against them.  *See
id.* at *6.  The district court concluded that Plaintiffs failed
to demonstrate that they were a "politically unpopular
group" for the purposes of an equal protection analysis.  *Id.*

It further noted that "even if the [California] Legislature sought to apply and then enforce the ABC test solely against [Uber and Postmates], legislators are entitled to identify 'the phase of the problem' of misclassification 'which seems the most acute to the legislative mind.'" *Id.* (citation omitted). Accordingly, the district court concluded that "Plaintiffs cannot show that the statute serves no legitimate governmental purpose *and* that impermissible animus toward an unpopular group prompted the statute's enactment." *Id.* (citation, alteration, and internal quotation marks omitted) (emphasis in the original)

Third and finally, the district court considered Plaintiffs' allegations that the passage of Prop. 22 "further establishes the irrationality of A.B. 5." *Id.* (citation omitted). The district court opined that "it is not clear that California voters' disapproval of [A.B.] 5 by voting for Prop 22 translates to a finding that [A.B.] 5 is irrational and thus unconstitutional." *Id.*

### b. Due Process claims

In dismissing the due process claims, the district court relied on its previous rational basis analysis. *See id.* at *7. The district court also reiterated that Plaintiffs failed to plausibly allege that A.B. 5 was "a complete prohibition on [Olson and Perez's] ability to pursue any profession." *Id.* (citation omitted). The district court noted that A.B. 5, as amended, and the ABC test "permit anyone to remain an independent contractor if their work relationship meets the ABC test's requirements." *Id.* The district court added that, even if Plaintiffs established that Olson and Perez's desire to remain independent contractors is its own "calling or profession" their due process claims fail because A.B. 5 "conceivably furthers [California's] legitimate interest in

preventing misclassification of workers in a wide swath of industries." *Id.*

### c. Contract Clause Claims

The district court observed that Contract Clause claims "involve a three-step inquiry." *Id.* First, courts consider "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* Next, courts consider "whether the state has a significant and legitimate public purpose behind the law." *Id.* (alteration and internal quotation marks omitted). Finally, courts consider "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* (citation and alteration omitted).

The district court began and ended its analysis at the first step, *see id.*, finding that Plaintiffs failed to plausibly allege that A.B. 5 substantially impaired their contracts under California law. *See id.* In the alternative, the district court concluded that even if Plaintiffs had plausibly alleged substantial impairment, their contract clause claims fail at the third step because California has the authority "to regulate employment relationship[s]," thereby satisfying "the public purpose test" applied when assessing a Contract Clause challenge. *Id.* at *8.

d. <u>Bill of Attainder Claims</u>[9]

Concluding that A.B. 5, as amended, is—notwithstanding its exemptions—"a law of general applicability to work relationships in California," the district court found that Plaintiffs failed to provide "clear proof that [A.B.] 5, as amended, singles them out." *Id.* at 9 (citation and internal quotation marks omitted).

Following this order, Plaintiffs filed a timely appeal. As we had not yet resolved Plaintiffs' appeal of the district court's denial of their motion for a preliminary injunction, we granted Plaintiffs' motion to consolidate the two appeals. Our order detailed that we would address the issue of whether the preliminary injunction was properly denied if we reversed the district court's dismissal order. *See Nationwide Biweekly Admin. Inc. v. Owen*, 873 F.3d 716, 730-31 (9th Cir. 2017) (discussing the merger of appeals).

## II. Standards of Review

We review *de novo* an order granting a motion to dismiss for failure to state a claim. *See Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022). "We must determine whether Plaintiffs' complaint pleads enough facts to state a claim to relief that is plausible on its face. . . ." *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 814 (9th Cir. 2016) (citation and internal quotation marks omitted). To do so, we credit "all factual allegations in the complaint as true" and construe them "in the light most favorable" to the nonmoving party. *Tingley*, 47 F.4th at 1066 (citation omitted).

---

[9] A bill of attainder results when legislation specifies affected persons and inflicts punishment on them without a trial. *See SeaRiver Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 668 (9th Cir. 2002).

We review *de novo* a district court's interpretation of
state law. *See Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th
973, 982 (9th Cir. 2022). When interpreting state law, we
are bound by the decisions of the state's highest court. *See
id*.

Finally, "[w]e review a district court's decision to grant
or deny a preliminary injunction for abuse of discretion."
*Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (per
curiam) (citation omitted).

### III. Discussion[10]

#### A. Equal Protection Claims

As we recently noted in *American Society of Journalists
& Authors, Inc. v. Bonta*, "[t]he Equal Protection Clause
prohibits states from denying to any person within its
jurisdiction the equal protection of the laws." 15 F.4th 954,
964 (9th Cir. 2021) (citation, alteration, and internal
quotation marks omitted), *cert. denied* 142 S. Ct. 2870
(2022). "If the ordinance does not concern a suspect or semi-
suspect class or a fundamental right, we apply rational basis
review and simply ask whether the ordinance 'is rationally-
related to a legitimate governmental interest.'" *Honolulu
Wkly., Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002)
(citation and internal quotation marks omitted). We apply
rational basis review in this case. *See Am. Soc'y of
Journalists & Authors*, 15 F.4th at 964 (applying rational
basis review to A.B. 5); *see also Dittman v. California*, 191
F.3d 1020, 1031 n.5 (9th Cir. 1999) (noting that "the
Supreme Court has never held that the 'right' to pursue a

---

[10] The parties agree that the analysis is the same under federal and state
law.

profession is a *fundamental* right, such that any state-sponsored barriers to entry would be subject to strict scrutiny").

Rational basis review is "a fairly forgiving standard," as it affords states "wide latitude . . . in managing their economies." *American Soc'y of Journalists & Authors*, 15 F.4th at 965. Under this standard, we "uphold economic classifications so long as there is any reasonably conceivable state of facts that could provide a rational basis for them." *Id.* (citation and internal quotation marks omitted). For a plaintiff whose equal protection claim is subject to rational basis review to prevail, they must "negate every conceivable basis which might have supported the distinctions drawn." *Id.* (citation and internal quotation marks omitted).

Even under this "fairly forgiving" standard of review, we conclude that, considering the particular facts of this case, Plaintiffs plausibly alleged that A.B. 5, as amended, violates the Equal Protection Clause for those engaged in app-based ride-hailing and delivery services.

Plaintiffs plausibly allege that the primary impetus for the enactment of A.B. 5 was the disfavor with which the architect of the legislation viewed Uber, Postmates, and similar gig-based business models. However, the publicly articulated purpose of A.B. 5 was to "ensure [that] workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve." A.B. 5 § 1(e). But, as Plaintiffs plausibly alleged, the exclusion of thousands of workers from the mandates of A.B. 5 is starkly inconsistent with the bill's stated purpose of affording workers the "basic rights and protections they deserve." A.B. 5 § 1(e). The plausibility of Plaintiffs' allegations is

strengthened by the piecemeal fashion in which the exemptions were granted, and lends credence to Plaintiffs' allegations that the exemptions were the result of "lobbying" and "backroom dealing" as opposed to adherence to the stated purpose of the legislation.  As one reporter noted, "[a] lobbying frenzy led to exemptions for some professions in which workers have more negotiating power or autonomy than in low-wage jobs.  Among them: lawyers, accountants, architects, dentists, insurance brokers and engineers." Roosevelt, *New Labor Laws*.  And along with the many categories of workers carved out, A.B. 5, as amended, also exempts those who work with certain app-based gig companies that perform errand services, such as Task Rabbit and Wag!, which have business models that are nearly identical to Uber and Postmates.  There is no indication that many of the workers in exempted categories, including those working for the app-based gig companies that are exempted, are less susceptible to being "exploited by being misclassified as independent contractors."  A.B. 5 § 1(e).[11] And as Plaintiffs plausibly alleged, the referral agency exemption was expressly amended to *exclude* Plaintiffs "after this court had previously indicated" that the referral exemption "might apply to Plaintiffs."

Additionally, Plaintiffs plausibly allege that their exclusion from wide-ranging exemptions, including for comparable app-based gig companies, can be attributed to animus rather than reason.  In the Second Amended Complaint, Plaintiffs cited reporting by the *Los Angeles Times* that after the passage of A.B. 5 (but before the passage

---

[11] It is notable that during oral argument, counsel for Defendants was unable to articulate a conceivable rationale for A.B. 5 that explains the exemptions made by A.B. 5, as amended.

of A.B. 2257), Assemblywoman Gonzalez stated that she is "open to changes in the bill next year, including an exemption for musicians–*but not for app-based ride-hailing and delivery giants*." Roosevelt, *New Labor Laws* (emphasis added). As further noted in the Second Amended Complaint, this statement by Assemblywoman Gonzalez followed numerous other comments "repeatedly disparag[ing]" Plaintiffs. We are persuaded that these allegations plausibly state a claim that the "singling out" of Plaintiffs effectuated by A.B. 5, as amended, "fails to meet the relatively easy standard of rational basis review." *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008), *as amended*. We recognize that we recently rejected an equal protection challenge to A.B. 5 in *American Society of Journalists and Authors*. However, Plaintiffs' plausible allegations of Assemblywoman Gonzalez's animus against them distinguish the two cases. *See* 15 F.4th at 966 ("Unlike the situation in *Merrifield*, however, nothing about section 2778 suggests that its classifications border on corruption, pure spite, or naked favoritism . . .") (citation, alteration, and internal quotation marks omitted).

We therefore hold that the district court erred by dismissing Plaintiffs' equal protection claim. *See United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534, 538 (1973) (commenting that a legislative "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").

**B. Due Process Claims**

We reject Plaintiffs' contention that the district court erred by dismissing their due process claims.

"A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or

property interest protected by the Constitution." *Dittman*, 191 F.3d at 1029 (citation omitted).   And we have recognized that "[a]lthough the precise contours of that liberty interest remain largely undefined, the Supreme Court observed recently that the line of authorities establishing the liberty interest all dealt with a complete prohibition of the right to engage in a calling." *Id.* (citation, alteration, and internal quotation marks omitted).

The district court correctly dismissed Plaintiffs' due process claims because Plaintiffs failed to plausibly allege that A.B. 5, as amended, completely prohibits them from exercising their "right to engage in a calling." *Id.*   In addition, Plaintiffs' allegations do not plausibly allege that A.B. 5, as amended, would bar Olson and Perez from continuing their work as "business owners in the sharing economy" with network companies that are exempted from A.B. 5, as amended.   These allegations are insufficient to plausibly allege a due process violation because, as we have previously held, "people do not have liberty interests in a specific employer." *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 925 (9th Cir. 2013) (citation and alteration omitted).

Reclassifying on-demand drivers as employees does not completely prohibit these drivers from engaging in a calling. Olson and Perez are still free to "use apps to facilitate the transportation of passengers or deliveries"; they are merely barred under A.B. 5, as amended, from doing so as independent contractors.   These allegations simply do not establish a complete prohibition of Olson and Perez's chosen "field of employment." *Franceschi v. Yee*, 887 F.3d 927, 937–38 (9th Cir. 2018).   Rather, the infringement is on the means of engaging in their chosen work.   As a result, Plaintiffs failed to plausibly allege that a protected liberty or

property interest was infringed. *See Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1226 (9th Cir. 2018) (concluding that the plaintiff's due process claims were without merit because they were not rooted in a constitutionally protected interest).

### C. Contract Clause Claims

A state law violates the Contract Clause if it "(1) operates as a substantial impairment of a contractual relationship, and (2) is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1279 (9th Cir. 2021) (citation, alteration, and internal quotation marks omitted).

Determining whether a state law substantially impairs a contractual relationship involves three inquiries: 1) "whether there is a contractual relationship," 2) "whether a change in law impairs that contractual relationship," and 3) "whether the impairment is substantial." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (citation omitted).

Plaintiffs satisfied the first component of this inquiry through their allegation that Uber and Postmates are "parties to valid contracts with the app-based drivers who use their apps, including [Olson and Perez]."

Plaintiffs satisfied the second component by alleging that "[e]nforcement of [A.B. 5, as amended] would substantially impair existing contracts . . . between [Uber and Postmates] and the app-based drivers who use their apps, including [Uber and Postmates'] contracts with [Olson and Perez]." More specifically, Plaintiffs alleged that A.B. 5, as amended, "would severely modify key contractual rights in those contracts (such as various rights to flexibility), and would

impose new obligations to which the parties did not voluntarily agree to undertake, such as a duty of loyalty, unemployment coverage, and other employment benefits."

Nevertheless, the district court properly dismissed Plaintiffs' Contract Clause claims because Plaintiffs failed to plausibly allege the third component of the inquiry. Plaintiffs asserted that A.B. 5, as amended, would "eliminate the very essence of the contractual bargain in these existing contracts, interfere with the reasonable expectations under these existing contracts, and eliminate the primary value of those contracts," because "[t]he classification of app-based drivers as independent contractors under the existing contracts . . . is a critical feature" of these contractual relationships. Even after taking this allegation as true—as we must at this juncture, *see Tingley*, 47 F.4th at 1066—we conclude that A.B. 5, as amended, does not violate the Contract Clause because it neither interferes with Plaintiffs' reasonable expectations nor prevents them from safeguarding or reinstating their rights. Notably—as Plaintiffs conceded at oral argument—nothing in A.B. 5, as amended, prevents Plaintiffs from amending their contracts in response to the statute's requirements.

Although Plaintiffs' Second Amended Complaint alleged that A.B. 5, as amended, infringed upon their "reasonable expectation in the enforcement of their contracts," we are not persuaded that these allegations plausibly allege that Plaintiffs had a "reasonable expectation" that their contractual terms were immune from regulation. We have consistently held that states have "clear" authority to regulate employment conditions. *See e.g.*, *RUI One Corp.*, 371 F.3d at 1150 ("The power to regulate wages and employment conditions lies clearly within a state's . . . police power. . . ."). And, "California

law is clear that the label placed by the parties on their relationship is not dispositive." *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 989 (9th Cir. 2014) (citation, alteration, and internal quotation marks omitted). We remain unconvinced that Plaintiffs' allegations required the district court to conclude that Plaintiffs' Contract Clause claims were plausible. *See generally Hotop v. City of San Jose*, 982 F.3d 710, 717 (9th Cir. 2020) (concluding that plaintiffs failed to plausibly allege a Contract Clause claim when the plaintiffs did "not specify *how*" the ordinance affected the contracts) (footnote reference omitted) (emphasis added).

### D. Bill of Attainder Claims

"A bill of attainder is a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial. . . ." *SeaRiver Maritime Fin. Holdings*, 309 F.3d at 668 (citation and internal quotation marks omitted). A statute is a Bill of Attainder if it "(1) specifies the affected persons, and (2) inflicts punishment (3) without a judicial trial." *Id.* (citation omitted).

Plaintiffs' Bill of Attainder claims fail because Plaintiffs did not plausibly allege that A.B. 5, as amended, inflicts punishment on them. In assessing whether a statute inflicts punishment we assess the following factors: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, reviewed in terms of the type and severity of burdens imposed reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a [legislative] intent to punish." *Id.* at 673 (citations and internal quotation marks omitted).

Plaintiffs' allegations fail the plausibility test on the first factor. In *SeaRiver*, we described the historical means of punishment that characterize an unconstitutional Bill of Attainder as legislation that "sentenced the named individual to death, imprisonment, banishment, the punitive confiscation of property by the sovereign, or erected a bar to designated individuals or groups participating in specified employments or vocations." *Id.* (citation omitted). Nothing in Plaintiffs' allegations plausibly allege punishment that conforms to this historical description. The closest allegations assert interference with Plaintiffs' business model. But even that allegation does not plausibly allege punishment. *See id.* at 673–74 (concluding that there was no bar to employment as long as the Plaintiffs continued to operate their business).

Nor do Plaintiffs' allegations plausibly describe a legislative intent to punish. To be sure, as previously discussed, Plaintiffs alleged that Defendants have animus against them. But animus does not necessarily translate into *punitive* intent. The purpose of A.B. 5 § 1(e), as amended, is remedial—to prevent worker misclassification. *See* A.B. 5 § 1(e). While the allegations of inconsistent exemptions and animus state a claim that A.B. 5, as amended, lacks a rational basis, "[a]bsent more compelling support in the record, we cannot conclude that there is 'unmistakable evidence of punitive intent.'" *SeaRiver*, 309 F.3d at 677 (citation omitted); *see also Fowler Packing Co. v. Lanier*, 844 F.3d 809, 819 (9th Cir. 2016) ("While such intent [for political expediency] does not align with a legitimate justification for a law, it is distinct from an intent to *punish*."). Given the absence of plausible allegations of both an alignment with historical notions of punishment and punitive intent, Plaintiffs fail to state a claim that A.B. 5, as

amended, represents a Bill of Attainder. *See SeaRiver*, 309 F.3d at 674.

### E. Preliminary Injunction.

Pursuant to our previous Order on Motion to Consolidate and Motion to Dismiss, we "address the issue of whether the preliminary injunction was properly denied" because "the district court's dismissal order is reversed." *See Nationwide Biweekly Admin.*, 873 F.3d at 730–31 (discussing the merger of appeals). Because we reverse in part the district court's dismissal order, we now address the district court order denying Plaintiffs' motion for a preliminary injunction.

The district court denied Plaintiffs' motion for a preliminary injunction based on the allegations contained in the Initial Complaint. The district court's dismissal order dismissed Plaintiffs' Second Amended Complaint, which contained allegations regarding facts—namely the passage of A.B. 2257 and Prop. 22—that did not exist when the Initial Complaint was filed. Although we could review the district court's order to determine whether it abused its discretion by denying Plaintiffs' motion, *see Roman*, 977 F.3d at 941, the more prudent course of action is a remand for the district court to reconsider Plaintiffs' motion for a preliminary injunction, considering the new allegations contained in the Second Amended Complaint. *See Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1283 (9th Cir. 2003) (per curiam) (remanding to the district court where it was "better able to decide the question in the first instance") (citation omitted).

We therefore remand Plaintiffs' motion for a preliminary injunction for reconsideration, consistent with this Opinion.

## IV. Conclusion

We conclude that the district court erred by dismissing Plaintiffs' Equal Protection claims.  However, the district court correctly dismissed Plaintiffs' Due Process claims, Contract Clause claims, and Bill of Attainder claims.

We remand the district court's order denying Plaintiffs' motion for a preliminary injunction for reconsideration.

**REVERSED IN PART, AFFIRMED IN PART, and REMANDED.**