**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LYDIA OLSON; MIGUEL PEREZ; POSTMATES, INC., (Successor Postmates LLC); UBER TECHNOLOGIES, INC., *Plaintiffs-Appellants*, | No.21-55757 |
| | D.C. No. 2:19-cv-10956-DMG-RAO |
| v. | |
| STATE OF CALIFORNIA; ROB BONTA, in his capacity as Attorney General of the State of California, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted En Banc March 20, 2024
San Francisco, California

Filed June 10, 2024

Before: Mary H. Murguia, Chief Judge, and Ronald M. Gould, Jacqueline H. Nguyen, Mark J. Bennett, Bridget S. Bade, Kenneth K. Lee, Gabriel P. Sanchez, Holly A. Thomas, Salvador Mendoza, Jr., Roopali H. Desai and Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Nguyen

## SUMMARY[*]

### Equal Protection/California Assembly Bill 5

In an action brought by Postmates, Inc., Uber Technologies, Inc., and two individuals challenging the constitutionality of California Assembly Bill 5, enacted by the California legislature to address a systemic problem of businesses improperly characterizing their workers as independent contractors to avoid fiscal responsibilities owed to employees, the en banc court affirmed the district court's dismissal of plaintiffs' state and federal Equal Protection claims and its denial of preliminary injunctive relief.

A.B. 5 does not directly classify any particular workers as employees or independent contractors. Rather, under A.B. 5, as amended, arrangements between workers and referral agencies that provide delivery or transportation services are automatically subject to the ABC test adopted by the California Supreme Court in *Dynamex Operations W., Inc. v. Superior Ct.*, 416 P.3d 1 (Cal. 2018), while arrangements between workers and referral agencies that provide other types of services, such as dog walking or handyman services, are subject to the multifactor test set forth in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 769 P.2d 399 (Cal. 1989), provided certain statutorily defined criteria are met.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Under the deferential rational basis standard, the en banc court concluded that there were plausible reasons for treating transportation and delivery referral companies differently from other types of referral companies, particularly where the legislature perceived transportation and delivery companies as the most significant perpetrators of the problem it sought to address—worker misclassification. That A.B. 5 may be underinclusive because it does not extend the ABC test to every industry and occupation that has historically contributed to California's misclassification woes does not render it unconstitutionally irrational.

The en banc court did not disturb the prior panel's disposition of plaintiffs' Due Process, Contract Clause, and Bill of Attainder claims. Accordingly, the en banc court reinstated Parts III.B, III.C, and III.D of *Olson v. California*, 62 F.4th 1206, 1220–23 (9th Cir. 2023).

---

## COUNSEL

Theane D. Evangelis (argued), Blaine H. Evanson, Heather L. Richardson, Dhananjay S. Manthripragada, Alexander N. Harris, and Patrick J. Fuster, Gibson Dunn & Crutcher LLP, Los Angeles, California; Joseph E. Barakat, Gibson Dunn & Crutcher, Dallas, Texas; for Plaintiffs-Appellants.

Samuel T. Harbourt (argued) and Joshua A. Klein, Deputy Solicitors General; Jose A. Zelidon-Zepeda, Larah Haddad, and Tamar Patchter, Deputy Attorneys General; Mark R. Beckington, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Michael J. Mongan, Solicitor General; Rob Bonta, California Attorney General; California Department of Justice, Office of the

California Attorney General, San Francisco, California; for Defendants-Appellees.

Nicholas S. Crown (argued) and Alisa B. Klein, Appellate Staff Attorneys; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Civil Division, Washington, D.C.; for Amici Curiae United States of America.

Scott A. Kronland, Stacey M. Leyton, and Robin S. Tholin, Altshuler Berzon LLP, San Francisco, California, for Amici Curiae International Brotherhood of Teamsters, Service Employees International Union California State Council, United Food and Commercial Workers Union Western States Council, and State Building and Construction Trades Council of California

Noah Purcell, Solicitor General, and Anastasia R. Sandstrom, Assistant Attorney General, Office of the Washington Attorney General, Seattle, Washington; Joshua D. Bendor, Hayleigh S. Crawford, and Timothy Horley, Attorneys, Office of the Arizona Attorney General, Phoenix, Arizona; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Anne E. Lopez, Hawaii Attorney General, Office of the Hawaii Attorney General, Honolulu, Hawaii; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Andrea Joy Campbell, Commonwealth of Massachusetts Attorney General, Office of the Commonwealth of Massachusetts Attorney General, Boston, Massachusetts; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Letitia James, New York Attorney General, New York Attorney General, Office of the New York Attorney General, Albany, New York;

Edward E. Manibusan, Commonwealth of the Northern Mariana Islands Attorney General, Office of the Commonwealth of the Northern Mariana Islands Attorney General, Saipan, Northern Mariana Islands; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Brian L. Schwalb, District of Columbia Attorney General; Office of the District of Columbia Attorney General, Washington, D.C.; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Springfield, Illinois; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Ellen F. Rosenblum, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; for Amici Curiae States of Arizona Washington, Connecticut, District of Columbia, Hawaii, Illinois, Maine, Maryland, Commonwealth of Massachusetts, Michigan, Minnesota, New Jersey, New York, Nevada, Commonwealth of the Northern Mariana Islands, Oregon, and Vermont.

Jonathan B. Miller and Abigail Lawlor, Public Rights Project, Oakland, California; Veena Dubal, San Francisco, California; for Amici Curiae Worker Rights Organizations.

Zarah Rahman, Housing Justice Attorney; Divya Musinipally, Deputy City Attorney; Zoe Savitsky, Supervising Deputy City Attorney; Maria Bee, Chief Assistant City Attorney; Barbara J. Parker, City Attorney; Office of the City Attorney, Oakland, California; Hydee

Feldstein Soto, City Attorney; Michael J. Bostrom, Senior
Assistant City Attorney, Office of the Los Angeles City
Attorney Office, Los Angeles California; David Chiu, City
Attorney; Yvonne R. Mere, Chief Deputy City Attorney;
Matthew D. Goldberg, Chief Worker Protection Attorney;
Ian H. Eliasoph, Deputy City Attorney, City and County of
San Francisco, San Francisco, California; Lessa Manion,
Prosecuting Attorney; King County Prosecuting Attorney
Office, Seattle, Washington; for Amicus Curiae, Local
Governments.

Christina N. Chung, Center for Law and Work, University
of California, Berkeley School of Law, Berkeley, California,
for Amici Curiae Center for Law and Work and Labor and
Constitutional Law Scholars.

Timothy A. Horton, The Law Office of Timothy A. Horton,
San Diego, California; Paul D. Cullen, Jr., and Charles R.
Stinson, The Cullen Law Firm PLLC, Washington, D.C.; for
Amicus Curiae Owner-Operator Independent Drivers
Association Inc..

## OPINION

NGUYEN, Circuit Judge:

Drawing the line between "employee" and "independent contractor" is a difficult task, with significant consequences for workers and businesses, that has long vexed courts and lawmakers across the country.  California is no exception.

In an effort to address what it perceived as a systemic problem of misclassification—that is, businesses improperly characterizing their workers as independent contractors to avoid fiscal responsibilities owed to employees—the California legislature enacted Assembly Bill 5.  *See* Act of Sept. 18, 2019, ch. 296, 2019 Cal. Stat. 2888 (A.B. 5).  A.B. 5 does not directly classify any particular workers as employees or independent contractors.   Rather, A.B. 5 provides that workers in certain industries who meet specific criteria will be subject to one test to ensure proper classification, while others will be subject to another such test. It is an elaborate statutory scheme providing various conditions, exemptions, and exclusions from exemptions that, taken together, reflect the California legislature's judgment as to how the fraught task of classifying workers as employees or independent contractors is best performed.

We must decide whether A.B. 5's differential treatment of app-based work arrangements in the transportation and delivery service industry, on the one hand, and app-based work arrangements in other industries, on the other hand, survives rational basis review.   In other words, we must determine whether it was rational for the California legislature to apply one test to determine the classification of Uber drivers and a different test to determine the

classification of dogwalkers who provide services through Wag!, the "Uber for dogs."

Under the deferential rational basis standard, we approach A.B. 5 with "a strong presumption of validity," and we will invalidate it only if Plaintiffs negate "every conceivable basis" which might justify the lines it draws. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993).  Plaintiffs have failed to carry that burden here. There are plausible reasons for treating transportation and delivery referral companies differently from other types of referral companies, particularly where the legislature perceived transportation and delivery companies as the most significant perpetrators of the problem it sought to address— worker misclassification.

We therefore affirm the district court's orders granting Defendants' motion to dismiss and denying Plaintiffs' motion for a preliminary injunction.

I.

We begin with an overview of how California courts have historically grappled with the issue of worker classification before turning to the legislature's enactment of A.B. 5 and the procedural history of the present case.

A.

Throughout much of the 20th century, California courts classifying workers as "employees" or "independent contractors" under various state employment laws applied the common law "control of details" test.  *See S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 769 P.2d 399, 403–04 (Cal. 1989).  Under this test, the primary question was "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the

result desired." *Id.* at 404 (quoting *Tieberg v. Unemp. Ins. Appeals Bd.*, 471 P.2d 975, 977 (Cal. 1970)).

But in *Borello*, the California Supreme Court "recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." *Id.* While emphasizing that the "right to control the manner and means of accomplishing the result desired" remained the primary consideration, the *Borello* court identified several other non-exhaustive, secondary factors that it deemed "logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor for purposes of workers' compensation law." *Id.* at 404, 407. Those factors, which were drawn from the Restatement Second of Agency and case law from other jurisdictions, include the right to discharge at will, whether the worker is engaged in a distinct occupation or business, the skills required in the particular occupation, whether the worker supplies her own tools, the length or degree of permanence of the working relationship, and whether or not the work is an integral part of the regular business of the hiring principal. *Id*. The *Borello* court held that when determining whether a worker is an employee or an independent contractor, courts must balance these factors and evaluate service arrangements based on their specific facts. *Id.* at 407.

For nearly three decades, California courts followed *Borello* and applied the multifactor balancing test to classify workers as employees or independent contractors. That changed in 2018, when the California Supreme Court held that a different test applied to determine "whether workers should be classified as employees or as independent contractors *for purposes of California wage orders*" issued

by the state Industrial Welfare Commission. *Dynamex Operations W., Inc. v. Superior Ct.*, 416 P.3d 1, 5 (Cal. 2018). Recognizing that the proper classification of a worker "has considerable significance for workers, businesses, and the public generally," and acknowledging the "significant" risk of workers being misclassified by businesses seeking to avoid fiscal obligations owed to employees, the *Dynamex* court adopted the "ABC test" to determine whether a worker is subject to California wage orders. *Id.* at 4–5, 7.

> Under the ABC test,
>
> a worker is properly considered an independent contractor to whom a wage order does not apply only if the hiring entity establishes: (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Id.* at 7.

The ABC test places the burden on the hiring entity to establish that a worker is an independent contractor, and the hiring entity's failure to establish any one of the ABC factors "will be sufficient in itself to establish that the worker is an . . . employee" included in the wage order. *Id.* at 40. The

*Dynamex* court opined that the ABC test "provide[s] greater clarity and consistency, and less opportunity for manipulation, than a test or standard that invariably requires the consideration and weighing of a significant number of disparate factors on a case-by-case basis." *Id.* It also noted that the ABC test adequately accounts for the "traditional independent contractor who has never been viewed as an employee of a hiring business and should not be interpreted to do so." *Id.* at 40 n.32. The *Dynamex* decision left the *Borello* test in place for purposes of classifying workers under labor and employment laws other than wage orders. *Id.* at 29.

B.

The legislature was quick to embrace the California Supreme Court's ruling in *Dynamex*. Concerned with the widespread misclassification of workers, the legislature enacted A.B. 5 in 2019. A.B. 5 codified the California Supreme Court's *Dynamex* decision and extended the application of the ABC test beyond wage orders to other labor and employment legislation, including workers' compensation, unemployment insurance, and disability insurance. A.B. 5 § 2. The legislature's stated intent in enacting A.B. 5 was "to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law," and to restore these important rights and protections, "including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave," to "potentially several million workers." A.B. 5 § 1(e).

While A.B. 5 expanded the reach of the ABC test beyond
wage orders, it also exempted certain occupations from the
application of that test, including, for example, physicians,
certain licensed professionals, and commercial fishermen.
*See* A.B. 5 § 2.  Under A.B. 5, the *Borello* test continues to
apply to determine the employee or independent contractor
status of individuals engaged in those professions.  *Id.*  A.B.
5 also included an exemption for referral agencies, or
"business[es] that provide[] clients with referrals for service
providers to provide services."        Cal.  Lab.  Code
§ 2777(b)(C).  A.B. 5 provides that the *Borello* test, rather
than ABC test, applies to the relationship between a referral
agency and a service provider *if* certain statutorily defined
criteria are met.[1]  In deciding which occupations and service
relationships may be exempt from automatic application of
the ABC test, "California weighed several factors: the
workers' historical treatment as employees or independent
contractors, the centrality of their task to the hirer's business,
their market strength and ability to set their own rates, and
the relationship between them and their clients."  *Am. Soc'y
of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 965

---

[1] A.B. 5 states that "the determination whether the service provider is an
employee of the referral agency shall be governed by Borello, if the
referral agency demonstrates that" each of the enumerated conditions are
satisfied.  A.B. 5 § 2.  Those conditions include showing the worker is
free from the control of the agency, that the worker provides their own
tools and supplies, that the worker is customarily engaged in an
independently established business of the same nature as that involved
in the work performed for the client, and that the worker is free to set
their own rates, hours, and terms of work.  *Id.*  These factors reflect
similar considerations as those articulated in *Borello*.  *Compare* Cal. Lab.
Code § 2777(a) (listing conditions), *with Borello*, 769 P.2d at 404 (listing
factors).

(9th Cir. 2021) (citing Cal. Bill Analysis, A.B. 5 (July 10, 2019)).

One year later, the legislature amended A.B. 5 with additional exemptions to the ABC test for various professions and occupations, such as certain musical recording professionals, live performers, insurance underwriters, and real estate appraisers. *See* Act of Sept. 4, 2020, ch. 38, 2020 Cal. Stat. 1836 (A.B. 2257).[2] At the same time that A.B. 2257 added these exemptions, it also revised the applicable definition of "referral agencies" to expressly exclude ten enumerated types of services, including "businesses that provide . . . delivery, courier, [and] transportation . . . services."         Cal.     Lab.     Code § 2777(b)(2)(C).  In other words, under A.B. 5 as amended, arrangements between workers and referral agencies that provide delivery or transportation services are automatically subject to the ABC test, while arrangements between workers and referral agencies that provide other types of services, such as dog walking or handyman services, are subject to the multifactor *Borello* test—provided the hiring referral agency can show that the eleven statutory criteria described in California Labor Code section 2777(a) are satisfied.

It is this differential treatment that Plaintiffs challenge in this action.

---

[2] The legislature also amended A.B. 5 to add an exemption to the ABC test for certain newspaper distributors and carriers. *See* Act of Oct. 2, 2019, ch. 415, § 1, 2019 Cal. Stat. 3747, 3750.

C.

Plaintiff Postmates, Inc. (Postmates) is a network company that provides and maintains an online marketplace and mobile platform that connects local merchants, consumers, and drivers to facilitate the purchase and delivery of goods from merchants—often restaurants. When consumers place orders through the Postmates app, nearby drivers can elect to pick up the order from a local merchant and complete the requested delivery.

Plaintiff Uber Technologies, Inc. (Uber) is also a network company that operates app-based platforms that connect individual consumers with providers. Uber offers the UberEats, Uber Rides, and Uber Driver mobile platforms.    The UberEats app, like the Postmates app, connects merchants, consumers, and drivers to facilitate the delivery of food orders.  The Uber Rides app allows riders to connect with available drivers based on their location. The Uber Driver app connects app-based drivers to those requesting rides.

Plaintiff Lydia Olson uses the Uber Driver mobile platform to connect with riders in need of transportation. Plaintiff Miguel Perez uses the Postmates app to accept and complete deliveries of food orders.

D.

On December 30, 2019, Olson, Perez, Uber, and Postmates (collectively Plaintiffs) jointly filed a complaint against the State of California and the Attorney General of California (collectively Defendants) seeking declaratory, injunctive, and other relief based on their allegations that A.B. 5 violates the Equal Protection Clauses, the Due Process Clauses, and the Contract Clauses of the United

States and California Constitutions.    They sought a
preliminary injunction to prevent Defendants from enforcing
A.B. 5.

The district court denied Plaintiffs' motion for
preliminary injunctive relief. *See Olson v. California*, No.
CV 19-10956-DMG (RAOx), 2020 WL 905572 (C.D. Cal.
Feb. 10, 2020). Evaluating the factors set forth in *Winter v.
Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008),
the district court first determined that Plaintiffs were
unlikely to succeed on the merits of their claims. 2020 WL
905572, at *5. It determined that A.B. 5 was rationally
related to a legitimate state interest and did not
unconstitutionally target gig economy companies. *Id.* at *6.
The district court rejected Plaintiffs' claims that A.B. 5's
many exemptions undermined its stated purpose of
protecting workers because the exemptions aligned with
"traditional distinctions between independent contractors
and employees." *Id.* at *8.    The district court also
determined that A.B. 5 did not deprive gig workers of the
right to pursue a career in violation of due process, *id.* at *10,
nor did A.B. 5 unconstitutionally impair Plaintiffs'
contracts, *id.* at *11. Turning to the other *Winter* factors, the
district court deemed Plaintiffs' alleged harm "speculative"
and found that the balance of equities and public interest
weighed against issuing injunctive relief. *Id.* at *14–16. The
district court later dismissed Plaintiffs' First Amended
Complaint. *See Olson v. California*, No. CV 19-10956-
DMG (RAOx), 2020 WL 6439166, at *12 (C.D. Cal. Sept.
18, 2020).

Plaintiffs appealed the district court's denial of the
preliminary injunction. In November 2020, shortly before
we heard argument in that appeal, California voters
approved Proposition 22 (Prop. 22), a ballot initiative that

classifies rideshare and delivery drivers—like Plaintiffs Olson and Perez—as independent contractors, notwithstanding A.B. 5 or any other provision of law. *See* Cal. Bus. & Prof. Code § 7451. Prop. 22 took effect on December 16, 2020, in accordance with the default rule provided by the California Constitution. *See* Cal. Const. art. II, § 10(a).

After Prop. 22 passed, but before we issued a decision in the appeal of the preliminary injunction, Plaintiffs filed the operative Second Amended Complaint.[3] Defendants moved to dismiss the Second Amended Complaint for failure to state a claim. The district court granted the motion. *Olson v. Bonta*, No. CV 19-10956-DMG (RAOx), 2021 WL 3474015 (C.D. Cal. July 16, 2021). It incorporated by reference its previous order dismissing Plaintiffs' claims as pled in the First Amended Complaint. *Id.* at \*1. The district court determined that Plaintiffs' new allegations concerning the amendments to A.B. 5 and Prop. 22 did not rescue their claims. *Id.* at \*10.

Plaintiffs timely appealed that order. We granted Plaintiffs' motion to consolidate the appeals of the order denying the preliminary injunction and the order dismissing Plaintiffs' claims.

A three-judge panel reversed in part, concluding that the district court erred by dismissing Plaintiffs' Equal Protection claims. *See Olson v. California*, 62 F.4th 1206, 1218–20 (9th Cir. 2023). The panel concluded that Plaintiffs plausibly alleged that "the exclusion of thousands of workers

---

[3] Plaintiffs' Second Amended Complaint included a new claim that A.B. 5 violates the Bill of Attainder Clauses of the United States and California Constitutions.

from the mandates of A.B. 5 is starkly inconsistent with the bill's stated purpose of affording workers the 'basic rights and protections they deserve.'" *Id.* at 1219 (quoting A.B. 5 § 1(e)).

Upon the vote of a majority of nonrecused active judges, we granted rehearing en banc and vacated the three-judge panel decision. *Olson v. California*, 88 F.4th 781 (9th Cir. 2023).[4]

## II.

We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court order granting a motion to dismiss for failure to state a claim. *See Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022).

## III.

As a preliminary matter, we agree with the parties that the passage of Prop. 22 does not moot this appeal. There are ongoing state enforcement actions seeking retrospective relief, including civil penalties, for Uber's and Postmates' alleged violations of A.B. 5 that transpired prior to Prop. 22's effective date. The extent of Uber's and Postmates' liability in those enforcement actions would be affected by our resolution of the constitutional challenge to A.B. 5, given that Prop. 22 does not apply retroactively. *See Lawson v. Grubhub, Inc.*, 13 F.4th 908, 914 (9th Cir. 2021). The parties therefore continue to maintain a concrete interest in the outcome of this litigation, and the appeal is not moot. *See*

---

[4] The panel affirmed the district court's dismissal of Plaintiffs' Due Process claims, Contract Clause claims, and Bill of Attainder claims. We do not disturb the panel's disposition as to those claims. Accordingly, we reinstate Parts III.B, III.C, and III.D of *Olson*, 62 F.4th at 1220–23.

*Fritsch v. Swift Transp. Co. of Ariz.*, 899 F.3d 785, 791 (9th Cir. 2018).

IV.

Plaintiffs bring Equal Protection claims under the federal and California constitutions.  We address these claims together because "[t]he equal protection analysis under the California Constitution is 'substantially similar' to analysis under the federal Equal Protection Clause." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004) (citing *Los Angeles Cnty. v. S. Cal. Tel. Co.*, 196 P.2d 773, 781 (Cal. 1948)).

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; Cal. Const. art. I, § 7 ("A person may not be . . . denied equal protection of the laws."). Plaintiffs do not allege that A.B. 5 employs suspect classifications, nor does their Equal Protection claim allege that A.B. 5 impinges on fundamental rights—we therefore apply rational basis review to their claims. *See Hodel v. Indiana*, 452 U.S. 314, 331 (1981). Under this standard, A.B. 5 "carries with it a presumption of rationality," and we must uphold it if "the legislative means are rationally related to a legitimate governmental purpose." *Id.*

A.

To establish an Equal Protection claim, Plaintiffs must demonstrate "that a class that is similarly situated has been treated disparately." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1063 (9th Cir. 2014) (quoting *Christian Gospel Church, Inc. v. City & Cnty. of San Francisco*, 896 F.2d 1221, 1225 (9th Cir. 1990)). The comparator groups "need

not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy." *Id.* at 1064 (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Once Plaintiffs identify a similarly situated class that is treated disparately under A.B. 5, they must also negate "every conceivable basis which might support" such disparate treatment. *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012) (quoting *Madden v. Kentucky*, 309 U.S. 83, 88 (1940)).

Plaintiffs contend that other app-based companies like Wag!, which provides on-demand dog-walking, and TaskRabbit, which provides on-demand help with daily tasks like handyman work, are functionally identical "in all relevant aspects" to Uber and Postmates. The complaint alleges that "service providers who use TaskRabbit and Wag! have the same patterns of use as the 'drivers' and 'couriers' who use Uber and Postmates." Wag!'s business model, Plaintiffs allege, is so similar to Uber's that Wag! is referred to as "Uber for dogs." And, according to Plaintiffs, these similarly situated comparators are treated differently under A.B. 5 because Uber drivers and Postmates couriers are automatically subject to the ABC test, while Wag! dogwalkers and TaskRabbit handymen are not.[5]

According to Plaintiffs, whether Uber drivers and Wag! dogwalkers are similarly situated for Equal Protection purposes is an issue of fact—one that is not amenable to

---

[5] To be clear, A.B. 5 does not automatically subject dogwalkers or handymen to the *Borello* test. Rather, the *Borello* test is applied to those service providers if, and only if, the hiring entity can establish the eleven criteria set forth in California Labor Code section 2777(a). *See supra* p. 12 n.1. If a hiring entity fails to establish any one of those criteria, the ABC test will apply to classify the worker. *See* Cal. Lab. Code § 2775.

resolution at the motion to dismiss stage. While a complaint's "[t]hreadbare recital" that another class is similarly situated will not suffice to survive a motion to dismiss, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), we recognize that determining whether a comparator is "similar in those respects relevant to the Defendants' policy" may be a fact-specific inquiry. *Brewer*, 757 F.3d at 1063 (citing *Nordlinger*, 505 U.S. at 10). But we need not engage in such an inquiry here. Even if we assume that Uber and Postmates are similarly situated to Wag! and TaskRabbit, and that A.B. 5 treats Uber and Postmates disparately from those similarly situated comparators, Plaintiffs' Equal Protection claim nevertheless fails. There are rational reasons for that disparate treatment.

When conducting rational basis review of economic legislation that disparately treats similarly situated groups, we ask whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns, Inc.*, 508 U.S. at 313. We need not rely on the legislature to proffer its actual rationale motivating the legislation—or any rationale, for that matter. *See Nordlinger*, 505 U.S. at 15. We may consider any "purposes the legislature, litigants, or district court have espoused," but we are not limited to those reasons—we may consider "*any* other rational purposes *possibly* motivating enactment of the challenged statute." *Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regul.*, 919 F.2d 593, 597 (9th Cir. 1990) (emphases added) (citing *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 457–58, 463 (1988)). And so long as there is some conceivable legitimate purpose justifying the statute, we need not inquire into the legislature's actual purpose in enacting it. *Raidoo v. Moylan*, 75 F.4th 1115,

1121 (9th Cir. 2023) (citing *Beach Commc'ns, Inc.*, 508 U.S. at 315).

The stated purpose of A.B. 5 is to address the "misclassification of workers," which the California legislature described as a "significant factor in the erosion of the middle class and the rise in income inequality." A.B. 5 § 1(c). By codifying and expanding the reach of the California Supreme Court's decision in *Dynamex*, the legislature sought to restore important workplace protections and rights to potentially several million workers who were "exploited by being misclassified as independent contractors instead of recognized as employees." *Id.* § 1(e). Plaintiffs do not contest that protecting workers, stemming the erosion of the middle class, and reducing income inequality are legitimate state interests. We therefore turn our focus to whether A.B. 5's distinction between transportation and delivery referral services, on the one hand, and other types of referral services on the other, is rationally related to this stated purpose. We conclude that it is.

While Plaintiffs allege that Uber and Wag! have functionally identical business models, that similarity alone does not compel us to conclude that there is no rational reason to treat those apps differently. One explanation for such a distinction is that the legislature perceived Uber, Postmates, and other transportation and delivery services as more substantial contributors to the problem of misclassification than referral agencies engaged in other services. As we recently observed in a different case challenging the rationality of A.B. 5, it is certainly "conceivable that misclassification was more rampant in certain industries and therefore deserving of special attention." *Am. Soc'y of Journalists & Authors, Inc.*, 15 F.4th at 965. To the extent that it perceived Uber, Postmates

and other transportation and delivery app-based services as posing a greater risk of misclassification than Wag! or TaskRabbit, the California legislature acted rationally by "strik[ing] at the evil where it is felt and reach[ing] the class of cases where it most frequently occurs." *Silver v. Silver*, 280 U.S. 117, 124 (1929); *see also Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1086 (9th Cir. 2015) (recognizing that "[t]argeting the biggest contributors" to a perceived problem "is certainly rationally related to a legitimate policy goal"). It is not necessary that such a perception be supported by "evidence or empirical data." *Beach Commc'ns, Inc.*, 508 U.S. at 315.

According to Plaintiffs, Wag! is sometimes referred to as "Uber for dogs." While Plaintiffs allege that this underscores the similarity between Uber and Wag!, it also highlights another plausible justification for their disparate treatment. The legislature may have perceived Uber as the pioneer of the on-demand app-based business model that many other services replicated. It is certainly reasonable for the legislature to try to target the problem of misclassification at its origin. *See Angelotti Chiropractic*, 791 F.3d at 1085–86 (recognizing that a legislature may approach a problem incrementally by targeting the worst offenders).

Considering the statutory scheme in its entirety further reinforces our conclusion that the legislature acted rationally in pursuing its intended goals. Under A.B. 5, even so-called "exempted" services like Wag! and TaskRabbit must satisfy eleven statutory criteria before the relationship between those agencies and their service providers are *actually* exempted from the ABC test. In other words, to avoid application of the ABC test, Wag! must show that its dogwalkers are "free from the control and direction of the

referral agency in connection with the performance of the work for the client, both as a matter of contract and in fact," along with ten other requirements, including that a dogwalker provide her own tools and supplies, set her own hours and terms of work, and that dogwalkers are free to accept or reject rates set by clients. Cal. Lab. Code § 2777(a). These statutory criteria ensure that the exemption to the ABC test is only available where service providers working through referral agencies display hallmarks of traditional independent contractor status, as articulated in *Dynamex* and *Borello*. The limited availability of the exemption in the referral agency industry reflects the legislature's rational choice to preserve the traditional distinctions between independent contractors and employees and leave the *Borello* test in place only for those workers who faced little risk of misclassification.

### B.

Nevertheless, Plaintiffs argue that A.B. 5 is an unconstitutionally irrational means of achieving California's stated interest of addressing misclassification. Relying on *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008), and *Fowler Packing Co. v. Lanier*, 844 F.3d 809 (9th Cir. 2016), Plaintiffs argue that A.B. 5's numerous broad exemptions contradict that purpose and roll back the protections of *Dynamex* and the ABC test for millions of workers, including workers in industries with demonstrated histories of misclassification. As already noted, the exemptions carved out by the legislature plausibly reflect its determination that workers in certain occupations and industries bore closer resemblance to traditionally lawful independent contractors. *See Am. Soc'y of Journalists & Authors, Inc.*, 15 F.4th at 965. And as Plaintiffs acknowledge, *Dynamex* itself applied only to wage-order

claims, while A.B. 5 was, in Plaintiffs' words, a "sea change" that expanded the ABC test to cover a vast array of previously unavailable employment benefits, even as it exempted certain workers.   Those benefits include "a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave." A.B. 5 § 1(e).

That A.B. 5 may be underinclusive because it does not extend the ABC test to every industry and occupation that has historically contributed to California's misclassification woes does not render it unconstitutionally irrational. *See Vance v. Bradley*, 440 U.S. 93, 108 (1979); *see also Brandwein v. Cal. Bd. of Osteopathic Exam'rs*, 708 F.2d 1466, 1471–72 (9th Cir. 1983) ("[T]he legislature may take piecemeal steps which only partially ameliorate a perceived evil and create some disparate treatment of affected parties."). Even accepting as true Plaintiffs' allegation that A.B. 5 rolled back more protection than it extended, that is insufficient to overcome rational basis review because "the law need not be in every respect logically consistent with its aims to be constitutional." *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 487–88 (1955). Whether A.B. 5, with all of its expansions and exemptions, will have a net effect of improving or worsening misclassification and income inequality remains to be seen, but that is entirely irrelevant for our purposes. To consider whether the law is actually effective in achieving its stated goals would require us to second guess a legitimate "legislative choice" and engage in "courtroom fact-finding." *Beach Commc'ns, Inc.*, 508 U.S. at 315. The Equal Protection Clause does not give us license to do so. *Id.* at 313.

Plaintiffs further argue that A.B. 5 is irrational because it arbitrarily "singles out" network companies for disfavored

treatment.  But the statute's referral agency provision plainly excludes not just Uber and Postmates—or any particular network company—but *all* referral-based businesses that provide "janitorial, delivery, courier, transportation, trucking, agricultural labor, retail, logging, in-home care, or construction services other than minor home repair."  Cal. Lab. Code § 2777(b)(2)(C).  Such a broad definition that sweeps in many different companies across many different industries can hardly be said to "single out" Plaintiffs for uniquely disfavored treatment.  And as the district court correctly observed, the decision to extend the exemption to some network companies while withholding it from other network companies demonstrates that the legislature did *not* arbitrarily target all app-based network companies.

Our decisions in *Fowler Packing* and *Merrifield* do not call for a contrary result.  In *Fowler Packing*, the state did not offer, nor could we conceive of, any explanation for cut-off dates in a statute that specifically carved out three specific employers, including the plaintiff, from a safe harbor that was extended to all other employers.  844 F.3d at 816.  *Fowler Packing* merely required us to apply the settled rule that "legislatures may not draw lines for the purpose of arbitrarily excluding individuals."  *Id.* at 815.  Rather than excluding individual employers from the application of the ABC test, A.B. 5 provides a complex framework that subjects certain categories of workers to the ABC test and other categories of workers to the *Borello* test, based on statutorily defined conditions and criteria.

Plaintiffs' reliance on *Merrifield* is similarly unavailing.  In *Merrifield*, we considered a state law that "singl[ed] out . . . three types of vertebrate pests" from a licensure requirement for non-pesticide-using pest controllers.  547 F.3d at 991.  We determined that the law did not survive

rational basis review because "those exempted [from the licensure requirement] under the current scheme are more likely to be exposed to pesticides" than those who were not exempted.  *Id.*   Thus, when applying the state's own rationale for requiring controllers to obtain a license, we found that "rationale so weak that it undercut[] the principle of non-contradiction."   *Id.*   For the reasons already discussed, the same is not true of A.B. 5.  The exemptions available in A.B. 5 plausibly reflect the legislature's view that certain industries and occupations posed a diminished risk of misclassification, and the legislature added in safeguards, like those contained in California Labor Code section 2777(a), to ensure that the exemption from the ABC test would only be available to those hiring entities that could meet a threshold showing that their workers bear the hallmarks of traditional independent contractors.[6]

Finally, Plaintiffs argue that A.B. 5 was motivated by impermissible animus and political favoritism.  Because we have identified plausible legitimate purposes motivating A.B. 5 and the lines it draws between workers in different industries and occupations, we need not further address these arguments.  *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir. 2018) ("When the politically unpopular group is not a traditionally suspect class, a court

---

[6] Defendants argue *Merrifield* was wrongly decided and invite us to expressly overrule that decision. We decline to do so, as we have already made clear that "*Merrifield* stands for the unremarkable proposition that no rational basis exists if the law lacks *any* legitimate reason for its adoption." *S.F. Taxi Coal. v. City & Cnty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020); *id.* (recognizing that *Merrifield* "provides an outer limit to the state's authority if the state's action borders on corruption, pure spite, or naked favoritism lacking any legitimate purpose").

may strike down the challenged statute under the Equal Protection Clause 'if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment.'" (quoting *Mountain Water Co.*, 919 F.2d at 598)); *Beach Comm'ns, Inc.*, 508 U.S. at 315 ("[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.").

V.

In evaluating the constitutionality of A.B. 5 under the Equal Protection Clause, we ask whether "plausible reasons" exist for the law. We find that they do. We therefore conclude that the district court correctly dismissed Plaintiffs' Equal Protection claims. And because Plaintiffs' suit was properly dismissed, the district court properly denied preliminary injunctive relief.

**AFFIRMED.**